**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

v.

CARRILLO HUETTEL LLP,
LUIS J. CARRILLO, WADE D. HUETTEL,
GIBRALTAR GLOBAL SECURITIES,
WARREN DAVIS, JOHN B. KIRK,
BENJAMIN T. KIRK, DYLAN L. BOYLE,
JAMES K. HINTON JR., LUNIEL DE BEER,
JOEL P. FRANKLIN, PACIFIC BLUE ENERGY
CORPORATION, TRADESHOW MARKETING
COMPANY LTD, AND DR. LUIS CARRILLO,

*Defendants*,

- AND -

DR. LUIS CARRILLO,

*Relief Defendant.*

1:13-cv-01735 (GBD)

**PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

Todd D. Brody
Joshua M. Newville
Katherine S. Bromberg
Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0080 (Brody)
*Attorneys for Plaintiff*
*Securities and Exchange Commission*

**Table of Contents**

Table of Authorities ............................................................................................................. iii

PRELIMINARY STATEMENT .............................................................................................. 1

I.  THE FACTS ALLEGED IN THE COMPLAINT .................................................................. 3

   A.  Ben Kirk's Role in the Fraudulent Scheme ......................................................... 4

   B.  James Hinton's Role in the Fraudulent Scheme ................................................. 6

   C.  Luniel de Beer's Role in the Fraudulent Scheme ............................................... 7

   D.  Luis Carrillo's and Wade Huettel's Role in the Fraudulent Scheme.................. 10

   E.  Gibraltar Global Securities's Role in the Fraudulent Scheme ........................... 13

ARGUMENT  ......................................................................................................................... 15

I.  THE STANDARD FOR A MOTION TO DISMISS UNDER RULES 12(b)(6) AND 9(b)... 15

II.  THE COMPLAINT ADEQUATELY ALLEGES PRIMARY FRAUD CLAIMS ................ 18

   A.  The Pleading Requirements for Scienter .......................................................... 19

   B.  The Complaint Alleges Defendants' Scheme Liability ...................................... 21

     1.  The Primary 10b-5 Fraud Claim Against Ben Kirk ...................................... 22

       a.   The Commission Has Met all 9(b) Pleading Requirements ............................. 22

       b.   Ben Kirk Had the Requisite Scienter ............................................................ 26

     2.  The Primary 10b-5 Fraud Claim Against James Hinton ................................. 27

       a.   The Commission Has Met all 9(b) Requirements .......................................... 28

       b.   Hinton's Duty Argument Fails as a Matter of Law ....................................... 29

     3.  The Primary 10b-5 Fraud Claim Against De Beer ......................................... 31

       a.   De Beer's Statements Were Material............................................................. 31

       b.   De Beer Had the Requisite Scienter ............................................................. 35

     4.  The Primary 10b-5 Fraud Claim Against Carrillo ......................................... 39

       a.   *Janus* is not Applicable to the SEC's Scheme Liability Claims ...................... 39

       b.   The SEC has Properly Alleged Deceptive Acts .............................................. 40

       c.   The Opinion Letters were Attributable to Carrillo and in Connection with the Purchase and Sale of a Security ...................................................................... 43

       d.   Carrillo is Liable for the False Statements in the Opinion Letters ................... 44

     5.  The Primary 10b-5 Fraud Claim Against Huettel.......................................... 49

     6.  The Primary 10b-5 Fraud Claim Against Carrillo Huettel LLP ...................... 51

     7.  The Primary 10b-5 Fraud Claim Against GGSI ............................................ 52

   C.  The Section 17 Claims are Adequately Pled Against all Defendants ................. 56

i

D.  The Aiding and Abetting Claims are Adequately Pled Against all Defendants ................. 57

    1.  Carrillo, Huettel and CH Aided and Abetted PBEC's Primary Violations of Section 10(b) and Rule 10b-5(b) thereunder ................................................................ 58

    2.  GGSI Aided and Abetted Ben Kirk's violations of Section 10(b) and Rule 10b-5(b) and Rules 10b-5(a) and (c) thereunder ........................................................... 60

    3.  De Beer Aided and Abetted the Kirks' and Boyle's Violations of Section 10(b) and Rule 10b-5(b) thereunder ......................................................................... 60

E.  The SEC Has Adequately Alleged Control Person Liability ............................................. 61

    1.  Ben Kirk .................................................................................................................. 63

    2.  De Beer ................................................................................................................... 64

    3.  Hinton ..................................................................................................................... 65

III.  THE SEC HAS PLEADED PRIMA-FACIE SECTION 5 CLAIMS ................................... 66

A.  Ben Kirk's Pleading Argument is Groundless .................................................................. 67

B.  Carrillo, Huettel, and CH Were "Necessary Participants" .............................................. 69

C.  GGSI and Davis are Liable Under Section 5 ..................................................................... 71

D.  De Beer Was a "Necessary Participant" ........................................................................... 74

E.  Dr. Carrillo Is Liable for Section 5 Violations ................................................................. 75

IV.  VENUE IS APPROPRIATE IN THE SOUTHERN DISTRICT OF NEW YORK ............. 76

V.  THE COURT HAS PERSONAL JURSIDICTION OVER DR. CARRILLO ...................... 82

A.  Dr. Carrillo Is Subject to Personal Jurisdiction Because His Conduct Caused Foreseeable Consequences to United States Investors. ........................................................................ 83

B.  The Exercise of Personal Jurisdiction Over Dr. Carrillo Is Reasonable ........................... 84

VI.  THE SEC'S COMPLAINT IS NOT TIME-BARRED UNDER DODD-FRANK ............... 85

VII.  SERVICE ON BEN KIRK WAS LAWFUL AND SUFFICIENT ..................................... 87

VIII.  THE ATTORNEY-CLIENT PRIVILEGE WAS WAIVED AS TO PACIFIC BLUE ...... 91

CONCLUSION .......................................................................................................................... 93

## Table of Authorities

*Aaron v. SEC*, 446 U.S. 680 (1980) ............................................................................. 19

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308 (S.D.N.Y. 1997) ............ 16

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ...................................... 52

*Arista Records LLC v. Lime Grp. LLC.*, No. 06 CV 5936, 2011 U.S. Dist. LEXIS 42881
     (S.D.N.Y. Apr. 20, 2011) ..................................................................................... 92

*Baena v. Woori Bank*, 515 F. Supp. 2d 414 (S.D.N.Y.), *recon. den.*, 2007 U.S. Dist. LEXIS
     74549 (S.D.N.Y. 2007) ....................................................................................... 27

*Bangkok Crafts Corp. v. Capitolo di San Pietro*, 03 Civ. 0015, 2006 U.S. Dist. LEXIS 49161
     (S.D.N.Y. July 18, 2006) ..................................................................................... 17

*Barnhart v. Peabody Coal Co.,* 537 U.S. 149 (2003) ..................................................... 87

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ................................................................. 31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). ......................................................... 15

*Berk v. Tradewell*, Inc., 01 Civ. 9035, 2003 U.S. Dist. LEXIS 12078
     (S.D.N.Y. July 16, 2003) ..................................................................................... 16

*Burkina Wear, Inc. v. Campagnolo, S.R.L.*, 07 Civ. 3610, 2008 U.S. Dist. LEXIS 29031
     (S.D.N.Y. April 9, 2008) ...................................................................................... 15

*Bustamante v. Napolitano*, 582 F.3d 403 (2d Cir. 2009) ................................................ 87

*Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303 (2d Cir. 1977) ............................ 72

*C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429 (10th Cir. 1988)). ............................................ 36

*CFTC v. Weintraub*, 471 U.S. 343 (1985) ..................................................................... 92

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .......................................... 15

*Charas v. Sand Technology Systems Int'l*, 90 Civ. 5638, 1992 U.S. Dist. LEXIS 15227
     (S.D.N.Y. Oct. 7, 1992), ...................................................................................... 85

*Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2001) .................................... 90

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir.),
     *cert. den.*, 414 U.S. 910 (1973) ........................................................................... 38

*City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*, 12 Civ. 0256, 2013
     U.S Dist. LEXIS 28505 (S.D.N.Y. Feb. 28, 2013) .................................................... 33

*City of Westland Police & Fire Retirement Sys. v. Metlife, Inc.*, 928 F. Supp. 2d 705
     (S.D.N.Y. 2013) ................................................................................................. 48

*Coburn v. Warner*, 110 F. Supp. 850 (S.D.N.Y. 1953) ................................................... 78

*Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957 (2d Cir. 1987) ................................. 19

*Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002). ................................................................. 86

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210 (S.D.N.Y. 2008) ...... 63

*Elbit Sys. v. Credit Suisse Group*, 917 F. Supp. 2d 217 (S.D.N.Y. 2013) ............................ 25

*Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) ................................................. 48

*First Federal Sav. & Loan Assoc. v. Oppenheim, Appel, Dixon & Co.*, 634 F. Supp.
     1341 (S.D.N.Y. 1986 .......................................................................................... 79

*Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529 (2d Cir. 1991) .................................. 32

*Food & Allied Service Trades Dept. v. Millfeld Trading Co., Inc.*, 841 F. Supp.
     1386 (S.D.N.Y. 1994). ........................................................................................ 67

*Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011) ...................................................... 52

*Freudenberg v. E* Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................ 36

*FTC v. Pecon Software, Ltd.*, 12 Civ. 7186, 2013 U.S. Dist. LEXIS 111375

(S.D.N.Y. Aug. 7, 2013) ......................................................................................... 89-90

*Ganino v. Cutizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000).......................................... 32

*Geiger v. SEC*, 363 F. 3d 481 (D.C. Cir. 2004) ............................................................ 75

*Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10 (D. Mass. 2000)................................... 29

*Graham v. S.E.C.*, 222 F.3d 994 (D.C. Cir. 2000)......................................................... 53

*Greenfield v. Heublein, Inc.*, 742 F.2d 751 (3d Cir. 1984), *cert. denied*, 469 U.S.
1215 (1985).................................................................................................................. 31

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) ....................................................... 55

*Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212 (S.D.N.Y. 2008)............ 52

*Hallwood Realty Partners L.P. v. Gotham Partners L.P.*, 104 F. Supp. 2d 279
(S.D.N.Y. 2000)........................................................................................................... 86

*IBEW Local 90 Pension Fund, v. Deutsche Bank AG, 11 Civ. 4209, 2013 U.S. Dist.
LEXIS 43774 (S.D.N.Y. March 27, 2013)*(S.D.N.Y. 2011) ....................................... 22

*In re AIG 2008 Sec. Litig.*, 741 F. Supp. 2d 511 (S.D.N.Y. 2010) ............................... 62

*In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008),
*aff'd*, 2009 U.S. App. LEXIS 13674 (2d Cir. 2009); ................................................. 37

*In re Audible Inc. Sec. Litig.*, No. 05-1027, 2007 U.S. Dist. LEXIS 25068
(D.N.J. April 3, 2007) .................................................................................................. 33

*In re Bear Stears Cos., Inc. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423
(S.D.N.Y. 2011).......................................................................................................... 34

*In re BISYS*, 397 F. Supp. 2d 430, 441(S.D.N.Y.), *recon. den.*, 2005 U.S. Dist. LEXIS 28343
(S.D.N.Y. Nov. 16, 2005) ..................................................................................... 20, 56

*In re Blech Sec. Litig.*, 928 F. Supp. 1279 (S.D.N.Y. 1996)......................................... 28

*In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002) .............. 20

*In re Fannie Mae 2008 Sec. Litig.*, 08 Civ. 7831, 2012 U.S. Dist. LEXIS 124008
(S.D.N.Y. Aug. 30, 2012) ............................................................................................ 34

*In re GLG Life Tech Sec. Litig.*, 287 F.R.D. 262 (S.D.N.Y. 2012) ............................... 90

*In re Grand Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000) ........................................ 93

*In re Horowitz*, 482 F.2d 72 (2d Cir.), *cert. den.*, 414 U.S. 867 (1973) ...................... 92

*In re Initial Pub. Off. Sec. Litig.*, 358 F. Supp. 2d 189 (S.D.N.Y. 2004) ..................... 34

*In re IPO Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................ 63

*In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276 (E.D.N.Y. 2000) ................ 33

*In re Merck & Co., Deriv. & ERISA Litig.*, MDL No. 1658, 2011 U.S. Dist. LEXIS
87578 (D.N.J. Aug. 8, 2011)........................................................................................ 50

*In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009)...................... 62-62, 65

*In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301 (D. Utah 2007)...................... 28

*In re OSG Securities Litig.*, 12 Civ. 7948, 2013 U.S. Dist. LEXIS 129164
(S.D.N.Y. Sept. 10, 2013)............................................................................................ 45

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005)................................. 63

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005)................................. 63

*In* re *Parmalat Sec. Litig.*, 477 F. Supp. 2d 602 (S.D.N.Y. 2007)................................. 17

*In re Quest Communication Int'l Inc. Sec. Litig.*, 387 F. Supp. 2d 1130 (D. Colo. 2005)........... 20

*In re Regeneron Pharms, Inc. Sec. Litig.*, 03 Civ. 3111, 2005 U.S. Dist. LEXIS
1350 (S.D.N.Y. Feb. 3, 2005) ...................................................................................... 33

*In re Reserve Fund Sec. & Derivative Litig.*, 09 MD 2011, 2013 U.S. Dist.
LEXIS 141018 (S.D.N.Y. Sept. 30, 2013).............................................................. 20-21

*In re Reserve Fund Secs. & Deriv. Litig.*, 09 MD 2011, 2012 U.S. Dist. LEXIS 147723
(S.D.N.Y. Sept. 12, 2012)...............................................................................35
*In re Sadia, S.A. Securities Litig.*, 269 F.R.D. 298 (S.D.N.Y. 2010)..............................................33
*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir.) *cert. denied*, 534 U.S. 1071 (2001) ..... 20
*In re Stephes, Inc.*, Release No. 33-7612, 1998 SEC LEXIS 2525 (Nov. 23, 1998)...................34
*In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277 (S.D.N.Y. 2012)..............50, 62
*In re Warnaco Group, Inc. Sec. Litig.*, 388 F. Supp. 2d 307 (S.D.N.Y. 2005),
*aff'd, Lattanzio v. Deloitte & Touch, LLP*, 476 F.3d 147 (2d Cir. 2007) ...............................32
*In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) ....................................63
*In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472 (S.D.N.Y. 2005) ....................................47
*In the Matter of Gualario & Co., LLC, et al.*, Admin. Proc. Rel No. 680,
2011 LEXIS 2806 (Aug. 11, 2011)....................................................................88
*In the Matter of Jacob Wonsover*, 1999 SEC LEXIS 430 (Commission Order,
March 1, 1999)..................................................................................................73
*Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011).....................passim
*Johnson v. Sequans Communications S.A.*, 11 Civ. 6341, 2013 U.S. Dist. LEXIS 8115
(S.D.N.Y. Jan. 17, 2013).................................................................................43
*JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247 (S.D.N.Y. 2005) ..............................58
*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)...............................................................................19
*Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269 (S.D.N.Y. 2008)......................65
*Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447 (S.D.N.Y. 2009) ....................................58-59
*KPN B.V. v. Corcyra D.O.O.*, 08 Civ. 1549, 2009 U.S. Dist. LEXIS 20906
(S.D.N.Y. March 16, 2009)..............................................................................90
*Krasner v. Rahfco Funds, LP*, 11 CV 4092, 2012 U.S. Dist. LEXIS 134353
(S.D.N.Y. Aug. 9, 2012) ...................................................................................79
*Lewy v. SkyPeople Fruit Juice, Inc.*, 11 Civ. 2700, 2012 U.S. Dist. LEXIS 128416
(S.D.N.Y. Sept. 7, 2012)..................................................................................65
*Marcus v. Frome*, 329 F. Supp. 2d 464 (S.D.N.Y. 2004).............................................................20
*Markowski v. SEC*, 34 F.3d 99 (2d Cir. 1994)...............................................................................36
*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) ..........................44, 53
*Microsoft Corp. v. Doe*, 12-CV-1335, 2012 U.S. Dist. LEXIS 162122
(E.D.N.Y. Nov. 13, 2012)...........................................................................88, 91
*Novak v. Kasaks*, 216 F.3d 300 (2d Cir.), *cert. den.*, 531 U.S. 1012 (2000) ..........................19-20
*Ortiz v. City of N.Y.*, 755 F. Supp. 2d 399 (E.D.N.Y. 2010)....................................................35-36
*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006)..............................................................37
*Pippinger v. McQuik's Oilube, Inc.*, 854 F. Supp. 1411 (S.D. Ill. 1994) .....................................20
*Powers v. British Vita. P.L.C.*, 57 F.3d 176 (2d Cir. 1995)..........................................................27
*Rice Corp. v. Express Sea Transp. Corp.*, 13 Civ. 43, 2013 U.S. Dist.
LEXIS 105045 (S.D.N.Y. July 8, 2013)............................................................90
*Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569, 2001 U.S. Dist. LEXIS 3167
(S.D.N.Y. March 23, 2001)...........................................................................65-66
*Ross v. Bolton*, 904 F.2d 819 (2d Cir. 1990)................................................................................15
*Sacody Techs. v. Avant, Inc.*, 862 F. Supp. 1152 (S.D.N.Y. 1994) ............................................78
*Samrat Ashoka Exports, Ltd. v. Mannix World Imports, Inc.*, No. 00 CV 3586,
2005 U.S. Dist. LEXIS 496 (S.D.N.Y. Jan. 12, 2005)......................................80

v

*SEC v. 800America.com, Inc.*, No. 02 Civ. 9046, 2006 U.S. Dist.
LEXIS 85571 (S.D.N.Y. Nov. 28, 2006)................................................78-79
*SEC v. Abellan*, 674 F. Supp. 2d 1213 (W.D. Wash. 2009) ..............................26-27, 30
*SEC v. Alternative Green Technologies, Inc.*, 11 Civ. 9056, 2012 U.S. Dist.
LEXIS 142154 (S.D.N.Y. Sept. 24, 2012)............................................... 19, 41, 51 74
*SEC v. Anticevic*, No. 05 Civ. 6991, 2009 U.S. Dist. LEXIS 11480 (S.D.N.Y. Feb. 13, 2009) .. 90
*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012), cert. den., 133 S.Ct. 2855 (2013)..............58, 60-62
*SEC v. Aragon*, 07-Civ.-919, 2008 U.S. Dist. LEXIS 3786 (S.D.N.Y. Jan. 16, 2008) ................ 17
*SEC v. Aronson*, 11-Civ-7033, 2013 U.S. Dist. LEXIS 114687 (S.D.N.Y. Aug. 6, 2013) ......... 59
*SEC v. Badian*, No. 06 Civ. 2621, 2008 U.S. Dist. LEXIS 64661
(S.D.N.Y. Aug. 22, 2008) ............................................................................. 23, 57
*SEC v. Blackwell*, 291 F. Supp. 2d 673 (S.D Ohio 2003)........................................................16-17
*SEC v. Boock*, No. 09-cv-8261, 2011 U.S. Dist. LEXIS 129673 (S.D.N.Y. Nov. 9, 2011)......... 40
*SEC v. Brown*, 740 F. Supp. 2d 148, 171-72 (D.D.C. 2010) ...................................................... 41
*SEC v. Burnett Grey & Co.*, No. 92-55361, 1993 U.S. App. LEXIS 25453
(9th Cir. Sept. 2, 1993)........................................................................................... 68
*SEC v. Cavanagh*, 98-Civ-1818, 2004 U.S. Dist. LEXIS 13372
(S.D.N.Y. July 16, 2004), *aff'd*, 445 F.3d 105 (2d Cir. 2006)................................22, 48, 71-72
*SEC v. Cavanaugh*, 1 F. Supp. 2d 337 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998).............. 67
*SEC v. Cherif*, 933 F.2d 403 (7th Cir. 1991) ............................................................................ 76
*SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375 (D. Colo. 2004) .................................................. 53
*SEC v. Commonwealth Chem. Securities*, 574 F.2d 90 (2d. Cir. 1978) ...................................... 27
*SEC v. Corporate Relations Group*, No. 6:99-CV-1222, 2003 U.S. Dist.
LEXIS 24925 (M.D. Fla. Mar. 28, 2003) ....................................................... 24, 26, 30
*SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475 (S.D.N.Y. 2002) ........................................... 31
*SEC v. Czarnik*, 10 Civ. 745, 2010 U.S. Dist. LEXIS 125463 (S.D.N.Y. Nov. 29, 2010);... passim
*SEC v. Drucker*, 76 Civ. 2643, 1983 U.S. Dist. LEXIS 13442 (S.D.N.Y. Sept. 26, 1983).... 42, 53
*SEC v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008)................................................................... 21
*SEC v. Elliot*, No. 09 Civ. 7594, 2011 U.S. Dist. LEXIS 91946 (S.D.N.Y. Aug. 11, 2011) ....... 75
*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996), cert. den.,
522 U.S. 812 (1997)................................................................................................ 57, 62
*SEC v. Fisher*, No. 07-CV-12552, 2008 U.S. Dist. LEXIS 24184
(E.D. Mich. March 27, 2008)............................................................................................ 69
*SEC v. Forest Resources Mgmt. Corp.*, No 09 Civ. 0903, 2010 U.S. Dist. LEXIS 50203
(S.D.N.Y. May, 18 2010) ................................................................................................ 48
*SEC v. Franco*, 253 F. Supp. 2d 720 (S.D.N.Y. 2030).................................................................. 16
*SEC v. Fraser*, No. CV-09-00443, 2010 U.S. Dist. LEXIS 7038 (D. Ariz. Jan. 28, 2010).......... 41
*SEC v. Gabelli*, 653 F.3d 49 (2d Cir. 2011), rev'd on other grounds, 133 S.Ct. 1216 (2013) ..... 87
*SEC v. Gad*, No. 07 Civ. 8385, 2007 U.S. Dist. LEXIS 92172 (S.D.N.Y. Dec. 17, 2007).......... 17
*SEC v. Garber*, 12 Civ. 9339, 2013 U.S. Dist. LEXIS 57643 (S.D.N.Y. April 22, 2013)..... 25, 40
*SEC v. Gold*, 05-CV-4713, 2006 U.S. Dist. LEXIS 87042 (E.D.N.Y. Aug. 18, 2006)................ 27
*SEC v. Geswein*, 5:10 CV 1235, 2011 U.S. Dist. LEXIS 111904 )(N.D. Ohio), adopted,
rejected, and modified in non relevant part, 2001 U.S. Dist. LEXIS 111898
(N.D. Ohio Sept. 29, 2011) ............................................................................................ 42
*SEC v. Goldstone*, No. Civ. 12-0257, 2013 U.S. Dist. LEXIS 95987
(D.N.M. July 8, 2013)..................................................................................................... 34

*SEC v. Greenstone Holdings, Inc.*, 10 Civ. 1302, 2013 U.S. Dist. LEXIS 97107
(S.D.N.Y. July 10, 2013) .................................................................. 44, 47, 69
*SEC v. Gruss*, 859 F. Supp. 2d 653 (S.D.N.Y. 2012) ................................................ 18
*SEC v. Huttoe*, No. Civ-A-96-2543, 1998 U.S. Dist. LEXIS 23211
(D.D.C. Sept. 14, 1998) ................................................................ 24, 27, 30
*SEC v. iBIZ Tech. Corp.*, CV 06-502, 2008 U.S. Dist. LEXIS 107297 (D. Ariz.
July 21, 2008) ................................................................................ 71
*SEC v. Johnson*, 650 F.3d 710 (D.C. Cir. 2011) ...................................................... 79
*SEC v. Kalvex, Inc.* 425 F. Supp. 310 (S.D.N.Y. 1975) ........................................ 35
*SEC v. Kearns*, 691 F. Supp. 2d 601 (D.N.J. 2010) ................................................ 41
*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) .............................................. 55
*SEC v. KPMG, LLP*, 03 Civ. 671, 2003 U.S. Dist. LEXIS 5669 (S.D.N.Y. Apr. 9, 2003) .......... 81
*SEC v. Landberg*, 836 F. Supp. 2d 148 (S.D.N.Y. 2011) ........................................ 23
*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) ............................................ 21, 45
*SEC v. Levin*, No. 12-21917-CIV, 2013 U.S. Dist. LEXIS 146702 (S.D. Fla. Oct. 10, 2013) ..... 50
*SEC v. Levin*, No. 12-21917-CIV, 2013 U.S. Dist. LEXIS 20027 (S.D. Fla. Feb. 14, 2013) ...... 68
*SEC v. Lines*, 07 Civ. 11387, 2009 U.S. Dist. LEXIS 69855 (S.D.N.Y. Aug. 9, 2005) .......... 90-91
*SEC v. Lucent Tech.*, 363 F. Supp. 2d 708 (D.N.J. 2005) ...................................... 27
*SEC v. Lybrand*, 00 Civ. 1387, 2000 U.S. Dist. LEXIS 9388 (S.D.N.Y. July 6, 2000) .............. 80
*SEC v. Mandaci*, No. 00 Civ. 6635, 2004 U.S. Dist. LEXIS 19143 (S.D.N.Y. Sep. 27, 2004) ... 26
*SEC v. Mannion*, 789 F. Supp. 2d 1321 (N.D. Ga. 2011) ...................................... 77
*SEC v. McNulty*, 137 F.3d 732 (2d Cir.), *cert. den.*, 525 U.S. 931 (1998) ............................ 38, 48
*SEC v. Mercury Interactive, LLC*, No. 5:07-cv-02822, 2011 U.S. Dist. LEXIS 134580
(N.D. Cal. Nov. 22, 2011) .................................................................... 41
*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) .................................... 56-57
*SEC v. Morriss*, No. 4:12-CV-80, 2012 U.S. Dist. LEXIS 151885 (E.D. Mo. Sept. 21, 2012) ... 52
*SEC v. Morton*, 10 Civ. 1720, 2011 U.S. Dist. LEXIS 36487 (S.D.N.Y. March 31, 2011) ......... 82
*SEC v. Mudd*, 885 F. Supp. 2d 654 (S.D.N.Y. 2012*)* ............................................ 34, 58
*SEC v. Murphy, 626 F.2d 633 (9*th* Cir. 1980)* ................................................ 70, 72, 75
*SEC v. NIR Group, LLC*, CV 11-4723, 2013 U.S. Dist. LEXIS 47522
(E.D.N.Y. March 24, 2013) .................................................................. 87
*SEC v. Obus*, 06 Civ. 3150, 2010 U.S. Dist. LEXIS 98895 (S.D.N.Y. Sept. 20, 2010) (Daniels,
J.), vacated on other grounds, 693 F.3d 276 (2d Cir. 2012) .................................... 45, 54
*SEC v. O'Meally*. No. 06 Civ 6483, 2010 U.S. Dist. LEXIS 107696 (S.D.N.Y.
Sept. 29, 2010) ............................................................................ 36
*SEC v. Opulentica, 479 F. Supp. 2d 319 (S.D.N.Y. 2007)* .................................... 67, 72
*SEC v. Park*, 99 F. Supp. 2d 889 (N.D. Ill. 2000) ............................................ 30
*SEC v. Parnes*, 01 Civ. 0763, 2001 U.S. Dist. LEXIS 21722 (S.D.N.Y. Dec. 26, 2001) ............ 72
*SEC v. Pentagon Capital Mgmt. PLC*, 2013 U.S. App. LEXIS 16402 (2d Cir. Aug. 8, 2013) .... 50
*SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241 (S.D.N.Y. 2009) ........................ 21
*SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377 (S.D.N.Y. 2012) ........................ 40
*SEC v. Pentagon Capital Mgmt.*, 725 F.3d 279 (2d Cir. 2013) .................................... 19
*SEC v. Power*, 525 F. Supp. 2d 415 (S.D.N.Y. 2007) .......................................... 15
*SEC v. R.A. Holman & Co., Inc.*, 366 F.2d 456 (2d Cir. 1966), *cert. denied*,
389 U.S. 991 (1967) ........................................................................ 26
*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ............................................ 72

vii

*SEC v. Ramiol Mgmt. Ltd.*, 01 Civ. 9057, 2007 U.S. Dist. LEXIS 79581
  (S.D.N.Y. Oct. 25, 2007) .................................................................................. 38, 67, 70
*SEC v. Reserve Fund Mgmt. Co.*, 732 F. Supp. 2d 310 (S.D.N.Y. 2010) .................... 20-21, 35, 51
*SEC v. Reynolds*, No. 3:08-cv-00438, 2008 U.S. Dist. LEXIS 63539
  (N.D. Tex. Aug. 19, 2008) ........................................................................................ 17
*SEC v. Santos*, 355 F. Supp. 2d 917 (N.D. Ill. 2003) ................................................. 16
*SEC v. Savino*, 01 Civ. 2438, 2006 U.S. Dist. LEXIS 6357 (S.D.N.Y.) (Daniels, J.),
  *aff'd in part*, 2006 U.S. App. LEXIS 30193 (2d Cir. 2006) ................................. 34, 45
*SEC v. Scammell*, Civ. No. 11-6597 (C.D. Ca. Nov. 15, 2011) .................................... 88
*SEC v. Scott*, 565 F. Supp. 1513 (S.D.N.Y. 1983), aff'd 734 F.2d 118 (2d Cir. 1984) ............... 34
*SEC v. Sekhri*, 98 Civ. 2320, 1998 U.S. Dist. LEXIS 7490 (S.D.N.Y. May 21, 1998) ............... 16
*SEC v. Sells*, No. C 11-4941, 2012 U.S. Dist. LEXIS 112450 (N.D. Cal. Aug. 10, 2012) .......... 17
*SEC v. Sharef*, 924 F. Supp. 2d 539 (S.D.N.Y. 2013), ................................................. 85
*SEC v. Shehyn*, 04 Civ. 2003, 2008 U.S. Dist. LEXIS 108951 (S.D.N.Y. Nov. 26, 2008) .......... 91
*SEC v. Simmons*, No. 8:04 CV 2477T17, 2008 U.S. Dist. LEXIS 124078
  (M.D. Fla. Apr. 25, 2008) ........................................................................................ 26
*SEC v. Simpson Capital Mgmt., Inc.*, 586 F. Supp. 2d 196 (S.D.N.Y. 2008) ................... 21, 25, 40
*SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348
  (2d Cir. 1998) ...................................................................................................... passim
*SEC v. Spongetech Delivery Systems, Inc.*, No. 10-CV-2031, 2011 U.S. Dist. LEXIS
  26146 (E.D.N.Y. March 14, 2011). ............................................................................. 39, 70
*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992)). ....................................................... 27
*SEC v. Stoker*, 865 F. Supp. 2d 457 (S.D.N.Y. 2012) .................................................. 21, 58
*SEC v. Syron*, No. 11 Civ. 9201, 2013 U.S. Dist. LEXIS 48183 (S.D.N.Y. Mar. 28, 2013) ....... 55
*SEC v. Tecumseh Holdings Corp.*, No. 03 Civ. 5490, 2009 U.S. Dist. LEXIS 119869
  (S.D.N.Y. Dec. 22, 2009) ........................................................................................ 71
*SEC v. Terezakis*, 95 CV 2533, 1997 U.S. Dist. LEXIS 16227 (E.D.N.Y. Sept. 30, 1997) ......... 16
*SEC v. Texas Gulf Sulpher Corp.*, 401 F.2d 833, 862 (2d Cir. 1968), *cert. denied sub nom.*
  *Coates v. United States*, 394 U.S. 976 (1969) .......................................................... 31
*SEC v. Thrasher*, 92 Civ. 6987, 1993 U.S. Dist. LEXIS 1289 (S.D.N.Y. Feb. 8, 1993) ............. 81
*SEC v. U.S. Environmental., Inc.*, 82 F. Supp. 2d 237 (S.D.N.Y. 2000) .............................. 23, 51
*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ..................................................... 83-84
*SEC v. Universal Express*, 457 F. Supp. 2d 412 *(*S.D.N.Y. 2007*)* ............................. 47, 67, 70-71
*SEC v. Verdiramo*, 10 Civ. 1888, 2011 U.S. Dist. LEXIS 101856 (S.D.N.Y. Sept. 9, 2011) ...... 67
*SEC v. Vindman*, 06 Civ. 14233, 2007 U.S. Dist. LEXIS 27371 (S.D.N.Y. April 9, 2007) ........ 78
*SEC v. Yorkville Advisors LLC*, 12 Civ. 7728, 2013 U.S. Dist. LEXIS 110624
  (S.D.N.Y. Aug. 1, 2013) ........................................................................................ 87
*SEC. v. N. Am. Research & Dev. Corp.*, 424 F.2d 63 (2d Cir. 1970). ............................... 67
*Sgalambo v. McKenzie*, 739 F. Supp. 2d 453 (S.D.N.Y. 2010) .................................... 62, 65
*SST Global Tech., LLC v. Chapman*, 270 F. Supp. 2d 444 (S.D.N.Y. 2003) ........................ 78
*Szulik v. Tagliaferri*, 12 Civ. 1827, 2013 U.S. Dist. LEXIS 119608 (S.D.N.Y. Aug. 21., 2013) 25
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .................................... 15, 19
*United States v. Estate of Machat*, 08 Civ. 7936, 2009 U.S. Dist. LEXIS 87000
  (S.D.N.Y. Sept. 21, 2009) ........................................................................................ 91
*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) .............................. 87
*United States v. Lebanese Canadian Bank SAL*, 285 F.R.D. 262 (S.D.N.Y. June 6, 2012) ........ 90

*United States v. Naftalin*, 441 U.S. 768 (1979) ................................................. 44, 53, 58

*United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938) ................................................. 60

*United States. v. Salmonese*, 352 F.3d 608 (2d. Cir. 2003) ................................................. 29

*United States v. Wells Fargo Bank,* No. 1:12-cv-07527, 2013 U.S. Dist.
    LEXIS 136539 (S.D.N.Y. Sep. 24, 2013)................................................. 16, 23

*United States v. Wenger* 427 F.3d 840 (10th Cir. 2005), *cert. den.,* 548 U.S. 913 (2006)........... 24

*VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011)................................................. 40-41

*Vicinanzo v. Brunschwig & Fils. Inc.*, 739 F. Supp. 891 (S.D.N.Y. 1990) ................................ 92

*Weiss v. SEC*, 468 F.3d 849 (D.C. Cir. 2006)................................................. 47

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)................................................. 84

*Wyndham Assocs. v. Bintliff*, 398 F.2d 614 (2d Cir.), cert. den., 393 U.S. 977 (1968) ............... 79

*Zacharias v. SEC*, 569 F.3d 458 (D.C. Cir.), *reh'g en banc den.*, 584 F.3d 1073
    (D.C. Cir. 2009) ................................................. 75-76

*Zorn v. Anderson*, 263 F. Supp. 745 (S.D.N.Y. 1966)................................................. 78-79

*Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979)................................................. 24, 29

Plaintiff, Securities and Exchange Commission ("SEC" or "Commission"), through its attorneys, submits the following memorandum of law in opposition to the motion of Defendants Ben Kirk, James Hinton ("Hinton"), Luniel de Beer ("de Beer"), Luis J. Carrillo ("Carrillo"), Wade Huettel ("Huettel"), Carrillo Huettel LLP ("CH"), Gibraltar Global Securities ("GGSI"), Warren Davis ("Davis"), and Dr. Luis Carrillo ("Dr. Carrillo") (collectively "Defendants") to dismiss the Complaint pursuant to Fed. R. Civ. Pro. 12(b)(6), 9(b), and 12(b)(2).

## PRELIMINARY STATEMENT

This case concerns a massive international scheme to profit on the unlawful sale of the restricted securities of two U.S. publicly traded corporations – Tradeshow Marketing Company ("Tradeshow") and Pacific Blue Energy Corporation ("Pacific Blue").  Canadian stock promoters took control of these companies and pumped up the price of these companies' shares through email and telephone solicitations run by stock touting websites and boiler rooms they also controlled, while simultaneously causing the two corporations to issue positive news releases. At the same time that the promoters were urging people to buy shares in the companies, the promoters dumped their own shares into the market, at inflated prices, from offshore nominee accounts that had been created for the sole purpose of hiding their identities.  The concealment of the promoters' ownership of the shares being sold into the market was a key component of the fraud because the promoters falsely told potential investors that the information they received in the email and telephone solicitations about the companies (including a purported research report with a very optimistic price projection) was independent.  In addition to the facts that the promoters' control of the companies and the promoters' stock sales were not disclosed in the emails and the telephone calls to potential investors, the companies' public filings also contained numerous false statements concerning share ownership and control.

1

The Commission has sued all of the key actors in the scheme, including the promoters (John Kirk, Ben Kirk, Dylan Boyle and Hinton), the lawyers who drafted the false documents and through whose attorney trust account the money flowed (CH and its partners Carrillo and Huettel), the offshore broker-dealer (GGSI) and its President (Davis) who made false representations about the ownership of the nominee accounts to a U.S. broker-dealer enabling the stock sales to take place, Tradeshow, Pacific Blue and their officers (de Beer and Franklin), and Dr. Carrillo who obtained and sold a large block of the unregistered securities as a front for the lawyers.  The Commission has asserted fraud claims against all of the Defendants (except Davis and Dr. Carrillo) based on both scheme liability and fraudulent misrepresentations and omissions and has also asserted claims against all Defendants for the unlawful sale of unregistered securities.  The allegations in the Commission's 50-page Complaint are detailed and clear and each defendant should be able to understand the nature of and basis for the Commission's claims against him.

Several of the Defendants have moved to dismiss the claims brought against them.  They make numerous arguments ranging from lack of venue and personal jurisdiction to the failure to plead fraud with specificity and the failure to allege scienter or the making of a fraudulent statement.  In many cases, the Defendants have failed to state the appropriate standard in this district and even where they do, they assert little more than the conclusion that the Commission has failed to meet the standard.  Their arguments are all without basis.  The claims asserted against each defendant are well-supported by the allegations in the Complaint, which are deemed

true for purposes of this motion, and the reasonable inferences that can be drawn from alleged

facts.  For the reasons set forth below, the motions to dismiss should respectfully be denied.[1]

## I.   THE FACTS ALLEGED IN THE COMPLAINT

The Commission has brought this action against participants in a fraudulent international

"pump-and-dump" scheme involving two publicly-traded U.S.-based companies: Tradeshow and

Pacific Blue.  The primary goal of the scheme was to enrich the participants by "pumping" up

trading in the stock of Tradeshow and Pacific Blue with false and misleading promotions,

purportedly based on "independent" research, and then secretly "dumping," *i.e*., liquidating the

promoters' shares into the artificially inflated demand they created.  (Cplt ¶ 1.)  Tradeshow and

Pacific Blue were controlled by a group of Canadian stock promoters: John Kirk, Ben Kirk,

Dylan Boyle and James Hinton (the "Kirk/Boyle group")[2].  This group secretly took control of

the companies and then "pumped" the companies' stock price by sending investors false and

misleading email blasts from two stock-touting websites they controlled – Skymark Research

("Skymark") and Emerging Stock Report ("ESR").  They also hired a "boiler room" of

individuals who called U.S. investors to tout the stocks, falsely claiming they were providing

independent research.  (Cplt ¶ 2.)  The scheme realized at least $11 million in Tradeshow and

Pacific Blue stock sale proceeds for the Defendants.  (Cplt ¶ 5.)

Although each defendant played a slightly different role in the scheme (as described

below), each of them took steps to conceal the Kirk/Boyle group's control of Tradeshow and

---

[1] If the Court determines that Defendants' motion should be granted, the SEC requests leave to replead.  Leave to amend is "almost always" granted to plaintiffs whose claims are dismissed under Rule 9(b).  *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (citations omitted).

[2] The Commission has entered into partial settlements with John Kirk and Dylan Boyle.  Consequently, this memorandum of law does not describe in detail the facts alleged in the complaint pertaining to those two defendants except to the extent that such facts relate to other defendants who have moved to dismiss the complaint.

Pacific Blue.  This deception was the key component of the fraudulent scheme because Skymark and ESR were promoting the companies as purportedly "independent" stock picks and investor demand for the shares depended on this ruse.  Thus, when an article appeared on an unrelated website for "StreetSweeper.org" calling attention to connections between Tradeshow and Skymark and calling into question the supposed independence, Tradeshow's stock price began a precipitous fall, dropping 40% over the next two weeks.  (Cplt ¶ 69.)

### A. Ben Kirk's Role in the Fraudulent Scheme

Ben Kirk and his brother John Kirk were the architects of the scheme.  They set up two "boiler-room" operations for the purpose of promoting Tradeshow stock and B. Kirk personally operated Skymark from Calgary, Alberta.  (Cplt ¶¶ 47-48.)  Ben Kirk (with J. Kirk, Boyle and Hinton) supervised and controlled Skymark/ESR employees, called "account managers," who made phone calls to potential investors to promote Tradeshow and Pacific Blue stock.  (Cplt ¶ 51.)  Ben Kirk provided the "account managers" a script to use when calling investors (at times, Skymark account managers called between 100 to 200 subscribers per day to tout either Tradeshow or Pacific Blue stock), and told Skymark "account managers" to watch the movie "Boiler Room" to learn how to promote stocks.  (Cplt ¶¶ 52-53.)  Under the direct supervision of Ben Kirk, Skymark "account managers" falsely told potential investors that Skymark was completely independent during telephone conversations and via email, and falsely portrayed their organization as an independent research service.  (Cplt ¶ 59.)  They made these false statements under Ben Kirk's direction and supervision.  (Cplt ¶ 60.)

Ben Kirk (along with J. Kirk and Boyle) drafted and/or approved multiple false and misleading statements in Skymark's stock-touting emails.  These emails, among other misrepresentations, falsely maintained that Skymark employees and associates were independent

of the promoted companies.  (Cplt ¶ 50.)  From November 2009 through March 2010, Skymark

sent dozens of misleading emails predicting dramatic increases in Tradeshow's stock price.

(Cplt ¶ 56.)  These emails falsely stated that Skymark had been paid $5,000 by "a third party"

but were misleading because there was no "third party," they grossly understated the amount

received, and they failed to disclose share ownership and scalping by the principals of Skymark.

(Cplt ¶ 57.)  Ben Kirk (along with J. Kirk and Boyle) provided undisclosed compensation to de

Beer for his role as CEO of Tradeshow by wiring de Beer over $330,000 in Tradeshow stock sale

proceeds in September and October 2009.  (Cplt ¶ 36.)

   Ben and John Kirk took control of Pacific Blue and asserted control over many of Pacific

Blue's major decisions, including pushing the company to conjure up, draft and release positive

press releases.  (Cplt ¶ 89.)  Starting in April 2010 and continuing through August 2010, the

Kirk/Boyle group caused Skymark to send dozens of false and misleading emails from April

through August 2010 touting Pacific Blue.  (Cplt ¶ 102.)  The Skymark emails falsely stated that

Skymark was an independent organization and that Skymark, its employees and its associates did

not hold any positions, shares or beneficial interest in Pacific Blue.  (Cplt ¶¶ 104-105.)  Ben Kirk

(with John Kirk) also drafted and released a fake "independent" analyst report that they used to

justify a $3.50 - $5.00 target price for Pacific Blue (when stock was trading at $1.05), which they

then caused ESR and Skymark to release and promote as "independent" research.  (Cplt ¶ 103.)

   In order to sell their shares, Ben Kirk (along with John Kirk and Boyle) opened accounts

at Scottsdale Capital Advisors (Scottsdale) in the names of fake nominee entities.  (Cplt ¶ 109.)

Ben Kirk also concealed his beneficial ownership of Tradeshow shares by transferring and

selling shares through at least three nominee accounts at GGSI in the names of Medford, Baltic

and Mazi.  (Cplt ¶¶ 140-141, 117-118.)  Ben Kirk owned and controlled these accounts.  (Cplt ¶

115-116.)  In total, Ben Kirk controlled at least 7,320,000 Pacific Blue shares through nominee entities which had purported to purchase the shares under a sham "Non-Affiliate Stock Purchase Agreement".  (Cplt ¶ 85.)  Ben Kirk ultimately sold 3.6 million Baltic and Mazi shares through GGSI (Cplt ¶¶ 117-118) and sold other shares through Scottsdale.  (Cplt ¶¶ 163-164)  In sum, GGSI sold both Tradeshow and Pacific Blue shares on Ben Kirk's behalf for total proceeds of at least $3.8 million during the scheme.  (Cplt ¶ 121.)

Along with John Kirk, Boyle and Hinton, Ben Kirk profited handsomely by selling millions of shares of Tradeshow and Pacific Blue into the increased demand created by their promotions, mostly through the offshore accounts that Ben Kirk and Boyle controlled.  (Cplt ¶ 157.)  Taking into account both Ben Kirk and Boyle's nominee entities, from August 2009 through February 2010 they realized over $4.4 million in proceeds from Tradeshow sales through accounts at Scottsdale and GGSI.  (Cplt ¶ 160.)  From March through August 2010, they realized over $5.6 million from Pacific Blue sales through their nominee accounts.  (Cplt ¶ 163.)  After these sales, Ben Kirk wired over $440,000 in Tradeshow sale proceeds from GGSI to the CH attorney IOLTA trust account (CH Trust Account), for the benefit of John Kirk and others.  (Cplt ¶ 161.)  Ben Kirk (and Boyle) also wired millions in sale proceeds from nominee accounts at GGSI and Scottsdale to offshore accounts in Barbados. (Cplt ¶¶ 162, 164-166.)

### B.  James Hinton's Role in the Fraudulent Scheme

Hinton served as a director and control person of ESR, and worked with ESR and Skymark to increase demand for the shares.  Hinton promoted Tradeshow to multiple investors and personally made phone calls to investors to promote the stock while working with Skymark and ESR.  He misled these investors by failing to disclose Skymark's and ESR's lack of independence resulting from his and the Kirk/Boyle group's ownership interest in Tradeshow.

(Cplt ¶ 61.)  Hinton acted in concert with the Kirks and Boyle; their group had "control" of Pacific Blue by virtue of their ownership of well over 50% of Pacific Blue stock; Hinton also acquired shares from John Kirk, an affiliate of Pacific Blue, with the intention that the shares would be sold at artificially high prices to the investing public.  (Cplt ¶¶ 145-146.)

Hinton sold Pacific Blue shares that he received from John Kirk, participated in the boiler room promotion of Pacific Blue touting the stock to U.S. investors, and received proceeds of the Kirks' U.S. stock sales.  (Cplt ¶ 155.)  From August 2009 through February 2010, Hinton sold over $21,000 of his own Tradeshow stock, and also received at least $31,000 in Tradeshow stock sale proceeds from Ben Kirk.  (Cplt ¶ 160.)  From March through August 2010, Hinton sold over $12,000 of his own Pacific Blue stock, and received an additional $150,000 in proceeds of Pacific Blue stock sales during the pump-and-dump.  (Cplt ¶ 163.)  Hinton also facilitated the scheme by attempting to broker a private placement investment in Pacific Blue by a U.S. resident while failing to disclose that he and his colleagues were dumping Pacific Blue shares.  (Cplt ¶ 106.)

### C.  Luniel de Beer's Role in the Fraudulent Scheme

Luniel de Beer, who was installed by the Kirks as the nominal president of Tradeshow and chairman of Pacific Blue, concealed the promoters' control of the companies and facilitated their stock sales while receiving over $330,000 in secret kickbacks.  (Cplt ¶ 7.)  Although de Beer was CEO of Tradeshow, the Kirks also exercised control over the company, as evidenced by dozens of emails.  (Cplt ¶ 34.)  De Beer engaged in an almost daily stream of communications with John and Ben Kirk regarding Tradeshow press releases and potential business announcements.  (Cplt ¶ 35.)  John Kirk sent de Beer emails to release news and updated financials and even drafted press releases for de Beer to release on behalf of Tradeshow.  (Cplt ¶

35.)  De Beer, who had control of Tradeshow's shareholder records, knew that the Kirks and Boyle owned a control block of Tradeshow shares.  (Cplt ¶ 39.)  De Beer also knew that ESR and Skymark were promoting Tradeshow stock by sending emails and calling investors while at the same time falsely claiming to be independent.  (Cplt ¶ 63.)  In September and October 2009, De Beer received substantial undisclosed compensation from the Kirks and Boyle in connection with Tradeshow, including over $330,000 of proceeds from their sales of Tradeshow stock.  (Cplt ¶ 36.)  In addition to the $330,000 in secret kickbacks, de Beer also received over $300,000 from the Tradeshow bank account which consisted of redirected proceeds of the Kirks' and Boyle's fraudulent sales of Tradeshow shares.  (Cplt ¶¶ 66, 67.)

De Beer signed and approved Tradeshow's annual and quarterly reports which contained material misrepresentations in furtherance of the scheme.  Specifically, Tradeshow's annual reports falsely stated that de Beer was the only officer, director or control person and that there were no known individuals or corporations owning more than 5% of the Company's common stock.  (Cplt ¶¶ 42-43.)  Each of Tradeshow's annual and quarterly reports from November 2009 through October 2010 also purported to disclose all related party transactions but fraudulently failed to disclose the stock ownership, paid promotion and scalping by the Kirks and also misrepresented de Beer's compensation by omitting the over $330,000 in kickbacks he received from the Kirks and Boyle.  (Cplt ¶¶ 44-45.)

De Beer also helped John Kirk, Ben Kirk and Boyle deposit Tradeshow shares for sale through Scottsdale by signing and providing misleading corporate resolutions and certifications.  (Cplt ¶¶ 122-123.)  In July and September 2009, he provided certifications that falsely represented to Scottsdale, with no reasonable basis, that shares owned by John Kirk and Boyle were not held by "an 'Affiliate' of the Company as that term is used in paragraph (a) of Rule 144

8

of the Securities Act of 1933 . . .” and that “the Holder is not a beneficial owner of 5% or more of any class of equity securities of the Company.”  (Cplt ¶ 124.)  He also provided misleading corporate resolutions to Ben Kirk for share deposits falsely claiming the shares were “validly issued” and “free trading” shares.  (Cplt ¶¶ 126-127.)

After the StreetSweeper.org article highlighted the Kirks’ connections to both Skymark and Tradeshow, de Beer conspired with the Kirks, Carrillo, Huettel and Boyle to deny the facts in the StreetSweeper.org article and to conceal the Kirks’ shared control.  (Cplt ¶¶ 69-71.)  Ben Kirk drafted Skymark’s initial misleading response and circulated it to de Beer.  (Cplt ¶ 72.)  De Beer then issued a misleading press release on behalf of Tradeshow claiming that the report contained a “significant number of inaccuracies.”  (Cplt ¶¶ 73, 75.)  De Beer failed to disclose the truth that, as the article implied, the Kirks and Boyle controlled both Skymark and Tradeshow.

De Beer was also a critical part of the Pacific Blue phase of the scheme, De Beer was installed as Chairman by the Kirks.  (Cplt ¶ 78.)  De Beer knew that the Kirk/Boyle group controlled Pacific Blue, beneficially owned well over 5% of Pacific Blue’s common shares, and were “affiliates” of Pacific Blue under Rule 144 of the Securities Act.  (Cplt ¶ 128.)  De Beer made misleading representations in furtherance of the scheme, signing Pacific Blue’s Form 10-K filed on April 8, 2010, which falsely stated that de Beer was the only person who owned 5% of the outstanding shares.  That section and the “related party transaction” section of the Form 10-K were false and misleading for failure to disclose: (1) the stock ownership and promotion by the Kirk/Boyle group as controlling shareholders and (2) the over $330,000 in kickbacks paid to de Beer.  (Cplt ¶ 93.)  De Beer also signed a sham “Affiliate Stock Purchase Agreement” to obtain Pacific Blue shares, which falsely stated that de Beer had purchased 40% of the company’s

shares for $80,000, even though de Beer knew he did not pay any consideration for this block of shares that were simply given to him by the Kirks.  (Cplt ¶ 84.)

### D.  Luis Carrillo's and Wade Huettel's Role in the Fraudulent Scheme

Carrillo and Huettel, as partners in the law firm Carrillo Huettel LLP, quarterbacked the legal structuring and corporate disclosures required to secretly distribute shares to the public in violation of the securities laws.  Although both attorneys worked hand-in-hand on the transactions, Carrillo appeared to conduct more outward-facing business, while Huettel focused more on preparing the documentation that pushed the Pacific Blue scheme forward.  Carrillo and Huettel knew that Skymark was under the control of the Kirks because, among other things, they trademarked Skymark for Ben Kirk.  (Cplt ¶ 64.)  Carrillo also provided advice to the Kirks and Boyle regarding the Skymark telephone sales script and written materials distributed by Skymark. (Cplt ¶ 65.)

After the StreetSweeper.org article highlighted the Kirks' connections to both Skymark and Tradeshow, Carrillo and Huettel conspired with de Beer, the Kirks and Boyle to deny the facts in the StreetSweeper.org article and to conceal the Kirks' shared control.  (Cplt ¶¶ 69-71.) Carrillo and Huettel reviewed drafts of public statements by Skymark and Tradeshow circulated between them, Ben Kirk, and de Beer in furtherance of the cover-up.  (Cplt ¶ 71.)  Carrillo and Huettel drafted or approved these false and misleading public statements.  (Cplt ¶ 75.)  Carrillo and Huettel knew that Tradeshow's operations were funded using $1.2 million in mysterious overseas private placement funds the Kirks sent through the CH Trust Account.  These supposed private placement investments were simply proceeds of the Kirks' and Boyle's fraudulent sales of Tradeshow shares, which they funneled back to Tradeshow through the CH Trust Account. (Cplt ¶ 66.)

In September 2009, Carrillo and the Kirks arranged to purchase all outstanding shares of shell company Descanso Agency, Inc., renamed it Pacific Blue, and decided that its purported business would be an alternative energy company.  (Cplt ¶ 77.)  Carrillo and Huettel facilitated the purchase of the Pacific Blue shell through the CH Trust Account.  (Cplt ¶ 79.)  Carrillo and Huettel arranged to distribute Pacific Blue shares in 4.9% increments to nominee entities controlled by the Kirks and Boyle, keeping the holdings of each secret nominee entity just under 5%, in order to give the misleading impression that shares were held by various independent entities and thereby to conceal and facilitate the manipulation.  (Cplt ¶¶ 80-81.)

Carrillo and Huettel also drafted a sham "Non-Affiliate Stock Purchase Agreement" under which the 4.9% purchasers purportedly acquired their shares.  (Cplt ¶ 82.)  Carrillo and Huettel knew that the 4.9% nominee owners were acting as a group because they knew that 90% of the purchase price came from their client John Kirk and almost all of the shares were being provided to entities connected to the Kirks.  (Cplt ¶ 82.)  Carrillo and Huettel drafted a sham "Affiliate Stock Purchase Agreement" distributing shares to de Beer, which falsely stated that de Beer had purchased 40% of the company's shares for $80,000 although they knew that de Beer did not pay any consideration for the block of shares assigned to him.  (Cplt ¶¶ 83-84.)  Carrillo drafted additional misleading "non-affiliate" stock purchase agreements for John Kirk's private sales of Pacific Blue shares, falsely stating that John Kirk was not an affiliate of Pacific Blue. (Cplt ¶ 86.)

Carrillo and Huettel knew that the Kirks controlled Pacific Blue because they were heavily involved in emails and discussions with the Kirks that demonstrated that the Kirks were exercising control over Pacific Blue.  (Cplt ¶ 90.)  Carrillo and Huettel knew that Pacific Blue's operations were funded through the transfer of $2 million in supposed private placement

investments that were really proceeds of the Kirks' and Boyle's fraudulent sales of Pacific Blue shares funneled back to Pacific Blue through the CH Trust Account.  (Cplt ¶ 87.)  Carrillo and Huettel also allowed the CH Trust Account to be used by John Kirk and Hinton as their de facto bank accounts to receive unlawful stock sale proceeds.  (Cplt ¶ 159.)

Despite knowing that the Kirk/Boyle group owned and controlled Pacific Blue, Carrillo and Huettel instructed Franklin to make false statements on behalf of Pacific Blue, and they drafted and actively facilitated Pacific Blue's false statements.  (Cplt ¶ 97.)  As detailed in the Complaint, Carrillo and Huettel drafted all of Pacific Blue's SEC filings (Cplt ¶ 98), including statements that were false and misleading for failure to disclose the stock ownership and promotion by the Kirk/Boyle group as controlling shareholders.  (Cplt ¶¶ 91-95.)  Carrillo prepared the Pacific Blue December 9, 2009 Form 8-K that falsely listed Franklin and de Beer as the only officers, directors, or "beneficial owner[s] of more than five percent (5%) of our outstanding common stock."  (Cplt ¶ 99.)  Indeed, Huettel specifically reviewed and commented on the misleading section of this 8-K that contained this false information.  (Cplt ¶ 99.)  This section should have, at the very least, disclosed that John Kirk bought and paid for the shell.

Carrillo also instructed Franklin to sign misleading "Related Party" worksheets to be relied upon by Pacific Blue's auditor that falsely stated that Franklin and de Beer were the only company "affiliates" and failed to mention the Kirks' secret control; Carrillo then sent these false documents to Pacific Blue's auditors.  (Cplt ¶¶ 100-101.)

Carrillo and Huettel authored multiple misleading opinion letters to facilitate the deposit and sale of the Kirks' and Boyle's Pacific Blue shares.  (Cplt ¶ 129.)  Carrillo signed at least three misleading opinion letters to facilitate the deposit and sale of shares as part of the scheme.  (Cplt ¶¶ 130-132.)  Huettel drafted (and Carrillo signed) an opinion letter that he and Carrillo

provided to the Depository Trust Company (DTC) falsely stating that shares owned by Boyle's nominee entity were "freely transferable without registration" and not held by an "affiliate" under Rule 144.  (Cplt ¶ 131.)

Carrillo's father, Dr. Carrillo, obtained a block of shares of Pacific Blue, at least in part, as a nominee for Carrillo and Huettel.  Carrillo (the son) had trading authority and power of attorney over the brokerage account where these shares were sold and provided instructions to the broker concerning that account.  In addition, about one-third of the $1.1 million in proceeds from the sales of this block was then redirected to CH.  (Cplt ¶¶ 150, 167.)  Specifically, $343,000 of these proceeds was transferred to Carrillo and Huettel as a sham "loan" to the CH firm through the CH Trust Account.  (Cplt ¶¶ 4, 169.)  No loan documentation was created. (Cplt ¶ 170.)  At least $125,000 of these proceeds was later transferred to Carrillo's personal account.  (Cplt ¶ 169.)  $32,500 of these proceeds was also transferred to Huettel's personal account.  (Cplt ¶ 169.)  The CH Trust Account ledgers (that would show the disposition of these funds) were destroyed by Carrillo and/or Huettel during the course of the SEC's investigation. (Cplt ¶ 171.)

### E.  Gibraltar Global Securities's Role in the Fraudulent Scheme

GGSI, a now-defunct Bahamian broker-dealer, provided false affidavits and misleading representations to brokerage firms in the United States, concealing the shares' true beneficial ownership, so that GGSI's client Ben Kirk could secretly sell those shares into the artificially increased demand.  (Cplt ¶ 6.)  Ben Kirk controlled at least three nominee accounts at GGSI for no apparent purpose other than to conceal his identity, and GGSI helped him use these accounts to secretly dump millions of shares of Tradeshow and Pacific Blue.  (Cplt ¶¶ 114-115.)

GGSI's business primarily consisted of liquidating low-priced, thinly-traded stocks on behalf of its clients, often during periods of suspicious promotion.  (Cplt ¶ 110.)  GGSI touted its goals of client secrecy and asset protection, and recommended that its clients use "International Business Corporations" (IBCs) with nominee officers and directors ("giving you an extra level of confidentiality as your name will not show up as an officer or director on your IBC.")  (Cplt ¶¶ 111-112.)

GGSI provided multiple misleading affidavits and representations to Scottsdale (the U.S. broker through which it dumped stock).  GGSI falsely represented that shares beneficially owned by Ben Kirk were instead beneficially owned by offshore entities.  For example, in September 2009, it provided an affidavit stating that nominee entity Medford Financial was its "client" and owner of 1 million Tradeshow shares (Cplt ¶ 116.)  In April 2010 it provided affidavits stating that two deposits of 1.8 million Pacific Blue shares were held for the "sole benefit" of nominee entities Mazi and Baltic (Cplt ¶ 117.)  In April 2010 it also signed share deposit forms ("DSR forms") misleadingly stating that the shares were "acquired" from Mazi and Baltic.  (Cplt ¶ 118.) These misleading documents, which concealed Ben Kirk's ownership, were signed by Warren Davis as president on behalf of GGSI.  (Cplt ¶¶ 120, 142, 156.)

GGSI knew these representations were false because the account opening documents provided to GGSI by Ben Kirk made clear that Ben Kirk was the beneficial owner of the multiple nominee accounts.  (Cplt ¶ 119.)  In addition to the fact that GGSI made affirmative misrepresentations to Scottsdale, there were numerous red flags that should have alerted GGSI to the pump-and-dump scheme, including the sale of large blocks of a low-priced, thinly-traded issuer and Ben Kirk's acts to conceal his beneficial ownership by transferring and selling shares through multiple nominee accounts at GGSI.  (Cplt ¶¶ 41, 156.)  After making these false

14

representations, GGSI sold Tradeshow and Pacific Blue shares for Ben Kirk (through his nominee accounts) for proceeds of over $3.8 million.  (Cplt ¶ 121.)

## ARGUMENT

## I.   THE STANDARD FOR A MOTION TO DISMISS UNDER RULES 12(b)(6) AND 9(b)

In considering a motion to dismiss under Rule 12(b)(6), the Court should accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  To survive dismissal, the plaintiff must provide the grounds upon which its claim rests through factual allegations sufficient "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Rule 9(b) of the Federal Rules of Civil Procedure provides additional pleading requirements in fraud cases.  "The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based."  *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990); *SEC v. Power*, 525 F. Supp. 2d 415, 423 (S.D.N.Y. 2007) ("Rule 9(b) 'is not intended to be an 'insurmountable hurdle for [claimants] to overcome, but was designed to afford defendants fair notice of the fraud alleged against them.'").  The particularity requirement also serves to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.  *Bolton*, 904 F.2d at 823; *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  Allegations of intent need not be pleaded with particularity.  *See Burkina Wear, Inc. v. Campagnolo, S.R.L.*, 07 Civ. 3610, 2008 U.S. Dist. LEXIS 29031 at * 11-12 (S.D.N.Y. April 9, 2008).

The amount of particularity required depends on the type of fraud alleged.  In particular, "where the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct."  *U.S. v. Wells Fargo Bank,* No. 1:12-cv-07527-JMF, 2013 U.S. Dist. LEXIS 136539 (S.D.N.Y. Sep. 24, 2013) (citing cases). Moreover, because the SEC was not a participant to the fraudulent telephone calls and emails, its ability and, therefore, its obligation to provide details about all such communications is far more limited than that of a private plaintiff.  *See SEC v. Terezakis*, 95 CV 2533, 1997 U.S. Dist. LEXIS 16227 *4 (E.D.N.Y. Sept. 30, 1997) ("While the complaint does not specify the exact date and place of each alleged misrepresentation, given the nature of the alleged scheme, it is sufficiently outlined to place defendants on notice so that they may frame a responsive pleading"); *SEC v. Sekhri*, 98 Civ. 2320, 1998 U.S. Dist. LEXIS 7490 *7-8 (S.D.N.Y. May 21, 1998); *SEC v. Franco*, 253 F. Supp. 2d 720, 724, 731-32 (S.D.N.Y. 2030); *SEC v. Blackwell*, 291 F. Supp. 2d 673, 689-92 (S.D.N.Y. 2003) (distinguishing particularity that a private plaintiff who relied on a representation must plead as opposed to that which the SEC who was not privy to the conversations must plead);  *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997) ("It is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant."); *Berk v. Tradewell*, Inc., 01 Civ. 9035, 2003 U.S. Dist. LEXIS 12078 *38-39 (S.D.N.Y. July 16, 2003); *SEC v. Santos*, 355 F. Supp. 2d 917, 921 (N.D. Ill. 2003) (particulars are not necessary to provide defendants with fair notice of the fraud.  "To the extent details are not alleged in the complaint, [defendants] have exclusive control over those precise facts surrounding the fraudulent scheme.").  Thus, even pleading based on information and belief is allowed where the

16

matters are within the opposing party's knowledge and the basis for the information is set forth.
*See SEC v. Sells*, No. C 11-4941, 2012 U.S. Dist. LEXIS 112450 * 27 (N.D. Cal. Aug. 10, 2012);
*SEC v. Reynolds*, No. 3:08-cv-00438, 2008 U.S. Dist. LEXIS 63539 (N.D. Tex. Aug. 19, 2008)
("If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud
pleadings may be based on information and belief"); *SEC v. Blackwell*, 291 F. Supp. 2d 673, 698
(S.D. Ohio 2003) ("Assuming that such a knowledge requirement is necessary, the
Commission's statement on information and belief is sufficient to satisfy the liberal pleading
standards of the Federal Rules of Civil Procedure").[3]

Indeed, as this Court has stated:  "[s]pecific pieces of information, such as the identity of
the speaker, are required under Rule 9(b) only as necessary to serve its underlying purposes."  *In
re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 611-12 (S.D.N.Y. 2007).  "Rule 9(b) does not
require that a complaint plead fraud with the detail of a desk calendar or a street map.  Nor
should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud
allegation brought in a federal court."  *Bangkok Crafts Corp. v. Capitolo di San Pietro*, 03 Civ.
0015, 2006 U.S. Dist. LEXIS 49161 *13 (S.D.N.Y. July 18, 2006).  "The . . . question is:  Do the
defendants know what the United States is claiming?"  *SEC v. Gruss*, 859 F. Supp. 2d 653, 669
(S.D.N.Y. 2012).

---

[3]  Because both Carrillo and Huettel declined to testify and asserted the Fifth Amendment privilege during the
SEC's investigation, facts relating to their activities and state of mind are particularly within their exclusive
knowledge.  (Declaration of Todd D. Brody "Brody Decl.", dated October 18, 2013, Exs. A, B.)  In addition, Hinton
did not testify, and his then counsel informed the staff that Mr. Hinton intended to assert the Fifth Amendment
privilege if called to testify.  (*Id.* Ex. C.)  Ben Kirk did not testify; he is a fugitive.  These Defendants now argue that
the SEC has failed to comply with Rule 9(b)'s requirements.  Yet as to facts peculiarly within their knowledge
because of their Fifth Amendment assertions and unavailability, the pleading burden should be eased.  *See SEC v.
Aragon*, 07-Civ.-919, 2008 U.S. Dist. LEXIS 3786 (S.D.N.Y. Jan. 16, 2008) (where defendant asserted his Fifth
Amendment privilege during SEC investigation and refused to testify, less particularity was required under Rule
9(b); *SEC v. Gad*, No. 07 Civ. 8385, 2007 U.S. Dist. LEXIS 92172, n.2 (S.D.N.Y. Dec. 17, 2007) ("the SEC could
not know precisely when the information was conveyed, as . . . the only people who know exactly what was said and
exactly when[] invoked the Fifth Amendment privilege . . . and refused to testify.")

## II.   THE COMPLAINT ADEQUATELY ALLEGES PRIMARY FRAUD CLAIMS

Section 10(b) of the Exchange Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, implementing Section 10(b), prohibits (a) the use of any device, scheme, or artifice to defraud, (b) the making of any untrue statement of a material fact or omission to state a material fact, and (c) any act, practice, or course of business which operates or would operate as a fraud, in connection with the purchase or sale of any security.  *See* 17 C.F.R. § 240.10b-5.

Section 17(a) of the Securities Act similarly prohibits fraud in the offer or sale of securities, using the mails or instruments of interstate commerce.  Section 17(a)(1) forbids the direct or indirect use of any device, scheme, or artifice to defraud; Section 17(a)(2) makes it unlawful to obtain money or property through misstatements or omissions about material facts; and Section 17(a)(3) proscribes any transaction or course of business that operates as a fraud or deceit upon a securities buyer.  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 861 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).  Claims under Section 17(a) of the Securities Act have essentially the same elements as 10(b), although subsections (a)(2) and (a)(3) only require a finding of negligence.  *Aaron v. SEC*, 446 U.S. 680 (1980); *SEC v. Pentagon Capital Mgmt.*, 725 F.3d 279, 285 (2d Cir. 2013).[4]

---

[4] Because the Complaint pleads facts demonstrating a strong inference of scienter as to each Defendant, the same allegations easily meet the lesser negligence standard.  The SEC does not separately address Defendants' negligent conduct, except to note that based on the scienter allegations, each Defendant also acted negligently under Section 17(a)(2) and (3).

### A. The Pleading Requirements for Scienter

Scienter is the mental state embracing an intent to deceive, manipulate or defraud. *See Tellabs*, 551 U.S. at 308, 323. When deciding a motion pursuant to Rule 12(b)(6), a court must decide whether all facts collectively taken together give rise to a strong inference of scienter, not whether any individualized statement in isolation meets that standard. *Tellabs*, 551 U.S. at 323. Rule 9(b) provides that scienter (or knowledge) "may be alleged generally." "Conclusory allegations of scienter are sufficient if there exist[s] a minimal factual basis giving rise to a strong inference of fraudulent intent." *SEC v. Alternative Green Technologies, Inc.*, 11 Civ. 9056, 2012 U.S. Dist. LEXIS 142154 *11 (S.D.N.Y. Sept. 24, 2012) (internal quotations and citations omitted); *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir. 1987).

Under Rule 9(b), a "strong inference" of fraudulent intent can be alleged by pleading either (1) motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); *accord Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000), *cert. den.*, 531 U.S. 1012 (2000). Motive and opportunity require plausible allegations of concrete benefits that could be realized by the fraudulent conduct, and the means and likely prospect of achieving such benefits. *Id.* at 307-08. A plaintiff sufficiently pleads motive by alleging the unique, and individual, financial gain a defendant received as a result of his misconduct. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir.) *cert. denied*, 534 U.S. 1071 (2001) (reversing dismissal; motive adequately pled by allegations of "unusual" insider stock sales); *Marcus v. Frome*, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) (motive pled by allegations that the defendants personally received securities through a fraudulent purchase agreement).

Recklessness "is conduct that is highly unreasonable and 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'  Allegations of defendants' knowledge of or access to contradictory information usually are sufficient to state a claim based on recklessness."  *In re BISYS*, 397 F. Supp. 2d 430, 441(S.D.N.Y. 2005), *recon. den.*, 2005 U.S. Dist. LEXIS 28343 (S.D.N.Y. Nov. 16, 2005) (citing *In re Scholastic*, 252 F.3d at 76). Allegations of recklessness have also been sufficient where the allegations demonstrate that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Novak*, 216 F.3d at 309.  A pattern of behavior may also give rise to an inference of scienter.  *See In re Quest Communication Int'l Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1138-39, 1147 (D. Colo. 2005) (pattern of "accounting manipulations and misrepresentations" supported inference of scienter); *Pippinger v. McQuik's Oilube, Inc.*, 854 F. Supp. 1411, 1419 (S.D. Ill. 1994) (scienter "established through a pattern of intentional deception"); *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 689 (S.D. Tex. 2002).

Certain Defendants argue that to survive a motion to dismiss, a plaintiff must plead "an inference of scienter at least as likely as any plausible opposing inference," citing *Tellabs*, 551 U.S. at 308.  While this may be the law in causes of action governed by the PSLRA, it is not the law in SEC enforcement actions.  *See SEC v. Reserve Fund Mgmt. Co.*, 732 F. Supp. 2d 310, 318-19 (S.D.N.Y. 2010); *SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 263-64 (S.D.N.Y. 2009); *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008).

### B.  The Complaint Alleges Defendants' Scheme Liability

As described above, Rules 10b-5(a) and (c) prohibit the use of any "device, scheme, or artifice to defraud" or any other "act, practice or course of business which operates . . . as a fraud or deceit" in connection with the purchase or sale of securities.  Sections 17(a)(1) and 17(a)(3) of the Securities Act similarly prohibit the use of any "device, scheme, or artifice to defraud" or "course of business that operates as a fraud or deceit."  In short, these antifraud provisions – known as the scheme liability provisions – impose primary liability on any individual who "substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device . . . intended to mislead investors."  *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (emphasis omitted).  The false or misleading statements or omissions by each Defendant are evidence of Defendants' scheme.  *See In re Reserve Fund Sec. & Derivative Litig.*, 09 MD. 2011 PGG, 2013 U.S. Dist. LEXIS 141018, at *32 (S.D.N.Y. Sept. 30, 2013) ("the jury could also have found, for example, that the dissemination of statements to investors—both orally and [written] . . .  was part of a scheme to defraud.")  *SEC v. Stoker*, 865 F. Supp. 2d 457, 467 (S.D.N.Y. 2012) (denying motion to dismiss scheme liability claim, in part based on misrepresentations and omissions that were considered part of the scheme); *SEC v. Simpson Capital Mgmt., Inc*., 586 F. Supp. 2d 196, 208 (S.D.N.Y. 2008) (misstatements made by others considered part of the scheme; individuals can be liable under a scheme liability theory as "architects" or "creators" of the misstatements).

Contrary to Defendants' arguments, the Complaint alleges specific and particular facts, not mere vague conclusions or speculations, concerning each defendant's participation in the pump-and-dump scheme described above.  The goal of the scheme was to profit from the secret sale of millions of purportedly unrestricted shares obtained from each issuer and held in nominee

accounts.  Defendants met this objective in each phase of the scheme by taking control of a shell;

inflating the price and trading volume of its stock by employing misleading press releases and

public filings concealing the true ownership of the companies; and using press releases, emails

and boiler room phone calls to artificially increase demand for the stock in the guise of

"independent" research, before selling secretly-owned stock.  This type of pump and dump

scheme has been called a "classic market manipulation."  *SEC v. Cavanagh*, 98-Civ-1818DLC,

2004 U.S. Dist. LEXIS 13372, at *83 (S.D.N.Y. July 16, 2004), *aff'd*, 445 F.3d 105 (2d Cir.

2006).

### 1.      The Primary 10b-5 Fraud Claim Against Ben Kirk

In his motion to dismiss, Ben Kirk argues that the Securities Fraud claims should be

dismissed because the SEC:  (1) failed to meet the heightened pleading standards of Rule 9(b);

and (2) failed to allege scienter.  These arguments are based on a mischaracterization of the

Complaint as well as the law and his arguments are groundless.

### a.  The Commission Has Met all 9(b) Pleading Requirements

Ben Kirk asserts that the allegations are not sufficiently particularized under Rule 9(b)

because certain allegations "clump" him together with other Defendants.[5]  Based on the

Complaint, however, Ben Kirk can readily ascertain the role he played in the pump-and-dump

scheme, which is all that Rule 9(b) requires.  *See SEC v. U.S. Environmental., Inc.*, 82 F. Supp.

---

[5] Ben Kirk also argues that the complaint fails to comply with Rule 9(b) because it does not provide sufficient information concerning each of the fraudulent calls to investors and potential investors.  Such detail is not required. The complaint alleges that the Tradeshow promotion lasted from at least November 2009 through March 2010, and the Pacific Blue promotion lasted from March through August 2010.  Listing individual phone calls is not required. Where, as here, "the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct."  *U.S. v. Wells Fargo Bank*, No. 1:12-cv-07527, 2013 U.S. Dist. LEXIS 136539, at *53-54 (S.D.N.Y. Sep. 24, 2013).

2d 237, 241 (S.D.N.Y. 2000) (SEC satisfied Rule 9(b) because it "distinguished the roles of each

participant in the alleged scheme" such that each defendant could "readily ascertain what part he

is alleged to have played in the stock manipulation"); *SEC v. Badian*, No. 06 Civ. 2621, 2008

U.S. Dist. LEXIS 64661, at *13-14 (S.D.N.Y. Aug. 22, 2008) (although defendants were "almost

always named together in the complaint," Rule 9(b) was satisfied because SEC alleged that they

"operated as a unit" and that "each" defendant committed the violations in question).

     While certain allegations in the Complaint refer to multiple Defendants, this is not

improper.  Instead, it reflects the fact that groups of Defendants worked together to coordinate

different parts of the fraudulent scheme.  For example, Ben Kirk and John Kirk worked together

with Hinton and Boyle to set up ESR and Skymark (Cplt ¶ 47); Ben Kirk managed the day-to-

day operations of Skymark with Boyle (Cplt ¶ 48); and the stock sales were primarily made

through nominee accounts controlled by Ben Kirk and Boyle at Scottsdale and GGSI.  (Cplt ¶¶

160, 163)[6]

### i.    Ben Kirk's Participation in the Scheme

     As described in the Complaint (summarized in Section I.A above), Ben Kirk was one of

the main architects of the fraudulent scheme.  He set up and personally operated the Skymark

boiler-room, supervised the Skymark "account managers" and provided those "account

managers" the script to use when calling investors to tout Pacific Blue and Tradeshow, which

---

[6] Ben Kirk also claims that the Complaint's use of the phrase "the Kirks" does not give him notice of the claims
asserted under Rule 9(b).  Given that John Kirk and Ben Kirk are the only "Kirks" named as defendants, and are
alleged to have created and masterminded the scheme, the only reasonable inference is that they are "the Kirks" in
the complaint.  For the record, the SEC confirms that "the Kirks" means John and Ben Kirk.  *See SEC v. Landberg*,
836 F. Supp. 2d 148, 156 n.5-6 (S.D.N.Y. 2011) (rejecting defendant's Rule 9(b) argument based on failure to name
entities in SEC complaint; omission was immaterial because SEC staff confirmed to Defendant the identity of
certain entities).

falsely portrayed Skymark as providing independent research.  Ben Kirk also drafted and/or

approved the false statements in dozens of Skymark emails touting the companies, and he drafted

and released a fake "independent" analyst report that Skymark touted.  At the same time, he and

the rest of the Kirk/Boyle group also controlled Tradeshow and Pacific Blue, including pushing

the companies to release positive press releases and even drafting those press releases.  Ben Kirk

then made millions selling shares at the height of the pump and he concealed his ownership of

shares by transferring and selling shares through multiple nominee accounts at separate broker

dealers.  By selling his shares during the time of promotion, Ben Kirk engaged in scalping.[7]  Ben

Kirk is liable for this scalping even if he did not personally make any of the specific

recommendations to investors.  *See, e.g., SEC v. Simpson Capital Mgmt., Inc*., 586 F. Supp. 2d

196, 208 (S.D.N.Y. 2008) (scheme liability appropriate against the "architects" or "creators" of a

fraudulent scheme where others in the scheme made the misstatements to third parties).

### ii.      Ben Kirk's Control over Skymark's False Statements

In addition to the fact that Ben Kirk is liable because of his participation in the fraudulent

scheme, he is also liable for the specific misrepresentations made by Skymark to investors and

---

[7] The practice of "scalping"– recommending the purchase of a stock and immediately selling the stock without adequate disclosure regarding the intent to sell – constitutes fraud or deceit, whether considered a material omission or part of a scheme.  *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268 (9th Cir. 1979) (scalping by newspaper columnist violated Section 10(b)); *U.S. v. Wenger* 427 F.3d 840, 854 (10th Cir. 2005), *cert. den.,* 548 U.S. 913 (2006) (affirming conviction under Section 10(b) for scalping violations by radio host and stock newsletter publisher); *S.E.C. v. Huttoe*, No. Civ-A-96-2543, 1998 U.S. Dist. LEXIS 23211 (D.D.C. Sept. 14, 1998) (publisher of stock newsletter recommending penny stocks violated 17(a) and 10(b) under omission and scheme theories); *SEC v. Corporate Relations Group*, No. 6:99-CV-1222, 2003 U.S. Dist. LEXIS 24925, at *32-33 (M.D. Fla. Mar. 28, 2003) (scalping by penny stock promoters in connection with stock publications constitutes fraudulent scheme under 17(a) and 10(b)).  A person who engages in scalping assumes a duty to disclose his or her intent to sell shares for profit at the time he or she recommends the stock to others.  *See Zweig*, 594 F.2d at 1268; *Huttoe*, 1998 U.S. Dist. LEXIS 23211, at *29 (non-disclosure of scalping violated a duty of ordinary care and operated as fraud or deceit on subscribers).  The fraud lies not in the practice of selling stocks contrary to recommendations, but in the failure to disclose that practice to potential investors and readers, which constitutes material information because it reflects on the objectivity of the recommendation.  *Zweig,* 594 F.2d at 1266; *Corporate Relations Group*, 2003 U.S. Dist. LEXIS 24925, at *32-33.

potential investors pursuant to Rule 10b-5(b) and Section 17.  The Complaint details how Ben

Kirk was one of the individuals with ultimate authority over Skymark's fraudulent

representations and omissions.[8]  As detailed in section I.A above, Ben Kirk set up and personally

operated Skymark's boiler-room and he directly supervised and controlled Skymark's

employees, including instructing them to watch the movie "Boiler Room" so they would know

how to sell the shares.  Ben Kirk provided the script that the "account managers" would use

when speaking with prospective investors by the boiler room "account managers" touting Pacific

Blue and Tradeshow.  Ben Kirk drafted and/or approved the language in Skymark's false touting

emails stating that Skymark was "independent" and falsely stating that Skymark's employees

and associates did not hold any positions, shares or beneficial interest in Pacific Blue.  Ben Kirk

also drafted and released the fake "independent" analyst report predicting a $3.50-$5.00 price

target for Pacific Blue that Skymark then touted as "independent" research.  (Cplt ¶ 103.)[9]  And

---

[8] Ben Kirk argues, citing *Janus,* that because he did not communicate with investors he cannot be held liable as a primary violator for Skymark's statements.  This argument is baseless, however, because the complaint describes how Ben Kirk had ultimate authority over Skymark's false representations.  Consequently, he is liable for the misrepresentations even if he did not specifically make them and even if the statements were not attributed to him. *See Janus*, 131 S. Ct. at 2302 (under Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it").  In similar cases, courts have found that the defendants had the ultimate authority over statements not personally made by them and not attributed specifically to them.  *See Szulik v. Tagliaferri*, 12 Civ. 1827, 2013 U.S. Dist. LEXIS 119608 *47-48 (S.D.N.Y. Aug. 21., 2013) (defendants liable for misleading statements because they were alleged to have authority over such statements); *SEC v. Garber*, 12 Civ. 9339, 2013 U.S. Dist. LEXIS 57643 *18 (S.D.N.Y. April 22, 2013) (defendants liable for statements in attorney opinion letter because they solicited the letter and had ultimate authority as to whether and how to communicate it); *Elbit Sys. v. Credit Suisse Group*, 917 F. Supp. 2d 217, 228 (S.D.N.Y. 2013) ("If CSG made the misleading statements through its agent CSS, as the Complaint alleges, Janus does not absolve CSG of liability because CSG is the party with ultimate authority for the false statements")

[9] Optimistic projections of future performance are actionable under the anti-fraud provisions upon a showing that the predictions are made without reasonable basis.  *SEC v. R.A. Holman & Co., Inc.*, 366 F.2d 456, 458 (2d Cir. 1966), *cert. denied*, 389 U.S. 991 (1967) (short-term price predictions).  Ben Kirk sold shares throughout the scheme while overseeing the misleading promotion, which negates any assertion that the price predictions were made with a reasonable basis.  *SEC v. Mandaci*, No. 00 Civ. 6635, 2004 U.S. Dist. LEXIS 19143, at *34 (S.D.N.Y. Sep. 27, 2004) (granting summary judgment against penny stock promoter for price predictions made without reasonable basis; prediction not reasonable when he sold shares at much lower prices); *SEC v. Simmons*, No. 8:04 CV 2477T17-MAP, 2008 U.S. Dist. LEXIS 124078, at *37 (M.D. Fla. Apr. 25, 2008) (same).

Ben Kirk approved and/or drafted specific price projections made by Skymark, such as statements that Tradeshow and Pacific Blue would deliver 100-500% gains in its stock price. (Cplt ¶¶ 56, 102.)  Ben Kirk thus had "ultimate authority" over the fraudulent statements.

### b.  Ben Kirk Had the Requisite Scienter

The Complaint alleges a strong inference of Ben Kirk's scienter through both motive and opportunity and conscious recklessness.  With respect to motive and opportunity, Ben Kirk obtained concrete benefits through the sale of millions of shares of stock he secretly owned.  He also had the opportunity to commit fraud because he controlled Skymark's misleading promotion activities, which he used to increase demand for the stock of Tradeshow and Pacific Blue (which he also controlled).  His conduct was also highly unreasonable and extremely reckless.  Inducing investors to buy while selling vast amounts of the same stock – scalping – is itself sufficient to establish scienter.  *Corporate Relations Group,* 2003 U.S. Dist. LEXIS 24925, at *32 ("The Defendants' scalping practice – the acquisition of stock followed by the touting of that stock in an effort to drive up the price, followed by a sale of that stock at a substantial profit – shows an intent to manipulate the market in a manner proscribed by the securities laws."); *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1219-20 (W.D. Wash. 2009) ("Engaging in the well-known fraud of scalping is an 'extreme departure from the standard of ordinary care.'") (*citing SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992)).

Ben Kirk's use of multiple fake offshore nominee accounts to conceal his stock sales is further evidence of scienter.  *See SEC v. Commonwealth Chem. Securities*, 574 F.2d 90, 102 (2d. Cir. 1978) (use of "phony nominee accounts" is evidence of scienter); *Huttoe,*1998 U.S. Dist. LEXIS 23211 at *30 ("actual knowledge of the fraud he was perpetrating is strongly suggested by Terry's effort to keep his trading activity secret by purchasing Dunbar Holdings, a shell

26

corporation in the Bahamas, and by trading the stocks he scalped under the name of Dunbar

Holdings through a Canadian brokerage account").

Finally, his participation in the efforts to cover up the information contained in the

StreetSweeper.org article is highly indicative of his fraudulent intent.  *See Baena v. Woori Bank*,

515 F. Supp. 2d 414, 421 (S.D.N.Y.), *recon. den.*, 2007 U.S. Dist. LEXIS 74549 (S.D.N.Y.

2007) (citing *Powers v. British Vita. P.L.C.,* 57 F.3d 176, 185-86 (2d Cir. 1995)) ("[t]he

significance of the subsequent alleged lies is that they speak to whether defendants acted with

scienter – and intent to deceive at an earlier point in time. The subsequent lies – the cover up –, if

proven, would be strong circumstantial evidence of a bank's state of mind and intentions at the

time of entry into the two sets of agreements.  This is the sort of 'conscious behavior' which

raises an inference of an intent to defraud"); *see also SEC v. Gold,* 05-CV-4713,  2006 U.S. Dist.

LEXIS 87042 (E.D.N.Y. Aug. 18, 2006); *SEC v. Lucent Tech.,* 363 F. Supp. 2d 708, 717 (D.N.J.

2005) ("common sense dictates that actions taken after the fraud occurred can be circumstantial

evidence that the defendant had acted with the requisite state of mind.  As example, that a person

takes certain steps to cover up a misdeed is certainly relevant evidence that the person knew he

had made a mistake."); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310

(D. Utah  2007) ("[e]vidence that a defendant has taken steps to cover-up a misdeed is strong

proof of scienter").

### 2.      The Primary 10b-5 Fraud Claim Against James Hinton

In his motion to dismiss, James Hinton argues that the Securities Fraud claims should be

dismissed because the SEC (1) failed to meet the heightened pleading standards of Rule 9(b); (2)

failed to allege facts giving rise to a duty; and (3) failed to allege that Hinton sold stock and that

other allegations in the Complaint are inconsistent with a claim of scalping.

27

### a. The Commission Has Met All 9(b) Requirements

As described above with respect to Ben Kirk, the allegations in the Complaint are legally and factually sufficient for Hinton to readily ascertain the role he played in the pump-and-dump scheme, which is all that Rule 9(b) requires. The Complaint alleges that Hinton with Boyle and the Kirks set up two boiler room operations to promote Tradeshow, operating under the names Skymark and ESR. The Complaint alleges that Hinton personally made telephone calls to investors to promote the stock and in those calls identified himself as the Director of ESR. The Complaint also alleges that he misled those investors by failing to disclose his lack of independence because at the same time that Hinton was promoting Tradeshow and Pacific Blue, he was also selling his stock in those companies, receiving $21,000 in proceeds from his sale of Tradeshow stock and $12,000 in proceeds from his sale of Pacific Blue stock. In addition, the Complaint alleges that Hinton received $21,000 in proceeds from sales of Tradeshow stock by Ben Kirk-controlled entities and also received $150,000 of proceeds from sales of Pacific Blue stock. These allegations are sufficient to meet Rule 9(b) requirements. Unlike the allegations described in *In re Blech Sec. Litig.*, 928 F. Supp. 1279 (S.D.N.Y. 1996) (cited by Hinton), the allegations against Hinton are not vague, specific acts are attributed to him alone, and the acts alleged against him are not conflated with the acts of others.[10]

The SEC has also alleged Hinton's scienter pursuant to Rule 9(b) through his motive and opportunity. There can be no denying that Hinton had the opportunity to commit fraud because

---

[10] Hinton also argues that although the complaint alleges Hinton operated ESR, it fails to allege that Hinton authored, or approved emails sent by ESR, that although Hinton supervised and controlled Skymark "account managers" he may not have supervised them while they made misleading statements. Rule 9(b) does not require this level of detail. And in light of the allegations of Hinton's participation in the fraud, crediting these arguments would require the Court to draw inferences in the defendant's favor, which is inappropriate on a motion to dismiss. *See Gelfer v. Pegasystems, Inc*., 96 F. Supp. 2d 10, 16 (D. Mass. 2000) (inference in defendant's favor is "wholly inappropriate" on motion to dismiss).

he was on the phone, personally calling investors to promote the companies.  Moreover, the SEC has demonstrated motive because Hinton obtained concrete benefits by selling his own shares at inflated prices and accepting fraud proceeds from the Kirks and Boyle.  *See U.S. v. Salmonese*, 352 F.3d 608, 618 (2d. Cir. 2003) (defendant's "active participation in the 'pump' phase of the conspiracy established his strong motive to 'dump' [securities] at inflated prices").

In addition, and as described above with respect to Ben Kirk, the act of scalping itself, is demonstrative of fraudulent intent.  In response to the scalping argument, Hinton argues that the Complaint against him does not allege that he actually sold any shares of his stock.  His reading of the Complaint is extremely tortured.  The Complaint can clearly be read (and should be understood to read) that Hinton sold his own shares of both Tradeshow and Pacific Blue during the pump and received $21,000 and $12,000 respectively.[11]

### b.  Hinton's Duty Argument Fails as a Matter of Law

Citing *SEC v. Park*, 99 F. Supp. 2d 889, 899 (N.D. Ill. 2000), Hinton further argues that the SEC must allege specific facts that would give rise to a duty by virtue of a fiduciary or other type of special relationship in order to assert a scalping claim against him.  This is a complete misreading of *Park*.  To the contrary, the court in *Park* held that a duty to disclose is created simply by virtue of the fact that the person intends to engage in scalping.  In explaining the decision of the 9th Circuit Court of Appeal's decision in *Zweig,* 594 F.2d 1261, the court stated that "although [newspaper] columnists usually did not have a duty to disclose facts about their

---

[11] Hinton also argues that the SEC has an obligation under Rule 9(b) to state how much stock he owned because if he owned a de minimus amount of stock such ownership would not arguably be material to a reasonable prospective investor when making an investment decision.  This argument is baseless.  In addition to the fact that materiality is an issue generally not suited to a motion to dismiss (*see* Section II.B.3.a. below regarding materiality), it is not only his ownership of the stock that made his representations false, it is the fact that he sold his stock at the same time he was making the recommendation.

financial affairs … the columnist had assumed the duty to disclose when 'with knowledge of the

stock's market and an intent to gain personally, he encouraged purchases of the securities in the

market.'  <u>Thus, a person who intends to engage in scalping assumes a duty to disclose his interest

in the targeted stock</u>."  (emphasis added).  Pursuant to *Park*, the SEC does not have to allege an

independent duty between Hinton and the investors.  The moment Hinton started selling his

stock, he created the duty to disclose this information to the prospective investors he called.  *See

Huttoe*, 1998 U.S. Dist. LEXIS 23211 at * 29 ("[n]on-disclosure of the practice of scalping stock

recommended to Whisper Newsletter subscribers certain violated a duty of ordinary care");

*Abellan*, 674 F. Supp. 2d at 1219-20 (scalping by penny stock promoter who used a promotional

mailer and coordinated company press releases); *Corporate Relations Group*, 2003 U.S. Dist.

LEXIS 24925, at *32-33 ( use of published newsletters, magazines and other publications to

promote penny stocks not adequately disclosed in violation of antifraud provisions).

Furthermore, Hinton assumed a duty to disclose his scalping in light of Skymark's and

ESR's email disclaimers, which falsely portrayed these entities as independent.  Once Hinton

(through ESR) made an affirmative representation, he was required to make sufficient disclosure

so that his representation was not false or misleading.  It is a well-settled principle that once

disclosures are made, there is a duty to disclose all material information regardless of a fiduciary

duty owed to the shareholders. *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 756, 758 (3d Cir.

1984), *cert. denied*, 469 U.S. 1215 (1985) (citing *SEC v. Texas Gulf Sulpher Corp.*, 401 F.2d

833, 862 (2d Cir. 1968), *cert. denied sub nom. Coates v. United States*, 394 U.S. 976 (1969)).

### 3.    The Primary 10b-5 Fraud Claim Against De Beer

De Beer moves to dismiss the Complaint because (1) the alleged misstatements and omissions were not material; and (2) the SEC has not properly alleged scienter.[12] These arguments are baseless. De Beer repeatedly made statements to the public in furtherance of the scheme which were false or misleading because the Kirks' and Boyle's share ownership and control over the companies was omitted. The fact that the persons who are promoting and recommending the purchase of shares are themselves selling at current prices is clearly material. And the Complaint provides a sufficient basis to demonstrate de Beer's scienter.

### a.   De Beer's Statements Were Material

The applicable materiality standard under section 10(b) and Rule 10b-5 is set forth in *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988), where the Court held that, to fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* While the SEC will ultimately have to prove materiality to the trier of fact, as a general matter, the lack of materiality is generally considered an inappropriate basis for dismissal at the motion to dismiss stage. *In re Warnaco Group, Inc. Sec. Litig.*, 388 F. Supp. 2d 307, 313 (S.D.N.Y. 2005), *aff'd*, *Lattanzio v. Deloitte & Touch, LLP*, 476 F.3d 147 (2d Cir. 2007). Because "[m]ateriality is a mixed question of law and fact . . . a

---

[12] De Beer does not contest that he was the "maker" of these false and misleading statements or that the statements were false and/or misleading, however, he appears to argue that the SEC has not alleged that investors relied on statements by de Beer or that the misrepresentations were the proximate cause of the fraud. (De Beer Mov. Br. at 15). Of course, the SEC is not required to prove investor reliance or loss causation in an action brought under Section 10(b), Rule 10b-5 or Section 17(a). *See, e.g., SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490-91 (S.D.N.Y. 2002) (collecting cases)  To the extent that de Beer's argument is that because Trademark and Pacific Blue were such bad companies that any misrepresentation concerning who owned their shares and who was selling their shares was not material, the SEC rejects this unsupported argument. If de Beer's argument were taken to its natural conclusion, there could never be fraud involving poorly performing companies, which cannot be the case.

complaint may not properly be dismissed . . . on the ground that the alleged misstatements or
omissions are not material unless they are so obviously unimportant to a reasonable investor that
reasonable minds could not differ on the question of their importance."  *Ganino v. Cutizens Utils.
Co.*, 228 F.3d 154, 162 (2d Cir. 2000).  "At the pleading stage, a plaintiff satisfies the materiality
requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would
have considered significant in making investment decisions."  *Id.* at 162.  To be material, the
information does not need to be the type that would cause an investor to change his investment
decision.  *Id.*; *see also Folger Adam Co. v. PMI Indus., Inc*., 938 F.2d 1529, 1533 (2d Cir. 1991).

In this case, no argument can be made that the false representations were so obviously
unimportant to a reasonable investor that reasonable minds could not differ.  The concealment of
the Kirk/Boyle group's share ownership was a key component of the fraud, because Skymark
and ESR were promoting the companies as purportedly "independent" stock picks.  Investor
demand for the shares depended on this ruse.  Thus, when the StreetSweeper.org article
highlighted the connections between Tradeshow and Skymark and called into doubt this
supposed independence, Tradeshow's stock price began a precipitous fall, dropping 40% over
the next two weeks.  The fact that the share price fell after these disclosures, and that the
defendants felt it necessary to publicly refute the disclosures, sufficiently demonstrates
materiality to defeat a motion to dismiss.  *See, e.g., City of Westland Police & Fire Ret. Sys. v.
Metlife, Inc.*, 12 Civ. 0256, 2013 U.S Dist. LEXIS 28505 *26 (S.D.N.Y. Feb. 28, 2013)
("Plaintiff alleges that Metlife's shares dropped in value after the disclosures.  This is
sufficient"); *In re Sadia, S.A. Securities Litig.*, 269 F.R.D. 298, 311 (S.D.N.Y. 2010) ("A
significant price drop following a corrective disclosure demonstrates a substantial likelihood that
a reasonable investor viewed the information contained in that disclosure as having altered the

total mix of information available to investors"); *In re Regeneron Pharms, Inc. Sec. Litig.*, 03

Civ. 3111, 2005 U.S. Dist. LEXIS 1350 *63 (S.D.N.Y. Feb. 3, 2005) (rejecting materiality

argument at motion to dismiss stage finding that "[t]he materiality of the statements at issue is

underscored by the fact that the price of Regeneron's common stock plummeted almost 57% the

day the negative news was released"); *In re Audible Inc. Sec. Litig.*, No. 05-1027, 2007 U.S.

Dist. LEXIS 25068 *29 (D.N.J. April 3, 2007) (drawing all inferences in plaintiff's favor on a

motion to dismiss, the stock price drop after the announcement was made demonstrates

materiality sufficiently); *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276. 282

(E.D.N.Y. 2000) (drop in stock price supports plaintiffs' allegations of materiality making

motion to dismiss on that ground inappropriate).

De Beer argues that investors should have known that Skymark and ESR were not

independent because each disclosed that it had received $5,000 from a "third party" and would

continue to receive $5,000 per month.  As discussed in Section I.A. above, this statement was in

and of itself false and served to conceal the shared control.  There was no "third party."  Any

payments were made by the Kirks and Boyle – insiders and control persons.  Moreover, the

disclosure grossly understated the millions in profits that were actually received, and it failed to

disclose share ownership and scalping by the principals of Skymark.  In order to be effective a

warning has to disclose to investors the actual risk.  *In re Bear Stears Cos., Inc. Sec., Deriv., &*

*ERISA Litig.*, 763 F. Supp. 2d 423, 494 (S.D.N.Y. 2011) ("[t]o be 'meaningful,' a 'cautionary

statement must discredit the alleged misrepresentation to such an extent that the 'risk of real

deception drops to nil.''  True cautionary language must warn[] investors of exactly the risk that

plaintiffs claim was not disclosed" …"[W]arnings of specific risks . . . do not shelter defendants

from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks

33

described.); *In re Fannie Mae 2008 Sec. Litig.*, 2012 U.S. Dist. LEXIS 124008 *45-46 (S.D.N.Y. Aug. 30, 2012) (warnings to investors about future risks and losses do not foreclose liability for allegedly failing to disclose FNMA's current inadequate risk control measures); *SEC v. Goldstone*, No. Civ. 12-0257, 2013 U.S. Dist. LEXIS 95987 *514-515 (D.N.M. July 8, 2013) (warnings not specifically specific or cautionary and did not directly relate to the risk at issue); *SEC v. Mudd*, 885 F. Supp. 2d 654, 669 (S.D.N.Y. 2012*); In re Initial Pub. Off. Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (disclosures must "warn investors of exactly the risk that plaintiffs claim was not disclosed").

Similarly, it would be significant to a reasonable investor to know that de Beer had received $330,000 in kickbacks from the Kirks.  Secret kickback arrangements are material "because they are always corrupting" *SEC v. Savino*, 01 Civ. 2438, 2006 U.S. Dist. LEXIS 6357 *41 (S.D.N.Y.) (Daniels, J.), *aff'd in part*, 2006 U.S. App. LEXIS 30193 (2d Cir. 2006) (*quoting In re Stephes, Inc*., Release No. 33-7612, 1998 SEC LEXIS 2525 (Nov. 23, 1998); *Softpoint*, 958 F. Supp. at 863 (undisclosed payments material); *SEC v. Scott*, 565 F. Supp. 1513, 1527 (S.D.N.Y. 1983), aff'd 734 F.2d 118 (2d Cir. 1984) (kickback agreement material because it raises an inherent conflict of interest and undermines the independence of the recipient); *cf. SEC v. Kalvex, Inc*. 425 F. Supp. 310, 315 (S.D.N.Y. 1975) ("[o]ne does not elect as a director an individual who is using the corporation he represents for personal gain").

Finally, the misleading corporate resolutions and certifications to help the Kirks and Boyle deposit Tradeshow are specifically alleged to have been material, because Scottsdale and its clearing brokers required these resolutions and representations from company management as part of their due diligence process before depositing and selling Tradeshow and Pacific Blue

shares.  (Cplt ¶¶ 122-123.)  But for those representations, Scottsdale and its clearing broker were

unlikely to clear the deposits and sell the shares.

### b.  De Beer had the Requisite Scienter

De Beer argues that the Complaint does not allege his scienter because (a) he relied on

the advice of counsel and (b) the Complaint does not specifically allege that de Beer knew about

the pump-and-dump scheme.  Neither argument is persuasive.

### i.      Reliance on Counsel not Relevant for this Motion

De Beer argues that the SEC does not adequately allege scienter because he was entitled

to rely on outside counsel who "crafted the transactions, drafted the public filings and

transactional documents, and opined that the transactions were lawful."  (de Beer Mov. Br. at 13,

17).  While the SEC agrees that good faith reliance on counsel might be a "factor for

consideration" for the trier of fact who will ultimately determine the case (*See In re Reserve

Fund Secs. & Deriv. Litig.*, 09 MD 2011, 2012 U.S. Dist. LEXIS 147723, at *18 (S.D.N.Y. Sept.

12, 2012)), it is not appropriate for consideration on a motion to dismiss.  Reliance on advice of

counsel is an affirmative defense and affirmative defenses are not generally appropriate for

determination on a motion to dismiss.  *See Ortiz v. City of N.Y.*, 755 F. Supp. 2d 399, 401-02

(E.D.N.Y. 2010) ("A motion to dismiss is often not the appropriate stage to raise affirmative

defenses . . . ."); *Freudenberg v. E\* Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010)

("the existence of a trading plan pursuant to a Rule 10b5-1 plan is an affirmative defense that

cannot be considered on a motion to dismiss").  The only time an affirmative defense can be

considered on a motion to dismiss is when its validity is apparent from the face of the complaint.

The advice of counsel defense, however, is highly fact-based, making it particularly

inappropriate to consider on a motion to dismiss.  Indeed, "to establish the affirmative defense of

advice of counsel, a defendant must show (1) that he made a complete disclosure to counsel; (2) sought advice from counsel as to the legality of his actions; (3) received advice that his conduct was legal; and (4) relied on such advice in good faith." *S.E.C. v. O'Meally*. No. 06 Civ 6483, 2010 U.S. Dist. LEXIS 107696, *4 (S.D.N.Y. Sept. 29, 2010) (*citing Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994). Moreover, "[t]he counsel consulted must be disinterested and independent." *Id*. (citing *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1436 (10th Cir. 1988)). The factual requirements that de Beer must prove to validate his reliance on counsel are not readily apparent from the face of the Complaint and, indeed, the Complaint alleges anything but that counsel was disinterested and independent (it alleges that the attorneys were part of the fraudulent scheme). Because of this, the Court cannot consider his affirmative defense of reliance on counsel in connection with the motion to dismiss.

### ii.        The SEC Alleges Motive and Opportunity

The Complaint alleges that De Beer had motive and opportunity to commit fraud. He obtained concrete benefits through the receipt of over $330,000 in undisclosed kickbacks from the Kirk/Boyle group, and also received a salary and bonus from Tradeshow and Pacific Blue that was funded with fraudulent stock sale proceeds. In addition, the Complaint alleges opportunity, as the opportunity to commit fraud is generally assumed where the defendant such as de Beer is a corporate officer. *See, e.g., In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008), *aff'd*, 2009 U.S. App. LEXIS 13674 (2d Cir. 2009); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.")

### iii.        The SEC alleges Reckless Conduct

In addition to having motive and opportunity, the Complaint sufficiently alleges that de Beer either knew or was reckless with respect to his knowledge that a pump and dump was going on.  The Complaint alleges that de Beer had control over Tradeshow's shareholder records as of October 30, 3007, when he became the CEO and President of the company.  As such, when the Complaint alleges that in June 2008, Bruce Kirk gifted 43% of the outstanding shares of the company to various nominee accounts, de Beer was aware or should have been aware of these transactions.  The mere fact of this gifting was highly suspicious.  The Complaint alleges that de Beer provided the Kirks and Boyle with corporate resolutions certifications for share certificates that allowed the Kirks and Boyle to deposit shares for sale.  The Complaint alleges that de Beer knew that Skymark was promoting Tradeshow.  The Complaint alleges that John Kirk sent de Beer daily emails telling de Beer to release news and updated financials.  The Complaint alleges that John Kirk actually drafted the press releases for de Beer to release on behalf of Trademark.  By answering to the Kirks, de Beer knew that the Kirks exercised control over the company.  The Complaint alleges that while de Beer was CEO and President, Tradeshow had negligible revenues and large losses and that its operations were funded almost entirely through mysterious "private placements" that were funneled to Tradeshow from overseas accounts through the CH Trust Account.  All of these were red flags that should have alerted de Beer to the pump and dump that was going on.  As the CEO and President of the company, de Beer had a fundamental obligation to investigate these warning signs.  This is the epitome of recklessness, and de Beer cannot "escape liability for fraud by closing his eyes to what he saw and could readily understand."  *See, e.g.*, *SEC v. McNulty*, 137 F.3d 732, 737 (2d Cir.), *cert. den.*, 525 U.S. 931 (1998) (finding requisite scienter based on defendant's failure to investigate suspicious

behavior); *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 398 (2d Cir.), *cert.*

*den.*, 414 U.S. 910 (1973) (a defendant cannot plead ignorance of the facts where there are

"warning signals" or other information that should put him on notice of either misrepresented or

undisclosed facts); *SEC v. Czarnik*, 10 Civ. 745, 2010 U.S. Dist. LEXIS 125463 *29 (S.D.N.Y.

Nov. 29, 2010); *SEC v. Ramiol Mgmt. Ltd.*, 01 Civ. 9057, 2007 U.S. Dist. LEXIS 79581 *9

(S.D.N.Y. Oct. 25, 2007) (recklessness where lawyer "egregiously refus[ed] to see the

obvious.").  Moreover, the same pattern of behavior by de Beer with Tradeshow was repeated

with Pacific Blue at an even more egregious level.  De Beer was appointed by the Kirks to be a

director of a company along with Joel Franklin who at the time was a residential house painter

with no experience managing publicly traded companies.  Moreover, in connection with the

Pacific Blue fraud, de Beer received shares pursuant to an Affiliate Stock Purchase Agreement,

which falsely stated that de Beer had purchased 15 million shares of the company's stock (40%)

for $80,000, which de Beer knew was false because he did not pay any consideration for the

shares.  The pattern of suspicious behavior with Pacific Blue again should have alerted de Beer

to the fact that there was a pump and dump taking place and further demonstrates his

recklessness.

      Finally, the Complaint alleges that de Beer received a significant amount of

compensation from the Kirks ($330,000) that was not disclosed.  The receipt of this money, by

itself, should have been a red flag that unlawful activity was taking place.

      For the reasons described, the SEC has sufficiently alleged de Beer's scienter, either on

the basis of motive and opportunity or on the basis of his egregious and reckless conduct.

### 4. The Primary 10b-5 Fraud Claim Against Carrillo

In his motion to dismiss, Carrillo asserts the following arguments: (1) the SEC has not alleged that he made any misrepresentations and that pursuant to the Supreme Court's decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), he cannot be held liable for the statements of others; (2) the SEC has not pled scheme liability because it has not alleged deceptive acts outside of the alleged misstatements; (3) the opinion letters are not alleged to be both objectively and subjectively false; and (4) that the opinion letters are not statements made in connection with the purchase or sale of a security.[13]

#### a. *Janus* is not Applicable to the SEC's Scheme Liability Claims

In *Janus*, the Supreme Court held that in misrepresentation cases brought under Section 10b-5(b) of the Exchange Act, the only persons that can be held liable for the misrepresentation are the ones who made the statement. In defining who is a maker, the Supreme Court held that the statements needed to be attributed or attributable to the defendant or the defendant had to the person with the ultimate authority over such statement. Carrillo's *Janus*-premised argument is unavailing because it does not apply to cases brought under 10b-5(a) or (c). *See, e.g., Garber*, 2013 U.S. Dist. LEXIS 57643, at *14 (S.D.N.Y. Apr. 22, 2013) ("The textual basis for *Janus* does not extend to claims based on schemes to defraud under Rule 10b–5(a) and (c), which do not focus on the "making" of an untrue statement"); *SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377, 421 (S.D.N.Y. 2012); *SEC v. Boock*, No. 09-cv-8261, 2011 U.S. Dist. LEXIS

---

[13] Carrillo also argues that his role was simply as an attorney, and that a higher duty of care must be exercised by the Commission before pursuing fraud charges against attorneys, citing *SEC v. Spongetech Delivery Systems, Inc.*, No. 10-CV-2031, 2011 U.S. Dist. LEXIS 26146 (E.D.N.Y. March 14, 2011).  However, *Spongetech* was different because a preliminary injunction was sought against the attorney, causing the court to apply more rigorous scrutiny. The Commission here is not seeking a preliminary injunction, but intends to apply for relief after a full hearing on the merits.

129673, at *5-6 (S.D.N.Y. Nov. 9, 2011) (liability under Rule 10b-5(a) & (c) was not affected by *Janus*). As described above, in scheme liability cases, individuals can be held liable even where someone else makes a fraudulent misstatement. *See, e.g., SEC v. Simpson Capital Mgmt., Inc*., 586 F. Supp. 2d 196, 208 (S.D.N.Y. 2008).

### b. The SEC has Properly Alleged Deceptive Acts

Carrillo argues that the SEC has failed to properly plead scheme liability because the SEC does not allege any deceptive acts by the Defendants beyond their misrepresentations. Consequently, Carrillo claims that the SEC is trying to bypass the elements necessary to impose misstatement liability under Rule 10b-5 by labeling the misconduct as a scheme rather than a misstatement. Carrillo's argument is misguided and should be rejected.

The fact that a defendant's deceptive conduct is related to misrepresentations made by that same defendant or others does not preclude the SEC from also asserting scheme liability claims against that defendant. In *VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011), for example, the Second Circuit Court of Appeals found that defendant's submission of orders after 4:00 pm for execution as the current day's NAV was an implied representation that could form the basis of a claim under Rule 10b-5(b). At the same time, the Court held that the following deceptive acts could form the basis of a scheme liability claim under Rules 10b-5(a) and (c) even though those acts were directly related to the implied representation:

> his "secur[ing] a new clearing broker for [Pritchard Capital Partners] knowing that its order entry system, MFRS, provided an opportunity to place orders after 4:00 p.m. and still receive that day's NAV, unlike the Firm's previous clearing broker"; his use of "time-stamped trade sheets to disguise the fact that [his] customers made trading decisions after the close of trading"; and his false assurances to Pritchard that he "had not been allowing customers to place orders after 4:00 p.m. and had never done so."

Id. at 139.  The relationship between the misrepresentations in *VanCook* and the

deceptive acts is no different from the relationship between the representations made in the

instant case and the deceptive acts of Carrillo, Huettel and CH in furtherance of the scheme.

Similarly, in *Alternative Green*, 2012 U.S. Dist. LEXIS 142154 at *17-18, the court held that the

fabrication and backdating of corporate documents as well as the issuance of assurances to

convince a transfer agent to remove the restriction from stock certificates were all inherently

deceptive conduct in furtherance of the scheme.  *See also SEC v. Brown*, 740 F. Supp.2d 148,

171-72 (D.D.C. 2010) (SEC stated a scheme liability claim against defendant Prince based on his

failure to file statements of holdings and transactions in the issuer's securities as required under

Section 16(a) of the Exchange Act); *SEC v. Mercury Interactive, LLC*, No. 5:07-cv-02822, 2011

U.S. Dist. LEXIS 134580 *6-7 (N.D. Cal. Nov. 22, 2011) (defendant's selection of effective

grant dates to maximize the personal benefit to the grantees and to prepare the necessary

paperwork to effect those grants "encompasses enough conduct beyond the concealment of the

compensation expenses to state a viable claim of scheme liability"); *SEC v. Kearns*, 691 F.

Supp.2d 601 (D.N.J. 2010) (CFO of the company could be held liable under a scheme liability

theory based upon the fact that the CFO knew of the billing scheme, permitted the scheme to

continue by implementing inadequate investigations when claims of fraud were made and by

affirmatively misleading the company's auditors); *SEC v. Fraser*, No. CV-09-00443, 2010 U.S.

Dist. LEXIS 7038 (D. Ariz. Jan. 28, 2010) (while  defendant's conduct was related to the

misrepresentations in the public filings, the court held that scheme liability properly was

alleged); *SEC v. Geswein*, 5:10CV1235, 2011 U.S. Dist. LEXIS 111904 (N.D. Ohio), *adopted,

rejected, and modified in non relevant part*, 2011 U.S .Dist LEXIS 111898 (N.D. Ohio Sept. 29,

2011) (court holds that allegations against defendant sufficient to allege scheme liability as to

improper use of bill and hold transactions, fraudulent manipulation of reserves, used equipment write-ups, and improper capitalization of reserves, even though these actions all related to the representations made in periodic filings and disseminated to investors).  Indeed, when the complaint has alleged a scheme with some deceptive acts, the complaint sufficiently states a claim against defendants whose only act in furtherance of the scheme was a misrepresentation. *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 11 Civ. 4209, 2013 U.S. Dist. LEXIS 43774 *42-44(S.D.N.Y. March 27, 2013) (three individual defendants could be held liable under scheme liability simply on the basis of the representations that they made in furtherance of the scheme).  And courts have recognized in cases involving illegal issuances of stock and pump and dump schemes, that all conduct in furtherance of the scheme is inherently deceptive.  *See SEC. v. Drucker*, 76 Civ. 2643, 1983 U.S. Dist. LEXIS 13442 (S.D.N.Y. Sept. 26, 1983) (describing plan to evade Rule 144 that had been "engineered and controlled by the defendant" as scheme, device or other artifice to defraud).  These cases all make clear that the SEC has properly alleged scheme liability against Carrillo.

    As detailed in Section I.D. above, Carrillo and Huettel engaged in multiple deceptive acts.  They helped the promoters acquire the Pacific Blue shell and arranged to distribute shares in 4.9% increments to give the misleading impression that shares were held by various independent entities.  Carrillo and Huettel drafted sham "Non-Affiliate" and "Affiliate" share purchase agreements (Carrillo signed the "Non-Affiliate" agreement on behalf of the fake nominee entities).  Even if Carrillo did not "make" statements in Pacific Blue's public filings, he drafted and approved misleading statements in those filings that were false and misleading for failure to disclose the stock ownership and promotion by the Kirk/Boyle group.  Carrillo also instructed Franklin to sign misleading "Related Party" worksheets and sent them to be relied

upon by Pacific Blue's auditors.  Carrillo used the CH Trust Account to facilitate the purchase of

the Pacific Blue shell and allowed the account to be used to funnel sale proceeds from offshore

accounts to John Kirk and Hinton as their de facto bank accounts.  Carrillo also profited from

shares that he deceptively arranged for his father to hold as a nominee, and controlled and

provided instructions to the broker where the sales of the Dr. Carrillo shares were made.  Finally,

evidence indicates that Carrillo and Huettel destroyed CH Trust Account records.  Each of these

deceptive acts serves to demonstrate his participation in the scheme.

### c.  The Opinion Letters were Attributable to Carrillo and in Connection with the Purchase and Sale of a Security

Carrillo's memorandum of law contains a section entitled "The Opinion Letters are not

Attributable to Carrillo." Notwithstanding the heading title, this section of Carrillo's

memorandum of law does not address whether or not the opinion letters are attributable to him.

Indeed, it would be difficult for him to make this argument since the opinion letters that he

attaches as exhibits (b)-(d) to his motion to dismiss are all signed by him.  *See e.g., Johnson v.*

*Sequans Communications S.A.*, 11 Civ. 6341, 2013 U.S. Dist. LEXIS 8115 *26 (S.D.N.Y. Jan.

17, 2013) (executive can be held accountable for statement that he signed).

Carrillo also argues that the opinion letters were not issued "in connection with" the

purchase or sale of any security because they were not issued to the investing public.  (Carrillo

Mov. Br. at 12).  This is not the standard.  Although the misrepresentations may not have been

made to the investing public, they meet the "in connection with" and "in the offer or sale"

requirements.  *See United States v. Naftalin*, 441 U.S. 768, 772, 773 (1979) (false statements

made within "the entire selling process" form a basis for liability under Section 17(a) of the

Securities Act.); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)

("[t]he requisite showing … is deception in connection with the purchase or sale of any security,

not deception of an identifiable purchaser or seller").  The Supreme Court has "espoused a broad interpretation" of the required nexus: "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or someone else."  *Id.*  In fact, the nexus requirement for both Section 10(b) and 17(a) is met when attorney opinion letters are sent only to transfer agents and not made available to the investing public, because they were made in connection with the issuance of stock.  *See Czarnik* at *3-4; *Greenstone Holdings* at *5.  As described in the Complaint, in order to deposit and sell thinly-traded, low-priced securities such as Pacific Blue, clearing and introducing brokers required legal opinions vouching for the unrestricted status of Pacific Blue shares.  Carrillo and Huettel provided these misleading opinion letters to facilitate the deposit and sale of these shares.  (Cplt ¶ 129.)  The opinion letters thus meet the nexus requirements of the securities laws.

Carrillo similarly argues that he cannot be held liable for the opinion letters because the Complaint does not allege that Carrillo had reason to expect that the opinion letters would be relied upon by parties other than to whom the letters were addressed (the brokerage firm or DTC).  This argument fails, however, as it is well-established that the SEC does not need to prove reliance in its enforcement actions.  *See, e.g., SEC v. Obus*, 06 Civ. 3150, 2010 U.S. Dist. LEXIS 98895*27 (S.D.N.Y. Sept. 20, 2010) (Daniels, J.), vacated on other grounds, 693 F.3d 276 (2d Cir. 2012) ("the SEC need not prove reliance"); *SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) (Daniels, J.) (same); *Savino*, 2006 U.S. Dist. LEXIS 6357 at*46.

### d.  Carrillo is Liable for the False Statements in the Opinion Letters

Carrillo argues that because the opinion letters contained statements of opinion, the SEC must allege that the statement was objectively and subjectively false.  This argument fails for several reasons:  (1) the fraudulent statements in the opinion letters were factual statements, not

opinions; (2) even if the relevant statements in the opinion letter were opinions, Carrillo did not

meet his burden of care with respect to those opinions; and (3) in any event the Complaint

alleges that Carrillo knew that these statements were false.

### i.     The Fraudulent Statements are not Statements of Opinion

While Carrillo's fraudulent statements were contained in attorney opinion letters, that fact

alone does not make them statements of opinion.  *See In re OSG Securities Litig.*, 12 Civ. 7948,

2013 U.S. Dist. LEXIS 129164 *23 (S.D.N.Y. Sept. 10, 2013) ("auditors may not shield

themselves from liability under Section 11 merely by using the word 'opinion' as a disclaimer").

Rather, to be considered statements of opinion, the statements must concern matters that are

"inherently subjective" rather than "matters of objective fact."  *Id.*  In OSG, the court held that

the applicability of a tax provision does not fall into the category of inherently subjective matters

and consequently, statements of tax liabilities were not opinions.  *Id.*

Here as well, the actionable statements are not inherently subjective and are thus, not

opinions.  Rather, the actionable statements in the opinion letters provided by CH in furtherance

of the Pacific Blue phase of the scheme were mere representations of fact as the Complaint

describes:

> On or about November 23, 2009, CH provided two opinion letters (signed by
> Carrillo) to Scottsdale, falsely stating that shares owned by Ben Kirk and Boyle's
> nominee entities "*are fully registered, unrestricted, . . . free trading*" shares.
> (Cplt ¶ 130)
>
> On or about March 2, 2010, CH provided an opinion letter (drafted by Huettel and
> signed by Carrillo) to the Depository Trust Company (DTC) falsely stating that
> shares owned by Boyle's nominee entity "*are freely transferrable without*

*registration under the Securities Act by a holder which is not an 'affiliate' of the Company as defined in Rule 144(a)(3)[14] under the Securities Act.*" (Cplt ¶ 131)

On or about April 21, 2010, CH provided an opinion letter (signed by Carrillo) to Scottsdale falsely stating that shares Ben Kirk owned through GGSI "*have been registered under the Securities Act of 1933*" and "*we are not aware of any other agreement or understanding that would preclude [GGSI] from selling …*" the shares. (Cplt ¶ 132)

Because these statements are statements of fact and are neither opinions nor inherently subjective statements, the SEC does not have the burden to allege subjective falsehood.

> **ii.      Even if the False Statements were Opinions, the SEC Alleges that Carrillo Did Not Meet his Duty of Care**

Even if the statements contained in the opinion letters were opinions, the SEC does not have to allege that Carrillo did not believe the opinions.  The SEC meets its burden where it alleges that Carrillo knew that there was no reasonable basis for his opinion.

In *Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006), the District of Columbia Circuit Court summarized the requisite duty of care for an attorney such as Carrillo.

> Under the securities laws, a statement of opinion includes an implied representation that the speaker rendered the opinion in good faith and with a reasonable basis.  Good faith alone is not enough.  An opinion must have a reasonable basis, and there can be no reasonable basis for an opinion without a reasonable investigation into the facts underlying the opinion.  [Defendant attorney] thus implicitly represented that he had conducted "a reasonably sufficient examination of material legal and factual sources and [had] reasonable certainty as to the subjects addressed therein.

*See also In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 496 (S.D.N.Y. 2005)

(accountant's scienter may be established where accountant refuses "to investigate the doubtful" or made "judgments [that] … were such that no reasonable accountant would have made the

---

[14]  Rule 144(a) defines an *affiliate* of an issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  17 C.F.R. § 230.144

same decisions if confronted with the same facts"); *Universal Express,* 475 F. Supp. 2d at 424.

Thus, "[r]epresenting information as true while knowing it is not, recklessly misstating

information, <u>or asserting an opinion on grounds so flimsy as to belie and genuine belief in its</u>

<u>truth, are all circumstances to support a conclusion of scienter</u>."   *SEC v. Greenstone Holdings*,

No. 10 Civ. 1302, 2012 U.S. Dist. LEXIS 44192, at *22 (S.D.N.Y. Mar 28, 2012) (emphasis

added) (granting summary judgment against attorney based on opinion letters for failure to

investigate and "avoidance of the true facts") (*quoting Weiss*).   Similarly, a disclaimer stating

that the attorney "had made no 'independent investigation' of the representations" in an opinion

does not permit an attorney to "escape liability for fraud by closing his eyes to what he saw and

could readily understand."  *SEC v. Czarnik*, 2010 U.S. Dist. LEXIS 125463, at *6, 28 (*quoting*

*McNulty*, 137 F.3d at 737).[15]

### iii.       The SEC has also met the Subjective Falsehood Standard

Even if the statements in the opinion letter were opinions and even if Carrillo is right

concerning the appropriate standard, the SEC has still met its pleading burden because it has

alleged facts demonstrating that Carrillo subjectively knew that the representations contained in

the opinion letters were false.  As described in the Complaint, Carrillo knew that the Pacific Blue

shares owned by Ben Kirk and Boyle were not "registered" under the Securities Act.  They knew

that the shares issued in the 2010 securities offering (the distribution by the Kirk/Boyle group)

---

[15] These principles still remain after the decision of the Second Circuit Court of Appeals in *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011).  In *City of Westland Police & Fire Retirement Sys. v. Metlife, Inc.*, 928 F. Supp. 2d 705 (S.D.N.Y. 2013), the court stated that the "key question at this [motion to dismiss] stage is whether plaintiff has alleged that the defendants did not actually believe the IBNR reserve estimates of needed reserves when reported 'or knew that [they] had no reasonable basis for those estimates."  As the court described, nothing in *Fait* suggested that "statements of opinion made in the knowledge that the opinions expressed were baseless are not actionable misstatements"

could not legally be considered "registered" under the Form SB-2 filed by the predecessor entity

(Descanso) in 2007, because registration statements are transaction specific.  (*See* Section III.B.

below)  And they knew that no valid exemption existed.  (Cplt ¶ 134.)  Thus, the shares should

have been "restricted" shares and could not have been "free trading" shares.[16]  In addition, at the

time they wrote the opinions, Carrillo knew that he and his firm had designed a transaction that

concealed the group ownership and control of the Pacific Blue shell.  Because they designed and

documented the transaction, Carrillo knew that the Kirk/Boyle nominees were acting as a group

and thus should be considered "affiliates" of the issuer under Rule 144(a).  As discussed in

Section V.B.4 and 5 above, Carrillo affirmatively helped the Kirks and Boyle mask their

ownership and control by transferring blocks of shares through offshore nominee entities.  He

knew that John Kirk paid 90% of the purchase price, because Carrillo facilitated the sale through

the CH Trust Account.  Carrillo helped the Kirk/Boyle group acquire the Pacific Blue shell and

arranged to distribute shares in 4.9% increments to the nominee entities to give the misleading

impression that shares were held by various independent entities.  And he drafted sham "Non-

Affiliate" and "Affiliate" share purchase agreements (Carrillo signed the "Non-Affiliate"

agreement on behalf of the fake nominees).  All of these facts alleged in the Complaint

demonstrate that Carrillo knew that the statements contained in the attorney opinion letters were

false.

---

[16] Free trading shares are generally understood to be shares of stock that are "free of any restrictive legends."  *SEC v. Cavanaugh*, No 98 Civ. 1811, 2004 U.S. Dist LEXIS 13372, at *71 (S.D.N.Y. July 16, 2004), *aff'd* 445 F.3d 105 (2d Cir. 2006); *see also SEC v. Forest Resources Mgmt. Corp.*, No 09 Civ. 0903 (JSR), 2010 U.S. Dist. LEXIS 50203, at *1 (S.D.N.Y. May, 18 2010) (discussing scheme to issue "purportedly free-trading shares" of stock, that is, stock "without the restrictive legend").  Contrary to the arguments of certain Defendants, the phrase is not impermissibly vague.

### 5.    The Primary 10b-5 Fraud Claim Against Huettel

The arguments made by Huettel are largely duplicative of the arguments made by

Carrillo and fail for the same reason.  For example, Huettel argues that he cannot be liable under

*Janus* for the statements made by others.  As described above, however, *Janus* does not apply to

scheme liability cases and, as such, the SEC does not have to allege that he made any

misrepresentations in order to establish liability against scheme for his participation in the

scheme, which is detailed above.  With regard to the fraudulent misrepresentation case against

him, Huettel argues that the statements in the opinion letters are opinions and, the SEC has not

met its pleading obligations regarding opinions. He also argues that the opinion letters were not

in connection with the sale or purchase of securities. These arguments are addressed above with

respect to Carrillo and are not repeated here.  In this section of the memorandum of law, we

address two arguments made by Huettel:  (1) that he cannot be held liable because his name is

not on any of the opinion letters and, as such, it cannot be said that he made any of those

statements; and (2) that he is not alleged to have had the requisite scienter.

Huettel asserts that he did not "make" any statements in the opinions because he did not

sign them.  It is alleged, however, that Carrillo and Huettel worked together to provide the

opinions, and that Huettel specifically drafted the March 2, 2010 DTC opinion.  The letter is sent

by CH, it is not limited to Carrillo (even though Carrillo signed) and the letters specifically

describe "we" as the maker, not "I."  Because Carrillo and Huettel were the only two named

partners in the firm, Huettel as well as Carrillo can be deemed to have "ultimate authority" over

the content of the opinions.  *See, e.g.*, *Janus*, 131 S. Ct. at 2302 (attribution can be implicit from

surrounding circumstances); *SEC v. Levin*, No. 12-21917-CIV, 2013 U.S. Dist. LEXIS 146702

*43 (S.D. Fla. Oct. 10, 2013) (managing member and owner of company had sufficient control

over the statements); *In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 288

(S.D.N.Y. 2012) (reasonable fact finder could conclude that in a company with a few employees,

the statements were made by its officers); *In re Merck & Co., Deriv. & ERISA Litig.*, MDL No.

1658, 2011 U.S. Dist. LEXIS 87578 *25 (D.N.J. Aug. 8, 2011) (senior executive liable as maker

of company's financial statements).  Moreover, there is nothing that precludes Carrillo and

Huettel from both being makers of the statements.  *SEC v. Pentagon Capital Mgmt. PLC*, 2013

U.S. App. LEXIS 16402 (2d Cir. Aug. 8, 2013) (holding that there can be more than one maker

of a statement in certain circumstances).

      With respect to his scienter, the SEC sufficiently alleges that Huettel had motive and

opportunity and that his acts were at least reckless.  Like a number of the other Defendants,

Huettel seeks to impose a greater pleading requirement for scienter than that required.  As

numerous courts have held, "knowledge, and other conditions of a person's mind may be alleged

generally" and even conclusory allegations are sufficient if there exists a minimal factual basis

for those allegations.  *See, e.g., Alternative Green*, 2012 U.S. Dist. LEXIS at * 11; *U.S. Envtl,

Inc.*, 82 F. Supp. 2d at 240-41 ("a plaintiff 'cannot be expected to plead a defendant's actual state

of mind'").  Moreover the PSLRA "strong inference" requirement applied by some courts does

not apply to SEC enforcement actions and notably none of the cases cited by Huettel for this

standard are SEC enforcement cases.  *Reserve Fund*, 732 F. Supp. 2d at 319 ("Those courts in

this Circuit that have directly addressed the issue have declined to apply the PSLRA's 'strong

inference' standard to Commission enforcement actions, and that is the approach this Court will

adopt").  Under these standards, it is clear that the SEC has met its pleading requirement here,

particularly given that Huettel asserted his Fifth Amendment privilege during the investigation

and refused to testify.  With respect to motive, Huettel obtained concrete benefits, in the form of

sale proceeds of the Dr. Carrillo block of Pacific Blue stock that were shared with him.  Huettel

had the opportunity to (and did) participate in the fraudulent scheme by drafting misleading

statements by Pacific Blue and drafting misleading documents that served to conceal the

Kirk/Boyle group's share ownership so that those shares could be deposited and sold.  Huettel's

recklessness is further demonstrated because he knew, or was reckless in not knowing, about the

use of nominee entities because he and Carrillo designed the 4.9% structure.  He also knew that

substantial funds were passing through the CH Trust Account.  The presumed destruction of the

CH Trust Account records by Carrillo and Huettel provides further evidence of scienter.

### 6.        The Primary 10b-5 Fraud Claim Against Carrillo Huettel LLP

The arguments made by CH are similar to the arguments made by Carrillo and Huettel

individually and the SEC refers CH to its arguments above.  Moreover, the facts supporting

scheme liability charges against the firm are the same facts that support charging its two

principals as primary violators of the antifraud provisions.  The firm's liability in this matter is

derivative of that of its two partners (Carrillo and Huettel); partners are agents of the partnership,

and "[a]n act of a partner, including the execution of an instrument in the partnership name, for

apparently carrying on in the ordinary course the partnership business or business of the kind

carried on by the partnership binds the partnership," unless the partner lacked authority.  West's

Ann.Cal.Corp.Code § 16301.  The firm does not contest that Carrillo and Huettel's acted, with

authority, in their capacity as partners in the firm.  With respect to state of mind, Carrillo's

knowledge and Huettel's knowledge, and thus scienter, are each imputed to the partnership.  *See*

West's Ann.Cal.Corp.Code § 16102(f) ("A partner's knowledge, notice, or receipt of a

notification of a fact relating to the partnership is effective immediately as knowledge by, notice

to, or receipt of a notification by the partnership . . ..").  This principle applies in securities fraud

cases.  *See, e.g. Frank v. Dana Corp.*, 646 F.3d 954, 963 (6th Cir. 2011) ("Because plaintiffs have

adequate pleaded scienter as to [CEO and CFO] they have also pleaded scienter as to [the

company]"); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ("Because the

complaint adequately alleges that [the president and CEO and the CFO] had the scienter to

defraud, those allegations are also sufficient to alleged scienter to defraud on behalf of [the

company] itself"); *SEC v. Morriss*, No. 4:12-CV-80, 2012 U.S. Dist. LEXIS 151885 *28 (E.D.

Mo. Sept. 21, 2012) ("the scienter of the senior officers of corporations may be attributed to

corporations under the securities laws …."); *Hall v. The Children's Place Retail Stores, Inc.*, 580

F. Supp. 2d 212, 234 (S.D.N.Y. 2008) ("Plaintiffs have sufficiently alleged that Dabah and Riley,

as agents of the corporation, have committed culpable acts with the requisite scienter. Therefore,

their acts and accompanying scienter are attributable to [the company]")

### 7.    The Primary 10b-5 Fraud Claim Against GGSI

GGSI makes the following arguments in its motion to dismiss regarding the primary

fraud claims against it:  (1) that the Complaint does not allege that GGSI made false

representations to any investor or potential investor; (2) that GGSI cannot be held responsible

under Janus for the statements made by others; and (3) the Complaint does not allege scienter.

Notably, GGSI does not contest that it made certain statements to U.S. brokers for the

purpose of depositing and selling shares; or that the statements were false.  Instead, GGSI asserts

that its representations are inactionable because they were not made to "the public" or to

"potential investors" in Tradeshow or Pacific Blue.  (GGSI Mov. Br. at 7)  This argument

misreads the standard.  Although the misrepresentations were not made to the investing public,

they meet the "in connection with" requirement, which is read broadly to encompass false

statements made within "the entire selling process."  *See, e.g., Dabit*, 547 U.S. at 85; *Naftalin*,

441 U.S. at 772, 773; *S.E.C. v. C. Jones & Co.*, 312 F. Supp. 2d 1375, 1381 (D. Colo. 2004) (false statements made in Form 211 concealing share ownership and control which enabled the stock to be publicly traded meet the "in connection with" requirement); *Graham v. S.E.C.*, 222 F.3d 994, 1002-1003 (D.C. Cir. 2000) (requirement met in stock kiting scheme in which brokers and clearing firms were defrauded in violation of Rule 10b-5) *SEC v. Drucker*, 76 Civ. 2643, 1983 U.S. Dist. LEXIS 13442, at *79 (S.D.N.Y. Sept. 26, 1983) (finding liability under Section 17(a) for scheme that included, among other things, not disclosing material facts to "the attorneys who prepared Rule 144 opinion letters . . . [the] transfer agent [or] . . . the broker-dealer approached to transact the sale").

GGSI also appears to suggest that because the false statements were not made to investors, they were not material.  This argument, while couched in materiality terms, appears to be that because the investors did not receive these misrepresentations, they could not have relied on such misrepresentations.  As set forth above, however, reliance is not an element in SEC enforcement actions.  *See, e.g., Obus*, 2010 U.S. Dist. LEXIS 98895 at *27 ("the SEC need not prove reliance").  To the extent, however, that GGSI is, in fact, arguing materiality, the Complaint sufficiently alleges that GGSI's concealment of Ben Kirk's beneficial ownership through the use of nominees was material to the "dump" for multiple reasons.  First, but for GGSI's acts of concealment, the shares would not have been purportedly unrestricted and eligible for deposit and sale without registration.  These misrepresentations mattered to the introducing and clearing broker, because shares sold by or on behalf of an "affiliate" of the company are generally considered "underwriter" sales and are ineligible for the Section 4(1) exemption unless additional Rule 144 requirements are met.  *See* 17 C.F.R. § 230.144. Facilitation of the share deposit depended on representations that the depositor was unrelated to

the company.  In addition, concealment of beneficial ownership was important to investors

because Skymark and ESR falsely claimed to provide "independent" research.  The concealment

of beneficial ownership was material because it perpetuated the illusion that purportedly

unrestricted Tradeshow and Pacific Blue stock was held by a number of unrelated investors,

thereby implying that the market for the stock would operate as a free market should.  Instead,

virtually all of the purportedly unrestricted stock was held and controlled by the Kirk/Boyle

group of entities.  There is a substantial likelihood that a reasonable investor would have

considered it important to know that most of the purportedly unrestricted stock on the market

was actually controlled by the same group of promoters that were urging investors to purchase

stock, and that any stock purchased on the market would likely be purchased from these insiders.

"The gravamen of manipulation is deception of investors into believing that prices at which they

purchase and sell securities are determined by the natural interplay of supply and demand, not

rigged by manipulators."  *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

GGSI's argument that the SEC's Complaint against it is insufficient because of *Janus*

likewise fails.  As alleged in the Complaint, GGSI actually made misrepresentations in DSR

forms and affidavits it provided to correspondent brokers, misleadingly stating that various

nominee entities were the sole beneficial owners of Ben Kirk's shares.  These statements, signed

by Davis as President on behalf of GGSI, were "made" by GGSI.  As such, the cases cited by

GGSI, including *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011), are factually

distinguishable.  GGSI was not just the drafter of statements in a prospectus, it actually made the

statements to the correspondent brokers under the authority of Davis, GGSI's President.  Once

GGSI made a statement regarding material facts, it was under a duty to do so truthfully.  *See,*

*e.g., SEC v. Syron*, No. 11 Civ. 9201, 2013 U.S. Dist. LEXIS 48183 (S.D.N.Y. Mar. 28, 2013).

In addition to its fraudulent misrepresentation claim against GGSI, the Complaint also alleges fraud based on scheme liability.  As set forth above, *Janus* does not apply to scheme liability cases.  With respect to scheme liability, GGSI not only made misleading statements, but engaged in manipulative acts by providing a platform for the "dump" portion of the scheme through nominee accounts.  Its uses of nominee accounts constituted deceptive acts in furtherance of the scheme.  GGSI maintained at least three separate nominee accounts for Ben Kirk in the name of fake nominee entities that he controlled.  After misrepresenting the beneficial ownership of Ben Kirk's Tradeshow and Pacific Blue shares, GGSI sold those shares to the public on his behalf, received and held over $3.8 million of fraudulent sale proceeds, and wired those funds to other offshore accounts.

With respect to motive, the Complaint alleges that GGSI acted with conscious recklessness.  It falsely represented that Ben Kirk's shares were owned by other offshore entities, and knew these representations were false because they contradicted the information in the account documentation GGSI maintained for Ben Kirk's nominee accounts.  *See In re BISYS*, 397 F. Supp. 2d at 441 (recklessness demonstrated by knowledge of or access to contradictory information).  In addition, the Complaint alleges red flags sufficient to warn GGSI that a pump and dump scheme was taking place, including that it was selling large blocks of low-priced, thinly-traded issuers through multiple nominee accounts at GGSI that had been established to conceal Ben Kirk's ownership.  Indeed, GGSI was particularly positioned to understand the implication of these very signs.  Its business model was based on providing a platform for microcap stock promoters to secretly dump shares while concealing their identities.

GGSI also had motive and opportunity.  GGSI was motivated to conceal Ben Kirk's activities because that is precisely the service GGSI provided.  Its business model (as it touted to

prospective clients) was to conceal beneficial ownership, GGSI took steps to do so, and as a broker executing trades on behalf of its clients, the most reasonable inference is that GGSI obtained concrete benefits in the form of commissions and fees for executing the "dump" portion of the scheme.

### C.  The Section 17 Claims are Adequately Pled against all Defendants

Because the SEC has adequately pled claims against each defendant under Section 10(b) and Rule10b-5, it has adequately pled each corresponding scheme and misstatement claim under Section 17(a).  As the Second Circuit has held:  "the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (*citing SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996), cert. den., 522 U.S. 812 (1997)).  The SEC's allegations of scienter are certainly sufficient to meet the negligence pleading requirements for its 17(a)(2) and (3) claims.

The only defendant who makes an independent Section 17(a) argument is De Beer, who claims that 17(a) applies only to actual "sellers" of stock, and that the claim against him should be dismissed because he did not personally sell shares.  (de Beer Mov. Br. at 15).  This argument relies on a phrase pulled out of context from *Aaron v.* SEC, 446 U.S. 680, 687 (1980), and has been routinely rejected by courts in this district.  *See Czarnik*, 2010 U.S. Dist. LEXIS 125463 at *11 (rejecting argument that 17(a) requires that the defendant be an actual seller or offeror of securities); *Badian*, 2008 U.S. Dist. LEXIS 64661 at *19-20 (same).  There is no requirement under Section 17(a) that the defendant be an actual seller of securities, in part because the statutory language of 17(a) is read broadly and includes the important qualifier "directly or

indirectly." *Czarnik,* 2010 U.S. Dist. LEXIS 125463, at *11.  De Beer, in fact, did obtain money

or property in connection with the fraudulent Kirk/Boyle sales – he received kickbacks and also

profited through salary and bonus from the companies, which were funded through the illegal

stock sales by the Kirk/Boyle group.  In this context, his statements to the public (such as those

in periodic filings) satisfy the "in the offer or sale" element of Section 17(a) and the "in

connection with" element of Section 10(b), as do corporate resolutions and representations used

to facilitate the deposit and sale of shares.

No other defendant appeared to raise a distinction between 17(a)'s "in the offer or sale"

and 10(b)'s "in connection with the purchase or sale" nexus, and any such argument has been

waived.  However, as both nexus requirements are read broadly, the same conduct suffices to

meet both standards.  *See Naftalin,* 441 U.S. at 772-73 (1979) (false statements made within "the

entire selling process" are sufficiently "in the offer or sale of securities" as encompassed by

Section 17(a) of the Securities Act).  *Mudd,* 885 F. Supp. 2d at 669-70 (Section 17(a)(2)

adequately pled where a corporate executive directly "obtained money or property for his

employer while acting as its agent" or "personally obtained money indirectly from the fraud"),

*quoting SEC v. Stoker,* 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012).

### D.  The Aiding and Abetting Claims are Adequately Pled Against all Defendants

To establish liability for aiding and abetting, the Commission must show: (1) a primary

violation; (2) a general awareness or knowledge by the alleged aider and abettor that his role was

part of an overall activity that was improper; and (3) knowing and substantial assistance by the

alleged aider and abettor in the conduct that constitutes the violation.  *SEC v. Apuzzo,* 689 F.3d

204, 211 (2d Cir. 2012), *cert. den.,* 133 S.Ct. 2855 (2013).  Carrillo, Huettel, CH, GGSI, and de

Beer are liable for aiding and abetting certain primary violations of Section 10(b) of the

Exchange Act and Rule 10b-5 thereunder, based on substantially the same facts that support

charging them as primary violators of the antifraud provisions.

### 1. Carrillo, Huettel and CH Aided and Abetted PBEC's Primary Violations of Section 10(b) and Rule 10b-5(b) thereunder

The SEC alleges that Carrillo, Huettel, and CH each aided and abetted primary violations

by their client Pacific Blue; specifically, Pacific Blue's false and misleading statements that they

drafted or approved.  These Defendants contend that the SEC has not alleged that they had

"actual knowledge" of wrongdoing.  It is well-settled, however, that the allegation of actual

knowledge does not have to be based on a defendant's explicit acknowledgment of the fraud.

*See JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 249 (S.D.N.Y.2005); *Kottler v.*

*Deutsche Bank AG*, 607 F. Supp. 2d 447, 465 (S.D.N.Y.2009) (false paper trail created to

minimize the appearance of fraudulent tax shelters sufficient to allege aiding and abetting

liability against the developer of the fraudulent strategy).[17]

As discussed in Sections I.D. and II.B.4 and II.B.5 above, Carrillo, Huettel, and CH

possessed "actual knowledge' of their client Pacific Blue's violations because Carrillo, Huettel,

and CH facilitated John Kirk's purchase of the Pacific Blue shell, they designed the transaction

that allowed the Kirks to conceal ownership in 4.9% blocks of shares to nominee entities under a

sham "Non-Affiliate" agreement, they knew about the Kirks' ownership, control and sales of

shares while promoting Pacific Blue stock, and knew that they provided  false opinion letters to

---

[17] The Dodd–Frank Financial Reform Act, enacted on July 21, 2010, clarified that the knowledge standard for aiding and abetting liability is satisfied by reckless conduct.  15 U.S.C. § 78t(e).  Although much of the alleged conduct pre-dates July 21, 2010, for activities after that date the standard is recklessness.  There is some dispute as to whether the pre-Dodd-Frank allegations require actual knowledge or extreme recklessness (*i.e.* scienter).  *See SEC v. Aronson*, 11-Civ-7033, 2013 U.S. Dist. LEXIS 114687 at *33-34 (S.D.N.Y. Aug. 6, 2013) (noting disagreement and applying an actual knowledge standard for pre-Dodd-Frank conduct); *Pentagon Capital Mgmt.*, *PLC,* 844 F. Supp. 2d at 413 (applying extreme recklessness).

facilitate the sale of the Kirks' stock.  (Cplt ¶¶ 79-87, 129-134).  Carrillo and Huettel knew that

the Kirks controlled Pacific Blue based on emails and discussions with the Kirks that

demonstrated that the Kirks were exercising control, and knew that the company was funded by

$2 million in private placement funds the Kirks facilitated.  (Cplt ¶¶ 87, 90).  Here, Carrillo,

Huettel and CH acted with scienter sufficient to meet the "actual knowledge" standard for the

aiding and abetting claim, because they actually knew that the Kirks were in control.  *JP

Morgan*, 406 F. Supp. 2d at 249.

Carrillo, Huettel, and CH also "substantially assisted" the securities violations.  The

substantial assistance prong requires that a defendant "in some sort associate[d] himself with the

venture, that [the defendant] participate[d] in it as in something that he wishe[d] to bring about,

[and] that he [sought] by his action to make it succeed."  *Apuzzo*, 689 F.3d at 212 (alteration in

original) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).  *Apuzzo* held that

the Commission successfully met this standard by pleading that a defendant agreed to participate

in and negotiated the details of certain transactions, signed agreements that he knew were

designed to conceal fraudulent activity and approved invoices related to the fraud.  *Id*. at 214.

Contrary to Carrillo and Huettel's assertions, a showing of proximate cause is not required.  *Id.*

at 213.

Here Carrillo, Huettel, and CH actively facilitated and caused Pacific Blue to make false

statements covering up the Kirk/Boyle group's role, despite knowing about the Kirk/Boyle

group's ownership and control.  As detailed in Section I.D. above, Carrillo and Huettel drafted

every one of Pacific Blue's false and misleading SEC filings.   Carrillo instructed Franklin to

sign misleading "Related Party" worksheets to be relied upon by Pacific Blue's auditors.   In

addition, Huettel and Carrillo wrote false opinion letters; designed the 4.9% share transaction

and drafted sham "Non-Affiliate" and "Affiliate" share purchase agreements. Finally, Carrillo, Huettel, and CH allowed their attorney trust account to be used as a de facto bank account for the Kirks' proceeds. (Cplt ¶¶ 3, 79-87, 129-134.) These allegations are sufficient to allege that Carrillo, Huettel, and CH substantially assisted Pacific Blue's primary violations.

    2.      **GGSI Aided and Abetted Ben Kirk's violations of Section 10(b) and Rule 10b-5(b) and rules 10b-5(a) and (c) thereunder**

Notwithstanding GGSI's assertion that it did not have knowledge or provide substantial assistance to the scheme to support its aiding and abetting claim (GGSI Mov. Br. at 16-17), the Complaint amply alleges both. As discussed in Section II.B.7. above, GGSI *knew* that its representations regarding beneficial ownership of Ben Kirks's shares were false because they contradicted the account documentation GGSI maintained for Ben Kirk's nominee accounts. GGSI also knew that Ben Kirk acted to conceal his beneficial ownership by using multiple nominee accounts at GGSI. As detailed in Section II.B.7. above, GGSI provided substantial assistance in support of the scheme by providing misleading representations concealing Ben Kirk's ownership in order to facilitate the deposit and sale of shares, and also sold shares on Ben Kirk's behalf through nominee accounts for millions of dollars in proceeds. GGSI thus actively aided and abetting the scheme as something it wished to bring about and make succeed. *See, e.g., Apuzzo*, 689 F.3d at 212-214.

    3.      **De Beer Aided and Abetted the Kirks' and Boyle's Violations of Section 10(b) and Rule 10b-5(b) thereunder**

Contrary to de Beer's assertion otherwise (de Beer Mov. Br. 20-21), the Complaint sufficiently pleads "actual knowledge" and "substantial assistance" by de Beer of the Kirks' and Boyle's primary violations of Section 10(b) and Rule 10b-5(b) thereunder. As detailed in Section II.B.3.b. above, De Beer knew that the Kirks, ESR and Skymark were falsely claiming to

be independent in their emails and phone calls to investors.  (Cplt ¶ 63).  De Beer knew that the

Kirks were undisclosed control persons of Tradeshow and Pacific Blue, and knew they were

working to promote the stock while selling shares because he provided corporate resolutions to

allow those shares to be deposited and sold.  (Cplt ¶¶ 123-124).  De Beer also provided

substantial assistance to the Kirks to facilitate their trading.  He made misleading statements that

concealed the Kirks' control status in corporate filings and provided misleading corporate

resolutions and certifications allowing the Kirks and Boyle to deposit shares for sale.    And after

the StreetSweeper article highlighted the Kirks' shared control of Tradeshow and Skymark, de

Beer coordinated with the Kirks to conceal their role and deny the true facts.  (Cplt ¶¶ 69-75).

These allegations are sufficient to make out an aiding and abetting claim against de Beer.  *See,*

*e.g., Apuzzo*, 689 F.3d at 212-214.

### E.  The SEC Has Adequately Alleged Control Person Liability

To establish control person liability under Section 20(a) of the Exchange Act, a plaintiff

must show: (1) a primary violation of the Act by the controlled person (in this case, Ben Kirk, de

Beer and Hinton); (2) control of the primary violator by the controlling person; and (3) "that the

controlling person was in some meaningful sense a culpable participant in the fraud perpetrated

by the controlled person."  *First Jersey*, 101 F.3d at 1472 (quotations and citations omitted).

Control is generally understood as "the power to direct or cause the direction of the

management and policies of the primary violator."  *Id.* at 1472-73 (quotation marks omitted).

Contrary to Ben Kirk and de Beer's unsupported assertion (*see* B. Kirk Mov. Br. at 15-16; de

Beer Mov. Br. 21-22), cases in this District have repeatedly held that allegations of control are

evaluated under the liberal pleading standard of Rule 8(a), not under a standard requiring

particularized allegations.  *See, e.g., Stillwater*, 858 F. Supp. 2d at 286 ("Allegations of control

are not averments of fraud and therefore need not be pleaded with particularity." (citations and quotation marks omitted)); *In re AIG 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 535 (S.D.N.Y. 2010) ("At the pleading stage, allegations of a Section 20(a) defendant's control need not be set forth with particularity."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 474 (S.D.N.Y. 2010) ("Allegations of control are not averments of fraud . . . . [T]he extent to which control must be alleged will be governed by Rule 8's pleading standard." (citations and quotation marks omitted)); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009) ("Control allegations are evaluated under the liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a)."). Accordingly, "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required." *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2003); *see also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 516-17 (S.D.N.Y. 2005) ("The allegations of control here are not extremely detailed, but they do not need to be at this stage, where they are governed by Rule 8."). The Complaint easily meets this standard.

Judges in this District disagree about whether "culpable participation" is a pleading requirement, as opposed to an element that has to be proved at trial to negate the affirmative defense of good faith.[18] Even if "culpable participation" is a pleading requirement, however,

---

[18] *Compare, e.g., In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307-10 (S.D.N.Y. 2005) (culpable participation not a pleading requirement); *WorldCom*, 294 F. Supp. 2d at 414-15 (same); *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (same), *with In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 598 (S.D.N.Y. 2010) (Section 20(a) plaintiff must allege culpable participation); *Moody's*, 599 F. Supp. 2d at 517 (same); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008) (same).

that is met with a showing of scienter, which as described above, has been pled for each of the defendants. *See, e.g.*, *MBIA*, 700 F. Supp. 2d at 598; *Moody's*, 599 F. Supp. 2d at 517.

### 1.     Ben Kirk

Ben Kirk's asserts that the Complaint does not establish his control over Skymark, but notably contains no case citation beyond the "particularized facts" standard, which, as noted above, is not the standard of this District.  Even relying solely only on the paragraphs Ben Kirk cites in his motion,[19] under this District's standard, the Commission has alleged that Ben Kirk's controlled Skymark.  *See Parmalat*, 376 F. Supp. 2d at 516-17.  As Ben Kirk noted (B. Kirk Mov. Br. at 16), Complaint ¶ 199 alleges that "Ben Kirk exercised actual power or control over Skymark, including through managing its operations, directing its strategy, and possessing authority to execute documents on its behalf."  Paragraph 51, also cited by Ben Kirk, alleges that "The Kirks and Boyle drafted and/or approved multiple false or misleading statements in Skymark . . . stock-touting emails."  Ben Kirk "drafted and/or approved" false statements sent by Skymark, including false representations that Skymark was independent and did not hold any beneficial interest in Pacific Blue.  (*Id.* ¶ 50).  These are clear allegations, taken, for the purposes of this motion, as true, showing Ben Kirk's control over Skymark – its sole purpose was to provide drafted statements to the market.  Ben Kirk's role both in drafting and/or approving these statements shows his control over Skymark.  So does Ben Kirk's involvement in providing Skymark's "account managers" with scripts to tell investors when calling to promote Tradeshow and Pacific Blue Stock.  B. Kirk Mov. Br. 16-17; (Cplt ¶ 52).

---

[19] For clarity's sake the Commission notes that the reference on 16 of Ben Kirk's memo to ¶ 99 should be ¶ 199 and the reference on 17 to ¶ 53 should be ¶ 52.  The quotation on 16 reflects language in ¶ 199 and the quotation on 17 contains language from ¶ 52 that is not in ¶ 53.

Ben Kirk's memo of law omits additional allegations demonstrating Ben Kirk's control. Notably, "Ben Kirk . . . told Skymark 'account managers' to watch the movie 'Boiler Room' to learn how to promote stocks. (Cplt ¶ 53). This allegation is as specific as it gets regarding *how* Ben Kirk controlled Skymark's management *and* policies. Ben Kirk acted to conceal Skymark's connection to Tradeshow once an article appeared in TheStreetSweeper.org highlighting connections. (Cplt ¶¶ 69-75). These allegations provide further specificity regarding *how* Ben Kirk controlled Skymark. It is clear from the Complaint that Skymark was controlled by Ben Kirk, (Cplt ¶ 2), because "Ben Kirk . . . ran [Skymark's] day-to-day operations" (*id*. ¶ 29), Ben Kirk set up Skymark in 2009 (*id*. ¶ 47), and "Ben Kirk . . . operated Skymark from Calgary. Alberta" (*id*. ¶ 48). The Complaint sufficiently alleges control person liability against Ben Kirk. *See, e.g., Parmalat*, 376 F. Supp. 2d at 516-17.

### 2.    De Beer

De Beer argues only that the Complaint has not alleged his culpable participation. (de Beer Mov. Br. at 22) Whether or not that is a pleading requirement, because the Complaint adequately alleges de Beer's scienter for the underlying violations (Section II.B.3.b above), his culpable participation has been amply pled. De Beer does not appear to contest that he was a control person of both Tradeshow (as Chief Executive Officer and President) and Pacific Blue (as a Director and Chairman of the Board). [20] Control is sufficiently pled by alleging a defendant's status as a high-ranking executive of the company. *See, e.g., Moody's*, 599 F. Supp.

---

[20] Executives such as de Beer who are senior enough to sign a company's SEC filings are presumed to satisfy Section 20(a)'s requirement of control. *See, e.g., Lewy v. SkyPeople Fruit Juice, Inc.*, 11 Civ. 2700, 2012 U.S. Dist. LEXIS 128416, at *34-37 (S.D.N.Y. Sept. 7, 2012); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008).

2d at 517 (CEO, COO and Group Managing Director each had control); *Sgalambo,* 739 F. Supp.

2d at 487 (CEO, President/COO, and Executive Chairman each had control).

### 3.      Hinton

Hinton's primary argument is that the SEC has failed to allege that he possessed "the

power to direct or cause the direction of the management and policies of the person."  (Hinton

Mov. Br. at 14 quoting *Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569, 2001 U.S. Dist. LEXIS

3167 at *26 (S.D.N.Y. March 23, 2001) (citation omitted)).  In so doing, Hinton ignores the

allegations in the Complaint that:  (1) "Hinton exercised actual power and control over Emerging

Stock Report, including through his ownership, managing its operations, directing its strategy,

and possessing authority to execute documents on its behalf."  (Cplt ¶ 206); (2) Hinton "sen[t]

investors false and misleading email blasts from [a] stock-touting website[] [he] controlled . . .

Emerging Stock Report" and that he, along with the Kirks and Boyle, "hired a 'boiler room' of

individuals who called U.S. investors to tout the stocks, falsely claiming [Emerging Stock

Report] [was] providing independent research."  (Cplt ¶ 2); (3) "Hinton ran the day-to-day

operations of ESR." (*Id*. at ¶ 30).  These allegations are clearly sufficient even under the cases

cited by Hinton.  In *Maidstone*, the court found control person liability adequately pleaded when

the plaintiff alleged that the defendant had the ability to release purchasers from a contract and

also that the defendant 'engineered' the transaction at issue in that case.  2001 U.S. Dist. LEXIS

3167 at *32.  The SEC's allegations are at least as compelling as those in *Maidstone*.

Hinton tries to argue that by alleging that Hinton called himself a director since at least

June 2010, the SEC concedes that he was not a control person before that time.  The SEC's

Complaint in no way suggests that June 2010 was the first time Hinton viewed himself as a

"director."  But even if Hinton only became a director of ESR in June 2010, there are allegations

that Hinton controlled ESR prior to June 2010, including that he ran the day-to-day operations of the company.  Hinton suggests that this allegation could be construed that Hinton was only a "general office manager" (Hinton Mov. Br. at 15), but this argument requests an exculpatory inference in his favor and ignores the other allegations demonstrating his control (he was *not* simply collecting mail and handling ministerial functions).  For instance, the SEC's Complaint alleges that "Hinton set up" the "boiler-room" ESR in 2009 and had numerous communications with investors where he recommended Tradeshow.  (Cplt ¶¶ 27, 60).  Hinton also argues there is an inconsistency with Hinton's running ESR while being 750 miles away in Calgary.  (Hinton Mov. Br. at 15).  Setting aside that Hinton is not alleged to have worked *only* from Calgary, companies can be controlled from a distance through email and telephone and websites obviously may be accessed and run from multiple locations – particularly a company such as ESR whose function was largely to disseminate false information on a website.  Hinton also argues that John Kirk's concurrent role as a control person of ESR means that Hinton is not *also* a control person of ESR.  This, however, is not the law as more than one person can control an entity.  *See, e.g. Food & Allied Service Trades Dept. v. Millfeld Trading Co., Inc.*, 841 F. Supp. 1386, 1388-89, 1391 (S.D.N.Y. 1994).

## III.   THE SEC HAS PLEADED PRIMA-FACIE SECTION 5 CLAIMS

To establish a prima facie case for a violation of Section 5, the Commission need only allege that:  (1) no registration statement was filed or was in effect as to the securities in question; (2) that the defendant, directly or indirectly, sold or offered to sell these securities; and (3) that in connection with the offer or sale, there was a use of interstate transportation, or communication in interstate commerce, or of the mails.  *SEC v. Cavanaugh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998); *Opulentica,* 479 F. Supp. 2d at 328-29.

Scienter is not required to establish a violation of Section 5 of the Securities Act. *Softpoint*, 958 F. Supp. at 859-60. Section 5 is a strict liability statute. *Ramoil*, 2007 U.S. Dist. LEXIS 79581 at *27-30.

In addition, liability under Section 5 does not require that the defendant actually offer or sell securities himself. *SEC v. Verdiramo*, 10 Civ. 1888, 2011 U.S. Dist. LEXIS 101856 *32-33 (S.D.N.Y. Sept. 9, 2011). All that is required is that the defendant "was a 'necessary participant' or 'substantial factor' in the illicit sale." *Id.* The "necessary participant" test "asks whether, but for the defendant's participation, the sale transaction would not have taken place." *Universal Express,* 475 F. Supp. 2d. at 424. To qualify as a "substantial factor," a defendant need not be a "prime mover[]" but only be shown to have "tak[en] 'steps necessary to the distribution' that [were] not so slight that [they] could be described as *de minimis*." *SEC. v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970).

The Complaint includes allegations that satisfy each of the required elements to plead a *prima facie* case for a Section 5 violation. The Complaint alleges: (1) that no registration statements were filed or in effect with the Commission for any of Defendants' securities sales (Cplt ¶ 9); (2) that Defendants effectuated the sale of the unregistered securities (Cplt ¶ 9); and (3) that Defendants used instruments of interstate commerce and communication, including telephones and the mails, in connection with the sale of these securities in the "over-the-counter" market (Cplt ¶¶ 26, 27, 223). Accordingly, the Commission has stated a *prima facie* Section 5 claim against the Defendants and Defendants do not dispute this point.

### A. Ben Kirk's Pleading Argument is Groundless

Ben Kirk, without citing *any* legal authority, attacks the Complaint under a non-existent pleading standard of specificity for Section 5 claims, stating that "the complaint is utterly devoid

of any details concerning these purported transactions, including, when the shares were sold, who they were sold to, the price at which they were sold, or whether Ben Kirk personally participated in or directed the sale." (Ben Kirk Mov. Br. at18). This argument has been rejected by the courts that have addressed it. As the Ninth Circuit Court of Appeals has stated, "[a]ppellants' first charge that the complaint fails to state sufficient facts concerning the offers or sales of securities. This charge rests on a misconception of the pleading requirements under Section 5 of the Securities Act. Contrary to appellants' assertion, violations of section 5 do not sound in fraud and are not subject to the requirement of Rule 9(b) that fraud claims be pleaded with particularity. Rather, the SEC need only comply with the notice-pleading requirements of Rule 8(a)." *SEC v. Burnett Grey & Co.*, No. 92-55361, 1993 U.S. App. LEXIS 25453 *4 (9th Cir. Sept. 2, 1993); *SEC v. Levin*, No. 12-21917-CIV, 2013 U.S. Dist. LEXIS 20027 (S.D. Fla. Feb. 14, 2013) ("A Section 5 violation does not require any allegation of misrepresentation or omission that would raise the same sort of reputation concerns when pled in conjunction with a fraud claim. Accordingly, Rule 9(b) does not apply …."); *SEC v. Fisher*, No. 07-CV-12552, 2008 U.S. Dist. LEXIS 24184 (E.D. Mich. March 27, 2008) (rejecting argument that the complaint did not provide sufficient detail concerning the registration violations).

As noted above, the Complaint plainly alleges a *prima facie* case against Kirk, alleging that "In 2009 and 2010 . . . Ben Kirk . . . arranged to illegally sell or offer to sell millions of Tradeshow shares for which no registration statement was in effect." (Cplt ¶ 135). The Complaint also alleges that Ben Kirk was an "underwriter" in the illegal distributions of Tradeshow and Pacific Blue shares (Cplt ¶¶ 138, 146). The Complaint alleges a prima facie Section 5 violations against Ben Kirk for which he asserts no legitimate defense.

### B.  Carrillo, Huettel, and CH Were "Necessary Participants"

Carrillo's, Huettel's and CH's primary argument concerning the SEC's Section 5 claims is that none had a "significant" role in the offering or served as a "necessary participant" or "substantial factor" in the transaction.  For example, CH argues that the Section 5 claims should be dismissed because the "allegations . . . establish that, at best, it played the *de minimis* role of an easily replaceable and insignificant pawn in the alleged scheme."  (CH Mov. Br. at 24).

The writing of opinion letters in connection with a distribution, such as those purporting to justify the removal of restrictive legends, is not a *de minimis* act; it is a crucial part of a scheme to sell unregistered securities.  Simply on the basis of the opinion letters that they wrote, the attorney defendants can be held liable under Section 5.  *See SEC v. Greenstone Holdings, Inc.*, 10 Civ. 1302, 2013 U.S. Dist. LEXIS 97107 *6 (S.D.N.Y. July 10, 2013) ("CST required a legal opinion letter providing the authority to issue the unregistered shares without a restrictive legend.  It would not have issued the shares without Sourlis's letter.  This is sufficient to hold an attorney liable under Section 5"); *Spongetech*, 2011 U.S. Dist LEXIS 26146 (issuing preliminary injunction against attorney stating that "the SEC has made a substantial showing that [attorney] violated Section 5 because [company] issued unregistered stock for unrestricted sale and [attorney] was a necessary participant and substantial factor in making the unregistered offerings" by virtue of the attorney letters he authored); *Czarnik*, 2010 U.S. Dist. LEXIS 125463 at *38 (denying attorney's motion to dismiss, stating that "[a] reasonable fact finder could infer that the transfer agents would not have issued the securities without [attorney's] documents"); *Ramoil*, 2007 U.S. Dist. LEXIS 79581 at *27-30 (corporate counsel violated Section 5 as a necessary participant by virtue of his opinion letter).

While the opinion letters alone are sufficient to ground liability against the attorney defendants, that is not all that the SEC alleges against them.  Rather, the SEC alleges that these defendants played "a significant role in the Pacific Blue offering and served as necessary participants and substantial factors in the distribution."  They designed the acquisition using 4.9% blocks of shares, provided documents and instructions directing Pacific Blue's transfer agent to issue shares, and Carrillo instructed Franklin to execute a resolution incorrectly certifying that the shares were not being deposited by an 'affiliate'.  They also drafted agreements for John Kirk's distribution of shares in private transactions."  (Cplt ¶ 152).  These allegations are also sufficient to state a claim against the lawyer defendants.  *Murphy*, 626 F.2d at 651-52; *Universal Express*, 475 F. Supp. 2d at 422 ("An indirect participant . . . may nevertheless be liable [if] the defendants' acts were a 'substantial factor in the sales transaction.'").

Huettel's assertion that he was not the "maker" of any fraudulent statements under *Janus* is of no moment.  Misrepresentations are not an element of a Section 5 claim.  Nor is scienter. *See, e.g., SEC v. Tecumseh Holdings Corp.*, No. 03 Civ. 5490, 2009 U.S. Dist. LEXIS 119869 (S.D.N.Y. Dec. 22, 2009); *Softpoint*, 958 F. Supp. at 859-60.  Consequently, even assuming that the lawyer defendants were not architects of the scheme or were not the most culpable of the defendants does not provide a defense.

Carrillo separately argues that the Pacific Blue common shares were in fact registered through the September 5, 2007 Form SB-2 filed by Descanso, the predecessor entity of Pacific Blue.  (Carrillo Mov. Br. at  22).  The Descanso Form SB-2, however, was filed well before the Kirks and Carrillo purchased all outstanding shares and took control of the company, replaced management, renamed the company Pacific Blue, and arranged for the redistribution of all

outstanding shares.  The 2010 distribution at issue in this case was a new offering and required

its own registration statement.  *Universal Express*, 475 F. Supp. 2d at 422 ("Registration of a

security is 'transaction specific,' in that the requirement of registration applies to each act of

offering or sale; proper registration of a security at one stage does not necessarily suffice to

register subsequent offers or sales of that security"); *SEC v. iBIZ Tech. Corp.*, CV 06-502, 2008

U.S. Dist. LEXIS 107297 *6 (D. Ariz. July 21, 2008) ("Each sale of a security must either be

made pursuant to a registration statement or be exempt from registration").  Indeed, Carrillo's

argument – that once a registration statement is filed for any sale of a security, subsequent sales

of that security do not need to be registered – was rejected by the Second Circuit Court of

Appeals.  *Cavanagh*, 155 F.3d at 133-34.  The 2007 form thus has no relevancy or application to

the 2010 securities offering at issue.

Carrillo also appears to argue that he is not liable under Section 5 because he personally

is not an underwriter, issuer, or dealer.  (Carrillo Mov. Br. at 23)  This argument misses the

point.  Carrillo was both a "necessary participant" and "substantial factor" in the facilitation of

an unregistered distribution by those who are statutory underwriters, issuers or dealers.  *Murphy*,

626 F. 2d at 651-52.  Consequently, he is liable regardless of his personal status.

### C.  GGSI and Davis are Liable Under Section 5

GGSI/Davis argue that they not liable under Section 5 because (1) their sales are

exempted under Section 4(a)(4) as "broker's transactions;" and (2) there were not "necessary

participants" or "substantial factors" in sales by other Defendants.  Neither argument has merit.

As a threshold matter, the SEC need not plead the inapplicability of an exemption, as the

party claiming exemption from registration requirements bears the burden of proving that the

exemption applies. *See SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953); *Cavanagh*, 445 F.3d at

105 ("once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption"); *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1311 (2d Cir. 1977); *Opulentica*, 479 F. Supp. 2d at 328; *SEC v. Parnes*, 01 Civ. 0763, 2001 U.S. Dist. LEXIS 21722 *20 (S.D.N.Y. Dec. 26, 2001).  In this case, Gibraltar/Davis do not contest the SEC's prima facie Section 5 case.  Rather, they allege that they are exempted because their transactions were "broker's transactions."  As described below, the issue of whether or not a broker can make use of this exemption is highly fact-dependent and is not appropriate for resolution on a motion to dismiss.  For this reason alone their motion should be dismissed.

Section 4(a)(4) of the Securities Act provides that the provisions of Section 5 shall not apply to "brokers' transactions executed upon customers' orders on any exchange or in the over-the –counter market but not the solicitation of such orders."  Rule 144(g) however contains important limitations on this exemption, including (1) that the broker does no more than execute the order to sell the securities as agent for the person for whose account the securities are sold; and (2) "[a]fter reasonable inquiry is not aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is a part of a distribution of securities of the issuer."  The exemption is not available where the broker has failed to make a reasonable inquiry:

> [A] dealer who offers to sell, or is asked to sell a substantial amount of securities must take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship with an issuer or underwriter. For this purpose it is not sufficient for him merely to accept "self-serving statements of his sellers and their counsel without reasonably exploring the possibility of contrary facts."  The amount of inquiry called for necessarily varies with the circumstances of particular cases.

*In the Matter of Jacob Wonsover*, 1999 SEC LEXIS 430 *28 (Commission Order, March 1, 1999) (quoting *Distribution by Broker-Dealers of Unregistered Securities*, Rel. No. 33-4445,

1962 SEC LEXIS 74 (Feb. 2, 1962)).  Absent a reasonable inquiry, a broker who participates in

the unregistered sale of securities violates Section 5 of the Securities Act.  The issue as to

whether Gibraltar/Davis conducted a reasonable inquiry, of course, is fundamentally fact-based

and cannot be determined on a motion to dismiss.  The SEC has alleged that numerous red flags

existed that would necessitate a more robust inquiry, including GGSI's own fraudulent

misrepresentations, the sale of blocks of a low-priced, thinly-traded issuer and Ben Kirk's acts to

conceal his beneficial ownership by transferring and selling shares through multiple nominee

accounts at GGSI.  (Cplt ¶¶ 140-141, 156)  In light of the numerous red flags surrounding Ben

Kirk's sales, there was a need for a "searching inquiry" into the Tradeshow and PBEC stock that

it deposited and sold.  GGSI did not conduct a reasonable inquiry.  "GGSI knew that it was

maintaining these nominee accounts beneficially owned by Ben Kirk in addition to his personal

account and that there was no readily apparent legitimate purpose for these accounts."  (*Id.* ¶

115)  And GGSI/Davis affirmatively helped Ben Kirk conceal his beneficial ownership of shares

from Scottsdale.  (*Id.*)  Thus, these allegations show that GGSI *knew* that Ben Kirk had multiple

nominee accounts at GGSI and it still *failed* to conduct a "reasonable inquiry" to be sure that

these transactions were not involving an issuer, or a person in a control relationship with an

issuer or underwriter.  These transactions were *not* "brokers' transactions" under Section 4(a)(4).

GGSI/Davis also violated Section 5 in connection with Tradeshow as a necessary

participant and/or substantial factor in Ben Kirk's sales of unregistered stock.  Davis, as

president of GGSI, signed the misleading documentation, provided to Scottsdale, concealing Ben

Kirk's beneficial ownership in furtherance of the deposit and sale of shares.  (Cplt ¶ 142).  As the

SEC's Complaint alleges, when Davis signed representations verifying the identity of its

customers, "GGSI knew that Ben Kirk was the beneficial owner of the Tradeshow and Pacific

Blue shares, not the nominee entity." (*Id.* ¶ 119).  Contrary to GGSI's Memorandum (21-22),

the Complaint alleges that GGSI *knew* that it was disguising Ben Kirk's ownership of nominee

entities concealing his ownership of Tradeshow shares.  But for Davis/GGSI's representations

concealing Ben Kirk's ownership, the unregistered distribution in which Ben Kirk sold

Tradeshow shares would not have occurred.  Defendants, such as GGSI and Davis, which

"'misrepresent[] the relevant facts in order to facilitate the distributions [of unregistered

offerings]'" may be liable as necessary participants and substantial factors for Section 5

violations.  *Alternative Green*, 2012 U.S. Dist. LEXIS 142154 (denying defendants' motion to

dismiss for fraud and Section 5 violations).  Thus, the Complaint sufficiently alleges that Davis

was a "necessary participant" and "substantial factor."

### D. De Beer Was a "Necessary Participant"

Contrary to de Beer's feeble argument that he was *not* a "necessary participant" and

"substantial factor" in the offer and sale of unregistered securities in violation of Section 5 (de

Beer Mov. Br. 22-23), the Complaint sets forth allegations that de Beer was a but for cause of the

unregistered distributions.  For instance, the Complaint alleges that "De Beer provided the Kirks

and Boyle with misleading corporate resolutions and certifications on behalf of Tradeshow that

allowed them to deposit shares for sale." Cplt ¶ 123.  The Complaint goes on to allege specific

instances in which de Beer signed corporate resolutions in furtherance of the unregistered

distributions for both Tradeshow and PBEC.  *Id.* at ¶¶ 124-128, 154.  De Beer also received over

$330,000 in secret sales proceeds from the illegal public distributions.  *Id.* at ¶ 139.  De Beer

falsely states that the Complaint does *not* allege that de Beer was "one who plan[ned] the scheme

or at least [was] a substantial motivating factor behind it," but the Complaint does just that.  de

Beer Mov. Br. 22-23 quoting *SEC v. Elliot*, No. 09 Civ. 7594, 2011 U.S. Dist. LEXIS 91946 at

*20 (S.D.N.Y. Aug. 11, 2011).  But for de Beer's resolutions concealing ownership of shares in Tradeshow and Pacific Blue, the unregistered distributions would not have occurred – de Beer was a "necessary participant" and a "substantial factor" in both companies' unregistered distributions.  *See, e.g., Murphy*, 626 F.2d at 633.

### E.  Dr. Carrillo Is Liable for Section 5 Violations

Dr. Carrillo argues that the Complaint does not allege that he offered PBEC stock, and also that the allegations are insufficient that he passed title.  (Dr. Carrillo Mov. Br. at 9)  When securities are not registered, which is undisputed here, however, Defendants do *not* have to sell shares directly to be liable for a Section 5 violation.  *Zacharias v. SEC*, 569 F.3d 458, 465-66 (D.C. Cir.), *reh'g en banc den*., 584 F.3d 1073 (D.C. Cir. 2009).  In fact, "we have previously held that for the purposes of § 5 the petitioners do 'not have to be involved in the final step of the distribution to have participated in it." *Id*. at 464 quoting *Geiger v. SEC*, 363 F. 3d 481 (D.C. Cir. 2004).  Like the defendants in *Zacharias*, Dr. Carrillo is liable for a Section 5 violation because he is a statutory underwriter under Section 2(a)(11).  Cplt ¶¶ 146-151; *Zacharias* 569 F.3d at 458.

Dr. Carrillo is a statutory underwriter because he acquired Pacific Blue securities from the issuer or an affiliate of the issuer with a view to public distribution and did not comply with the applicable conditions of Rule 144.  Cplt ¶¶ 146-151.  Dr. Carrillo did not hold the securities for at least one year under Rule 144(d)(1)(ii), which applies because Pacific Blue was not subject to the reporting requirements of the Exchange Act.  He also did not comply with the volume limitations, which limited sales to 1% of the outstanding shares, or 373,500 shares.  Dr. Carrillo sold over 1 million shares from March-May 2010.  Dr. Carrillo failed to file a Form 144 as required by Rule 144(h) for his Pacific Blue sales.  *Id.*  Accordingly, because the applicable

conditions of Rule 144 were not met, Dr. Carrillo is considered a statutory underwriter for his distribution of Pacific Blue shares.  Because his sales were not registered, he engaged in an illegal public distribution in violation of Sections 5(a) and (c).  *Zacharias*, 569 F. 3d at 465-66.[21]

Dr. Carrillo also argues that charges against him as a relief defendant contradicts the Section 5 claim against him.  Yet the authority Dr. Carrillo cites support the Complaint's naming of Dr. Carrillo as both a relief defendant *and* as a defendant.  *SEC v. Cherif*, 933 F.2d 403, 414-415 (7th Cir. 1991).  In *Cherif*, the court suggests that the naming of a defendant as solely a nominal defendant without establishing subject matter to be improper *if* the evidence reflects that the defendant should be named as an actual defendant.  *Id.*  Here the Complaint alleges that Dr. Carrillo is guilty of a Section 5 violation and also that he holds funds that were procured as a result of a fraudulent scheme.  The Complaint simply properly alleges two separate claims in accordance with the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency"); *SEC v. Mannion*, 789 F. Supp. 2d 1321, 1340 (N.D. Ga. 2011) ("Defendants [point] to the 'inherent contradiction' in alleg[ations] . . . The Federal Rules of Civil Procedure, however, permit plaintiffs to plead inconsistent claims.  Fed. R. Civ. P. 8(d)(3)").  Dr. Carrillo's protestation has no legal significance and both claims may properly proceed.

## IV.  <u>VENUE IS APPROPRIATE IN THE SOUTHERN DISTRICT OF NEW YORK</u>

Defendants Wade Huettel, Luis J. Carrillo, and the Carrillo Huettel law firm have moved to dismiss the Complaint on the grounds that venue against them in the Southern District of New

---

[21] Dr. Carrillo's argument that he is not a "necessary participant" and "substantial factor" is equally unavailing.  Dr. Carrillo is liable because he is a statutory underwriter under Section 2(a)(11) of the Securities Act and would also be liable as a "necessary participant" and "substantial factor" under any of the cases he cited.  Dr. Carrillo Mov. Br. at 11-13.

York is improper.[22]  As described below, because the Complaint contains factual allegations

demonstrating that some of the Defendants in this scheme are subject to venue in this district, all

of the Defendants, including these Defendants, are subject to venue in this district.

    The Complaint alleges that venue properly lies in this district pursuant to Section 22 of

the Securities Act and Section 27 of the Exchange Act.  Under Sections 22(a) of the Securities

Act, venue is proper "in the district where the offer or sale took place, if the defendant

participated therein."  15 U.S.C. § 77v(a).  Under the broader provisions Section 27 of the

Exchange Act, venue is proper where "any act of transaction constituting the violation occurred."

15 U.S.C. § 78aa.  When the Commission brings actions based upon both the Exchange Act and

the Securities Act, the Exchange Act's broader venue provisions apply to the entire action.  *See*

*Coburn v. Warner*, 110 F. Supp. 850, 851 (S.D.N.Y. 1953).  What is more, courts expansively

construe the Securities and Exchange Acts' venue provisions.  *See SEC v. 800America.com, Inc.*,

No. 02 Civ. 9046, 2006 U.S. Dist. LEXIS 85571, at *15 (S.D.N.Y. Nov. 28, 2006) ("Given the

nature of securities fraud actions, it is well-established that the special venue provisions should

be liberally construed.").  Indeed, "[t]he act or transaction committed within the district need not

constitute the core of the violation" to meet the Exchange Act's venue requirements; "an

important step in the fraudulent scheme" will suffice.  *SST Global Tech., LLC v. Chapman*, 270

F. Supp. 2d 444, 453 (S.D.N.Y. 2003) (internal quotations omitted) (citing *Como v. Commerce*

*Oil Co.,* 607 F. Supp. 335, 341 (S.D.N.Y. 1985)).  In its Complaint, the Commission alleges that

Carrillo and Huettel provided a misleading opinion letter dated March 2, 2010 to the DTC; the

letter was addressed and sent to the DTC at 55 Water Street in this district.  (Cplt ¶ 131)  Carrillo

---

[22] The arguments are set forth in Huettel's memorandum of law.  The other Defendants incorporate those arguments
in their memorandum of law without additional comment.

filed a copy of this opinion letter with his motion to dismiss, and both Carrillo and Huettel have

asked the Court to consider it on this motion.  (Huettel Mov. Br. at 14-15; Carrillo Mov. Br.

Decl. Ex. C, Dkt. 69-4).  In addition, the Complaint alleges that Defendants solicited investments

in securities from investors in this District and sold securities through a broker-dealer located in

this District.  Acts such as this are repeatedly held to be sufficient conduct to establish venue in

the Southern District of New York.  See, e.g., *SEC v. Vindman*, 06 Civ. 14233, 2007 U.S. Dist.

LEXIS 27371 *6-7 (S.D.N.Y. April 9, 2007) (trading through online brokerage headquartered in

New York sufficient to establish venue in the SDNY); *Sacody Techs. V. Avant, Inc.*, 862 F.

Supp. 1152, 1157 (S.D.N.Y. 1994) (correspondence mailed to district sufficient to establish

venue); *Zorn v. Anderson*, 263 F. Supp. 745, 748 (S.D.N.Y. 1966) (proxy statements mailed to

state sufficient to establish venue under § 78aa).

Huettel does not really contest that the SEC has alleged conduct by some Defendants in

this district, and his brief ignores the March 2, 2010 opinion letter he drafted for the DTC in this

district.  Instead, Citing *SEC v. Johnson*, 650 F.3d 710-715 (D.C. Cir. 2011), Huettel argues that

the SEC has not alleged that he conducted any activity in this district and that venue against him

cannot be based upon the actions of another defendant.  Notably, Huettel does not cite any

Second Circuit law for this proposition.  This is because the Second Circuit Court of Appeals and

the district courts in this circuit have explicitly approved the so-called co-conspirator theory of

venue.  In *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 620 (2d Cir.), cert. den., 393 U.S. 977

(1968), for example, the court held that venue in Texas against one defendant could be based on

the "alleged acts by other defendants in Texas."  More recently, in *Krasner v. Rahfco Funds, LP*,

11 CV 4092, 2012 U.S. Dist. LEXIS 134353 *12-13 (S.D.N.Y. Aug. 9, 2012), the court applying

the same venue statute applicable here, held that "where the complaint alleges a conspiracy

among multiple defendants, venue is appropriate as to all defendants when it is established even as to one." (citing *Wyndham*).  As one court has stated:  "in a multi-defendant securities case in which a common scheme of acts or transactions to violate the securities laws in alleged, the occurrence in the district of 'any act or transaction' by any defendant in furtherance of the scheme is enough to establish venue as to any other defendant who knowingly participated in the scheme – even if such defendant did not perform any independent venue-establishing act or transaction in the district."  *First Federal Sav. & Loan Assoc. v. Oppenheim, Appel, Dixon & Co.*, 634 F. Supp. 1341, 1350 (S.D.N.Y. 1986); *See also 800America.com,* 2006 U.S. Dist. LEXIS 85571 at *17-19.  (finding that venue was proper under co-conspirator theory of venue even though the moving defendant was the only defendant left in the case as the co-conspirator whose acts were located in the district had died); *SEC v. Lybrand*, 00 Civ. 1387, 2000 U.S. Dist. LEXIS 9388 *11 (S.D.N.Y. July 6, 2000) ("venue does not depend on whether [the moving defendants] performed any act or transaction in [the] district, it is sufficient if there occurred in [the] district 'any act or transaction' by any defendant … in furtherance of a manipulative scheme in which [moving defendants] knowingly participated.'"  (citations omitted).

In the alternative, Huettel has asked this court to exercise its discretion under 28 U.S.C. § 1404(a) and transfer venue to the Southern District of California.  (Huettel Mov. Br. at 7-9.) Under 28 U.S.C. § 1404(a), "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  Courts consider numerous factors in deciding whether to transfer cases in the interest of justice, although some factors are given more weight than others.  Those factors are as follows:

> (1) the locus of the operative facts; (2) the parties' convenience; (3) the
> convenience of witnesses; (4) the location of evidence and the relative ease of

access to such proof; (5) the availability of process to compel attendance of reluctant witnesses; (6) the plaintiff's choice of forum; (7) the relative means of the parties; (8) the forum familiarity with the governing law; and (9) trial efficiency and the interests of justice.

*Samrat Ashoka Exports, Ltd. v. Mannix World Imports, Inc.*, No. 00 CV 3586, 2005 U.S. Dist. LEXIS 496, at *5 (S.D.N.Y. Jan. 12, 2005). Huettel has not born his burden of demonstrating that transfer to the Southern District of California serves the interest of justice.

As this Court has held, "[p]laintiffs' choice of forum must be given due deference and should not be disturbed unless the balance of convenience and justice weigh heavily in favor of defendants' forum." *Samrat*, 2005 U.S. Dist. LEXIS 496, at *5. In a Commission enforcement action, the Commission's choice of forum "is a particularly strong factor … as the venue provision of the [Exchange] Act is intended to give the plaintiff the widest possible choice of forum." *SEC v. Thrasher*, 92 Civ. 6987, 1993 U.S. Dist. LEXIS 1289, at *9 (S.D.N.Y. Feb. 8, 1993); *cf. SEC v. KPMG, LLP*, 03 Civ. 671, 2003 U.S. Dist. LEXIS, at *11 (S.D.N.Y. Apr. 9, 2003) ("The plaintiff has shown that its choice of forum was dictated by convenience, principally the presence of an SEC office in New York, and its choice is therefore entitled to substantial deference."). The Commission has chosen to bring this action in this District, where its New York office is located, and that choice should be entitled to deference.

Against that deference, Huettel advances three arguments in support of his request: (1) that transfer "would remove the current cloud on venue;" (2) that venue is authorized under securities laws in his preferred district because "multiple defendants live and transact business" there; and (3) that unlike the Southern District of New York the complaint alleges specific acts that occurred in his preferred district. (Huettel Mov. Br. at 8-9.) His first argument fails because the Commission has properly laid venue; there simply are no clouds. With regards to Huettel's second argument, which suggests that the Southern District of California is a more convenient

location for this litigation, the Commission notes only three of the fourteen Defendants live in San Diego.  The rest reside all over the country, in Canada, in Mexico, and in the Caribbean.  One of the San Diego Defendants, Carrillo Huettel LLP, however, describes itself in its motion to dismiss as defunct.  And it further states in its motion to dismiss that it has produced all of the documents in its possession to the Commission.  Likewise, it is unclear whether Carrillo is still in the Southern District of California.  Consequently, only one defendant can truly be said to be presently residing in the Southern District of California and, as such, Huettel's argument is even further weakened.

Mr. Huettel's final argument potentially leans in favor of transfer insofar as conduct occurring in the Southern District of California constitutes part of the "locus of operative facts" at issue.  However, the fact that the alleged scheme operated throughout the United States as well as in multiple foreign jurisdictions substantially weakens this argument.  At any rate, the argument certainly does not raise the sort of heavy concerns justifying transfer on its own.

In sum, Mr. Huettel essentially requests this court to transfer venue to the Southern District of California because that venue is more convenient for him.  He has thus failed to make "a clear and convincing showing" that a change in venue would serve the interests of justice.  *See Kanbar*, 715 F. Supp. at 604.  Particularly instructive is the decision in *SEC v. Morton*, 10 Civ. 1720, 2011 U.S. Dist. LEXIS 36487 *45-47 (S.D.N.Y. March 31, 2011), where the court found that there was "no compelling basis for upsetting the [SEC's] choice of forum:

> Given our deference to the SEC's choice of forum, defendants fail to justify requiring a transfer. Essentially their truncated argument boils down to the fact that they reside in California. They also make allusion to the presence of many (but unidentified) witnesses in California and to Mrs. Morton's undocumented ill health. There is no indication at the moment-that large numbers of witnesses (other than Mr. and Mrs. Morton) are located in California, and apparently a number of alleged victims are located here. Moreover, if there are a number of California non-party witnesses, the SEC attorneys will in all likelihood be

required to travel to California if they wish to depose these individuals on defendants' home turf. As for the location of documents — which defendants do not mention in their motion — after the SEC's pre-suit investigation we infer that both sides have most if not all of the pertinent files. Moreover, if the SEC intends to depose the Mortons, it will also have to travel to California. Only if the case goes to trial would the Mortons be expected to travel here. Moreover, we note that the Mortons have operated a national business and Mr. Morton has been traveling to New York to promote it. In addition, Mrs. Morton impliedly concedes that she has traveled here for other purposes, and it appears in any event that despite the vague allusion to health problems by her — she has been traveling at least as recently as last March. In short, the siting of the litigation here will not impose an undue burden on the defendants. We also note that the prosecuting office of the SEC for this case is located here, and thus we may infer, at least on the present record, that the convenience of the plaintiff and the public interest in efficient litigation would be enhanced by preserving the lawsuit in its current location.

Accordingly, the Commission respectfully requests this Court to deny Defendant's request to transfer venue to the Southern District of California.

## V.        THE COURT HAS PERSONAL JURSIDICTION OVER DR. CARRILLO

Dr. Carrillo asserts that a United States Court does not have jurisdiction over an individual who purchased shares of a U.S. issuer under an agreement governed by U.S. law, engaged in a distribution of those shares in violation of U.S. federal securities law, and funneled sale proceeds back to U.S. bank accounts controlled by a U.S. law firm, merely because he was located on foreign soil. That is not the law in the Second Circuit, and Dr. Carrillo fails to cite a relevant case that supports his view.

As this Court has held, personal jurisdiction lies in cases brought under the federal securities laws where a defendant's foreign activities "had 'an unmistakably foreseeable effect within the United States,' and could 'reasonably be expected to be visited upon United States shareholders.'" *Softpoint*, 2001 U.S. Dist. LEXIS 286 at *15-16 (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)). Although personal jurisdiction must also be "reasonable," that is a "largely academic" inquiry in cases brought under the federal securities laws, and a

ground on which "few [courts] (and none in this Circuit) have ever declined jurisdiction."  *See Softpoint*, 2001 U.S. Dist. LEXIS 286, at *19.

### A.  Dr. Carrillo Is Subject to Personal Jurisdiction Because His Conduct Caused Foreseeable Consequences to United States Investors.

The federal securities laws "permit[] the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment."  *Unifund*, 910 F.2d at 1033.  "Those standards permit the exercise of jurisdiction over a defendant whose 'conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'…  One circumstance making such anticipation reasonable is where a defendant has acted in such a way as to have 'caused consequences' in the forum state."  *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Applying this standard in *Unifund*, the Second Circuit held that a foreign investment company was subject to personal jurisdiction where, while overseas, it allegedly bought securities of an issuer listed on a U.S. stock exchange based on inside information.  The defendant's "transactions are alleged to have had a rather direct and unmistakably foreseeable effect within the United States," namely, effects on the U.S. shareholders of a company that was traded on a U.S. exchange.  910 F.2d at 1033.  This Court reiterated this standard in *Softpoint*, where it stated "that a district court may exercise its personal jurisdiction in a securities action so long as the defendant's activities had 'an unmistakably foreseeable effect within the United States,' and could 'reasonably be expected to be visited upon United States shareholders.'"  2001 U.S. Dist. LEXIS 286, at *15-16 (quoting *Unifund*, 910 F.2d at 1033).

Under this standard, the Complaint alleges personal jurisdiction over Dr. Carrillo.  The Complaint alleges that Dr. Carrillo acquired Pacific Blue shares and sold them in an unregistered distribution that had a "direct and unmistakably foreseeable effect" on United States investors

because he sold Pacific Blue shares in violation of the registration provisions of the Securities
Act.  (Cplt ¶¶ 4, 28, 80, 145-151.)  The Complaint alleges that Dr. Carrillo purchased Pacific
Blue shares with a view to distribution.  (*Id*. at ¶ 146.)  To further the distribution, Dr. Carrillo
held his shares, in part, as a nominee for U.S. attorneys Carrillo and Huettel.  (*Id*. at ¶ 150.)  In
short, Dr. Carrillo's alleged conduct subjects him to the Court's personal jurisdiction.

The applicable test for personal jurisdiction is a causation-based analysis – whether the
defendant's acts had a direct and foreseeable effect on United States investors.  Dr. Carrillo
specifically intended to affect and did affect United States investors.[23]  Therefore, this Court
should exercise personal jurisdiction over him.

### B.  The Exercise of Personal Jurisdiction Over Dr. Carrillo Is Reasonable

The exercise of personal jurisdiction over Dr. Carrillo not only satisfies the causation
standard above but is also "reasonable."  *Softpoint*, 2001 U.S. Dist. LEXIS 286, at *18 (citing
*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)).  As Dr.
Carrillo appears to concede, "few [courts] (and none in this Circuit) have ever declined
jurisdiction" on this ground.  *Id.*; (Dr. Carrillo Mov. Br. at 18 n.9.)  In cases brought under the
federal securities laws – or any other "federal law which provides for nationwide service of
process" – this inquiry is "largely academic."  *Id*. at *19.

---

[23]  The cases Dr. Carrillo relies on most heavily (Dr. Carrillo Mov. Br. at 16-17) do not suggest otherwise.  In
*Charas v. Sand Technology Systems Int'l*, 90 Civ. 5638 (JFK), 1992 U.S. Dist. LEXIS 15227, at *16 (S.D.N.Y. Oct.
7, 1992), the court held that it could not exercise personal jurisdiction over a foreign outside director of a foreign
corporation who did not have any knowledge of or involvement in financial misstatements but merely failed to
monitor the corporation's affairs.  .  The decision was based on the lack of any allegations whatsoever that the
director had contacts with the United States relating to the company or the claims asserted – in contrast, the
complaint here alleges that Dr. Carrillo actually purchased shares of a U.S. issuer with a view to distribution.
Similarly, in *S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 546-47 (S.D.N.Y. 2013), the court declined to exercise personal
jurisdiction over a foreign defendant whose only role was introducing foreign officials to an executive of a company
who, after additional activities, later bribed those officials and then signed false SEC filings.  In that case, that
foreign defendant's actions were not a "but for" cause of the violation and too attenuated to warrant jurisdiction.
Here, Dr. Carrillo was directly involved in his alleged securities law violations.

Although Dr. Carrillo cites his residence in Mexico and advanced age that may make it burdensome for him to defend this litigation (Dr. Carrillo Mov. Br. at 17-18), these factors do not render the exercise of personal jurisdiction over him unreasonable.  The exercise of personal jurisdiction over a defendant "of modest means" who lived and worked in Italy and did not speak English as a first language has still been held to be reasonable.  *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 457 (S.D.N.Y. 2005).  In that case, the court held that "the interest of the United States in securing relief … for U.S. citizens injured here in consequence of any violations of the federal securities laws by officials of a foreign company that accessed our capital markets" was a countervailing consideration that trumped any inconvenience to the defendant.  *Id.; see also Hallwood Realty Partners L.P. v. Gotham Partners L.P.*, 104 F. Supp. 2d 279, 286 (S.D.N.Y. 2000) ("In cases brought under [the federal securities and antitrust laws] and comparable statutes, the personal jurisdiction analysis must give appropriate consideration to the strong federal concerns involved.").  Because of the compelling federal interest in regulating the United States securities markets, the exercise of personal jurisdiction over Dr. Carrillo is reasonable.

## VI.  <u>THE SEC'S COMPLAINT IS NOT TIME-BARRED UNDER DODD-FRANK</u>

Defendant Huettel (and through incorporation Carrillo Huettel, LLP) argues that the Complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) for failure to plead compliance with Section 929U of the Dodd-Frank Act.  This argument must be rejected.  First, while the initial 180-day deadline was February 19, 2013,[24] on February 1, 2013 the SEC enforcement staff requested an extension until March 19, 2013 to file an enforcement action and that request was

---

[24] Wells notices were provided to Carrillo, Huettel and CH on August 24, 2012.  (Brody Decl. at ¶ 6).

granted by the Director of Enforcement.  (Brody Decl. ¶ 7).[25]  Pursuant to the terms of the

extension, the SEC's Complaint was filed on March 15, 2013 well in advance of the extended

Dodd-Frank deadline.[26]  Consequently, this argument fails.  *See SEC v. Yorkville Advisors*, 12

Civ. 7728, LLC, 2013 U.S. Dist. LEXIS 110624 (S.D.N.Y. Aug. 1, 2013) ("Defendants also

argue that the complaint must be dismissed under Rule 12(b)(1) for failure to plead compliance

with Section 929U of the Dodd Frank Act.  That argument is unavailing.  Prior to the Dodd

Frank deadline, the SEC requested, and was granted an extension to file an enforcement action.

The Complaint was filed well in advance of the extended deadline.")

In any event, Section 929U of Dodd Frank is not a statute of limitations, nor does it

shorten statutorily provided limitations periods; it merely provides an internal SEC timeline for

completing enforcement investigations and compliance examinations and inspections.  Where, as

here, a statute imposes internal agency timing requirements but does not specify a consequence

for noncompliance, such requirements are not a limitations period.  *United States v. James*

*Daniel Good Real Prop.,* 510 U.S. 43, 62-65 (1993); *Barnhart v. Peabody Coal Co.,* 537 U.S.

149, 158-59 (2003) ("Nor . . . have we ever construed a provision that Government 'shall' act

within a specified time, without more, as a jurisdictional limit precluding action later").  Section

929U contains no consequence for non-compliance, but simply provides that the SEC either file

an action or provide notice to the Director of Enforcement of its intent to not file an action no

---

[25] While Huettel argues that there was an insufficient basis for the Commission to grant the extension, that action by the Commission is committed to agency discretion and, thus, is not reviewable by this Court.  *See, e.g., Drake v. FAA*, 291 F.3d 59, 71-72 (D.C. Cir. 2002).

[26] Nor was the SEC required to plead the receipt of the extension.  *SEC v. Gabelli*, 653 F.3d 49, 60-61 (2d Cir. 2011), *rev'd on other grounds*, 133 S.Ct. 1216 (2013) (the "lapse of a limitations period is an affirmative defense that a defendant must plead and prove and dismissing claims on statute of limitations grounds at the complaint state is appropriate only if a complaint clearly shows the claim is out of time.")

later than 180 days after providing a written Wells notice.[27]  Defendants cite no case law in support of their argument regarding this specific Dodd-Frank provision, which is not surprising, given that the only tribunals that have considered it have rejected it.  See *SEC v. NIR Group, LLC*, CV 11-4723, 2013 U.S. Dist. LEXIS 47522 (E.D.N.Y. March 24, 2013) (quashing notices of deposition on the SEC regarding its compliance with section 929U of Dodd Frank on the grounds that failure to comply with the rule would not dictate dismissal of the enforcement action and, consequently, the discovery sought was not relevant).[28]

## VII.   **SERVICE ON BEN KIRK WAS LAWFUL AND SUFFICIENT**

Defendant Ben Kirk moves to dismiss the Complaint pursuant to Rule 12(b)(5) on the grounds that the "court was misled" when it ordered that alternative service could be made on Ben Kirk through service on his attorneys and his known email addresses.  This argument is specious and the only person who is misleading the Court is Ben Kirk, a fugitive who is believed to have fled Canada in order to avoid prosecution there.  Indeed, not only was service by alternative means proper, but it also indisputably served the intended goal, as Ben Kirk received a copy of the Complaint, demonstrated by the filing of his motion to dismiss.[29]

---

[27] Defendants rely on *Bustamante v. Napolitano*, 582 F.3d 403, 409 (2d Cir. 2009), in support of their argument. Unlike in *Bustamante* where the immigration statute at issue had a specific consequence if the United States Citizenship and Immigration Services failed to act within 120 days of an application interview ("the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter"), no specific consequence of dismissal or preclusion is provided for in Dodd Frank.

[28] *See also SEC v. Scammell*, Civ. No. 11-6597 (DSF)(MRW) (C.D. Ca. Nov. 15, 2011) ("It is well-established that a violation of statutory deadlines for internal agency action does not bar a claim by the agency if it is otherwise brought within the statute of limitations.") (Brody Decl. Ex. D); *In the Matter of Gualario & Co., LLC, et al.*, Admin. Proc. Rel No. 680, 2011 LEXIS 2806 *3-4 (Aug. 11, 2011) (without reaching issue, ALJ finds compelling Division's argument that Section 929U "is not a statute of limitations, but rather provides deadlines for Commission staff without providing any enforceable rights to outside parties").

[29] *See Microsoft Corp. v. Doe*, 12-CV-1335, 2012 U.S. Dist. LEXIS 162122 *8 (E.D.N.Y. Nov. 13, 2012) ("In the instant matter, certain Defendants have responded to Plaintiffs' service of process—thereby proving the sufficiency of Plaintiffs' service and demonstrating that they have been provided adequate notice of the action against them, and effectively estopping them from claiming otherwise.")

As a threshold matter, Ben Kirk had the opportunity to oppose the SEC's motion for alternative service and to correct any purportedly misleading statements made by the SEC when the motion was first filed and he chose not to do so.  Based on this fact alone, the Court should deny Ben Kirk's motion, which essentially amounts to an untimely motion to reconsider.  Specifically, as described in the SEC's declaration in support of its motion to serve certain defendants by alternative means (Docket #42), on June 12, 2013, the Commission staff spoke with Steven Feldman (Ben Kirk's attorney in this proceeding).  Mr. Feldman, in his declaration supporting Ben Kirk's motion to dismiss, notably fails to inform the Court about this conversation.  During the conversation, the Commission staff informed Mr. Feldman (among other things) of its intent to move this Court for alternative service by serving Ben Kirk's attorney with the Complaint.  (Brody Decl. at ¶ 8).  And Mr. Feldman inquired as to whether the SEC intended to effectuate service by serving Ben Kirk's Canadian counsel or the Herrick firm.  (*Id.*).  On June 17, 2013, the Commission filed its motion for alternative service and a copy of the motion was sent to Mr. Feldman and to Ben Kirk's Canadian counsel.  Notwithstanding the clear notice of the motion, Ben Kirk did not oppose the motion or claim that the SEC had misrepresented the facts.

Ben Kirk does not argue that the method of alternative service violated his due process or was not properly designed to provide him with notice.  Rather, he argues that the motion was improperly granted because the SEC did not make a proper showing that it had reasonably attempted to effectuate service on him prior to making its motion.  His argument fails for two reasons.  First, because Rule 4(f)(3) contains no such requirement.  Second, because assuming there is such a requirement, the SEC met its burden.

While some courts have required a plaintiff to take reasonable efforts to serve prior to moving for alternative service, Rule 4(f)(e) contains no such requirement and courts in this district have held that "[a] plaintiff is *not* required to attempt service through the other provisions of Rule 4(f) before the Court may order service pursuant to Rule 4(f)(3)." *FTC v. Pecon Software, Ltd.*, 12 Civ. 7186, 2013 U.S. Dist. LEXIS 111375 *10 (S.D.N.Y. Aug. 7, 2013); *S.E.C. v. Anticevic*, No. 05 Civ. 6991, 2009 U.S. Dist. LEXIS 11480 at *3 (S.D.N.Y. Feb. 13, 2009); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 639 (S.D.N.Y. 2001) (rejecting argument that party seeking alternative service must demonstrate inability to serve).  Indeed, "[s]ervice of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief. It is merely one means among several which enables service of process on an international defendant."  *Id.*

Even assuming that the SEC was required to make "reasonable attempts" to serve him prior to seeking alternative service, such efforts were made.[30]  It is well-established that attempts to serve the defendant by seeking a waiver from counsel satisfy the reasonable attempts standard.  *See. e.g., Rice Corp. v. Express Sea Transp. Corp.*, 13 Civ. 43, 2013 U.S. Dist. LEXIS 105045 *5 (S.D.N.Y. July 8, 2013); *United States v. Lebanese Canadian Bank SAL*, 285 F.R.D. 262, 267 (S.D.N.Y. June 6, 2012) (government met burden by sending waiver of service package to counsel); *KPN B.V. v. Corcyra D.O.O.*, 08 Civ. 1549, 2009 U.S. Dist. LEXIS 20906 * 2-4

---

[30] Ben Kirk cites *Madu, Edozie & Madu, P.C. v. Socketworks Ltd. Nigeria*, 265 F.R.D. 106 (S.D.N.Y. 2010) and *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, 03 Civ. 8554, 2005 U.S. Dist. LEXIS 8902 (S.D.N.Y. May 11, 2005).  Neither is applicable here.  In *Madu*, the Court rejected the plaintiff's motion for alternative service because the plaintiffs did not discuss what methods they used to attempt service and did not support their assertion that service via letters rogatory in Uganda and Ghana would be futile.  265 F.R.D. at 116. Here, the SEC described in detail what steps it took to effectuate service in Canada against Ben Kirk including attempting to serve him through the Hague Convention.  And in *Export-Import*, the Court granted the motion for alternative service, holding that defendants' attempts to frustrate service were relevant.

(S.D.N.Y. March 16, 2009) (granting alternative service motion where defendants' counsel refused to stipulate to accept service and defendants otherwise resisted service).  Likewise, failed attempts to serve through the Hague Convention satisfy the reasonable attempts standard and no more is required.  *In re GLG Life Tech Sec. Litig.*, 287 F.R.D. 262, 266 (S.D.N.Y. 2012); *SEC v. Lines*, 07 Civ. 11387, 2009 U.S. Dist. LEXIS 69855 (S.D.N.Y. Aug. 9, 2005) (alternative service motion granted when attempts to serve through the Hague Convention failed).

The SEC took reasonable steps to effectual service on Ben Kirk before moving for service by alternative means.  In its declaration supporting the motion, the SEC noted that after commencing the action, it sent copies of the Complaint and requests to waive personal service to Ben Kirk's Canadian counsel by UPS and email.  When none of the waiver requests were returned executed, Commission staff spoke to Ben Kirk's Canadian counsel on several occasions to attempt to have counsel accept service.  When these efforts failed, the Commission attempted to serve Ben Kirk through the Hague Convention at his last known address.  And only after those attempts were unavailing did the SEC move this Court for permission to serve him through his counsel and his known email addresses.  Ben Kirk argues that the SEC's attempts to serve him through the Hague Convention at his last known address cannot be considered serious or reasonable due to the fact that the SEC believed that he no longer lived at that address as he had fled the country.  This argument is nonsensical.  What does Kirk expect?  His current whereabouts are unknown to the SEC.  His lawyers did not provide the SEC with an address.  And he is a fugitive.  When a person is actively evading service, he should not be heard to complain that the plaintiff cannot find his present address when he himself has made regular service difficult or impossible to accomplish.  *Doe*, 2012 U.S. Dist. LEXIS 162122; *United States v. Estate of Machat*, 08 Civ. 7936, 2009 U.S. Dist. LEXIS 87000 *10 (S.D.N.Y. Sept. 21,

2009) (alternative service granted based in part on defendant's attempts to evade service); *SEC v. Shehyn*, 04 Civ. 2003, 2008 U.S. Dist. LEXIS 108951 *12 (S.D.N.Y. Nov. 26, 2008) ("[Defendant's] deliberate avoidance and obstruction made [the alternative service] appropriate").  For these reasons, Ben Kirk's 12(b)(5) motion should be denied.

## VIII.  THE ATTORNEY-CLIENT PRIVILEGE WAS WAIVED AS TO PACIFIC BLUE

In his motion to dismiss, de Beer contends that the SEC breached the attorney client privilege by knowingly and intentionally reading, reviewing, and incorporating into its investigation documents that were privileged to Pacific Blue, on whose board of directors de Beer sits.  While de Beer's inaccurate and incomplete recitation of the facts spans three pages of his memorandum of law, it does not appear to be the basis of any of his arguments in support of the motion to dismiss or in support of any other relief.  Consequently, the SEC need not respond to this argument in any substantive fashion.

The SEC notes, however, that the documents at issue were produced to the SEC by Joel Franklin, the President of Pacific Blue who is also a director of the company.  Mr. Franklin was represented by counsel and his production of the documents was intentional and with the knowledge that it would constitute a waiver of the attorney-client privilege.  His motivation for producing those materials to the SEC is irrelevant and it is well-established that the corporation's privilege is exercised by its officers and directors who can waive such privilege.  *See, e.g. CFTC v. Weintraub*, 471 U.S. 343, 348 (1985); *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. den.*, 414 U.S. 867 (1973).

Second, Mr. de Beer is now asserting a reliance on counsel defense.  (*See* de Beer Mov. Br. at p.17 "[s]urely de Beer was entitled to rely on outside counsel's opinion on legal questions typically within the province of counsel").  The assertion of this defense is, in and of itself, a

waiver of the attorney client privilege.  *Arista Records LLC v. Lime Grp. LLC.*, No. 06 CV 5936,

2011 U.S. Dist. LEXIS 42881 *2 (S.D.N.Y. Apr. 20, 2011) (*quoting Vicinanzo v. Brunschwig &*

*Fils. Inc.*, 739 F. Supp. 891, 894 (S.D.N.Y. 1990) ("a party who intends to rely at trial on the

advice of counsel must make a full disclosure during discovery; failure to do so constitutes a

waiver of the advice-of-counsel defense."); *accord, In re Grand Jury Proceedings*, 219 F.3d 175,

182 (2d Cir. 2000).

Finally, even if the privilege was not waived, the SEC informed de Beer's counsel on

January 27, 2012, that SEC staff did not "substantively review[]" any of the documents that were

produced by Mr. Franklin and its review of the flash drive was "cursory."  The documents

certainly did not form the basis of any of the allegations in the SEC's Complaint.  In a later

telephone conversation on February 9, 2012 (which De Beer's counsel does not mention in his

declaration), the Commission staff explained that the SEC's review of the flash drive was only to

understand the organization and the volume of documents and to confirm whether the drive did,

in fact, contain attorney emails.  (Brody Decl. at ¶ 5).  And the staff explained to counsel that all

contents of the flash drive produced by Franklin were segregated from the remainder of the

investigative file.[31]  .  (*Id.*).  The SEC has not reviewed or consulted these documents whatsoever

since January 2012 and will not do so until the Court rules on the privilege issues – in addition to

waiver, the SEC believes that these documents are not privileged at all under the crime-fraud

exception.  Pursuant to Federal Rule of Evidence 502, however, it is the responsibility of Pacific

Blue as the purported holder of the privilege (and not the SEC) to seek judicial review of this

issue and the SEC notes that neither Pacific Blue nor De Beer sought any judicial intervention

---

[31] The Federal Rules do not require that even inadvertently privileged materials be returned (much less intentionally produced documents).  They can be segregated.  Fed. R. Civ. P. 26(b)(5)(B).

seeking return of the documents produced by Mr. Franklin pursuant to the SEC's lawfully issued

subpoena.

## CONCLUSION

For the reasons set forth herein, the SEC respectfully requests that this Court deny the

Motions to Dismiss filed by Defendants Ben Kirk, James Hinton, Luniel de Beer, Luis J.

Carrillo, Wade Huettel, Carrillo Huettel, GGSI, Warren Davis, and Dr. Luis Carrillo.  If this

Court decides to grant Defendants' motions in whole or in part, however, the SEC requests leave

to file an Amended Complaint in conformity with the Court's ruling.


Dated: October 18, 2013                    Respectfully Submitted,


                                       ____/s/___Todd D. Brody_____
                                       Todd D. Brody
                                       Senior Trial Counsel
                                       SECURITIES AND EXCHANGE COMMISSION
                                       New York Regional Office
                                       200 Vesey Street
                                       New York, NY 10281

                                       Katherine Bromberg
                                       Joshua Newville