

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
NEW YORK REGIONAL OFFICE
3 WORLD FINANCIAL CENTER
ROOM 400
NEW YORK, NEW YORK 10281-1022

**WRITER'S DIRECT DIAL LINE**
JOSHUA M. NEWVILLE
(212) 336-0578
NewvilleJ@sec.gov

March 18, 2013

**By Email and UPS**

Pacific Blue Energy Corp.
Joel Franklin, President
c/o PARACORP INCORPORATED
318 N. Carson St. #208
Carson City, NV 89701

Re:   SEC v. Carrillo Huettel LLP et al., 13-cv-1735 (GBD)

Dear Mr. Franklin:

Enclosed please find a copy of the complaint in the above referenced matter, along with a notice of the lawsuit and request to waive service of a summons, addressed to you as President of Pacific Blue Energy Corp.

If you have any questions, please contact me at the phone number or email listed above, or contact Todd Brody at 212-336-0080.  If the company is represented by counsel, you should have counsel contact us.

Sincerely,

Joshua M. Newville
Senior Counsel

Enclosure(s)

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | | |
|---|---|---|
| Securities and Exchange Commission | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   13-cv-01735 (GBD) |
| Carrillo Huettel LLP, et al. | ) | |
| *Defendant* | ) | |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:  Pacific Blue Energy Corp.
*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within __30__ days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date:  3/18/2013

_____
*Signature of the attorney or unrepresented party*

Joshua M. Newville
*Printed name*

Securities & Exchange Commission
3 World Financial Center, Suite 400
New York, NY 10281
*Address*

newvillej@sec.gov
*E-mail address*

212-336-0578
*Telephone number*

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | | |
|---|---|---|
| Securities and Exchange Commission | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  13-cv-01735 (GBD) |
| Carrillo Huettel LLP, et al. | ) | |
| *Defendant* | ) | |

## WAIVER OF THE SERVICE OF SUMMONS

To:  Joshua M. Newville, Senior Counsel, SEC
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Signature of the attorney or unrepresented party*

_____
*Printed name of party waiving service of summons*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | | |
|---|---|---|
| Securities and Exchange Commission | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   13-cv-01735 (GBD) |
| Carrillo Huettel LLP, et al. | ) | |
| *Defendant* | ) | |

## WAIVER OF THE SERVICE OF SUMMONS

To:  Joshua M. Newville, Senior Counsel, SEC
       *(Name of the plaintiff's attorney or unrepresented plaintiff)*

        I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

        I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

        I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

        I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Signature of the attorney or unrepresented party*

_____
*Printed name of party waiving service of summons*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

        Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

        "Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

        If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

        If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

**ANDREW M. CALAMARI**
**Regional Director**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**3 World Financial Center, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0080 (Brody)**

JUDGE DANIELS

13 CV 1735

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

*Plaintiff*,

v.

**CARRILLO HUETTEL LLP,**
**LUIS J. CARRILLO, WADE D. HUETTEL,**
**GIBRALTAR GLOBAL SECURITIES,**
**WARREN DAVIS, JOHN B. KIRK,**
**BENJAMIN T. KIRK, DYLAN L. BOYLE,**
**JAMES K. HINTON JR., LUNIEL DE BEER,**
**JOEL P. FRANKLIN, PACIFIC BLUE ENERGY**
**CORPORATION, TRADESHOW MARKETING**
**COMPANY LTD, AND DR. LUIS CARRILLO,**

*Defendants*,

- AND -

**DR. LUIS CARRILLO,**

*Relief Defendant.*

13 Civ. _____ ( )
**ECF CASE**

RECEIVED
MAR 1 5 2013
U.S.D.C. S.D.N.Y.
CASHIERS

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Defendants Carrillo Huettel LLP, Luis J. Carrillo, Wade D. Huettel, Gibraltar Global Securities ("Gibraltar"), Warren Davis, John B. Kirk, Benjamin T. Kirk, Dylan L. Boyle, James K. Hinton Jr., Luniel de Beer, Joel P. Franklin, Pacific Blue Energy Corporation ("Pacific

Blue"), Tradeshow Marketing Company Ltd. ("Tradeshow"), and Dr. Luis Carrillo (collectively, the "Defendants"), and Relief Defendant Dr. Luis Carrillo (the "Relief Defendant"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     This action arises out of a fraudulent international "pump-and-dump" scheme involving two publicly-traded U.S.-based companies: Tradeshow and Pacific Blue.  The primary goal of the scheme was to enrich certain stock promoters by "pumping" up trading in the stock of Tradeshow and Pacific Blue with false and misleading promotions, purportedly based on "independent" research, and then secretly "dumping," i.e., liquidating the promoters' shares into the artificially inflated demand they created.

2.     Tradeshow and Pacific Blue were controlled by a group of Canadian stock promoters: John Kirk, Ben Kirk, Dylan Boyle and James Hinton.  The Kirks, Boyle and Hinton secretly took control of the companies and then "pumped" those companies' stock price by sending investors false and misleading email blasts from two stock-touting websites they controlled -- Skymark Research and Emerging Stock Report.  They also hired a "boiler room" of individuals who called U.S. investors to tout the stocks, falsely claiming they were providing independent research.

3.     U.S.-based attorneys Luis Carrillo and Wade Huettel were central participants in the scheme.  Under the guise of providing legal services, they helped the promoters acquire the Pacific Blue shell, drafted Pacific Blue's misleading public filings, provided misleading legal opinions, and allowed the promoters to funnel sales proceeds through their firm's attorney-client trust account.  Carrillo and Huettel also helped the Kirks and Boyle mask their ownership and

control of Pacific Blue by transferring blocks of shares through a complex web of dozens of offshore nominee entities.

4.     Carrillo and Huettel also received proceeds from sales of Pacific Blue stock that they arranged to be transferred to Carrillo's father, Dr. Carrillo.  The Pacific Blue shares held in Dr. Carrillo's name were liquidated for over $1 million in proceeds at the height of the pump, of which over $300,000 was transferred to Carrillo and Huettel, partially as a sham "loan" to Carrillo Huettel, LLP.

5.     The Kirks, Boyle and Hinton made at least $11 million  by "scalping," *i.e.,* by secretly selling Pacific Blue and Tradeshow shares while simultaneously promoting the stocks and encouraging others to buy.  They sold these shares, in part, through accounts at Gibraltar in the Bahamas and a broker-dealer in Turks and Caicos.  By doing so, contrary to their recommendations to other investors, their recommendations were misleading and fraudulent.

6.     Gibraltar provided false affidavits and misleading representations to brokerage firms in the United States that concealed the shares' true beneficial ownership so that Gibraltar's client Ben Kirk could secretly sell those shares into the artificially increased demand.

7.     Luniel de Beer, who served as president of Tradeshow and chairman of Pacific Blue, made false representations, helped to conceal the promoters' control of Tradeshow and Pacific Blue, and facilitated the promoters' stock sales while receiving over $330,000 in secret kickbacks.  Joel Franklin, who served as president of Pacific Blue, also made misleading representations and facilitated the promoters' stock sales.

8.     In August 2011, the Alberta Securities Commission (the "ASC") issued an interim cease trade order against Skymark and its representatives, putting a halt to Skymark's fraudulent promotion.  The ASC subsequently filed quasi-criminal charges in the Provincial Court of

3

Alberta against John Kirk, Ben Kirk and Boyle in connection with the pump-and-dump schemes, for which a trial is currently scheduled for June 2013.

## VIOLATIONS

9.      By virtue of the conduct alleged herein, certain of the Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].   By offering and selling securities for which no registration statement was in effect, all Defendants violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

10.     The Commission seeks to have the Court enter judgments permanently enjoining Defendants from violating the securities laws, requiring disgorgement of ill-gotten gains and prejudgment interest thereon from Defendants and the Relief Defendant, civil monetary penalties from certain Defendants, and barring certain Defendants from participating in future penny stock offerings or serving as officers or directors of publicly traded companies.

11.     Unless Defendants are permanently restrained and enjoined, they each will again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts and transactions of similar type and object.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to the authority conferred by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and 77t(d)], and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

13.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means or

instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this district pursuant to Section 22 of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York. Among other things, Defendants solicited investments in securities from investors in this District and sold securities through a broker-dealer located in this District.

## DEFENDANTS

15.     Defendant **Carrillo Huettel LLP** is a San Diego, California law firm purporting to specialize in securities and reverse mergers. Carrillo Huettel LLP and its predecessor, SteadyLaw Group LLP, at various times represented Pacific Blue, Tradeshow, Gibraltar, non-defendant Scottsdale Capital Advisors, Skymark Research, John Kirk and Hinton. At all relevant times, Carrillo Huettel LLP was controlled by its two partners Luis J. Carrillo and Wade D. Huettel. The firm is currently winding down.

16.     Defendant **Luis J. Carrillo**, age 39, is a resident of San Diego, California. Carrillo is an attorney admitted in New York, New Jersey, and California. Carrillo is a partner in Carrillo Huettel LLP and its predecessor, SteadyLaw Group LLP.

17.     Defendant **Wade D. Huettel**, age 39, is a resident of San Diego, California. Huettel is an attorney admitted in California. Huettel is a partner in Carrillo Huettel LLP and its predecessor, SteadyLaw Group LLP.

18.     Defendant **Gibraltar Global Securities** is a broker-dealer incorporated and headquartered in the Bahamas.  Gibraltar is not registered with the Commission in any capacity. Benjamin T. Kirk, Boyle, Hinton., and Carrillo all maintained accounts at Gibraltar.  On May 23, 2012, the British Columbia Securities Exchange Commission ("BCSC") issued a cease trade order against Gibraltar for trading and advising in securities in British Columbia without being registered and for refusing to provide BCSC with information relating to British Columbia residents with accounts at the company.  Gibraltar recently announced it is terminating its business.

19.     Defendant **Warren Davis**, age 38, is a resident of the Bahamas and the President of Gibraltar.  As President, he controlled all of Gibraltar's activities during 2009 and 2010.

20.     Defendant **John B. Kirk**, age 40, is a Canadian citizen and resident of Surrey, British Columbia.  John Kirk is a stock promoter, was sole director of Skymark Media Group Ltd., and controlled Emerging Stock Report.  On August 11, 2011, the ASC charged John Kirk with quasi-criminal violations for his role in the Skymark pump-and-dump scheme.

21.     Defendant **Benjamin T. Kirk** ("Ben Kirk"), age 34, is a Canadian citizen and was formerly a resident of Calgary, Alberta.  Upon information and belief, he fled Canada in 2010 or 2011.  Ben Kirk is a stock promoter and was a principal of Skymark Research.  In October 2009, along with two other Canadian citizens, Ben Kirk was indicted in the U.S. District Court for the Eastern District of Philadelphia for his role in an unrelated 2008 scheme to manipulate shares of another Pink Sheets issuer, China Health Management Corp.  Ben Kirk failed to appear at his initial appearance on October 26, 2010 and a bench warrant was issued for his arrest.  On August 11, 2011, the ASC charged Ben Kirk with quasi-criminal violations for his role in the Skymark pump-and-dump scheme.

6

22.     Defendant **Dylan L. Boyle**, age 34, is a Canadian citizen and resident of Calgary, Alberta.  Boyle is a stock promoter and was a principal of Skymark Research.  The ASC charged Boyle with quasi-criminal violations on August 11, 2011 for his role in the Skymark pump-and-dump scheme.

23.     Defendant **James K. Hinton, Jr.**, age 42, is a Canadian citizen and resident of White Rock, British Columbia.  Hinton is a stock promoter and worked closely with the Kirks. Starting in at least June 2010, Hinton identified himself as "Director" of Emerging Stock Report. During 2010, Hinton worked from an office at Skymark's location in Calgary, Alberta.

24.     Defendant **Luniel de Beer**, age 41, is a resident of Sammamish, Washington.  De Beer was the president and CEO of Tradeshow and a director of Pacific Blue.

25.     Defendant **Joel P. Franklin**, age 39, is a resident of North Carolina, but during the relevant period was a resident of Anthem, Arizona.  Franklin was the president and CEO of Pacific Blue.

26.     Defendant **Pacific Blue Energy Corporation** ("Pacific Blue") is a corporation incorporated under the laws of the State of Nevada, with its place of business in Flagstaff, Arizona.  Pacific Blue registered an offering of its common stock on a Form SB-2 that became effective in September 2007, and made quarterly and annual filings with the Commission through 2011.  During 2010 its shares were quoted on OTC Link (formerly "Pink Sheets") operated by OTC Markets Group, Inc. ("OTC Link") under the symbol "PBEC".  Since August 20, 2010, trading of Pacific Blue has been suspended in the province of Alberta by order of the ASC.  Pacific Blue has not made any quarterly or annual filings since September 2011.

27.     Defendant **Tradeshow Marketing Company** ("Tradeshow") is a corporation incorporated under the laws of the State of Nevada, with its principal place of business in

Bellevue, Washington. Tradeshow was founded by Bruce Kirk, the father of John and Ben Kirk.

Tradeshow's common shares were registered under Section 12(g) of the Exchange Act until it

filed a Form 15, terminating its registration under Rule 12g-4, effective 90 days after it was filed

on June 4, 2008. During 2009 and 2010, its common shares were quoted on the Pink Sheets /

OTC Link under the symbol TSHO. Since August 20, 2010, trading of Tradeshow has been

suspended in the province of Alberta by order of the ASC.

28.    Defendant and Relief Defendant **Dr. Luis Carrillo**, age 74, is a resident of

Mexicali, Baja California, Mexico, and is the father of attorney Luis J. Carrillo. The block of

Pacific Blue shares in Dr. Carrillo's name was sold for proceeds of $1.1 million.

## OTHER RELATED ENTITIES

29.    **Skymark Media Group Ltd.** ("Skymark") is a corporation incorporated under

the laws of Alberta, Canada with its principal place of business in Calgary, Alberta. Skymark

ran a website called Skymark Research through which investors could pay to receive research

reports covering microcap companies. John Kirk is the sole director of Skymark and Ben Kirk

and Boyle ran its day-to-day operations. Skymark is a respondent subject to the ASC Interim

Cease Trade Order. Skymark was not registered with the Commission in any capacity, nor was it

registered with any Canadian securities regulators.

30.    **Emerging Stock Report** ("ESR") is an unincorporated Canadian organization

with its principal place of business in Surrey, British Columbia. It is owned by John Kirk

through his company Kita-Kaine Investment Holdings Company. Emerging Stock Report ran a

website through which investors could pay to receive research reports covering microcap

companies. John Kirk and Hinton ran the day-to-day operations of ESR. ESR was not registered

with the Commission in any capacity, nor was it registered with any Canadian securities regulators.

## FACTS

### I.   **The Tradeshow Scheme**

31.     Tradeshow was founded in 2003 by Bruce Kirk, the father of John and Ben Kirk. Tradeshow was purportedly established for the purpose of selling consumer merchandise at trade shows and shopping malls.  From the end of 2008 through mid-2009, Tradeshow's operations appeared to be dormant and its stock traded at only a few cents per share.  On April 31, 2009, Tradeshow's balance sheet showed that the company's only asset was $100 in cash.

32.     Until 2007, Bruce Kirk was the President and CEO and individually had beneficial control of approximately 50-60% of Tradeshow's outstanding shares.

33.     Since at least 2006, John Kirk exercised control over Tradeshow, even though he was never disclosed as an officer or director in Tradeshow's public filings.  John Kirk oversaw Tradeshow's employees, made major company decisions, and had control over its bank account.

34.     On October 30, 2007, Luniel de Beer was promoted to CEO and President of Tradeshow after Bruce Kirk resigned from his executive positions.  Notwithstanding this promotion, the Kirks retained their control over Tradeshow through de Beer, their co-conspirator.

35.     Dozens of emails demonstrate that de Beer was reporting to and taking instruction from the Kirks.  De Beer and the Kirks engaged in an almost daily stream of communications regarding Tradeshow press releases, potential business announcements and contacts with investors.  For example, John Kirk drafted press releases for de Beer to release on behalf of Tradeshow and sent emails to de Beer to release news and updated financials.

36.   De Beer received substantial undisclosed compensation from the Kirks and Boyle for his role as CEO of Tradeshow.  In September and October 2009 the Kirks and Boyle wired de Beer over $330,000 of their proceeds from their sale of Tradeshow stock.

**A. The Kirks Consolidated Tradeshow Shares in Preparation for the Pump.**

37.   In June 2008, John Kirk arranged for Bruce Kirk to gift 10 million Tradeshow shares (43% of the outstanding shares) at John Kirk's direction.  John Kirk then instructed Tradeshow's stock transfer agent to reissue these shares in the name of various nominee entities controlled by John Kirk, Ben Kirk and Boyle.

38.   As of August 2009, the Kirks and Boyle controlled at least 9.2 million Tradeshow shares – approximately 40% of the company's outstanding shares.  These shares included:

    a.  4,000,000 shares beneficially owned by Ben Kirk through his nominee entities Strotas Group Corp., Medford Financial and Stonehurst Limited;

    b.  3,000,000 shares beneficially owned by Boyle through his nominee entities Irish Delta and Northlake Equities; and

    c.  1,200,000 shares beneficially owned by John Kirk through his entity Kita-Kaine.

39.   De Beer, who had control of Tradeshow's shareholder records, knew that the Kirks and Boyle owned a control block of Tradeshow shares.

40.   By at least April of 2009, the Kirks were planning a new promotion of Tradeshow in order to increase the stock price and trading volume.

41.   In July 2009, the Kirks, Boyle, Hinton and de Beer began promoting Tradeshow's purported new business model of selling products through television infomercials.

### B. False statements by Tradeshow and de Beer in Furtherance of the Tradeshow Scheme

42.     Tradeshow's annual reports signed by de Beer and filed with OTCMarkets.com in November 2009 and October 2010 falsely claimed that de Beer was the only officer, director or control person of Tradeshow.  The annual reports failed to mention the Kirks' and Boyle's share ownership, or the fact that the Kirks were control persons of Tradeshow, or that they were serving as de facto investment bankers, promoters and investor relations consultants.  Instead, they misleadingly claimed that:

      a.   "There are no known individuals or corporations owning more than 5% of the Company's common stock."

      b.   "The Company does not utilize the services of an investment banker, promoter, relations consultant or an investor relations consultant.  The Company does not utilize the services of the promoter."

43.     De Beer signed and approved Tradeshow's annual reports filed with OTC Link during November 2009 and October 2010 and signed and approved Tradeshow's quarterly reports filed in November 2009, March 2010, April 2010 and October 2010.

44.     Tradeshow's public filings misrepresented de Beer's compensation by failing to disclose kickbacks of stock sale proceeds he received from the Kirks and Boyle.  Specifically, none of these filings disclosed over $330,000 in wire transfers that he received from the Kirk/Boyle group.

45.     Each of Tradeshow's annual and quarterly reports from November 2009 through October 2010 purported to disclose all related party transactions.  This section was misleading because it failed to disclose: (1) the over $330,000 in kickbacks from the Kirks and Boyle to de Beer paid out of Tradeshow stock sales, and (2) the stock ownership, paid promotion and scalping orchestrated by the Kirks.

11

46.     Furthermore, from July 2009 through October 2010, de Beer approved and publicly released dozens of Tradeshow press releases that provided updates on various supposed company developments.  These press releases were misleading because they failed to disclose that the primary purpose of Tradeshow's existence as a publicly traded company, and the underlying purpose of the press releases, was simply to inflate demand for the shares so that the Kirks and Boyle could sell their Tradeshow shares.

### C. False and Misleading Statements by the Kirks, Boyle, Skymark and ESR in Furtherance of the Tradeshow Scheme

47.     In 2009, the Kirks, Boyle and Hinton set up two "boiler-room" operations for the purpose of promoting Tradeshow stock.  These two boiler rooms operated under the names Skymark and ESR.

48.     Ben Kirk and Dylan Boyle operated Skymark from Calgary, Alberta.  John Kirk and Hinton operated ESR from John Kirk's home in Surrey, British Columbia.  In practice, they coordinated all of their stock promotion activities.

49.     Skymark and ESR shared a database of over 30,000 email subscribers, and during 2009 and 2010, Skymark and ESR sent dozens of emails to their subscribers touting their purported "independent" research coverage.

50.     The Kirks and Boyle drafted and/or approved multiple false or misleading statements in Skymark and ESR stock-touting emails, including the representations that Skymark and ESR employees and associates were independent and did not hold any positions or beneficial interest in the promoted companies.

51.     Skymark also hired employees to make phone calls to potential investors in the United States and Canada for the purpose of promoting Tradeshow and Pacific Blue common

stock. These Skymark employees, called "account managers," worked under the supervision and control of the Kirks, Boyle and Hinton.

52.    Ben Kirk and Boyle provided the "account managers" a script to use when calling investors. At times, Skymark account managers called between 100 to 200 subscribers per day to tout either Tradeshow or Pacific Blue stock.

53.    Ben Kirk and Boyle told Skymark "account managers" to watch the movie "Boiler Room" to learn how to promote stocks.

54.    On July 24, 2009, Skymark announced coverage of Tradeshow and sent the first of dozens of misleading email blasts to its database of potential investors.

55.    Starting on at least November 24, 2009, ESR sent an email touting Tradeshow as its "latest recommendation." ESR and Skymark then coordinated their email touts of Tradeshow, sending identical emails on the same dates. From November 2009 through January 2010, the email touts from ESR stated they were "sent from: Skymark Research."

56.    From November 2009 through March 2010, ESR and Skymark sent dozens of false and misleading emails touting Tradeshow and predicting dramatic increases in the stock price. For example:

    a. November 24, 2009 emails from Skymark and ESR contained a price target of $7.57 to over $30 with no reasonable basis, when the shares were trading at around $.70;

    b. December 13, 2009 emails from Skymark and ESR, when the stock was trading at $.80, stated that Tradeshow had "[t]hree infomercials to follow in 2010 with 15 other products ready for TV, [and] 60 products in their portfolio" without any reasonable basis and stated that the stock "is on the verge of showing subscribers 100-500% from its current price";

    c. February 2, 2010 emails from Skymark and ESR when the price reached $.90: "our analysts have upgraded short-term price targets from $1.31 to $1.93 in the coming months," predicted that the stock price could reach $30 and that "If you haven't taken a position in Tradeshow … it is not too late."

13

d. February 8, 2010 emails from Skymark and ESR, after Tradeshow reached $1.38: "ratings continue to be 100% Buy," "More and more independent sources have started to confirm, Tradeshow . . . is in a strong uptrend." "Tradeshow . . . is on the verge of a major breakout in the very near future."

57.     From July 2009 through February 2010, the disclaimers contained in Skymark and ESR emails stated that each had been paid $5,000 by "a third party" and that each "expects to be paid a minimum of five thousand dollars per month for research and advertising purposes." Each of these attempted disclaimers was false and misleading because each falsely claimed the source was a "third party," grossly understated the amount received, and failed to disclose share ownership and scalping by the principals of Skymark and ESR.

58.     None of the Skymark or ESR emails touting Tradeshow disclosed that the control persons of Skymark and ESR received millions of shares from John Kirk, who also controlled Tradeshow.  Nor did the emails disclose that the Kirks and Boyle sold those shares during the period of promotion and used the proceeds to fund Skymark and ESR and make payments to the Kirks, Boyle, Hinton and others.

59.     Under the direct supervision of Ben Kirk and Boyle, Skymark "account managers" falsely told potential investors that Skymark was completely independent during telephone conversations and via email, falsely portraying their organization as an independent research service.

60.     Although Skymark "account managers" repeatedly told investors they were completely independent, Skymark and ESR's principals (the Kirks, Boyle and Hinton) secretly owned millions of shares of Tradeshow stock.

61.     Hinton promoted Tradeshow to multiple investors and made calls to investors to promote the stock while working with Skymark and ESR.  He misled these investors by failing to disclose his ownership interest in the promoted company and lack of independence.

62.   By virtue of their conduct, which involved recommending the purchase of Tradeshow securities without disclosing their ownership interest, stock sales, and intent to sell, John Kirk, Ben Kirk, Boyle and Hinton engaged in undisclosed "scalping" that rendered each recommendation misleading.

63.   De Beer knew that Skymark and ESR were promoting Tradeshow stock by sending emails and calling investors while falsely claiming to be independent.

64.   Carrillo and Huettel knew that Skymark was under the control of the Kirks, because, among other things, they trademarked Skymark for Ben Kirk.

65.   On information and belief, Carrillo also provided advice to the Kirks and Boyle regarding the Skymark script and other written materials distributed by Skymark.

66.   Tradeshow never generated any significant revenues.  For its fiscal year ended May 31, 2010, Tradeshow reported revenue of only $32,085 and a net loss of ($614,012). Instead, Tradeshow's operations were funded almost entirely through $1.2 million in mysterious overseas private placement funds facilitated by Carrillo, Huettel and the Kirks.  On information and belief, these supposed private placement investments were simply proceeds of the Kirks' and Boyle's fraudulent sales of Tradeshow shares, which they funneled back to Tradeshow through the Carrillo Huettel Trust Account.

67.   Tradeshow spent a large portion of these funds on expenses and salary for de Beer.  De Beer received over $300,000 from the Tradeshow bank account, in addition to the $330,000 in secret kickbacks he previously received from the Kirks and Boyle.

### D. The Kirks and de Beer Conspired to Conceal the Kirks' True Role when Investors Suspected Skymark's Connection to Tradeshow.

68.   From July 24, 2009, when Skymark first announced "independent coverage" of Tradeshow, through February 2010, Skymark and ESR's aggressive promotion successfully

pushed the price of Tradeshow stock from less than $.15 to over $1.50/share, reaching a high value of $1.62 on February 9, 2010.

69.     On February 24, 2010, an article titled: "Tradeshow Marketing Knows How To Sell Its Stock" appeared on TheStreetSweeper.org.  It highlighted the Kirks' connections to both Skymark and Tradeshow using information found in older SEC filings and other internet sources, and noted that Carrillo Huettel LLP represented both Skymark and Tradeshow.  After the article was publicized, Tradeshow's stock began a precipitous fall, dropping 40% over the next two weeks.

70.     The day of the Street Sweeper article, Skymark subscribers began calling their Skymark "account managers" demanding to know whether Skymark was independent as it claimed.

71.     Instead of coming clean, the Kirks, Carrillo, Huettel, Boyle and de Beer went into damage control mode.  They conspired to deny the facts in the Street Sweeper article and to conceal the Kirks' shared control.  In furtherance of this cover-up, Skymark and Tradeshow made public statements blaming the article on a mysterious stock shorting conspiracy.  Drafts of these statements were circulated between Ben Kirk, Carrillo, Huettel and de Beer.

72.     For example, on February 24, 2010, Skymark responded to its subscribers, stating: "certain individuals have maliciously and fictitiously attacked Skymark Research and [Tradeshow]. … We are in the process of starting an investigation into the reasoning behind the attacks.  Our legal counsel is currently reviewing the matter and has suggested possible legal action against the involved parties."  This response was drafted by Ben Kirk and circulated to de Beer, among others.

73.   On February 26, 2010, de Beer, on behalf of Tradeshow, issued a press release stating that there were "a significant number of inaccuracies within the associated report that are not based on fact." De Beer called the Street Sweeper article part of an "intentional attempt to falsely discredit our company" and that "organized stock shorting activities behind this smear campaign … may account for the sudden erratic trading in our company's stock. . . . We have engaged legal counsel on this matter and we will do everything in our power to rise above this unfortunate and untimely attempt at deprecation and stock manipulation."

74.   On February 26, 2010, Skymark released a second statement asserting that the Street Sweeper article was "written with an ulterior motive and may be linked to a ring of destructive stock manipulators, who have attempted to have a negative impact on the shares and trading in TSHO over the last 30 days." Skymark falsely asserted that "Contrary to recent information suggesting otherwise, neither Skymark nor any of its team has ever been compensated in shares of stock of any company profiled."

75.   The public statements by Skymark and Tradeshow responding to the Street Sweeper article, which were drafted by or approved by the Kirks, Carrillo, Huettel and de Beer, were false and misleading because they failed to disclose the truth: as the article implied, the Kirks and Boyle controlled Skymark, whose purpose was simply to promote the common stock of Tradeshow, a company also controlled by the Kirks and Boyle.

## II.   The Pacific Blue Scam

76.   Pacific Blue began its corporate existence in April 2007 as Descanso Agency, Inc., which purported to be a specialized travel service company. In actuality, Descanso Agency was a shell with no substantive operations or revenue.

77.     In September 2009, the Kirks and Carrillo arranged to purchase all outstanding shares of Descanso Agency, Inc., renamed the company Pacific Blue, and decided its purported business would be an alternative energy company.

78.     The Kirks installed de Beer as Chairman of Pacific Blue and installed Joel Franklin as President, CEO and Director.  At the time, Franklin was a residential house painter and contractor, living in Arizona, with no experience managing publicly traded companies. None of the Kirks, Franklin or de Beer had any background in solar or alternative energy.

79.     John Kirk contributed $200,000 of the purchase price for the Pacific Blue shell, and Dr. Luis Carrillo contributed $20,000.  Carrillo and Huettel facilitated these payments through Carrillo Huettel LLP's attorney IOLTA trust account (the "Carrillo Huettel Trust Account").

80.     Carrillo and Huettel arranged for Pacific Blue's outstanding shares to be distributed in blocks of 4.9% to John Kirk, to Dr. Luis Carrillo, and to various foreign nominee entities controlled by the Kirks and Boyle.  The acquisition was structured in this manner to keep the holdings of each secret nominee entity just under 5% of the outstanding shares.

81.     The 4.9% structure designed by Carrillo and Huettel was meant to conceal and facilitate the manipulation by giving the misleading impression that shares were held by various independent entities, not by the Kirk/Boyle group.

82.     To further conceal the true ownership of Pacific Blue's shares, Carrillo and Huettel drafted a sham "Non-Affiliate Stock Purchase Agreement" under which the 4.9% purchasers purportedly acquired their shares.  Carrillo and Huettel knew that the 4.9% nominee owners were acting as a group, because they knew that 90% of the purchase price came from

their client John Kirk and almost all of the shares were being provided to entities connected to the Kirks.

83.     Carrillo and Huettel also arranged for a large restricted block of Pacific Blue shares to be distributed to de Beer under an "Affiliate Stock Purchase Agreement" that they drafted.

84.     The de Beer "Affiliate Stock Purchase Agreement" was also a sham because it falsely stated that de Beer had purchased 40% of the company's shares for $80,000.  As Carrillo, Huettel and de Beer knew, de Beer did not pay any consideration for the shares: John Kirk paid for the shares and the block of restricted shares was simply assigned to de Beer as part of the shell transaction.

85.     Because the Kirks controlled the offshore nominee entities that were the purported 4.9% "purchasers" under the sham "Non-Affiliate Stock Purchase Agreement," the Kirks and their associates (Boyle, Dr. Carrillo and de Beer) beneficially owned or controlled at least 85% of the company's outstanding shares -- or over two-thirds of the total purported unrestricted shares.  These shares included:

    a.  7,320,000 shares beneficially owned by Ben Kirk through his nominee entities Strotas Group Corp., Baltic Investment Ltd., Mazi International Corp. and Veritas Holdings Ltd.;

    b.  3,660,000 shares beneficially owned by Boyle through his nominee entities Irish Delta and True North Consulting;

    c.  3,660,000 shares beneficially owned by John Kirk individually and through his entity Kita-Kaine;

    d.  1,830,000 shares issued in the name of Dr. Luis Carrillo; and

    e.  15,000,000 restricted shares held by de Beer.

86.     During late 2009 and early 2010, John Kirk sold over 1 million shares of Pacific Blue in privately negotiated transactions for proceeds of over $210,000, which he received

through the Carrillo Huettel Trust Account.  Carrillo drafted additional misleading "non-affiliate" stock purchase agreements for these private sales of shares by John Kirk, falsely stating that John Kirk was not an officer, director or affiliate of Pacific Blue.

87.     Pacific Blue never generated any revenues, but was funded almost entirely through the transfer of $2 million in mysterious overseas private placement funds, facilitated by Carrillo, Huettel and the Kirks.  On information and belief, these supposed private placement funds were simply proceeds of the Kirks' and Boyle's fraudulent sales of Pacific Blue shares, which they funneled back to Pacific Blue through the Carrillo Huettel Trust Account.

88.     Pacific Blue spent a large portion of these funds on expenses and salaries for de Beer and Franklin, including $75,000 "bonuses" in December 2010 to de Beer and to Franklin (which were approved by Carrillo).  All told, de Beer received over $200,000 of these funds from the Pacific Blue bank account, in addition to the $330,000 in secret kickbacks he previously received.

### A. The Kirks Directed Pacific Blue's Release of Misleading Statements.

89.     After the Kirks took control of Pacific Blue in September 2009, they asserted control over all of Pacific Blue's major decisions, including pushing the company to draft and release positive press releases.

90.     Carrillo and Huettel were heavily involved in the communications between Pacific Blue and the Kirks.  They participated in emails and discussions with the Kirks regarding Pacific Blue that demonstrated their knowledge that the Kirks were exercising control over Pacific Blue.  In addition, Huettel specifically provided Ben Kirk comments on Pacific Blue promotional documents.

91.     Pacific Blue's SEC filings from December 2009 through August 2010 contained multiple statements and omissions that were misleading, including statements that concealed the Kirks' affiliation with Pacific Blue.

92.     Pacific Blue's Form 8-K filed on December 9, 2009, and signed by Franklin, incorrectly stated that de Beer was the only person who owned 5% of the outstanding shares. The Form 8-K was rendered false and misleading because it failed to disclose (1) the stock ownership and promotion by the Kirk/Boyle group as controlling shareholders and (2) the over $330,000 in kickbacks paid to de Beer from the Kirk/Boyle group.

93.     Pacific Blue's Form 10-K filed on April 8, 2010, which was signed and approved by de Beer and Franklin, likewise falsely stated that de Beer was the only person who owned 5% of the outstanding shares.  That section and the "related party transaction" section of the Form 10-K were false and misleading for failure to disclose: (1) the stock ownership and promotion by the Kirk/Boyle group as controlling shareholders and (2) the over $330,000 in kickbacks paid to de Beer from the Kirk/Boyle group.

94.     In addition, Franklin falsely certified, in connection with Pacific Blue's April 8, 2010 Form 10-K, that as CEO he had designed or supervised the design of effective disclosure controls, evaluated disclosure controls and procedures, and determined they were effective.  In fact, he had not designed, supervised or evaluated any disclosure controls or procedures, and none existed.

95.     The "related party transaction" sections of Pacific Blue's Forms 10-Q (filed November 16, 2009, May 13, 2010 and August 17, 2010) were false and misleading for failure to disclose: (1) the stock ownership and promotion by the Kirk/Boyle group as controlling shareholders and (2) the over $330,000 in kickbacks paid to de Beer from the Kirk/Boyle group.

21

96.     Furthermore, from April through September 2010, Pacific Blue distributed over a dozen press releases that provided supposed updates on various company developments.  None of the company press releases disclosed that all Pacific Blue press releases and Forms 8-K were the product of Skymark and the Kirk/Boyle group – a group that was also falsely publicizing "independent" research to promote the stock while selling millions of shares and whose interests were adverse to those of the "buy-and-hold" investors that Skymark employees were soliciting.

### B. Carrillo and Huettel Caused Pacific Blue to Make False and Misleading Statements.

97.     Carrillo and Huettel drafted and actively facilitated Pacific Blue's false statements above.  Despite knowing that the Kirk/Boyle group owned and controlled Pacific Blue, they instructed Franklin to make false statements on behalf of Pacific Blue.

98.     Carrillo and Huettel drafted all of Pacific Blue's SEC filings and presented them to Franklin for his signature and approval.  Franklin, who had no experience managing public companies, signed whatever Carrillo Huettel LLP sent to him.

99.     For example, Carrillo prepared and Huettel commented on the December 9, 2009 Form 8-K that falsely listed Franklin and de Beer as the only officers, directors, or "beneficial owner[s] of more than five percent (5%) of our outstanding common stock."  Huettel specifically reviewed and commented on this section.

100.    On November 6, 2009, Carrillo, copying Huettel, instructed Franklin to sign a misleading "Related Party" worksheet to be relied upon by Pacific Blue's auditors.  The worksheet stated that Franklin was the only company "affiliate" and failed to mention the Kirks' secret control over Pacific Blue, disclose any of the Kirk-related entities, or mention de Beer.  After Franklin signed the document, Carrillo sent it to Pacific Blue's auditors.

101.    On May 10, 2010, Carrillo instructed Franklin to sign an updated "Related Party" worksheet to be relied upon by Pacific Blue's auditors.  The worksheet stated that Franklin and de Beer were the only company "affiliates" and failed to mention the Kirks' secret control over Pacific Blue or disclose the share ownership of the Kirk-related entities.  After Franklin signed the document, Carrillo sent it to Pacific Blue's auditors.

### C. False and Misleading Statements by Skymark and ESR Promoting Pacific Blue

102.    In April 2010 Skymark and ESR began heavily promoting Pacific Blue as their next stock pick.  From April through August 2010, ESR and Skymark sent over a dozen false and misleading emails touting Pacific Blue and predicting dramatic increases in the stock price. For example:

a. June 27, 2010: "As this story continues to unfold and Pacific Blue Energy (PBEC) delivers on its business plan we are reassured Pacific Blue Energy (PBEC), like JAZZ, will deliver 100-500% gains from its current price as of its close on Friday of $1.05."

b. June 30, 2010: "If you haven't yet taken a position in Pacific Blue Energy (PBEC), it is not too late.  Pacific Blue Energy (PBEC)'s potential to show 100-500% has become very real from today's close of $1.19."

c. July 16, 2010: Pacific Blue's "potential to show 100-500% has become very real from today's price. . . . With 38.75 Million shares outstanding, $33 Million dollars net income each year would translate into earnings of $0.85 per share.  An average anticipated industry multiple of 25 results in a share price of $21.25."

103.    The Kirks also drafted and released a fake "independent" analyst report that they used to justify a $3.50 - $5.00 target price for Pacific Blue (when stock was trading at $1.05). On August 6, 2010 Skymark and ESR emails touted the purportedly "independent" report that they had created to their subscribers, stating:

a. "It has been brought to our attention that the equity research group, "BuySide" has issued coverage on Pacific Blue Energy (PBEC).  Buyside

is known for its consistency, long-standing track record and "invitation only" subscriber base."

b.   "This independent report confirms our belief that Pacific Blue Energy (PBEC) has the potential to show our subscribers substantial gains from its close of $1.05."

104.   Beginning on March 5, 2010 and extending through the Pacific Blue promotion, the Skymark and ESR emails contained disclaimers that falsely stated:

"[Skymark/ESR] is an independent organization that produces and publishes unbiased research. [Skymark/ESR] is independently funded through its subscriber base, at $49.95/month per user. [Skymark/ESR] has received no compensation from any of the said companies above. [Skymark/ESR] does **not** accept compensation for research coverage from companies, **nor** does it actively seek such compensation. [Skymark/ESR], along with its employees and associates do **not** hold any positions, shares, or beneficial interest in the company mentioned above. … [Skymark/ESR] has **not** been paid in shares, cash, or any other form of compensation by any third party related to the said company." (emphasis in original)

105.   The disclaimer was entirely false and misleading because, in reality, Skymark and ESR's principals were substantial shareholders and control persons of Pacific Blue, and were secretly selling millions of Pacific Blue shares for profit.

106.   The Kirks, Boyle and Hinton also attempted to facilitate private placement purchases of Pacific Blue stock.  For example, Hinton offered to sell a block of Pacific Blue shares to a potential private placement investor in the U.S.  While offering the stock, he failed to disclose that he and his colleagues (the Kirks and Boyle) owned blocks of Pacific Blue shares and were dumping those shares into the increased demand created by their promotion.

107.   By virtue of their conduct, which involved recommending the purchase of Pacific Blue securities without disclosing their ownership interest, stock sales and intent to sell, John Kirk, Ben Kirk, Boyle and Hinton engaged in undisclosed "scalping" that rendered each recommendation misleading.

### III.   The Illegal Distribution of Shares

#### A. Gibraltar Facilitated Deposits of Ben Kirk's Shares and Misrepresented the Shares' Beneficial Ownership.

108.   The Kirks and Boyle sold millions of Tradeshow and Pacific Blue shares through accounts they held at Scottsdale Capital Advisors ("Scottsdale"), a registered broker-dealer in the U.S., and also through accounts they maintained at Gibraltar in the Bahamas.

109.   The Kirks and Boyle opened accounts at Scottsdale in the name of fake nominee entities, and they also opened accounts at Gibraltar in the name of fake nominee entities.

110.   Gibraltar maintained omnibus accounts at Scottsdale through which it liquidated stocks held by its clients.  Gibraltar's business primarily consists of liquidating low-priced, thinly-traded stocks on behalf of its clients, often during periods of suspicious promotion.

111.   Gibraltar's website touts its goals of client secrecy ("confidentiality is paramount to Gibraltar") and asset protection ("transferring your assets into a legal entity which will protect them from litigation [or] government seizure").

112.   Gibraltar also offers to incorporate "International Business Corporations" (IBCs) for its clients, and suggests using nominee officers and directors ("giving you an extra level of confidentiality as your name will not show up as an officer or director on your IBC.")

113.   Ben Kirk, Boyle and Hinton had accounts at Gibraltar in their own names or in the names of offshore corporations they controlled.  Carrillo also had an account at Gibraltar, and represented Gibraltar as its U.S. counsel.

114.   Gibraltar served a key role in the "dump" portion of the scheme by providing misleading representations in September 2009 and April 2010 that served to conceal the beneficial ownership of millions of Tradeshow and Pacific Blue shares controlled by Ben Kirk.

115.    Ben Kirk controlled at least three separate nominee accounts at Gibraltar, for no apparent purpose other than to conceal his identity.  Gibraltar knew that it was maintaining these nominee accounts beneficially owned by Ben Kirk in addition to his personal account and that there was no readily apparent legitimate purpose for these accounts.

116.    In order to effectuate share deposits and sales on behalf of its client Ben Kirk, Gibraltar misrepresented the shares' beneficial ownership.  For example, in September 2009, Gibraltar provided an affidavit to Scottsdale (as part of Scottsdale's due diligence) stating that a nominee entity (Medford Financial) was its "client" for the purpose of depositing 1 million Tradeshow shares that Gibraltar knew were beneficially owned by Ben Kirk, falsely stating that:

    a.  "Gibraltar holds [Medford's] securities as 'custodied securities' as custodian only for the sole benefit of [Medford] and that

    b.  "[a]ll interest, dividends, distributions, and other income attributable from the custodied securities are the property of [Medford]."

117.    Gibraltar provided additional affidavits to Scottsdale in April 2010 for two separate deposits of 1.8 million Pacific Blue shares misleadingly stating that it held securities for the "sole benefit" of its clients Mazi and Baltic, when Gibraltar knew that Ben Kirk was the beneficial owner and that Mazi and Baltic were nominee entities.

118.    Also in April 2010, Gibraltar signed share deposit forms (called "DSR forms") relied upon by Scottsdale's clearing broker for the deposit and sale of 3.6 million Pacific Blue shares on behalf of Ben Kirk.  These forms misleadingly represented that the shares were "acquired" from nominee entities Mazi and Baltic, when Gibraltar knew that its client Ben Kirk was the beneficial owner of the shares.

119.    These representations were false because they contradicted the information contained in the account opening documents Ben Kirk provided to Gibraltar for his nominee accounts.  Moreover, Gibraltar's own AML procedures, which cited the Bahamian Financial

26

Transactions Reporting Act (2000) and Proceeds of Crime Act (2000), imposed on it a duty to investigate the beneficial ownership and purpose of Ben Kirk's sub-accounts. The AML requirements expressly required Gibraltar to verify the identity of its customers, including the customer's occupation and name of employer, purpose of the account and the potential account activity, source of funds, and the beneficial ownership for all corporate accounts. Gibraltar knew that Ben Kirk was the beneficial owner of the Tradeshow and Pacific Blue shares, not the nominee entity.

120.    These representations, which were signed by Warren Davis, president of Gibraltar, were made to conceal the beneficial ownership of the shares in furtherance of the scheme.

121.    After making these false representations, Gibraltar arranged to sell Pacific Blue and Tradeshow shares on behalf of Ben Kirk's nominee accounts for proceeds of over $3.8 million through omnibus accounts in Gibraltar's name at Scottsdale.

### B. De Beer and Franklin Provided False and Misleading Corporate Resolutions.

122.    In order to deposit the Kirks' and Boyle's Tradeshow and Pacific Blue share deposits for sale, Scottsdale and its clearing brokers required corporate resolutions from Tradeshow and Pacific Blue as part of their due diligence process.

123.    De Beer provided the Kirks and Boyle with misleading corporate resolutions and certifications on behalf of Tradeshow that allowed them to deposit shares for sale. These resolutions and certifications were maintained as part of Scottsdale and/or its clearing firm's due diligence files.

124.    For example, on or about July 14, 2009, and again in September 2009, de Beer provided certifications for share certificates John Kirk held in the name of a nominee entity. De

Beer's certifications falsely represented to Scottsdale, with no reasonable basis, that the "Holder is not a director, officer or an "Affiliate" of the Company as that term is used in paragraph (a) of Rule 144 of the Securities Act of 1933 . . ." and that "the Holder is not a beneficial owner of 5% or more of any class of equity securities of the Company." On or about July 14, 2009, De Beer provided a certification with the same misleading representations as to a share certificate held by Boyle.

125.   On or about August 28, 2009, de Beer provided a corporate resolution to Ben Kirk for shares Ben Kirk held at Gibraltar in the name of a nominee entity. De Beer's resolution falsely claimed that the shares were "validly issued" and "free trading" shares.

126.   These Tradeshow certifications and resolutions were false and misleading because De Beer knew that the Kirks and Boyle beneficially owned well over 5% of Tradeshow common shares, that they controlled Tradeshow, that they were "affiliates" under Rule 144 of the Securities Act, and that shares they held were not "free trading" shares.

127.   Franklin and de Beer also provided Ben Kirk with misleading corporate resolutions and certifications on behalf of Pacific Blue that allowed him to deposit shares for sale. For example, on or about April 6, 2010, Franklin and de Beer provided a corporate resolution to Ben Kirk for shares Ben Kirk held at Gibraltar in the name of a nominee entity. This resolution, signed by Franklin and de Beer on behalf of Pacific Blue, falsely certified that the shares were "validly issued" and "free trading". Ben Kirk and Gibraltar used this resolution to deposit and sell multiple shares.

128.   This Pacific Blue resolution was false and misleading because Franklin and de Beer knew that the Kirks and Boyle beneficially owned well over 5% of Pacific Blue's common

shares, that they controlled Pacific Blue, that they were "affiliates" under Rule 144 of the

Securities Act, and that shares they held were not "free trading" shares.

### C. Carrillo and Huettel Provided False and Misleading Opinion Letters for Pacific Blue.

129.    In order to deposit and sell thinly-traded, low-priced securities such as Pacific

Blue, clearing and introducing brokers required legal opinions vouching for the unrestricted

status of Pacific Blue shares.  Carrillo and Huettel provided multiple misleading opinion letters

to facilitate the deposit and sale of the Kirks' and Boyle's Pacific Blue shares.

130.    For example, on or about November 23, 2009, Carrillo and Huettel provided

opinion letters (signed by Carrillo) to Scottsdale for blocks of shares owned by Ben Kirk and

Boyle's nominee entities, falsely confirming that the "shares are fully registered, unrestricted, . . .

free trading" shares.

131.    On or about March 2, 2010, Carrillo and Huettel provided an opinion letter

(drafted by Huettel and signed by Carrillo) to the Depository Trust Company (DTC) for shares

owned by Boyle's nominee entity falsely stating "the Subject Shares are freely transferrable

without registration under the Securities Act by a holder which is not an 'affiliate' of the

Company as defined in Rule 144(a)(3) under the Securities Act."

132.    On or about April 21, 2010, Carrillo and Huettel provided an opinion letter

(signed by Carrillo) to Scottsdale for blocks of shares in Gibraltar's name but owned by Ben

Kirk's nominee entities falsely stating that "the shares have been registered under the Securities

Act of 1933" and "we are not aware of any other agreement or understanding that would

preclude [Gibraltar] from selling ..."

133.    Carrillo and Huettel knew that the Kirk/Boyle group beneficially owned well over

5% of Pacific Blue's common shares, that they controlled Pacific Blue, that they were

"affiliates" under Rule 144 of the Securities Act, and that shares they held were not "free trading" shares.

134.    Carrillo and Huettel knew that the shares were not "registered" under the Securities Act.  They knew that the shares issued in the 2010 securities offering were not "registered" under the Form SB-2 filed by the predecessor entity (Descanso) in 2007, because registration statements are transaction specific.  The 2007 Form SB-2 was filed well before the Kirks, Boyle and Carrillo purchased all outstanding shares, took control of the company, replaced management, renamed the company Pacific Blue and arranged for the redistribution of all outstanding shares.  The distribution in 2010 was a new offering, and each new offering must have a valid registration statement or a valid exemption.  As discussed below, no valid exemption existed.

### D. De Beer, Gibraltar, Davis, Ben Kirk, John Kirk, Boyle and Hinton Illegally Distributed Tradeshow Shares.

135.    In 2009 and 2010, as part of the conduct described above, de Beer, Gibraltar, Davis, Ben Kirk, John Kirk, Boyle and Hinton arranged to illegally sell or offer to sell millions of Tradeshow shares for which no registration statement was in effect.

136.    John Kirk, who controlled Tradeshow, arranged for the Kirks, Boyle and Hinton to acquire Tradeshow securities (originally held by Bruce Kirk, who was also an affiliate of the issuer), in a transaction or chain of transactions not involving any public offering.  Therefore, the Tradeshow securities were restricted securities as defined in Rule 144(a)(3)(i).  These securities were also control securities, because the beneficial ownership of over 40% of the outstanding stock of Tradeshow by the Kirks, Boyle and Hinton gave them control over the issuer, as demonstrated by their active involvement in the operations and promotion of the company.

137.   The Kirks, Boyle and Hinton are statutory underwriters under Securities Act Section 2(a)(11) because they acquired the securities from an affiliate of the issuer with a view to public distribution.  As statutory underwriters, in order to resell the securities to the public in reliance on Section 4(a)(1), they were required to comply with the applicable conditions of Rule 144 in order to not be deemed "underwriters" engaged in an illegal public distribution.

138.   The Kirks, Boyle and Hinton did not comply with the conditions of Rule 144 in connection with their distribution of Tradeshow securities, including the conditions relating to current public information, holding period, manner of sale, and volume limitations.  Because the applicable conditions of Rule 144 were not met, the Kirks, Boyle and Hinton were underwriters for their distribution of Tradeshow shares.  Because their sales were not registered, they engaged in an illegal public distribution in violation of the registration requirements of the Securities Act.

139.   De Beer was a necessary participant and/or substantial factor in the distribution of Tradeshow shares.  He provided misleading corporate resolutions that allowed the deposit and trading of Tradeshow shares by the Kirks and Boyle, and received over $330,000 in secret sales proceeds from the illegal public distribution.

140.   Gibraltar is subject to liability for its illegal distribution of Tradeshow shares on behalf of its client Ben Kirk.  Gibraltar's sales were not considered "brokers' transactions" under Section 4(a)(4) because the exemption is not available where the broker has failed to make a reasonable inquiry.

141.   Here, numerous red flags existed, including the sale of blocks of a low-priced, thinly-traded issuer and Ben Kirk's acts to conceal his beneficial ownership by transferring and selling shares through multiple nominee accounts at Gibraltar.  In light of the numerous red flags surrounding Ben Kirk's sales, there was a need for a "searching inquiry" into the Tradeshow

stock that it deposited and sold.  Gibraltar did not conduct a reasonable inquiry, but instead affirmatively helped Ben Kirk conceal his beneficial ownership of shares from Scottsdale.

142.   Warren Davis, as president of Gibraltar, signed the misleading documentation, provided to Scottsdale, concealing Ben Kirk's beneficial ownership in furtherance of the deposit and sale of shares.

### E. All Defendants Illegally Distributed Pacific Blue Shares.

143.   In 2010, as part of the conduct described above, all defendants arranged to illegally sell or offer to sell millions of Pacific Blue shares for which no registration statement was in effect.

144.   When John Kirk, with the assistance of Carrillo and Huettel, purchased all outstanding shares of Descanso in late 2009, took control of the company, replaced management, renamed the company Pacific Blue and arranged for the redistribution of all outstanding shares, he set into motion a new distribution and offering of shares.

145.   The Kirks, Boyle, Hinton and Dr. Carrillo acquired Pacific Blue securities as part of this transaction from the issuer or an affiliate of the issuer with a view to public distribution. All shares were acquired as part of the consolidation and redistribution of 100% of the outstanding shares by John Kirk, who was an affiliate of the issuer.  Therefore, the Pacific Blue securities were restricted securities as defined in Rule 144(a)(3)(i).  These securities were also control securities, because the Kirks, Boyle and Hinton acted in concert and had "control" by virtue of their ownership of well over 50% of Pacific Blue stock.

146.   The Kirks, Boyle, Hinton and Dr. Carrillo are underwriters under Section 2(a)(11) because they acquired shares from an affiliate of the issuer with a view to public distribution and did not comply with the applicable conditions of Rule 144.

147.   Pacific Blue was a shell company when its shares were purchased and redistributed by John Kirk in September 2009. Rule 144 is not available for the resale of securities initially issued by a company that at any time has been a shell company, unless the company has filed the same information as would be required in a registration statement ("Form 10 information") and the stock is held for one year after the Form 10 information has been filed.

148.   The Kirks, Boyle, Hinton and Dr. Carrillo sold millions of Pacific Blue shares within one year of Pacific Blue's December 9, 2009 Form 8-K that purported to contain the required Form 10 information and certification that the company had ceased being a shell.

149.   The Kirks, Boyle, Hinton and Dr. Carrillo also did not comply with the Rule 144 conditions relating to current public information, holding period, manner of sale, and volume limitations.

150.   Dr. Carrillo held his shares, at least in part, as a nominee for Carrillo and Huettel. Carrillo (the son) had trading authority and power of attorney over the brokerage account where the sales were made, Carrillo provided instructions to the broker concerning that account, and over one-third of the $1.1 million in sale proceeds was redirected to Carrillo Huettel LLP.

151.   Because the applicable conditions of Rule 144 were not met, the Kirks, Boyle, Hinton and Dr. Carrillo were considered statutory underwriters for their distribution of Pacific Blue shares. Because their sales were not registered, they engaged in an illegal public distribution in violation of the registration requirements of the Securities Act.

152.   Carrillo, Huettel, and Carrillo Huettel LLP played a significant role in the Pacific Blue offering and served as necessary participants and substantial factors in the distribution. They designed the acquisition using 4.9% blocks of shares, provided documents and instructions directing Pacific Blue's transfer agent to issue shares, and Carrillo instructed Franklin to execute

a resolution incorrectly certifying that the shares were not being deposited by an "affiliate." They also provided misleading opinion letters to clearing brokers and the DTC, facilitating the deposit and sale of shares, and drafted agreements for John Kirk's distribution of shares in private transactions.

153.    Franklin played a significant role in the Pacific Blue offering and served as a necessary participant and substantial factor in the distribution because he provided blank corporate resolutions that allowed Ben Kirk's shares to be deposited and sold.

154.    De Beer played a significant role in the Pacific Blue offering and served as a necessary participant and substantial factor in the distribution because he signed misleading statements concealing Boyle's, Hinton's and the Kirks' involvement in the company.

155.    Hinton played a significant role in the Pacific Blue offering and served as a necessary participant and substantial factor in the distribution because he sold Pacific Blue shares that he received from John Kirk, participated in the boiler room promotion of Pacific Blue touting the stock to U.S. investors, and received proceeds of the Kirks' U.S. stock sales.

156.    Davis and Gibraltar are subject to liability for their roles in the illegal distribution of Pacific Blue shares because Gibraltar's sales on behalf of its client Ben Kirk did not qualify as brokers' sales under Section 4(a)(4).  Gibraltar failed to conduct a reasonable inquiry, and instead concealed Ben Kirk's beneficial ownership of millions of shares.  Davis, as President of Gibraltar, signed misleading documentation in furtherance of the deposit and sale of shares.

### F. The Kirks, Boyle and Hinton Recognized Over $11 Million in Illegal Profits Selling Tradeshow and Pacific Blue Shares.

157.    The Kirks, Boyle and Hinton profited by selling millions of shares of Tradeshow and Pacific Blue into the increased demand created by their promotions.  Most of these sales

were made using at least 8 different offshore nominee entities, through accounts controlled by Ben Kirk and Boyle.

158.    Proceeds of the sales were then wired to the Gibraltar accounts of the Kirks, Boyle, Hinton and others, to accounts held at a bank in Barbados, and to the Carrillo Huettel Trust Account.

159.    Carrillo and Huettel allowed the Carrillo Huettel Trust Account to be used by John Kirk and Hinton as their de facto bank account. Fraudulent "pump and dump" proceeds were funneled from offshore accounts to the Kirks, Hinton, and other conspirators through the Carrillo Huettel Trust Account.

160.    With respect to Tradeshow sales, from August 2009 through February 2010:

    a.  Nominee entities controlled by Ben Kirk and Boyle realized more than $4.4 million in proceeds from stock sales of over 5 million shares through accounts at Scottsdale and Gibraltar;

    b.  Boyle received more than $300,000 in proceeds from stock sales that he conducted through a personal offshore account in Turks and Caicos;

    c.  John Kirk realized proceeds of $306,000 from stock sales conducted through accounts in his own name; and

    d.  Hinton realized proceeds of more than $21,000, and also received at least $31,000 in proceeds from sales from Ben Kirk-controlled accounts.

161.    From December 2009 through February 2010, Ben Kirk wired over $440,000 in Tradeshow sale proceeds from his nominee accounts at Gibraltar to the Carrillo Huettel Trust Account, for the benefit of John Kirk and others.

162.    In February 2010, Ben Kirk and Boyle wired over $3.4 million in Tradeshow proceeds from nominee accounts they held at Scottsdale to an account at a bank in Barbados.

163.    With respect to Pacific Blue sales, from March through August 2010:

    a.  Nominee entities controlled by the Kirks and Boyle realized more than $5.6 million from stock sales;

b. John Kirk realized proceeds of more than $210,000 from his sale of over 1 million shares of Pacific Blue in privately negotiated transactions to friends and acquaintances leading up to the pump;

c. John Kirk realized proceeds of more than $100,000 from shares held in his mother's name but that he controlled; and

d. Hinton also realized proceeds of over $12,000 from shares sold during the pump, and received an additional $150,000 in proceeds of Pacific Blue stock sales.

164.    In April 2010, Ben Kirk and Boyle wired over $1.7 million in Pacific Blue proceeds from nominee accounts they held at Scottsdale to an account at a bank in Barbados.

165.    In June 2010, Ben Kirk and Boyle wired over $450,000 in Pacific Blue proceeds from nominee accounts they held in Turks and Caicos to an account in Barbados.

166.    In June 2010, Ben Kirk wired over $1.5 million in Pacific Blue proceeds from nominee accounts he held at Gibraltar to an account in Barbados.

### G. Dr. Carrillo's Pacific Blue Shares Were Sold for Over $1 Million.

167.    Carrillo, Huettel and Carrillo Huettel LLP also profited from the Pacific Blue scheme. An account controlled by Carrillo sold most of the Dr. Carrillo block of Pacific Blue shares at the height of the pump for proceeds of over $1.1 million, which was then wired to a foreign account held in Dr. Carrillo's name. Carrillo, Huettel and Carrillo Huettel LLP all received proceeds from the sale of Dr. Carrillo's block of shares.

168.    Over $472,000 of the proceeds from the sale of Dr. Carrillo's shares was wired to the same offshore account in Barbados where the Kirks and Boyle sent their proceeds.

169.    $520,000 of the Dr. Carrillo proceeds were wired to accounts in California, which was distributed, in part, as follows:

a. $343,000 was then transferred to the Carrillo Huettel Trust Account, purportedly as a "loan" from Dr. Carrillo;

    b.  At least $125,000 of proceeds were transferred to Carrillo's personal account; and

    c.  At least $32,500 of proceeds were transferred to Huettel's personal account.

170.    When the SEC staff requested documentation of the $343,000 "loan" from Dr. Carrillo to Carrillo Huettel LLP, counsel for Carrillo Huettel LLP informed it that no loan documentation existed.

171.    In addition, counsel for Carrillo Huettel LLP has informed the SEC that the ledgers maintained by Carrillo and Huettel for the Carrillo Huettel Trust Account no longer exist. On information and belief, these trust records were destroyed during the course of the SEC's investigation, notwithstanding that Carrillo, Huettel, and/or the firm were under a duty to maintain the ledgers, both under California law pertaining to attorney trust accounts and also in light of the Commission's investigation.

### FIRST CLAIM FOR RELIEF
### Violations of Section 17(a)(1)-(3) of the Securities Act
(Against Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow and Pacific Blue)

172.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

173.    By engaging in the acts and conduct described in this Complaint, Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow and Pacific Blue directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Tradeshow and/or Pacific Blue securities, have:

    a.  Employed devices, schemes, and artifices to defraud;

    b.  Obtained money or property by means of untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    c.  Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Tradeshow and/or Pacific Blue.

174.    Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow and Pacific Blue engaged in the above conduct knowingly or recklessly.

175.    By reason of the foregoing, Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow and Pacific Blue, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Against Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, de Beer,
John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow and Pacific Blue)

176.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

177.    By engaging in the acts and conduct described in this Complaint, Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow and Pacific Blue directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Tradeshow and/or Pacific Blue securities, have:

    a.  Employed devices, schemes, and artifices to defraud;

b. Made untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. Engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchasers of securities issued by Tradeshow and/or Pacific Blue.

178.    Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow and Pacific Blue engaged in the above conduct knowingly or recklessly.

179.    By reason of the foregoing, Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow and Pacific Blue, directly or indirectly, singly or in concert, have violated and unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
(Against Carrillo Huettel LLP, Carrillo, and Huettel)

180.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

181.    By engaging in the acts and conduct described in this Complaint, Carrillo Huettel LLP, Carrillo, and Huettel knowingly provided substantial assistance to Pacific Blue's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and thereby are liable under those provisions as aiders and abettors, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

182.    By reason of the foregoing, Carrillo Huettel LLP, Carrillo, and Huettel have violated and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against de Beer)

183.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

184.    By engaging in the acts and conduct described in this Complaint, de Beer knowingly provided substantial assistance to John Kirk, Ben Kirk and Boyle's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and thereby is liable under those provisions as an aiders and abettor, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

185.    By reason of the foregoing, de Beer has violated and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against Gibraltar)

186.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

187.    By engaging in the acts and conduct described in this Complaint, Gibraltar knowingly provided substantial assistance to Ben Kirk's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and thereby is liable under those provisions as an aiders and abettor, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

188.   By reason of the foregoing, Gibraltar has violated and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SIXTH CLAIM FOR RELIEF**
**Control Person Liability for Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5**
(Against de Beer)

189.   Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

190.   By engaging in the acts and conduct described in this Complaint, Tradeshow and Pacific Blue directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Tradeshow and/or Pacific Blue securities, have:

    a.   Employed devices, schemes, and artifices to defraud;

    b.   Made untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.   Engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchasers of securities issued by Tradeshow and/or Pacific Blue.

191.   De Beer was a control person of Tradeshow and a control person of Pacific Blue for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

192.   De Beer exercised actual power and control over Tradeshow, including through serving as its president and sole director, managing its operations, directing its strategy, and possessing authority to execute documents on its behalf.

41

193.    De Beer exercised actual power and control over Pacific Blue, including through serving as its chairman of the board of directors, managing its operations, directing its strategy, and possessing authority to execute documents on its behalf.

194.    By reason of the foregoing, as a control person of Tradeshow and of Pacific Blue under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], de Beer is liable for Tradeshow's and Pacific Blue's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SEVENTH CLAIM FOR RELIEF
#### Control Person Liability for Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against John Kirk, Ben Kirk and Boyle)

195.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

196.    By engaging in the acts and conduct described in this Complaint, Skymark directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Tradeshow and/or Pacific Blue securities, has:

    a.  Employed devices, schemes, and artifices to defraud;

    b.  Made untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.  Engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchasers of securities issued by Tradeshow and/or Pacific Blue.

197.    John Kirk, Ben Kirk and Boyle were control persons of Skymark for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

198.    John Kirk exercised actual power and control over Skymark, including through serving as its sole director, managing its operations, directing its strategy, and possessing authority to execute documents on its behalf.

199.    Ben Kirk exercised actual power and control over Skymark, including through managing its operations, directing its strategy, and possessing authority to execute documents on its behalf.

200.    Boyle exercised actual power and control over Skymark, including through serving as its president, managing its operations, directing its strategy, and possessing authority to execute documents on its behalf.

201.    By reason of the foregoing, as control persons of Skymark under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], John Kirk, Ben Kirk and Boyle are liable for Skymark's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## EIGHTH CLAIM FOR RELIEF
### Control Person Liability for Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against John Kirk and Hinton)

202.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

203.    By engaging in the acts and conduct described in this Complaint, Emerging Stock Report directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Tradeshow and/or Pacific Blue securities, has:

   a.  Employed devices, schemes, and artifices to defraud;

b. Made untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. Engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchasers of securities issued by Tradeshow and/or Pacific Blue.

204.   John Kirk and Hinton were control persons of Emerging Stock Report for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

205.   John Kirk exercised actual power and control over Emerging Stock Report, including through his ownership, managing its operations, directing its strategy, and possessing authority to execute documents on its behalf.

206.   Hinton exercised actual power and control over Emerging Stock Report, including through serving as its director, managing its operations, directing its strategy, and possessing authority to execute documents on its behalf.

207.   By reason of the foregoing, as control persons of Emerging Stock Report under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], John Kirk and Hinton are liable for Emerging Stock Report's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NINTH CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act
(Against Franklin)

208.   Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

209.   By engaging in the acts and conduct described in this Complaint, Franklin directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Pacific Blue securities, has obtained money

44

or property by means of untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

210.   Franklin engaged in the above conduct knowingly or recklessly.

211.   By reason of the foregoing, Franklin, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)].

## TENTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Against Franklin)

212.   Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

213.   By engaging in the acts and conduct described in this Complaint, Franklin directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Pacific Blue securities, has made untrue statements of material fact, or has omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

214.   Franklin engaged in the above conduct knowingly or recklessly.

215.   By reason of the foregoing, Franklin, directly or indirectly, singly or in concert, has violated and unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## ELEVENTH CLAIM FOR RELIEF
**Sale of Unregistered Securities in Violation of Section 5(a) and (c) of the Securities Act**
(Against Gibraltar, Davis, John Kirk, Ben Kirk, Boyle, Hinton, de Beer and Tradeshow)

216.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

217.    The shares of Tradeshow that Gibraltar, Davis, John Kirk, Ben Kirk, Boyle, Hinton, and de Beer offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

218.    Gibraltar, Davis, John Kirk, Ben Kirk, Boyle, Hinton, de Beer, and Tradeshow, directly or indirectly, singly and in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

219.    Davis, de Beer and Tradeshow were necessary participants and/or substantial factors in the distribution of Tradeshow shares by Gibraltar, John Kirk, Ben Kirk, Boyle and Hinton.

220.    By reason of the foregoing, Defendants have violated and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

**TWELFTH CLAIM FOR RELIEF**
**Sale of Unregistered Securities in Violation of Section 5(a) and (c) of the Securities Act**
(Against all Defendants)

221.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

222.    The shares of Pacific Blue that Defendants offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

223.    Defendants, directly or indirectly, singly and in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

224.    Carrillo Huettel LLP, Carrillo, Huettel, Davis, de Beer, Franklin and Pacific Blue were necessary participants and/or substantial factors in the distribution of Pacific Blue shares by Gibraltar, John Kirk, Ben Kirk, Boyle, Hinton and Dr. Carrillo.

225.    By reason of the foregoing, Defendants have violated and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

**THIRTEENTH CLAIM FOR RELIEF**
(Against Relief Defendant)

226.    Paragraphs 1 through 171 are realleged and reincorporated by reference as if fully set forth herein.

47

227.    Relief Defendant Dr. Carrillo obtained proceeds of the fraudulent offerings of securities alleged above under circumstances in which it is not just, equitable, or conscionable for the Relief Defendant to retain these ill-gotten gains.  Relief Defendant gave no consideration for his receipt of these ill-gotten gains and has no legitimate claim to these funds.  Relief Defendant has therefore been unjustly enriched.

228.    By reason of the foregoing, Relief Defendant should disgorge his ill-gotten gains, plus prejudgment interest thereon.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court issue a Final Judgment:

### I.

Finding that Defendants each violated the securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of each of the securities laws and rules promulgated thereunder, or alternatively, from aiding and abetting such future violations, as respectively alleged against them herein;

### III.

Ordering Defendants Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, Davis, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow, Pacific Blue, and Defendant and Relief Defendant Dr. Carrillo, to each submit a verified written accounting, signed by each of them

under penalty of perjury, to determine the amount of ill-gotten gains received directly or indirectly as a result of the misconduct alleged herein;

## IV.

Ordering Defendants Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, Davis, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow, Pacific Blue, and Defendant and Relief Defendant Dr. Carrillo, to repatriate all funds and assets obtained from the fraudulent activities described herein that are now located outside the Court's jurisdiction;

## V.

Ordering Defendants Carrillo Huettel LLP, Carrillo, Huettel, Gibraltar, Davis, de Beer, John Kirk, Ben Kirk, Boyle, Hinton, Tradeshow, Pacific Blue, and Defendant and Relief Defendant Dr. Carrillo, to disgorge, with prejudgment interest thereon, all ill-gotten gains received directly or indirectly as a result of the misconduct alleged herein, jointly and severally;

## VI.

Ordering Defendants Carrillo Huettel LLP, Carrillo, Huettel, and de Beer to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Enjoining and restraining Defendants Carrillo, Huettel, de Beer, Franklin, John Kirk, Ben Kirk, Boyle, and Hinton, from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

49

**VIII.**

Barring Defendants Carrillo, Huettel, de Beer, Franklin, John Kirk, Ben Kirk, Boyle, and

Hinton from serving as an officer or director of any public company, pursuant to Section 20(e) of

the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §

78u(d)(2)].

**IX.**

Granting such other and further relief as this Court deems just and proper.

Dated:   New York, New York
        March 15, 2013

Respectfully submitted,

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center, Room 400
New York, New York 10281-1022
Telephone: (212) 336-0080 (Todd Brody)
CalamariA@sec.gov

*Of Counsel:*
Todd D. Brody
Michael D. Paley
Joshua Newville
Katherine Bromberg

50