```
E2qnscgm
```

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  SECURITIES AND EXCHANGE
    COMMISSION,
 4
                    Plaintiff,
 5
                 v.                        13 Civ. 1735 (GBD)
 6
    CARRILLO HUETTEL LLP, et al.,
 7                                         Argument
                 Defendants.
 8
    ------------------------------x
 9
                                           New York, N.Y.
10                                         February 26, 2014
                                           10:55 a.m.
11
    Before:
12
                 HON. GEORGE B. DANIELS
13
                                           District Judge
14

15
                 APPEARANCES
16

17  TODD D. BRODY
    JOSHUA M. NEWVILLE
18  KATHERINE S. BROMBERG
    ROBERT A. GIALLOMBARDO
19  JAMES KIDNEY
         Attorneys for Plaintiff
20

21  VENABLE LLP
         Attorneys for Defendant Carrillo Huettel LLP
22  BY:  WILLIAM H. DEVANEY

23

    PECKAR & ABRAMSON, P.C.
24       Attorneys for Defendant Luis J. Carrillo
    BY:  THOMAS J. CURRAN
25       DORIS D. SHORT
         MONATHAN S. KONOVICH

```
1              APPEARANCES

2

   NELSON MULLINS RILEY & SCARBOROUGH LLP
3       Attorneys for Defendant Dr. Luis Carrillo
   BY:  JUAN M. MARCELINO, SR.
4       DAVID E. FIALKOW (tel.)

5

   GAGE SPENCER & FLEMING LLP
6       Attorneys for Defendant Huettel
   BY:  WILLIAM B. FLEMING

7

8  DE FEIS O'CONNELL & ROSE P.C.
        Attorneys for Defendants Gibraltar Global Securities, Inc.
9       and Warren Davis
   BY:  NICHOLAS M. DE FEIS
10      PHILIP C. PATTERSON

11

   HERRICK FEINSTEIN LLP
12      Attorneys for Defendant Kirk
   BY:  STEVEN D. FELDMAN
13      SHARON A. O'SHAUGHNESSY

14

   DAVID R. CHASE
15      Attorney for Defendant Hinton

16

   SALLAH ASTARITA AND COX LLC
17      Attorneys for Defendant Hinton
   BY:  JAMES D. SALLAH

18

19 DAVID U. GOUREVITCH
        Attorney for Defendant De Beer
20

21

22

23

24

25
```

 1            (Case called)

 2            THE COURT:  Good morning.  Who wants to be heard first

 3   from the defense on the motion?

 4            MR. CURRAN:  I believe I will have that honor, your

 5   Honor.  Tom Curran on behalf of Luis Carrillo.

 6            THE COURT:  Good morning, Mr. Curran.

 7            MR. CURRAN:  Thank you, Judge.

 8            Your Honor, on behalf of Luis Carrillo, an overriding

 9   theme here is that our client and his partner in their firm

10   were lawyers, transactional securities lawyers, acting as such

11   for lawyer compensation, and nothing in the complaint changes

12   that.  The complaint does not meet the standards of

13   particularity, particularly as regards to anything that our

14   clients did to distinguish them in such a way that it is

15   fraudulent or wrongful.

16            For the primary liability asserted against Luis

17   Carrillo, there are three basic bases:  The opinion letters of

18   November 23, 2009, the March 2, 2010 opinion letter, and the

19   April 21, 2010 opinion letter; the second bases are alleged

20   misstatements, which are actually statements made by others;

21   the third bases for the 10b-5 primary liability are the

22   so-called deceptive acts.  We particularly want to discuss

23   these, as they are not deceptive, they are merely lawyers

24   acting as such.

25            As to the opinion letters, Judge, these are actually

1    not really statements by Luis Carrillo at all.  They did not

2    have the ultimate authority over the content of those

3    statements.  The manner, whether, and how those opinions were

4    to be issued, the ultimate authority for those rested with

5    others.  Under the Janus case, liability does not rest there.

6              THE COURT:  How do I determine that on the face of the

7    complaint?

8              MR. CURRAN:  We believe that there can't be liability

9    for the statements of others.  The opinion letters, if you take

10   a look at them, Judge, are conditioned:  Here is what we have

11   been told, we haven't done certain things, but based upon what

12   we have been told, this is our opinion.  And the opinions are

13   provided as directed by the people seeking the opinions, in

14   this case the company.

15             THE COURT:  Those are opinions of the law firm?

16             MR. CURRAN:  Conditioned opinions of the law firm.

17             THE COURT:  And these are the two partners of the law

18   firm?

19             MR. CURRAN:  And the law firm itself, Judge, yes.

20             THE COURT:  You are not arguing that these aren't

21   opinions of the law firm?

22             MR. CURRAN:  They are opinions of the law firm based

23   upon what they are informed and conditioned, as they were on

24   the face of the opinions themselves.

25             THE COURT:  They allege that the two partners are the

1    two who were drafters of the opinion?

2         MR. CURRAN:  What they allege, Judge, is that certain

3    misstatements in those opinions, we knew that those statements

4    were false.  There is no allegation, Judge, much less meeting

5    Rule 9(b), as to how we knew that, when we knew that, under

6    what circumstances we knew.  It's just we knew.

7         There is one exception to that.  The one explanatory

8    statement in the complaint relates to our client's opinion that

9    these were free-trading shares for which no further

10   registration was required.  The SEC takes issue with that and

11   states that the prior registration in 2007, under the prior

12   company, the public shell which was taken over, that

13   registration in 2007 was transaction-specific; thus, in

14   2009-2010 a separate or new registration was required.  We take

15   issue with that because on the face of the 2007 registration,

16   Judge, it was for purposes of an ongoing offering, a continuous

17   offering.

18        THE COURT:  You started out first discussing the

19   allegations of their personal participation in what the SEC

20   alleges as a false and misleading statement.  They specifically

21   allege, don't they, to take one example, particularly as to

22   Pacific Blue, that there were false statements in the SEC

23   filings and that Carrillo and Huettel drafted all of Pacific

24   Blue's SEC filing and presented it to Franklin for his

25   signature and approval, and Franklin signed whatever the law

```
 1   firm sent to him.

 2           MR. CURRAN:  Judge, the key there is they allege that

 3   there is falsity in the filings and they allege that we knew

 4   that.  They don't tell us how we knew it.

 5           THE COURT:  They say you drafted the filings.

 6           MR. CURRAN:  As lawyers do, Judge, you draft documents

 7   based upon what you are informed by your client.  There is no

 8   recklessness by our client.  They acted with the duty of care

 9   that lawyers act with as transactional lawyers every single

10   day.  The only difference here, Judge, with respect, is that

11   they allege that we knew that what was going to go in the

12   filing, which we didn't actually file.  We drafted them based

13   upon what our client provided to us.  We provided them back to

14   the client, and the client filed them.

15           THE COURT:  That is not the context in which they make

16   those allegations.  They make the allegation that (1) you were

17   directly involved in setting up what they claim were the shell

18   companies, (2) that you drafted sham nonaffiliate stock

19   purchase agreements, and that you drafted the SEC filings which

20   they claim were false.  They specifically allege that the two

21   partners Carrillo and Huettel personally were involved in those

22   activities.

23           MR. CURRAN:  No.  What they say, Judge, is that we

24   knew that the filings were false.

25           THE COURT:  No, that's not what they say.  They say at
```

1    paragraph 98, Carrillo and Huettel drafted all of Pacific

2    Blue's SEC filings and presented them to Franklin for his

3    signature and approval.  They don't just say that you were

4    aware.  They say that you specifically drafted.

5              MR. CURRAN:  Judge, lawyers draft things all the time.

6              THE COURT:  I know.  The question is whether you

7    drafted it knowing the true condition of the company or whether

8    the inference is that you drafted it not knowing that there was

9    fraud going on.  Their allegation is you were involved in this

10   from the very beginning; you not only helped set up the

11   companies, purchase the companies, you were in a position to

12   have the information to know whether or not or at least have

13   some reasonable basis to determine whether or not what you were

14   saying was true or not; you also gave opinion letters which

15   were false; and under these circumstances there is no reason to

16   believe that you were unwitting lawyers who were simply doing

17   lawyer work, unaware that their clients were participating

18   independently in fraud.

19             MR. CURRAN:  Judge, first off, there is nothing wrong

20   with locating a public shell.

21             THE COURT:  That's true.  It depends on what it is

22   used for and whether there is an inference that you probably

23   knew that when you set up this company, the company didn't have

24   any business, and that when you made representations with

25   regard to the status of the company later on that were not

 1   true, you then knew that those representations were false

 2   because you intimately were involved with what the company, how

 3   it was set up, what the business it was or wasn't doing,

 4   whether the representations made publicly by your clients were

 5   true and whether the representations made by the lawyers on

 6   behalf of the clients were true.

 7         MR. CURRAN:  It is not alleged in the complaint,

 8   Judge, that we failed to vet representations made to us by our

 9   client.

10         THE COURT:  No.  It is alleged that you specifically

11   participated in the fraud.

12         MR. CURRAN:  But then they don't tell you what the

13   participation is.

14         THE COURT:  They say, one example, that you instructed

15   or drafted documents with regard to the representation that was

16   going to be made regarding related parties and you knew that

17   they were submitting those documents and filing those documents

18   and representing that there were no related parties, and you

19   clearly were in a position to know that they were related

20   parties when these statements were made and when you helped and

21   asked Franklin and others to make those statements.

22         Again, I'm trying to get it from the papers and the

23   complaint as I recollect it, but that seems to be the gist of

24   what they are accusing your clients of.

25         MR. CURRAN:  But, Judge, they are saying that we were

F2gmsscm

1    in a position to know.  They are not saying we are in a

2    position to know.  They say we knew.

3              THE COURT:  Right.

4              MR. CURRAN:  Yet there is no explanation for how we

5    knew, whether we knew.  There is no particularity.

6              THE COURT:  The explanation for how you knew is

7    because you were there when the companies were set up, you were

8    intimately involved in setting them up, you clearly had to have

9    known what the purpose of the companies were or had some

10   understanding of what the purpose of the companies were.

11             You drafted the documents that ultimately were filings

12   with the SEC, that made certain representations that were

13   untrue.  For example, they say that you drafted a statement to

14   the SEC and told the president of the company to file this

15   statement with the SEC and this statement makes a specific

16   representation that there are no related parties.  What

17   argument is there that it isn't, at least for purposes of the

18   pleading, a reasonable position to take that if you set up this

19   company, you know who owns the stock, you know who the

20   beneficial owners are, you know who the principals of the

21   companies are?  We are not here debating all of that

22   information.

23             Unless there is some competing, conflicting, disputed

24   evidence, a reasonable conclusion from a trier of fact would be

25   that if you knew that these were related parties and you told

1    them to say that they were not related parties, absent some

2    other explanation, there is a reasonable inference can be drawn

3    by a trier of fact that you were a participant in a scheme to

4    defraud.

5            MR. CURRAN:  There's a lot of ifs there, Judge.  If we

6    knew, how did we know?  Other than just asserting that we knew,

7    how did we know?  What are the particularities of the

8    knowledge?  Without that, Judge, all you have are lawyers

9    acting like lawyers.

10           THE COURT:  When you say how did we know, it depends

11   on how you characterize that.  The answer is either you knew

12   because we can tell you chapter and verse exactly what you

13   looked at and what was given to you and what was said to you or

14   you knew because given this set of circumstances, it is a

15   reasonable conclusion, absent some other explanation, that you

16   could not be the lawyer making these representations and

17   asserting that you have a basis for making these

18   representations when the representations are clearly untrue and

19   there would be no basis on which you could possibly have

20   verified or used any reasonable evidence to determine that this

21   evidence was true.

22           They say you knew what the true set of facts were, you

23   knew because you had set up the company, the partners had taken

24   an intimate role in making representations or in drafting and

25   instructing the principals to make certain representations

1    about the company, and there were no facts to support those

2    representations anywhere.

3         For you to say that you should make such a

4    representation where there was clearly not a single fact that

5    you could have possibly based that representation on, it's kind

6    of hard to say, whether you are a lawyer or nonlawyer, that

7    absent some other reasonable explanation of why you made that

8    representation given the set of circumstances that there are

9    absolutely no facts that a lawyer or anyone else could have

10   uncovered that would give them a reasonable basis to make that

11   representation or to advise someone else to make that

12   representation, absent some other reasonable explanation, fraud

13   might be a reasonable conclusion, right?

14        MR. CURRAN:  Actually, not in our view, Judge.

15   Respectfully, here is why.  Our clients located a public shell.

16   Happens every day, Judge.

17        THE COURT:  Right.

18        MR. CURRAN:  Our clients drafted SEC filings as

19   transactional lawyers.  Happens every day, Judge.

20        THE COURT:  It depends on what you put in the SEC

21   filing.

22        MR. CURRAN:  Ultimately, those are statements of the

23   company, Judge.

24        THE COURT:  It depends.  They allege they are not the

25   statements of the company.  They allege that they are both the

F2GruSE Cm

1   statements of the company and they are also certain statements

2   that your clients advised, for example, Franklin to make when

3   it was not Franklin's independent assertion, it was the

4   assertion that Franklin made because your clients told him to

5   make it when he had no basis and he knew he had no basis to

6   make that statement.  That is the way I read their allegation.

7           If you read it differently --

8           MR. CURRAN:  I do.  All you have premised upon that to

9   distinguish this from everyday lawyering that occurs in these

10  types of transactions which take place every day are the bald

11  accusation that we knew that the filings were false, that we

12  knew.  Before you can make a jump without particulars, which

13  this complaint does not have after over three years of

14  investigation, Judge, before you make the leap, then you start,

15  as your Honor was referring to, well, you were in a position to

16  know, therefore you must.  That doesn't meet the standard,

17  respectfully, Judge.

18          THE COURT:  They also indicate with regard to the

19  percentage of ownership that the lawyers were intimately

20  involved in making those representations or advising them to

21  make those representations when clearly those representations

22  were false.  That's what they say.

23          MR. CURRAN:  Your Honor, if we are making this a

24  structuring case in a securities context, which I'm not sure we

25  can, but if we are --

E2C9TSECm

```
 1              THE COURT:  I don't know why we need to do it.

 2              MR. CURRAN:  I don't know, either.

 3              THE COURT:  I'm just trying to figure out whether this

 4   is a scheme to defraud.

 5              MR. CURRAN:  This is another thing that happens every

 6   day that is characterized --

 7              THE COURT:  No.  I'm sorry, I didn't mean to interrupt

 8   you.  It doesn't happen every day that the lawyers make a

 9   representation that you are a 4.9 percent owner when it was

10   clear that your clients had to have known that they had a

11   greater ownership.  I don't think you can legitimately argue

12   that they didn't have knowledge as to the extent of the

13   ownership and didn't know that the ownership of the shares was

14   greater than what was being represented.

15              MR. CURRAN:  Judge, you just wrote a better complaint

16   than the SEC did after three years of investigation.

17              THE COURT:  That's what I read from the complaint.

18              MR. CURRAN:  I'm glad you're not a member of the

19   commission staff, frankly.  But that is not what this complaint

20   says.  There aren't particulars as to conversations that our

21   client had.  There aren't even dates and times when this

22   knowledge came to us as to this structuring allegation, which

23   really isn't an allegation at all absent some illicit

24   knowledge, which they assert summarily without any particulars

25   around it.
```

```
 1          We are back to it must be, you must have.  After more
 2   than three years of investigation, there really needs to be
 3   more than you must have, you were in the position, therefore
 4   you're different than every other transactional lawyer involved
 5   in these types of transactions because somehow you were
 6   involved.
 7          THE COURT:  The specifics that you are asking for for
 8   purposes of minimal pleading, for example, paragraph 80 and
 9   some of the subsequent paragraphs, "Carrillo and Huettel
10   arranged for Pacific Blue's outstanding shares to be
11   distributed in blocks of 4.9 percent to Kirk, to Dr. Luis
12   Carrillo, and to various foreign nominee entities controlled by
13   the Kirks and Boyle.  The acquisition was structured in this
14   manner to keep the holdings of each secret nominee entity just
15   under 5 percent of the shares."
16          Paragraph 81.  "The 4.9 percent structure designed by
17   Carrillo and Huettel was meant to conceal and facilitate the
18   manipulation by giving the misleading impression that shares
19   were held by various independent entities, not by the Kirk
20   Boyle group."
21          Paragraph 82.  "To further conceal the true ownership
22   of Pacific Blue's shares, Carrillo and Huettel drafted a sham
23   nonaffiliate stock purchase agreement under which the 4.9
24   percent purchasers purportedly acquired their shares.  Carrillo
25   and Huettel knew that the 4.9 percent nominee owners were
```

F2G19SECCM

1   acting as a group because they knew that 90 percent of the

2   purchase price came from their client John Kirk and almost all

3   of the shares were being provided to entities connected to the

4   Kirks."

5           There are other allegations with consistent with that

6   that follow and specific allegations about the law firm and the

7   partners facilitating the purchase and sale and distribution of

8   the proceeds that clearly would put them in a position to be in

9   the know, if that is what we are discussing, about whether

10  there are sufficient allegations of knowledge that the

11  structure of this and the activity of this was such that it was

12  taking the principals' money and distributing it and making

13  sales and being involved in sales and purchases in such a way

14  that the principals were the ones who were profiting.

15          Most of these individuals who were nominee entities

16  were not profiting, including the firm and Carrillo's father,

17  apparently.

18          MR. CURRAN:  First off, Carrillo's father, every

19  dollar that he put in, no money attaches to our client.  If

20  somebody were looking for a secret nominee, does it make sense?

21  Would you pick someone who happens to be your father, who does

22  a lot of work with your law firm and who, by the way, has the

23  same name?

24          Judge, let's return back to paragraphs 80, 81, 82

25  because they are instructive.  The question isn't whether a

1    lawyer would be in a position to know.  I don't think we are

2    here today to adjust the securities laws to add extra burdens

3    upon transactional lawyers to investigate their clients.  I

4    don't think that that is the purpose here.  If you read the

5    language of paragraph 80, "arranged," how did they arrange it?

6    What are you talking about?

7         THE COURT:  They are not required to give you every

8    how.  That's not the pleading requirement.  The requirement is

9    to give you what they say they did, whether they arranged it by

10   asking someone else to do it for them or they arranged it by

11   making a telephone call.  When you say how, I'm not sure what

12   additional requirement.

13        MR. CURRAN:  Arranging, Judge, is what a transactional

14   lawyer does every day.  What makes this arrangement,

15   arranging -- and they use words like "facilitation," they use

16   words like "plan."  That is what transaction lawyers do, Judge.

17   They arrange.  What makes it different?  According to them,

18   what makes it different --

19        THE COURT:  What makes it different is that the

20   information is not true.  They allege that they knew the

21   representations about the companies were not true.  Your

22   argument is regardless of what they say, your response will be

23   but they don't tell us how.

24        MR. CURRAN:  Judge, take nonillicit conduct on its

25   face.  Transactional lawyers arrange, they facilitate.  That's

```
 1    why they are hired.  If the premise is that there were

 2    misstatements and there were arrangements made relating to a

 3    company, there were false things and we knew it, OK, that makes

 4    it something different.  But that knowledge is the key, Judge

 5    without that knowledge, all you have are transactional lawyers

 6    acting as such.

 7              THE COURT:  I agree with you.  If that's all that they

 8    were alleging, then I wouldn't have to try to get over these

 9    paragraphs.  Paragraph 82, which makes a lot of sense -- and I

10    am not sure you are standing here saying that ultimately it's

11    going to be disputed, but that is not the question -- says that

12    Carrillo and Huettel knew that the 4.9 percent nominee owners

13    were acting as a group because they knew that 90 percent of the

14    purchase price came from their client Kirk.  That's the answer

15    to your how.

16              MR. CURRAN:  That doesn't make sense.

17              THE COURT:  How does that not make sense?  They are

18    the lawyers.  They are doing the transaction.  Kirk is giving

19    them the money.  They are putting the money through the trust

20    fund.  How possibly could you argue that they didn't know where

21    this money was coming from and whose money it was or that this

22    is an insufficient allegation for a reasonable trier of fact to

23    conclude that, yes, if you're the lawyer and you get 90 percent

24    of the cash from your client and you structure it in a way that

25    it only shows up as 4.9 percent for each individual, and then
```

E2GH1SECC 18

1    when you cash out you give 90 percent if not more of the money

2    back to the client, there is not a reasonable inference?

3            MR. CURRAN:  Wait a minute.  Wait.  First off, there

4    is no violation of the securities laws by structuring 4.9

5    percent.

6            THE COURT:  That's true.

7            MR. CURRAN:  There is no violation, Judge.  A person

8    comes to you as an investor.  Two people come heading up an

9    investment group.  They tell you, as the lawyer, what the

10   breakdown of the group is.  You don't necessarily know that the

11   group is acting as a group.

12           THE COURT:  That's true, but they say you knew.

13           MR. CURRAN:  They don't tell us how we knew.

14           THE COURT:  You are the one who set up the company.

15   There is nobody else involved and you know there is nobody else

16   involved you're taking money from the principal and structuring

17   it in a way saying that it is the money from somebody other

18   than the principal.  That is not rocket science.

19           MR. CURRAN:  But, Judge, lawyers represent investment

20   groups all the time.  They don't know what the discussions

21   between the leaders of the group and the people behind it may

22   be.

23           THE COURT:  It depends.  It depends on how intimately

24   they are involved in the transaction.

25           MR. CURRAN:  That's why 9(b) says tell us the basis of

1    the knowledge.

2         THE COURT:  The basis of the knowledge is they were

3    the ones who set up the company.  They know who the owners of

4    the company are.  They know who they are dealing with.  They

5    have alleged, look, they know exactly who these people are.

6    They know who the Kirks are, they know who De Beer is, they

7    know who Franklin is.  They know what the roles are.

8         They don't allege that they somehow think there is

9    somebody else involved.  They say these are the people they are

10   aware of, these are the people they dealt with, these are the

11   people they structured the company for, these are the people

12   they advised as to what representation they would make.  These

13   are the people who they did the transactions for and even

14   fronted for in terms of making purchases in others' names,

15   including themselves, but ultimately the profits from those

16   purchases went back to the principals.

17        If I am misstating what they have alleged, fine, you

18   can tell me, but that's what I read.

19        MR. CURRAN:  Judge, I don't want you on the commission

20   staff now, because you are adding.  They used words like

21   "sham."  You are using words like "front," and that is not

22   helping me at all.

23        In all seriousness, Judge, everything that you have

24   described, everything that you have described -- they set up

25   the company.  Yes, they did.  That's what transactional lawyers

1   do.  They are doing it today, Judge.  Transactional lawyers,

2   maybe future clients if this is the view of the commission

3   towards these types of transactions, are out there today

4   setting up the companies, writing purchase agreements,

5   following their clients' instructions as to the distribution of

6   assets, following client instructions as to drafting important

7   documents.

8          THE COURT:  It depends on what they are doing, it

9   depends on what they knew, and it depends on what the result of

10  the transaction happens to be.

11         MR. CURRAN:  Precisely, Judge.

12         THE COURT:  The debate about it is not the purpose in

13  terms of conflicting evidence.  I'm not sure that there is

14  anything that they claim about what the lawyers were in a

15  position to know that doesn't raise at least an inference that,

16  look, there is no way these lawyers could have said or advised

17  anyone to say that no one had greater than a 5 percent interest

18  in this company.  They knew it.  They knew it.  They knew who

19  the principals of the company were and they knew the Kirks

20  owned 85 percent of the company.

21         MR. CURRAN:  Judge, again, no single thing that you

22  said there is wrong.  It comes down to knowledge.  After more

23  than three years of investigating, I think 9(b) requires on

24  serious allegations against a lawyer that there be something

25  more than that they knew because of the position they were in.

 1    Lawyers are always in that position, Judge.

 2         THE COURT:  No.  They said that they knew that their

 3    client was the Kirks.  I'm using that because that is in the

 4    front of my head.  There are some others.  I am using that as

 5    an example.  They knew that their clients were the Kirks.  They

 6    knew who owned this company because they helped structure it.

 7    They knew who owned the company because their clients owned the

 8    company.  There is really not much dispute about that.

 9         I'm not sure you in good faith could argue that they

10    didn't know who owned 85 to 90 percent of this company.  They

11    say they knew that they owned 90 percent of the company, but

12    they helped structure statements and reporting so that it would

13    look like no one owned more than 5 percent.  That's not routine

14    lawyer stuff.

15         MR. CURRAN:  But it is.

16         THE COURT:  In connection with a pump-and-dump scheme?

17    That is in furtherance of a pump-and-dump, right?

18         MR. CURRAN:  Judge, wait.  If somebody comes to a

19    lawyer, I represent a group of investors, people like me, have

20    a track history with me, I have some success --

21         THE COURT:  That person is the Kirk brothers.

22         MR. CURRAN:  Fine.

23         THE COURT:  I'm saying you know nobody else owns this

24    company other than the Kirk brothers, two people who you know

25    own the vast majority if not total of this company.  You are

1    saying there is not a reasonable inference to draw that your

2    clients didn't know who owned the company?

3              MR. CURRAN:  That is precisely what I'm saying, first

4    off.

5              THE COURT:  That would be incompetent lawyers,

6    wouldn't it, to move forward on these transactions and not know

7    who the principals are of the company?

8              MR. CURRAN:  Wait.  They know that this group comes to

9    them led by these people, but that doesn't mean that that's all

10   the people.

11             THE COURT:  They had all of the documentation that

12   indicates who these people are.

13             MR. CURRAN:  They don't even have an allegation of

14   what documentation they had, Judge.

15             THE COURT:  I know.

16             MR. CURRAN:  You and I are having a conversation that

17   is solved after more than three years of investigating by a

18   proper pleading under 9(b).

19             THE COURT:  But I don't know what your alternative

20   scenario is at this point.  You may have an alternative

21   scenario that you wish to debate about and litigate, but I'm

22   not sure what the alternative scenario would be if the

23   allegations in the complaint are not disputed.

24             I look at it this way.  Let's say that they put on

25   their case and they prove everything that they say they are

1    going to prove in this complaint, and then you rest.  My

2    analysis is could a reasonable trier of fact find your clients

3    liable on this evidence and no reasonable explanation that you

4    have put forward?  That's a tough one for you.

5              MR. CURRAN:  Judge, presumptively in that case you are

6    talking about they are going to produce some evidence of the

7    knowledge they assert without anything else.  They just say

8    they knew, they knew.

9              THE COURT:  No.

10             MR. CURRAN:  They throw in sham and throw in

11   facilitate and planned and arranged.

12             THE COURT:  They say they knew because they are going

13   to demonstrate that they were intimately involved in every

14   stage of the formation, development, and purchase and sales

15   involved and reporting about the condition of the company that

16   was involved with these two companies.

17             MR. CURRAN:  You just described every transactional

18   lawyer.

19             THE COURT:  No, I didn't.

20             MR. CURRAN:  Yes, you did.  Absent knew, absent the

21   knew and evidence of knew, and this is specific knowledge here,

22   Judge, absent evidence of knew and absent supporting specific,

23   objective evidence and subjective knowledge, Judge, absent that

24   you don't have the knew, then you are left with lawyers doing

25   nothing but what transactional lawyers do.

```
 1              THE COURT:  No, you don't.  They do what transactional

 2   lawyers do, but transactional lawyers do not put out misleading

 3   or false opinion letters.  They don't advise clients to make

 4   representations that they know are not true.  They don't

 5   involve themselves personally in the purchase and sale of the

 6   stock that is the subject of the pump-and-dump scheme without

 7   having some knowledge of whether or not --

 8              MR. CURRAN:  I'm unaware of my client being involved

 9   in any personal purchase or sale here at all, Judge.

10              THE COURT:  I guess it is not fair for me -- well, no,

11   it is fair for me.  He had power of attorney.  Mr. Carrillo had

12   power of attorney over his father's account.

13              MR. CURRAN:  Yes.

14              THE COURT:  He made those trades in his father's

15   account, in his father's name.

16              MR. CURRAN:  And every dollar on those trades went to

17   his father.

18              THE COURT:  That wasn't the point you just made.  You

19   just said you don't know of any instance where they were

20   involved in purchase or sale of the stock.

21              MR. CURRAN:  I said personally because that's what you

22   had said.

23              THE COURT:  Buying stock in his father's account is

24   not personal involvement?

25              MR. CURRAN:  Not for their own personal benefit.
```

1          THE COURT:  That's the problem.  The SEC alleges none

2    of it was for their own personal benefit, it was for the

3    benefit of the people who had a pump-and-dump scheme.

4          MR. CURRAN:  Then we are back.

5          THE COURT:  So that is not the argument to make.

6    You're right, they didn't have any personal interest in this.

7    Their personal interest in this was to facilitate whatever

8    their clients were attempting to accomplish.  If the inference

9    is that their clients were attempting to accomplish a pump-and-

10   dump scheme or a scheme to defraud, then the question arises as

11   to why all the lawyers intimately involved in the activities

12   that facilitated that, whether or not they were involved in

13   such a manner and so intimately that it is a reasonable

14   inference to draw that they knew that the stock was being

15   touted by promoters who were affiliated with the owners, that

16   the nature of the ownership was such that the representations

17   that were being made about the nature of the ownership was not

18   accurate and was misleading, and that the representations about

19   whether or not others were affiliated with the company and

20   companies were true representations.

21          I understand all of your arguments other than this is

22   the standard stuff that lawyers do.  No, this isn't the

23   standard stuff that lawyers do.  Lawyers have a more

24   independent professional relationship usually with their

25   clients.  Lawyers usually do not find themselves in a situation

1  where the clients are making false representations about the

2  company that they know are false but they are continuing to

3  help facilitate the profits that they are reaping from what

4  they claim is a pump-and-dump scheme.

5         MR. CURRAN:  Judge, unless they knew that these things

6  were false --

7         THE COURT:  How could they not know the owner

8  percentage or the affiliate representations were not false?

9  They knew that any representation saying that any of these

10  other defendants were not affiliating with this company was a

11  false statement, right?

12         MR. CURRAN:  No, Judge.

13         THE COURT:  They allege that.

14         MR. CURRAN:  They allege the knew part, yes.

15         THE COURT:  That is a reasonable allegation on which

16  one could find liability, isn't it?

17         MR. CURRAN:  That is not even the allegation here.

18  All they say is that they knew.

19         THE COURT:  Of course they knew.  That's the question.

20         MR. CURRAN:  As to the opinion letters, Judge, even

21  the cases cited by the SEC, the Czarnik case, for instance,

22  deminimize the import of opinion letters as the basis for

23  liability.

24         THE COURT:  Sure, deminimize the import.

25         MR. CURRAN:  The Garber case actually does come out

F2GT1SECm

1    and say it's not a basis.

2         THE COURT:  It is not independently a basis.  But it

3    is clearly relevant if it is consistent with intimate knowledge

4    rather than consistent with ignorance.

5         MR. CURRAN:  Yes.  But, Judge, without the knowledge

6    here, without particularized knowledge to show the subjective

7    knowledge of falsity on behalf of Luis Carrillo, absent that,

8    all you have is surmise:  You must have been.  After more than

9    three years of investigation, you must have been is not

10   anywhere near the standard.

11        THE COURT:  What would be the legitimate purpose for

12   utilizing the Carrillo-Huettel trust account for the clients'

13   transaction?  That's not appropriate, is it?  Tell me.  You

14   wouldn't do that.

15        MR. CURRAN:  I would have uncomfortable conversations

16   with my managing partner or the chairman of my firm if that

17   happened on account of me.

18        THE COURT:  Right, because there is no legitimate

19   purpose for that kind of activity.

20        MR. CURRAN:  Judge, we are talking about a two-person

21   law firm.

22        THE COURT:  The rules still apply to the two-person

23   law firm as apply to a thousand-person law firm.

24        MR. CURRAN:  These rules are violated all the time,

25   Judge, without amounting to securities fraud.

E2G11SECm

1          THE COURT:  And they are violated when there is

2     securities fraud.  And it is consistent with securities fraud,

3     it is not inconsistent.

4          MR. CURRAN:  It was an unwise way to do this, but a

5     small firm can do that as opposed to handling it properly --

6          THE COURT:  The question isn't whether it is wise or

7     unwise.  The question is what could one infer was the

8     motivation for doing that.  It is hard for me to think, in this

9     context, of a legitimate motivation for them to do these

10    transactions.

11         MR. CURRAN:  There is no motivation.  They did the

12    transactions because it was easy.

13         THE COURT:  Of course there is a motivation.  The

14    explanation the SEC says was motivation was that there was a

15    pump-and-dump scheme.  That was a legitimate motivation.

16         MR. CURRAN:  Judge, it's a red herring.  Whether it

17    went through the trust account or it went through separate

18    accounts set up at different banks, the transaction is the

19    same.

20         THE COURT:  I know.  But whether or not you are

21    attempting to conceal the people involved in the transaction is

22    relevant to whether or not you are involved in securities fraud

23    or involved in a pump-and-dump scheme.  It is easier for me and

24    it is consistent with me trying to accomplish a pump-and-dump

25    scheme if I can make it more difficult for them to know that

1    I'm both the buyer and the seller than it is if I tell them

2    right up front, you know what, I really own 90 percent of the

3    stock that I am trying to make a profit off of, and these

4    people touting the stock, saying it is a great buy, are people

5    that I set up so they could do that so they can pump up the

6    price of the stock and I can make a profit at your expense.

7    You might be able to uncover that a lot easier if you knew that

8    this was directly in my name and that I was on both ends of the

9    transaction.  That's a reasonable inference.

10            MR. CURRAN:  Not against Luis Carrillo it's not.

11            THE COURT:  Why not?

12            MR. CURRAN:  Because none of those statements or

13    misstatements are attributable to Luis Carrillo.

14            THE COURT:  It is not a question of whether it was

15    attributable to him.  It is a question of whether he was aware

16    of it and he took an active part in either creating or

17    accomplishing the scheme.

18            MR. CURRAN:  Judge, you mentioned two things, whether

19    he was aware and they allege he knew, and that's it.  Did he

20    take an active part?  The case law says that while some of

21    these things may be instrumentalities of the alleged fraud on

22    behalf of others, that doesn't create liability in and of

23    itself, because it is not part of the core misconduct.  Absent

24    that knowledge, it is nothing at all, Judge.  And that

25    knowledge is nowhere particularized, it is just asserted.

E2G1SECN

1    After more than three and a half years of investigation, there

2    should be more than this.

3         THE COURT:  I'm not here to debate whether it is

4    minimal or it is overwhelming.  There are specific

5    representations being made in the SEC filings, there are

6    specific representations being made by the client, and there

7    are specific representations being made to the auditors.  Those

8    representations are not accurate.  Some of those

9    representations are made by Carrillo and Huettel and the firm.

10        For example, the allegation that on November 6, 2009,

11   Carrillo, copying Huettel, instructed Franklin to sign a

12   misleading related party worksheet to be relied upon by Pacific

13   Blue's auditors.  Why is that an innocent allegation as opposed

14   to an inference of --

15        MR. CURRAN:  First off, that's not what the email

16   says, we believe.  But wait, you can't fabricate evidence

17   either, Judge.

18        THE COURT:  I agree with that.

19        MR. CURRAN:  A lawyer is preparing documents for a

20   client.  OK, I have prepared the documents as you have

21   directed, here it is, review it and provide it to your auditors

22   as you need to.  The client takes it and he reviews it and then

23   provides it to auditors.  I have lost count on how removed Luis

24   Carrillo is from that.

25        THE COURT:  He is not removed, because he knows that

1    that representation is not true.

2         MR. CURRAN:  How?

3         THE COURT:  He is not removed, because they say

4    Carrillo sent it to Pacific Blue's auditors.  They don't say

5    Franklin sent it to them, they say Carrillo did.  They are

6    providing what you are asking for.  That's the involvement.  He

7    says, look, I signed this misleading related party document.

8    He is clearly in a position to know whether or not there is a

9    related party.  Franklin signs it and Carrillo gives the false

10   statement to the auditors.  That's what he says.

11        MR. CURRAN:  What if he is not in a position to know,

12   Judge?

13        THE COURT:  How is he not in a position to know?

14        MR. CURRAN:  As a lawyer, Judge, this is one of your

15   greatest fears in practice, listening to your client and

16   relying upon that which you are told.

17        THE COURT:  Right.

18        MR. CURRAN:  You listen to your client.  We are not

19   increasing lawyer obligations here, I don't believe.

20        THE COURT:  No, we are not.

21        MR. CURRAN:  This isn't a malpractice action, I don't

22   believe.  You listen to your client and you exercise a level of

23   care.  You have no reason to think your client is lying to you.

24   You are not some investigator of your own client.  There is no

25   duty for that.  You prepare the comment and you hand it back to

F2CJ19GCR

1    the client for them to execute.

2           THE COURT:  On the facts as they have alleged them,

3    you can't argue from anything in this that it implies that they

4    were in a position not to know.

5           MR. CURRAN:  Judge, what does that mean, they were in

6    a position not to know?

7           THE COURT:  It means that you want to say that they

8    didn't necessarily know.  I'm saying to you the reasonable

9    inference is you structured this company, you obviously know

10   who the principals of this company are.  If you are doing

11   transactions in this company and you are facilitating the sale

12   and purchase of stock, you obviously know who owns the stock.

13          If your client is the owner of the company, you

14   obviously know your client is the owner of the company.  There

15   is no way I can read this complaint to assume that these

16   lawyers had their head in the sand and don't have a clue as to

17   who owns this company and what percentage, who controls this

18   company.

19          Is it reasonable on these facts for you to say that

20   anything in the allegations here would be consistent with your

21   clients not knowing that if they were submitting a related

22   party worksheet to the auditors and it didn't have the

23   principals who they are dealing with in the company -- clearly,

24   from these facts a reasonable conclusion could be drawn that

25   they know that these are related parties.  You're saying that

```
 1   on this complaint, not on what you may want to fight about
 2   later but on this complaint, it is not a reasonable conclusion
 3   that when they handed it to them and told them to make
 4   representations that did not disclose these other related
 5   parties, somehow they were just ignorant?
 6            MR. CURRAN:  Judge, wait.  First off, lawyers are not
 7   investigators of their clients.
 8            THE COURT:  But he is advising the client to submit
 9   this form to the auditor.
10            MR. CURRAN:  Wait.  He didn't create this form out of
11   the blue.  The client provided him the information upon which
12   to draft this form.
13            THE COURT:  The way this complaint is alleged, is
14   there any reasonable basis to say that this complaint at all
15   implies a possibility that the lawyers didn't know that that
16   was not an accurate statement?
17            MR. CURRAN:  With respect, Judge, 9(b) says that is
18   not enough.
19            THE COURT:  I understand that.  I am trying to
20   understand the extent to where you're trying to push your
21   argument.  I'm trying to understand whether or not you are
22   legitimately trying to argue that these lawyers, I assume
23   competent lawyers, were totally in the dark, they didn't have a
24   clue, that on these facts it wouldn't be reasonable for anybody
25   to conclude that the lawyers advising them, and I assume
```

F2GVVECM

1   getting paid for it, the lawyers engaged in setting up the

2   company, advising about the reporting, structuring sales and

3   purchases of shares on the principals' behalf by using entities

4   and individuals who are nominees or individuals who are not the

5   principals, and the people involved are not disclosing that

6   they are the true individuals behind these transactions and are

7   involved from the beginning in the distribution of what the SEC

8   claims are illegal profits back to the principals that have

9   hired them, what basis I would have to conclude that somehow

10  the reasonable conclusion from this complaint would be that

11  they were just ignorant, didn't have a clue as to any of these

12  representations and everything that they advised them to say

13  and do, they genuinely believed that that was an accurate state

14  of affairs.

15          There is nothing in this complaint that would lead any

16  reasonable person to conclude that they actually believed that

17  there were no related parties.  There is just nothing

18  consistent with the way this complaint reads that one could

19  make that argument, is there?

20          MR. CURRAN:  Judge, that's not what 9(b) says.  9(b)

21  says you have to allege knowledge with specificity.  You have

22  to allege that fraud with specificity.

23          This is the particular danger.  Here we kind of jumped

24  all over, from primary theories to aiding and abetting,

25  secondary theories, which is fine.  But when you are talking

E2G11SECm

1   about lawyers who on the face of it take out words like "sham"

2   and "facilitate": and "arrange" and "plan" and then add the

3   word "and they knew," if you step back, the danger is your

4   penalizing lawyers acting as such.

5        If you are saying they knew and after all the time

6   that's been spent here allege the knowledge, it takes no time

7   at all.  Judge, you could do -- it disturbingly well,

8   frankly -- probably this afternoon.  But that's what 9(b) says.

9   These are experienced civil liberties who are required to do

10  that.

11       Their response, Judge, to our 9(b) argument is

12  basically a footnote on page 17 of their opposition brief in

13  which they seem to equate the attorney-client privilege with

14  insider trading rings.  I know that in recent years the

15  privilege has come under attack, certainly in government eyes,

16  as being an obstruction.  But I didn't think that we had fallen

17  quite so far as to analogize it to being part of an insider

18  trading ring.

19       Particularly given the background of this

20  investigation, Judge, we begged the commission to vindicate

21  their extraordinary position of the crime-fraud exception, we

22  begged them to vindicate that during the investigative stage.

23  They purposely chose not to, and frankly cynically so.

24       Now they are sitting there saying, we can't know the

25  specifics and particularities that we are supposed to know and

1    we are not providing them anyway after three and a half years

2    of investigation, because you invoked the Fifth Amendment in

3    the face of our allegations of the crime-fraud exception which

4    we wouldn't substantiate.  And yes, your lawyer engaged in

5    efforts to show you that the privilege applied, your new lawyer

6    whittled down claims of privilege to its narrowest bare bones,

7    but still we are not going to do that, because we don't have to

8    and it makes our complaint sound better.

9         THE COURT:  We didn't discuss their participation and

10   knowledge of the activities and the relating of Skymark and

11   Tradeshow.  They specifically allege that the lawyers drafted

12   the statement denying any relationship between Sky Mark,

13   Tradeshow, and the companies.  They specifically allege that

14   part of the representations that were made after consulting

15   with the lawyers is that they were in the process of starting

16   an investigation into the reasoning behind the false attacks

17   and that our legal counsel is currently reviewing the matter

18   and has suggested possible legal action against the involved

19   parties.

20        You could say to me, yeah, they were duped.  That's

21   basically your response, they were duped, they thought this was

22   all true when they participated in it, and they advised them,

23   and they let them make the statement on their behalf and that

24   they drafted the statements to go out with regard to that.  But

25   that is not what the complaint says.

 1             MR. CURRAN:  Judge, those statements under the Janus

 2   case were prepared on behalf of others who had the ultimate

 3   authority over whether and how to communicate those statements.

 4   There is no allegation that our clients communicated those

 5   drafts.  Our client provided a draft and --

 6             THE COURT:  That doesn't help you on the issue that

 7   you are arguing, which is knowledge.  That doesn't help you on

 8   the issue of knowledge.  Whether or not they made the statement

 9   or didn't make the statement is irrelevant to whether or not

10   they had knowledge that the statements were false.

11             On this set of facts you want me to say that based on

12   reading this complaint, there is a possibility that these facts

13   could be read for one to conclude that they had no idea that

14   Skymark and Tradeshow were related to --

15             MR. CURRAN:  That Skymark lacked independence as a

16   research firm, I think that is the allegation.

17             THE COURT:  If you are making a distinction between

18   what I just said, I'm not sure I understand what distinction

19   you're making.

20             MR. CURRAN:  No, I'm not.  I'm saying I believe that

21   is the allegation and that so-called scripts, another buzzword

22   frankly.  You were using the kinder statements, Judge.  I

23   believe they called them scripts.  It's a buzzword.  Scripts

24   come from boiler rooms.  Having been involved in some of the

25   prosecutions of boiler rooms, that's not what these were.  Your

 1   Honor had it right when you said that they were statements,

 2   that they were drafted.

 3           A lawyer is asked, what do I say in response to this?

 4   What's it about?  Well, here is a draft.  We don't even know

 5   whether those drafts became the ultimate statements.  We do

 6   know that those statements were not made by my client.  Again,

 7   what you come back to, Judge, is you have intent-neutral

 8   conduct that is engaged in every day.  The ultimate question is

 9   what did they know.  Well, 9(b) tells us you have to plead that

10   with particularity, you simply can't assert that they knew.

11           THE COURT:  The allegation, and whether it is

12   sufficient or insufficient we can discuss, is that

13   Carrillo-Huettel represented both Skymark and Tradeshow.  Under

14   what scenario could I talk to any reasonable nonlawyer and say

15   they represent the principals of the companies of the stock

16   that's been sold, they also represent the supposedly

17   independent companies that are supposed to be touting the

18   stock, and it is reasonable to conclude --

19           MR. CURRAN:  "Touting" is a bad word, by the way, but

20   go ahead.

21           THE COURT:  -- promoting the stock, that it is

22   reasonable to conclude that they didn't have a clue that there

23   is any relationship between these clients?  The reasonable

24   inference is clearly in the other direction.

25           MR. CURRAN:  Judge, with all due respect, we have

1    Judge Daniels acting as a member of the commission and drawing

2    their compliant again.

3           THE COURT:  I am not trying to draft the complaint.  I

4    am telling you as a reasonable person reading the complaint,

5    not as a lawyer or judge, that's what I understand they are

6    trying to say.  Whether or not they have said it sufficiently,

7    you debate.

8           MR. CURRAN:  My argument is that they have not, Judge.

9           THE COURT:  That seems to be the inference that they

10   say should be drawn from these facts.  Their argument is for

11   pleading purposes those inferences are clearly compelling only

12   in one direction, they are not compelling in any other

13   direction.

14          That's like saying I went to the doctor but the doctor

15   has no idea I'm sick.  That is not a reasonable conclusion for

16   me to draw.  If they say I went to the doctor and I was sick

17   and therefore I went for treatment, you can't say you didn't

18   tell me how the doctor knew you were sick.  That is not the way

19   you can respond to it.

20          You have to say, yes, a reasonable conclusion would be

21   they are aware of what would be the reasonable information that

22   a lawyer would have if they were representing clients in these

23   different roles.  They represent the promoters.  They represent

24   the company.  They help structure the company.  They represent

25   the principals of the company.  They help buy and facilitate

1    the purchase and sale of the stock even through their own trust

2    account.  And despite in whose name the stock is transacted,

3    they make sure that the profits go back to the principals,

4    where we all started.  That might not be fire, but that's a lot

5    of smoke.

6          MR. CURRAN:  This isn't a little old lady from

7    Pasadena making this pleading here.  This is the Securities and

8    Exchange Commission that has investigated this for over three

9    years.  I'm glad you don't work there, again, Judge, because

10   you are drafting their complaint perhaps as they properly

11   should have but have not, have not sufficiently.  And they

12   don't get a pass on Rule 9(b), Judge.

13         THE COURT:  I don't know what facts I put in here that

14   you say I got from someplace else.  Everything that I am

15   talking about in terms of facts from which I say that is the

16   conclusion one could draw is here.

17         MR. CURRAN:  Judge, you have constructed a bridge

18   about reasonable inferences.  You have constructed a bridge

19   based upon your knowledge of the law and inferences that color

20   the word "knew" in a way that the complaint itself doesn't do,

21   Judge.  Everything here turns upon what they knew.  If the SEC

22   is saying that they knew, then have to provide how did they

23   know.

24         THE COURT:  You don't think it is sufficient to say

25   they knew because they structured this company, they represent

1    the principals, they represent the promoters, they advise them

2    as to the statements that they put out, some of which have

3    already been identified as not being accurate, and they even,

4    more directly, provided certain statements after they were made

5    by others to auditors and others, and they also participated

6    in, how should I characterize it, the reaction, the damage

7    control of the public's inquiry with regard to the independence

8    of the promoters, and they also helped structure the sale of

9    the stock during this period of time that they say that the

10   principals were involved in a pump-and-dump scheme, and they

11   facilitated the transaction and the masking of the principals

12   and the profits, and they helped transfer the profits that were

13   gained from what the government contends was a pump-and-dump

14   scheme.  That is not the law.  That's common sense if those are

15   the facts, right?

16             MR. CURRAN:  You started out with they located the

17   public shell.  That's in the complaint.

18             THE COURT:  I'm sorry?

19             MR. CURRAN:  They found the public shell, this law

20   firm.

21             THE COURT:  No.

22             MR. CURRAN:  That's one of the conceptive acts, Luis

23   Carrillo located a public shell.

24             THE COURT:  No, I think that they --

25             MR. CURRAN:  Paragraph 77, Judge.

1    THE COURT:  I didn't read it to be that nefarious.  I

2  read it to be that they helped structure the acquisition of one

3  company and the set-up of the other.  Maybe I have that wrong.

4    MR. CURRAN:  Judge, in this area of the securities

5  industry, this happens all the time.  The SEC has never sought

6  to make any of this improper, illegal, you can't do it anymore.

7    THE COURT:  But you can't say that any lawyer who is

8  involved in that as a lawyer could be involved in that without

9  knowing who the principals are?

10    MR. CURRAN:  Yes, I can, and I do.

11    THE COURT:  You have to give me an example.  I don't

12  know how you could practice law and acquire a company for an

13  individual who hires you and not know who the ultimate owner of

14  company is.  I have never heard of that.

15    MR. CURRAN:  Judge, they didn't acquire it for an

16  individual, though.  The stock purchase agreement tells you

17  that there were others behind.

18    THE COURT:  Which others other than the people who are

19  alleged to be involved in the pump-and-dump scheme?

20    MR. CURRAN:  They list a bunch of them in the

21  complaint.

22    THE COURT:  Who else other than the people alleged in

23  the complaint?  I don't remember.  I genuinely don't remember

24  who else was a principal of Pacific and who else was a

25  principal of --

1          MR. CURRAN:  In paragraph 85, Judge, they list A, B,

2    C, D, E, a number of people who would represent the ownership

3    behind, presumptively, the Kirks who come to you and say, I

4    have a group of people and we are doing this.

5          THE COURT:  No.  Where does it say that?  A says owned

6    by Ben Kirk, B says owned by Boyle, C says owned by John Kirk,

7    D says in the name of Dr. Luis Carrillo, and E says held by De

8    Beer.  Other than the defendants in this case, who are you

9    referencing?  The nominee entity?

10         MR. CURRAN:  They use the word "nominee."

11         THE COURT:  Right.

12         MR. CURRAN:  There is not even a particularized

13   allegation that we had any reason to know that these were

14   nominees.  They just say that they are nominees.  Maybe they

15   were and maybe they were not.  But as to us and our liability,

16   it all comes down to knowledge, and that knowledge has to be

17   alleged particularly.  That's what the rules say.

18         THE COURT:  You think that, reading this complaint, it

19   is a reasonable inference to draw that the lawyers didn't know

20   that Kirk was behind all of this?

21         MR. CURRAN:  It all comes down to the knowledge,

22   Judge, as to my client and --

23         THE COURT:  The knowledge is exactly the way it is

24   alleged.  You think, the way it is alleged, it is a reasonable

25   conclusion to draw that he didn't know that Ben Kirk was

F2C11SECM

```
 1  behind --
 2          MR. CURRAN:  What does "behind" mean?  Were they the
 3  leaders of this group?
 4          THE COURT:  It means that they were the beneficial
 5  owners.  That's what it means.
 6          MR. CURRAN:  Unless someone knows that --
 7          THE COURT:  You think reading this complaint one could
 8  not reasonably conclude, if there is no other competing
 9  evidence, that they knew that Kirk, since Kirk is their client
10  I assume, that they knew that Kirk was the beneficial owner of
11  all of this stock?
12          MR. CURRAN:  It comes down to knowledge, Judge.
13          THE COURT:  Right, it does.
14          MR. CURRAN:  They throw all of this out, "facilitate,"
15  "sham," "nominee," "script," and these kinds of words, and they
16  say they knew.
17          THE COURT:  I assume you are not at this stage
18  attempting to represent that your clients didn't know it was
19  Kirk.
20          MR. CURRAN:  Oh, yes.  He knew that Mr. Kirk was
21  involved in this investment, in this taking over of a public
22  shell.
23          THE COURT:  Involved in what way?
24          MR. CURRAN:  He was the leader of this group of
25  investors that came to him, here is our investment money, find
```

 1    us a shell, here is money to fund the shell.

 2              THE COURT:  What else is at issue with regard to that?

 3              MR. CURRAN:  There is wrong with any of that.

 4              THE COURT:  No, there is nothing wrong with any of

 5    that alone.

 6              MR. CURRAN:  Absent knowledge.  That is the key.  The

 7    knowledge needs to be particularly pled.

 8              THE COURT:  What is it you say that they haven't

 9    sufficiently alleged that he knew?

10              MR. CURRAN:  I don't believe that they have

11    sufficiently alleged the nominee.

12              THE COURT:  I'm sorry.  Say that again.  They haven't

13    sufficiently alleged that he knew what about the nominee?

14              MR. CURRAN:  That he knew that these were nominees.

15              THE COURT:  What do you think A is supposed to mean?

16              MR. CURRAN:  I'm sorry?

17              THE COURT:  How could Kirk ask them to do this and

18    they not know that this is on behalf of Kirk?

19              MR. CURRAN:  I have a group of investors, here is the

20    money for the investment, and you're going to distribute these

21    shares on this company A, B, and C.  On the basis of that

22    conversation, Judge, I have no reason to know that A, B, or C

23    are your nominees if you come and give me that instruction, and

24    there is nothing about doing that that is at all improper.  It

25    happens every day, Judge.

 1                 THE COURT:  That's true.

 2                 MR. CURRAN:  The SEC can put a stop to it tomorrow if

 3     they want to.

 4                 THE COURT:  I can hide my involvement in a purchase

 5     and sale as long as I don't defraud the investor.  You're

 6     right, that's not determinative of whether or not there is an

 7     allegation of fraud.  You are just talking about the one

 8     element of knowledge.  Frankly, I would have to almost conclude

 9     that under these circumstances these lawyers were totally

10     ignorant and incompetent if they didn't have clue as to any of

11     these basic facts.

12                 MR. CURRAN:  The ifs that you are using, Judge, that's

13     what 9(b) is supposed to address.

14                 THE COURT:  That's what they allege.  They didn't

15     allege if.  They say they did know.  They say they knew because

16     they are the ones that structured it.  There is nobody else to

17     know.

18                 MR. CURRAN:  They could innocently structure this.

19     This transaction could just as easily have been, assuming

20     everything that the SEC is says is true, absent you knew --

21                 THE COURT:  That's where we differ.  If what the SEC

22     says is true, that they were involved in drafting, advising,

23     and making false statements in furtherance of the profits that

24     were made by the principal, then they are liable, right?

25                 MR. CURRAN:  No.

 1           THE COURT:  If they drafted, advised them to make

 2     false statements, and themselves made false statements, you're

 3     saying that is somehow innocent activity?

 4           MR. CURRAN:  First off, there is no specific

 5     allegation.  What they say is we advised them to make

 6     statements.  They say those statements were false and that we

 7     knew it.  First off, they don't allege how do we know that.

 8           As you said, Judge, finding the public shell,

 9     providing legal advice in the acquisition of the public shell,

10     distributing the shares as per client instructions relating to

11     the purchase agreement, doing all these things absent that

12     knowledge, there is no difference between us and transactional

13     lawyers acting as such every single day.

14           It comes down to, Judge, did we know.  It's not that

15     we advised these people, but did we knowingly advise them to

16     accomplish something.  That's what they say, but they say it

17     without the particulars.

18           THE COURT:  Explain to me how they could advise to

19     indicate that there were no related parties and have him

20     execute such a document and then provide that document to the

21     auditors and not know that that was not true.  Give me a

22     scenario under these facts in terms of what their role was here

23     that one could possibly conclude that rather than conclude that

24     of course they knew, if they did this, they knew they were

25     related parties.  How could they not know they were related

1  parties?

2  MR. CURRAN:  Mr. Smith, my lawyer, I have to prepare

3  an unrelated party statement for the auditors, they want that.

4  THE COURT:  What did you do about their knowledge

5  about Kirk?  You can't deny they had knowledge about Kirk.

6  What did they do with their knowledge about Kirk?

7  MR. CURRAN:  Judge, absent some detail, I don't know

8  what that means.

9  THE COURT:  I'll tell you exactly what it means.  They

10  knew Kirk was a related party.

11  MR. CURRAN:  The SEC says that without any

12  explanation.

13  THE COURT:  Why do you say there is any possibility

14  that one could conclude that they didn't know that?

15  MR. CURRAN:  Because if Mr. Kirk came to them and

16  said, I have an investment group, companies A through Z are

17  with me, and here is the money on behalf of our group, and I'm

18  the face of the group that you will deal with, find me a public

19  shell, structure the deal this way, distribute --

20  THE COURT:  If you have somebody who is willing to say

21  that, then that would be a defense against their claim if the

22  jury credits that testimony.  But it doesn't tell me whether or

23  not the allegations made absent that defense or that claim or

24  that statement.  I'd be curious to see as this case progresses,

25  who you're going to get to say that.

```
1        You're giving me a big if.  I want to make sure that I
2   understand it as a hypothetical rather than something that you
3   are trying to proffer to me that you have such evidence, that
4   you reasonably anticipate that somebody in this case is going
5   to say that, particularly given the criminal convictions and
6   some other things in this case.
7        MR. CURRAN:  Criminal convictions?
8        THE COURT:  Yes.  I think there were a couple.  There
9   were a couple of pleas in this.  Oh, there were settlements or
10  what?
11       MR. CURRAN:  Judge, I'll let somebody else talk about
12  those settlements.  When I saw those documents, Judge, I was
13  like, oh boy.  Then I read those documents for what they don't
14  say.  I'll let others talk to those documents.  They are really
15  quite amazing about what those people who are settling aren't
16  really settling, and they are all here despite the fact that
17  they have some sort of pseudosettlement agreement with the SEC.
18  I'll let them talk for themselves.
19       THE COURT:  I shouldn't have raised that issue.  That
20  is irrelevant.
21       MR. BRODY:  Your Honor, at some point will we be able
22  to address this?
23       THE COURT:  Yes.  Hold the thought.  I don't want to
24  interrupt him.
25       I have to buy into your scenario, your big if
```

1    scenario, which, on the facts as I have them, is unlikely.

2           MR. CURRAN:  It is a big if, Judge.  Let me seize upon

3    the big if.

4           THE COURT:  Only seize upon it if you think you will

5    generally be in the position --

6           MR. CURRAN:  Wait, Judge.  It all comes down to

7    whether my client knew as alleged.

8           THE COURT:  That's true.

9           MR. CURRAN:  The rules say you have to particularize

10   the knowledge, and there is nothing there about that.  Likening

11   it to an insider trading case, I don't know how to respond to

12   that other than to kindly say that is wholly inapposite.

13          THE COURT:  You can respond to it this way.  You

14   clearly agree that knowledge can be inferred from the

15   circumstance.  You clearly agree to that, right?

16          MR. CURRAN:  I don't agree.

17          THE COURT:  No?

18          MR. CURRAN:  I don't in the following way, Judge.

19          THE COURT:  Not in a way.  I'm just talking about in

20   the abstract.  You agree that knowledge can be inferred from

21   the circumstances.

22          MR. CURRAN:  I agree, Judge.

23          THE COURT:  Right.

24          MR. CURRAN:  As a general matter, I agree.  We don't

25   have mind reading machines, so you have to infer it from

1    something, correct.

2         THE COURT:  The question is whether or not it is

3    reasonable on these facts to infer that they knew and, you say,

4    how.  Because of their intimate involvement in every phase of

5    the activity that the SEC says was in furtherance of the pump-

6    and-dump scheme.  That is, I assume their argument with regard

7    to how they knew.

8         MR. CURRAN:  Judge, that is not kind of circular, it

9    is absolutely circular.  You come right back to a transactional

10   lawyer acting as such, particularly in this segment of the

11   industry.  This isn't Skadden Arps, Judge.  It is not Peckar &

12   Abramson.  It is not any of the firms seated here represented

13   today.  You come right back to absent that knowledge,

14   everything that was done here is, on its face, what

15   transactional lawyers do on a day-to-day basis.

16        THE COURT:  No, on its face it is not what

17   transactional lawyers do.  Transactional lawyers don't find

18   themselves in this unfortunate set of circumstances with the

19   inferences that the SEC is attempting to ask one to draw,

20   having simply represented a client, helped them structure a

21   company, and then gone on about their business.  Quite frankly,

22   I cannot think of what aspect of involvement in any of these

23   companies the SEC doesn't allege that the law firm and the two

24   lawyers were involved in, intimately involved in.

25        MR. CURRAN:  Judge, it is not whether they were

F2G1J9ECM

 1   involved as lawyers in facilitating a transaction.  Even I have

 2   used the word now.

 3              THE COURT:  It is for their knowledge.  It is for how

 4   much one could reasonably infer that they have to have known.

 5              MR. CURRAN:  Judge, you are assuming knowledge, which

 6   is the key here.  That's the linchpin.  Without knowingly,

 7   knowingly participating, all they are are transactional

 8   lawyers.

 9              THE COURT:  You say on these facts it is unreasonable

10   to infer that they knew who the related parties were?

11              MR. CURRAN:  I'm saying --

12              THE COURT:  You have to answer that question first yes

13   or no.

14              MR. CURRAN:  My answer is yes with an explanation.

15              THE COURT:  Then give me the explanation.

16              MR. CURRAN:  My explanation is absent the knowledge,

17   Judge, you have what transactional lawyers do.  You're sitting

18   there saying, we are implying knowledge from, and a few shams

19   and things like that, you are implying the knowledge from what

20   otherwise transactional lawyers do because that's what they

21   did.

22          That's why knowledge is the big if here, Judge, and

23   that's why it needs to be alleged with particularity and not

24   compared to an insider trading ring.  These are lawyers acting

25   as such.  It is bootstrapping to say they were lawyers acting

1    as such, therefore they knew.  You have to particularize the

2    knowledge:  Well, we showed you they were acting in the

3    following way.

4              THE COURT:  The purchase of stock on the father's

5    behalf, on Dr. Carrillo's behalf, is not acting as lawyers.

6    That is beyond a lawyer capacity.

7              MR. CURRAN:  Judge, that happens all the time.

8              THE COURT:  It doesn't happen all the time.

9              MR. CURRAN:  It does.

10             THE COURT:  It doesn't happen all the time.  Even if

11   it happens more often than I see, it is still not a hired

12   lawyer related activity.  That is not what he is hired to do.

13   He is doing that either for his own interest or he is doing

14   that as a nominee for the interests of the client.  I don't

15   know which position you take, but that is not what the lawyer

16   is hired to do.  You can't say to me that that is normal lawyer

17   activity.  That is not why this lawyer was hired.

18             MR. CURRAN:  In my experience this does happen more

19   often than not.  More importantly, Judge, in my experience,

20   someone who is trying to have a nominee for their interest

21   doesn't use someone who has the same name.

22             THE COURT:  It depends.  It depends on whether you can

23   mask the illegality.  The question is always not whether or not

24   you have to mask everybody's identity, because that may be

25   difficult.  The ultimate question is whether you are going to

1    be able to mask the illegality.

2            MR. CURRAN:  I don't think you are masking anything if

3    the premise is that part of the misconduct was engaged through

4    this part of it relating to this person who happens to have the

5    same name as you do.  Before, you said, Mr. Curran, you would

6    have to have me believe that your clients are totally

7    incompetent.  Now you're asking me to believe my clients are

8    totally incompetent in trying to mask an elicit transaction

9    through the use of someone who has the same name as my client.

10            THE COURT:  That's not the nature of the illegality

11    that they are being charged with.  Your argument is mostly,

12    well, there could be an alternative explanation, this could

13    represent lack of knowledge and innocent activity rather than

14    the knowledgeable illegal activity the government asserts.

15    That may be true, but I can't weigh those two things on this

16    complaint.

17            I have to say, if you have no defense, if you don't

18    articulate a different scenario, if they present this case

19    exactly as it is stated here, could I allow a jury to conclude

20    or not conclude based on these allegations and these facts, if

21    they are proven, that there was a scheme to defraud here and

22    these were the participants in that scheme and they played a

23    more than minor role, a substantial role, that their activity

24    helped facilitate this and did so under circumstances that

25    clearly one cannot say I was the only one that didn't have a

1      clue as to what was going on here.  That is the difficult part

2      on this point.

3              MR. CURRAN:  Presumptively, part of that presentation

4      of evidence would contain specific evidence of the knowledge

5      that separates this from lawyer acting as such to lawyer being

6      knowing participant.  There is none of that in this complaint,

7      Judge.  They are characterizing lawyer acting as such to show

8      that they must have known.  That's bootstrapping.  9(b) says

9      you can't do that.

10              If you're going to allege knowing participation in the

11     fraud, which is everything here, you have to particularize it,

12     and they don't other than to say they were lawyers acting as

13     such and they arranged and planned and facilitated and sham and

14     script and all of rest of it.

15              When you bear it down, they are taking the lawyer

16     acting as such role and using that to support the knowledge

17     that they were something more.  That's not fair.  That's not

18     what 9(b) requires.  Even the cases recognize, in the instances

19     of opinion letters, for instance, that those are at most

20     instruments of misconduct, not core misconduct.  There has to

21     be something more here, Judge.

22              THE COURT:  You don't think that the facts as alleged

23     in this case would support the conclusion that the securities

24     were controlled securities because the Kirks, Boyle, and

25     Huettel acted in concert and had control by virtue of their

1   ownership of well over 50 percent of Pacific Blue stock and

2   that the allegations in this complaint are sufficient that the

3   lawyers knew this?

4       MR. CURRAN:  I don't think the allegations in the

5   complaint are sufficient to support that the lawyers knew it.

6       THE COURT:  That Kirk, Boyle, and Hinton owned more

7   than 50 percent of the stock?

8       MR. CURRAN:  I don't believe the allegations of the

9   complaint are sufficient to establish that the lawyers knew it.

10      THE COURT:  Your argument is what?  Because it doesn't

11  say who told them?

12      MR. CURRAN:  It's on two levels.  There is no on the

13  knowledge they knew this, they knew that.  There is no

14  allegation of any how and whether.  What there is, Judge, is a

15  description of lawyers acting as a lawyers and then they knew.

16  How did they know?  Well, they were lawyers acting as lawyers,

17  they were close to all this, they arranged it, they planned it,

18  they structured it, all these words, Judge.  But that is

19  equally true as someone who doesn't know.

20      The key comes down to knowledge.  That separates it

21  out.  How did they know?  It has to be something more than just

22  acting as transactional lawyers always act.

23      THE COURT:  "They knew because they designed the

24  acquisition using 4.9 percent block of shares, provided

25  documents and instructions directing Pacific Blue's transfer

1      agent to issue shares, and Carrillo instructed Franklin to

2      issue a resolution incorrectly certifying that the shares were

3      not being deposited by an affiliate.  They also provided

4      misleading letters to clearing brokers and the DTC facilitating

5      the deposit and sale of shares and drafted agreements for John

6      Kirk's distribution of shares in private transactions."

7              That's pretty intimate knowledge, don't you think?

8              MR. CURRAN:  Judge, every single thing you just said

9      is them acting as lawyer on behalf of somebody else.  Somebody

10     comes to them and says, I want a public shell.  OK, we do that,

11     we'll find you one.  Happens every day.  I'm representing a

12     group of buyers and we want to avoid Rule 13.  OK.  Happens

13     every day.  Here's how.  I need a nonaffiliated statement for

14     the auditors.  OK, I'll draft one for you.

15             THE COURT:  A nonaffiliated statement from the

16     auditors that's accurate.

17             MR. CURRAN:  Judge, that depends on whether we knew it

18     was inaccurate.  They say we know.  How did we do?  Well, you

19     represented the company.  OK, that's what lawyers do.  You

20     can't bootstrap the knowledge.

21             THE COURT:  Just because that is what lawyers do is

22     not determinative of whether or not it is legal or illegal.

23             MR. CURRAN:  That's right.  Knowledge is, Judge.  That

24     is what isn't sufficiently alleged here, and that's what 9(b)

25     requires, and that's after more than three years of

1    investigating.  That's what this calls for.

2           THE COURT:  You don't think on these facts that they

3    have demonstrated that they knew anything?

4           MR. CURRAN:  They haven't demonstrated that my client

5    knew anything in an illicit way, with any illicit intent.

6           THE COURT:  Any of the false information, any of the

7    inaccurate information, you think there is no sufficient

8    allegation that they knew that certain information was not --

9           MR. CURRAN:  I don't.  They possessed information.

10   Our clients possessed information, drafted documents, the rest

11   of it, that the SEC alleges are false.  Unless they can allege

12   that my client knew, and it requires more than just saying that

13   my client knew.  How did they know?  Because he was the lawyer.

14   Well, yes, he was the lawyer.  Then he knew.  How did he know?

15   Because he was the lawyer, and therefore he must have known.

16   No.

17          THE COURT:  That is not what they say.  They don't say

18   he knew because he was a lawyer.  They say he knew because he

19   was involved in certain activity with regard to the stock and

20   with regard to his clients, that he could not have been

21   involved even as a lawyer in that activity unless he knew

22   certain minimal things, and he acted consistent with knowing

23   those minimal things.

24          There is no reason to conclude, for example, as you

25   said, going back to the related parties, there is no way that a

 1    lawyer could advise a client that he should make such statement

 2    unless the lawyer has convinced himself that it is an

 3    appropriate statement to make and an appropriate thing to

 4    advise the client to do.

 5         You could say to me it doesn't mean that somebody

 6    didn't lie to him and say that was the case.  That's true, but

 7    that's not what they say.  They say that obviously they knew

 8    because that's their client and the client hired them and the

 9    client came to them owning the company.

10         MR. CURRAN:  But the client didn't, they didn't.  They

11    don't even allege that, Judge.

12         THE COURT:  That Kirk was not?

13         MR. CURRAN:  No.  They allege that Luis Carrillo

14    located a public shell.

15         THE COURT:  And Kirk purchased it and structured it,

16    right?

17         MR. CURRAN:  If you look at the agreements, Judge, he

18    purchased it on behalf of a number of people and entities that

19    they allege were affiliated and that our client knew it.  But,

20    Judge --

21         THE COURT:  That's like saying George Steinbrenner

22    wasn't the Yankees.  It's not a reasonable conclusion to draw

23    that they haven't a clue that Kirk has a significant financial,

24    beneficial, majority interest in this company.  You are not

25    denying that.  You aren't legitimately trying to say --

```
 1              MR. CURRAN:  We are not here in the merits, Judge.
 2              THE COURT:  That's exactly right.  That is exactly my
 3    point.
 4              MR. CURRAN:  If the complaint were written in the
 5    manner you are positing here, Judge, it would be a different
 6    thing.  It's not written that way.
 7              THE COURT:  If you give me some affidavit from one of
 8    those lawyers that says that I had no idea that Kirk was behind
 9    all of this, maybe I'd give that some credence.  But you want
10    to argue in the abstract a scenario which none of us in this
11    room legitimately think exists, so it is not a legitimate
12    inference.
13              The only other inference, if these facts are true,
14    unless you can come up with a defense, a defense of I didn't
15    know, I guess I should have known but I didn't know, I was not
16    as good a lawyer as some other lawyers, I was so busy because
17    there were only five of us and not a hundred of us, I could
18    speculate as to those things.  But they don't detract from the
19    plausibility that they were intimately involved and involved in
20    criminal activity based on the facts here.
21              MR. CURRAN:  This isn't a criminal case.  I don't know
22    what the SEC thinks, but this is a civil case, Judge.
23              THE COURT:  Right.
24              MR. CURRAN:  That's one.  Two, you have --
25              THE COURT:  I'm not sure I understood your point.
```

 1             MR. CURRAN:  There is an implication by saying my

 2   client was involved in criminal activity and knew it.

 3             THE COURT:  I shouldn't have said criminal activity.

 4   I should have said illegal activity.

 5             MR. CURRAN:  I needed to kind of jump on that one,

 6   Judge.

 7             THE COURT:  It could have been criminal activity, I

 8   don't know.  Some were accused of criminal activity.

 9             MR. CURRAN:  We don't even know if it is misconduct,

10   Judge.

11             THE COURT:  It is alleged to be misconduct.

12             MR. CURRAN:  It is not sufficiently alleged to be

13   misconduct unless the establishment of knew is there, and

14   that's all it is.

15             THE COURT:  All right.  Your argument is the primary

16   driver of all the other arguments, I think, for the most part.

17             MR. CURRAN:  But they are a lot smarter than I am,

18   Judge.

19             THE COURT:  You have done a very adequate and

20   sufficient job of getting your point of view on this.

21             MR. CURRAN:  I think they are all going to beat me up

22   in a minute, Judge, so don't cut them off.

23             THE COURT:  I won't.

24             MR. FLEMING:  I represent another of the lawyers.  I

25   am going to get specific with you.  I think it is very

F2GTL9SEC

1    important because it will address some issues that I think have

2    not yet been addressed.  You asked whether there has been a

3    reasonable basis to conclude that the lawyers did not know what

4    has been alleged by the SEC.  Here is the reasonable basis.

5            The Pacific Blue shares were purchased by two

6    individuals, John Kirk and Dr. Carrillo, and ten entities.

7    Three of those entities, by the way, have nothing to do with

8    this case, but they bought shares in Pacific Blue.  Seven

9    entities purchased 4.9 percent each.  There is no allegation in

10   the complaint that Mr. Huettel had any idea who these entities

11   were, who they were owned by:  Mr. Kirk, Mr. Boyle.

12           THE COURT:  But it is a reasonable inference that they

13   were asked to do this at Mr. Kirk's direction.

14           MR. FLEMING:  Why?  Why is that a reasonable

15   inference?

16           THE COURT:  You tell me.  Is there another inference?

17   What is the other inference?

18           MR. FLEMING:  Money came to the law firm to facilitate

19   the purchase of this company.

20           THE COURT:  From whom?

21           MR. FLEMING:  The money came from John Kirk's account.

22           THE COURT:  Right.

23           MR. FLEMING:  That's it.  There is no indication that

24   the money is all John Kirk's.  There is no indication that the

25   money is someone else's.  It just came from his account.

1          THE COURT:  You would have a strong argument if it

2     came out of a different account.

3          MR. FLEMING:  That is a circumstance that isn't fair

4     to tag the lawyers with.  Here is what the lawyers know.  The

5     lawyers know that John Kirk is not buying all or 90 percent of

6     the company.  There are 10 entities, 3 of which have nothing to

7     do with anything in this case and 7 they have no knowledge are

8     owned by the Kirks or other people.

9          THE COURT:  Let me ask you this question because we

10    haven't addressed this.  Whose stock could the lawyers have

11    possibly thought was being sold?

12         MR. FLEMING:  Whose stock?  I missed that.

13         THE COURT:  Whose stock could the lawyers have

14    believed was being sold?

15         MR. FLEMING:  Being sold?

16         THE COURT:  Right.

17         MR. FLEMING:  I think there is another confusion here,

18    which is what I wanted to talk about.  There is kind of two

19    phases of the case.

20         THE COURT:  Right.

21         MR. FLEMING:  There is what I think we all can agree

22    is the core misconduct alleged by the SEC, that being the pump-

23    and-dump, which occurred, I don't even know when, sometime in

24    2010.  The purchase of the company by these 12 individuals and

25    entities occurred in September of 2009.  There is a time

F2GTH9SCm

 1   difference there.  There is no allegation by the SEC that the

 2   lawyers played any role, at least Mr. Huettel, no role

 3   whatsoever in any of the core misconduct, the pump-and-dump.

 4        There is an allegation that Mr. Huettel and Mr.

 5   Carrillo played a role in the acquisition of the company.  The

 6   question then becomes -- and this is the whole case, it rises

 7   or falls on this point -- did the Kirks or the group that the

 8   SEC refers to control 90 percent of the shares?  And if they

 9   did, did the lawyers know about it?

10        THE COURT:  Where was the stock coming from?  Before

11   it went to these entities, who owned the stock?

12        MR. FLEMING:  Very good question.  There was a public

13   company called Descanso Agency, a Nevada-based company, I

14   believe.  There was a registration statement in 2007.  Shares

15   were sold.

16        THE COURT:  To?

17        MR. FLEMING:  To the public.

18        THE COURT:  OK.

19        MR. FLEMING:  That's the end of that.  Descanso goes

20   nowhere.  Pacific Blue and Alternative Energy Company reversed

21   mergers into Descanso to become a public entity.  As part of

22   that, there is a sale from the Descanso shareholders holding

23   free-trading shares.  I will take you through the documents.

24   Which, by the way, goes to the question of whether the opinion

25   letters were false.  I maintain they weren't, they were

1   completely accurate.

2          The shares go from the Descanso shareholders to

3   Carrillo Huettel in trust, who were representing a group of the

4   12 buyers who I mentioned to you.  To facilitate, the money

5   goes from Carrillo Huettel after it had been gotten from the

6   John Kirk account on behalf of these 12, 3 of which have

7   nothing to do with John Kirk apparently, and the shares come

8   in, and then they get distributed out to the 12.

9          THE COURT:  You think it is a reasonable conclusion to

10  draw that the lawyers thought that Mr. Kirk had no relationship

11  with these companies?

12         MR. FLEMING:  I think the lawyers knew that Mr. Kirk

13  did have a relationship with the buyers.

14         THE COURT:  That is a reasonable conclusion.

15         MR. FLEMING:  But not whether it was a control

16  relationship.

17         THE COURT:  Is there a basis to believe that there are

18  some other principals who have a control relationship other

19  than Mr. Kirk?

20         MR. FLEMING:  I think Mr. Huettel would say this.  And

21  it is not part of the complaint, I grant you.  I'm just going

22  to give you an alternative scenario.  John Kirk is an Angel

23  investor who invests in companies he likes.  Investors come

24  along with John Kirk because presumably they think, hey, these

25  are some great opportunities, I like John's ideas.  I'm

1  speculating here.  But that doesn't mean that John Kirk

2  controls all the shares.  These are individuals who are putting

3  up their money and at risk.

4          THE COURT:  That begs the question.  To do the work

5  that you say the lawyers would legitimately have to do, they

6  would need to know who controls the company, wouldn't they?

7  Isn't that critical to the work that they have to do?

8          MR. FLEMING:  Yes.

9          THE COURT:  OK.

10          MR. FLEMING:  That's exactly right.

11          THE COURT:  Then we have to infer some kind of

12  knowledge.

13          MR. FLEMING:  No, you don't, and here is why.

14          THE COURT:  Either information was provided to them to

15  make them think one way or the other, and on these facts I

16  can't think of the information that would be provided to them

17  to make them think --

18          MR. FLEMING:  Precisely.  You put your finger on it.

19  That is exactly right.  That's what this complaint lacks.

20          Let me give you a case.  I really want your Honor to

21  read the following case:  SEC v. Czarnik.  I have to provide it

22  to you because it is apparently not reported in the F.Supp.

23          THE COURT:  Is it a Westlaw case?  I'll pull it up

24  over lunch.

25          MR. CURRAN:  Yes, Judge.  It is 10 CV 745, 2010 WL

1    4860678, and it is actually cited in the SEC's papers first.

2             MR. FLEMING:  Right.  The SEC cited this case.  Here

3    is the import of it.  I'll give you little Cliff Notes version,

4    but I really urge you to read it.  Judge Castel decided it.  It

5    deals with a lawyer, it deals with a lawyer in I believe a

6    pump-and-dump situation, and it deals with a lawyer making

7    representations.  He made seven in all.

8             First of all, I'll read you this.  Judge Castel cites

9    from the Second Circuit, which says, "Especially in securities

10   fraud cases, requiring particularity serves to give a defendant

11   notice of the plaintiff's claim and safeguards the defendant's

12   reputation from improvident charges."

13            Not to be dramatic, Mr. Huettel is a lawyer.  He is

14   being charged with fraud by the SEC.  There is no greater

15   reputational damage.  In the age of Google, that is ruinous.

16   So, the SEC at a bare minimum has got to allege with

17   particularity what his knowledge is.

18            Judge Castel goes on.  He reads, and these are Second

19   Circuit well-settled rules, "Conclusory allegations that

20   defendants knew but concealed some things or knew or were

21   reckless in knowing other things do not satisfy the

22   requirements of Rule 9(b).  Such allegations are 'so broad and

23   conclusory as to be meaningless,'" quoting the Shields case.

24   He goes on to say, and this is critical, "Where plaintiffs

25   contend defendants have access to the contrary facts, they must

1    specifically identify the reports or statements containing this

2    information."

3             Judge Castel goes on to determine, and this is what is

4    fascinating about this case, seven opinions.  Three of them, on

5    a motion to dismiss, he dismisses.  The reason he dismisses is

6    he says there is no allegation or basis as to how the lawyer

7    would have known.  The representations were that the clients

8    are not going to sell shares, unregistered shares, that the

9    clients are not going to sell shares.  Of course, the clients

10   then sold shares.  He dismisses three of these representations

11   on the ground that the lawyer had no basis to know based on the

12   complaint.

13             But he finds that there are emails that are cited by

14   the SEC with respect to four others where the clients are

15   talking to the lawyer, talking about, hey, we got to get going

16   to sell these shares.  Judge Castel concludes that there's a

17   reasonable inference that the lawyer knew that what he was

18   saying was false.

19             THE COURT:  That's interesting.  Why isn't that

20   analogous to the allegations that Carrillo and Huettel provided

21   multiple misleading opinion letters to facilitate the deposit

22   and sale of the Kirk and Boyle Pacific Blue shares when they

23   specifically in November of 2009 provided opinion letters

24   signed by Carrillo to Scottsdale for blocks of shares owned by

25   Ben Kirk and Boyle's nominee entities, falsely confirming that

1    the shares are fully registered, unrestricted, free-trading

2    shares?

3            MR. FLEMING:  Because they are unrestricted and they

4    are registered and they are free-trading, and the opinion is

5    true, not false, that's why.

6            I'll explain it this way, because I just explained it

7    before.

8            THE COURT:  They said the shares have been registered

9    under the Securities Act of 1933 and that "we are not aware of

10   any agreement or understanding that would preclude Gibraltar

11   from selling."

12           MR. FLEMING:  That's right, and that's true.

13           THE COURT:  They weren't at that time registered.

14           MR. FLEMING:  They were registered, Judge.

15           THE COURT:  They were currently registered when that

16   representation was made?

17           MR. FLEMING:  Yes, they were.

18           THE COURT:  They, Pacific Blue shares?

19           MR. FLEMING:  No.

20           THE COURT:  That was the representation, wasn't it?

21           MR. FLEMING:  No, no.

22           THE COURT:  I am trying to understand your argument.

23           MR. FLEMING:  Judge, please, let me.  This is a

24   distinction without a difference.  There are only one shares.

25   What they are called is just a name on it.  That's what

1  happened.

2          THE COURT:  There is no such thing legally.

3          MR. FLEMING:  Hear me out.

4          THE COURT:  There is no legal representation that you

5  or any lawyer could make that would say, oh, there's no

6  distinction, the new company is the old company and so when we

7  said stuff about the new company, we meant the old company.

8  You know that.

9          MR. FLEMING:  No, I don't know that, and I'll tell you

10  why.  Shares, Judge, that are registered do not need further

11  registration unless two things:  One, they come to rest back in

12  the company.  Then they have to be reregister and reissued.

13  That's number one.  Two, if they are sold or come into the

14  possession of someone who is an affiliate of the company.  This

15  gets us back to square one.  This is the linchpin issue in the

16  case:  Do the lawyers know that the shares are controlled by

17  this group that the SEC identifies?

18          THE COURT:  They just did the transfer.

19          MR. FLEMING:  Yes.

20          THE COURT:  What wouldn't they know?  Tell me what

21  they wouldn't know given the fact that they were the lawyers

22  for the transaction.

23          MR. FLEMING:  I can only answer by telling you what

24  they would know.  Here is what they would know.

25          THE COURT:  No, you have to tell me that they wouldn't

 1   know the intimate details of the company so they wouldn't know

 2   whether or not these representations were true or false.

 3        MR. FLEMING:  Wade Huettel doesn't know they were

 4   controlled by the Kirk group.  How does he know?  There is no

 5   allegation.  Here is the complaint.  Paragraph 82, which is

 6   what your Honor picked up on, says this.  "Carrillo and Huettel

 7   knew that the 4.9 percent nominee owners were acting as a

 8   group."

 9        How did they know?  Let's go to 90, paragraph 90.

10   "Carrillo and Huettel were heavily involved in the

11   communications between Pacific Blue and the Kirks."  OK.  I'm

12   reading this.  I'm waiting to see what those communications

13   are.  "They participated in emails and discussed with the Kirks

14   regarding Pacific Blue.  That demonstrated their knowledge that

15   the Kirks were exercising control over Pacific Blue."

16        I'm thinking here we are, it's Czarnik again, Judge

17   Castel's case.  We are going to get the emails, we are going to

18   say Wade Huettel communicated with so-and-so and was told

19   whatever.  It doesn't come.  There is nothing there.  There is

20   no allegation.  There is a threshold pleading requirement that

21   of all people the SEC should have to meet.  There is no

22   allegation that established knowledge, and that's critical.

23        THE COURT:  Explain to me how they could have worked

24   on the transaction involving Descanso converting into Pacific

25   Blue and what it is that you say that they wouldn't know.

1          MR. FLEMING:  It is a sale.

2          THE COURT:  If it's a sale, I assume they know the

3    parties in the sale.  Right?  They would have to know that.

4    They would have to know that.

5          MR. FLEMING:  They know there are 12 entities.  They

6    clearly know there are 12.

7          THE COURT:  They would have to know who is selling and

8    who is buying.

9          MR. FLEMING:  Right.  They are buying in trust from

10   shareholders that they have identified four shareholders --

11         THE COURT:  They would have to know who has authority

12   to bind those purchasers, right to the purchase.

13         MR. FLEMING:  To bind them?

14         THE COURT:  Yes.  Companies don't talk, people talk.

15         MR. FLEMING:  Yes.

16         THE COURT:  They have to know who has the authority

17   and what that authority is to act on behalf of those companies.

18         MR. FLEMING:  I don't disagree with you.  Where is it

19   in the complaint?  Is there an allegation, your Honor -- and

20   this is critical, too.

21         THE COURT:  The allegation is it is Kirk, and you're

22   not denying that it was Kirk.

23         MR. FLEMING:  No.  The allegation should be that there

24   was an email on September 6th and John Kirk told Wade Huettel,

25   here is the money that I'm buying for all of my nominee

1    entities.  There are 12 entities.  They have no knowledge that

2    there is a relation between them.  That is the SEC's burden.

3    It is a minimal burden.  They have had three years to

4    investigate, they still don't do it.

5           Your Honor, there are a host of other issues.  Mr.

6    Huettel made those statements.  No statements in this

7    complaint.  Under Janus, he is not the maker of any statement.

8           THE COURT:  That doesn't mean that he is not part of

9    the scheme.

10          MR. FLEMING:  No, it doesn't.

11          THE COURT:  So that is not determinative.

12          MR. FLEMING:  I'm going one by one.  I'm knocking them

13   down one by one.

14          THE COURT:  That does not exclude them.  That is not a

15   basis for me dismissing him because he doesn't make the

16   statement.

17          MR. FLEMING:  I'm going to get to the scheme in a

18   second.  All I'm saying is that to the extent the claims

19   against Mr. Huettel are misstatement-related, there is no

20   claim, got to be dismissed.

21          To the extent they are scheme-related --

22          THE COURT:  I have to back up.  That is not true.

23   There were certain statements made by others that the SEC

24   claims that the lawyers told them to make and there were

25   certain statements made independently or transferred

F2G11895M

1    independently by the lawyers to others.

2             MR. FLEMING:  Respectfully, Judge, I maintain that

3    Janus, the Supreme Court case, says no.

4             THE COURT:  Says no to what?

5             MR. FLEMING:  Says no, that a lawyer who drafts a

6    document, a lawyer who advises on a document, is like a speech-

7    writer, the speechwriter that Justice Thomas talked about in

8    Janus.  The speechwriter is not liable, because he doesn't make

9    the statement.  He may write it.  The speech maker may read it

10   exactly as it is written.  He is not the maker of the

11   statement.

12            THE COURT:  That is not necessarily true.  I

13   understand the rationale that Judge Castel must have been

14   addressing.  But if I tell you I have a person who is

15   supposedly the head of the company but is not really the head

16   of the company, because he doesn't have a clue what is going

17   on, he is just doing whatever he is told to do, he has been set

18   up as head of the company, and I as the lawyer say, look,

19   you've got to make a representation to the auditors, if you

20   make a true representation, we are not going to be able to

21   accomplish our goal, so you must make a false representation.

22   This is the representation you must make.  Would you execute

23   this document, make this representation, and then I will take

24   the document, and I will give it to the auditors.

25            You're saying that Judge Castel's case or any other

1      case says that that excludes you from liability for the

2      creation and the transmitting of that statement to the auditors

3      when you know the statement is false?

4              MR. FLEMING:  For primary liability, yes.

5              THE COURT:  We don't have to argue about primary

6      liability or secondary liability.  You're in the suit either

7      way, right?

8              MR. FLEMING:  Yes.  If you have knowledge like that,

9      absolutely.

10             THE COURT:  Right, you're still in the suit.

11             MR. FLEMING:  No question.

12             THE COURT:  However turns out, one could debate

13     whether that makes you primarily liable or liable as an aider

14     and abettor.  Quite frankly, I'm not sure that the case law

15     stands for the proposition that it is across the line beyond

16     primary reliability when you instruct someone else to make a

17     statement and you know that statement needs to be made in order

18     to facilitate your illegal activity and the person executes a

19     document making that statement at your direction and then you

20     provide that statement to the people who are supposed to rely

21     upon it.

22             MR. FLEMING:  Mr. Huettel didn't do anything of the

23     sort.  But I get your hypothetical, I do.  I will say that

24     there is probably a level of control that at some point is a

25     line that can be crossed.

 1           THE COURT:  You're talking about isolated.  They give

 2   me an example of everything.  The opinion letters are

 3   statements by them.

 4           MR. FLEMING:  Yes.

 5           THE COURT:  You have a different argument as to why

 6   that doesn't make them liable, but that is not the argument

 7   that they are not in this because they didn't make any direct

 8   statements that the SEC says were false.  You can't make that

 9   argument.

10           MR. FLEMING:  Respectfully, Mr. Huettel can make that

11   argument because, as the SEC admits, Mr. Huettel did not make

12   those statements within the meaning of the Supreme Court

13   precedent.

14           THE COURT:  The opinion letters?

15           MR. FLEMING:  The opinion letters.

16           THE COURT:  OK.

17           MR. FLEMING:  That is just the fact.  They did not

18   make those.

19           THE COURT:  Doesn't it depend on what you do with the

20   opinion letters?  Just because it is opinion letters, it

21   doesn't have any protection against fraud.

22           MR. FLEMING:  First of all, I think opinion does have

23   protection under Virginia Bank Shares.

24           THE COURT:  It depends on what is in the opinion

25   letter.

```
 1              MR. FLEMING:  Right.  If it's a false opinion, right.

 2              THE COURT:  Not if it's a false opinion.  If it's a

 3    false statement in the opinion letter.

 4              MR. FLEMING:  Yes.

 5              THE COURT:  That's what they claim.

 6              MR. FLEMING:  I'm making a technical point that Mr.

 7    Huettel cannot make those opinions.

 8              THE COURT:  Who made those opinions?

 9              MR. FLEMING:  Mr. Carrillo did technically.

10              THE COURT:  You're going to put it on Carrillo?

11              MR. CURRAN:  Objection.

12              THE COURT:  Carrillo didn't put it on you.

13              MR. FLEMING:  I'm standing over here because I don't

14    want Mr. Curran to take my head off.  The fact is there are no

15    statements in that opinion letter anyway.  The burden is not on

16    the defendants to prove that on a motion to dismiss.  The

17    burden is on the SEC, and they haven't done it.  They just

18    haven't done it.  They have said those shares were unregistered

19    and therefore there is a violation of section 5 for their sale.

20    That is conclusory.  That is not permissible.  They have a

21    bigger burden than that.

22              THE COURT:  They say the Pacific Blue shares were not

23    registered and your clients represented that they were

24    registered.

25              MR. FLEMING:  They were registered.
```

```
 1            THE COURT:  Pacific Blue shares were registered?

 2            MR. FLEMING:  Yes.  The Descanso shares were sold to

 3   the Pacific Blue shareholders.

 4            THE COURT:  That doesn't make the Pacific Blue shares

 5   registered.

 6            MR. FLEMING:  It does.

 7            THE COURT:  That means you don't have to register the

 8   Pacific Blue shares.  Is that your argument, that you don't

 9   have to independently register the Pacific Blue shares once the

10   transaction is completed?

11            MR. FLEMING:  That's correct, that is my

12   understanding.

13            THE COURT:  If one wants to look up and figure out

14   whether the shares are registered, how are they going to do so?

15   That is not my understanding of what needs to be done.  There

16   has to be someplace where the Pacific Blue shares are

17   registered.  There has to be some transfer of the registration

18   to Pacific Blue shares.  It can't just be, well, I'm the tenth

19   company that was bought out and the first company was

20   registered, so therefore the next nine are registered.  That is

21   not the way it works, particularly when they are not even in

22   the same base.

23            MR. FLEMING:  Your Honor, I'm not a transactional

24   lawyer, but here is my understanding.  There are two ways that

25   shares have to be reregistered.  Three ways.  One, as I told
```

1    you, if they come to rest in the company, they have to be

2    reregistered.  Two is if they come into the hands of someone

3    who is an affiliate of the company, which raises the threshold

4    question here of knowledge, did they know that the group

5    controlled.

6         THE COURT:  What if the company no longer has that

7    company name and is no longer in the business of what that

8    previous company was involved in and now the company has a

9    totally different name and is incorporated for a totally

10   different purpose?

11        MR. FLEMING:  I can only tell you my understanding.

12        THE COURT:  No.  I want an answer to the question.

13        MR. FLEMING:  My understanding is yes, those shares

14   are free-trading unless ones of those three things I mentioned

15   happens.

16        THE COURT:  Free-trading and registered?

17        MR. FLEMING:  Registered and free-trading, yes.

18        THE COURT:  That doesn't make a lot of sense to me.

19   If I'm going to check and see if the shares I want to buy are

20   registered, how would I do that?

21        MR. FLEMING:  If I'm wrong --

22        THE COURT:  That would defeat the purpose of

23   registering.

24        MR. FLEMING:  The commission has, I'm sure, a person

25   or two in their office that knows such stuff.  They could have

 1   explained it.  They could have sent it out.  What
 2   they did was they cited a case, SEC v. Cavanaugh, that dealt
 3   with an S8 registration statement, which is a totally different
 4   animal.  That's an animal where shares are registered and
 5   distributed to employees pursuant to a plan.  Those shares have
 6   to be reregistered before they can be publicly traded.

 7          But the Descanso shares were free-trading when issued.
 8   They did not come to rest in the company, and to the lawyer's
 9   knowledge they did not come to rest in the hands of an
10   affiliate of the company, maintaining their free-trading
11   status, making the opinion letter true, at a minimum making the
12   opinion letter subjectively true to the lawyers who issued it.

13          THE COURT:  How do you -- and then we will break for
14   lunch.  Let me move to another area.  How do you get around the
15   allegation that the lawyers were participants in a cover-up
16   with regard to the relationship between Skymark and Tradeshow,
17   and that they drafted the statements that were circulated, and
18   in those statements there were representations made about the
19   lawyers suggesting possible legal action for the false
20   allegation that there was a relationship?

21          MR. FLEMING:  Let me speak to that.  I don't think
22   that is what this complaint alleges.  Let me read from it.  I
23   will only take a couple of minutes, so bear with me.

24          THE COURT:  That's OK.

25          MR. FLEMING:  Paragraph 71 says Huettel, among others,

1    "conspired to deny the facts in The Street Sweeper article and

2    to conceal the Kirk shares controlled."  it hasn't established

3    on this complaint share control.  It is just conclusory about

4    conspired.  What does it say Huettel did?

5              THE COURT:  It says that he drafted the statements

6    that were --

7              MR. FLEMING:  No.  Let's read that.

8              THE COURT:  I'm sorry.  "Drafters of the statements

9    were circulated amongst Carrillo, Huettel, and De Beer."

10             MR. FLEMING:  Right.

11             THE COURT:  Then after that, "Skymark responded,

12   certain individuals had maliciously and fictitiously attacked

13   Skymark research and Tradeshow.  We are in the process of

14   starting an investigation into the reasoning behind the

15   attacks.  Our legal counsel," which I assume is Carrillo and

16   Huettel, "is currently reviewing the matter and has suggested

17   possible legal action against the involved parties."

18             MR. FLEMING:  Yes.

19             THE COURT:  From paragraph 71 and 72 and the

20   allegation in 75, which says, "The public statements by Skymark

21   and Tradeshow responding to The Street Sweeper article drafted

22   by or approved by the Kirks, Carrillo, Huettel, and De Beer

23   were false and misleading because they failed to disclose the

24   truth.  As the article implied, the Kirks and Boyle controlled

25   Skymark, whose purpose was simply to promote the common stock

1    of Tradeshow, a company also controlled by the Kirks and

2    Boyle."

3            I can't take an innocent inference from that.

4            MR. FLEMING:  I will speak to them.  You tell me if

5    there is an innocent explanation.  Ultimately, you are the one

6    who has to determine this.  It says drafted by or approved by.

7    There is no statement that Huettel drafted this document.  It

8    is left vague.

9            THE COURT:  But he could not have legitimately let

10   this statement go out if he had known that there was a

11   relationship between Skymark and Tradeshow and that they were

12   going to put out a statement saying that there was no

13   relationship and the lawyers were going to sue these people for

14   making these false and fictitious, salacious allegations.

15           MR. FLEMING:  Let's talk about these people for a

16   second.  Your Honor is probably familiar, I would imagine from

17   the spate of cases that come into this courthouse, with what I

18   will call short sale shops.  They issue articles talking about

19   how bad a company is while they are maintaining or putting on a

20   short position, and then they benefit from it.

21           THE COURT:  Right.

22           MR. FLEMING:  It's a manipulation itself.  That is

23   what the principals here suspected had happened with Street

24   Sweeper.

25           THE COURT:  No, you couldn't suspect that that

1    happened with Street Sweeper.  You suspect that happens when

2    they do that and use information that is false.  In this case

3    everybody on that list knew that what they were saying about

4    the company was true.  You may want to say, well, they are just

5    revealing the truth so that they could profit off of shorting

6    the stock.  But that's not the question.

7        The question is whether or not it's a true statement

8    or a false statement.  Everybody there knew that that was a

9    true statement and everyone there conspired, as they allege, to

10   cover that up and try to give the public the impression that

11   that was a false statement, that there was no relationship, and

12   that these people, the only thing that you can't, quote, be

13   sued for is for falsely claiming that there was a relationship

14   between Skymark and these individuals and these companies and

15   Tradeshow.  But they knew that it was true and they misled the

16   public.  They all participated in a scheme to mislead the

17   public to believe that it was not true.

18       MR. FLEMING:  I don't believe the complaint says that.

19       THE COURT:  You don't think that is a reasonable

20   reading of those three paragraphs?

21       MR. FLEMING:  No.  Let me tell you why.

22       THE COURT:  All right.

23       MR. FLEMING:  Maybe I'm crazy, but let me tell you

24   why.

25       THE COURT:  No, you're not.  You're the lawyer.

           1          MR. FLEMING:  Paragraph 64.  "Carrillo and Huettel

           2     knew that Skymark."  Skymark is the promotional, investor

           3     relations, whatever you want to call it.  It is a double opt-in

           4     company.

           5          THE COURT:  Which paragraph are we at?  64?

           6          MR. FLEMING:  64.  People who subscribe to Skymark pay

           7     money for the service.  It's only going out to people who paid

           8     for the service.

           9          THE COURT:  Let's be clear about what 64 says.

          10     Carrillo and Huettel knew that Skymark was under the control of

          11     the Kirks because, among other things, they trademarked Skymark

          12     for Ben Kirk.

          13          MR. FLEMING:  That's right.

          14          THE COURT:  That is one of the answers to how.  That's

          15     a how.  That's how they knew that.

          16          MR. FLEMING:  Judge, maybe I'm dancing on the head of

          17     a pin here, but they trademarked Skymark for Ben Kirk.  Then

          18     they are saying under the control of the Kirks, as if John and

          19     Ben are inseparable Siamese twins, they do everything together.

          20          THE COURT:  What difference does that make?

          21          MR. FLEMING:  I think it makes a big difference.

          22          THE COURT:  Even if the other Kirk had nothing to do

          23     with it, if Ben Kirk had something to do with it, they couldn't

          24     take the position that the information was not true.

          25          MR. FLEMING:  Does it talk about Ben Kirk in the

1       complaint with respect to Tradeshow.

2               THE COURT:  It doesn't talk about Ben Kirk.  What they

3       said was the information that was out there claiming there was

4       a relationship between Skymark and Tradeshow, that there was a

5       relationship, was false.  If you knew you had trademarked it

6       for Ben Kirk, you could not legitimately deny that there was a

7       relationship, could you?

8               MR. FLEMING:  If it comes out and says Huettel knew

9       that Ben Kirk was not only the person you trademarked Skymark

10      for but was a shareholder in Tradeshow and a controlling

11      shareholder, I would agree with you.

12              THE COURT:  He was the president.

13              MR. FLEMING:  So they say.

14              THE COURT:  Yes, that's what they say.  I go by what

15      they say.  They say he was the president.  What other

16      relationship?  We can go all the way back to paragraph 21.  It

17      says he is a stock promoter, a principal of Skymark research.

18      Where did I read that?  Am I wrong to say that he was the

19      president of Skymark?  Am I wrong or not?

20              MR. FLEMING:  I don't know.  Let me say one last thing

21      about Tradeshow.  There are allegations about Tradeshow that go

22      on for pages.

23              THE COURT:  I'm sorry.  Maybe I had that wrong.  Go

24      ahead.

25              MR. FLEMING:  Huettel comes in to the whole Tradeshow

1    situation with Mr. Carrillo at the end, when there is The

2    Street Sweeper article.  It doesn't talk about helping to form

3    the company, it doesn't talk about structuring.

4              THE COURT:  It doesn't say he came in at the end.  You

5    say he came in at the end.  It says the firm was there at the

6    beginning.  I don't know who came in when.

7              MR. FLEMING:  It doesn't say.

8              THE COURT:  I don't have any reason to believe that he

9    is a latecomer as opposed to the early guy.  I don't know what

10   I am supposed to take from that.

11             MR. FLEMING:  You know with Pacific Blue they allege

12   that the lawyers advised on 4.9 percent, and they helped find a

13   shell.  Mr. Curran says they did all these lawyerly things.

14   There are no such allegations with respect to Tradeshow.

15   That's all I'm pointing out.  The first time you hear of the

16   lawyers is when The Street Sweeper arm comes out, and that's

17   after Tradeshow has been established and after, of course,

18   Skymark has been established.

19             We can break if you would like.

20             THE COURT:  Yes, I want to give the court reporter a

21   break.  Let's continue at 2:30.

22             MR. FLEMING:  Your Honor, I still have a couple of

23   arguments, though.

24             THE COURT:  Yes.  We will continue at 2:30.

25             (Luncheon recess)

F2G11SECM

1                      AFTERNOON SESSION

2                         2:30 p.m.

3          THE COURT:  Yes, sir.

4          MR. FLEMING:  Your Honor, I will try to keep this

5     short.  There are a couple of other issues I want to discuss,

6     primarily the venue argument that we have lodged.  As your

7     Honor knows, going forward in the case, improper venue is

8     reversible error.  So venue is very important here.  Very few

9     of the defendants, certainly not my client, are anywhere near

10    New York.  Most of them are from the western part of the United

11    States or Canada, Mexico, not New York.

12          The nexus for alleging venue, according to the SEC, is

13    that there were acts or transactions which constituted the

14    violation occurring in this district.  In specific, I believe

15    buyers in New York and a brokerage in New York or exchange in

16    New York.

17          The important point I wanted to make is this.  Mr.

18    Huettel is not alleged to have committed any of those acts.  As

19    you may remember, I described the core misconduct, which is

20    clear from the complaint as being the pump-and-dump.  There is

21    no allegation that Mr. Huettel played a role in that part of

22    it.  Therefore, he can only be here properly on a venue basis

23    on the acts or conduct of another.

24          The law is not clear in the Second Circuit, but there

25    is law, State Teachers Retirement Board v. Fluor Corp., 500

F.Supp. 278, 290, a Southern District case, that says that

grounding venue on the acts of another can only occur where

there is a conspiracy alleged, which is not technically alleged

here.  There is no conspiracy charge.  Also, where the person

who is hailed in front of the court knowingly participated in

that conspiracy.

        The last point I wanted to make on this is a D.C.

Circuit case which I think is very important, very persuasive,

and I would urge your Honor to read it if you haven't already.

It is SEC v. Johnson, 650 F.3d 710, a 2011 D.C. Circuit case.

The reasoning very quickly is this.

        When the Supreme Court decided the Central Bank of

Denver case where they determined that there was no implied

right of action for an aiding and abetting claim, they did it

with such force that the United States Congress acted to ensure

that the SEC would be permitted to bring aiding and abetting

claims.  When they did so, they did not institute a conspiracy

section to the U.S. securities laws.  Accordingly, the D.C.

Circuit reasons that based on Supreme Court precedents, all

listed there, that it is very clear you cannot base venue on

policy considerations, it has to have a statutory grounding.

        The predicate and the case cited by the SEC for

permitting this co-conspirator theory of venue in this district

is a Second Circuit case from 1968, Windham, which obviously

predates the Central Bank decision.  The D.C. Circuit posits

1    that the policy basis for allowing venue against people who

2    have not committed acts in the district is one for convenience

3    of litigation, to have related claims all in the same courtroom

4    and tried at the same time for judicial efficiency purposes.

5    But the D.C. Circuit, citing the U.S. Supreme Court precedence,

6    says it is very clear that policy considerations are no ground

7    for venue, there has to be a statutory basis, and in light of

8    Central Bank of Denver and what followed in the U.S. Congress,

9    there is no such statutory basis.

10          THE COURT:  The part I have difficulty with in that

11   argument is that the counts alleged are not an act of

12   defrauding.  It is a scheme to defraud.  That analysis isn't

13   necessarily the appropriate analysis.  The question is whether

14   he was involved, participated, in a scheme to defraud and

15   whether or not there were acts committed by those involved in

16   that scheme collectively that would give venue over the scheme

17   and therefore its schemers in New York.  It doesn't have to be

18   that he has to personally have taken some act that ultimately

19   was the step towards accomplishing the scheme.

20          MR. FLEMING:  Your Honor, I would say this.  If you

21   are right, then once again this case boils down to the central

22   point, which is the failure of the SEC to allege properly, as

23   is its burden, the scienter element.  It comes down to knowing

24   participation.  There is no dispute, even in this district,

25   that an actor who has not acted in this district, as you say,

1   under a scheme but outside of this district, has to knowingly

2   participate in that scheme.

3          THE COURT:  No, no.  For venue purposes that is not

4   the analysis.  Venue can be determined whether or not he was

5   involved in the scheme, knew of or was aware of the purposes of

6   the scheme.  Whether he was involved in or aware of the illegal

7   purposes of the scheme may or may not be the analysis for

8   whether or not a cause of action is alleged.  But whether or

9   not he could anticipate or reasonably expect that whatever

10  conduct he was involved in might make him subject to a lawsuit

11  in New York is the appropriate venue analysis.

12         MR. FLEMING:  I think we are kind of in agreement,

13  with one little bit of difference of opinion, and that is this.

14  I don't think you can reasonably expect to be hailed in front

15  of this Court if you have not knowingly participated.  The only

16  way you can get there is if it is alleged that you have

17  knowingly participated.

18         THE COURT:  No, I don't agree with that.  I think the

19  question is whether or not they prevail or you can vindicate

20  yourself in which jurisdiction, in which venue.  Even if they

21  cannot prevail, that doesn't decide the issue of venue.  The

22  question is wheres is it reasonable to resolve the dispute.

23         It is not reasonable to allow them to bring this

24  action and to resolve this dispute in a form in which the

25  defendants have no connection or could not have anticipated

1     that their acts or the acts of those participating with them

2     had some connection.  Whether you are liable or not liable is

3     backwards analysis.  It is not determinative of whether there

4     is venue.  There can be venue, and if that's wrong, you can

5     demonstrate that they don't have a cause of action.

6                 MR. FLEMING:  I agree.  But I think you would agree

7     with me that if the complaint did not establish knowledge,

8     hypothetically speaking -- maybe you wouldn't agree with me --

9     but if it did not establish knowledge, it wouldn't be fair to

10    bring a defendant into this court, if he hadn't committed any

11    acts.

12                THE COURT:  It depends on what you mean.  What

13    knowledge?

14                MR. FLEMING:  Right.

15                THE COURT:  It has to demonstrate knowledge but not

16    the same knowledge necessarily that would make you liable for

17    the illegal conduct alleged.

18                MR. FLEMING:  Fair enough.

19                THE COURT:  Knowledge has to be that you could

20    reasonably expect that your conduct might have these kinds of

21    consequences in New York, whether it was legal or illegal

22    conduct.

23                MR. FLEMING:  I think we agree.  The question then is

24    whether knowledge has been sufficiently alleged.  We maintain

25    it hasn't for the reasons I spoke about this morning and the

1    reasons Mr. Curran spoke about this morning.

2         THE COURT:  You think it is unreasonable to expect

3    that these trades that were done would likely be done through

4    an exchange in New York and likely affect New York investor?

5         MR. FLEMING:  Yes, and I'll tell you why.  Because the

6    lawyers had nothing to do with this later-in-time trading,

7    pump-and-dump trading that occurred.  The lawyers' involvement

8    was at the company formation stage.

9         THE COURT:  Why is that?  Even if you were using a

10   conspiracy analysis, it doesn't matter at what point you're

11   involved in the scheme.  It matters whether or not you intended

12   to accomplish the scheme's objectives.  You're sort of making a

13   distinction that somehow those who come into the scheme and

14   play their role at the beginning or in the middle have a

15   different liability or different analysis than those who were

16   there when this scheme become successful or was completed.

17   That's not the appropriate analysis.

18        MR. FLEMING:  Your Honor, I would agree with you that

19   if there was an allegation that was sufficient to show that Mr.

20   Huettel had guilty knowledge at the time he did what he did,

21   the subsequent trading, maybe he could be hailed here.  First

22   of all, I disagree that there is any such.

23        THE COURT:  No.  If he had innocent knowledge and he

24   expected that he was doing everything appropriately, but he

25   still expected that there were going to be New York investors

1    who were going to respond and those trades would occur on the

2    exchange, I can't resolve that issue now.  You're saying to me

3    I have to resolve the issue of whether or not he had sufficient

4    mens rea to violate the law before I can decide the issue of

5    venue, and that's not true.

6              MR. FLEMING:  I'm not saying that.  What I am saying

7    is your job, your Honor, respectfully, is to look at the

8    complaint and determine whether as a matter of law it is

9    sufficiently pleaded on the knowledge point.

10             THE COURT:  On the knowledge of what?  On venue?

11             MR. FLEMING:  On the knowledge of the scheme.

12             THE COURT:  You're saying that in order for me to

13   determine venue, I have to determine that he is likely guilty

14   of the scheme?

15             MR. FLEMING:  No.  You have to determine that the

16   complaint sufficiently establishes for pleading purports

17   knowledge.

18             THE COURT:  If it doesn't sufficiently establish for

19   pleading purposes knowledge, then there is no venue anywhere.

20   That is not a determination of where that issue is supposed to

21   be decided.  I'm not supposed to decide that issue if I don't

22   have venue.  I'm supposed to send it to another jurisdiction to

23   decide that issue.  That's not my issue if I don't have venue.

24   That's an issue for the court that has venue.

25             You've got it backwards.  I can't make that

1     determination and then after that decide whether I have venue.

2     That's like saying I have to decide the merits of the case, and

3     then after I decide the merits of the case figure out if I have

4     jurisdiction.  That is not the analysis.

5          Venue is independent of what the merits of the

6     allegations are.  Venue has to do with contacts, and venue has

7     to do with anticipated effects and where it would be reasonable

8     to expect that one could be sued.  That is not an analysis of

9     the merits of the complaint.  That's an analysis of the

10    contacts and the anticipated relationship with the venue.

11         MR. FLEMING:  I'm mindful of the shortness of time,

12    and I'm only the second arguer of many people.  One last point.

13    There is a divide in time between what the lawyers did and then

14    subsequent trading.  They didn't help their client merge into a

15    public company to engage in a pump-and-dump or they did.  The

16    complaint will either say that or not.  We say it does not say

17    that.  We say that there are not the allegations of knowledge

18    sufficient to establish that.

19         But if there are not at the time, what they have done

20    is they have helped the client set up a company, shareholders

21    have whatever interest they have.  There is not a control

22    group.  Then there is a subsequent decision to bump and dump

23    the stock.  If that is the allegation, the lawyers are

24    attenuated from that.

25         THE COURT:  Maybe you are, again, trying to separate

F2G1C8RCM

 1   yourself from Mr. Carrillo.  I thought that part of the later

 2   sale of stock had to do with the sale of stock by Dr. Carrillo,

 3   by the firm, and the use of the firm's trust fund to transfer

 4   these proceeds.  Am I wrong?  Maybe I have that wrong.

 5        MR. FLEMING:  I think there is an allegation about

 6   that.  It does not relate to Mr. Huettel.

 7        THE COURT:  That's what I'm saying.  You must be

 8   separating yourself on that issue of Huettel.  You can't say

 9   that there is no lawyer activity at the later part in the

10   scheme.  As a matter of fact, I think paragraph 167 says, "An

11   account controlled by Carrillo sold most of the Dr. Carrillo

12   Pacific Blue shares at the height of the pump for proceeds of

13   over $1.1 million, which was then wired to a foreign account

14   held in Dr. Carrillo's name.  Carrillo, Huettel, and Carrillo

15   Huettel LLP all received proceeds from the sale of Dr.

16   Carrillo's block of shares."

17        So you can't even say your client was missing in

18   action there, because it says that he got part of the proceeds

19   from the sale of the stock that was in the Carrillo account.

20        MR. FLEMING:  It does say it.

21        THE COURT:  Isn't that at the back end of the scheme,

22   as you say, and that your client isn't at the back end of the

23   scheme?

24        MR. FLEMING:  Yes, it is at the back end of the

25   scheme.

1        THE COURT:  OK.

2        MR. FLEMING:  Your Honor, as Mr. Curran pointed out,

3   again not in the complaint, Dr. Carrillo was a client of the

4   firm for many matters, transfers in and out at other times.

5   The SEC has the records to show all this.  They say that this

6   is wiring of proceeds from the sale.  Our information is

7   different.  There are no dates given.  There is no identifying

8   information.

9        THE COURT:  They allege that over $472,000 of the

10  proceeds from the sale of Dr. Carrillo's shares was wired to

11  the same offshore account in Barbados where the Kirks and Boyle

12  sent their proceeds.  As I say, that can be read as more than

13  just coincidence.

14       MR. FLEMING:  They say 472, but then they say 343,000

15  goes to the Carrillo Huettel firm.

16       THE COURT:  Right.

17       MR. FLEMING:  They don't tell you, your Honor, they

18  don't tell anyone, which they know to be true, which is that

19  $343,000 went out from Carrillo and Huettel's firm.

20       THE COURT:  I thought I did know that.

21       MR. FLEMING:  I don't know why we are in the position

22  to have to tell you that.

23       THE COURT:  I will discuss that with them and Dr.

24  Carrillo's lawyer, but I don't have any indication that Dr.

25  Carrillo got any of this money.  Maybe I'm wrong, but that's

E2GFPEC9

1      the way I read it.

2              MR. FLEMING:  I think you do need to raise this with

3      the SEC.

4              Last point and I will sit down.  On the section 5, I

5      argued this earlier, but just to close the loop.  The cases

6      talk about the exemption, the four sub (1) exemptions to

7      section 5.  A case is Culpepper.  I don't have the cite

8      unfortunately with me, at least I don't think I do.  What they

9      say is that exemption applies to subsequent trades of

10     registered stock.  It makes total sense.  If you are a

11     recipient of shares that have been issued by an issuer and you

12     are in possession of them, you can then trade them on an

13     exchange without having to file a second registration statement

14     or a third or whatever.

15             As I explained to you earlier, our understanding and

16     my understanding is that the free-trading shares of the

17     Descanso shareholders were transferred or traded or sold to the

18     Pacific Blue shareholders and retained their free-trading

19     status.  That is another issue.

20             THE COURT:  That is not the way they allege it.  That

21     may be the case, but I'm not sure in what way I can say that

22     you are going to demonstrate that.  Therefore, their opposite

23     allegations are insufficient allegations.

24             MR. FLEMING:  You can tell I'm sitting down.  My only

25     answer to that one is, your Honor, they have the documents.

F2GHSECM

 1   They know this is what happened, one.  Two, one way you can

 2   deal with it, it's not a factual allegation, it is a legal

 3   allegation, so it is not entitled to deference to their

 4   pleading.  It is not a factual statement that you have to defer

 5   to.

 6            Thank you, your Honor.

 7            THE COURT:  You're welcome.  Thank you.

 8            Who wants to be heard next?

 9            MR. DEVANEY:  Good afternoon, your Honor.  William

10   Devaney on behalf of the law firm Carrillo Huettel.

11            Your Honor, I won't re-cover any of the ground that

12   Mr. Fleming and Mr. Curran covered.  I would like to make the

13   point to the Court that the law firm is defunct.  It was a

14   two-principal law firm, Carrillo and Huettel.  Any liability of

15   the law firms is fully derivative from Mr. Carrillo and Mr.

16   Huettel.

17            There is no reason for us to be in this case.  There

18   are no damages that can be had from the law firm that would not

19   be had from Carrillo and Huettel as individuals.  There is no

20   injunctive relief that can be had against a defunct entity.

21   There is no discovery.  We have produced everything in our

22   possession, custody, or control.  Again, no reason for us to be

23   here.

24            We would request that the Court use its inherent power

25   to control its docket to dismiss the law firm.  Again, there is

1    no practical reason for us to be in this case.

2              Thank you, your Honor.

3              THE COURT:  Who else wanted to be heard at this point?

4              MR. GOUREVITCH:  Good afternoon, your Honor.  David

5    Gourevitch on behalf of Luniel De Beer.  Luniel De Beer was the

6    CEO and president of Tradeshow and later chairman of Pacific

7    Blue.

8              I wanted to pick up the torch with a question that you

9    asked of Tom Curran.  You said, taking this complaint on its

10   face, would you win the case today, nothing more.  The answer I

11   would give to you from Mr. De Beer is yes.  This complaint is

12   extraordinary.  It is very unusual.  This complaint makes out a

13   defense for Mr. De Beer in a couple of ways.

14             First, it describes a complex fraud.  It describes the

15   Kirks and, as your Honor has pointed out, to some extent the

16   Carrillo law firm as being involved in an effort to conceal and

17   to hide the ownership of these offshore corporations and sort

18   of even going to the extent of using a daisy chain of offshore

19   corporations to conceal the fact that, in the SEC's view, the

20   Kirks were the beneficial owners of each of these.

21             In this context of a complex fraud, there is no

22   allegation anywhere that either Carrillo Huettel or the Kirks

23   ever took De Beer into their confidence, and there would really

24   be no reason for them to do so.  I think these allegations, and

25   I'm going to turn to them, the lack of allegations that he was

 1   told anything concrete showing that he knew of the fraud is

 2   really fatal to the fraud.

 3          THE COURT:  The first thing that he has to get over is

 4   that he is the CEO of Tradeshow and he is a director of Pacific

 5   Blue.

 6          MR. GOUREVITCH:  He is, your Honor.

 7          THE COURT:  In those capacities one would infer

 8   certain knowledge about the operation of the two companies.  It

 9   is awkward at best to argue that De Beer would not have known

10   under these circumstances, is it not reasonable to infer that

11   De Beer knew of a connection between Tradeshow and Pacific

12   Blue?  Let's start with that.

13          MR. GOUREVITCH:  Yes, your Honor.  If we may jump into

14   the weeds a little bit of the complaint.  Your Honor is clearly

15   very familiar with it.  The complaint alleges that Ben Kirk

16   acquired an interest in Tradeshow in 2003 and that he owned

17   between 50 and 60 percent of the stock, that on October 30th of

18   2007 Luniel De Beer became the president and CEO, and that at

19   some time thereafter, either in June of '08 or June of '09, the

20   Kirks, through a series of transfers that are not entirely

21   clear, ultimately transferred the bulk of their ownership in

22   the company to a series of offshore companies.

23          It is clear that at a certain point they had an

24   interest in this company.  There is no question about that.  It

25   is also clear that at a certain point they transferred their

1    interest to the offshore companies.

2         The only evidence in the complaint other than your

3    Honor's argument that perhaps as the CEO and as the president

4    there was sort of some sense to know what was going on, the

5    only argument that the SEC has made anywhere in its papers that

6    he knew that they controlled the offshore corporations is an

7    argument that he had control of, not possession of, that he had

8    essentially access to the shareholder list.

9         THE COURT:  Isn't the primary hurdle for Mr. De Beer

10   to get over the allegation with regard to the relationship and

11   his relationship between Tradeshow and Pacific?

12        MR. GOUREVITCH:  I don't view that as a hurdle, your

13   Honor.  If your Honor's point is that he goes from one

14   corporation to the other and both seem to have a connection at

15   one point in time with the Kirks, the fact is that both of them

16   do have a connection at a certain point with the Kirks and that

17   the Kirks in each case later transfer that interest to what

18   appears to Mr. De Beer to be unrelated corporations.

19        THE COURT:  That's not what I'm concentrating on.

20   What I'm concentrating on is that it is reasonable to infer

21   that De Beer knew that Tradeshow was not independent of

22   Pacific, that there was clearly a connection through Mr. Kirk.

23        MR. GOUREVITCH:  Your Honor, if I may, Tradeshow was,

24   as far as I understand it and as far as the complaint has

25   alleged, completely independent of Pacific Blue.  Your Honor

1    may be thinking of the underlying company Descanso, which was

2    the original company that later became, I believe, Pacific

3    Blue.

4              THE COURT:  I'm sorry.  You're right.  I meant the two

5    promotion companies.

6              MR. GOUREVITCH:  Your Honor is referring to the

7    company that issues the press releases?

8              THE COURT:  Yes.  I'm sorry.

9              MR. GOUREVITCH:  Your Honor, he has no knowledge, and

10   there is no allegation as far as I can recall in the complaint

11   that he knows, that that company is controlled by the Kirks.

12   There is no evidence of that.

13             You ask, what is the evidence?  He owns 40 percent of

14   Pacific Blue.  What can be more inconsistent with knowledge of

15   a pump-and-dump scheme than holding your stockholdings through

16   the entirety of a pump-and-dump.  It is the least economically

17   rational thing that somebody could do.  Usually, you would say

18   if you hold your stock through a pump-and-dump, that is a

19   smoking gun that you either don't know it or you are not

20   participating or both of those.

21             THE COURT:  It depends on whether you are getting

22   otherwise compensated.  They allege that De Beers received over

23   $330,000 from the sale of Tradeshow stock.

24             MR. GOUREVITCH:  Your Honor, they allege that he has

25   received over $330,000.  It does not in any way say why he

1    received that.  It doesn't say that it has anything to do with

2    Tradeshow.  It doesn't say that it has anything to do with

3    Pacific Blue.  You cannot simply draw an inference that it

4    does.  It could be related to a business dealing, to a prior

5    debt.  After three years of investigation, the SEC does not

6    allege that this is even related to his employment.  It simply

7    says that he received this money from the Kirks at a certain

8    point in time.

9          THE COURT:  They say at a point in time.  It's not

10   just a point in time.  In the sequence of events they say that

11   they wired him this money, $330,000 of their proceeds, from the

12   trade of Tradeshow stock.

13         MR. GOUREVITCH:  But there is no allegation that Mr.

14   De Beer has any idea where this money came from.

15         THE COURT:  I know.  I was responding to your first

16   point of why would one conclude, consistent with his owning 40

17   percent of the stock, that he was involved in the scheme.  My

18   response was, well, one could conclude he is involved in the

19   scheme for the same reason everybody else was involved in the

20   scheme:  Because he is going to profit from the sale of stock,

21   and when they do sell that stock in the pump-and-dump scheme,

22   they give him 330,000 of those profits.

23         MR. GOUREVITCH:  Your Honor, I would submit to you

24   that the economically rational thing for anybody who is aware

25   of a pump-and-dump is to sell when it is high because they know

1   shortly, at the end of it, it is going to become worthless.

2          THE COURT:  If we all could time that, we would all be

3   millionaires.  Nobody, even those who want to break the law,

4   are not privy to when the scheme ultimately is going to be

5   discovered.  Wait until it is sufficiently high and make

6   sufficient profit by pumping up the stock, and then you dump it

7   before the stock begins to go down.

8          MR. GOUREVITCH:  I agree with your Honor that it is

9   fair to say that nobody who engages in pumps and dumps

10  anticipates the discovery of it.  But I think it is an integral

11  aspect of every pump-and-dump that the stock drops rapidly in

12  value.  That's the dump.

13         If you hold a large position in a company during a

14  pump-and-dump that you are aware of, the only rational thing

15  for you is to sell your stock.  When the pump is finished, the

16  dump begins, and the stock is going to become virtually

17  worthless.  The stock you have that is trading at whatever a

18  share during the course of the pump is going to be virtually

19  worthless during the dump.

20         I think it is fair to infer, since we are talking a

21  little bit about the inferences, that that undercuts any sense

22  of knowledge or scienter.

23         The third point that I would bring to your Honor's

24  attention is that the SEC has gone out of its way to describe

25  these deals and every document in them as lawyered to the hilt,

1   as being crafted by counsel, being drafted by counsel, as being

2   approved by counsel.  It has over the course of the years

3   encouraged, as we all do, businessmen to turn to the experts.

4   That's what Mr. De Beer did, and that's what the complaint

5   alleges.  It alleges that virtually everything here was done by

6   counsel and then sent to Mr. De Beer.  It alleges even that

7   they wrote the SEC filings themselves.

8        Into the issue of the affiliated stock purchase

9   agreements, the law of what affiliated entities are, when

10  companies that each own less than 5 percent should be

11  aggregated, to be treated as a group, is a fairly complex area,

12  even for securities attorneys.

13       THE COURT:  The scenario they give in this complaint,

14  though, is not that complex.  They say that the primary, if not

15  sole, beneficiaries of most or all of this stock were the Kirks

16  and others who were affiliated with them who benefited in a

17  less significant way dollar-for-dollar.  This isn't a

18  sophisticated relationship.  They say Kirks were the owners and

19  everybody knew the Kirks were the beneficial owners, they

20  either misrepresented that or hid that.

21       You say they didn't make any allegation with regard to

22  De Beer.  They basically said that Tradeshow's annual reports

23  falsely claimed that De Beer was the only officer, director, or

24  control person of Tradeshow, and that it also didn't disclose

25  the $330,000 that De Beer received.  They say that those

1   statements in the annual report were false and those statements

2   were made by De Beer and De Beer signed those annual

3   statements.

4        MR. GOUREVITCH:  Your Honor, we acknowledge that he

5   signed the initial filings.  But I come back to the basic

6   issue, the core issue, underlying much of this oral argument

7   today.  It is the SEC's burden to demonstrate facts, facts, to

8   allege facts in the complaint creating a strong inference of

9   knowledge.

10       THE COURT:  In what way did De Beer not know that Kirk

11  could be classified as a control person at Tradeshow?

12       MR. GOUREVITCH:  At a certain point he may have been a

13  control person.  He owned a large portion of the stock.  But by

14  a later point in time, which I believe the SEC is referring to,

15  the bulk of the stock is owned by these offshore shell

16  companies and there are no factual bases to allege that De Beer

17  know that the Kirks owned and controlled these.

18       THE COURT:  But De Beer never disclosed at any point

19  that the Kirks had any control relationship with Tradeshow.

20       MR. GOUREVITCH:  Your Honor, I believe the complaint

21  is referring to the later point in time.

22       THE COURT:  Right.

23       MR. GOUREVITCH:  By the time the Kirks transfer their

24  ownership, that is the state of affairs as he understands it,

25  the bulk of the stock is held by these offshore corporations

1   that are ostensibly independent.

2          I would like to make two points to your Honor.  The

3   first is that the only evidence in the entirety of the

4   complaint that he has or should have or could have, might even

5   possibly have, any knowledge that they have a relationship with

6   these is his access to a share hold license.  A shareholder

7   list simply identifies who the shareholders are.  It doesn't

8   show who the beneficial owners are.  It doesn't show how they

9   acquired the stock, what the circumstances are.

10          THE COURT:  That is not an accurate statement.  He

11  knew when he was promoted to CEO and president of Tradeshow

12  what the relationship of the Kirks were to Tradeshow.

13          MR. GOUREVITCH:  Yes, your Honor, he did at a certain

14  point in time.

15          THE COURT:  That's in 2007.

16          MR. GOUREVITCH:  That's is 2007.  The Kirks owned a

17  large percentage of the stock, according to the complaint, and

18  they did not transfer their ownership interest to the offshore

19  shell corporations until 2008 or even until 2009.

20          THE COURT:  At what time should I assume that Mr. De

21  Beer no longer believed that the Kirks were the control

22  persons.

23          MR. GOUREVITCH:  When they transfer the stock to the

24  offshore shell companies.

25          THE COURT:  Why would I assume that he had that

1    knowledge if I don't assume that he had any other knowledge?

2    At what point should I assume that he found out and transferred

3    the company and therefore concluded that they were no longer

4    control persons?  That's not on the face of this complaint.

5            MR. GOUREVITCH:  You're right, your Honor.

6            THE COURT:  I know he knows the Kirks' relationship.

7    You're telling me that at some point it changed.  You want me

8    to say that when it changed, I should assume that he no longer

9    knew.

10           MR. GOUREVITCH:  No, your Honor, I don't want you to

11   make any exceptions.  That I believe what this complaint is all

12   about.

13           THE COURT:  We know when he started that he knew that

14   the Kirks were the controlling persons of the company.

15           MR. GOUREVITCH:  At a certain point in time, yes, he

16   did, your Honor.

17           THE COURT:  As of October 30, 2007, when he was

18   promoted to CEO and president of Tradeshow, we can agree on

19   that?

20           MR. GOUREVITCH:  Yes, your Honor, we can agree on

21   that.

22           THE COURT:  That is a reasonable, rational allegation.

23   We know that he knew that for at least two years.  The

24   transfers that you are relying upon, if I'm correct, those

25   happened in 2009, right?

```
 1              MR. GOUREVITCH:  Your Honor, I want to emphasize that
 2    I think ultimately it is the SEC's burden, and we are relying
 3    on the allegations in this complaint.
 4              THE COURT:  Right.  But the allegation is he found out
 5    in 2007 that these were the controlling persons, and they don't
 6    allege that that knowledge ever changed.
 7              MR. GOUREVITCH:  Your Honor, they don't allege that he
 8    had any knowledge of who owned the offshore shell companies.
 9    They don't even allege --
10              THE COURT:  You say offshore shell companies.  The
11    offshore shell companies aren't even referenced until August of
12    2009.
13              MR. GOUREVITCH:  The timing when you dig into the
14    allegations is somewhat unclear.  The SEC alleges, I believe,
15    that the stock is gifted in June of '08, approximately eight or
16    nine months after De Beer arrives, and then there is a jump in
17    time.
18              Part of the problem in this complaint is that there is
19    enormous vagueness as to what happens and as to the transfer.
20    I don't think that that vagueness can be held against Mr. De
21    Beer.  It is the SEC's burden to demonstrate facts that
22    demonstrate that he knew at a point in time that these offshore
23    shell companies were controlled by the Kirks.  That is the
24    SEC's allegation.
25              THE COURT:  I don't know if I can take that from the
```

1    face of the complaint.  If I go to paragraphs around 123, 124,

2    125, they accuse Mr. De Beer of filing false and misleading

3    corporate resolutions and certificates on behalf of Tradeshow

4    to allow the Kirks to make these transactions.

5          MR. GOUREVITCH:  Part of the difficulty is that some

6    of these are somewhat undated.  The transactions that I

7    understand they were referring to -- and the SEC of course can

8    correct me if I'm wrong -- is transactions involving the

9    offshore shell companies and the transfer of stock and whether

10   those companies are affiliated.

11         I understand that the gravamen of the SEC's complaint

12   is what happens to these companies after the Kirks allegedly

13   transfer control of the stock to the offshore shell

14   companies -- that's really what this case is about -- and the

15   SEC's belief that they should have been described as control

16   persons afterwards because they effectively control the

17   offshore shell companies and, by dint of the fact that they

18   control the offshore shell companies, that they continue to

19   have an ownership position in Tradeshow.

20         THE COURT:  You wouldn't disagree with that legal

21   proposition in the abstract, would you?

22         MR. GOUREVITCH:  Which legal proposition, your Honor?

23         THE COURT:  That if they are the beneficiaries of the

24   moneys in the shell companies, they are the beneficial owners

25   of the shares that the shell companies are trading.

1          MR. GOUREVITCH:  Your Honor, there is no basis for

2     Luniel De Beer to --

3          THE COURT:  I understand that.  You are not disputing

4     that that is a reasonable and legal proposition, that you can't

5     just set up a shell company and trade through the shell company

6     and then deny that you are the beneficial owner of shares that

7     are being traded?

8          MR. GOUREVITCH:  Your Honor, I believe that is really

9     the argument of other counsel today perhaps on behalf of the

10    Kirks.  This is not my issue.

11         THE COURT:  Right.  That's not the proposition that

12    you put forth.

13         MR. GOUREVITCH:  Right.  The proposition I submit to

14    you on behalf of Mr. De Beer is that he does not know that the

15    Kirks own or control these offshore shell companies.

16         THE COURT:  Where do I get that out of this complaint?

17         MR. GOUREVITCH:  Because the standard for 9(b) is that

18    the SEC must allege in the complaint factual allegations,

19    facts, creating a strong inference of knowledge.  It is the

20    SEC's burden to allege that.  What is missing is precisely

21    that.  The only thing, I have come back to it a couple of

22    times, that is there is his access to the shareholder list.

23         When we highlighted this issue in the motion to

24    dismiss, the SEC actually changes the basis of its argument in

25    its opposition brief and essentially offers a whole new theory,

 1   which is that he somehow should have been on knowledge of the

 2   pump-and-dump.

 3            THE COURT:  That is a different issue.

 4            MR. GOUREVITCH:  Your Honor, I so agree with you.  It

 5   is not what is articulated in the complaint at all.

 6            THE COURT:  If your argument is that he had no reason

 7   to know that the Kirks were the beneficial owners and control

 8   persons of the company, I'm not sure what facts in this

 9   complaint don't support the position that when he started, when

10   he got promoted to this position, he knew it was the Kirks that

11   were in control.

12            He knew for a substantial amount of time the Kirks

13   were in control.  Even if this was a transfer to companies that

14   are under the Kirks' control, why am I supposed to conclude in

15   that that he no longer thinks the Kirks are in control,

16   particularly when the stock is sold and he is said for

17   $330,000, he gets it from the Kirks and Boyle?

18            MR. GOUREVITCH:  Your Honor, we do have a

19   disagreement.

20            THE COURT:  A factual disagreement?

21            MR. GOUREVITCH:  A legal disagreement, your Honor.

22            THE COURT:  What is the legal disagreement?

23            MR. GOUREVITCH:  The legal disagreement is that I

24   believe it is the SEC's responsibility, their duty, if they are

25   going to survive a motion to dismiss, to plead facts.

1          THE COURT:  We don't disagree.  We have no legal

2     disagreement.

3          MR. GOUREVITCH:  It is their obligation to create a

4     strong inference that he did know.

5          THE COURT:  We know he knew in 2007, right?

6          MR. GOUREVITCH:  You are correct.

7          THE COURT:  We know he knew in 2008, right?

8          MR. GOUREVITCH:  The allegation in the complaint, your

9     Honor, is that the Kirks begin to transfer the stock away from

10    them in 2008.  There is no allegation about what De Beer did or

11    did not know.

12         THE COURT:  What you are saying is that the

13    allegations are sufficient to indicate that he knew of their

14    role in 2007 but the allegations aren't sufficient to allege

15    that he continued to know of their relationship after they sold

16    the company.  You are not even arguing that he was unaware or

17    was aware that he had sold the company.

18         MR. GOUREVITCH:  You are correct, your Honor.  But all

19    of the bad acts that are alleged in the complaint, all of the

20    acts that the SEC is talking about and complaining about are

21    those that occur after the transfer of the stock to the shell

22    companies.

23         The theory of the case that the SEC is articulating to

24    your Honor in the complaint is that the Kirks essentially

25    beneficially owned all these offshore shell companies, that

1    they were control persons, that they shouldn't have been

2    treated in various documents, including SEC filings and in

3    these affiliated agreements and stock transfer agreements, as

4    unaffiliated, because in essence they were control persons.

5              THE COURT:  Right.  Isn't that a factual issue?

6              MR. GOUREVITCH:  My issue on behalf of Mr. De Beer,

7    your Honor, is a different issue.  It is that these are issues

8    that occurred after in time the transfer of the stock by the

9    Kirks, according to the SEC, to these offshore corporations.

10             The theory of the case, as I understand the SEC's

11   theory, is that the stock is transferred at 4.9 percent to a

12   whole series of offshore shell companies and that everybody

13   should have recognized the reality that these companies were

14   all owned and controlled by De Beer.

15             THE COURT:  Not De Beer.  Not controlled by De Beer.

16             MR. GOUREVITCH:  I'm sorry.  Owned and controlled by

17   the Kirks.  I apologize, your Honor.  Thank you.  I appreciate

18   it.  That they were owned and controlled by the Kirks and that

19   all the filings and all the things that did not recognize that

20   reality were either false by statement or false by admission.

21   All the bad things they are talking about in this complaint are

22   things that occur after the transfer of the stock to the

23   offshore shell companies.

24             THE COURT:  Isn't that dependent on the allegation

25   that your client found out that it was transferred and didn't

1    know that the Kirks still had an interest in it?

2            MR. GOUREVITCH:  Your Honor, if it were my burden,

3    that might be the case.  But it is the SEC's burden to

4    demonstrate that he did know.  The reasonable assumption when

5    you see stock that is held in the name of offshore shell

6    companies or the name of offshore companies is that they are

7    the owners of it.

8            THE COURT:  You're saying that what they need to

9    allege is that even though he knew or had sufficient facts to

10   know that the Kirks were control persons in the early years,

11   that once it was transferred to these shell companies, they

12   have to allege that they still knew that the Kirks were

13   controlling the shell companies?

14           MR. GOUREVITCH:  Your Honor, I'll a little reluctant

15   to tell the SEC what they have to allege.  But basically yes,

16   your Honor, that's true.

17           THE COURT:  I don't know what else to say is missing.

18           MR. GOUREVITCH:  Your Honor, I would go even further.

19           THE COURT:  It's like saying you know where I live but

20   you didn't allege that I moved.  You know where I live and you

21   make that allegation, then to say that I moved, you have added

22   that as a relevant fact.  You're saying that the transfer of

23   the stock to the shell companies is something that because it

24   was known by De Beer, it should give him the defense of saying

25   that because it was transferred to the shell companies, I no

1   longer believed that the Kirks were in charge.

2           MR. GOUREVITCH:  No, your Honor.

3           THE COURT:  He knew and believed that the Kirks were

4   control persons.

5           MR. GOUREVITCH:  No, your Honor.

6           THE COURT:  At some point he would have to change that

7   belief, wouldn't he?

8           MR. GOUREVITCH:  No, your Honor.

9           THE COURT:  Why not?

10          MR. GOUREVITCH:  The SEC's point, as I understand it,

11  is that the stock is transferred to these offshore shell

12  companies in an effort to leave the belief with everybody that

13  these are the bona fide beneficial owners and legal owners of

14  the stock and that it was done in a way with all these

15  complications and daisy chains and all these other things to

16  create that impression.

17          THE COURT:  To the outside world?

18          MR. GOUREVITCH:  To the whole world.

19          THE COURT:  No, not to the whole world.  They don't

20  present any facts that it was done to create that impression

21  for anyone within the company or at the law firm.

22          MR. GOUREVITCH:  Your Honor, I respectfully disagree.

23          THE COURT:  Point to me a paragraph where that is the

24  reasonable inference, that they are saying that anybody who was

25  in any of these companies or the law firm, that something was

 1     structured to make sure that they were unaware of it or

 2     deceived by it.

 3              MR. GOUREVITCH:  I respectfully submit, your Honor,

 4     really respectfully, that this is burden shifting.

 5              THE COURT:  It is not burden shifting.  You said in

 6     there, and I said show me.

 7              MR. GOUREVITCH:  Your Honor, the allegation there,

 8     consistently and in sweepingly broad terms, is that the stock

 9     was transferred to these offshore shell companies.

10              THE COURT:  But not in a way that was somehow

11     deceiving any of these defendants.

12              MR. GOUREVITCH:  Your Honor, they don't make any

13     distinction between who was deceived.

14              THE COURT:  They do.  They say your guy was involved

15     in helping them make transfers and accepting money.  When the

16     sales were made by these entities, your client benefited from

17     it.  They say that's more than just coincidence, that your

18     client wasn't deceived and thought that the shell companies

19     were some independent companies from the Kirks when the shell

20     companies sell the stock and the Kirks send you a check.

21     That's logic, right?

22              MR. GOUREVITCH:  No, your Honor.

23              THE COURT:  That is not evidence of your somehow being

24     deceived to believe that the Kirks don't have anything to do

25     with this anymore.

 1          MR. GOUREVITCH:  Your Honor, to the extent that they

 2    now allege that the entire purpose of this and the entire goal

 3    of these transfers was to deceive --

 4          THE COURT:  Shareholders, purchasers, sellers.

 5          MR. GOUREVITCH:  No, your Honor, I respectfully

 6    disagree.  There is no such limitation in the complaint.  There

 7    is nothing like that.  It says in the most sweeping terms that

 8    you could possibly find that the purpose and the creation of

 9    all this complexity --

10          THE COURT:  What paragraph am I looking at to conclude

11    that that somehow the purpose was or the effect was to deceive

12    your client?

13          MR. GOUREVITCH:  Your Honor, there is no paragraph

14    that specifically addresses my client, but there is no

15    paragraph that says anything along the lines that your Honor

16    has suggested, which is basically we cut everybody out --

17          THE COURT:  Who are you including in that?  Which

18    defendants are you including and which defendants are you

19    excluding?

20          MR. GOUREVITCH:  For my purposes, my client.

21          THE COURT:  Your purpose is just your client.  How is

22    this deceiving the whole world except for the other guys

23    sitting at the table?

24          MR. GOUREVITCH:  The entire complaint rests on the

25    idea that he knew that the Kirks owned these offshore shell

1    companies.  To the extent they are going to make that the

2    centerpiece of their complaint, they actually have to allege

3    facts that create a strong inference that he did know.  That is

4    what is completely missing from the complaint.

5         THE COURT:  The fact that they personally had control

6    of this company when he first arrived and for months if not

7    years that he was the CEO, and that there were transfers to

8    shell companies, and then, after transfers to shell companies

9    of the stock, the stock was sold, and after the stock was sold,

10   Boyle and Kirk sent your client a check for $330,000 out of the

11   proceeds of the sale of the stock of the shell companies, you

12   don't think there is some inference at all to draw from that?

13        MR. GOUREVITCH:  Your Honor, I do respectfully

14   disagree.  That's a daisy chain of allegations that the SEC

15   does not allege that had De Beer knew about.  It alleges that

16   there was a transfer of the stock to the offshore shell

17   companies.  It alleges that he received money from the sale of

18   the stock.

19        It does not allege that he was aware of the sale of

20   the stock by the offshore shell companies.  It doesn't allege

21   that he knew that the money had anything to do with the shell

22   companies.  And it doesn't alleged that the money came to him

23   for any reason having anything to do with Tradeshow/Pacific

24   Blue or the sale of the stock.

25        THE COURT:  It specifically alleges that he generated

1  misleading corporate resolutions and certificates on behalf of

2  Tradeshow and he provided it to the Kirks and Boyle so that the

3  shell companies could do the transactions, right?

4          MR. GOUREVITCH:  Your Honor, that is precisely it.

5          THE COURT:  It would be an inference that he thinks

6  Kirk and Boyle had something to do with the shell companies.

7          MR. GOUREVITCH:  Your Honor, I think the terminology

8  is important.  Something to do with versus being the beneficial

9  or legal owner of shell companies, whatever it is, are two

10  completely different things.

11          THE COURT:  Tell me in what way it's different.  I'm

12  not sure what way it is different.  If you're giving false

13  corporate resolutions to Kirk and Boyle so that it will allow

14  the shell companies to do the trades, then the shell company

15  does the trading, and then you profit by money given to you by

16  Kirk and Boyle in the amount of $330,000, what else is there?

17          MR. GOUREVITCH:  Your Honor is suggesting by handing

18  it or giving it, however it is worded in the complaint, to the

19  Kirks and the Boyles, that that --

20          THE COURT:  To further the transaction.

21          MR. GOUREVITCH:  To further a transaction.

22          THE COURT:  Right.

23          MR. GOUREVITCH:  A transaction.  That from there you

24  can obtain a strong inference that he in fact knew that they

25  were the beneficial owners, I respectfully submit that is a

1  bridge way too far.  In other words, I can give a document to

2  Mr. Marcelino here.  I'm just handing him a document.

3      THE COURT:  No, he can't use that document on behalf

4  of me to do a transaction in my name or to facilitate a

5  transaction that he has nothing to do with.

6      MR. GOUREVITCH:  Mr. Marcelino is looking more and

7  more uncomfortable with this.

8      THE COURT:  That's not logic.  This isn't rocket

9  science.  You're not going to give him something that has to do

10  with somebody else's transaction in order to facilitate that

11  transaction unless he has some relationship there.

12      MR. GOUREVITCH:  Your Honor, I respectfully submit the

13  issue here isn't what inference could one possibly draw.

14      THE COURT:  No, the inference is what is the only

15  inference to draw from the facts as they have alleged them

16  unless I hear some other facts.

17      MR. GOUREVITCH:  No, your Honor, that's not it.  I

18  respectfully submit the key is whether the SEC has alleged the

19  fact -- you can draw any number of inferences from the fact

20  that you handed a document to somebody.

21      THE COURT:  No.  There is only one inference to draw.

22  If I know that I am giving you a document to facilitate a

23  transaction that someone else or some other entity is doing,

24  the only inference to draw from that is that you have some

25  relationship and you are in a position to help that transaction

 1   be accomplished.

 2           MR. GOUREVITCH:  Your Honor, respectfully, you and I

 3   are on the same page with respect to the first part of that.

 4   We are on a different page with respect the second part of it.

 5   I agree with you completely that the only inference you can

 6   draw is that the person has something to do with the

 7   transaction.

 8           THE COURT:  Right.

 9           MR. GOUREVITCH:  You cannot go where the SEC needs to

10   go in this complaint and create a strong inference, which is

11   the legal standard here, that the person you are handing the

12   document to is the beneficial owner of that company.

13           THE COURT:  If you combine that with the fact that

14   that is the person who owned the company for the two years

15   while you were dealing with him prior, that is a little

16   stronger, right?

17           MR. GOUREVITCH:  Not very much, your Honor.

18           THE COURT:  If I say to you than I'm paying you rent

19   because you're my landlord and then all of a sudden my landlord

20   becomes the corporation, and then you come to collect the rent,

21   tell me what inference I'm supposed to draw from that rather

22   than somebody else coming to collect the rent.

23           MR. GOUREVITCH:  I like the metaphor, but I think it

24   is flawed in this context, your Honor.  I don't want to keep

25   turning to Mr. Marcelino, because he is starting to fidget a

 1   little bit.  But simply by dint of handing a document, I think

 2   your Honor put it absolutely dead-on and I would rely on your

 3   Honor's words, the only inference you can draw, the only one

 4   you can draw, is that the person has something to do with the

 5   transaction, and you cannot go the further steps from it even

 6   if your belief is that they are the former owner of it.

 7        THE COURT:  If he has something to do with it more

 8   specifically, something like giving him personally misleading

 9   corporate resolutions would facilitate the transaction.  That's

10   what they allege.

11        MR. GOUREVITCH:  Your Honor, that is the only respect

12   in which these resolutions in the documents are alleged to be

13   misleading, is that they do not disclose or they treat the

14   offshore shell companies as if they are stand-alones and as if

15   they are not owned and controlled by the Kirks.  That is the

16   only respect.

17        This complaint turns completely on whether the SEC has

18   established facts creating a strong inference that De Beer knew

19   that he controlled these offshore shell companies.  All of the

20   allegations, all of the things that he is alleged to have

21   signed -- the documents, the transactional records, the SEC

22   filings -- the way they allege that these things are false is

23   because they treated these offshore shell companies as

24   independent as opposed to being sort of collectively owned or

25   collectively controlled -- and the SEC is not all that clear

1    about it, and it doesn't identify the mechanism; but that

2    aside -- by the Kirks.

3            THE COURT:  I understand your argument.  But I don't

4    see, based solely on reading this complaint, how one could

5    reach any other conclusion other than the Kirks are the control

6    persons of the shell companies and the beneficial owners of the

7    shares that the shell company owns.  I don't know what other

8    conclusion you could draw from that.  And I'm not sure you are

9    urging a different conclusion on that issue.

10           MR. GOUREVITCH:  I am going to let very distinguished

11   counsel over here carry that burden.  I am really focused on a

12   more narrow issue.  I am focused on the sole issue of does the

13   complaint allege facts, facts, from which they create a strong

14   inference that De Beer knew that they controlled it.  I'm

15   saying I don't know whether they controlled it, I don't know

16   whether they didn't control it, that is someone else's

17   argument.

18           THE COURT:  I would understand that argument more

19   powerfully if the shell companies showed up out of the blue and

20   they didn't know who the principals of the shell companies

21   were, and that they weren't aware of any relationship between

22   the Kirks and the shell companies, and he wasn't already aware

23   that the Kirks were the control persons of the company.  You

24   give me three sets of facts, which is a little more awkward

25   than the scenario that you want.

1        They know the Kirks are in charge.  Then you want to
2   say they didn't allege that they still knew the Kirks were in
3   charge when the stock was transferred to the shell companies
4   even though the Kirks are the only people that it is alleged
5   have done anything, had any communication with Mr. De Beer
6   about the shell companies.

7        MR. GOUREVITCH:  No, your Honor.  There is no
8   allegation that I can recall, and it is a lengthy complaint,
9   that the Kirks and De Beer had communications of any type.

10       THE COURT:  No.  They said that he gave them
11  specifically the misleading resolution.

12       MR. GOUREVITCH:  Maybe I'm being awfully literal
13  minded and I'm drawing a distinction between handing someone a
14  document and --

15       THE COURT:  I assume they had more of a conversation
16  than just silently handing them a document.

17       MR. GOUREVITCH:  Your Honor, what I emphasize to you
18  and ask you to consider is the frequency with which the word
19  "assumption" is coming up in this argument.  In essence, that's
20  what the SEC is asking you to do.  They are asking you to make
21  assumptions that simply are nowhere in this complaint.

22       THE COURT:  I'm not looking for assumptions.  I'm
23  looking for inferences, legitimate inferences from the facts.

24       MR. GOUREVITCH:  Your Honor, I'm looking for factual
25  allegations that create those inferences.

```
1                THE COURT:  Right.

2                MR. GOUREVITCH:  The only one that I see is this

3    notion that somehow he had access to a shareholder list.

4                THE COURT:  He had more than access to a shareholder

5    list.  He is directly dealing with the Kirks.  You can't

6    legitimately argue with me that in his direct dealings with the

7    Kirks for two years, at least two years before the shell

8    companies were set up, he didn't know that the Kirks were the

9    people who were in charge and who owned the controlling

10   interest.

11               MR. GOUREVITCH:  Your Honor, there are I believe two

12   different time periods that are being referred to in this

13   complaint.  The first time period is a period of time that the

14   SEC alleges that the Kirks controlled -- and for Tradeshow I

15   believe it is about 50 to 60 percent of the stock.

16               THE COURT:  Right.

17               MR. GOUREVITCH:  They allege that during that period

18   of time he is in communication with Mr. De Beer about various

19   issues.

20               THE COURT:  Right.

21               MR. GOUREVITCH:  However, all of the false statements

22   that they are alleging, all of them, every single one, relate

23   to the single issue of did he know that they controlled the

24   offshore corporations.  There are no factual allegations to

25   create a strong inference that he did.  In fact, all of the
```

1    facts that I have suggested, which is that he held his stock

2    through a pump-and-dump, that according to the SEC these

3    documents are lawyered to the hilt --

4         THE COURT:  The way you said it, though, I don't know

5    why it is a logical assumption, inference, however you want to

6    characterize it, to assume that he doesn't have a clue that

7    these companies have anything to do with the Kirks under these

8    circumstances.

9         MR. GOUREVITCH:  Your Honor, it is not my burden to

10   assume.

11        THE COURT:  You said that to me.  You said that the

12   evidence indicates that he didn't know that they had any

13   relationship.

14        MR. GOUREVITCH:  No, your Honor.  What I have focused

15   on is the legal requirement that the SEC complaint alleges

16   facts creating a strong inference that they did, and there are

17   none.  That is the crux of the argument, your Honor.

18        THE COURT:  Even though, from reading this complaint,

19   the only people that he dealt with on any business that was

20   related or transactions that were related to the shell

21   companies were the Kirks?  You don't think that that is at

22   least an inference?

23        Maybe you think it is an insufficient inference, but

24   it is clearly not an inference, oh, I didn't know that the

25   Kirks had anything to do with this.  It is more of an inference

 1   that the Kirks have something to do with this company.  Whether

 2   they own it or whether they are fronting for somebody else,

 3   which is probably the least likely inference, if I'm only

 4   dealing with the Kirks and I'm dealing with the Kirks when

 5   there is some issue, decision, activity on behalf of the

 6   company, why is that not a reasonable inference?

 7        I understand your argument that you don't think the

 8   inferences are strong enough and you don't think the facts

 9   support the kinds of inferences the SEC wants to draw.  But all

10   the alternatives that most of you are proposing to me are not

11   the reality of this case.  You know it is not the reality.  You

12   don't even want to say it is the reality.  You don't want to

13   say that the Kirks had nothing to do with the shell companies.

14   You just want to say that your client didn't know they had

15   anything to do with the shell companies.

16        MR. GOUREVITCH:  That is the crux of the claim against

17   him, your Honor.  I want to rely on your Honor's own words.  I

18   think you put it even better than I did.  You put it in a

19   clear, concise way, and I wish I had said it.  You can draw a

20   reasonable inference that they had something to do with the

21   corporation.  That's it.  That's the only inference you can

22   draw.  What that relationship is is a matter of speculation.

23        THE COURT:  The relationship is clearly a financial

24   one.

25        MR. GOUREVITCH:  No, your Honor.

1          THE COURT:  Yes, it is.  When the shell companies sold

2     the stock, Kirk paid De Beer.  You can't say that's not a

3     reasonable inference that they have a financial relationship

4     with the company, because they are transferring the cash.

5          MR. GOUREVITCH:  Your Honor, I am completely saying

6     that.

7          THE COURT:  If somebody gives me $300,000 after some

8     other entity sold stock, I don't know how you can reasonably

9     argue to me that that person doesn't have a financial

10    relationship in that they have the authority to take the cash

11    from the company and give it to De Beer.

12         MR. GOUREVITCH:  Your Honor, I respectfully submit

13    that you are misreading the complaint.  Respectfully, that's

14    not what the complaint alleges.  The complaint alleges that the

15    money given to De Beer came from the sale of the stock.  It

16    does not allege it came from the shell companies.

17         THE COURT:  Came from whose sale of stock?  You just

18    said the stock was owned by the shell company.

19         MR. GOUREVITCH:  Your Honor, I'm focusing on what the

20    allegations in the complaint are.  What it more particularly

21    and more importantly doesn't say --

22         THE COURT:  I don't get your point.  I'm not sure what

23    that is supposed to mean.  If it is the proceeds of the sale of

24    the stock and your argument is that the shell company owns the

25    stock, then it is the proceeds of the shell company's sale of

```
 1      the stock, right?

 2              MR. GOUREVITCH:  Your Honor, no.

 3              THE COURT:  Then I'm not following you.

 4              MR. GOUREVITCH:  Your Honor, the SEC has engaged in

 5      what I respectfully submit is very clever pleading here.  It is

 6      a pleading that is intended to elide over, as any good

 7      advocate, the flaws in the complaint, the flaws in its proof.

 8      What they don't allege is that De Beer knew, had any knowledge

 9      of, or even had any reason to believe that the money was from

10      the sale of the stock, had any connection to it, or had any

11      connection to any of this.

12              THE COURT:  Would you agree that the sale of the stock

13      was a sale by the shell company?  You would agree that that is

14      at least the inference that I am taking from this?  I thought

15      that's what you were arguing.  You were saying they don't own

16      the stock anymore, the shell company does.

17              MR. GOUREVITCH:  I am making a more narrow argument

18      now.

19              THE COURT:  I know.  But can you answer that question?

20              MR. GOUREVITCH:  I can't go there.  On behalf of Mr.

21      De Beer, I am really focusing on the allegation as to what he

22      knows, which is the centerpiece of the issue.

23              THE COURT:  The reason I ask that is because you say

24      they don't make that allegation.  They specifically say in

25      paragraph 36, "In September and October 2009, the Kirks and
```

1    Boyle wired De Beer over $330,000 of their proceeds from their

2    sale of Tradeshow stock."  That's what they said.

3              MR. GOUREVITCH:  Yes, your Honor, that's absolutely

4    correct.  That is correct.  That's exactly what they said.

5              THE COURT:  So there is an allegation --

6              MR. GOUREVITCH:  No, your Honor.

7              THE COURT:  That is an allegation that it came from

8    the sale of the stock.  That's why I asked you.  Do you think

9    that is talking about some other sale other than the sale to

10   the shell company?

11             MR. GOUREVITCH:  What they do not allege is that Mr.

12   De Beer had any knowledge of where this money came from or that

13   it had any connection to the shell company or that it had any

14   connection to the sale of stock.  Green is green.  De Beer gets

15   $300,000.  There is no allegation in this complaint that he had

16   any knowledge.

17             THE COURT:  We are supposed to assume this was a

18   Christmas present from Kirk?  Is this a reasonable inference?

19             MR. GOUREVITCH:  Your Honor, the truth is you and I

20   are not supposed to assume anything.  That's what is concerning

21   to me.

22             THE COURT:  Right.  But I'm supposed to accept what

23   they say.  They say the Kirks gave it to them and it came out

24   of the proceeds of their sale of the stock, and Boyle.

25             MR. GOUREVITCH:  I believe for purposes of a motion to

E2qrssen

1    dismiss your Honor is correct that you have to accept the well-

2    pleaded allegations as true.  What is missing from that well-

3    pleaded allegation is the central point of did De Beer know

4    that it had anything to do with the sale of stock, did he know

5    that it had anything to do with the shell companies, did he

6    know that it had anything to do with the scheme.  More

7    importantly or as importantly, did it have anything to do with

8    either Tradeshow or Pac Blue?  That's what's missing here.

9         THE COURT:  I'm assuming that your argument is

10   dependent on the fact that De Beer thought at that time that

11   the shell companies owned all the shares and that Kirk and

12   Boyle didn't own shares in their own name.

13        MR. GOUREVITCH:  Your Honor, my argument is yes, that

14   is true.

15        THE COURT:  It had to have come from the shell company

16   sale, then.

17        MR. GOUREVITCH:  No, your Honor.

18        THE COURT:  Where else could it have come from?

19        MR. GOUREVITCH:  To Kirks could have been wealthy

20   people.  The Kirks, I assume, have significant assets.

21        THE COURT:  You're saying that from here there is no

22   reasonable inference to draw that he thinks he is getting this

23   money from the sale of the stock?

24        MR. GOUREVITCH:  Absolutely not, your Honor.

25        THE COURT:  What is the other reasonable inference to

1    draw?

2         MR. GOUREVITCH:  Not even, your Honor --

3         THE COURT:  What is the other reasonable inference to

4    draw?

5         MR. GOUREVITCH:  Your Honor, not even is there not an

6    inference of that, the SEC doesn't allege it, even in the

7    conclusory terms.

8         THE COURT:  Allege what?  They allege $300,000 of

9    their proceeds from the sale of the shell stock.

10        MR. GOUREVITCH:  They allege that he got money, not

11   stock.  Green is green.

12        THE COURT:  No, they allege that he got $330,000 of

13   proceeds from the sale of Tradeshow stock.  That's what they

14   allege.  Whether he knew it came from the sale of the Tradeshow

15   stock is a different question, but they clearly allege that.

16        MR. GOUREVITCH:  Your Honor, we both read the

17   complaint the same.  I rely on your words.  Whether he knew

18   that it came from the sale of the stock is a different matter,

19   and it is not alleged in the complaint.  It is not even alleged

20   in conclusory form, which the SEC seems to have done quite a

21   bit of here.

22        THE COURT:  What alternative reasonable conclusion

23   could one draw?

24        MR. GOUREVITCH:  One could draw the conclusion that

25   the Kirks are wealthy and substantial people and that they are

1     angel investors and that they have $330,000 and they paid them.

2              THE COURT:  Paid them for what reason?

3              MR. GOUREVITCH:  That is missing from the complaint,

4     your Honor.

5              THE COURT:  That's what I'm saying.  They are not

6     saying that it is any reason other than he helped facilitate

7     the illegal transactions at issue.

8              MR. GOUREVITCH:  No, your Honor.  You put your finger

9     on one of the problems here.  There is no allegation as to what

10    this payment is for.  After a three-year investigation, there

11    is no allegation that this payment has anything to do with

12    Tradeshow or Pacific Blue.  There is no allegation as to what

13    this has anything to do with at all.

14             THE COURT:  It says it is the profit part of the

15    proceeds of the sale.

16             MR. GOUREVITCH:  Your Honor, I'm saying why De Beer is

17    getting it.  There is no allegation as to why this is going to

18    De Beer.  Maybe this is going to him for a preexisting debt

19    that they owed him.  Maybe it is going for some other

20    transaction.  I can posit for you ten different alternatives as

21    to why they are giving him the money and what this complaint is

22    fundamentally silent about, as it is silent about so many

23    things, as what the purpose of this payment was.  They don't

24    know.  There is no allegation of a quid pro quo.

25             THE COURT:  There is an allegation of quid pro quo.

1          MR. GOUREVITCH:  No, your Honor.

2          THE COURT:  It says that he helped facilitate the sale

3   by providing false documentation.  That would be a quid pro

4   quo, wouldn't it if that's true?

5          MR. GOUREVITCH:  Your Honor, the SEC alleges that he

6   facilitated the sale.  They don't allege that he knew that the

7   Kirks owned or controlled the offshore corporations, and they

8   don't allege -- which they could have if they had a factual

9   basis, but I don't think they do -- that in point of fact, as

10   your Honor I think is suggesting, this was a quid pro quo for

11   signing the documents.  That's just not there.

12          I respectfully submit, your Honor, Mr. Curran

13   suggested you have now written a better complaint than the SEC

14   has.  But we are stuck with the one that they have written, and

15   there is no allegation about what this is connected to, there

16   is no allegation that he knew.

17          THE COURT:  All right.  Thank you.

18          MR. GOUREVITCH:  Thank you, your Honor.

19          Mr. De Feis.

20          MR. DE FEIS:  Yes, your Honor.  Now for something

21   completely different.  Good afternoon, your Honor.  I represent

22   Warren Davis, an individual named in the complaint, as well

23   Gibraltar Global Securities.

24          Like the law firm involved in the case, Gibraltar is

25   no longer in business.  It is in wind-down, as pleaded in the

1    complaint.  Gibraltar is named more in the causes of action,

2    particularly in the fraud causes of action, than Mr. Davis, so

3    I'm going to focus on Gibraltar.  One can wonder about the

4    wisdom of pursuing a case seeking injunctive relief against a

5    foreign company that is no longer in business, as the SEC well

6    knows.

7             Let's talk about those fraud allegations for a moment.

8    Essentially, what we have here is a case involving alleged

9    fraudulent misrepresentations, misrepresentations made to the

10   investing public in terms of SEC filings, misrepresentations

11   involved in a pump-and-dump scheme about the value of the

12   securities.

13            Gibraltar was not involved in any of that.  Gibraltar

14   had no involvement in he viewing any of these statements, in

15   making of the statements to the investing public.  Its

16   principal had no such involvement.  It is not charged with any

17   involvement in misrepresentations.

18            To use the phrase used by the Court, there were no

19   direct dealings as referenced in complaint between Gibraltar

20   and its principals and everybody here.  They are separated in

21   terms of the geography, in terms of their role in the

22   transaction, in terms of their knowledge and what can be

23   inferred and the reasonable inferences that can be drawn from

24   the complaint.

25            More importantly and very, very significantly in a

1   case of this kind, particularly taking off from where we left

2   off with Mr. Gourevitch, talking about proceeds, etc., and

3   funds, there is no allegation that Gibraltar or Davis received

4   any money in exchange for this.  They don't even talk about

5   ordinary commissions that Gibraltar received.  There is no

6   allegation it was a significant percentage of Gibraltar's

7   business in any way, shape, or form.

8          So, there is no reason to infer that Gibraltar should

9   have been on notice that there was something wrong here or had

10  a motive to look the other way, was closing a blind eye to the

11  transactions.

12         What they did here, allegedly, as alleged in the

13  complaint, is assist in providing certain affidavits in

14  connection with the opening of accounts.  That is alleged to be

15  false.  These affidavits were based on information that

16  Gibraltar received from parties that believed it to be

17  legitimate and acting in good faith.  There was no reason for

18  them to be suspicious.

19         For some reason the SEC thinks that there is something

20  wrong with opening accounts.  These accounts, by the way, are

21  opened and customers are represented to be the names of

22  companies:  Mazi, Baltic, Medford Trading or Medford Financial.

23  Those are the affidavits.  Mr. Davis, who is not charged again

24  in the fraud allegation, provides affidavits saying that these

25  are the customers.  They were in fact the customers.  There is

138

1   no obligation to pierce the corporate veil.  They are obviously

2   corporations.  They have one name.

3       THE COURT:  As we already discussed the last time you

4   were here, selling stock in nominee entities is something

5   Gibraltar did for a living.  This is what they touted that they

6   did successfully.  I don't think the question on these facts is

7   that they shouldn't have known, had any suspicion, that there

8   was somebody else behind the nominee entities that were selling

9   stock.  That is exactly what they told their customers they

10  were doing.

11      MR. DE FEIS:  They touted their confidentiality, it's

12  true.  But what we are talking about here are the affidavits in

13  the names of or that represented these three companies that

14  owned the stock.  Obviously, Scottsdale is not going to assume

15  that Mazi is a real person, which has only one name, or that

16  Medford is a real person.  People stood behind these companies.

17      THE COURT:  That is a little different from my

18  recollection of what Gibraltar touted it had the ability to do.

19  They touted that they had the ability to -- let me look at the

20  last time we spoke.  I don't have the exact language, but I

21  know they promised prospective customers, quote, an extra layer

22  of confidentiality to protect assets from government seizure or

23  frivolous divorce settlements.

24      What they did in general is they let people come and

25  they would buy stock in another nominee name in order to mask,

1    and I'm not saying inappropriately necessarily, but mask the

2    true owner of shares and the true beneficial owner of shares.

3    It would not trade in that name.

4           If you're asking me again to draw the reasonable

5    inference that somehow they didn't have any reason to believe

6    it was somebody else other than Baltic and Mazi that were

7    trading, that it could have traded in its own name but did so

8    because it wanted the confidentiality of not trading in its own

9    name.  That's what they touted to be successful.

10          MR. DE FEIS:  The point is these are patently

11   artificial entities.  Merrill Lynch or anyone else on the

12   planet, any other brokerage firm, would be submitting the same

13   affidavit.

14          THE COURT:  Merrill Lynch is a company that does

15   something for a living other than trading stock.

16          MR. DE FEIS:  I think the Court may be quoting from

17   either the website or the other complaint.

18          THE COURT:  Right.

19          MR. DE FEIS:  Another couple of comments.  They don't

20   incorporate the other complaint or the website at all.

21          THE COURT:  I understand that.  You're saying that I

22   should assume that somehow they have no reason to believe that

23   Mazi or Baltic is a nominee entity for some other entity or

24   person who wants to trade but does not want to trade in its own

25   name.

1          MR. DE FEIS:  I guess what I'm saying is any third

2     party, any brokerage firm, providing such an affidavit would

3     have to assume that there is some person or entity behind that

4     entity because it is obviously not a real person.

5          THE COURT:  But they won't have to assume that the

6     person or entity that is behind that name is a different person

7     or entity than what one would assume was behind that name.  If

8     you tell me that they were trading in the name of Microsoft,

9     then I could understand that Bill Gates might be behind it.

10    But if you tell me that they were trading in the name of Jones

11    Doughnuts, I don't know why it would be logical for me to

12    assume that Bill Gates is behind that.

13          In this case it is not really a question of just that

14    there is a corporate fiction here.  It is a question that there

15    is a corporate fiction which really doesn't do any real

16    business other than to trade in this stock and does so simply

17    to mask the true trade.

18          MR. DE FEIS:  I just don't know.  I don't think the

19    complaint pleads enough about Gibraltar's mode of doing

20    business, nor do I think it is appropriate to think that there

21    is something illegal or inappropriate about --

22          THE COURT:  That's true.  As I say, want to know

23    whether the lawyers are giving me lawyer arguments or they

24    really think these are the true facts.  We know what the true

25    facts are.

1          The true facts are part of their business was to give

2    people an opportunity to trade confidentially and therefore to

3    trade in names that would not reveal the true individual or

4    entity who was the beneficial owner.  You know that.  There is

5    no secret about that.  That's what their website said they do

6    for you.

7          So, it is not a real strong argument to make that we

8    are supposed to just assume that Mazi is a company and Baltic

9    is a company and they have no reason to look behind that and

10   figure out who the principals are.

11         MR. DE FEIS:  Let's assume that there is something

12   wrong with that.

13         THE COURT:  I didn't say there was anything wrong with

14   it.

15         MR. DE FEIS:  Let's assume that is what they did, your

16   Honor.  That is not a representation or a misrepresentation

17   made to the investing public.

18         THE COURT:  Right.

19         MR. DE FEIS:  It is based on information they received

20   from third parties, people they thought were acting in good

21   faith and were legitimate, including company officials in the

22   form of corporate resolutions they received.  There is some

23   depth to these statements that are made in the affidavit.

24   Again, not made to the investing public, not part of a

25   pump-and-dump, and I think an insufficient basis to bring a

1    fraud claim, 10b-5.

2           THE COURT:  Assuming allegations here in that regard

3    as they are in the other case, the similar allegation is that

4    they made a representation to Scottsdale that this was the

5    client, this was the beneficial owner, when they knew that the

6    beneficial owner was really Kirk.  That is the allegation.

7           MR. DE FEIS:  I understand that is the allegation.

8    Again, isn't it obvious to Scottsdale, since these are

9    artificial entities, that they had to be owned by someone else?

10          THE COURT:  Yes.  But it is not obvious to them that

11   the entity Gibraltar says is the beneficial owner is truly not

12   the beneficial owner, the beneficial owner is a man named Kirk.

13   That's what the question they are asking.

14          MR. DE FEIS:  Only if you pierce that veil.

15          THE COURT:  That is the representation they are

16   supposed to be making, isn't it, who the beneficial owner is.

17   Their allegation is that Gibraltar, in order to facilitate this

18   transaction, similar to what they alleged in the other case, in

19   order to facilitate this transaction, falsely stated that only,

20   I guess, Medford Financial was the client when they knew

21   Medford Financial wasn't the client and sole beneficial owner,

22   that Ben Kirk was.

23          They say, "Gibraltar falsely stated that Gibraltar

24   holds Medford securities as custodian only for the sole benefit

25   of Medford and that all interest, dividends, distributions and

1    other income distributable from the custodial securities are

2    the profit of Medford.  They say Gibraltar provided additional

3    affidavits to Scottsdale in April of 2000 for two separate

4    deposits of $1.8 million, meaning Pacific Blue shares,

5    misleadingly stated that it held securities for the sole

6    benefit of its client Mazi and Baltic, when Gibraltar knew that

7    Ben Kirk was the beneficial owner and that Mazi and Baltic were

8    the nominee entities."

9           They are not talking about that they knew that there

10   was a corporate fiction.  They are saying they deliberately

11   made a misrepresentation about who the beneficial owner was by

12   representing that these companies were the beneficial owners

13   when they knew they had an obligation to disclose that Ben Kirk

14   was the beneficial owner.  Isn't that the essence of their

15   claim?

16          MR. DE FEIS:  That is the essence their compliant.  I

17   am repeating myself, and I apologize, given the late hour.  I

18   think it is obvious to a sophisticated custodian like

19   Scottsdale that there has to be somebody owning this company.

20          THE COURT:  I'm glad you put it that way.  The

21   question is not who owns the company.  The company is who owns

22   the stock.

23          MR. DE FEIS:  Right.

24          THE COURT:  Those are two different answers.  Sure,

25   they know somebody else owns the company.  But they are asking

1    the question of who owns the stock, who is the beneficial owner

2    of stock.  That is a different issue.  They have nothing to do

3    with each other.  They are asking who is the owner of the

4    stock.  They say the owner is Medford when they know the

5    beneficial owner is Kirk, and they had an obligation to

6    disclose that regardless of who owned Medford.  Isn't that it?

7         MR. DE FEIS:  Yes.  They are relying, again, as I

8    think is pleaded in the complaint, on corporate resolutions

9    reflecting this.  They give us no reason to doubt the good

10   faith of the representations that Gibraltar is relying on.

11        THE COURT:  It says, "Ben Kirk controlled at least

12   three separate nominee accounts at Gibraltar for no parent

13   purpose other than to conceal his identity.  Gibraltar knew

14   that it was maintaining these nominee accounts beneficially

15   owned by Ben Kirk in addition to his personal account and there

16   was no readily apparent legitimate purpose for these accounts."

17        MR. DE FEIS:  Those are the accounts of Gibraltar.

18        THE COURT:  Right.

19        MR. DE FEIS:  I think we are talking about the

20   accounts or transactions that were conducted at Scottsdale.

21        THE COURT:  I thought that was done through the --

22   maybe they are separate.

23        MR. DE FEIS:  I think it is a separate issue.  I guess

24   as pleaded in the complaint they know who Ben Kirk is, etc.,

25   and they know there is a business relationship, so to speak,

 1   with Ben Kirk.  But I think we are talking about the

 2   information that they pass along the Scottsdale.

 3          THE COURT:  The next paragraph is the paragraph that

 4   starts out saying, "In order to effectuate share deposits and

 5   sales on behalf of its client Ben Kirk, Gibraltar

 6   misrepresented the shares of beneficial ownership."

 7          MR. DE FEIS:  Again, they are relying on corporate

 8   resolutions as to the ownership.

 9          THE COURT:  That's not what it says here.  That's the

10   issue.

11          MR. DE FEIS:  I understand.  I would say we are

12   talking about a fraud claim, a misrepresentation claim.  I

13   would state these are representations or misrepresentations

14   that are not made to the investing public and not part of the

15   pump-and-dump.

16          What I have seen in the SEC's reply is the possibility

17   that they are trying to convert this into what could be called

18   a scheme liability case, which is quite different.  I cite a

19   case that came to our attention filed just after the SEC filed

20   its complaint.  It's called United States v. Benger.  The

21   citation, I can provide it in a separate letter, is 931

22   F.Supp.2d at page 908.

23          They talk about an attempt just like that, where the

24   gravamen is a misrepresentation.  The false statements part of

25   it stands, but the attempt to make this into a scheme case does

1   not.  I am quoting from toward the end of the opinion.  It is a

2   short opinion.

3        "The claim that the scheme involved obscuring

4   identities of every one of the participants except the lawyers

5   and covering their tracks when the heat got too high merely

6   describes activities designed to conceal the scheme, but that

7   is an inherent part of every illicit scheme."  It cites cases

8   for that.  "If concealment were sufficient, every 10b-5(b)

9   violation, which is the misrepresentation violation, could be

10  charged as a scheme liability violation as well."

11       This is not a scheme liability case.  It is a

12  misrepresentation case involving false statements, largely

13  about ownership of related parties and also the pump-and-dump.

14  Even if there is something amiss or Gibraltar should have

15  looked harder or should have fine-tuned those affidavits, which

16  I contend are based on good faith information that it had

17  received, it still does not make out a fraud case under 10b-5.

18       THE COURT:  I understand your alternative factual

19  scenario, but that is not what is said in the complaint.  The

20  complaint said that these representations were false because

21  they contradicted the information contained in the account-

22  opening documents Ben Kirk provided to Gibraltar for his

23  nominee account.  They don't say that it simply read that

24  information someplace.  They say the information they were

25  provided was just the opposite of the information that they

1    represented.

2          MR. DE FEIS:  I'm saying even if true, let's take it

3    as a given, even if true, which I think the Court frankly is

4    supposed to at this point in the proceedings, but let's say

5    even if those allegations are true, it is still not validly

6    pled as a misrepresentation under 10b-5(b).  These

7    representations are not made to the investing public.  They are

8    not part of the pump-and-dump.  If anything, they are part of a

9    scheme, so to speak, which is not what the SEC is relying on

10   here.  I go back to they are part of concealing, so to speak,

11   the beneficial ownership of these funds.

12         THE COURT:  Part of the misrepresentation primarily is

13   the misrepresentation to the public that they are buying shares

14   where the seller is simply another trader in the market who is

15   trading on these shares and is not someone who has artificially

16   pumped up the price of the stock in order to dump that stock on

17   the market.

18         MR. DE FEIS:  But they don't know that.  There is no

19   reason to believe that Gibraltar knows anything about that.

20   There are no direct dealings.  They are over in the Bahamas.

21   They don't meet anybody.  There are no phonecalls, no emails

22   cited.  They don't even cite Gibraltar's ordinary way of doing

23   business.

24         I realize the Court's impression may be impacted by

25   the other case we have pending.  It was the SEC's decision to

1   bring two separate actions against the same out-of-business

2   brokerage firm with another set of lawyers from D.C. to deal

3   with these.  The bottom line is that there is no reason, based

4   on the four corners of this complaint, to think that Gibraltar

5   has any knowledge.

6           I go back to where I started.  They don't allege that

7   Gibraltar received commissions or received any payment

8   whatsoever.  Giving to some extent the defendant here the

9   benefit of the doubt, there is no reason to think that

10  Gibraltar is part of a scheme to deceive the investing public

11  or knows about the pump-and-dump or knows about the ownership

12  of anyone else.

13          We also argue that there is no basis for secondary

14  liability, which would be the aiding and abetting claim,

15  because there is no knowledge of the primary violation, at

16  least as far as Gibraltar goes.  I echo the very able arguments

17  of my co-counsel.  Obviously, if you cannot find liability as

18  to those defendants, you cannot find liability as to my

19  clients, who are very, very far removed in every respect from

20  these transactions.

21          THE COURT:  Gibraltar is charged in the section 17(a)

22  violation, the 10(b) violation, and the aiding and abetting?

23          MR. DE FEIS:  That's correct.  There are also

24  allegations related to Gibraltar, I think all of the

25  defendants, in connection with the sale of allegedly

1    unregistered securities.

2            THE COURT:  Right.

3            MR. DE FEIS:  They are registered, which co-counsel

4    has again very effectively argued.  That falls.

5            Also, anticipating the SEC's argument, we argue that

6    the broker exemption applies.  The elements are, of course, if

7    you are only executing orders for ordinary commissions -- and

8    the SEC doesn't even allege there were commissions -- and the

9    company neither solicited nor arranged the solicitation and

10   otherwise acted reasonably, you meet that exemption.

11           We have no obligation to plead an affirmative defense

12   at this point, which is what it is.  However, in their

13   complaint, they took up this obligation in paragraphs 140 and

14   156, of arguing that the broker exemption doesn't apply.

15           For all of these reasons, your Honor, I believe that

16   all of the allegations against both Gibraltar and Mr. Davis

17   should be dismissed.  Thank you.

18           THE COURT:  Thank you.

19           (Recess)

20           MR. KIDNEY:  Your Honor, Jim Kidney.  I'm in the other

21   case.  A number of us have planes, trains to catch.  I talked

22   to Mr. De Feis.  We have nothing to raise.  The argument has

23   been very fascinating today.  If we get catch our trains, leave

24   a little later, we could excuse ourselves?

25           THE COURT:  That's fine, sure.

1            Who else needs to be heard?

2            MR. FELDMAN:  Steve Feldman on behalf of Benjamin

3    Kirk, your Honor.

4            MR. SALLAH:  On behalf plaintiff Hinton.

5            MR. MARCELINO:  On behalf of Dr. Carrillo.

6            THE COURT:  Then the SEC.  We are going to go until

7    5:00.  You can leave any time you would like.  We are going to

8    have to, obviously, continue.  We can continue any day within

9    the next week.

10           MR. GOUREVITCH:  Your Honor, unfortunately, I'm out of

11   the country from this Saturday for the next two weeks

12   thereafter.

13           THE COURT:  Are you available to continue either

14   tomorrow sometime if we have to or Friday?

15           MR. BRODY:  Your Honor, I apologize.  I'm in the

16   middle of an administrative proceeding that is actually going

17   on now without me, much to the chagrin of my colleagues.  That

18   is continuing tomorrow, Friday, and Monday, and it is

19   imperative that I'm there for those three days, your Honor.  It

20   was very difficult.  It was a case that took longer than

21   expected, and we are in the middle of this hearing right now.

22           THE COURT:  Is the hearing all day?

23           MR. BRODY:  Yes, your Honor, from 9:00 basically until

24   6:00.

25           THE COURT:  Yes?

1          MR. CURRAN:  As much as I'm sure your Honor seems to

2     like to hear from me, I'm out from Tuesday through next Friday.

3     I am actually out of town.

4          THE COURT:  Can we at least continue the arguments

5     that I haven't heard on Monday?

6          MR. BRODY:  Your Honor, I won't be able to make my

7     argument on Monday.  Perhaps it is possible Monday afternoon,

8     but I don't know that yet.  Certainly Monday morning.  I know

9     there are two witnesses who are being called Monday morning who

10    were very difficult to schedule.

11         THE COURT:  I am just trying to do it at the

12    convenience of the parties.  I'd be willing to do Monday at,

13    say, 2 o'clock.

14         MR. GOUREVITCH:  Your Honor, on behalf of Mr. De Beer,

15    the SEC's response, I really do feel an obligation to attend it

16    and would feel uncomfortable if it went forward in my absence.

17         THE COURT:  How can you adjust your schedule to make

18    it comfortable for you?

19         MR. GOUREVITCH:  Your Honor, I am going to be in South

20    Sudan.  It would be extremely difficult.  I can't even

21    participate by phone.

22         THE COURT:  What do you suggest?

23         MR. GOUREVITCH:  What I was going to suggest, your

24    Honor, and I realize having a postponement is less than ideal,

25    but given the number of attorneys with scheduling issues here,

```
 1    that at the end of today or early in the next day or two we

 2    convene amongst ourselves and propose a couple of dates as soon

 3    as possible that will work for everybody and come back to your

 4    Honor with perhaps three days of a proposal.

 5             THE COURT:  I would like to resolve it now, literally.

 6    I would like everybody knowing when they walk out of here when

 7    we are going to continue.  When will you be back?

 8             MR. GOUREVITCH:  I will be back March 15th, your

 9    Honor.  It's a long trip back, and I would be grateful for a

10    day or two to get over the jet lag.

11             THE COURT:  What if we continued on either the 18th or

12    the 19th, Tuesday the 18th or Wednesday the 19th?

13             MR. FLEMING:  The 9th or the 19th?

14             THE COURT:  18th or 19th.

15             MR. CURRAN:  I don't have my schedule here, but I will

16    make one or the other work.

17             THE COURT:  Any preference?

18             MR. DEVANEY:  I am scheduled to be in Washington on

19    the 18th.  The 19th would be preferable.

20             MR. DE FEIS:  There is a PAL luncheon, lawyers

21    luncheon, on the 19th.  I don't know whether Mr. Curran goes.

22    I know I had planned to go.  It is 11:30.  We can do it in the

23    afternoon.  I'm free on the 18th.  Mr. Patterson could cover.

24             THE COURT:  You said you prefer the 19th?

25             MR. CURRAN:  The 19th works for me.
```

```
 1              THE COURT:  What time is the lunch over?

 2              MR. DE FEIS:  It starts early, 11:30.

 3              THE COURT:  What time is it over?

 4              MR. KIDNEY:  2:00.

 5              THE COURT:  My suggestion would be that we start in

 6   the morning of the 19th.  We can break for lunch and continue.

 7              MR. DE FEIS:  I can send Mr. Patterson from my office

 8   to cover if necessary.

 9              MR. CURRAN:  I'll skip the lunch, Judge.

10              THE COURT:  Where is the lunch?

11              MR. DE FEIS:  Uptown, at the Pierre.

12              MR. BRODY:  We are fine with both of those dates, your

13   Honor.

14              THE COURT:  Is it better to do the 19th or the 18th?

15              MR. CURRAN:  I have no preference at all.  The 19th is

16   better for Mr. Devaney.

17              MR. KIDNEY:  Do you think you will need counsel from

18   the SEC on the other case here for that or are you just going

19   to hear the rest of the arguments on this case?

20              THE COURT:  Maybe, because I may rule.

21              MR. KIDNEY:  On all them?

22              THE COURT:  Yes.

23              MR. KIDNEY:  We will be here.  Mr. Giallombardo and/or

24   I will attend.

25              THE COURT:  Let's start at 10 o'clock.  We will break
```

154

1    at like 11:30 so you can go to the lunch.

2            MR. DE FEIS:  Don't break on my account.

3            MR. CURRAN:  Don't break on the part of the lunch,

4    Judge.

5            MR. DE FEIS:  Forget about the lunch.  Somebody from

6    my office will be here.

7            MR. CURRAN:  Somebody else can have the free chicken.

8            MR. DE FEIS:  I want the chicken.

9            THE COURT:  Let's say 10 o'clock that day.  I will put

10   aside as much that day, morning and/or afternoon, as we may

11   need so we can finish up.

12           MR. BRODY:  Your Honor, whatever your Honor's

13   preference is.  We can either give a presentation on our case

14   with respect to each of the individual defendants or we can

15   simply answer questions that your Honor has.  We are happy to

16   do either one.

17           THE COURT:  I will leave that up to the other side.

18   We have 20 minutes.  You can tell me how you want to use that

19   time.

20           MR. BRODY:  I'm talking about when we reconvene, your

21   Honor.  I'm not sure which way you would prefer to hear from

22   us.

23           THE COURT:  When we reconvene, I'm probably going to

24   want to hear from you one time.  If we can do at least one, if

25   not two of these quickly, then I want to do that.  We may only

1    have one or two other people to hear from by the time we

2    reconvene.

3            MR. BRODY:  I was a little vague.  The question I was

4    asking is do you want us to have a presentation for each one of

5    these defendants or should we just stand up here and ask

6    whatever questions you want?  I'm comfortable with either one,

7    your Honor.

8            THE COURT:  Whatever you think is helpful.

9            MR. BRODY:  Fine.  Thank you.

10           THE COURT:  Who wants to be heard?

11           Let me do this.  I want to talk about Dr. Carrillo for

12   a second.  Why don't we do that.  Of all the cases that I

13   reacted to, I genuinely reacted to the allegations with regard

14   to Dr. Carrillo as being the least significant and artfully

15   pled, is the best way I can put it in terms of Dr. Carrillo's

16   direct involvement.  Quite frankly, I really need to hear from

17   you briefly because I have more questions for the SEC.  I have

18   some specific questions, but you can say what you want to say.

19   I am trying to figure out whether there is an allegation that

20   Dr. Carrillo took any active role in any of these claims that

21   are against it.

22           MR. MARCELINO:  Thank you very much, your Honor.  Juan

23   Marcelino here for Dr. Carrillo.  I really do appreciate that

24   set-up, because that is how I have been viewing this case.

25           I have been sitting here all afternoon listening to

1  some serious allegations of fraud and deceit and some very

2  impressive arguments from my brethren and co-counsel here.  I

3  have to confess that I am as bewildered as I was the first day

4  I read the staff's complaint as to why Dr. Carrillo is in this

5  matter.

6          As we all know, Dr. Carrillo is the only defendant in

7  this case who has been charged with fraud.  Excuse me for

8  pointing this out, but being included with, from my

9  perspective, such an aggressive stretch of section 5 liability

10  was nothing but an overzealous attempt by the staff to cast as

11  wide a net as possible.

12          It was in reality, your Honor, nothing but an

13  offensive attempt to pile on and exert as much pressure as

14  possible against Dr. Carrillo's son, Luis Carrillo.  I truly

15  believe it is a shameful litigation tactic.  The end result was

16  to drag a 75-year-old doctor, Spanish-speaking resident in

17  Mexico, into this mess who truly does not belong here.

18          I want to address the section 5 violation, but first I

19  would like to address the jurisdictional issues here, because

20  we do believe that this court lacks personal jurisdiction over

21  Dr. Carrillo.

22          As anybody knows, basic constitutional law, due

23  process requires minimum contacts that don't offend notions of

24  traditional fair play and justice.  This district decided the

25  Stroff case that we cite in the papers, focused on the context

1    of a foreign national when jurisdiction was based on the

2    effects of their actions.

3           Specifically, in Stroff it was stated that those

4    actions must be, and this is the important part, must be

5    sufficiently extensive and regular to make the possibility of

6    litigation in the U.S. a foreseeable risk.  They cite the

7    Leaseco Data case from the Second Circuit supporting that

8    proposition.

9           The only single affirmative act that I have read in

10   the commission's complaint is that Dr. Carrillo contributed

11   $20,000 to the acquisition of a company.  They don't allege

12   that Dr. Carrillo controlled the account that Pacific Blue

13   traded.  In fact, they specifically allege that his son, Luis

14   Carrillo, controlled the account and had power of attorney over

15   the account.

16          They do not allege that Dr. Carrillo ordered the sale

17   of Pacific Blue.  In fact, they take it to the next step and

18   specifically plead that the son, Luis Carrillo, gave

19   instructions to the broker.  What they don't point out, your

20   Honor, since we are focused on jurisdiction, is that this isn't

21   even a U.S. brokerage account we are talking about.

22          I would like to emphasize this case is really no

23   different from another case decided recently in this district,

24   your Honor, SEC v. Alexander.  I would like to apologize to the

25   Court.  We put the Alexander case in our reply brief and we

1    misstated the facts.  But I will say we did not misstate the

2    law.  We spoke of, I believe, Greek nationals who were husband

3    and wife.  The case really involved Italian nationals, and the

4    subject of the jurisdictional issue was really a mother and her

5    daughter.

6           Plain and simply, that case was an insider trading

7    case where the mother of the tipper executed a transaction in

8    her account at an Italian bank in Italy.  She was clueless that

9    that would result in an ADR transaction on the New York Stock

10   Exchange.  The court in that particular case recognized the

11   unfairness of requiring a 65-year-old non-English-speaking

12   person to defend herself from charges arising from one single

13   transaction.  In that case, your Honor, citing Leaseco, they

14   made clear that the person sought to be charged must know or

15   have good reason to know that their conduct will have effect in

16   the state seeking to assert jurisdiction.

17          Further in the Alexander case, your Honor, they made

18   clear, line 1, Burger King v. Rudzewicz, a Supreme Court case,

19   that the Court must determine that the defendant purposefully

20   directed his activities at the residence of the former.  The

21   Supreme Court has made clear foreseeability requires that the

22   defendant's conduct and connection with the forum are such that

23   he should reasonably anticipate being here under the court

24   here, further stating that this requirement ensures that a

25   defendant will not be hailed into a jurisdiction as a result of

1    random fortuitous or attenuated conduct.

2           Thus, the Alexander court concluded that the

3    circumstances of the defendant's transactions in that manner

4    presented unmistakably foreseeable facts and could not be

5    unreasonably expected to be visited on U.S. shareholders.

6    Excuse me.  I believe I left out the negative, that they could

7    not be.

8           THE COURT:  Where exactly was the account and where

9    was the trade made?

10          MR. MARCELINO:  Your Honor, Dr. Carrillo possessed a

11   Canadian brokerage account.

12          THE COURT:  Right.

13          MR. MARCELINO:  The allegations in the complaint are

14   that the son, Luis Carrillo, gave instructions to the broker.

15   There is not even an allegation that Dr. Carrillo, resident in

16   Mexico, directed any activity.  Number one, they are not

17   alleging that he directed the trade.

18          THE COURT:  Where the broker was in Canada?

19          MR. MARCELINO:  Yes.

20          THE COURT:  Are we talking about a buy and a sell?

21          MR. MARCELINO:  We are talking about the sale, your

22   Honor.

23          THE COURT:  I'm trying to get what the underlying

24   facts are that you believe the SEC is relying on.  Dr. Carrillo

25   is in Mexico.  He has an account, I don't know how it is set

 1     up, and he gives his son the power of attorney over that

 2     account.  You say that account is in a brokerage firm in

 3     Canada?

 4              MR. MARCELINO:  Correct.

 5              THE COURT:  At some point he is given or purchases --

 6     how does he obtain his shares?

 7              MR. MARCELINO:  We don't know.  It is not pled.  One

 8     of the particular problems we have is the sufficiency of the

 9     pleadings here, your Honor.

10              THE COURT:  So he has the shares.  It says he does

11     something to contribute $20,000 to the initial company.

12              MR. MARCELINO:  Correct.  In paragraph 79 of the

13     complaint, there is a very vague allegation that Dr. Carrillo

14     contributed $20,000.

15              THE COURT:  Do you know what that reference is

16     supposed to be to?

17              MR. MARCELINO:  No.

18              THE COURT:  He contributes $20,000.  I assume in

19     response to that contribution there are some shares issued in

20     his name to an account in his name.

21              MR. MARCELINO:  I think that is a fair assumption.

22     What I would like to be careful about is presuming that Dr.

23     Carrillo had any knowledge of that.

24              THE COURT:  Right.

25              MR. MARCELINO:  As the SEC does plead, they make clear

1    that Dr. Carrillo here was nothing more than a nominee, and I

2    believe that is in paragraph 150.

3           THE COURT:  It clearly alleges that at some point he

4    knows that he has an account and he gives his son the power of

5    attorney over that account.

6           MR. MARCELINO:  No, I would not agree with that, your

7    Honor.

8           THE COURT:  That's what I want to find out.

9           MR. MARCELINO:  The one thing that is clear is that

10   they have pled that his son controlled the account and had

11   power of attorney over the account.  What is not clear is if

12   ten years ago the son had power of attorney over this account.

13          THE COURT:  To get power of attorney, it's got to be

14   granted.

15          MR. MARCELINO:  Correct.

16          THE COURT:  I assume at some point, I don't know when,

17   but at some point he is aware that he has an account because he

18   is asked to execute some document that gives his son the

19   authority to trade on that account.

20          MR. MARCELINO:  Correct.  I want to make clear that we

21   were inferring that he was given power of attorney for this

22   particular transaction.

23          THE COURT:  I don't know when he had power of

24   attorney.  That is not clear to me.  So the son has power of

25   the attorney over the account.  The way I read it is that at

1    some point in the sale of other stock, the stock that is in the

2    father's name is traded and sold through this account by the

3    son.

4          MR. MARCELINO:  Correct.

5          THE COURT:  The proceeds of that account plus the

6    other proceeds are at some point transferred in some direction

7    to the Kirks or to --

8          MR. MARCELINO:  To other defendants, correct.

9          THE COURT:  To other defendants or entities related to

10   the various people.

11         MR. MARCELINO:  That's correct.

12         THE COURT:  The other part that I didn't understand is

13   there is no allegation that the father received any of the

14   proceeds of the sale of the stock.

15         MR. MARCELINO:  A very de minimis amount.  The SEC

16   pleads that 90 percent or more of the stock, the proceeds were

17   directed to the accounts of other defendants.

18         THE COURT:  I didn't get what that meant.

19         MR. MARCELINO:  I believe a small balance of funds

20   never left that account.

21         THE COURT:  It doesn't say that moneys were paid to

22   him?

23         MR. MARCELINO:  Correct.

24         THE COURT:  But the bulk of the money that was the

25   result of that trade was transferred to other entities or other

1   defendants?

2           MR. MARCELINO:  Absolutely correct, your Honor.

3           THE COURT:  There is a reference to a purported loan.

4   What is that supposed to be a reference to, if you know?

5           MR. MARCELINO:  I don't know, your Honor.  I have not

6   seen a reference to that loan in the complaint.  I missed it.

7           THE COURT:  I thought I did see a reference to that in

8   the complaint.  Maybe I read it in other papers.  I thought it

9   was supposedly a purported loan that was made.  For example,

10  paragraph 169 makes reference, and I think there are other

11  references, to $520,000 of the Dr. Carrillo proceeds were wired

12  to accounts in California which was distributed in part as

13  follows.  The $343,000 was then transferred to the Carrillo

14  Huettel trust account purportedly as a loan from Dr. Carrillo.

15          Then paragraph 170 says, "When the SEC staff requested

16  documentation of the $343,000 loan from Dr. Carrillo to

17  Carrillo Huettel LLP, counsel for Carrillo Huettel LLP informed

18  it that no loan documentation existed."

19          Do you know what that is a reference to?

20          MR. MARCELINO:  No, I do not, your Honor.

21          THE COURT:  What other allegations against your client

22  do you believe warrant addressing by you?

23          MR. MARCELINO:  I would also like to address, your

24  Honor, the substantive section 5 violations against my client.

25  I'll be quick because I know a lot of folks are ready to catch

1     flights.  In essence, we outlined in our motion to dismiss that

2     based on everything that had been pled in the complaint, you

3     could not conclude that Dr. Carrillo was in fact a seller.

4     Even the SEC has pled that he was a nominee.

5            With respect to that, in the SEC's opposition that

6     they filed in response to us, they, in essence, took the

7     position that you do not have to be a seller for section 5

8     liability.  They have relied on three primary cases:  Zacharia,

9     Murphy, and Verdiramo.  I don't take issue with that, your

10    Honor.

11           I'm looking at the SEC's own pleadings here, their

12    memorandum of law in opposition.  I turn to page 67, and I will

13    quickly read.  I think the SEC gets the point part right here.

14    They state that, "In addition, liability under section 5 does

15    not require that a defendant actually offer or sell securities.

16    All that is required is that the defendant was 'a necessary

17    participant or substantial factor in the illicit sale.'."

18           Being a substantial factor or a necessary participant

19    is a critical element for section 5 liability if you are not a

20    seller.  Given what the SEC has pled here, your Honor, there is

21    absolutely no way that Dr. Carrillo meets that standard.

22           Moreover, your Honor, if I could turn you back to the

23    complaint for one quick moment, because I do think the

24    pleadings here are deficient, I direct the Court's attention to

25    paragraph 152.

1          THE COURT:  Yes.

2          MR. MARCELINO:  Paragraph 152 reads, "Carrillo,

3     Huettel, and Carrillo Huettel played a significant role in the

4     offering and served as necessary participants and substantial

5     factors."  I then looked at paragraph 153.  "Franklin played a

6     significant role, was a necessary participant and a substantial

7     factor."  I looked at paragraph 154.  "De Beer played a

8     significant role, was a necessary participant and a substantial

9     factor."  Lastly, paragraph 155, "Hinton played a significant

10    role, was a necessary participant and a substantial factor."

11         Your Honor, I read this complaint more times than I

12    cared to.  I do not see a single allegation here that Dr.

13    Carrillo played a significant role or was a substantial factor.

14    The reason for that is simply he was not.  They could not plead

15    that, your Honor.  In fact, given all of the affirmative things

16    they pled, such as his son giving the brokerage instructions,

17    his son having power of attorney over the account, Dr. Carrillo

18    clearly doesn't meet that standard.

19         The one thing that I would point out to the Court is

20    that with respect to all of the cases that address participant

21    liability of the Murphy case, the Verdiramo case, and the

22    Zacharia case, they set a high bar with respect to that

23    substantial participation, necessary participant test, and they

24    have demonstrated that you need a far higher level of

25    involvement in the distribution than Dr. Carrillo's role here

1   as a nominee can support.

2           In the Murphy case you had a defendant who prepared

3   and reviewed the offering memoranda.  That defendant met

4   personally with broker-dealers and investors.  That defendant

5   spoke at broker-dealer sales seminars.

6           In Veridiramo you had a defendant who personally

7   authorized the issuance of shares.  He signed four separate

8   board resolutions that authorized the issuance.  He personally

9   directed the transfer agent to issue the shares.  He also

10  retained an attorney to write an opinion letter.

11          As you look at the participant liability cases here, I

12  think Dr. Carrillo's lack of actions fall far short of that.  I

13  do not think the staff's complaint was adequately pled with

14  respect to Dr. Carrillo.  Again, the jurisdictional issues are

15  problematic.  I believe Dr. Carrillo should be dismissed.

16          One thing that I want to point out and make clear.  I

17  am not attempting to disparage the staff.  I know we have all

18  piled on all day long about how poorly this entire matter had

19  been pled.  But I can understand what happened with Dr.

20  Carrillo.  I presume, having been on the staff for over 20

21  years, the focus here was on defendants with far more serious

22  conduct.  Dr. Carrillo was probably an afterthought who didn't

23  receive the type of attention and analysis that he deserved.

24          Thank you.

25          THE COURT:  Thank you very much.

1              Let's adjourn.  We will continue on the 19th at 10

2    o'clock.  I will give you a full opportunity to be heard.  I am

3    going to try to prepare myself to be able to rule on these

4    issues, if I can, to the extent that I can rule on any of these

5    issues when I see you on the 19th.  Have a good day.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25