```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   SECURITIES AND EXCHANGE
     COMMISSION,
 4
                    Plaintiff,
 5
              v.                          13 Civ. 1735 (GBD)
 6
     CARRILLO HUETTEL LLP, et al.,
 7                                        Argument
                    Defendants.
 8
     ------------------------------x
 9
                                          New York, N.Y.
10                                        March 19, 2014
                                          10:41 a.m.
11
     Before:
12
              HON. GEORGE B. DANIELS
13
                                          District Judge
14

15
              APPEARANCES
16
17   TODD D. BRODY
     JOSHUA M. NEWVILLE
18   KATHERINE S. BROMBERG
     ROBERT A. GIALLOMBARDO
19   KEVIN PATRICK O'ROURKE
          Attorneys for Plaintiff
20

21   VENABLE LLP
          Attorneys for Defendant Carrillo Huettel LLP
22   BY:  ADAM G. POSSIDENTE

23
     PECKAR & ABRAMSON, P.C.
24        Attorneys for Defendant Luis J. Carrillo
     BY:  THOMAS J. CURRAN
25
```

1              APPEARANCES

2

NELSON MULLINS RILEY & SCARBOROUGH LLP
3       Attorneys for Defendant Dr. Luis Carrillo
   BY:  JUAN M. MARCELINO, SR.
4
GAGE SPENCER & FLEMING LLP
5       Attorneys for Defendant Huettel
   BY:  WILLIAM B. FLEMING
6

7  DE FEIS O'CONNELL & ROSE P.C.
        Attorneys for Defendants Gibraltar Global Securities, Inc.
8       and Warren Davis
   BY:  NICHOLAS M. DE FEIS
9       PHILIP C. PATTERSON

10 HERRICK FEINSTEIN LLP
        Attorneys for Defendant Kirk
11 BY:  STEVEN D. FELDMAN

12 SALLAH ASTARITA AND COX LLC
        Attorneys for Defendant Hinton
13 BY:  JAMES D. SALLAH

14 DAVID U. GOUREVITCH
        Attorney for Defendant De Beer
15

16

17

18

19

20

21

22

23

24

25

E3jesecc

1          (In open court)

2          THE DEPUTY CLERK:  This is the continuation of the

3     oral argument in Securities and Exchange Commission versus

4     Carillo Huettel, LLP, et al. and also that is 13 CV 1735.

5          THE COURT:  I'm not going to need everybody's

6     appearance again.  I think the court reporter has it all.

7          I think where we were the last time, there were two

8     more defendants who had to be heard from.  Who was that?

9          MR. FELDMAN:  Your Honor, it's Steven Feldman on

10    behalf of Benjamin Kirk.  We did not have a chance to speak

11    last week.

12         MR. SALLAH:  Likewise, your Honor, he's going to go

13    first.  But James Salah on behalf of Mr. Hinton.

14         THE COURT:  All right.

15         MR. FELDMAN:  Good morning, your Honor.

16         THE COURT:  Good morning.

17         MR. FELDMAN:  Thank you for taking the time to

18    accommodate us again.  We represent Benjamin Kirk, one of the

19    Kirk brothers.

20         I know last time we were here, reality playing out,

21    part of the problem we were trying to raise in our motion is we

22    talked over and over again about Kirk, Kirks.  We never

23    distinguished between them.  There's actually two Kirk brothers

24    in the case.  There's John Kirk and there's Benjamin Kirk.

25         The complaint alleges that John Kirk ran an operation

E3jesecc

1   called the Emerging Stock Report in Vancouver, in Surrey, and

2   that Benjamin Kirk ran an operation called Skymark ten hours

3   away in Calgary.  And apparently they all ran them together,

4   because the allegations are that they operated, set up and

5   jointly ran everything as one big group.  As a practical

6   matter, I don't see how that works.

7          We have three main points we raised in our argument,

8   in our papers, I want to address with you today.  One is that

9   as to the 10(b) and 17(a) fraud allegations, the complaint

10  doesn't meet the 9(b) requirement.  As to Benjamin Kirk in

11  particular, the complaint doesn't detail what he did wrong,

12  doesn't explain his particular conduct, doesn't say what

13  Benjamin Kirk is responsible for.  So it doesn't put him on any

14  notice so that we can focus and defend him in this case.  It's

15  not rocket science to make allegations that somebody ran a

16  boiler room, that they made phone calls, that they lied to

17  people on the phone.  But that's what's missing in this

18  complaint.

19         Second, we argue that as to control person liability,

20  under Rule 20(a) the SEC alleges Mr. Kirk operated, controlled,

21  was the ultimate authority over this Skymark operation.  That's

22  what they say.  But when you look at the complaint and take the

23  time to actually study what they say, there are no facts in

24  there showing that Mr. Kirk directed, managed, operated, was

25  the guy responsible for Skymark.  So, again, we're missing the

E3jesecc

allegations.  And under your Honor's decisions in a number of

cases, your Honor has pointed out that the parties need to

provide specific facts as to somebody's role as the ultimate

operator.

        And third, we want to make an argument to your Honor

that process here is insufficient as to Mr. Kirk; that the SEC

represented to your Honor that it had reasonably attempted to

serve Mr. Kirk in Canada in order to get an order to do

alternative service.  In fact, they hadn't reasonably attempted

to serve him in Canada at all, and yet they made that

representation to your Honor and got this alternative service

motion.  And because we think your Honor was given inaccurate

information about these reasonable attempts, that service was

not proper.

        THE COURT:  Well, let's address that first so we can

put that aside and we'll deal with the more substantive issues.

        What do you say they should have done?

        MR. FELDMAN:  Well, what they said to your Honor was

we made reasonable attempts.  And when you study what they did,

they also said "we think Mr. Kirk fled Canada."  So they went

to apparently an address that they say was the last known

address in Canada, and they kept trying to serve him there,

which to me is the exact opposite of reasonable.  If you know

somebody doesn't live --

        THE COURT:  I assume if they didn't do that, you'd be

E3jesecc

1    complaining they didn't even bother to do that.

2              MR. FELDMAN:  I would say at a minimum, they're an

3    investigative agency.  They were conducting an investigation.

4    You try to figure out where the guy is and you try to serve him

5    where he is.

6              THE COURT:  So I'm not quite sure what you claim the

7    circumstances were.

8              MR. FELDMAN:  I claim --

9              THE COURT:  They say they couldn't find the guy.  They

10   looked for him.  He's making himself scarce.  Judge, would you

11   allow us to do substituted service, because we know he'd get

12   notice, but he just is making himself not available for

13   service?  What else --

14             MR. FELDMAN:  My issue, your Honor --

15             THE COURT:  -- should they have done or said?

16             MR. FELDMAN:  My issue is the representation they made

17   to you that they attempted reasonable service when they went to

18   a house they believed he didn't live.  They repeatedly tried to

19   serve him there, but they told you what's reasonable to serve

20   him --

21             THE COURT:  That's a legal conclusion.  That's not a

22   misrepresentation.  The misrepresentation would be to tell me

23   that they did X and they really didn't do X.

24             So what is it that you say they did in support of

25   their application to get substituted service, that they did

E3jesecc

1    that they claim was a reasonable attempt to serve him that you

2    say was a misrepresentation to the Court?

3        MR. FELDMAN:  They went to a place where they believed

4    he didn't live.  They attempted to serve him there over --

5        THE COURT:  But what misrepresentation did they make

6    with regard to that attempt?

7        MR. FELDMAN:  Then they told your Honor that they had

8    reasonably attempted to serve him --

9        THE COURT:  I know, but that's not a

10   misrepresentation.  That's not even a fact.  That's a legal

11   conclusion.

12       MR. FELDMAN:  That was an allegation --

13       THE COURT:  That's a legal conclusion.  What is it --

14       MR. FELDMAN:  That was a representation they made to

15   you in order to get --

16       THE COURT:  But that's not the representation I relied

17   upon.  The representation I relied upon is what, in fact, did

18   you do to reasonably serve him?  And what way can I conclude

19   that you've made reasonable attempts to locate him and serve

20   him?

21       So I made my decision of substituted service based on

22   what they told me they did and what the possibilities were that

23   they might do something else that would serve him.  So what is

24   it that you're saying that they -- you're not saying that they

25   misrepresented any act that they took in terms of service?

E3jesecc

1          MR. FELDMAN:  I'm saying that in describing their acts

2     it was not a fair description.

3          THE COURT:  It was not a fair description because they

4     called it reasonable?

5          MR. FELDMAN:  Right.

6          THE COURT:  And it wasn't reasonable?

7          MR. FELDMAN:  And any reasonable person would know

8     that serving somebody where you know they don't live is not the

9     way to go about making service.

10          THE COURT:  But what else -- I'm not sure what else

11     you say --

12          MR. FELDMAN:  What you do is you investigate, try to

13     find out where the person lives, and then you try to serve them

14     there.  There's all kinds of tools out in the world where one

15     investigates.

16          THE COURT:  But I want to make sure I understand your

17     legal argument.  Is your legal argument that they should not

18     have gotten the substituted service and then misled the Court

19     by giving the Court improper facts; or is it just that, well,

20     they said what they did was reasonable and it really wasn't

21     reasonable, because they could have done some other thing?

22          MR. FELDMAN:  I think my point is exact -- that they

23     represented to you that what they had done was reasonable when

24     it was not.

25          THE COURT:  Okay.

E3jesecc

1          MR. FELDMAN:  That you considered that, and because we

2     were not in the case, we didn't respond to the motion.  So you

3     considered that in making your decision.

4          THE COURT:  No, I didn't consider that.  I mean, if I

5     made decisions based on what the lawyers told me were

6     reasonable, I'd have a lot simpler job.  I don't make decisions

7     based on the lawyers' representation it's the reasonable thing

8     to do.  I make decisions based on the factual representations

9     they make to me.  And I made my conclusion about whether or not

10    that was reasonable and there's something else they could have

11    done.

12          I don't remember the details of it, but my

13    recollection at this point is that I did make a further inquiry

14    about whether they did some other things and whether or not

15    some other attempts might be successful to locate him.  So I'm

16    not sure what it is that you say that if they had done X,

17    that that would have been the reasonable thing to do and that

18    would have located him.  Are you making that argument?

19          MR. FELDMAN:  I'm suggesting -- first of all, your

20    Honor, as to your point that you asked them to do more, I don't

21    know anything about that.  Perhaps you did ask them and went

22    back and scrutinized.  My point is that --

23          THE COURT:  I may be wrong, but I thought -- and they

24    can correct me, too -- I thought that there was some discussion

25    on the record of this before -- but maybe there wasn't.

E3jesecc

1          MR. FELDMAN:  I don't think there was any on the

2     record here.

3          THE COURT:  I don't remember, because I remember --

4          MR. FELDMAN:  But my point is if when one scrutinizes

5     their papers -- we didn't have the benefit of an adversarial

6     scrutinizing because I didn't get involved.  But when one

7     scrutinizes the papers, you have a paper that says "we

8     repeatedly served the place.  We know he doesn't live there,

9     but now we're representing we've met the reasonable effort

10    standard and, therefore" --

11         THE COURT:  So tell me what they could have done that

12    would have located him.

13         MR. FELDMAN:  You know all the things people can do.

14         THE COURT:  No, I don't.  I don't know where the guy

15    was.

16         MR. FELDMAN:  You search credit card records.  You

17    talk to law enforcement.  You send out an investigator.  You

18    ask people in the neighborhood.

19         THE COURT:  Slow down.  I'm not asking you in the

20    abstract.  I'm asking you specifically.  What should they have

21    done that would have located your client, and where would it

22    have located him so that they could have served him?

23         MR. FELDMAN:  They should have gone to court in

24    Alberta anytime he had a court appearance, because he shows up

25    there every time.  And they should have handed him the piece of

E3jesecc

1    paper there.  That's what they should have done.

2              THE COURT:  So they knew that he was going to court?

3              MR. FELDMAN:  They're cooperating with the Alberta

4    securities commission.  Absolutely.  I'm sure they knew every

5    time he had a court date and when he has to show up.  That

6    would have been service.

7              THE COURT:  Okay.  So what was unreasonable about

8    going to his address several times in trying to locate him and

9    trying to find a business address for him, which there was

10   none, and trying to locate him by asking his attorneys and

11   others, and nobody wants to provide them that information?

12             MR. FELDMAN:  What was unreasonable, your Honor, is

13   they've told you in their application that he was a fugitive a

14   year or two earlier, right?  So they said that he had left

15   Canada.  He had left Canada because he was a fugitive from

16   justice.  That's what they told you in their application.  And

17   then they went to an address in Canada and kept serving him

18   there.

19             Now, to me, that's the definition of making a mockery

20   of what a reasonable effort is.

21             THE COURT:  I'm not sure that I could agree with that.

22   The marshals do that all the time.  You'd be surprised where

23   people show up when they live someplace and they're fugitives,

24   and they come right back to where they live for some reason.

25   So that's not --

E3jesecc

1          MR. FELDMAN:  But clearly, your Honor, he wasn't a

2     fugitive.  He was showing up in Alberta in court every time he

3     had an appearance.

4          THE COURT:  Let me ask you this, then we can move

5     forward from that.  Again, I've just got too many facts in my

6     head.  I want to make sure I'm not mistaken.

7          My understanding was they specifically asked his

8     lawyers where he could be served, and they refused to give them

9     that information.  I don't know if that was you or other

10    lawyers, but am I incorrect in characterizing it that way?

11         MR. FELDMAN:  No, they certainly inquired of the

12    lawyers whether the lawyers would accept service.

13         THE COURT:  I thought it was more than that.  I

14    thought they inquired of the lawyers where he could be served,

15    if the lawyers were not accepting service.  And the lawyers

16    would not provide any information as to his location.

17         MR. FELDMAN:  They may have asked the Canadian lawyer

18    where -- I don't know the answer to that, your Honor.  But to

19    me, that's fine.

20         THE COURT:  That's kind of important, right?  If I

21    say, look, the guy's not home.  We know he's got -- you tell me

22    that they know he's got legal proceedings.  They call up the

23    lawyer and say, "look, we're trying to serve your guy.  You

24    can't run forever.  You know, if he's hiding out, if you won't

25    accept service -- accept service.  If you don't want to accept

E3jesecc

1    service, tell us where he is and we'll give him the piece of

2    paper and we'll move forward."

3            The lawyer says, "take a hike," you know.

4            And they come to the court and they say, "look, Judge

5    we tried to serve the guy.  He's not home.  The lawyers don't

6    want to tell us where he is.  You know, we have no way of

7    knowing whether this guy is in Timbuktu, Canada, China or

8    anyplace.  But we've gone to his last known address, we tried

9    to locate him through the people we know are at least in

10   communication with him.  Nobody wants to give us his

11   information.  We know he will get notice.  Can we do

12   substituted service?"

13           If I'm not incorrect, that's pretty much the scenario

14   that I had.  Would that be accurate?

15           MR. FELDMAN:  I think in part, except for the part

16   where they said, "your Honor, we kept trying to serve him at

17   his home" but they don't point out that they know he doesn't

18   live there.

19           THE COURT:  How do they know he doesn't live there?

20           MR. FELDMAN:  They represented it in the same

21   application that he had left Canada two years previously.

22           THE COURT:  Yeah, but --

23           MR. FELDMAN:  That's how they know he doesn't live

24   there.  They represented it to you.

25           THE COURT:  He didn't sell the house.

E3jesecc

1          MR. FELDMAN:  I don't know if he ever owned the house.

2     They didn't represent he owned it.  It was an address he used

3     two years ago, whatever --

4          THE COURT:  Are you representing that at the time they

5     served it, that was not a legitimate address for him?

6          MR. FELDMAN:  I'm not representing anything about the

7     details of where the house is.

8          THE COURT:  You can't argue it's unreasonable if you

9     can't represent that that wasn't his residence or that wasn't

10    his address.

11         MR. FELDMAN:  I don't think it's a factual question,

12    your Honor.

13         THE COURT:  No, it's a question of reasonableness.

14         MR. FELDMAN:  It's a question of someone telling you

15    "we know he doesn't live here, but we keep serving here and we

16    think that's reasonable."  To me, that's the definition of

17    unreasonable --

18         THE COURT:  Well, where else --

19         MR. FELDMAN:  -- serving the same place you know

20    somebody isn't.  They could say, "your Honor, look, we don't

21    know where he lives.  We've done these investigative steps to

22    try to find where he lives.  We still couldn't find it.  We've

23    done these other steps and, therefore, we think we've made the

24    right application."

25         THE COURT:  Didn't they --

E3jesecc

1              MR. FELDMAN:  That's not what they said.

2              THE COURT:  -- also attempt to serve him through the

3       Hague?

4              MR. FELDMAN:  No.  The service through the Hague was

5       the delivery to the house where they knew he didn't live.  That

6       was the Hague service.

7              THE COURT:  Okay.  So --

8              MR. FELDMAN:  Anyway, that is the argument, your

9       Honor.

10             THE COURT:  And this is not an argument of lack of due

11      process notice.  This is technically an argument that because

12      they couldn't find him, they knew he wasn't to be located at

13      his last known address and the lawyers weren't going to give

14      them any information to find him or accept service on his

15      behalf, it was not a reasonable conclusion to reach that

16      they -- it was an inappropriate conclusion to reach what they

17      did what was reasonable to attempt to locate him.

18             And my final question, again, would be the same

19      question I had before.  And I'm not sure there is an answer to

20      it.  What is it that you say that they could have reasonably

21      done that would have effectuated service?

22             MR. FELDMAN:  We're asking -- we're using reasonable

23      in ten different ways here.  My point, my point is that they

24      made a representation that they had reasonably attempted to

25      effectuate service.  They based that representation on the fact

E3jesecc

1      this they repeatedly went to a house where they knew he didn't

2      live.

3                  THE COURT:  Well, that's not --

4                  MR. FELDMAN:  That he --

5                  THE COURT:  That's not all they did.  They also asked

6      the lawyers --

7                  MR. FELDMAN:  Correct.

8                  THE COURT:  -- would they provide information so that

9      he could be located.  And they asked the lawyers, would the

10     lawyers accept service on his behalf?  And they said no to both

11     those questions.  So that is also further attempt to attempt

12     service.  It's not just, we just went to his last known

13     address.

14                 And you say you want me to make a conclusion that that

15     was not reasonable, but you still don't represent to me in what

16     way it was unreasonable to attempt to serve him at this

17     address.

18                 MR. FELDMAN:  I represent to you that it's

19     unreasonable to serve a person at an address where you believe

20     they don't live.

21                 THE COURT:  No, it's unreasonable to serve a person at

22     an address that he, in fact, doesn't live.  Are you saying that

23     he didn't live there, that that was not his residence; or is

24     that --

25                 MR. FELDMAN:  Your Honor, I don't know the details of

E3jesecc

1    where he lived on any particular day --

2             THE COURT:  But they don't either.

3             MR. FELDMAN:  -- and the date they showed up.  But

4    they represented to you that he had left Canada two years

5    previously.  So do an investigation.  Find out where he lives

6    and serve him there.

7             THE COURT:  What investigation could they have done

8    that would have located him in some other country?  What would

9    be reasonable?  Reasonable means they would have likely been

10   successful.

11            MR. FELDMAN:  Any steps in an investigation, anything,

12   any minimal effort to investigate, I think, is what's required.

13            THE COURT:  Give me an example of the minimal effort.

14   They did the minimal effort.

15            MR. FELDMAN:  They did no investigation.  They called

16   his lawyer, right?  I mean, that's the minimal.  I think the

17   minimal is doing some investigation, trying to locate the

18   person.  There's all kinds of tools we use trying to locate

19   people.

20            THE COURT:  I think what is -- then we can move past

21   this.  I think what is the tough issue for me to hear is that

22   given the fact that he had ongoing litigation and the fact that

23   he was represented in that ongoing litigation, and the fact

24   that the lawyers were not willing to make him available for

25   service or provide any information so that he can be served,

E3jesecc

1     the only logical conclusion is that he preferred not to be

2     served, okay?  So it's kind of -- that argument would be a

3     little bit better piecemeal.

4           But once you say -- you can't say to me, why don't

5     they just hang out at the courthouse, see when he shows up.

6     They went to the lawyers and said, "look, we don't want to have

7     to bother to hang out at the courthouse every day.  We're

8     asking you, where's the guy you want to take the paper?"

9           MR. FELDMAN:  But why can't you find a court date and

10    show up and serve people?  We all do that all the time.  If you

11    know that somebody has to be in court at a certain day, you

12    serve them there.

13          THE COURT:  You can, but it's tough --

14          MR. FELDMAN:  That's not rocket science.

15          THE COURT:  That's true.  But it's tough for me to say

16    that's the only reasonable course of action after you've gone

17    directly to the lawyers who represent him in that court

18    proceeding, asked them where is he and they say "we're not

19    going to tell you."

20          MR. FELDMAN:  It would have been a more reasonable

21    course than going to a house you don't think he lives at and

22    then representing to the court that you made reasonable effort.

23          THE COURT:  All right.  Now, if, in fact, they had

24    reason to believe that he would not return to that location --

25          MR. FELDMAN:  Right.  They represented that he had

E3jesecc

1      left Canada years earlier.  That's what they represent.

2                  THE COURT:  All right.

3                  MR. FELDMAN:  But, your Honor, that was supposed to be

4      the third argument.  So I wanted to focus on one and two.

5                  THE COURT:  We'll put that aside for now.  That's not

6      your strongest argument.

7                  MR. FELDMAN:  That's not the one I want to take up

8      your time on this morning.

9                  THE COURT:  Go ahead.

10                 MR. FELDMAN:  So I wanted to start with the fraud

11     allegations, the 10(b) and 17(a).  And the point is simply that

12     9(b) requires fraud with particularity.  And what we have here,

13     we have vague allegations that fail to detail Ben Kirk's

14     specific activities that group him together with others in ways

15     that just fail to give a notice of the particular illegal acts

16     that he supposedly took part in in his role.

17                 And there's crutches here; rather than saying what Ben

18     Kirk did, they group him -- the Kirks did this; Kirk, Boyle and

19     Hinton did this; they and/or others did this.  And we can go

20     through some great -- all the examples here, if your Honor will

21     allow us to do it, in a little bit.  If you look at paragraphs

22     47 through 67 of the complaint, those are the key paragraphs

23     dealing with Ben Kirk and with the Skymark operation.

24                 THE COURT:  But this isn't a group pleading.  This is

25     something different.  Group pleading would be the defendant

E3jesecc

1   said yes.  To say John and Kirk did X means John did X and Kirk

2   did X.  I mean, sorry, I got it wrong.  Ben did -- yeah.

3          MR. FELDMAN:  Well, I think it turns on what you're

4   saying.  If you simply say -- if you have four defendants and

5   you say "the defendants did X," I'm not sure that that's any

6   different than taking four of ten defendants and saying, Ben,

7   John, Hinton and Boyle did this.  And that's what we have in

8   here.  So I think it is group pleading.

9          THE COURT:  Well, it depends on what the allegation

10  is.  If the allegation is that Ben and John each drafted false

11  documents, or each made certain representations, that's a

12  different pleading.

13         MR. FELDMAN:  Let's look at -- if your Honor would

14  bear with me, we can look at a particular example or two,

15  because I think these are the key allegations and these are the

16  ones that my client should have notice of because this is what

17  he needs to defend in this case.  So, for example, paragraph

18  52.

19         THE COURT:  Okay.

20         MR. FELDMAN:  Ben Kirk and Boyle provided the account

21  managers a script to use when calling investors.

22         THE COURT:  Okay.

23         MR. FELDMAN:  Now, we don't know what the script said.

24  We don't know that anybody used it.  This is supposedly a

25  boiler room, so you're not calling investors.  You're supposed

E3jesecc

1    to be calling potential investors to get their money.  It

2    doesn't say when, if ever, they used the script or didn't use

3    the script.  It's a boiler room touting more than one stock,

4    according to the story.  So you'd expect multiple scripts on

5    different days, at least two one on each of the stocks.

6    Usually the way these work is you have a script that you use

7    the first time, and then you get people and you get them

8    interested, and then you have a second script.  But we don't

9    know what a script has to do with anything in this case.

10          THE COURT:  But isn't the critical allegation here

11   that he was the promoter, and -- I mean -- I'm sorry, that he

12   was the principal of -- Ben Kirk was the principal of Skymark,

13   and the promoter in Skymark, and he had a beneficial interest

14   in the stocks that he was promoting, and he was representing

15   that he didn't have a beneficial interest in the stocks?  Isn't

16   that the essence of the allegation?

17          MR. FELDMAN:  That's the overarching story.  But

18   there's no details of any of that.  So when you say he's

19   promoting, it doesn't say he ever sent out an e-mail to any of

20   the investors.  It doesn't say he spoke on the phone to any of

21   the potential investors.  It doesn't say he told the phone

22   callers what to say on the phone to the potential investors.

23   It doesn't say that he pushed the button to cause somebody else

24   to send the e-mail, cause Skymark to send the e-mail.  It

25   doesn't say -- it just -- yeah, I understand that theme, but I

E3jesecc

1    want to be able to defend it, so I need notice of what he did

2    wrong.

3              So, for example, it says Skymark had a database, and

4    it said Skymark hired employees and Skymark sent out e-mails.

5    Well, did Ben Kirk press the button to make those e-mails go?

6    If he did --

7              THE COURT:  It says the Kirks and Boyle drafted or

8    approved the statements in the Skymark and the ESR stock

9    autonomy.

10             MR. FELDMAN:  That is the best allegation in the whole

11   group, I agree.  But know what?  They put them all together,

12   right?  The Kirks and Boyle.  So you have three people drafted

13   and/or approved multiple misleading statements.  So I'm not

14   sure as to Benjamin Kirk; did he approve, did he draft?  Did

15   Boyle do the drafting or did John Kirk do the drafting?  What

16   did Benjamin Kirk do?  Because I want to defend it.  I want

17   notice of what he did.  And this putting three people together

18   in the key statement and saying that they drafted and/or

19   approved the statements?  If he sent out the e-mails, then have

20   an allegation that says Ben Kirk caused Skymark to send out

21   those e-mails.

22             THE COURT:  And what was the paragraph you were

23   reading earlier?

24             MR. FELDMAN:  We were reading 52 before.

25             THE COURT:  52.  Right.  Ben Kirk and Boyle provided

1    the account managers with script to use in calling investors.

2    At times Skymark account managers called between 100 and 200

3    subscribers per day to tout either Trade Show or Pacific Blue

4    stock.  Ben Kirk and Boyle told Skymark accountants to watch

5    the movie Boiler Room to learn how to promote stocks.  In

6    July 2009 Skymark announced coverage of Trade Show and sent the

7    first of a dozen misleading e-mail blasts to his database of

8    potential investors.

9            Now, even if I were to accept your argument that they

10   could need greater, more specific allegations, this is the

11   scenario that I have.  I got Ben Kirk, who is pretty much --

12   I'll just concentrate on him.  I think one could reasonably

13   infer from these facts that Ben Kirk was a principal in

14   Skymark; that he had a role in its creation and its operation;

15   that he gave directions and drafted documents for the employees

16   who were going to tout the stocks; that the employees were

17   touting the stock that he owned; and that Skymark and pretty

18   much everybody at Skymark knew or had to know that Skymark was

19   holding itself out to be an independent research entity, okay?

20           Now, you know, these facts -- it may be a little vague

21   on Mr. Kirk's knowledge, but I don't think, reading these

22   facts, that one could reasonably conclude that he wasn't aware

23   and wasn't partially responsible for those statements that it

24   was an independent entity.  It would be unreasonable to read

25   this complaint and assume he's the only person that didn't know

E3jesecc

1   that, okay?  And knowing that, he owns the stock that is being

2   touted by Skymark.  And so he clearly -- if anybody knows, he

3   clearly knows that any representation that his employees are

4   told to make on behalf of Skymark that Skymark's people are

5   independent researchers and that's why they're touting this

6   stock and that there's no reason to believe that they have any

7   interest in someone else buying the stock, because they will

8   profit personally from that stock being sold; because when you

9   tout the stock, it will hopefully go up in price.  And so those

10  who already hold the stock, including Mr. Kirk, will be able to

11  sell it based on the increased interest created by Skymark when

12  Skymark is claiming that it's independently assessing this

13  stock and telling everybody how it's such a great deal, okay?

14  Based on those facts, one could reasonably start out with a

15  premise that Mr. Kirk is in an awkward position at best to

16  argue that he was not responsible for any of these statements

17  that were put out by his employees, and there were -- and some

18  of them that they say were drafted or approved by him.  Isn't

19  that the essence of --

20          MR. FELDMAN:  Your Honor, look, if we had had evidence

21  and people testified, and we were now at the close of evidence

22  and I was trying to argue to you that this shouldn't go to the

23  jury because there's no facts and they can't take all these

24  circumstantial inferences and draw them, that's a great

25  argument you just made.

E3jesecc

1          THE COURT:  Yeah, but that would -- that's the easy --

2          MR. FELDMAN:  That's not stating fraud with

3    particularity.

4          THE COURT:  No.  You've got it backwards.  If you were

5    doing that, that would be an easier argument than the argument

6    you're making now, because now you're just telling me I should

7    assume on the basis of these allegations, assuming all of these

8    facts are true, that they are not stating a plausible theory

9    that your client is guilty of any pump and dump scheme.

10         MR. FELDMAN:  Your Honor, this isn't failure to state

11   a claim.  It's failure to plead fraud with particularity.  It's

12   failure to give us notice of the fraud that Ben Kirk did.

13         So, for example, you said, okay, Ben Kirk had the

14   employees do a bunch of stuff.  But when you look here at 51,

15   it says Skymark hired the employees.  If Ben Kirk hired the

16   employees, tell me that.  Then I can determine whether, in

17   fact, he did hire the employees, and I can defend this case.

18         THE COURT:  Under the direct supervision of Ben Kirk

19   and Boyle, Skymark account managers falsely told potential

20   investors that Skymark was completely independent during

21   telephone conversations and via e-mail, falsely portraying

22   their organization as an independent research service.  That's

23   pretty specific.  I was reading paragraph 59.  That's the kind

24   of stuff you're talking about, right?

25         MR. FELDMAN:  Yeah, but that says these guys were the

E3jesecc

1    managers, right?  They were the midlevel supervisors.

2              THE COURT:  Right.

3              MR. FELDMAN:  It doesn't say they directed the account

4    managers to give the false statements.  They supervised them.

5              THE COURT:  You think any reasonable trier of fact, if

6    they were given these facts, couldn't conclude that Mr. Kirk --

7    particularly since he has the stock that's being touted in his

8    back pocket and is ready to sell it when the stock is pumped

9    up, that a reasonable jury couldn't conclude that he was in a

10   position to have had -- to have known that he was going to be

11   the beneficiary of these representations that his employees

12   were making, that he was supervised?  Are we supposed to assume

13   he had no clue what the employees were telling the public?

14             MR. FELDMAN:  I just want an allegation he did have a

15   clue.  I want an allegation --

16             THE COURT:  It says they were under his direct

17   supervision.

18             MR. FELDMAN:  It says he supervised the people and

19   they did the false statements.  He supervised them, yes.  He

20   was their supervisor.  And they made false statements.  Now, if

21   he directed them to do it, say so.  If he gave them the script

22   with the false statements, say so.  They mention a script, but

23   they don't say what the script said.

24             THE COURT:  Well, you know, I'm not even sure that

25   that would be required; because even if he didn't direct them,

E3jesecc

1    if he is their direct supervisor, he is a manager of the

2    Skymark and owner of Skymark.  He knows that his employees are

3    touting the stock that he owns, and he knows that they are

4    saying that Skymark's research is independent of that.  He

5    knows that that is not true.

6            And he knows that the true representation would be

7    that, no, we are not independent.  The people who own us own

8    the stock that we're trying to sell to you and will benefit

9    from that stock.  Does it really matter much whether he's

10   standing over them at the time when they make those

11   misrepresentations?  Because you're not really reasonably

12   arguing that these representations, based on these facts, could

13   possibly have been made without his knowledge.

14           MR. FELDMAN:  Your Honor, if I was drafting this

15   complaint --

16           THE COURT:  You probably would write --

17           MR. FELDMAN:  -- I would have done it right, as it

18   sounds like you would have.  And it sounds like you would have

19   tried to put down by interviewing witnesses who could say, "he

20   told me to do this, that he told me to do it," right?  That's

21   how one builds a case.

22           But to put somebody through a federal court case on

23   allegations of security fraud on vague statements that a group

24   of people drafted an e-mail or that he handed someone a script

25   without saying at all what the script said or that anybody used

E3jesecc

1     it, or that he told people to watch a movie without saying what

2     the purpose of telling them to watch -- you know, so they would

3     know how to promote things?  I mean, yeah, the movie is about

4     exciting people on the phone promoting things.  Does that mean

5     they're told to lie?  Is that the point?

6          If that's the point, say it.  If he was telling people

7     to get on the phone and lie to potential investors, make that

8     allegation so I can defend it.  That's all I'm asking for under

9     9(b).  And it's not in here.  It's pages of ambiguous stuff,

10    groups of people, Boyle, Kirks all did this and/or that.  And

11    that's not the law under 9(b).

12         And I think the SEC could probably get it right,

13    right?  It sounds like from their motion, they rewrote it in

14    the way they described his behavior.  I'm sure they have good

15    faith in the way they put it down in their opposition papers.

16    Go back and get it right.

17         But I have the right to be on notice of the details

18    and not these vague, overarching themes.  And your Honor has

19    picked up on those themes.  And I agree that they are here, but

20    that's not what I should be defending against.

21         THE COURT:  Okay.

22         MR. FELDMAN:  Second, your Honor, the same, the same

23    allegations go to the SEC's fallback position.  The SEC's

24    fallback position is it's alleged Mr. Kirk had ultimate

25    authority over Skymark.  And, again, I don't think that this

E3jesecc

1    complaint makes the allegation that Mr. Kirk had ultimate

2    authority over Skymark.  It doesn't show him actually running

3    the operation, making the policy decisions.  The best it shows

4    is the one you pointed out; that he directly -- it says under

5    his direct supervision account managers did things.  And then

6    it has a conclusion at paragraph 199.  It says he exercised

7    actual power and control through managing its operations,

8    directing its strategy and possessing authority to execute

9    documents.  None of that is the kind of details that would show

10   he has actual ultimate authority over this organization.

11           THE COURT:  I mean, they say he's a stock promoter,

12   principal of Skymark.

13           MR. FELDMAN:  They don't say he's the principal of

14   Skymark.

15           THE COURT:  Yes, it does.  Go to paragraph 21.  It

16   specifically says it.  Says he relied on that.  It's there.

17           MR. FELDMAN:  Okay.  So there they say that.  But when

18   you look at paragraph 198 --

19           THE COURT:  You can't just go past that because that

20   was just your argument.  Your argument is that they didn't put

21   him in a role as the principal of Skymark, so, therefore, it's

22   insufficient.

23           MR. FELDMAN:  I understand.

24           THE COURT:  They did put him in as the role, both as

25   the stockholder and principal of Skymark.  So they put him

E3jesecc

1    right in the suit.

2            MR. FELDMAN:  I appreciate that, your Honor.  But they

3    also say at 198 that his brother is the sole director, right?

4    So I'm not sure how he's the principal when his brother is the

5    sole director.

6            THE COURT:  What's inconsistent with that?  Do you say

7    that you can't have a director and a principal, and they'd be

8    two different people?

9            MR. FELDMAN:  I guess one could mean that, whatever

10   that means.

11           THE COURT:  And then, you know, I would assume Bill

12   Gates is the principal of Microsoft.  I don't know if he's a

13   director.

14           MR. FELDMAN:  Your Honor, again, the point I was

15   making is regardless of them using the word principal, when you

16   look at the facts and the particularities and how they back

17   that up --

18           THE COURT:  You're saying he had --

19           MR. FELDMAN:  They said he supervised somebody.

20           THE COURT:  He has overall supervision of those people

21   who were promoting stock.

22           MR. FELDMAN:  It says -- he supervised account

23   managers with somebody else.  That doesn't mean he's the

24   ultimate authority.

25           THE COURT:  Well, who else is the ultimate authority?

E3jesecc

1                MR. FELDMAN:  I don't know who else, but that's what

2          I'd like them to detail, the ultimate authority.

3                THE COURT:  Ultimate authority to do what?

4                MR. FELDMAN:  To run that organization.

5                THE COURT:  Why does that matter?

6                MR. FELDMAN:  That was their fallback argument.

7                THE COURT:  That's not --

8                MR. FELDMAN:  That's their argument.

9                THE COURT:  Even if he's not the ultimate authority,

10         that's not determinative of whether or not he's involved in the

11         scheme and fraud.

12               MR. FELDMAN:  What they're saying, your Honor, is that

13         he is on notice of bad statements because he was the ultimate

14         authority of Skymark and, therefore, anything that they say

15         Skymark did can be attributed to him.  And I'm saying as a

16         matter of law, they haven't detailed him hiring the employees,

17         firing the employees, signing the lease, controlling the bank

18         account, any of the kinds of things that would actually show

19         that he was the ultimate authority of that institution.

20               THE COURT:  But, I mean, in most complaints that

21         detail isn't in the complaint.  They don't have to -- they

22         don't have to give me that kind of detail.

23               MR. FELDMAN:  If they're using that as their argument

24         as to why their allegations are sufficient, they need those

25         details.

E3jesecc

1           THE COURT:  No.  They say Mr. Kirk is the -- the Kirks

2   and Boyle drafted and/or approved multiple false, misleading

3   statements in Skymark and ESR stock accounting e-mails,

4   including the representations that Skymark and ESR employees

5   and associates were independent and did not hold any position

6   of beneficial interest in the promoted company.  Now, you can

7   attack that as group pleading, but you can't attack that as a

8   lack of specificity.

9           MR. FELDMAN:  I'm sorry, your Honor.  Which paragraph

10  is that?

11          THE COURT:  I'm sorry.  I was looking at 51.

12          MR. FELDMAN:  Sorry.  I'm not keeping up with you.

13          THE COURT:  And then it concludes saying these Skymark

14  employees called account managers, worked under the supervision

15  and control of the Kirks, Boyle and Hinton.  And then you went

16  to give me the script, and then you gave me the Boiler Room

17  movie.  And then -- I mean, remember, this is a scenario I

18  have.  Given the nature of that relationship, whatever the

19  detail of that day-to-day relationship is, then on July 24th of

20  2009, Skymark announced coverage of Trade Show and sent the

21  first of dozens of misleading e-mail blasts to its database of

22  potential investors.

23          Now, I would have to assume at that point, despite all

24  his total involvement, he has blinders on or he doesn't know

25  this was going on.

E3jesecc

1          MR. FELDMAN:  All I want to know is who had Skymark do

2     that.  Say that.

3          THE COURT:  Why is that critical?

4          MR. FELDMAN:  That's fraught with particularity, your

5     Honor.  It is.  The people, the who, what and where of who

6     caused the fraudulent actions take place --

7          THE COURT:  No.  That's not the critical part of what

8     keeps him in the suit.

9          What keeps him in the suit is a reasonable inference

10    that he knows that it's being done.  He doesn't have to be the

11    one that necessarily directed them to do it, because he knows

12    that it's being done and it's being done to benefit him

13    personally.  And he's supervising all of these people.  And if

14    they're doing it, I don't care if his brother told them to do

15    it.  If he's sitting there and they say, "we're getting ready

16    to put this out," and he goes, "no problem," I mean, he doesn't

17    get to do that.

18         MR. FELDMAN:  If they make those allegations, those

19    are great.  We have no allegation in here about who was running

20    the e-mail system, right?  They say he was the manager of the

21    guys on the phone.

22         THE COURT:  So am I supposed to infer from this that

23    he doesn't have a clue or he does have a clue?

24         MR. FELDMAN:  You're supposed to infer that fraud with

25    particularity requires them to tell me what the details are so

E3jesecc

1    my client can have notice of them and respond.

2              THE COURT:  I'm trying to figure out what it is you

3    say -- you say that you don't know what they claim that you say

4    that you need to know in order to defend against the -- to

5    answer this complaint.

6              MR. FELDMAN:  I don't know what they claim Ben Kirk

7    did in particular that was fraudulent.

8              THE COURT:  You know they claim that he helped set up

9    Skymark so that they would have a vehicle to tout stocks, and

10   he participated in the decision to decide to tout the stock

11   that he owned --

12             MR. FELDMAN:  It doesn't say that, your Honor.

13             THE COURT:  It does say that.

14             MR. FELDMAN:  Where does it say he participated in the

15   decision to tout the stock?

16             THE COURT:  It says dozens of e-mails that De Beer was

17   reporting to and taking instructions from the Kirks demonstrate

18   that De Beer and the Kirks engaged in almost daily stream of

19   communications between Trade Show -- regarding Trade Show press

20   releases, potential business announcements and contacts with

21   investors.  For example, John Kirk drafted a press release for

22   De Beer to release on behalf of Trade Show and sent e-mails to

23   De Beer.  And in September and October the Kirks and Boyle

24   wired De Beer over $330,000 from Trade Show.  By at least April

25   of 2009, the Kirks were planning a new promotion of Trade Show

E3jesecc

1    in order to increase the stock price from trading bottom.

2          Now, you want to say, oh, well, that could be John

3    Kirk, not Ben Kirk, I mean, I understand that argument.  But

4    you can't say they didn't allege that Ben Kirk planned a

5    promotion of Trade Show in order to increase the stock price

6    from trading bottom.  That's exactly what they allege.

7          MR. FELDMAN:  But what that means, your Honor --

8          THE COURT:  The details --

9          MR. FELDMAN:  The promotion is, what, they ran

10   infomercials?  What does planning a promotion mean?  I just --

11         THE COURT:  They train -- they helped draft scripts.

12   They approved statements.  And the e-mails, they approved the

13   statement that -- and helped draft the statements indicating

14   that Skymark was independent and did not hold any position of

15   beneficial interest in promoting companies?  That's what

16   paragraph 50 says.

17         MR. FELDMAN:  No paragraph says they drafted scripts.

18   For example, there's no paragraph in there.  It says Ben Kirk

19   provided a script on one occasion.

20         THE COURT:  It says the Kirks and Boyle drafted and/or

21   approved multiple false or misleading statements in Skymark and

22   ESR stock touting e-mails, including the representation that

23   Skymark and ESR employees and associates were independent and

24   did not hold any position of beneficial interest.

25         MR. FELDMAN:  Right.  So we have that one paragraph

E3jesecc

1    that three people drafted and/or approved the e-mails.

2              THE COURT:  Ben Kirk and Boyle provided -- and that's

3    more specific.

4              MR. FELDMAN:  Ben Kirk and Boyle provided a script.

5              THE COURT:  Right.  Provided --

6              MR. FELDMAN:  A script.

7              THE COURT:  -- a script to use when calling investors.

8              MR. FELDMAN:  Right.  What did that script say?  Does

9    it have lies in it?  I'd like to know.  If it did, that would

10   be great, because then I could try to locate that script and

11   try to defend it.

12             THE COURT:  Well --

13             MR. FELDMAN:  That's what fraud with particularity is.

14   That's what 9(b) requires.  That's all I'm asking the SEC to

15   do, is live up to 9(b).

16             THE COURT:  Okay.

17             MR. FELDMAN:  Your Honor, then the last point -- I

18   want to be quick because I've taken up more than enough time --

19   is under 20(a) the SEC has alleged that Mr. Kirk has control

20   person liability.  Your cases, your Honor, require that the

21   plaintiff allege meaningful culpable participation in the

22   control person's acts of frauds.  Meaningful culpable

23   participation.  Then you've gone on to say that allegations are

24   insufficient for 20(a) where they fail to allege any

25   particularized facts indicating that a defendant had actual

E3jesecc

1    control over the statements that were made or otherwise played

2    some discernible role in making those statements.  And apart

3    from 50, right, which is this group pleading, that's the best

4    of Mr. Kirk having control over the statements.

5          THE COURT:  Well, you have to use some other

6    paragraphs to -- take, for example, 59.  That's the nature of

7    that allegation.  It may not be particularly specific as to how

8    and why, but that's the nature of that allegation.  59.

9          MR. FELDMAN:  The nature is that he was a supervisor

10   of people who made false statements.

11         THE COURT:  No, that's not right.  No.  It says, under

12   the direct supervision of Ben Kirk the account managers made

13   false statements.

14         MR. FELDMAN:  Again, they should just tell us what

15   that means.  Does that mean he told them, say this on the

16   phone?  If that's what it is, great, let's hear it.

17         THE COURT:  Well, but they did say it.  They said that

18   he was one of the individuals who drafted and/or approved

19   statements that falsely portrayed the organization as an

20   independent research service.

21         MR. FELDMAN:  Right.  That's what they say.  The Kirks

22   and/or -- the Kirks and Boyle drafted and/or approved multiple

23   false and misleading statements.  That's right.

24         THE COURT:  And the nature of those false and

25   misleading statements included the kind of statements in 59.

E3jesecc

1    There's no other way to read that.

2              MR. FELDMAN:  I don't disagree about independence.

3    I'm not sure how that helps in terms of the SEC having to

4    provide -- he provided -- having to provide -- that they've

5    alleged meaningful culpable participation in the control

6    person's acts --

7              THE COURT:  Well, it helps if it's supposed to mean,

8    and reasonably does mean, that he was structuring this

9    organization and managing these people in such a way and

10   approving and drafting statements in a way so that these

11   individuals under his supervision would mislead the public into

12   thinking that they were touting -- they were an independent

13   research service touting a stock in which none of the

14   principals of the research service had any interest.  And the

15   purpose of that, the reasonable conclusion, is that when they

16   pump up the stock, then Mr. Kirk could sell his and he will get

17   an artificially inflated price above what he paid for it

18   because people would not know that the people are saying this

19   is a good buy at this price.  Other people who are on the other

20   end were going to make the profit when you pay this inflated

21   price for the stock.

22             MR. FELDMAN:  I understand the theme, your Honor.

23   We're on the same page that the SEC has a theme here.  But it's

24   not a particularized fact indicating that Mr. Kirk had actual

25   control over the statements.  What we have here, at best, under

E3jesecc

```
1    50 and 59, for example, the ones you pulled out is Mr. Kirk is

2    a guy who writes PR.  He writes the false e-mails.  That

3    doesn't mean he controlled the organization.

4              THE COURT:  Well, he doesn't have to -- okay.  We're

5    just concentrating on the control.

6              MR. FELDMAN:  I'm concentrating on 20(a).  Under the

7    20(a) liability --

8              THE COURT:  Well, what do you say -- let's separate

9    the illegal activity from the control activity.  What is it

10   that you say his role was here that takes it out of the

11   definition of having control, given the nature of how they

12   describe his involvement from beginning to end and his

13   supervision of all of the employees in this organization?

14             MR. FELDMAN:  I take from reading this complaint that

15   they've alleged with facts -- not with broad conclusory

16   statements, but with facts -- that Mr. Kirk is a midlevel

17   manager who writes PR.

18             THE COURT:  Well, on what basis would you -- what

19   language would make you put him down to the midlevel?

20             MR. FELDMAN:  Because he's a direct supervisor of the

21   guys on the phone.

22             THE COURT:  No.  He's a principal.

23             MR. FELDMAN:  You're going back to that, to the broad

24   allegation in the beginning.  I'm talking about the facts of

25   what it says he did, right?  The particular facts --
```

E3jesecc

1              THE COURT:  I don't know where you get midlevel from.

2              MR. FELDMAN:  I get it from paragraph --

3              THE COURT:  I mean, nobody -- who's on the top level?

4              MR. FELDMAN:  I would think the CEO, right?

5              THE COURT:  Who's that?

6              MR. FELDMAN:  Whoever that is.

7              THE COURT:  What makes you think there's somebody

8       above him?

9              MR. FELDMAN:  I'm guessing, because this is the SEC's

10      complaint, right, Judge?  So I'm looking for particularized

11      facts about where Mr. Kirk figures into this organization.

12             THE COURT:  You characterized him as a midlevel

13      employee.  And there's nothing in this complaint that

14      characterized him as a midlevel employee.  Everything in this

15      complaint is trying to characterize him as a principal and a

16      high-level employee.

17             MR. FELDMAN:  That may be what they're trying to do,

18      Judge, but, again, when you focus on the actual facts and the

19      details of what they said he was doing day in and day out in

20      his job, he is supervising people making phone calls.

21             THE COURT:  He's supervising everybody.

22             MR. FELDMAN:  A phone call.  I don't know if that's

23      everybody.  Apparently there's an e-mail, too.

24             THE COURT:  They say he drafted the e-mails, that he

25      approved the e-mails.

E3jesecc

1              MR. FELDMAN:  They don't say he sent them out.  We

2    don't know who sent them out.

3              THE COURT:  The secretary may have sent them out.

4              MR. FELDMAN:  Maybe.  Did he supervise the secretary?

5    When you're saying he supervised everybody, those facts aren't

6    in here.

7              THE COURT:  There's no facts that limit his control or

8    position in this company.

9              MR. FELDMAN:  There's no facts that say he, in the day

10   in and day out, exercised the ultimate authority; that he

11   signed the lease; that he paid the paychecks; that he did the

12   kind of things that would be the control person liability under

13   20(a).  That is my point.  And the SEC perhaps can allege

14   those.  If they do a do-over, and I think they should, then

15   that's the kind of notice we're required to get.

16             THE COURT:  All right.  So what do you think that

17   they're trying to say what his role was?

18             MR. FELDMAN:  I know what they're trying to say,

19   Judge.  You know what they're trying to say.  They just haven't

20   said it.  And their responsibility in filing a complaint is to

21   say it.  It's not to try to say it.  And I just want them to

22   say it.

23             THE COURT:  And I assume you would want them to say

24   something like John Kirk is the sole director of Skymark, and

25   Ben Kirk and Boyle ran its day-to-day operations?

E3jesecc

1           MR. FELDMAN:  I'd like them to say better than that.

2           THE COURT:  That's what they said.

3           MR. FELDMAN:  I'd like them to say, what does that

4    mean when you get to the particularized facts?

5           THE COURT:  You can't do that.  That, you can't do.

6    You can't -- you know, as they say, I always tell the lawyers

7    you can't make the argument on this kind of motion that, yeah,

8    they said he did it but they don't tell us exactly how.

9    Because then you keep moving the mark.  If they say he ran the

10   day-to-day operations, you can't just say, "well, they don't

11   say how."  And then they said, "well, we say how because he was

12   their direct supervisor."

13          Ah, but they didn't say how he supervised.

14          Oh, well, he supervised because he did --

15          Well, they didn't say how.

16          I mean, you could take that argument any way.  He ran

17   the day-to-day operations.  Now, that is a -- you think that

18   that's an insufficient allegation to put him on a level that is

19   other than, as you would call, a midlevel manager?

20          MR. FELDMAN:  Your Honor, I think that if that

21   allegation standing alone is enough to put somebody on the hook

22   for 20(a) liability --

23          THE COURT:  That's not the only allegation.

24          MR. FELDMAN:  Right, but that's the one allegation of

25   what his role was, that --

E3jesecc

1            THE COURT:  No.  That's not the one allegation.  I

2    added that to the other allegations that you say alone were

3    insufficient.

4            MR. FELDMAN:  So you have day-to-day operations with

5    another guy.  You have another statement where he directly

6    supervised his account managers.

7            THE COURT:  You have another statement that says he's

8    a principal.  You have another statement that says he drafts

9    and/or approves the false -- the e-mails.  You have another

10   statement that said he drafted the scripts.

11           MR. FELDMAN:  No, a script.  No, you don't have that.

12           THE COURT:  I take that back.  Drafted a script.

13           MR. FELDMAN:  Not even drafted; provided a script.

14   Not even drafted.  Your Honor, the conclusion of all this is

15   those -- you've taken vague statements:  He ran day-to-day

16   operations; he was a principal.  You've taken then specific

17   statements:  He manages the phone callers and he, with a group

18   of others, wrote some e-mails that were false.  That's not,

19   taken together, the allegation that makes a legal standard of

20   particularized facts that he had actual control over the

21   statements that were made or, you know, actual control over

22   this entity.

23           THE COURT:  Well, I mean, other than having day-to-day

24   control of the day-to-day operations and supervising the people

25   who are making the false statement and providing them a script

E3jesecc

1    and --

2              MR. FELDMAN:  Which we don't know what it said.

3              THE COURT:  Right.  I'm not even using that as any

4    evidence of wrongdoing.  I'm just using that as evidence of

5    control.  If he provides them a script, I assume the person who

6    provides them the script is -- unless they say he was told to

7    do that by somebody else, in combination with what they say his

8    day-to-day operations were in the supervision, that he has the

9    authority to do that.

10             MR. FELDMAN:  Again, the person who provides the

11   script is probably the guy who manages that group of people.

12   That doesn't mean he --

13             THE COURT:  No.  It's not probably that, because you

14   want me to assume there's supposed to be some other layer of

15   operation here that they don't say that --

16             MR. FELDMAN:  I have no idea how many layers there

17   are.

18             THE COURT:  Right.  You only have the layers that they

19   give you in this complaint, and they only give you one layer.

20   They say he's the guy responsible for the day-to-day

21   operations.  His brother is the guy who -- he and his brother

22   own the company, and that they -- he's responsible for the

23   day-to-day operations.  And it's reasonable to conclude that

24   these statements that they are putting out, he knows that those

25   statements are false because he knows what his beneficial

E3jesecc

1    interest in the company is, and he knows that he will benefit

2    from the touting of this stock; and benefit more significantly

3    from not letting the purchaser know that he, the principal of

4    Skymark, the person responsible for its day-to-day operation,

5    the person who's supervising all these people who are giving

6    you this information, is the one who's going to make the

7    profit.  That's a serious allegation, you understand?  It's an

8    allegation of a pump and dump scheme.

9             MR. FELDMAN:  I certainly understand the overarching

10   theme, and you've done a good job of explaining it again.  But

11   I don't think, as I've argued, that those are the kind of

12   particularized details that are required under the legal

13   standard.  And I think that by -- for example, you said he and

14   his brother ran these operations.  But when you look back at

15   paragraph 47, it's four people who set up the boiler room.

16   It's the Kirks and Boyle and Hinton, right?  So these

17   allegations are always grouping everybody together and not

18   giving the actual detail that it would be nice to have

19   separated out the way your Honor did it.  But that's not what

20   the SEC did here.

21            THE COURT:  But I have to take certain inferences from

22   the facts.  And I can make a reasonable inference that it's a

23   coincidence that John Kirk is the sole director of Skymark, and

24   his brother Ben Kirk and Boyle ran its day-to-day operations.

25   And Ben Kirk supervised the people who they claim were making

E3jesecc

1   the false statements and approved and/or drafted those

2   statements.

3            MR. FELDMAN:  I'm not suggesting whether you should

4   draw or not draw inferences on things, right?  What we come

5   down to here is whether they've pled the requisite

6   particularity to meet the --

7            THE COURT:  But it also includes the reasonable

8   inferences that's supposed to be drawn from the facts as they

9   allege them.  And you're sort of arguing that, well, I know

10  what they mean.  I just want them to say it a little bit more

11  specifically, even though I know exactly what they're accusing

12  us of, and we could either deny it or admit it.

13           MR. FELDMAN:  You know how a boiler room worked and I

14  do.  So I certainly know what they think goes on here.  But

15  what they think goes on in the boiler room and what you and I

16  think goes on in the boiler room and what goes on like we see

17  in the movie Boiler Room that they mention here --

18           THE COURT:  I never saw the movie.

19           MR. FELDMAN:  -- doesn't tell us the kinds of facts

20  that put an individual on notice to defend the kind of fraud

21  that's alleged here.  And that's what we're asking him to meet

22  up with.

23           THE COURT:  Thank you.

24           MR. FELDMAN:  Thank you.

25           THE COURT:  Yes.  Let's begin.  I'm having the marshal

E3jesecc

1  bring up a prisoner.  We're in between a plea, but I didn't

2  want to waste time.  So let's talk about Mr. Hinton.

3          MR. SALLAH:  Thank you, your Honor.

4          My name is Jim Salah.  I represent, and my firm

5  represents Mr. Hinton in this matter.

6          Your Honor, I've read through the transcript from the

7  last session and all sorts of talk about Mr. Boyle and the

8  Kirks and others.  Mr. Hinton's name, other than in

9  introductions and so forth, was mentioned less than a half

10  dozen times.  And if you review the complaint, 50-page

11  complaint, the SEC spent years investigating the matter.

12  There's 171 factual allegations excluding the counts, which,

13  total them up, it's almost 250.

14          There's approximately a dozen paragraphs where

15  Mr. Hinton is mentioned.  Some of the paragraphs, your Honor,

16  refer to him in passing reference or as part of a group.

17  Others are innocuous.  There's not a single misrepresentation

18  attributed to Mr. Hinton.  In fact, there's no allegations that

19  he reviewed, drafted or approved any public filing or had any

20  editorial control over it.  There's no allegations that he

21  drafted, reviewed any scripts or press releases or anything

22  else.  In fact, there is not even a suggestion in here that he

23  is aware that any of the information that was put out to

24  investors or the public or potential investors was false or

25  misleading.  In fact, going back and forth with Mr. Feldman a

E3jesecc

1   minute ago about paragraph 59, he's not even alleged to have

2   supervised any individuals.

3            So Mr. Hinton finds himself here accused of fraud

4   based on some scant paragraphs in a complaint that fall far

5   short of 9(b).

6            I typically practice down in Florida.  I don't

7   practice here.  I'm a guest here in the courtroom.  But there's

8   a great quote that we use, and it's from the Southern District,

9   and it talks about when considering 9(b) -- because 9(b) is not

10  so much for the Court; it's for the defendant to be able to

11  identify and be able to kind of craft arguments in an answer

12  based on allegations.  And it says, broad allegations that

13  several defendants participated in a scheme or conclusory

14  assertions that one defendant controlled another or that some

15  defendants are guilty of their association with others do not

16  inform each defendant of its role in the fraud and do not

17  satisfy Rule 9B.  This type of clumping of defendants together

18  and vague allegations of fraud is the very type of inadequate

19  pleading that Rule 9B seeks to prevent.

20           So we don't have any misrepresentations attributed to

21  Mr. Hinton.  So the best we can do, I guess, is craft, or at

22  least the commission can craft, is a scalping case against him.

23  And it says under scalping, it basically says, your Honor, if

24  somebody's recommending a security, they need to disclose that

25  they have an interest in that security.  And they're selling

E3jesecc

1    it.

2              Now, things change a little bit after the Supreme

3    Court case in *Chiarella*, because in *Chiarella* the Court said

4    only those who have a duty, a duty in an omissions case, have

5    to speak, have to disclose their interests.  So if I walk into

6    a New York subway and I start telling people to buy IBM stock,

7    even if I'm getting paid to do it, I don't need to disclose

8    that if I'm -- or if I've got stock and I'm selling it, unless

9    I owe a duty to someone who's listening to me, my audience.

10             Now, if you look at the complaint against Mr. Hinton,

11   there's a couple statements that are made.  It says, with

12   respect to Skymark, it says -- I'm sorry.  It says Mr. Hinton

13   promoted Trade Show to multiple -- this is paragraph 61 -- to

14   multiple investors and made calls to investors to promote the

15   stock while working with Skymark and ESR.  He misled those

16   investors by failing to disclose his ownership in the promoted

17   companies and lack of independence.  What is his obligation to

18   do so?  What duty does he owe?

19             This is in the *Park Financial* case.  They cite in

20   their response *SEC v. Park Financial*.  That was a case referred

21   to as the Tokyo Joe case out of Chicago.  And in that case the

22   commission in its complaint took pains to create a duty, a

23   duty.  They talked about that people paid a subscriber's fee to

24   Tokyo Joe's website, that he would give them personalized

25   advice in chat rooms, and they went on and on about all the

E3jesecc

1    personal service that he provided.  This is nothing more than

2    an arm's length transaction.  We don't even know who these

3    investors are.  Do they have some prior relationship with

4    Mr. Hinton?  Did he talk to him on other occasions, or is this

5    just an individual trying to promote a stock to somebody else?

6    Where is the duty that he owes to that individual?

7           Now, they also said in the *Zweig* case -- *Zweig*

8    predated *Chiarella.*  Zweig was someone who was an author of

9    newspaper articles.  And in *Zweig*, the newspaper, the analyst

10   that would provide analysis in his newspaper articles was sued.

11   And this was in the Ninth Circuit case.  And the court in that

12   case said, well, you do have a duty.  If you decide to speak

13   and you're selling a stock, you kind of take on the duty to

14   disclose your interest in the stock and what you're doing with

15   it, particularly if you're selling it.

16          However, that case was subsequently questioned by

17   *Feldman*, which was another Ninth Circuit case which postdated

18   *Chiarella*.  And it says -- and it limited *Zweig*.  And it said,

19   when there's a financial advisor, when one is giving advice --

20   which was what *Zweig* did; he was an analyst that wrote for a

21   newspaper.  And, again, even in that case the Court found the

22   columnist had a duty to his readers because he was a, quote,

23   informal advisor, controlling -- kept secret the information he

24   owned the stock.  He was a salary columnist and he benefited

25   from his relationship.  The column initiated many stock

E3jesecc

1    transactions and so forth.  He had a relationship.

2           Here, no relationship is alleged.  And I'm not sure if

3    the SEC can allege relationship.  And that goes for emotion and

4    is based on 12(b).  The promotion of Trade Show and the duty

5    there is even more bizarre and more attenuated.  Hinton

6    promoted Trade Show to multiple investors and made calls to

7    investors to promote the stock while working with Skymark and

8    ESR.  He misled these investors -- I'm sorry, Pacific Blue.  I

9    apologize.

10           Mr. Hinton offered to sell a block of Pacific Blue to

11   an investor in the US in a private transaction.  While offering

12   this block, he failed to disclose he and other defendants were

13   allegedly dumping their shares into the increased demand

14   created by the promotion.  Well, obviously, if he's offering to

15   sell stock to somebody, he's selling the stock.  Now, if he's

16   selling somebody else's block, they don't say that.  But

17   moreover, even -- and, again, there's no allegations that he

18   sold.  There's allegations that others sold on his behalf.

19   That's another thing, your Honor, to further kind of put things

20   in context.

21           If you read the complaint as drafted, there were

22   21,000 shares, or $21,000 of the $11 million worth of stock

23   that they say that Hinton and the Boyles and -- or Boyle and

24   the Kirks sold.  Less than one-third of 1 percent apparently

25   was owned by Mr. Hinton.  They sold $21,000 worth of Trade Show

E3jesecc

stock and $12,000 worth of Pac Blue.  I would venture to say

that our last hearing, the billable hours by the attorneys in

this courtroom would probably equal the amount apparently from

this huge pump and dump.

          Moreover, it doesn't even say he sold the stock --

scalping, you have to have selling -- or that he was aware of

the selling.  It says, and if I can get to it, Mr. Hinton

realized proceeds of more than $21,000 and received at least

$31,000 in proceeds from the sales of Ben Kirk controlled

accounts.

          THE COURT:  I'm sorry.  Where are you reading from?

          MR. SALLAH:  I'm sorry.  That's in paragraph 160.

          So I'm here for Mr. Hinton trying to figure out what

exactly it is that he did to defraud anybody.  I don't see any

misrepresentations attributed to him.  I don't see where he had

any editorial control or directed anybody.  I don't even see

that he was aware of any misrepresentations.

          And moreover, your Honor, with regard to the scalping

claim, I don't even think it satisfies 12(b) -- I don't think

it survives the motion to dismiss on a 12(b) standard because

they never pled existence of a duty.  I don't know what facts

would give rise to a duty that Mr. Hinton was acting as a

financial advisor, because that's what scalping kind of grew

out of, the scalping cases were investment advisers, capital

gains research and some of the older cases, where there was a

E3jesecc

fiduciary duty established between the person giving the

investment advice and the audience, and undisclosed to those

individuals that the investment advisor was selling a stock.

And we've seen it grow a little bit in the Tokyo Joe case,

where they said, well, you can be an informal advisor.  But in

those cases the SEC has gone at lengths to plead kind of what

gives rise to that fiduciary relationship; because absent a

fiduciary or other relationship, other special relationship,

there's no duty to speak of.

          Now, turning to the 20(a) claim, your Honor, not

really sure exactly what Mr. Hinton -- I know they do -- there

is an allegation that he set up boiler rooms, whatever that

means.  I don't know if that means set them up from the ground

and that he was involved in the day-to-day operations.  There's

got to be something more than participation.  There's got to be

culpable participation, as your Honor, I think, pointed out.

What was culpable about his participation if he's not aware?

There's no allegations he's aware that there's any wrongdoing

afoot or that someone's done anything inappropriate regarding

scripts or sitting down or forcing brokers to watch --

salespeople to watch Boiler Room.  He's not alleged to have

been involved in any of that conduct.

          So, again, with respect to the 20(a) claim, your

Honor, we're also at a loss as to what is culpable

participation, absent just this fleeing mention of the fact he

E3jesecc

1    was involved in the day-to-day operations, and at one point he

2    identified himself as a director.  But that point, your Honor,

3    if you'll notice in the complaint, postdated the Skymark

4    promotion.  Wasn't until 2010.

5            And he was never a legal director.  There's no

6    allegations of that.  And we don't know to whom he said he was

7    a director.  Was it to somebody in a bar, to impress somebody

8    he was talking to?  I don't even know what that means, that he

9    said he was a director.  And being a director in and of

10   itself -- and there's some cases we cited in the Second

11   Circuit -- isn't enough to rise to the level of a culpable

12   participant.

13           Moreover, they haven't alleged that he's owned more

14   than 10 percent of the stock, which clearly he didn't make that

15   much, so there's no assertions there.  But by virtue of his

16   ownership, he was some kind of a control person.

17           So thank you, your Honor.  I'm open to any questions.

18           THE COURT:  No.  I want to inquire first of the SEC.

19           MR. SALLAH:  Okay.

20           THE COURT:  Let me take a short break.  I need about

21   10, 15 minutes, and bring out the prisoners.  If you could

22   just, particularly the back table, clear out the back table so

23   the marshals can get there.

24           MR. BRODY:  Can we leave some of the stuff here, your

25   Honor?

E3jesecc

1          THE COURT:  Front table, you can.  Just clear half of

2    the back table.

3          (Recess)

4          THE COURT:  Yes.

5          MR. BRODY:  Good afternoon, your Honor.  My name is

6    Todd Brody.  I represent the SEC in this matter.  And with me

7    today also representing the SEC are Katherine Bromberg and

8    Joshua Newville.

9          It's a little difficult for us to address all of

10   the -- there's a lot of arguments that the defendants made,

11   your Honor.  So in attempt to address these efficiently, I'm

12   going to address the fraud claims that we have brought against

13   the defendants in this case, and that would include the aiding

14   and abetting and control person liability claims.  Ms. Bromberg

15   will then address the Section 5 claims.  And then when she is

16   finished, Mr. Newville will address the jurisdiction, venue and

17   process issues, to the extent that your Honor wants argument on

18   those issues from the SEC.

19         As a preliminary note, your Honor, the SEC believes

20   that the allegations in the complaint are sufficient against

21   all defendants on all counts.  However, if the Court disagrees

22   in whole or part, we respectfully request leave to amend,

23   because we do not believe there are any inherently failed

24   defects in the claims that the SEC has brought.

25         THE COURT:  Let me organize you in a little different

E3jesecc

1    manner, because I want to first take it defendant by defendant.

2    And I'd like to first start with where I have my greatest

3    concern.  And I don't know if that's what you intended to

4    address personally, but let's first talk about Dr. Carillo.

5           Obviously your complaint is -- I'll characterize it as

6    artfully drafted around Dr. Carillo.  Tell me, first of all,

7    what's your jurisdiction, and then tell me what you say he did.

8           MR. BRODY:  If I may, your Honor.  I'm going to hand

9    this over to Mr. Newville, who's going to address Dr. Carillo

10   and the jurisdictional issues.

11          MR. NEWVILLE:  Thank you, your Honor.  Josh Newville

12   with the SEC.

13          As to Dr. Carillo, his counsel asserts that we've

14   failed to allege that he either purchased or sold shares.  We

15   believe that assertion is incorrect.  And the Court asked, when

16   we were here last, whether there's any allegation that

17   Dr. Carillo took any active role in the acts alleged.  Let me

18   just go through, because these issues are kind of combined.

19   And we're charging Dr. Carillo with a Section 5 violation,

20   which has a slightly more limited pleading requirement than the

21   fraud charges.

22          THE COURT:  Well, before you get to the substance of

23   the charge, what's your jurisdictional --

24          MR. NEWVILLE:  He's subject to personal jurisdiction

25   because he took acts that had a foreseeable and direct

E3jesecc

1     consequence in the US.

2                THE COURT:  What acts are those?

3                MR. NEWVILLE:  Let me just go through in the

4     complaint.

5                Paragraph 79, Dr. Luis Carillo contributed $20,000 of

6     the purchase price for the Pacific Blue shell that was an act

7     through the Carillo Hotel Trust account, through a US law firm

8     and a US bank account.

9                THE COURT:  I'm sorry.  Say that again, because that's

10    not in the complaint.  Where were you just --

11               MR. NEWVILLE:  Paragraph 79.

12               THE COURT:  You say -- it says Dr. Carillo contributed

13    $20,000.

14               MR. NEWVILLE:  Right.

15               THE COURT:  It says John Kirk contributed $200,000 of

16    the purchase price for the Pacific Blue shell, and Dr. Carillo

17    contributed $20,000.  I don't know what that means.  You were

18    giving me some more, but the rest of what you're giving me is

19    not in this complaint.

20               So tell me, what's the basis of the jurisdiction -- in

21    what way did he contribute $20,000 that gives jurisdiction over

22    him?  He's a Mexican citizen?

23               MR. NEWVILLE:  He wrote a check.

24               THE COURT:  I'm assuming you're proceeding on the

25    presumption he's a Mexican resident, and you're not alleging

E3jesecc

1    that he came to the United States and participated in any of

2    the other activity that you're alleging, not alleging.

3              MR. NEWVILLE:  We're not alleging his location at any

4    point in time.  We think it's irrelevant to the claims that

5    we've alleged, which are simply based on the effects that those

6    acts had in the US.

7              THE COURT:  So you're not alleging that he came to the

8    United States and took any acts over which his presence in the

9    United States would give you jurisdictional?

10             MR. NEWVILLE:  We're not sure where he was located at

11   the time he took these acts.

12             THE COURT:  Okay.  Well, the answer to my question,

13   then, is no?

14             MR. NEWVILLE:  Right.  We have not alleged that in the

15   complaint.

16             THE COURT:  Okay.  So you're alleging that he did what

17   act?  What is the act that you say gives you jurisdiction?

18   When you call the act that he contributed $20,000, what does

19   that mean?

20             MR. NEWVILLE:  Right.  He contributed $20,000 to

21   purchase shares in a US company.

22             THE COURT:  So what did he do?

23             MR. NEWVILLE:  He paid $20,000 in shares.

24             THE COURT:  To whom, where, what?  I mean, tell me

25   what that means.  When he could have contributed -- he could

E3jesecc

1    have given $20,000 in an envelope to his son when he was in

2    Mexico City.  You're saying that that would give you

3    jurisdiction?

4              MR. NEWVILLE:  No.  I'm not addressing that.

5              THE COURT:  Tell me what he did.  Tell me what he did.

6              MR. NEWVILLE:  He wrote a check from a US bank account

7    to another US bank account.

8              THE COURT:  Okay.  That's --

9              MR. NEWVILLE:  That was his son's law firm's trust

10   account.

11             THE COURT:  He wrote a check because -- again, this is

12   not in the complaint, so that's why I'm asking.  He wrote a

13   check on a US bank account?

14             MR. NEWVILLE:  That's right.

15             THE COURT:  And that check --

16             MR. NEWVILLE:  That check was written to the Carillo

17   Huettel law firm.

18             THE COURT:  To the law firm.  All right.

19             And what is it about that -- you would not say just in

20   the abstract that that would be sufficient presence or

21   transaction of any business that would be a basis to assert

22   jurisdiction over because he wrote a check on a US bank; that's

23   not the basis on which you're --

24             MR. NEWVILLE:  No.  We're asserting the basis is that

25   the check was for the purchase of shares in a US company.  And

E3jesecc

1    through that purchase, he became an owner, a partial owner of a

2    US company.

3             THE COURT:  Okay.  So why does that give you

4    jurisdiction?  You have jurisdiction over everybody who buys a

5    share of a US company?

6             MR. NEWVILLE:  No, but in the context of this case,

7    there are additional allegations as to Dr. Carillo.

8             THE COURT:  Okay.  I'm just trying to understand your

9    legal theory first.  What's the legal theory that his writing a

10   check on his US bank account to purchase some shares in -- and

11   that was to purchase shares in Pacific Blue?

12            MR. NEWVILLE:  Right.

13            THE COURT:  To purchase shares in Pacific Blue.  What

14   about that act gives you jurisdiction over him if he's in

15   Mexico?

16            MR. NEWVILLE:  Because as an investor in a US company,

17   one would expect that you have an interest in a company that's

18   acting in the US.  And we haven't only alleged that he

19   purchased shares; we also allege that he sold shares in that

20   company.

21            THE COURT:  Well, if you want to go there, I'm not

22   finished with the purchase.  But in what way do you allege he

23   sold shares?  Because that's not the way I read the complaint.

24   I read the complaint that he gave his son power of attorney

25   over his shares and the son sold the shares.  That's what I

E3jesecc

1    would read from the way you wrote it.  You clearly deliberately

2    avoided saying that he personally sold the shares.  You wrote

3    it.  Because if you wanted to say that, you could have clearly

4    stated it.  It's clearly that you knew you couldn't say that.

5    You know, you're not alleging that he personally sold the

6    shares or even that he directed that the shares be sold.

7    You're not alleging that, right?

8              MR. NEWVILLE:  No, your Honor.  We were informed that

9    both Carillo, the son, and Dr. Carillo provided instructions to

10   the account, but we could not pinpoint who made the instruction

11   to sell these shares.

12             THE COURT:  But you're not relying on that; his active

13   participation in selling the shares or active decision to sell

14   the shares, you're not relying on that either for your purpose

15   of jurisdiction over him or for the purpose of alleging that he

16   participated in a scheme?

17             MR. NEWVILLE:  Well, we don't allege that he

18   participated in the scheme.  The Section 5 claims are fairly

19   limited.  Really all we need to do for those types of claims is

20   allege that he sold shares, and we have in a couple of

21   paragraphs.

22             THE COURT:  Well, you've got to allege more than he

23   sells shares.  Everybody sells shares.  So that's not a

24   Section 5 violation, just selling shares.  So what are you

25   accusing him of doing?  That's what I'm trying to understand.

E3jesecc

1          MR. NEWVILLE:  Right.  He sold shares that were not

2    registered.

3          THE COURT:  Okay.

4          MR. NEWVILLE:  We've also alleged that it was in

5    the -- through the means of interstate commerce.  Those are the

6    prima facie elements that we need to plead in order to move

7    forward on a Section 5 claim.

8          THE COURT:  You don't say he sold shares.

9          MR. NEWVILLE:  If I could, your Honor.

10         THE COURT:  Show me the paragraph, because I looked

11   for that specifically.  And the paragraph that comes closest to

12   that seems to deliberately avoid saying that he sold the

13   shares.  So point me to the paragraph that you're relying on

14   that says he sold shares.

15         MR. NEWVILLE:  Paragraph 148 of the complaint, your

16   Honor.

17         THE COURT:  Okay.  148 says the Kirks, Boyle and

18   Hinton and Dr. Carillo sold means of Pacific Blue share within

19   a one-year period.  You're saying Dr. Carillo sold means of

20   Pacific Blue shares?

21         MR. NEWVILLE:  In fact, he sold over a million Pacific

22   Blue shares.

23         THE COURT:  Well, you don't mean to say millions.

24   That's not what you mean by him.  Because it says the Kirks,

25   Boyle, Hinton and Dr. Carillo.

E3jesecc

1          Now, what is the factual basis for saying he sold the

2     shares?

3          MR. NEWVILLE:  The shares were in his name.

4          THE COURT:  Okay.  I understand that.

5          MR. NEWVILLE:  They were sold through his brokerage

6     account.

7          THE COURT:  I understand that.

8          MR. NEWVILLE:  The funds went from that brokerage

9     account to his bank account.

10          THE COURT:  Some of the funds.

11          MR. NEWVILLE:  We believe the majority of the funds

12     went to his bank account in Mexico.

13          THE COURT:  I thought the majority of the funds were

14     distributed through -- some through the trust fund for the firm

15     and were distributed to the other principals you allege in this

16     scheme.  How much money do you say went to him personally in

17     Mexico?

18          MR. NEWVILLE:  I believe it was over 900,000 that went

19     to him in Mexico.  We don't allege that in the complaint.

20          THE COURT:  Right.  That's what I'm trying to

21     understand, what you're saying he did.  Are you saying he made

22     the decision to sell these shares?

23          MR. NEWVILLE:  We don't know which of them made the

24     decision to sell these shares.  But we know that he gave

25     trading authority over the account to his son, who is a US

E3jesecc

1   citizen and US resident.

2           THE COURT:  And you think that that's a basis for

3   asserting jurisdiction over him, because he gave trading

4   control to the son?

5           MR. NEWVILLE:  I believe in the context of his other

6   actions that he took that had direct and foreseeable effects in

7   the US, yes, it does.

8           THE COURT:  What are the other actions he took?

9   Again, I'm asking these questions out of ignorance.  It's not

10  in the complaint.  What are the other actions you say he took?

11  Because this is what I get from the complaint, and you can tell

12  me -- I want to make a big distinction between what you think

13  happened and what you say happened.  What you say happened is

14  that the son created an account for him, no?

15          MR. NEWVILLE:  No, your Honor.  We don't say the son

16  created the account.  We say it was his account, and at some

17  point Dr. Carillo gave trading authority and power of attorney

18  over that account.  He didn't relinquish control over the

19  account.

20          THE COURT:  Okay.  So you say that this was already an

21  existing account that he set up to trade in US shares?

22          MR. NEWVILLE:  We don't allege anything about when the

23  account was set up.

24          THE COURT:  Well, by whom?  I'm not asking about when.

25  By whom?  See, again --

E3jesecc

1              MR. NEWVILLE:  The account was set up by Dr. Carillo.

2              THE COURT:  It was set up by Dr. Carillo?

3              MR. NEWVILLE:  That's correct.

4              THE COURT:  And what does that mean?

5              MR. NEWVILLE:  That means he signed the account

6     opening documents to open the account.

7              THE COURT:  Okay.  He signed the account opening

8     documents for what kind of account?

9              MR. NEWVILLE:  The trading -- it was a securities

10    trading account.

11             THE COURT:  Okay.

12             MR. NEWVILLE:  And the way it was used in this

13    instance was simply to dump over a million shares of Pacific

14    Blue stock for proceeds of over $1 million.

15             THE COURT:  Well, again, they're right when they argue

16    that that's a fairly sweeping statement.  I want to know

17    what -- I'm trying to figure out both the jurisdictional

18    purposes.  You say you have jurisdiction over him because he

19    had a US account in the United States.  He bought shares in

20    Pacific Blue.  Those shares were sold and moneys were sent to

21    him as a result of selling those shares and moneys were sent

22    elsewhere.

23             And you say that -- again, just give me the legal

24    theory.  The reason why you have jurisdiction over him is

25    because he did what?

E3jesecc

1          MR. NEWVILLE:  I think the sales of the shares in and

2     of themselves are enough to provide jurisdiction.

3          THE COURT:  The sale because why?  What's the legal

4     theory that selling shares gives jurisdiction over --

5          MR. NEWVILLE:  The insider trading cases that we've

6     cited in our briefs are instructive on this point, because in

7     those cases, the US effects were attenuated.  The sale or

8     purchase of shares in the insider trading case only indirectly

9     affects US investors.

10          For example, in the *Unifund* case, the defendant

11     traded, on behalf of inside information, options of a company

12     that was listed on the US stock exchange.  Now, that activity

13     created a near certainty that somewhere on the other side of

14     those trades would be a US investor.  Similarly, in --

15          THE COURT:  So your jurisdiction is dependent upon not

16     the sale itself, but his being involved in a sale which would

17     have consequences, illegal consequences, for other investors?

18          MR. NEWVILLE:  That's right, your Honor.

19          There's two different bases for personal jurisdiction.

20     One is the investment in US company through US law firm under a

21     US purchase agreement.  And the second one is the sale of those

22     shares, which would undoubtedly have effect somewhere along the

23     line on US investors.  For example, one of the cases that was

24     cited by Dr. Carrillo's counsel is the *SEC v. Alexander* case.

25     There, the Court exercised jurisdiction over a foreign

1    defendant who traded in a foreign account, US shares, and only

2    dismissed the defendant where that person really didn't do

3    anything whatsoever connected with the US or with the trading.

4            THE COURT:  Well, that's what I'm trying to ask you.

5    What's the difference between that and Dr. Carrillo?  What did

6    Dr. Carrillo do that had a relationship with the US?

7            MR. NEWVILLE:  Right.  And I think counsel for

8    Dr. Carrillo has kind of gotten hung up on the fact that

9    Dr. Carrillo granted his son trading authority over his

10   account.  We're not saying that he relinquished authority.  The

11   most --

12           THE COURT:  But what is the evidence that you have

13   that Dr. Carrillo is involved in this scheme?  That's what I'm

14   basically trying to understand.  I got a guy who buys some

15   stock in a company that his son is involved in.  He sends him

16   $10,000.  Sends his son a power of attorney.  The son buys the

17   stock, in his account.  The son at a particular time, when

18   he's -- as you would argue, when he's benefiting from his own

19   scheme, decides to sell the stock, and he sends Dr. Carrillo

20   his money back to Mexico.

21           What is it that Dr. Carrillo did to be part of this

22   scheme?

23           MR. NEWVILLE:  In the complaint we allege that he sold

24   the shares.  And those shares were sold without the benefit of

25   a registration statement, which serves to protect US investors,

E3jesecc

1    and especially those investors who bore the end of that stock

2    without that benefit.

3            THE COURT:  Why is Dr. Carrillo culpable?  That's what

4    I'm not understanding.

5            MR. NEWVILLE:  We don't have to prove his scienter for

6    purposes of a Section 5 case.  We don't have to prove --

7            THE COURT:  But he wasn't the one that -- you don't

8    even allege that he did the sale.

9            MR. NEWVILLE:  Your Honor, we allege twice in the

10   complaint that Dr. Carrillo sold the shares.

11           THE COURT:  In what way are you alleging that he did

12   the sale?

13           MR. NEWVILLE:  The reasonable inference, when you've

14   got an account that is in one person's name and somebody else

15   has been granted power of attorney, is that both of them retain

16   the ability to control the account.

17           THE COURT:  Right.

18           MR. NEWVILLE:  So a sale on that account is a sale by

19   the account holder.

20           THE COURT:  But it's not necessarily a sale by him in

21   violation of the rule, if somebody else sells it for him.  If I

22   call up someone and say, "I want to buy some stock, I hear it's

23   a good stock," and the guy says, "okay, I'm a broker, I'll buy

24   it for you."  I said, "well, hang on to it.  When you think

25   it's appropriate for me to have my money back, you have

E3jesecc

1    discretion, sell the stock whenever you want to and just send

2    me my money.  All I want is a profit, okay," on what basis am I

3    personally liable if it turns out those stocks aren't

4    registered, simply as an owner of the stock?

5         MR. NEWVILLE:  Because any sale that's made without

6    the benefit of a registration statement is in violation of

7    Section 5.  If there is an exemption from registration --

8         THE COURT:  Suppose I say that I didn't sell it.  I

9    didn't make the decision to sell it.  It wasn't my decision.  I

10   gave somebody else the power of attorney over that stock.  One,

11   I didn't even know -- one, I didn't know the stock wasn't

12   registered.  Why am I supposed to know?  I'm just, you know, a

13   doctor in Mexico.  I don't know anything about US registration.

14   My son says it's a good stock out there.  You've got a good

15   investment.  I say, "okay, fine, here's some money."  He calls

16   me up, says, "you know what, that stock you told me to buy, it

17   went up in price.  I sold it for you and I made you some money

18   off it.  I'm going to send you your money."

19        You're going to charge me with selling an unregistered

20   security?  Is that the way it works?

21        MR. NEWVILLE:  Your Honor, it's a strict liability

22   statute.

23        THE COURT:  What I'm asking you, is that the theory on

24   the way you say it worked, that simply because I owned the

25   stock, if the person I gave the power of attorney to sold it,

E3jesecc

1    that makes me liable?

2              MR. NEWVILLE:  Your Honor, it sounds like it would be.

3              THE COURT:  That's your theory?  I'm asking.

4              MR. NEWVILLE:  It sounds like it would be liable under

5    those facts.  Under these facts we've actually alleged he made

6    the sale.  We alleged that he sold shares.

7              THE COURT:  You don't allege that he did anything --

8    you don't allege that he made the decision to sell the shares.

9    You don't allege that he called up and gave direction to sell

10   the shares.  You don't say that he got on his computer and

11   clicked the button that said "sell."  You don't allege at all

12   that he personally made the decision or personally sold the

13   shares.  You don't allege that.

14             You allege his son sold the shares.  Am I wrong?

15             MR. NEWVILLE:  No.  We allege that his son gave some

16   trading instructions on that account.

17             THE COURT:  Well, what did he do?

18             MR. NEWVILLE:  Dr. Carrillo controlled the account.

19             THE COURT:  What did he do to sell the shares?

20             MR. NEWVILLE:  Your Honor --

21             THE COURT:  Is the answer nothing?  I'm asking.  This

22   is not a trick question.  What did he do to sell the shares?

23   If you have a different theory, simply because he's the owner

24   and he has the ability to make the decision, I'll hear that

25   argument.  But you say that you've alleged that he sold the

E3jesecc

1    shares.  I don't see anywhere where you've told me how he sold

2    the shares.

3            In what way did he sell the shares, other than they

4    were his shares, he owned them?  Is there any other act that he

5    took that sold the shares?

6            MR. NEWVILLE:  We don't allege particular acts that he

7    took to sell the shares.

8            THE COURT:  So in what way are you alleging that he

9    sold the shares; because he owned it?  Is that why?

10           MR. NEWVILLE:  Yes.  He owned the shares.

11           THE COURT:  Okay.  Other than being the owner of the

12   shares, you're not alleging that he decided to sell the shares;

13   you're not alleging he gave any direction to anybody to sell

14   the shares; you're not saying that he personally sold the

15   shares; you're saying his son sold the shares, right?

16           MR. NEWVILLE:  No, we're not saying -- your Honor, I'm

17   sorry.  We're not saying that his son sold the shares.

18           THE COURT:  Who sold the shares?

19           MR. NEWVILLE:  The shares were sold in an account in

20   Dr. Carrillo's name.

21           THE COURT:  Who sold the shares?

22           MR. NEWVILLE:  Dr. Carrillo.

23           THE COURT:  How did Dr. Carrillo sell the shares?

24   Tell me what Dr. Carrillo did to sell the shares.

25           MR. NEWVILLE:  That's the question we have for

E3jesecc

1    Dr. Carrillo.

2              THE COURT:  No.  It's a question I have for you.  You

3    have to allege that he sold the shares.  In what way are you

4    saying he sold the shares?  It's not a trick question.  If he's

5    just -- you're just sort of hiding behind the wall of saying he

6    says it's his shares.  He gave the power of attorney to

7    somebody else.  That's our theory.  I'll understand that's your

8    theory, and then I'll decide whether I think that's a valid

9    theory.

10             MR. NEWVILLE:  Yes, your Honor, that is our theory.

11             THE COURT:  If that's your only theory, then don't

12   tell me he sold the shares.  Tell me that you're charging him

13   with this violation because he is the owner of the shares that

14   his son sold, and his son was given power of attorney, which

15   included that power to sell those shares by the father.

16             But you're not -- there's no way that you're claiming

17   that he did anything to initiate the sale of these shares,

18   right?

19             MR. NEWVILLE:  No, your Honor.  We don't allege that

20   in the complaint.

21             THE COURT:  That's all I'm asking.  So he didn't sell

22   the shares personally; he didn't make the decision, or he

23   didn't take the action to sell the shares, right?

24             MR. NEWVILLE:  Well, frankly, we're not sure what the

25   facts are going to show.  But we are --

E3jesecc

1        THE COURT:  You're not alleging that, and you have no

2   facts at this point for me to -- that's not what you're trying

3   to make me believe from this complaint, right?  If it was, I'm

4   sure you would have said it.  So you have no evidence at this

5   point that he personally sold the shares, right?

6        MR. NEWVILLE:  We don't have evidence either way,

7   other than --

8        THE COURT:  There's no such thing as evidence either

9   way.  You either have evidence that he sold the shares or you

10  don't have evidence that he sold the shares.  You have no

11  evidence that he personally sold the shares, participated in

12  the decision to sell the shares, gave direction to anybody else

13  to sell the shares or personally took action that effectuated

14  the sale of the shares; is that accurate?

15       MR. NEWVILLE:  We have not alleged that in the

16  complaint, your Honor.

17       THE COURT:  Is that accurate?

18       MR. NEWVILLE:  That is accurate.

19       THE COURT:  So you say that he should be hauled into a

20  US court from Mexico to defend this action because his son made

21  a decision within the authority he gave him to sell the shares

22  on his behalf; that's basically it?

23       MR. NEWVILLE:  Unfortunately for Dr. Carrillo, the

24  distinction of whoever made the decision to sell shares in his

25  account does not make a difference.

E3jesecc

1          THE COURT:  So Dr. Carrillo is liable for the shares

2     because the -- now, what is the basis on which -- am I supposed

3     to imply from this that Carrillo knew this was happening,

4     Dr. Carrillo knew this was happening?  Is that what you're

5     trying to imply or no?

6          MR. NEWVILLE:  Unfortunately for Dr. Carrillo, his

7     intent is irrelevant.

8          THE COURT:  I'm not talking about intent.  I'm talking

9     about knowledge.  No, you're not even talking about intent.

10    You know what goes to intent.  I'm asking you about knowledge.

11    You're not even alleging that he knew this took place when it

12    took place?

13         MR. NEWVILLE:  We're not, your Honor, because it's a

14    strict liability statute.

15         THE COURT:  Strict liability for what?

16         MR. NEWVILLE:  For the seller of shares.

17         THE COURT:  Strict liability against whom; the seller

18    of the shares or the owner of the shares?

19         MR. NEWVILLE:  Against both.

20         THE COURT:  Okay.  All right.  So if I have a broker,

21    and I tell the broker, "buy me some stock, and I'm letting you

22    control that account for me."  He buys some stock.  Turns out

23    the stock is not registered.  I live in South America.  He

24    sells the stock, sends it to me.  You send me a notice from

25    Washington that I should come up from Buenos Aires to defend

E3jesecc

1  myself because the stock that my broker happened to buy turned

2  out not to be registered.  That's basically your theory?

3           MR. NEWVILLE:  I believe that's correct, your Honor.

4           THE COURT:  Okay.  You know, you may be right.  Sounds

5  pretty harsh to me, but, you know, let's see if they want to

6  dispute that.  But okay.  That's all I want to understand.

7           You don't accuse Dr. Carrillo -- and that's why I'm

8  trying to understand from both the jurisdictional basis and a

9  liability basis, you do not claim that Dr. Carrillo came to the

10 United States to be involved in any of this activity; that he

11 directed any of this activity; that he participated in the

12 decisions about any of this activity; that he was even aware

13 that any of this activity was taking place.  But you say that

14 because he has an account in the United States in which

15 unregistered securities were sold, you have a basis to assert

16 jurisdiction over him?

17          MR. NEWVILLE:  No.  The account where the shares were

18 dumped was an account that was opened in Canada.

19          THE COURT:  I'm not sure -- sorry.  I missed your

20 point.

21          MR. NEWVILLE:  The bank account through which the

22 purchase was made was an account in the US.

23          THE COURT:  Right.

24          MR. NEWVILLE:  The shares were dumped through an

25 account in Canada.

E3jesecc

1      THE COURT:  I'm sorry.  I'm not following.  What do

2   you mean, shares were dumped through an account in Canada?

3      MR. NEWVILLE:  The shares were held in an account in

4   Dr. Carrillo's name in Canada.  That's where the sale took

5   place.

6      THE COURT:  Okay.  So how does that give you

7   jurisdiction over Carrillo based on the sale if the sale took

8   place in Canada?

9      MR. NEWVILLE:  Well, that's why I mentioned the

10   insider trading cases, your Honor.

11      THE COURT:  But he's not insider trading.  That's why

12   I'm genuinely just confused.

13      MR. NEWVILLE:  The jurisdictional point is the same,

14   because it's the same jurisdictional statute.

15      THE COURT:  Yeah, but not if you're basing it on --

16   you can't be basing it on the sale if the sale took place in

17   Canada.  That doesn't give you jurisdiction in US, right?

18      MR. NEWVILLE:  It's a sale of a US stock.

19      THE COURT:  In Canada.

20      MR. NEWVILLE:  Through a Canadian broker, and

21   necessarily, there would be counterparties to that --

22      THE COURT:  Not in the United States necessarily.  Why

23   is it necessarily counterparties to that in the US?

24      MR. NEWVILLE:  Because it's --

25      THE COURT:  Do you even know that that's true?

E3jesecc

1          MR. NEWVILLE:  It's --

2          THE COURT:  Is that, in fact, the case, that a US

3     counterparty bought those shares?  You don't know that.

4          MR. NEWVILLE:  It's an eventuality that's bound to

5     occur when you sell shares on the over-the-counter market.

6          THE COURT:  Wait a minute.  If I'm a Mexican citizen

7     selling shares in Canada, why is it bound to occur that some US

8     buyer is going to get the share?

9          MR. NEWVILLE:  Because they're being sold on an open

10    market to a variety of broker dealers.  This is not a privately

11    negotiated sale with one particular person.

12         THE COURT:  And is that a sole US broker dealership?

13    A variety of people buy this in a variety of countries, right?

14         MR. NEWVILLE:  That's right.

15         THE COURT:  So what does that have to do with the US?

16    If I own shares that I sell in Canada, why am I supposed to

17    foresee -- why is it foreseeable that some US consequences take

18    place?  I'm not sure I understand the argument.  Because I

19    thought your argument was that it was the US purchase and sale

20    of that that was the basis of your jurisdiction.

21         MR. NEWVILLE:  There's two separate bases.  And when

22    you put them together --

23         THE COURT:  Well, one basis -- was the purchase made

24    in the US?

25         MR. NEWVILLE:  Yes, your Honor.

E3jesecc

1        THE COURT:  Okay.  But the sale was made in Canada.

2        MR. NEWVILLE:  Right, with US effects.

3        THE COURT:  What were the US effects?

4        MR. NEWVILLE:  The counterparties to those sales would

5   necessarily include American purchasers and Canadian

6   purchasers.

7        THE COURT:  Why?  Do you know that to be the fact?

8        MR. NEWVILLE:  We did not trace all the individual

9   shares, your Honor.

10       THE COURT:  How can you say it's necessarily going to

11  include US counterparties?

12       MR. NEWVILLE:  Let me just refer you to --

13       THE COURT:  I'm not sure why you are saying that as

14  opposed to Canadian counterparties.

15       MR. NEWVILLE:  Your Honor, I would just like to refer

16  you to the insider trading cases that we've cited in our brief.

17  And in those cases the purchases and sales were made on foreign

18  stock exchanges.  And the only link to the US there was the

19  fact that the underlying security had a derivative that was

20  linked to a US stock.

21       THE COURT:  Yeah, but that's an insider trading case.

22  This isn't an insider trading case.  As you say, you don't have

23  to prove scienter.  You don't have to prove intent.  You don't

24  even have to prove any consequences, right?  You don't have to

25  even prove that anybody got suffered as a result of this sale

E3jesecc

1    of unregistered shares, do you?

2             MR. NEWVILLE:  No, we don't have to prove those

3    elements.

4             THE COURT:  Right.  So what has that got to do with

5    somebody is going to be hurt; there's some US citizen who's

6    probably buying these stocks in Canada who's going to suffer

7    because they sold or be affected because they sold it in

8    Canada?  I don't understand what that has to do with it.

9             MR. NEWVILLE:  Because it provides the minimum context

10   to exercise personal jurisdiction over the seller.

11            THE COURT:  But you said that a person who sells stock

12   in Canada should expect that he has -- there's minimal contacts

13   to sue him in New York if the SEC decides that the shares that

14   were sold in Canada were unregistered in the US?

15            MR. NEWVILLE:  Yes, your Honor.  I think I would agree

16   with you there.  And the point is the jurisdiction is based on

17   the nation as a whole.

18            THE COURT:  Right.

19            MR. NEWVILLE:  And one point as to --

20            THE COURT:  That doesn't include Canada.  That's a

21   different nation.

22            MR. NEWVILLE:  Right.

23            THE COURT:  I understand you say -- because that's

24   where I thought you had a stronger position; that, you know,

25   oh, they sold it and he had an account in the US, he bought it

E3jesecc

in the US account and he sold it out of the US account to US
citizens.  I thought that was your argument.  That's not your
argument.

MR. NEWVILLE:  No.  The argument is that he sold the
shares of the US company.

And another point that I want to make here is that for
purposes of Section 5, this is not like a diversity case, where
we can replead it in another jurisdiction.  There is no other
jurisdiction because it's the US federal securities laws.

THE COURT:  Right.

MR. NEWVILLE:  So to the extent --

THE COURT:  So he violated US federal securities laws
when he sold unregistered securities in Canada?

MR. NEWVILLE:  That's right, your Honor.

THE COURT:  I thought the sale had to be a sale of the
US shares in the US.

MR. NEWVILLE:  No.  I don't think there's a
requirement that the shares be sold in the US.  That's why I
keep going back to the insider trading cases, where all of the
trading took place outside of the United States.  And there's
only a very minimal extenuated effect on US shareholders.
Here, we've got somebody that invested in and became a
shareholder of a US company directly.

THE COURT:  Okay.

MR. NEWVILLE:  And then the sales took place outside

E3jesecc

1    of the US.  We think --

2              THE COURT:  Why does that make him liable, rather than

3    a victim?

4              MR. NEWVILLE:  Because unfortunately, for purposes of

5    Section 5 liability, that statute is to protect all the other

6    purchasers of those shares that purchase without the benefits

7    of the registration statement.

8              THE COURT:  Isn't he a purchaser of the shares?

9              MR. NEWVILLE:  Right.  He purchased --

10             THE COURT:  He's not entitled to that benefit himself,

11   if he didn't know that the shares were unregistered when he

12   bought them?

13             MR. NEWVILLE:  Right.  His intent is irrelevant, your

14   Honor.

15             THE COURT:  It's not his intent.  You say that the

16   rule is to protect purchasers from unregistered shares.  That's

17   what he is, right?  The purchaser of an unregistered share.

18             MR. NEWVILLE:  He is, your Honor.  And so were the

19   Kirks.

20             THE COURT:  Same category.

21             MR. NEWVILLE:  And so was Dylan Boyle and all of the

22   other purchasers that purchased under this same agreement.

23             THE COURT:  All right.  I think I understand your

24   theory.  It's not -- I mean, I'd have to look a little more

25   carefully.  It's not particularly compelling on its equities,

E3jesecc

1      you know?  You just say -- your response is, ah, tough luck on

2      him.  Strict liability, it was his.  He's in the suit with

3      everybody else.  I mean, he didn't do anything wrong, but, who

4      cares?  We're going to sue him anyway.

5              That's basically your argument, right?

6              MR. NEWVILLE:  Let me just add that --

7              THE COURT:  Do you think he did anything wrong?

8              MR. NEWVILLE:  I do.

9              THE COURT:  Personally?

10             MR. NEWVILLE:  I do.

11             THE COURT:  Do you have evidence that he did something

12     wrong, consciously did something wrong?

13             MR. NEWVILLE:  I'm not at liberty to start disclosing

14     facts that we don't have in the complaint.  And I don't think

15     it's relevant for purposes of --

16             THE COURT:  That's fine.  That's fine.  You're right,

17     it's not in the complaint, so I'm going to assume it doesn't

18     exist; because that's what I assume exists, is what's in the

19     complaint.

20             So you say that the only facts that I have is that

21     he's in Mexico -- how do you claim that he purchased the

22     shares?  Do you claim that --

23             MR. NEWVILLE:  By providing $20,000 to the attorney

24     trust account that was located in California at his son's law

25     firm.

E3jesecc

1          THE COURT:  I know.  But when -- he gave that money

2    for what purpose?

3          MR. NEWVILLE:  To purchase shares of Pacific Blue.

4          THE COURT:  That was his intent when he gave the

5    money?

6          MR. NEWVILLE:  Right.  And we allege paragraph 145,

7    quote, Dr. Carrillo acquired Pacific Blue securities as part of

8    this transaction from an issuer or an affiliate of the issuer

9    with a view to public distribution.

10         THE COURT:  And what you mean by that is the son

11   Carrillo bought the shares for him; that's what you really

12   mean, right?

13         MR. NEWVILLE:  Right.  That all the shares were

14   purchased in trust by the Carrillo Huettel firm and then

15   assigned to a bunch of nominee entities.

16         THE COURT:  Right.  Right.  And what you are

17   attempting to allege is that the son did that to facilitate

18   this greater scheme?

19         MR. NEWVILLE:  As to the son.  That's what we allege.

20         THE COURT:  Right.

21         MR. NEWVILLE:  As to Dr. Carrillo, I think the

22   allegation stands on its own.

23         THE COURT:  Right.  You don't claim that Dr. Carrillo

24   did -- was participating in that or had any reason -- had this

25   same reason or even was aware of the reason that these folks,

E3jesecc

1    or aware of the Pacific Blue relationships, with the others and

2    the -- other people's beneficial interests, and to try to

3    tout -- aware of the pump and dump scheme; you're not accusing

4    Dr. Carrillo of any of that?

5              MR. NEWVILLE:  No, we're not accusing him of

6    participating in the fraudulent scheme.  We're accusing him of

7    acquiring the shares with a view to distribution and selling

8    them without registration, which is improper under the

9    securities laws.

10             THE COURT:  Okay.  All right.  Then I understand.  I

11   guess, unless you have some other argument or some other facts

12   that you want to rely on in this complaint -- because the facts

13   aren't particularly numerous with regard to his personal

14   involvement, so I'm trying to understand your theory.  Your

15   theory is that being the beneficial -- being the owner of these

16   shares, that when he sold them, that makes him strictly liable

17   as a defendant in this case in the United States?

18             MR. NEWVILLE:  Yes, your Honor.

19             THE COURT:  Even though he's not in the United States?

20             MR. NEWVILLE:  I think under the laws that apply to

21   Section 5 liability, that's the law.

22             THE COURT:  All right.

23             MR. BRODY:  Your Honor, is there a different argument

24   that you would like me to address now?

25             THE COURT:  You know, I think the one that I want to

E3jesecc

1    go to -- and then we'll take a break in about ten minutes.  The

2    one I want to go to is probably Gibraltar, because I understand

3    your theory with regard to Gibraltar and the other case we

4    discussed.  So that probably can be quick with Gibraltar.

5            I'm trying to figure out what it is you say Gibraltar

6    was involved in.  Is Gibraltar's liability supposed to be

7    strict liability also or -- I've got to go back.

8            MR. BRODY:  Are you talking about the Section 5 claim,

9    your Honor, or are you talking about the fraud claims?

10           THE COURT:  Gibraltar is under the fraud claim, right?

11           MR. BRODY:  And under Section 5 as well, your Honor.

12           THE COURT:  Section 5 I understand, the unregistered

13   securities.  And that's a similar argument that we heard in the

14   other case, so I don't really need a lot of argument on that.

15   What I'm trying to figure out, what is it that you say

16   Gibraltar -- let me -- I'll focus you on where I am having

17   difficulty.

18           Gibraltar for a living decides that they will tout --

19   they will hold themselves out to be an entity that could buy

20   stock for people who don't want to buy stock in their own name.

21   They do that every day of the week, okay?  They do that, and

22   99 percent of their clients are doing that without any evidence

23   that they're committing any violations of criminal or civil

24   laws by doing so.  Okay?  So I would expect that the Gibraltar

25   would do in this case the exact same thing they would do in

1    every other case.  And I'm trying to figure out what is the

2    allegation you make against Gibraltar, as they say, that puts

3    them in the suit of this scheme, other than they're just doing

4    the same thing they did every day.

5         And I gave my law clerk this example.  She thought it

6    was good.  I didn't think it was so good.  This is the example

7    I gave, and then we can talk about it briefly, and we can

8    continue after lunch.

9         I'm a cab driver.  I'm sitting in front of the bank.

10   A guy walks in the bank, robs the bank.  Comes out, hails the

11   cab.  Gets in the cab.  I take him where he wants to go.  Not

12   everybody is accusing me of being the getaway driver for the

13   guy who robbed the bank.  I'm saying, look, this is just what I

14   do.  I'm a cab driver, I take people where I want to go.  I

15   didn't know the guy was robbing the bank.

16        So why isn't Gibraltar in that kind of situation?

17   Gibraltar just says, look, I know, you know, it all looks a

18   little funny.  You know, people obviously got their own

19   reasons.  They may want to avoid taxes.  They may want to avoid

20   divorce judgments.  They may want to not let people know what

21   assets they have.  But they want somebody else to front for

22   them for buying shares.  And we do that for a living.  We do

23   that for the good guys.  We do that for the bad guys.  We don't

24   ask any questions.  We just do it.

25        What is it about this incident that makes it a

E3jesecc

knowledgable, intentional act to be involved in the scheme as

opposed to the guy that did this the day before or the guy they

did this for the day after?  Do you understand my question?

MR. BRODY:  I think I understand part of your

question, your Honor.

THE COURT:  What do you allege -- in what way did they

participate in this scheme, other than to simply say, okay, you

want to buy or sell stock?  What we do for a living is that we

do it for you and we say it's in our name.  Now they may have

us on another violation; maybe we shouldn't be doing that.

But what allegation in this complaint makes them a

knowledgable intentional participant in the greater scheme?

MR. BRODY:  First of all, your Honor, I would suggest

that your analogy with the cab driver is not really

appropriate, because in the instance with the cab driver, you

have an innocent person who happens to be there; wrong place,

wrong time.

THE COURT:  That's what Gibraltar is claiming.

MR. BRODY:  I don't think so, your Honor.  Gibraltar

is --

THE COURT:  Sounds like a pump and dump scheme.

MR. BRODY:  Gibraltar is an inherently corrupt

organization that makes a living hiding people's identities.

And the moment the SEC --

THE COURT:  But that's not what you're charging them

E3jesecc

1    with.

2              MR. BRODY:  It is, your Honor, because we specifically

3    state in our complaint that that is what Gibraltar does and

4    that's how Gibraltar makes a living.

5              THE COURT:  I know, but that doesn't make them liable

6    of the particular pump and dump scheme that you want to put

7    them in.  Give me an example in this complaint that I can infer

8    that they got involved in this with knowledge or intent to

9    further the pump and dump scheme.  Give me one example.

10             MR. BRODY:  Setting aside the scheme for one second,

11   your Honor, they made specific false representations to

12   Scottsdale because they --

13             THE COURT:  They make those specific false

14   representations every day.

15             MR. BRODY:  And every day those specific false

16   representations is a violation of the securities laws.

17             THE COURT:  Right.

18             MR. BRODY:  Every single --

19             THE COURT:  That's not a pump and dump scheme.

20             MR. BRODY:  Doesn't make a difference, your Honor,

21   whether it's a part of a pump and dump scheme or not.  It's a

22   false representation.  They're telling Scottsdale that the

23   beneficial owners of these shares are these entities.  And the

24   truth of the matter is that Gibraltar knows very well that

25   these entities are not the beneficial owners, if the beneficial

E3jesecc

1    owners of the stock are -- is Kirk.

2              THE COURT:  You see, that's different.  That's

3    different.  That doesn't put them in a pump and dump scheme.

4    It doesn't put them in any fraudulent scheme to fraudulently

5    take money from people or to defraud people.  That doesn't

6    mean -- why does it follow that somebody is going to be

7    defrauded by that representation?  The only fraud that you

8    contend in this case is a fraud to -- for those people who were

9    pumping up the stock, not to let the others know that they were

10   going to be the beneficial owner of this false value in the

11   stock.  And that's the scheme that you want to put Gibraltar

12   in.  That's the scheme that you've put Gibraltar in.

13             So what is the allegation that Gibraltar knew or

14   participated in or in any way had a relationship with the

15   scheme to falsely tout a stock by saying that they're an

16   independent researcher and not disclosing that the people who

17   were touting that stock were not independent but were, in fact,

18   involved in a pump and dump scheme to push up the price so they

19   could sell it?  You don't even say Gibraltar knew that that was

20   occurring.

21             MR. BRODY:  That's correct, your Honor.

22             THE COURT:  So you're not accusing them of that?

23             MR. BRODY:  We don't accuse Gibraltar of having

24   specific knowledge of the pump and dump scheme that was taking

25   place with Skymark and Emerging Stock.  You're correct.

E3jesecc

1          THE COURT:  But isn't that the scheme that you're

2     alleging in Count One of the indictment?

3          MR. BRODY:  I'll say two points, your Honor, which is

4     that we're holding Gibraltar liable under both

5     misrepresentation theory of liability and under scheme theory

6     of liability, your Honor.  Under the misrepresentation theory

7     of liability, it doesn't make a difference if they knew about

8     the scheme.

9          THE COURT:  What's the misrepresentation theory of

10    liability, because --

11         MR. BRODY:  Because they're handing Scottsdale a

12    false --

13         THE COURT:  You didn't understand my question.  Which

14    count is the theory, is that theory?  Because both Counts One

15    and Two say that they employed devices, schemes and artifices

16    to defraud.  They're both scheme counts.

17         Which is the nonscheme count?  That's what I don't

18    understand.

19         MR. BRODY:  Well, your Honor, with respect to the

20    second claim for relief, your Honor, we bring the claim based

21    on A, B and C.  B is not the scheme liability theory, your

22    Honor.  B is the misrepresentation theory of liability, your

23    Honor.

24         THE COURT:  Well, where --

25         MR. BRODY:  They made untrue statements of material

E3jesecc

1     fact.

2            THE COURT:  So --

3            MR. BRODY:  So we're alleging, your Honor, both

4     misrepresentation theory, as well as scheme theory, your Honor.

5            THE COURT:  Well, then tell me what is the scheme

6     theory?

7            MR. BRODY:  Well, the scheme theory, your Honor, is

8     that they are part of a participant in helping the owners, the

9     beneficial owners of this stock, hide the fact that they are

10    the beneficial owners.

11           THE COURT:  But that's not --

12           MR. BRODY:  And the fact that they don't know about

13    the rest of it is irrelevant.

14           THE COURT:  But that's not the scheme that you're

15    accusing the others of.  You're accusing the others of a much

16    broader scheme.

17           MR. BRODY:  And you're right, your Honor --

18           THE COURT:  So you can't put them in the same count,

19    because that's a different scheme.

20           MR. BRODY:  Not everyone, your Honor, has to have the

21    equivalent knowledge of the scheme to be part of the same

22    scheme.  There are different components of the scheme that are

23    taking place.

24           So, for example, Gibraltar's involved in one aspect of

25    it.  They may be blind to the rest of that aspect, but they're

E3jesecc

1    still involved in that overall scheme, even if they don't have

2    knowledge of the other parts, your Honor.  The knowledge they

3    have is a knowledge that what they're doing is incorrect.

4              THE COURT:  Tell me how -- I'm not quite sure what --

5    you're saying that that's true simply because they

6    misrepresented a beneficial ownership?

7              MR. BRODY:  That's correct.

8              THE COURT:  But that in and of itself -- would you

9    agree that simply misrepresenting the beneficial ownership of

10   the shares is not sufficient under A to employ a device, scheme

11   and artifice to defraud?  That alone does not make it under A.

12   Would you agree with that?

13             MR. BRODY:  No, your Honor.  I think that the

14   misrepresentations that are -- in the context of the overall

15   scheme, the fact that even though their acts are limited to the

16   false representations, that doesn't make their liability under

17   the scheme liability theory less, your Honor.

18             THE COURT:  Tell me what their intent to defraud was.

19             MR. BRODY:  Your Honor, if you have knowledge in your

20   possession that is contrary to what you are saying, that is

21   recklessness.  That is the intent to defraud.

22             THE COURT:  No, that does not necessarily turn into an

23   intent to defraud the investor.  I can tell the investor that

24   the product is made is blue and not red.  And it doesn't mean

25   just because I know it's -- that's not true, it doesn't mean

E3jesecc

1    I'm defrauding the investor.  That's what scienter is about,

2    isn't it?

3              MR. BRODY:  No, your Honor.  Scienter -- first of all,

4    the misrepresentation doesn't have to be made to an investor,

5    your Honor.

6              THE COURT:  But the misrepresentation has to be made

7    to defraud, right?  There has to be an intent to defraud.

8              MR. BRODY:  We don't have to allege in the complaint

9    that I decide -- that I woke up in the morning and said I

10   wanted to commit fraud.  What we have to allege in our

11   complaint in order to meet the scienter requirement is that I

12   made a false statement and I knew that statement was false.

13             THE COURT:  No.  That's not true.  That's not true at

14   all.

15             MR. BRODY:  Or reckless --

16             THE COURT:  Wait a minute.  Over lunch you show me a

17   case that says simply because you prove that they made a

18   material false statement and you don't prove that it was made

19   for the purpose of defrauding someone, that that still meets

20   the --

21             MR. BRODY:  For purposes of intent and recklessness,

22   your Honor?

23             THE COURT:  For any purpose.

24             MR. BRODY:  All I have to demonstrate is that they

25   knew the statement they were making was false.  It's a false

E3jesecc

1   statement.

2              THE COURT:  That's right.  So if I didn't intend to

3   defraud anybody, simply making a false misrepresentation you

4   say violates the --

5              MR. BRODY:  If I make a false representation --

6              THE COURT:  That is not intended to defraud.

7              MR. BRODY:  In connection with the sale and purchase

8   of securities, that creates liability for me under the

9   securities laws.

10             THE COURT:  Yeah, but --

11             MR. BRODY:  They made a false statement.

12             THE COURT:  No.

13             MR. BRODY:  They knew the statement was false.

14             THE COURT:  That's not what I'm asking.  I'm asking

15  you whether or not you say that you're trying to now allege A,

16  B and C, right?  You're saying you try to allege all three

17  sections.  Don't two of those sections require an intent to

18  defraud?  Or maybe I have it wrong.  Isn't that true?

19             MR. BRODY:  No, I don't think that's true, your Honor.

20             THE COURT:  So what does it mean for you to allege

21  that they employed devices, schemes and artifice to defraud?

22  You're saying that's not a requirement, that's just gratuitous

23  language?

24             MR. BRODY:  I don't think you have to show their

25  specific intent to defraud.

E3jesecc

1          THE COURT:  But you have to show some intent to
2   defraud, right?
3          MR. BRODY:  I think you have to show that you knew
4   what they were doing in connection with this overall scheme was
5   not correct.
6          THE COURT:  No.  They have to have intent to defraud,
7   right?
8          MR. BRODY:  I don't think that's the intent we have to
9   demonstrate, your Honor.  I think the intent we have to
10  demonstrate is the recklessness that what they were doing was,
11  in fact, false and in connection with the purchase --
12         THE COURT:  But suppose it was false and it wasn't
13  going to affect the price of the shares.  You're not going to
14  say that that would affect --
15         MR. BRODY:  Then it would be a different issue.  Then
16  materiality would be the issue.
17         But in this case materiality is not the question
18  because they know that the reason why Scottsdale requires this
19  information is because Scottsdale has to assure themselves that
20  it is not acting as an underwriter.  So the way Scottsdale --
21         THE COURT:  So you're saying Scottsdale is being
22  defrauded?
23         MR. BRODY:  Sure.
24         THE COURT:  You're not talking about the investor
25  being defrauded?

E3jesecc

1            MR. BRODY:  We don't have to demonstrate the --

2            THE COURT:  I'm asking.  I'm asking --

3            MR. BRODY:  Scottsdale is being defrauded, your Honor.

4       And likewise, all of the people who purchase through Scottsdale

5       are being --

6            THE COURT:  The problem I have is I'm just trying to

7       understand what your theory is.  Who's supposed to be -- is

8       anybody being defrauded?  Who's being defrauded?  You've thrown

9       in about eight people into the same count, but you tell me that

10      they had different schemes.  You tell me that Carrillo, Huettel

11      De Beer, Kirk, Hinton, Trade Show, Pacific, they were all

12      scheming and planning to try to do a pump and dump scheme.

13      That's the scheme that you lumped at me.  You don't say

14      Gibraltar was trying to do a pump and dump scheme, but you

15      throw them into the same scheme.  So you're saying even though

16      they didn't know it was a pump and dump scheme, I can just

17      throw them in because their scheme was limited to just giving

18      false information to Scottsdale?

19           MR. BRODY:  Yes, your Honor.  They're --

20           THE COURT:  That's the way you charge it.

21           MR. BRODY:  Yes, your Honor.

22           THE COURT:  So you don't --

23           MR. BRODY:  With respect to the other defendants, it's

24      true as well that not every defendant in this case did the

25      exact same thing, even though they're a part of the same -- the

E3jesecc

1    scheme, if you want to call it --

2              THE COURT:  What is the scheme?  What is the common

3    scheme?

4              MR. BRODY:  The scheme was the Kirks and Boyle selling

5    their shares.  They involved a lot of other people in different

6    aspects of the --

7              THE COURT:  What was the common illegal scheme?  What

8    was the common illegal scheme to defraud?

9              MR. BRODY:  Was the sale of the unregistered shares.

10             THE COURT:  But I thought it was the pump and dump

11   scheme.

12             MR. BRODY:  Well, but it was -- that's part of it.

13             THE COURT:  Well, it can't be part of it.  Those are

14   two different things.  If I decided my intent was and my

15   purpose was and my activity was to simply sell unregistered

16   shares, that doesn't put me in a scheme with other people who

17   are doing a pump and dump scheme, right?  Doesn't make me part

18   of that same scheme.  You can't charge me with them and say,

19   well, you had that part of their scheme.  That's why -- you

20   can't put that -- you can't put them in the same scheme.

21             MR. BRODY:  Their role was more limited, but they were

22   an essential element of that scheme.  But for them, the sale of

23   the shares couldn't have been sold.

24             THE COURT:  And you're saying that that's true even

25   though they had no knowledge; if they had no knowledge of the

E3jesecc

1    scheme, and they had no intent to do anything to further a pump

2    and dump scheme, they're still liable for the pump and dump

3    scheme that you're charging the other --

4              MR. BRODY:  Gibraltar is setting up numerous accounts,

5    numerous accounts --

6              THE COURT:  I understand.

7              MR. BRODY:  Not being for the same person.

8              THE COURT:  They do that every day, though.

9              MR. BRODY:  There's no legitimate --

10             THE COURT:  Wait a minute, then we're going to take a

11    break.

12             They do that for the people doing pump and dump

13    schemes, and they do that for the people not doing pump and

14    dump schemes.  The only way you can put them in with the people

15    doing pump and dump schemes is if they're doing it to

16    facilitate the pump and dump scheme.  Doesn't that make sense?

17             MR. BRODY:  I'll think about that over lunch.

18             THE COURT:  Okay.  Let's do that.  I mean, that's what

19    I'm trying to do.  You know, I've got all these people lumped

20    in these two schemes.  You can't keep splicing it and say,

21    well, but, you know, they were just trying to defraud

22    Scottsdale.  These people were trying to defraud the investors,

23    and these people were involved in a pump and dump scheme, so we

24    dumped them all into the same violation, because I don't know

25    if we even have them under aiding and abetting.

E3jesecc

1          MR. BRODY:  Your Honor --

2          THE COURT:  You even have them under aiding and

3     abetting.  You have them aiding and abetting --

4          MR. BRODY:  For aiding and abetting, your Honor --

5          THE COURT:  Ben Kirk's violation of 10(b).  How can

6     you -- you can't unknowingly aid and abet someone else's

7     violation of the law.

8          MR. BRODY:  You don't have to demonstrate for the

9     knowledge purposes ever aiding and abetting.  I don't believe,

10    your Honor, that you have to establish the knowledge of what

11    the exact person, the aider and abettor, are doing.  You have

12    to acknowledge that what he was doing was wrong.  And I think

13    they had knowledge what he was doing was wrong because he's

14    setting up these multiple accounts, and he's hiding the fact

15    that --

16         THE COURT:  No.  No.  You can't aid and abet a

17    violation of 10(b) unless that is your intent to help someone

18    violate 10(b).  So you can't say they're violating -- I'm

19    helping them to violate something other than 10(b), and then

20    charge them with an aiding and abetting of 10(b).

21         Do you understand what I'm saying?

22         MR. BRODY:  I do.  What I would suggest, your Honor,

23    before we head to lunch is that regardless of how you view the

24    scheme liability case, the scheme liability aspect, that they

25    are also being charged with misrepresentation liability.  And

E3jesecc

1    the fact is that they made --

2              THE COURT:  Not under that count.

3              MR. BRODY:  Under count B, under the second count,

4    they're being alleged as committing A, B and C.  And B is

5    misrepresentation, your Honor.  And they made a false

6    representation to Scottsdale that was clearly in connection

7    with the purchase and sale of securities, because they're

8    telling Scottsdale who the beneficial owner is, and they're not

9    being truthful about that.  And they understand that the reason

10   why Scottsdale needs this information is so Scottsdale can

11   assure themselves that it is not acting as an underwriter.  So

12   they --

13             THE COURT:  You say everybody you charged under that

14   count, that they're responsible for that?

15             MR. BRODY:  I say everyone -- your Honor, each

16   individual made their own -- not -- individual --

17             THE COURT:  Because that's the way you charged.

18             MR. BRODY:  Individuals made their own

19   misrepresentations.

20             THE COURT:  Yeah, but you don't charge it that way.

21             MR. BRODY:  Those misrepresentations are contained

22   within the text of the complaint before the charging document.

23             THE COURT:  So you're --

24             MR. BRODY:  So with respect to Gibraltar, we allege

25   what their specific misrepresentations are.

E3jesecc

1          With respect to the other defendants, we allege what

2     their specific misrepresentations are.

3          THE COURT:  You're not relying on the same

4     representations, saying those representations had anything to

5     do with the other?

6          MR. BRODY:  I'm saying that Gibraltar's liable for its

7     own misrepresentations and --

8          THE COURT:  Well, you don't charge them separately as

9     being liable for --

10         MR. BRODY:  We don't break out each individual and

11    say, in Count One we're going to charge Gibraltar for this and

12    Count Two we're going to charge Carrillo for this and

13    Count Three we're going to charge Huettel for this.  Each one

14    of them made their own misrepresentations.  Carrillo made --

15         THE COURT:  Slow down.

16         MR. BRODY:  Carrillo made his misrepresentations.

17    Gibraltar made their misrepresentations.

18         THE COURT:  I think I understand better, if not just

19    differently, your theory of liability, because that's not the

20    way I read your complaint.

21         The way I read the complaint, in the standard way of

22    reading a complaint, is all of those people who are charged

23    under the same count are charged with the same act, okay?

24    That's usually the way it's played.  You don't charge both of

25    us with bank robbery under one count and then say you robbed

E3jesecc

1    Chase Bank on Monday and I robbed Capital Bank on Tuesday.

2    That's not the way you do it.  You've charged them all in one

3    count.

4            And then you still beg the question of, what does the

5    aiding and abetting mean?  What is Gibraltar -- that you can't

6    get around, because you're saying Gibraltar is aiding and

7    abetting their violation.  So you've got to give me some

8    recklessness, some knowledge, some intent to further their

9    scheme.  But that's not the way you say you charged them.

10   You're charging them with their own separate misrepresentations

11   to Scottsdale.  So --

12           MR. BRODY:  I think we said we were charging them with

13   both, the participation in the scheme and with the

14   misrepresentations.

15           With respect to the scheme, it's our view that we

16   don't have to allege they were participants in the entire part

17   of the scheme, only that they were participants in their small

18   part of the scheme.

19           THE COURT:  But you have to tell me how they knowingly

20   assisted the scheme, knowing the general purpose of the scheme.

21   That's the law.

22           MR. BRODY:  For the aiding and abetting claim or the

23   primary claim?

24           THE COURT:  For the aiding and abetting claim, you

25   said they're aiding and abetting a 10(b) violation.  You're not

E3jesecc

1   saying they're aiding and abetting an unregistered security or

2   misrepresentation about beneficial ownership securities.  You

3   say they're aided and abetted a 10(b) -- a fraud violation.

4   They can't unconsciously aid and abet a fraud violation,

5   wouldn't you agree?  You would agree with that, right?

6           MR. BRODY:  I think under your theory, I just think

7   that our understanding of what knowledge is required may be a

8   little different, your Honor.

9           THE COURT:  Well, I don't even know if we've gotten

10  there, because I'm not even sure what knowledge you assert.

11  That's why I'm still at the point trying to ask you, what

12  knowledge are you asserting on behalf of Gibraltar about a

13  securities fraud violation?  That's where I was.  That's where

14  I start.  I still don't understand what you say Gibraltar --

15  how Gibraltar intended to help them commit a 10(b) violation.

16          So let's take the lunch break.  As a matter of fact,

17  let's come back at 2:30 and we'll continue.

18          (Luncheon adjournment)

19

20

21

22

23

24

25

E3jesecc

                           AFTERNOON SESSION

                                3:34 p.m.

1              THE COURT:  Okay.  Yes.

2              MR. BRODY:  Thank you, your Honor.

3              First of all, to the extent that your Honor pointed

4     out that in a typical case you might expect to see a complaint

5     that set forth separately the allegations or the claim that

6     there's a misrepresentation case and a claim that there's a

7     scheme case, we apologize for that, your Honor.

8              THE COURT:  You don't have to apologize.

9              MR. BRODY:  We note that in our opposition to the

10    motion to dismiss on page 65, we specifically pointed out with

11    respect to Gibraltar that we were asserting both a

12    misrepresentation case as well as a scheme liability case.  And

13    just so the Court is clear on this --

14             THE COURT:  That the misrepresentation case is based

15    on both 10(b)(5)(B) and 17(a)(2).  The scheme liability case --

16    scheme liability is 17(a)(1) and 17(a)(3) and 10(b)(5)(A) and

17    C.

18             With respect to the 17(a)(2) claim, that's actually a

19    negligence based claim as opposed to a fraud based claim.  And

20    I don't know to the extent that the Court finds that important,

21    but it does have an impact on what we were discussing before

22    your Honor, which is what is the knowledge that we allege in

23    the complaint?  And I think about Gibraltar's knowledge of the

E3jesecc

1   larger scheme.

2            THE COURT:  Right.

3            MR. BRODY:  And I think the way we put it in our

4   memorandum of law, this is the best way I think that we can put

5   it is that the complaint alleges red flags sufficient to warn

6   Gibraltar that a pump and dump scheme was taking place,

7   including that it was selling large blocks of low priced,

8   thinly traded issuers through multiple nominee accounts at

9   Gibraltar that had been established to conceal Mr. Kirk's

10  ownership.

11           And furthermore, we allege that Gibraltar was

12  particularly positioned to understand those signs, given its

13  business model, which we allege in the complaint.  So --

14           THE COURT:  But how is that different than any other

15  security that they take and sell as --

16           MR. BRODY:  Well, I don't know what other securities

17  they sell.  All I know is with respect to the securities at

18  issue in this case --

19           THE COURT:  So that should have been an indication of

20  them of what, of what kind of illegality?

21           MR. BRODY:  Well, your Honor, if someone had opened an

22  account at Gibraltar and the stocks that went into those

23  accounts were IBM and Microsoft and something along those

24  lines, I think that Gibraltar could well assure itself that

25  there wasn't a pump and dump going on because it's difficult,

E3jesecc

1    if not impossible, to do pump and dump with those stocks.

2              But with respect to the type of thinly traded issuers

3    that we're talking about here, Trade Show and Pacific Blue,

4    these are stocks that are easily subject to a pump and dump.

5              THE COURT:  That may be true, but why would you assume

6    that the party that's asking you to sell it for them is

7    involved in a pump and dump scheme as opposed to any other

8    scheme?

9              MR. BRODY:  You're right.  There could be other

10   schemes, I suppose, that are involved in there.

11             THE COURT:  What points it to a pump and dump scheme?

12             MR. BRODY:  Well, the multiple nominee accounts is

13   also unusual, your Honor.  If they had opened up one nominee

14   account, then you could say, okay, there are potentially

15   legitimate reasons for opening one nominee account.

16             The opening of three nominee accounts seems a little

17   more unusual, your Honor, and would suggest that there is

18   something going on in order to try to hide percentages of

19   stock, which would suggest a pump and dump scheme; because the

20   reason why you split up percentages, your Honor, is so you

21   avoid disclosure requirements, which obviously are important in

22   the pump and dump.

23             THE COURT:  Well, the point -- for a lot of other

24   reasons, also.

25             MR. BRODY:  That might be --

E3jesecc

1          THE COURT:  But you're saying they were on notice that

2     this was probably a pump and dump scheme, is that your theory?

3          MR. BRODY:  Certainly on notice enough that they

4     should have done further investigation before engaging in the

5     type of activity they were engaging in.  For example, sending

6     those false letters to Scottsdale.

7          THE COURT:  Yeah, but there's no such thing as

8     negligently not looking at the red flags to find out whether I

9     am a participant in a pump and dump scheme.  I mean, I don't

10    understand that theory.

11         MR. BRODY:  I might disagree with your Honor on

12    negligence versus reckless.  I think that they were reckless as

13    opposed to negligent.  But even with respect to negligence, the

14    17(a)(2) standard is a negligence standard, your Honor.  And

15    17(a)(3), your Honor -- sorry, which is the scheme liability

16    statute under Section 17, or one of them at least, is a

17    negligence standard, your Honor.

18         THE COURT:  Okay.  I mean, I think I understand what

19    you're saying, but that's not what I get from reading the

20    count.  That's not what it said.

21         MR. BRODY:  Well, and I understand that, your Honor.

22    And that's what I was trying to say at the beginning, which is

23    that the activities that they conducted are -- described

24    throughout the bulk of the complaint, not just in the counts --

25    the counts make references to the various statutes that are at

E3jesecc

1    issue, which aren't just scheme liability statutes.  They're

2    also misrepresentation statutes.

3         THE COURT:  But that was going to be my second point.

4    Even when I look through the rest of the complaint, I don't see

5    that allegation with regard to Gibraltar.

6         MR. BRODY:  They that they made misrepresentations

7    or --

8         THE COURT:  That's the only allegation that they made

9    misrepresentations.  But I see nothing else beyond that,

10   nothing of what you just argued.

11        MR. BRODY:  Well, I think right from the beginning,

12   your Honor, with respect to how they're positioned, we argue

13   about what the nature of the business was, of their business

14   was.  We argue -- I believe the complaint alleges that Pacific

15   Blue and Trade Show were thinly traded securities.  They were

16   petty stocks, your Honor.  So those allegations are there.  The

17   multiple nominee accounts, that's there.  So the different

18   pieces are in there.

19        The way that we described it in our memorandum of law

20   puts that all together to describe the red flags that they were

21   aware of or should have been aware of.

22        THE COURT:  I understand, because I'm looking back at

23   paragraph 140, 141, 142.  I assume that those are some of the

24   paragraphs that you're referring to?

25        MR. BRODY:  Yes, your Honor.  141 specifically

E3jesecc

1    describes that.

2                THE COURT:  And am I correct in reading it that

3    Gibraltar is accused of being involved in one sale, and that

4    would be with regard to Trade Show shares only?

5                MR. BRODY:  Hold on, your Honor.  I believe it's both,

6    your Honor, but I would have to read through the complaint,

7    too, to look at that.

8                THE COURT:  But I thought Gibraltar's role was only to

9    trade Ben Kirk's shares in Trade Show, am I right?

10               MR. BRODY:  Your Honor, I --

11               THE COURT:  They did Ben Kirk's shares, right?

12               MR. BRODY:  Yes.  Ben Kirk was the only one who had

13    the accounts at Gibraltar.

14               THE COURT:  And did they trade something on behalf of

15    Ben Kirk other than Trade Show shares?

16               MR. BRODY:  Well, I thought Pacific Blue as well, your

17    Honor.

18               THE COURT:  There was --

19               MR. BRODY:  I have to go back and look at the

20    complaint, your Honor.

21               THE COURT:  Oh, okay.  All right.  I think there is --

22    yeah, Pacific Blue and Trade Show.  Okay.

23               MR. BRODY:  The mechanism where it worked, your Honor,

24    is that there were numerous -- there were three, I think, at

25    least three nominee accounts at Gibraltar.  And then those

E3jesecc

1   nominee accounts would then trade through omnibus accounts that

2   were held at Scottsdale.

3          THE COURT:  I mean, I don't think this is

4   determinative, but I find curious, why is Gibraltar charged and

5   Davis is not?  Why is Davis only charged with the sale of

6   unregistered security?  I was just curious why Davis is not in

7   the Gibraltar account.  Is there some reason for that?

8          MR. BRODY:  Hold on, your Honor.  It's been a while

9   since I thought about that one.

10          Standing here, your Honor, I don't recall the reason

11   why.

12          THE COURT:  Because I only have Davis in the sale of

13   unregistered securities count.

14          MR. BRODY:  I believe that's right, your Honor.

15          THE COURT:  And not the 17(a) count or not the 10(b)

16   count and not the aiding and abetting violation.

17          MR. BRODY:  That's correct, your Honor.

18          THE COURT:  But you attribute all of Gibraltar's

19   conduct to Davis or no?  Are you saying there are others beyond

20   Davis?

21          MR. BRODY:  Gibraltar was the one, your Honor --

22   sorry.  Davis was the one, I believe, who sent the

23   representations to Scottsdale.

24          THE COURT:  Right.  That's what I thought.  He was the

25   one who made what you claim are the misrepresentations.

E3jesecc

1              MR. BRODY:  That's correct, your Honor.

2              THE COURT:  But you're not charging him personally?

3              MR. BRODY:  No, your Honor.

4              THE COURT:  Okay.  All right.  Go ahead.

5              MR. BRODY:  I don't know who your Honor wants me to

6    address now.

7              THE COURT:  You know, I think you can take all the

8    others in any order you want, because I don't want you to be

9    repetitive.  So whichever way -- I think a lot of the arguments

10   overlap with regard to the others.

11             MR. BRODY:  I would agree with your Honor.  I guess

12   I'll try to address them in the order that they argued before

13   your Honor.  So I'll first address Luis Carrillo.

14             In *SEC v. Frank*, your Honor, the Second Circuit said

15   that a lawyer no more than others cannot escape liability for

16   fraud by closing his eyes to what he saw and could readily

17   understand.

18             We heard a lot of argument from Mr. Carrillo's lawyer

19   that somehow he was acting as a transactional lawyer and he

20   shouldn't be held to some other standard because that -- or so

21   he should be held to a lower standard; that there should be a

22   higher threshold that the SEC should have to reach before they

23   can make a case against him.  We would suggest that that's not

24   the case.  But I think that that theme was echoed throughout

25   Mr. Curran's entire presentation.  So we would just have the

E3jesecc

1    Court be aware of that.

2           He makes numerous arguments in support of his motion

3    to dismiss, notwithstanding that he signed the attorney opinion

4    letters at issue in this case.  Carrillo argues that he is not

5    the maker of the false statements in those letters, and in

6    doing so he turns the Supreme Court's decision in *Janus* on its

7    head.

8           In *Janus* the Supreme Court said that one makes a

9    statement by stating it.  Here, Carrillo and Huettel and their

10   law firm made the statements.  It's on their letterhead.

11   Carrillo signed the documents and they sent the letters to

12   Scottsdale and DTC.  So recognizing this weakness, Carrillo

13   argues that the ultimate authority for these opinion letters

14   rested with someone else.  And as this Court stated during oral

15   argument -- I think it was spot on -- the Court said, how can I

16   make that determination on the face of the complaint?  On a

17   motion to dismiss, where we are right now, when the facts

18   alleged in the complaint are taken as true and all reasonable

19   inferences are decided in plaintiff's favor, the Court cannot

20   address this argument that somehow others had ultimate

21   authority over the letters.

22          Indeed, in *Janus* the Supreme Court held then the

23   ordinary case attribution within the statement or implicit from

24   surrounding circumstances is strong evidence that a statement

25   was made by the party to whom it is attributed.  Here, the

E3jesecc

1    attribution in the opinion letter is within the statement

2    itself.  Within the statement itself, it is the signature of

3    Carrillo and the name of his law firm that appears in the

4    letter.

5         Likewise, the Court in *Janus* held that the maker of

6    the statement is the person with ultimate authority over the

7    statement, including its content.  Here, there is no argument

8    by Carrillo that anyone but he and Mr. Huettel and the law firm

9    controlled the content of the letter.  Their argument appears

10   to be that the Kirks and Boyle controlled when and to whom the

11   letters were sent.  But even with respect to that, the

12   complaint says nothing about the Kirks and Boyle controlling

13   the timing or the destination of the letters.  To the contrary,

14   the complaint in paragraphs 129 to 131 specifically provides

15   that Carrillo Huettel provided the letters to Scottsdale and

16   DTC.

17        In *SEC v. Boyd*, which is a 2012 case in the District

18   of Colorado, the Court held that unless the client is actually

19   controlling the actual contents of the letter, the attorney is

20   the maker of that statement.  And we note there are no

21   allegations in the complaint that the Kirks and Boyle control

22   the contents of these letters.  Indeed, if the Kirks and Boyle

23   dictated the contents of the attorney opinion letter to

24   Carrillo, and Carrillo simply signed that letter, then it

25   really wouldn't be an attorney opinion letter at all.  And

E3jesecc

1    Carrillo would have committed a wholly different kind of fraud.

2         Mr. Carrillo cites the decision in *SEC v. Garber* for

3    the proposition that the client is the maker of statements in

4    an attorney opinion letter to the exclusion of the attorneys.

5    And this was not a holding in Garber.  In that case the Court

6    did not hold that the attorneys were not makers of the

7    statements in the opinion letter.

8         The reverse situation was being argued, i.e. whether

9    the person who had engaged the attorney to write the letter

10   could be considered a maker, notwithstanding that the letter

11   had not been attributed to him.  In *Garber* the Court held that

12   where the client had control over how the document was used,

13   that client couldn't argue that it didn't have ultimate

14   authority.  But the Court in that case did not rule that the

15   attorney was also not a maker of the statement.  Indeed, that

16   issue does not appear to have been before the Court.

17        In addition to the cases cited in our brief, we're

18   going to refer the Court to the decision of the Court in

19   *Kerr v. Exobox*, which is a 2012 decision from the Southern

20   District of Texas, where the Court stated the obvious point,

21   that the fact that a document is called an attorney opinion

22   letter indicates that it is the statement of the attorney.

23        Likewise, in *SEC v. Greenstone Holdings*, after

24   discussing the *Janus* "maker" requirement, the Court granted

25   summary judgment against the general counsel of a company for

E3jesecc

1    sending out false opinion letters without even a discussion of

2    whether or not the general counsel was the maker, because of

3    course he was the maker.  The statements were specifically

4    attributed to him.

5            Carrillo argues secondarily that because this is an

6    opinion letter, the SEC has to prove that the statements

7    therein were subjectively believed to be false, and

8    Mr. Carrillo is wrong on this point.  The mere fact that this

9    document is titled an opinion letter does not mean that

10   everything within that letter is a statement of opinion.

11           For example, the statement that the shares were fully

12   registered is not a statement of opinion; it's a statement of

13   fact.  Likewise, the statement that the nominee entity was not

14   an affiliate of Pacific Blue is not a statement of opinion.

15   It's a statement of fact.  These are not issues that are

16   inherently subjective.

17           In the OSG securities litigation case cited in our

18   brief, the Court rejected an auditor's argument that because

19   the false statements were in an auditor's opinion letter, the

20   standard was subjective falsehood.  The Court stated that

21   auditors cannot shield themselves from liability merely by

22   using the word opinion as a disclaimer.  And the Court stated

23   that although the internal revenue code is complex, and often

24   gives rise to debate, it cannot be said that statements of

25   income tax liability are subjective valuations.  Likewise, the

E3jesecc

1    issue of whether stocks are free trading or restricted is

2    objective.  It's guided by rules but it's objective.

3              But even if the standard here was subjective

4    falsehood, the SEC has met that required standard because the

5    SEC has alleged at that time that Carrillo knew that the

6    statements were false.  As described in the complaint, Carrillo

7    knew that the Kirks control Pacific Blue because he knew that

8    Kirk paid 90 percent of the purchase price.  And he and his

9    firm designed the transaction that concealed the group

10   ownership and control over the Pacific Blue shell by

11   distributing shares in 4.9 percent increments.  Carrillo says,

12   and he argues, that he was entitled to rely on the statements

13   of his clients that none of these foreign entities were

14   controlled by them, no matter how unreasonable those statements

15   might have been.

16             And Carrillo argues that through this case the SEC is

17   telling transaction lawyers that they have to investigate their

18   clients and that the securities laws should not be adjusted to

19   make this requirement.  The law, however, already requires

20   attorneys to make such inquiries.  In *SEC v. Spectrum*, which is

21   a Second Circuit decision, the Court of Appeals stated that the

22   securities laws provide a myriad of safeguards designed to

23   protect the interests of the investing public.  Effective

24   implementation of those safeguards, however, depends in large

25   measure on the members of the bar who serve in advisory

E3jesecc

1    capacity to those engaged in securities transactions.  And the

2    Court held that in the distribution of unregistered securities,

3    the preparation of an opinion letter is too essential, and the

4    reliance of the public is too high to permit due diligence to

5    be cast aside in the name of convenience.  This is exactly what

6    happened here even, if you credit Carrillo.

7            In *SEC v. Greenstone*, the Court likewise rejected the

8    very argument raised by Carrillo stating that an opinion must

9    have a reasonable basis.  And there can be no reasonable basis

10   for an opinion without a reasonable investigation into the

11   facts underlying the opinion.  The defendant implicitly

12   represents by citing the opinion letter that he has conducted a

13   reasonably sufficient examination of material legal and factual

14   sources and had reasonable certainty as to the subjects

15   addressed therein.

16           Your Honor, even if you credit Mr. Carrillo's

17   arguments, there is no way that he did a reasonable

18   investigation in this case.  And indeed, his lawyer does not

19   suggest that he did.  His lawyer suggests that he was entitled

20   to rely on the representations of his clients.  And that is

21   simply not the law.

22           Consequently, the SEC has sufficiently stated a case,

23   a misrepresentation case against Carrillo based upon the

24   opinion letters that were sent.  The SEC has also sufficiently

25   alleged that Carrillo participated in the scheme to defraud.

E3jesecc

1   Carrillo has argued that he did not perform any deceptive acts,

2   but this is false.  The use of the attorney trust fund here was

3   inherently deceptive.  As your Honor stated, what would be the

4   legitimate purpose for using the Carrillo Huettel trust account

5   for the clients' transaction?  That's not appropriate.

6           And when Mr. Curran responded to your Honor that if a

7   client wanted to use his firm's trust account in that manner,

8   that he would have an uncomfortable conversation with the

9   managing partner of his firm, your Honor responded that that

10  was because there would be no legitimate purpose for that kind

11  of activity.  The Court is right.  This was an inherently

12  deceptive act.

13          But the use of the trust account was not Carrillo's

14  only inherently deceptive act.  He drafted fraudulent

15  nonaffiliate and affiliate share purchase agreements and

16  arranged to distribute Pacific Blue shares in 4.9 increments to

17  nominee entities, the purpose of all of which was to give the

18  misleading impression that the shares were held by various

19  independent entities.  And the affiliate stock purchase

20  agreement that he drafted for De Beer was particularly odious,

21  since he knew that De Beer did not pay $80,000 for the

22  40 percent interest in the company.  He knew that that money

23  came from Kirk because the money came in through his attorney

24  trust account.  Carrillo drafted corporate filings for the

25  company that he knew were false.  He instructed Franklin to

E3jesecc

sign a false related party worksheet that was to be relied upon
by the auditors.  Carrillo's counsel says that in order for
these acts to be deceptive, the SEC would have to allege that
Carrillo knew about the Kirks' control over the company, and he
argues that the SEC has failed to make such allegations under
Rule 9(b).

He repeatedly argued that the SEC has to allege
knowledge with specificity.  And this is an absolute
misstatement of what is required under 9(b).  9(b) explicitly
provides that unlike other aspects of fraud, state of mind can
be alleged generally.  As the Second Circuit stated in the
Shields v. Cititrust decision, and as is repeated in numerous
district court decisions, Rule 9(b) actually represents a
relaxation of the specificity requirement in pleading the
scienter element of fraud claims.  And while fraud cannot be
alleged based upon speculation and conclusory allegations,
under Rule 9(b), allegations of scienter are sufficient if
there exists a minimum factual basis giving rise to a strong
inference of fraudulent intent.

Here, the SEC has given much more than a minimum
factual basis to support Carrillo's knowledge of the Kirks'
ownership and control.  Carrillo knew that Ben Kirk purchased
the Pacific Blue shell.  As alleged in the complaint, Kirk paid
90 percent of the shell.  And Carrillo facilitated the purchase
of the shell through the trust account.  As your Honor stated

E3jesecc

at oral argument, if the money is coming through the attorney

trust account, how can you possibly argue that he did not know

where the money is coming from or whose money it was?

Moreover, the remainder was paid for by Carrillo's

father.  This is a further allegation that supports the

inference that Carrillo knew exactly whose money was involved

in this transaction.

The complaint further alleges that Carrillo Huettel

were heavily involved in the communications between Pacific

Blue and the Kirks, as they were participants in e-mails, that

demonstrated that the Kirks were exercising control over

Pacific Blue.  As your Honor stated, unless there is some

competing conflicting disputed evidence, a reasonable

conclusion from a trier of fact, based on the facts alleged in

the complaint, is that Carrillo knew that these were related

parties and was a participant in a scheme to defraud.

Carrillo argues that his actions are just the actions

of any transactional lawyer, but this is not true.

Transactional lawyers don't fund money through their attorney

trust account.  Legitimate transactional lawyers don't

structure ownership arrangements to give a false appearance.

Legitimate transactional attorneys don't draft false statements

for corporate filings or draft false statements to be provided

to a company's auditors.

Finally, Carrillo argues that his deceptive acts have

E3jesecc

1    to be entirely distinct from any misrepresentation made, but we

2    note that in the *SEC v. Alternative Green* case, the Court

3    rejected this very argument, finding that the creation of false

4    corporate documents, as well as assurances to convince a

5    transfer agent to remove the restrictions from stock

6    certificates, those were inherently deceptive acts.  This is

7    the very case here and should come as no surprise that Carrillo

8    does not address the *Alternative Green* case in his briefs.

9         If your Honor has any questions with respect to

10   Carrillo, I'll answer them now.  Otherwise, we'll move on.

11        THE COURT:  Why don't you go to Huettel, since a lot

12   of the arguments are the same but they make some factual

13   distinctions.

14        MR. BRODY:  Sure.

15        At oral argument Mr. Huettel argued that a reasonable

16   inference that could be drawn from the complaint is that the

17   Kirks represented a group of owners and that the Kirks were

18   simply the face of this ownership group.  Consequently, he

19   argued that just because the money to purchase the Pacific Blue

20   shell came from the Kirks does not mean that that money only

21   belonged to the Kirks but, rather, a reasonable inference could

22   be drawn that the money belonged to the group.

23        First, the complaint specifically alleges in paragraph

24   82 that Carrillo Huettel knew that these entities were

25   nominees.  And the complaint also alleges that the 4.9 percent

E3jesecc

1    structure was specifically designed by Carrillo and Huettel to

2    conceal and facilitate the manipulation, and the misleading

3    impression that the shares were being held by various

4    independent entities.

5        Moreover, the complaint alleges that the money was

6    funneled through the trust account, which also demonstrates

7    that there was an intent to mislead here because there's no

8    legitimate reason for the money being transferred through the

9    Carrillo Huettel trust account.

10       And lastly, any reasonable transactional attorney

11   would have asked who controlled these mysterious foreign

12   entities that purportedly were the purchasers of the shares.

13   In the absence of that, how can Carrillo Huettel have honestly

14   issued any of the opinion letters saying that these companies

15   were not affiliates?  How could they have honestly prepared any

16   of the corporate filings, saying that there were no other

17   entities, no other control entities?  How could they have

18   honestly prepared the schedule, frankly, that was provided to

19   your Honor?

20       We think that the Court was absolutely right when it

21   suggested to Huettel's attorney that the only reasonable

22   inference that could be drawn from the allegations of the

23   complaint is that Huettel knew that the Kirks controlled these

24   entities.

25       In his memorandum of law, Huettel separately argues

E3jesecc

1    that the SEC appears to have abandoned its claims against him

2    based on false statements in favor of scheme liability.  We

3    disagree with that assertion in the memorandum of law, since

4    the complaint alleges both theories and the SEC argued both

5    theories in its opposition brief.

6            With respect to the misrepresentation, the SEC alleges

7    that the law firm Carrillo Huettel issued numerous false

8    opinion letters that Huettel worked with Carrillo to provide

9    the opinions and that Huettel specifically drafted the March 2,

10   2010, DTC opinion.  The fact that Huettel did not personally

11   sign the opinion letter we do not believe is of any

12   consequence, because the letters were sent by the law firm

13   Carrillo Huettel.  The letters describe "we" as the maker, not

14   I, or the signatory Luis Carrillo.  And because Huettel is only

15   one of two named partners, and this was a very small law firm,

16   we believe that the statements in the opinion letters are

17   equally attributable to him as well as to Carrillo and the law

18   firm generally.

19           And in the *Stillwater* case, which we cite in our

20   brief, the Court held that a reasonable fact-finder could

21   conclude that statements were made by all of the officers,

22   given the small size of the company.  We believe that that

23   guidance is equally applicable here.

24           Moreover, in the *Pentagon* case the Court held that

25   there could be more than one maker of a statement for *Janus*

E3jesecc

1    purposes.  Therefore, the SEC believes that has complied with

2    *Janus* with respect to the statements alleged to be false that

3    underlie the SEC's misrepresentation case.

4            THE COURT:  But I want to make sure I understand how

5    far you're pushing this.  You're not saying that simply because

6    he's the named partner in a small law firm, that if one of his

7    other partners sends out a misleading letter, that there's some

8    reasonable conclusion to reach that he participated in that?

9            MR. BRODY:  If that was the only allegation in the

10   complaint, I think it would be a tough case.  But that's not

11   the only allegation in the complaint, since Huettel here

12   actually worked on the opinion letters as alleged in the

13   complaint.

14           THE COURT:  All right.

15           MR. BRODY:  So I don't think we need to take it as far

16   as potentially it could go, your Honor.  But we think that

17   we've complied with *Janus*.

18           I'm trying to cut through the arguments.  I think with

19   respect to scheme liability, I think we've already argued the

20   existence of the scheme with respect to Mr. Carrillo.  I'm not

21   going to reargue it here.

22           But I want to address his aiding and abetting

23   argument.  Mr. Huettel argues he did not provide substantial

24   assistance because the SEC merely alleges that he performed the

25   typical tasks of a transactional attorney.  Mr. Huettel,

E3jesecc

however, does not cite a single case for the proposition that a lawyer who performs tasks in furtherance of a fraud cannot be held liable under aiding and abetting.  Substantial assistance requires that the person associate himself with a venture, participate in it as something that he wished to bring about and sought by his actions to make it happen.  And our allegations against him meet that standard.

Likewise, we allege that he had the requisite standard, with scienter, the knowledge.  He knew that the share of Pacific Blue had been bought for and paid almost entirely by John Kirk.  When he created documents, he drafted SEC filings that hid that fact he participated in e-mails demonstrating the Kirks were exercising control over Pacific Blue, and even provided Ben Kirk comments on Pacific Blue documents.

And lastly, I'll just address the argument of the Carrillo Huettel law firm, which was an independent argument that I guess is a policy argument where they say that they should be dismissed because the firm is defunct and that any liability that the firm would get would be duplicative of the relief that the SEC might obtain against the individual lawyers.  As a preliminary matter, we believe that that argument is premature first outside of the representation of counsel and perhaps some articles that we've seen in papers. We have no confirmation that the law firm ceases to exist.

Second, we don't know what assets are available to pay

E3jesecc

1    any judgment that the SEC might obtain in this case.  We don't

2    know what assets are in the names of Carillo and Carrillo

3    individually and what other assets might be in the name of the

4    law firm.  The law firm might have assets that are available to

5    pay judgments, and consequently, the firm should not be

6    dismissed.

7           Fourth, we believe that there are important policy

8    considerations in keeping the firm as a party to this action.

9    As holding law firms responsible, we believe it sort of as a

10   significant deterrent.

11          And finally, there isn't really an argument that the

12   cost to the firm would be less if they're dismissed to this

13   action.  They still have documents.  They'll still have to

14   respond to discovery, whether or not they are a party or a

15   third party.  So we don't think that the costs would be

16   measurably different.  So for that reason, we don't believe

17   that the law firm should be dismissed simply on the basis of

18   its defunct status.

19          THE COURT:  All right.  Who do you --

20          MR. BRODY:  I'll move on to Mr. De Beer.

21          Mr. De Beer was the president and CEO of Trade Show

22   and the chairman of Pacific Blue.  While serving as the

23   president and CEO of Trade Show, he signed Trade Show's annual

24   reports and quarterly reports.  And the complaint alleges that

25   these filings were misleading because they failed to mention

E3jesecc

1    the Kirks and Boyle share ownership and the fact that the Kirks

2    were control persons of Trade Show, as well as the fact that

3    they were serving as de facto investment bankers, promoters and

4    investor relation consultants.

5         Trade Show's public filings also misrepresented

6    De Beer's compensation because they did not disclose over

7    $330,000 in kickbacks that he received from the Kirks and

8    Boyle.  While serving as the chairman of Pacific Blue, De Beer

9    signed Pacific Blue's form 10K, filed it in April 2010.  This

10   document was also falsely misleading because it failed to

11   disclose the control and stock ownership and promotion by the

12   Kirk group.

13        Mr. De Beer's main argument in support of his motion

14   to dismiss is that the SEC has not properly alleged scienter.

15   And at oral argument his counsel articulated the argument as

16   follows:  The complaint alleges that in June 2008 the Kirks

17   gifted 10 million shares of Trade Show to various nominee

18   accounts.  Consequently, while De Beer concedes that he might

19   have known in October 2007 when he first became the CEO and

20   president of Trade Show that the Kirks controlled the company,

21   after June 2008, when the share transfer took place, he had no

22   reason to know that the Kirks continued to control the company.

23   And he claims that the only basis alleged in the complaint for

24   this knowledge is the fact that he possessed the shareholder

25   records.

E3jesecc

1        This argument totally misrepresents the allegations in

2   the complaint.  First, as we have stated previously,

3   allegations of scienter are sufficient if there exists a

4   minimum factual basis giving rise to a strong inference of

5   fraudulent intent.  And a strong inference can be alleged

6   either by pleading motive and opportunity or strong

7   circumstantial evidence of conscious misbehavior or

8   recklessness.  While either is sufficient in this case, the SEC

9   has alleged both.

10       As described in paragraph 35 of the complaint, De Beer

11  and the Kirks engage in an almost daily stream of

12  communications regarding Trade Show press releases, business

13  announcements and investor contacts.  John Kirk drafted press

14  releases for De Beer to release on behalf of Trade Show and

15  also sent e-mails to De Beer, telling De Beer to release news

16  and updated financials for the company.  I think that the

17  argument was made that the complaint doesn't specifically

18  allege what the time frame of these communications were, but

19  the time frame was the entire time of the complaint, and in

20  particular, during the time of the promotion, because what are

21  they releasing?  They're releasing the press releases, the

22  business announcements, the news and financial.  This was part

23  of the pump and dump scheme.

24       So during the time period following the transfer of

25  the shares in June 2008, and in particular, during the time of

E3jesecc

the pump, De Beer was getting communications from the Kirks

demonstrating their control.  Likewise, in paragraph 41, the

complaint alleges that the Kirks, Boyle, Hinton and De Beer

began promoting Trade Show in June and July of 2009.  This

activity also took place after the June 2008 transfer.

          Most important, however, is the fact that in

paragraphs 122 through 127 the complaint alleges that from July

through September 2009, De Beer provided the Kirks and Boyle

with corporate resolutions and certifications that allowed the

Kirks around Boyle to deposit stock at Scottsdale for sale.  As

this Court pointed out, why would the Kirks and Boyle have even

requested that De Beer provide these resolutions and

certifications for the nominee entities if they weren't

exercising control over the nominee entities?

          And in September and October of 2009, shortly after

De Beer provided those resolutions and certifications to the

Kirks and Boyle, the Kirks and Boyle wired him over $330,000,

the proceeds of the sale of the Trade Show stock.  Again, as

your Honor pointed out during oral argument, if the Kirks and

Boyle did not control these nominee entities, why would they

have sent De Beer proceeds from the sale of stock that those

entities made?  The only reasonable inference to be drawn from

the various allegations of the complaint is that De Beer

understood at all times that the Kirks and Boyle controlled the

nominee entities and, therefore, controlled the company.

E3jesecc

1          The facts are no better for De Beer concerning his

2     involvement with Pacific Blue, because right from the very

3     beginning, he knew that the ownership of the company was being

4     misrepresented.  De Beer received 40 percent of the company's

5     shares pursuant to an affiliate stock purchase agreement.  That

6     agreement said that De Beer paid $80,000 for the shares, but

7     De Beer knew that that was a false statement because he didn't

8     pay any money for those shares.  The money was paid by the

9     Kirks and he was just to sign the shares.

10          Moreover, many of the nominee entities that purported

11    to purchase 4.9 percent interest in Pacific Blue pursuant to

12    the nonaffiliate stock purchase agreement were the very same

13    entities that had been gifted shares of Trade Show in 2008,

14    including Strotas, Irish Delta and Kita-Kaine.  De Beer knew

15    from Trade Show that those entities were controlled by the

16    Kirks and Boyle.  Consequently, he knew that the shares of

17    those entities of Pacific Blue were likewise controlled by the

18    Kirks and Boyle.

19          Finally, in paragraph 89, the complaint alleges that

20    after the Kirks took control of Pacific Blue in September 2009,

21    they asserted control over all of Pacific Blue's major

22    decisions, including pushing the covenant draft of the press

23    releases as giving what his position was in the company.

24    De Beer had to know that the Kirks controlled.  In sum, for

25    both Pacific Blue and Trade Show, De Beer either knew that the

E3jesecc

Kirks had control, Boyle controlled the nominee entities and,
therefore, controlled the entities or was reckless with respect
to that control.  These facts are more than sufficient to meet
the minimum factual basis standard.

Separately, the complaint alleges that De Beer had
motive and opportunity.  The motive comes from his receipt of
$330,000 in kickbacks from the Kirks and Boyle, which was on
top of the salary that he received.  Mr. De Beer argues in his
memorandum of law that 300,000, $330,000 is not an uncommon
amount for CEOs to receive.  According to De Beer, CEOs
commonly receive seven-figure salaries.  And perhaps if this
was a real company, De Beer might have a better argument.

But as alleged in paragraph 46, this was not a real
company.  Trade Show's existence as a publicly traded company
was solely to increase demand in the company shares so that the
Kirks and Boyle could sell their shares.  And as alleged in
paragraph 66 of the complaint, for the fiscal year ended 2010,
Trade Show's revenue was approximately $32,000, less than
10 percent of the kickback paid to De Beer.  De Beer also
argues that there are possible other plausible explanations for
the payment, repayment of a debt, settlement of a dispute.

On a motion to dismiss, however, inferences are to be
drawn in favor of the plaintiff.  And the most plausible
inference of the payments from the Kirks and Boyle, if not the
only plausible inference, given the timing, is that this was a

E3jesecc

1    kickback relating to the sale of shares.  And, again, the key

2    here and the elephant in the room is that the transfers from

3    the Kirks and Boyle to De Beer were undisclosed.  The fact they

4    are undisclosed is demonstrative of the nefarious purpose.  If

5    there was nothing wrong with them, there would have been no

6    problem disclosing it.

7              I'd like to move on to Mr. Hinton.

8              THE COURT:  Yes.

9              MR. BRODY:  Today during oral argument Mr. Hinton's

10   counsel has suggested that there aren't allegations in the

11   complaint that demonstrate that he did anything fraudulent.

12   I'd like to address that.

13             The complaint alleges that Hinton set up the ESR

14   boiler room.  The complaint alleges that he was a director.

15   The complaint alleges that he ran the day-to-day operations,

16   and most important, it alleges that he ran the day-to-day

17   operations from John Kirk's home.  So I think the only

18   inference that can be drawn is that Mr. Hinton knew that John

19   Kirk was actively involved in Emerging Stock Report.  That's

20   what the complaint alleges.

21             The complaint also alleges that he owned shares, and

22   that he also knew that the Kirks owned shares.  And how does it

23   allege that the Kirks owned shares?  Because he was given

24   proceeds from the Kirks' sale of their shares.  He specifically

25   alleged that in the complaint.  So Kirk knows that ESR is being

E3jesecc

1    run in part by John Kirk.  He knows that John Kirk, or the

2    Kirks for sure, but John Kirk owns shares of that stock.  And

3    he owned shares of that stock.

4           And then he engaged, he actually engaged in the

5    promotions for the company.  He promoted the company to

6    multiple potential investors.  He made calls to investors.  And

7    in these calls he didn't disclose his ownership of the stock

8    and he didn't disclose the Kirks' ownership of the stock, and

9    he didn't disclose that ESR was not independent.

10          Now, Mr. Hinton argues that the SEC has failed to

11   allege a duty on his part.  And we think the law is fairly

12   clear, your Honor, where there are certain circumstances where

13   a duty is created, even in the absence of some type of

14   fiduciary relationship, one example would be insider trading.

15   If I have material nonpublic information concerning a company,

16   I'm not allowed to trade unless I make a disclosure, unless I

17   disclose the information.

18          Likewise, with respect to scalping, if I am promoting

19   a company, I am not allowed to sell shares of that company

20   unless I disclose that I am selling my shares.  The act of

21   selling shares creates this duty, your Honor.  So he had a

22   duty.  The duty that he had was to disclose that at the same

23   time he's promoting the shares, that he is also a seller.  And

24   he never made that disclosure.

25          Mr. Hinton argues that the SEC has failed to prove

E3jesecc

that he had scienter also based on the following argument,
which is that he says the SEC has not alleged that he actually
sold any stock.  Consequently, the SEC cannot argue that he had
motive and opportunity.

Moreover, citing a single 2005 case from the Southern
District of Florida, Hinton argues that motive and opportunity
alone is insufficient to prove scienter and that more is
required.  These arguments fail both factually and legally.

First, the SEC has alleged that Mr. Hinton sold stock.
With respect to Pacific Blue, in paragraph 155, it says Hinton
played a significant role in the Pacific Blue offering and
served as a necessary participant and substantial factor in the
distribution because he sold Pacific Blue shares that he
received from John Kirk.  So the allegation is clear that he
sold the shares.

Likewise, in paragraph 160D and in paragraph 163D, the
complaint alleges that Hinton realized proceeds of more than
21,000 and also received at least 31,000 in proceeds from sales
from Ben Kirk controlled accounts.  Now, I will concede to your
Honor that perhaps this could have been drafted a little
better.  But the $21,000 that we're referring to here are the
proceeds from his own sales as opposed to the $31,000 that he
received in proceeds from the Ben Kirk controlled accounts.
And the same thing is true with respect to Pacific Blue in
paragraph 163D, where we say that Hinton also realized proceeds

E3jesecc

1    of over 12,000 from shares sold during the pump and received an

2    additional $150,000 in proceeds of Pacific Blue stock sales.

3              What we're trying to get across there, your Honor, was

4    that the first part of that was his own stock sales.  The

5    second part of it, the $150,000, was money that he received

6    from other persons' stock sales.  But we made this very clear

7    in our memorandum of law exactly what the meaning and

8    understanding of this phrase was.  So not only do we explicitly

9    state that he sold shares; we also state in those two

10   paragraphs how much money he earned from his own stock sales.

11   Those stock sales, combined with his opportunity as a director

12   of ESR, as well as the person who ran the day-to-day operations

13   of ESR, that gives him the opportunity.  The motive is the

14   stock sale.  Together, we think we've alleged scienter on that

15   basis.

16             But Mr. Hinton is also wrong when he argues that

17   motive and opportunity by itself is insufficient to prove

18   scienter.  In the Second Circuit, motive and opportunity alone

19   is sufficient.  And this is in the *Vaughan v. Powers* case, the

20   Kolnet case, Novak case.  These are all cited in our brief.

21             Finally, we allege that the very act of scalping, of

22   promoting a stock while at the same time selling that stock

23   into the market, is an inherently reckless act.  Unless you

24   disclose in the promotion that you are selling, you have

25   committed an inherently reckless act.  So the act of scalping

E3jesecc

1    itself is an act of recklessness that meets the scienter

2    requirement.

3         I'll move on to Ben Kirk.  And then I think I've

4    already addressed Gibraltar, your Honor, so I don't think I

5    need to go through Gibraltar again.

6         Ben Kirk makes the following arguments.  He says that

7    because the complaint in certain paragraphs alleges that he and

8    other people committed certain acts, he cannot ascertain from

9    the complaint what his role in the fraud was.  He further

10   argues that because the SEC in certain limited circumstances

11   used the phrase "and/or" to describe his acts, he also cannot

12   ascertain what his role was.  And all of this according to

13   Mr. Kirk violates Rule 9(b).

14        As a threshold matter, however, Mr. Kirk argues that

15   the SEC is somehow trying to mislead the Court, because in its

16   complaint the SEC alleged that Ben Kirk and other people did

17   something, whereas in the SEC's opposition papers, the SEC said

18   that Ben Kirk said something.  We think that's a nonsensical

19   argument.  As the SEC stated in its opposition brief, that John

20   Kirk and Dylan Boyle, two of the main coconspirators with

21   Mr. Kirk, have already entered into partial settlements with

22   the SEC.

23        Consequently, it was unnecessary to describe in our

24   opposition motion the facts relating to those individuals

25   because they had settled and not filed motions to dismiss.

E3jesecc

1     Consequently, we focused on Ben Kirk because he moved to

2     dismiss the complaint.

3              With respect to the argument that the SEC has

4     improperly pled under Rule 9(b) because they've grouped

5     defendants together, we believe that this was totally

6     appropriate.  In *SEC v. Badian*, the Court held that it was

7     proper for the SEC to name defendants together because they

8     operated together as a unit.  And each defendant committed the

9     acts complained of.

10             The same is true in this case.  And this reflects the

11    facts that certain defendants worked together to effectuate the

12    various aspects of the scheme.  For example, in paragraph 47 of

13    the complaint, the SEC alleges that Ben Kirk, his brother, John

14    Kirk, Dylan Boyle and James Hinton set up two boiler rooms to

15    promote Trade Show.  And in paragraph 48, the SEC specifies

16    that Ben Kirk and Boyle operated Skymark while John Kirk and

17    Hinton operated Emerging Stock room.  There is no question from

18    these two paragraphs who did what.

19             And as this Court pointed out today, to the extent the

20    SEC alleges that two people did something, this is not group

21    pleading.  This is because the SEC is alleging that each of

22    those persons did those acts.  This is a 50-page complaint,

23    your Honor, with nearly 230 paragraphs.  If the SEC had to

24    state in multiple paragraphs that each individual did the same

25    thing as the next, the complaint would be twice as long and

E3jesecc

unreadable.  And we do not believe that Rule 9(b) requires
this.  And we would refer the Court to 2013 decision called
Szulik, S-Z-U-L-I-K vs. Tagliaferri.  And in that case the
defendants complained that the complaint violated Rule 9(b)
because it referred to two of the defendants as if they were a
combined unit no less than 298 times in the complaint.  But the
Court held that 9(b) did not prevent such pleading, finding
that each defendant could determine the role that he played in
the fraud.

          And we say the same thing here, your Honor.  Mr. Kirk
can easily determine what it is that he did.  We have set it
out very plainly.  And to the extent that two people are
alleged to have done something, it's because those two people
did that act.

          Similarly, with respect to the "and/or" paragraphs, we
ask the Court to pay attention to what is being alleged here.
Going back to your bank robbery analogy this morning, your
Honor, we don't allege that one defendant robbed the bank
and/or drove the get-away car.  In such a case a defendant
might reasonably say that he doesn't know what he's being
accused of.  But in this case the SEC used the term and/or
according to Ben Kirk, twice in the factual allegations and
once in the recitation of the first claim for relief.  So we
don't use this as a crutch, as Mr. Kirk suggests.

          And in these two instances, in the factual recitation,

E3jesecc

1    the term and/or is utilized with respect to whether a defendant

2    drafted and/or approved certain language in the stock touting

3    e-mails and the public statements responding to the street

4    sweeper article.

5              First, drafted and/or approved is different from the

6    example I just gave in the bank robbery example.  There is a

7    fine line, your Honor, between drafting and approving language.

8    And it is often difficult to determine exactly which person

9    drafted and which person approved.  And many times a person

10   will do both.  And as an outsider to these transactions, the

11   SEC cannot be held to make such allegations with such

12   specificity because this is information that is particularly

13   and keenly within the defendant's own knowledge.

14             And second, for their liability purposes, it doesn't

15   really make a difference whether or not they drafted or

16   approved the language.  Reliability would be the same, your

17   Honor.

18             In addition to the 9(b) claim, Mr. Kirk claims that

19   the SEC has failed to allege scienter.  Here the SEC alleges

20   both motive and opportunity and strong circumstantial evidence

21   of conscious misbehavior or recklessness.  And it's notable

22   that Mr. Kirk does not even discuss motive and opportunity in

23   his reply brief.  And the reason for this is that it's

24   uncontrovertible that he sold millions of shares of stock that

25   he owned.

E3jesecc

1          For Trade Show the complaint alleges that the nominee

2     entities that he and Boyle controlled realize more than

3     $4.4 million in proceeds from sales of over 5 million shares

4     during a seven-month period.  And for Pacific Blue, the

5     complaint alleges that over a six-month period the Kirks and

6     Boyle realize more than I think $5.6 million from stock sales.

7     This is a concrete benefit.

8          Moreover, the complaint alleges opportunity to commit

9     the fraud as he set up the boiler rooms that were promoting

10    these companies, which increased the demand for the stock and

11    also exercised control over the companies, even if he was not a

12    named control person.

13         The complaint also alleges reckless conduct, first

14    through the scalping, which by itself by its nature is reckless

15    conduct.

16         Second, the use of the multiple fake offshore nominee

17    accounts to conceal stock sales is evidence of scienter.  If

18    Ben Kirk didn't believe that he was doing something wrong, why

19    did he need to sell his shares to not just one account in a

20    fake name but in multiple fake account names?

21         Third, Mr. Kirk's attempts to cover up the scheme when

22    it was discovered is further demonstrative of his fraudulent

23    attempt, but the complaint is filled with allegations

24    describing his fraudulent intent.  He set up the boiler room.

25    He wrote the Skymark script.  He told the account managers to

E3jesecc

watch the movie Boiler Room.  He was highly involved in the

language in Skymark's e-mails that said that Skymark was

independent.  He drafted and released the fake independent

research report that Skymark touted as being independent.

Finally, in addressing the Section 20(a) claim,

Mr. Kirk claims that his reply brief that the SEC did not

provide any specifics with respect to the tasks that Ben Kirk

performed in running Skymark's operations.

First, as a matter of pleading, the SEC is not

required to particularize the allegations concerning control as

set forth in the numerous cases alleged in our opposition

brief, including In Re: AIG and Colombo, which make clear that

allegations of control are not averments of fraud and are,

therefore, governed by Rule 8 and not Rule 9(b).  Your Honor's

case In Re Sarnafi, which discusses particularized allegations,

does so in the context of the third prong of control person

liability, which is culpable participation and not with respect

to the second prong, control over the primary violator.

But even if the SEC was required to allege control of

particularity, it has done so.  In addition to the fact that

Ben Kirk established Skymark, the complaint alleges that he

gave the script that the Skymark account managers used; that he

instructed Skymark account managers to watch the movie Boiler

Room so they would know how to sell stock.  The complaint

alleges that Kirk drafted the false and misleading statements

E3jesecc

1    in Skymark's e-mails to customers, and that Kirk drafted the

2    false research report that Skymark sent to investors.

3            Your Honor has also pointed out numerous other

4    paragraphs in the complaint that demonstrate the allegations

5    that particularize Mr. Kirk's control over the company.

6    Consequently, the SEC believes that it has met its pleading

7    obligations with respect to Mr. Kirk generally and also with

8    respect to the control person liability claims.

9            I'll answer any questions your Honor has.

10            THE COURT:  No, I think you've answered my questions.

11            MR. BRODY:  Thank you, your Honor.

12            Your Honor, we can now address the Section 5 claims

13    separately at your ...

14            MS. BROMBERG:  Good afternoon, your Honor.

15            THE COURT:  Good afternoon.  I don't want to sell you

16    short, but we probably had a lot of this discussion before.

17            MS. BROMBERG:  I'll keep it short.  I wanted to

18    revisit briefly with you the scenario you were talking about

19    with my colleague, Mr. Newville, about who is subject to the

20    requirements of Section 5.  And the prima facie obligation as

21    you said, is simply that we have to meet an obligation

22    defendant used the instrumentalities in interstate commerce

23    directly or indirectly to offer to sell securities where a

24    valid registration statement was not in effect.

25            Now, there are exemptions, and one exemption that is

E3jesecc

1    available to ordinary people is Section 4.1, which says that

2    offers to sell or buy securities are not subject to Section 5

3    if they're by persons other than an underwriter, issuer,

4    dealer.  In our complaint we have made allegations that all the

5    defendants are underwriters or necessary participants in

6    substantial factors.  With regard to Dr. Carrillo, because he

7    is an underwriter and --

8            THE COURT:  Well, that's what I was going to ask,

9    because I went back and looked at that.  On what basis are you

10   alleging he's an underwriter?

11           MS. BROMBERG:  Great question.  Well, first, I'd like

12   to just also address, because I will address both issues, the

13   arguments by counsel for Carrillo and Huettel that the shares

14   from Pacific Blue were already registered pursuant to the 2007

15   SB-2 for Zonso (phonetic) travel agency.  And we'll get to the

16   underwriter issue through this discussion.

17           THE COURT:  We've been through this discussion.

18           MS. BROMBERG:  We haven't.  We haven't addressed it

19   yet.  So the registration statements are in effect --

20           THE COURT:  They persuaded me on that one.  You can

21   talk me out of it.  You can't register one stock and then

22   convert it into something else because you want to make people

23   think they're getting something new and not reregister it.

24   That's kind of a hard argument to make.

25           MS. BROMBERG:  Terrific.  So we'll move on to

E3jesecc

1    Dr. Carrillo.  When he obtained his shares, he obtained them in

2    the same 2009 transaction that the Kirks, Boyle also obtained

3    their shares.  And that transaction was from a control person

4    of the issuer, so those then became restricted shares.

5              THE COURT:  Okay.

6              MS. BROMBERG:  So the statutory underwriter provision

7    is Section 2(a)(11).  And that says -- you know, and that says

8    the term underwriter means any person who has purchased from an

9    issuer with a view to or offers or sells for an issuer in

10   connection with the distribution of any security, or

11   participates, or has a direct or indirect participation in any

12   such undertaking, or participates or has participation in the

13   direct or indirect underwriting of any such undertaking.

14             And the statute goes on to define the term issuer to

15   include, quote, in addition to an issuer, any person directly

16   or indirectly controlling or controlled by the issuer or any

17   person under direct or indirect common control with the issuer,

18   end quote.

19             So Dr. Carrillo obtained his shares from a control

20   person in connection -- of the issuer.

21             THE COURT:  I was listening for what you say -- what

22   language applied to Dr. Carrillo?  What way did he participate,

23   in --

24             MS. BROMBERG:  He purchased the shares from a control

25   person.

E3jesecc

1          THE COURT:  But it doesn't say a purchaser of the

2     share is an underwriter.  That's not what it says.

3          MS. BROMBERG:  It does.  The term underwriter means

4     any person who has purchased from an issuer with a view or who

5     participates in any kind of distribution is an underwriter.

6          THE COURT:  With a view?

7          MS. BROMBERG:  Or --

8          THE COURT:  Give me --

9          MS. BROMBERG:  Or has a direct or indirect

10    participation in any such undertaking.

11         THE COURT:  But you're not saying he has any direct or

12    indirect participation.

13         MS. BROMBERG:  Well, with the distribution, yes, he

14    does, because its shares are sold.

15         THE COURT:  What was his participation?  That's what I

16    went through this morning.  Nobody, nobody can articulate for

17    me what his participation was.  What was his participation?

18         MS. BROMBERG:  He purchased the shares from a control

19    person --

20         THE COURT:  I'm sorry.

21         MS. BROMBERG:  So he purchased the shares from a

22    control person of the issuer, and then the shares are

23    restricted securities and they are subject to the holding

24    requirements of Rule 144, which he didn't comply with.  And he

25    did purchase the shares with a view to then sell them.  And

E3jesecc

1    that's all that's required under the statute.

2              THE COURT:  But you don't say that.  You don't say

3    that.

4              MS. BROMBERG:  We do.

5              THE COURT:  You don't say Dr. Carrillo purchased the

6    shares with a view to sell them.  You don't say Dr. Carrillo

7    purchased the shares at all.

8              MS. BROMBERG:  May I point you to paragraph 146 of the

9    complaint.

10             THE COURT:  Okay.

11             MS. BROMBERG:  We say the Kirks, Boyle, Hinton and

12   Dr. Carrillo are underwriters under Section --

13             THE COURT:  Yeah --

14             MS. BROMBERG:  Because they acquire shares from an

15   affiliate of the issuer with a view to public distribution and

16   did not comply with the applicable conditions of Rule 144.

17             THE COURT:  But that's a conclusory statement.  In

18   what way did Dr. Carrillo purchase the shares with his view of

19   public distribution?

20             MR. BRODY:  Well, he purchased them in the transaction

21   in 2009.

22             THE COURT:  Okay.

23             MR. BRODY:  And then distributed them.  So.

24             THE COURT:  Wait a minute.  That's true of everybody

25   who buys and sells stock.  That doesn't make everybody

E3jesecc

 1    underwriters.  Every human being who purchases a share

 2    purchased it with the eye of some day selling it.  That's not

 3    what you mean --

 4              MS. BROMBERG:  But not everybody who purchases the

 5    shares purchases it from directly from the issuer or control

 6    person of the issuer.  And --

 7              THE COURT:  I know --

 8              MS. BROMBERG:  And people who buy shares, many of them

 9    aren't --

10              THE COURT:  Slow down.  That's not the definition you

11    gave me.  That's not what it means.  It doesn't mean that

12    because somebody gave it to me, that I automatically am the

13    underwriter; because I purchased it, I am automatically the

14    underwriter.  Under that definition you're trying to put on

15    Dr. Carrillo because someone purchased it in his name for him

16    and he now owns it.  That makes him an underwriter.  That's

17    your argument?

18              MS. BROMBERG:  Because Dr. Carrillo himself purchased

19    it from an affiliate of the issuer.  That's the statutory

20    definition.  And then if he has even indirect participation in

21    the distribution, that's the terms of the statute.

22              THE COURT:  But what is his indirect participation?

23              MR. NEWVILLE:  Having a brokerage account and either

24    trading himself or having his son trade from that brokerage

25    account and distribute the shares in the public distribution

E3jesecc

1   that were control shares and in violation of the Rule 144

2   holding period in violation of Section 5, that's at the very

3   least indirect participation.  And that's the statute.

4              THE COURT:  Wait a minute.  Wait a minute.  Slow down.

5              What allegation is there that Dr. Carrillo

6   participated in any way in the purchase of these shares?  And

7   what do you mean to allege by that?  When you say

8   participation, I assume you're not talking about any active

9   participation.  Or are you?  I mean --

10             MS. BROMBERG:  There's the act of participation of

11  buying the shares.

12             THE COURT:  Did he actively participate in buying the

13  shares?

14             MS. BROMBERG:  Yeah.  He wired money from a US bank

15  account to Carillo and Huettel's trust account to purchase the

16  Pacific Blue shares.

17             THE COURT:  Okay.  You say he wired -- and you believe

18  that the wiring of that money was specifically so that he could

19  buy the Pacific Blue share?

20             MS. BROMBERG:  Yes.

21             THE COURT:  Okay.  All right.  Okay.  Go ahead.  So

22  your argument is dependent on his being defined as an

23  underwriter?

24             MS. BROMBERG:  Yes.

25             THE COURT:  Because that's not the discussion we were

E3jesecc

1    having earlier.  So if I don't find him to be an underwriter,

2    there's no other reason to keep him in this case?  You can't

3    have it both ways.

4              MS. BROMBERG:  Well, yes, we believe he's statutory

5    underwriter.  I also wanted to correct one statement, which is

6    that he sent the money by check, the 20,000 to buy the Pacific

7    Blue shares, and not a wire.

8              THE COURT:  Right.  I didn't know whether that was

9    significant.  All right.  So he is an underwriter because he

10   received it directly from the issuer?

11             MS. BROMBERG:  From an affiliate of the issuer, yes.

12             THE COURT:  And but does it have -- it has to be with

13   the intent for him to distribute, doesn't it?

14             MS. BROMBERG:  There's not actually an intent.  It's

15   just if there's a direct or indirect participation in any

16   distribution.  That's within the statute.

17             THE COURT:  How do --

18             MS. BROMBERG:  Section 2(a)(11).

19             THE COURT:  Tell me how I can have shares and not have

20   by your definition a direct or indirect participation in the

21   distribution.

22             MS. BROMBERG:  Well, if you bought shares in an

23   offering or there's registration statement, and you're just --

24             THE COURT:  Well, that has to do with where the shares

25   come from.  I'm asking you about your definition of direct and

E3jesecc

1    indirect participation.

2            MS. BROMBERG:  Okay.  So Dr. Carrillo purchased the

3    shares from an affiliate of the issuer.  He sold shares to the

4    market.  Now, if you were somebody who read the misleading

5    information on Skymark and cited that you wanted to buy the

6    Pacific Blue shares, then you could buy them and you wouldn't

7    be buying them from the issuer.  So you wouldn't be an

8    underwriter.  So in that case you would be able to claim

9    that that 4.1 exemption.

10           THE COURT:  So your definition of underwriter is

11   someone who gets the shares directly from the issuer?

12           MS. BROMBERG:  Yes, or an affiliate of the issuer.

13           THE COURT:  But tell me if I'm wrong, and you may have

14   a handle on this better than I.  But my understanding of the

15   intent and the definition of an underwriter is someone who

16   takes the shares -- not because they intend to own them

17   themselves, but they take the shares because they intend to

18   temporarily hold them until they find a buyer.  Is that an

19   accurate statement?

20           MS. BROMBERG:  I believe that is.  And that actually

21   speaks to what Rule 144 --

22           THE COURT:  So what evidence is there, what allegation

23   is there that that's what Dr. Carrillo did?

24           MS. BROMBERG:  Because he, in fact, obtained the

25   shares from the affiliate of an issuer and then distributed

E3jesecc

1    them within the one-year holding requirement of Rule 144.  And

2    Rule 144 has a holding requirement on restricted securities in

3    part so that people will hold the shares for at least a year

4    before there's a distribution.

5              THE COURT:  So did anyone ever find me the strict

6    liability case that you were trying to rely upon?

7              MS. BROMBERG:  Yeah.  There's a whole bunch of them,

8    but one of them is SEC v. Soft Point -- or, I'm sorry, SEC v.

9    Burm Oil and Management, Southern District of 2007 case.  I

10   have it over there, and I can get you the language, if you'd

11   like.

12             THE COURT:  I don't want to, as I say, beat a dead

13   horse here, but you see my problem.  My problem is that your

14   allegations are dependent upon my concluding that the act of

15   the son Carrillo is sufficient to make the Dr. Carrillo a

16   direct or indirect participant.  And even your allegations -- I

17   mean, as a matter of fact, even your allegations about the

18   sale -- and you can point me to that paragraph -- even your

19   allegations about the sale is that you don't even say that the

20   son Carrillo sold the shares.  You say that they were sold out

21   of that account.  You said the account sold them, is my

22   recollection.

23             Do you know what paragraph I'm talking about?

24             MS. BROMBERG:  I believe I do.

25             THE COURT:  Which paragraph?

E3jesecc

1          MS. BROMBERG:  Well, I think you're talking about

2     paragraph 150, but in paragraph --

3          THE COURT:  150, hold on.  Slow down.

4          MS. BROMBERG:  148 --

5          THE COURT:  Let me just look.  I have all the

6     Dr. Carrillo paragraphs with a "doctor" next to it.

7          I don't see that.  I don't think that that's --

8     there's a paragraph that says that the shares were sold.

9          And also, while I look for that, also we had an

10    earlier discussion -- I think it was earlier represented that

11    Dr. Carrillo received $900,000.  And the way I read the

12    complaint was that the ultimate receipt of that money, that

13    money was distributed to these other folks that you say were in

14    this scheme that --

15          MS. BROMBERG:  In part.

16          THE COURT:  What money -- are you saying that moneys

17    after the sale of the stock, $900,000, was received and

18    retained by Dr. Carrillo?  Because that's not the way I read

19    it.  And when I added up the numbers of where you say the

20    moneys were distributed, there's no $900,000 left out of the

21    sale of the $1.1 million of proceeds.

22          MS. BROMBERG:  Well, let me just back up for a minute,

23    just to kind of get back to the Section 5 allegations and the

24    prima facie case that the SEC has made.

25          Once the SEC pleads the elements of the prima facie

E3jesecc

1    claim, the instrumentalities of interstate commerce were used

2    to offer or sell securities directly or indirectly, without

3    registration statement in effect, then the burden to prove any

4    exemption, including Section 4.1, which I mentioned earlier, is

5    on the defendant.

6         THE COURT:  Right.  I understand that.  They can't

7    assert -- no defendant here can use as a ground for dismissing

8    the complaint the fact that they intend to assert a defense.

9         MS. BROMBERG:  Right.  But claiming not to be a

10   statutory underwriter, which we've alleged is, in fact, an

11   exemption that would have to be argued by a defendant --

12        THE COURT:  No.  If that's your basis for saying that

13   he's liable, you have to allege --

14        MS. BROMBERG:  Right, and we did.

15        THE COURT:   -- sufficient facts that indicate that

16   he's liable on that basis.  And you can't just simply call

17   everybody an underwriter and that's good enough.

18        MS. BROMBERG:  Right.  No, we're not doing that.  He's

19   an underwriter because he acquired the shares from an affiliate

20   of the issuer.

21        THE COURT:  Look, you've got a bunch of smart lawyers

22   over there at the SEC.  And if you chose the language in

23   paragraph 167, if you chose the language that an account

24   controlled by Carrillo sold most of the Dr. Carrillo block of

25   Pacific Blue shares, there's a reason you chose to word it that

E3jesecc

1    way, okay?  Because you don't have any evidence that

2    Dr. Carrillo himself sold those shares, and you don't have any

3    evidence to say -- and in this case you probably don't even

4    have evidence to say Carrillo, the son, sold the shares because

5    you don't even accuse him of doing it.  You say an account

6    controlled by Carrillo sold the shares.  Well, there's no such

7    thing.  Somebody sold the shares.

8             And then you say that the shares were wired to a

9    foreign account held in Dr. Carrillo's name.  And then you give

10   me a list of places where the money ultimately went to from the

11   Dr. Carrillo account, I assume.  And then you give me a list of

12   all of the money that went elsewhere.  And it doesn't -- I

13   don't know where the representation is that Dr. Carrillo

14   received $900,000.

15            MS. BROMBERG:  Yes, there is no representation that he

16   received the money.  I mean --

17            THE COURT:  Well, there was this morning.  I was told

18   Dr. Carrillo got $900,000.

19            MR. NEWVILLE:  May I address this?

20            THE COURT:  I assume you did not mean that that money

21   was given to him and that's where it remained.

22            MR. NEWVILLE:  Your Honor, let me just address this,

23   and I think --

24            THE COURT:  Because it's not in the complaint.  You're

25   confusing me.

E3jesecc

1              MR. NEWVILLE:  I can clarify the complaint.

2              Now, what we allege in paragraph 167 is that the

3    majority of those proceeds were wired to the foreign account

4    held in Dr. Carrillo's name.

5              THE COURT:  Right.

6              MR. NEWVILLE:  We don't have a specific number in

7    there.

8              THE COURT:  Right.  But then you say 472 -- no, you do

9    have a number.  You say that the proceeds were $1.1 million.

10             MR. NEWVILLE:  Right.

11             THE COURT:  Then the next paragraph you tell me that

12   $472,000 of the proceeds from the sale of Carrillo was wired to

13   the offshore account in Barbados to the Kirk and Boyle

14   accounts.  And then you say $520,000 of the Carrillo proceeds

15   were wired to accounts in California.  Then you give me the

16   list of all the accounts.

17             MR. NEWVILLE:  Correct.

18             THE COURT:  That adds up to almost $1.1 million.

19             MR. NEWVILLE:  That's right.

20             THE COURT:  So where's the $900,000?  What $900,000

21   are you referencing?  You confused me.

22             MR. NEWVILLE:  I'm sorry, your Honor.

23             THE COURT:  You just said this morning, you referenced

24   that $900,000 went to Dr. Carrillo.

25             MR. NEWVILLE:  Yeah.  I believe that $900,000 went to

E3jesecc

1   the account in Mexico, which was the account in Dr. Carrillo's

2   name.  And we can --

3            THE COURT:  And that's the money you say then,

4   therefore, then went to other people?

5            MR. NEWVILLE:  Let me explain to you what happened.

6            THE COURT:  No.  You've got to answer my question

7   because you're going to confuse me.  That's the money that you

8   are referencing here.  You're not saying that that $900,000

9   stayed with Dr. Carrillo; that's not what you meant to

10   represent, is that right?

11            MR. NEWVILLE:  That's right.

12            THE COURT:  You're saying that $900,000 was wired to

13   the Carrillo related accounts in this manner and then

14   distributed to these other people that had been personally in

15   the pump and dump scheme?  That's basically what I understand?

16            MR. NEWVILLE:  Here is the issue.  In paragraph 168 --

17            THE COURT:  That $472,000 of proceeds, right?

18            MR. NEWVILLE:  That just went to an offshore bank

19   account.  We don't know which one controlled that.  We don't

20   know how they divided it up.

21            THE COURT:  Yeah, we do.  You say bank account in

22   Barbados where the Kirks and Boyle sent their proceeds.

23            MR. NEWVILLE:  It was the same account.  Everybody was

24   sending all their funds there.

25            THE COURT:  It wasn't a Dr. Carrillo account?  You

E3jesecc

1   don't claim it was a Dr. Carrillo account?

2          MR. NEWVILLE:  Well, we know that it's an account

3   where he sent the proceeds.

4          THE COURT:  You don't claim it was a Dr. Carrillo

5   account?

6          MR. NEWVILLE:  No, we don't, your Honor.

7          THE COURT:  That's all I'm asking.  You don't say

8   that, but you don't want me to believe that Dr. Carrillo got

9   the money out of Barbados back; that's not what you're trying

10  to have me believe, right?

11         MR. NEWVILLE:  Well, no, your Honor.  We can't draw

12  any conclusions at this point --

13         THE COURT:  All right.  So Dr. Carrillo did not

14  personally receive as a profit to him $900,000 that you are

15  alleging?

16         MR. NEWVILLE:  Well, it would certainly be strange if

17  somebody could avoid liability simply by just sending the money

18  to an offshore account.

19         THE COURT:  You know you're trying to get to my

20  ultimate point if you're trying to figure it out, and I'm not

21  trying to make a point.  I'm trying to ask a question, a

22  factual question.

23         You're not alleging that Dr. Carrillo received a

24  profit personally of $900,000 on the sale of this stock?

25         MR. NEWVILLE:  No, we're not alleging that.

E3jesecc

1          THE COURT:  That's all -- I mean, as I say, I just

2     wanted to make sure I knew what $900,000 you were talking about

3     because there's no $900,000 reference that Dr. Carrillo

4     personally received in this complaint.

5          MR. NEWVILLE:  That's right, your Honor.

6          THE COURT:  All right.  So by your laying out these

7     facts, 67 through 70, how much of this $20,000 are you

8     contending went back to Dr. Carrillo personally?

9          MR. NEWVILLE:  How much of the 520?

10         THE COURT:  No, how much of the initial investment?

11         MR. NEWVILLE:  We're not sure how much was retained by

12    Dr. Carrillo.

13         THE COURT:  Okay.  That's all I'm asking.  You don't

14    know.

15         MR. NEWVILLE:  We don't know.

16         THE COURT:  Okay.  But all of this money --

17    approximately how much money that was distributed through the

18    Carrillo account and went to other places, how much of the

19    $1.1 million does this add up to?

20         MR. NEWVILLE:  Well, I believe what we've got is the

21    343,000 is part of the 520 that was sent to California.

22         THE COURT:  Okay.  You have 472,000 plus 520,000?

23         MR. NEWVILLE:  Right.

24         THE COURT:  Okay.  So if my math is right, that's

25    992,000 of the $1.1 million you know were -- didn't stop in

E3jesecc

1    Dr. Carrillo's account.

2            MR. NEWVILLE:  Right.  Those are the amounts that went

3    through the account in Mexico.

4            THE COURT:  And what about the -- okay.  All right.

5    Okay.  Go ahead, because I want to wind up in a minute.

6            MR. BRODY:  I'm not sure --

7            THE COURT:  Try to finish this up in the next 20

8    minutes.

9            MR. BRODY:  I'm not sure --

10           THE COURT:  My time is 20 minutes.

11           MR. BRODY:  Sir, we can address the venue and process

12   issues, if your Honor wants us to address those.

13           THE COURT:  Yeah.  Remind me of the venue issue.  That

14   was --

15           MR. BRODY:  That was Mr. Huettel argued, and I think

16   the Carrillo Huettel -- maybe Carrillo, too.

17           MR. CURRAN:  Mr. Fleming argued that on behalf of

18   whoever it may apply to, but certainly Mr. Carrillo.

19           THE COURT:  Go ahead.  I mean, I'm not sure what -- I

20   had to remember the venue argument.  Venue should be where?

21           MR. NEWVILLE:  And, you know, as you're aware, we've

22   pled this case here in New York.  Mr. Huettel and apparently

23   the firm and Mr. Carrillo would prefer it to be in San Diego.

24   But we believe that venue here is appropriate not only under

25   the coconspirator theory of venue, which I think your Honor

E3jesecc

1    touched on when we were here last, but also through the

2    Mr. Huettel's own acts.

3         And paragraph 131 of the complaint -- Mr. Brody

4    referenced this before -- Mr. Huettel drafted, and he and

5    Carrillo provided, a letter that was addressed to the DTC in

6    this district.  So as we've discussed in our brief, that was an

7    important step in the execution of the scheme.  And it was a

8    step that Mr. Huettel and Mr. Carrillo took themselves.  In a

9    scheme liability case, that's enough to grant venue over the

10   entire case.

11        THE COURT:  Well, was there argument -- you have to

12   remind me.  I'm sorry.  Was there argument that venue was

13   improper here, or is their argument that venue is more

14   appropriately transferred to California?

15        MR. NEWVILLE:  We've got both arguments.  So they've

16   argued that venue is improper, and in the alternative, they'd

17   like it transferred.

18        The second point on whether venue is appropriate here

19   is under the coconspirator theory.  In a scheme liability case

20   the venue is proper as to all defendants so long as venue here

21   is established as to any defendant.  We believe venue is

22   established as to Carrillo and Huettel on that opinion letter.

23        In addition, paragraph 14 of the complaint notes that

24   certain defendants solicited investments from investors in this

25   district, and the defendants sold securities through a broker

E3jesecc

1    located in this district.

2              THE COURT:  Well, you know, let me stop you there.

3    You don't have to make a strong argument.  This is not

4    compelling.  The only person in California is Carrillo and

5    Huettel, if they're still in California.  And they say the law

6    firm is even defunct, so it's not even a law firm I have to

7    consider is a valid defendant for venue purposes in terms of

8    being compelling to send it to California.  Nobody else has any

9    contact with California.  In fact, Mr. Carrillo is a New York

10   lawyer.  So venue, I think, on the basis of what you argued, it

11   is appropriate here.

12             If there was some other compelling issue, and most of

13   these defendants and most of the records and parties were in

14   California, it might be more compelling.  But, quite frankly,

15   most of these people are international, so it's not a very

16   compelling reason to tell anybody they've got to go to

17   California simply because Mr. Carrillo and Mr. Huettel want to

18   be in California, because that's where they're from.

19             MR. NEWVILLE:  Your Honor, I think the only other

20   point I wanted to make, Ben Kirk's counsel today made some

21   arguments about whether service process was appropriate as to

22   his client.  I just want to correct the record on one point.

23             He had asserted that the SEC should have gone to Ben

24   Kirk's court appearances in Alberta and that he has not missed

25   a single court appearance there when his presence was required.

E3jesecc

1    I think that statement is, at best, misleading.  According to

2    the Alberta Securities Commission, Ben Kirk's appearance has

3    not been required at any court proceedings.  They couldn't find

4    him, and they only served him when counsel showed up on his

5    behalf and agreed to accept service.  So they're not quite sure

6    where Ben Kirk is either.  That said, if you have other

7    questions as to service and the reasonable efforts we took, I'd

8    be happy to answer.

9            THE COURT:  No.  I'll let anyone else who wants to

10   briefly respond respond, then I'm going to end.

11           MR. MARCELINO:  Your Honor, I would actually like to

12   briefly respond to some of the SEC's assertions.  And I'd start

13   out by saying a very good lawyer sometimes recognizes when it's

14   time to sit down and just be quiet and not say anything

15   further.  I'm hoping that I don't preclude myself from such

16   consideration.

17           I couldn't help but want to jump up during some of the

18   staff's arguments, particularly with respect to Section 5, your

19   Honor.  In summary, in the assertion that Dr. Carrillo is

20   somehow statutory underwriter and, thus, strictly liable, as

21   this staff stated, a statutory underwriter is defined in

22   Section 2(a)(11), okay?  All being a statutory underwriter

23   means is that you're not eligible for a Section 4.1 exemption.

24   4.1 exemption covers private transactions.  A statutory

25   underwriter the exemption is not eligible, but you still have

E3jesecc

1   to go through the next step of establishing a Section 5

2   violation.

3           The staff has asserted participant liability.  As all

4   of the participant liability cases make extremely clear, with

5   regard to participant liability, it's not a strict liability

6   standard.  You have to demonstrate that somebody was a

7   necessary participant or a substantial factor.  And I think

8   that it's been misleading to assert this.  And I'm not saying

9   that it's done intentionally, but part of the problem I

10  speculate is that you have a group of enforcement lawyers

11  talking about a corporation finance issue.  I don't concede

12  that Dr. Carrillo is a statutory underwriter, but if I did, I'd

13  simply say whoop-de-doo.  It doesn't mean he violated

14  Section 5.

15          The other point that I would like to make, going back

16  to the earlier jurisdictional arguments, your Honor, I'm kind

17  of -- if this wasn't such a serious proceeding, I'd find some

18  humor to it, because I see the staff is just running from their

19  complaint.  And I want to pause at that.

20          You should live by your -- if you live by your

21  complaint, you drag somebody into court, you should die by your

22  complaint.  How the staff runs from paragraph 150, which

23  strongly -- you know, we talk about all the inferences.  I

24  can't read paragraph 150 and walk away from that and say

25  Dr. Carrillo was selling these shares.  They want to run from

E3jesecc

1    that and interject a lot of facts which are not in the

2    complaint.  And I just would like to remind the Court that

3    traditionally, a plaintiff in establishing personal

4    jurisdiction, it must be based on allegations in the complaint.

5    I quickly cite *Ball v. Metallurgie*.  It's 902 F.2d 194.

6    Conclusory allegations and statements must be ignored by the

7    court.  *Melnick v. Adelson-Alelnick*, 346 F.Supp. 501 (Southern

8    District 2004).

9            And lastly, when the plaintiff fails to submit

10   documents or an affidavit, the Court is limited to the

11   allegations in the complaint.  Again, this matter was filed a

12   year ago.  The staff has had ample time to file affidavits with

13   additional facts, and they haven't.  The Court shouldn't

14   consider them.

15           And the last point that I would like to make -- I know

16   everybody's had a long day, your Honor -- but I would take

17   issue with the cases that the staff has relied on with respect

18   to jurisdiction.  I think you seized on the moment correctly

19   when the staff was discussing *Unifund* as you distinguished that

20   case pointing out that it involved an insider trading case.

21   *Unifund* is actually a fun case I think for lawyers to read in

22   that there's a lot of hyperbole on each side in front of the

23   Court.  On the one hand, in determining whether to apply

24   jurisdiction over a foreign defendant, the SEC ran around in

25   that particular case and said, you know, our markets won't be

E3jesecc

1    viewed as fair if you don't bring this person under our

2    jurisdiction.  It won't impact the integrities of the markets.

3    The defendant posited, if you bring my guy in from a foreign

4    country to defend this, foreign investors will stay away.  The

5    judge amply demonstrated to each side that he thought that that

6    was a bit excessive, and they put forward -- and I don't argue

7    with the SEC on the law in *Unifund* that they rely on.

8    *Unifund* -- and I'm quoting from the SEC's brief here on page

9    83 -- *Unifund*, it says that to exercise jurisdiction over a

10   defendant when the conduct and the connection with the forum

11   state as such, they should anticipate being held with the

12   Court.

13           Total agreement there.  What I disagree on is how they

14   apply that standard.  Because one of the things that the SEC

15   wants to continually assert that these cases stand for, the

16   proposition that Dr. Carrillo should be subject to this

17   jurisdiction.  You know, when I look at *Unifund*, it supports

18   the point that you're making, your Honor.  Right after shooting

19   down the hyperbole on each side, *Unifund* says, and *Unifund* did,

20   in fact, find that there was jurisdiction over the

21   extraterritorial defendant.  But they go on to explicitly state

22   not every securities law violation involving shares of a United

23   States corporation will have the requisite effect within the

24   United States.

25           This is the important part.  It goes on to point out,

E3jesecc

1    as you perceived, insider trading, however, has serious effects

2    that can reasonably be expected to be visited upon US

3    shareholders where these shares are traded exclusively on a US

4    exchange.  The other case that they rely on, the *Soft Point*

5    case, is no different.

6         THE COURT:  You don't have to go through that.  I have

7    *Soft Point* in front of me, and *Soft Point* specifically says

8    *Unifund* holds that a district court may exercise its personal

9    jurisdiction in a securities action so long as the defendants'

10   activities had, quote, an unmistakably foreseeable effect

11   within the United States and could reasonably be expected to be

12   visited upon the United States shareholders.  That's what I

13   take from *Soft Point*.  And if there's some other section in

14   that you think is more directive than that, you can tell me.

15        MR. MARCELINO:  No.  And I think that when you look at

16   *Soft Point* in terms of the background of facts that got the

17   Court to where it was, it's certainly, I think, not the case to

18   use to suggest that Dr. Carrillo should be hailed into court

19   here, in that that was a particular case that the

20   jurisdictional issues were challenged after judgment.  It

21   didn't involve an extraterritorial defendant.  It actually

22   involved a narrow question of jurisdiction in the state forum

23   or nationally, because of the securities law issue.

24        And you had a defendant, recalcitrant defendant whose

25   own counsel withdrew from the case.  He was convicted, fines

E3jesecc

1    levied, who later shows up and then tries to challenge

2    jurisdiction.  You know, I think none of us here would want to

3    be dealt that hand and have to go and argue to the Court you

4    shouldn't exercise jurisdiction over this gentleman who did his

5    acts in Nevada.  So I just thought *Soft Point* was a totally

6    inappropriate case.

7              THE COURT:  All right.  Thank you.

8              Anybody else want to be heard?  Yes.

9              MR. CURRAN:  I think I can do it right from here,

10   Judge, if you can hear me.

11             MR. MARCELINO:  Thank you.

12             MR. CURRAN:  First, on the point of whether Pacific

13   Blue was registered, I draw your Honor's attention, paragraph

14   26 of the commission's complaint, second sentence of which

15   reads, Pacific Blue registered an offering of its common stock

16   on a form SB-2 that became effective in September of 2007 and

17   made quarterly and annual filings with the commission through

18   2011.

19             There seems to be an assumption, Judge -- and I know

20   you cut counsel off about whether these Pacific Blue securities

21   were registered or not.  We believe they were.

22             THE COURT:  Okay.

23             MR. CURRAN:  Two, there's been a lot of discussion in

24   this case about the use of the trust account and how that is a

25   deceptively -- an inherently deceptive act.  Well, a lot of

E3jesecc

1    talk of that without any support for that premise.  We don't

2    believe that it's inherently deceptive.  As a matter of fact,

3    just the opposite.

4            Under California rules, and specifically, California

5    Rules of Professional Conduct 4-100(b), a lawyer should

6    promptly pay or deliver as requested by client any funds,

7    securities or other properties in the possession of the member

8    lawyer which client is entitled to receive.  And there's a case

9    T & R foods, 47 Cal.App. 4 Supp. 11996, Judge.  The purpose of

10   Rule 4-100 is to provide against the probability in some cases,

11   possibility in many, endangering all that commingling will

12   result in the loss of clients' moneys.

13           Frankly, Judge, I think that the use of the Carillo

14   Huettels trust account is not deceptively -- it's not deceptive

15   at all, not inherently deceptive.  It's meant to simply

16   segregate Dr. Carrillo's money and original clients' money.

17   And it wasn't deceptive, didn't have a deceptive purpose at

18   all.

19           THE COURT:  The question on this or this motion is not

20   whether it has a deceptive purpose, but whether or not one

21   might draw an inference that that would not be the usual or the

22   preferable way to transact business on behalf of a client.  I

23   assume most of your trust accounts in which you hold funds for

24   clients are held in the separate account under that client's

25   name.

E3jesecc

1          MR. CURRAN:  They don't let me near those, Judge.

2          THE COURT:  I assume that's the standard practice.

3          MR. CURRAN:  I can only tell you that client funds are

4     put in trust held for them, and that's all the trust account

5     is.  So if Dr. Carrillo sent to Carillo Huettels $20,000 for

6     the purposes of investment, it was held in that account for his

7     purpose.  It's not their money.

8          THE COURT:  That may be true.  But I can't determine

9     that on --

10         MR. CURRAN:  But it's not, as Mr. Brody implied,

11    inherently deceptive.  It's just not.

12         Just give me a second, please, your Honor.  The

13    complaint by counsel's own, and as your Honor points out, who

14    directed the sale of the P-back stock, there's a lack of

15    specificity on that.  Mr. Newville said at one point that it

16    wasn't relevant.  Quote, the decision of who made the decision

17    to sell is not relevant.  They are not saying that Dr. Carrillo

18    didn't.  They're not saying that he did.  They're not saying

19    that Luis Carrillo didn't.  They're not saying that he did.

20    There's a lack of specificity, frankly, as to that direction.

21         But let's be clear about what that transaction was.

22    And Mr. Newville was quite candid, I think, despite the

23    statement that he's not at liberty to disclose facts not in the

24    complaint -- kind of a cryptic thing that we'll discuss at some

25    point in this case I anticipate in more detail.  But when he

E3jesecc

1    was candid, he was saying that the stock was sold out of the

2    Canadian account at whoever's direction, perhaps pursuant to

3    the power of authority granted to his son.

4              THE COURT:  That would be the reasonable inference.

5              MR. CURRAN:  But it wasn't a power of attorney granted

6    for this security.  And I think the commission would even

7    concede that.  It was an old power of attorney.  It was long

8    existing.  It wasn't --

9              THE COURT:  But still, he had the authority and --

10             MR. CURRAN:  Okay.

11             THE COURT:   -- it is reasonable to read from this

12   complaint that he exercised that authority when he purchased

13   the shares for his father.

14             MR. CURRAN:  Well, you know, his father sent a check

15   to him for the purpose of buying the shares.

16             THE COURT:  So he's got the check.  Exactly.

17             MR. CURRAN:  But the 20,000 goes into the trust

18   account.  It's the father's money.  The father says, buy

19   shares.  It is not Carrillo's money.  He uses it properly out

20   of his trust account to buy shares.  The stock is sold out of

21   the Canadian account for 1.1 roughly, okay?  $900,000 of that

22   is transferred to Dr. Carrillo's accounts in I believe Mexico

23   and in the United States.

24             THE COURT:  Right.

25             MR. CURRAN:  And they had to be transferred to an

E3jesecc

1    account in Dr. Carrillo's name pursuant to Canadian anti-money

2    laundering rules I'm told, okay?  So there's 900,000.

3            THE COURT:  All right.  So who does that help other

4    than Dr. Carrillo?  How does that help your client?

5            MR. CURRAN:  I don't see where we come back to the

6    472,500, Judge.

7            THE COURT:  Well, I don't either, but that's not -- I

8    mean, I just need -- that's neither here nor there --

9            MR. CURRAN:  You add up the numbers, it's impossible.

10           THE COURT:  What's impossible?

11           MR. CURRAN:  You take 1.1 and you add up to 472,500,

12   the 520,000, the 350 that's alleged to come back to the trust

13   fund, which was Dr. Carrillo's --

14           THE COURT:  I know.  I already came up with

15   900-something, $992,000.  But --

16           MR. CURRAN:  And I believe they know exactly what the

17   numbers are.

18           THE COURT:  Okay.  But I don't see how that gets your

19   guy off the hook.

20           MR. CURRAN:  I don't think he should be on the hook at

21   all.

22           THE COURT:  But why does that get him off the hook?

23           MR. CURRAN:  It's indicative of some of the artful

24   drafting of this complaint that your Honor has alluded to.

25           THE COURT:  I noticed the artful drafting.

E3jesecc

1              MR. CURRAN:  I wrote it down.

2              THE COURT:  I mean, as I say --

3              MR. CURRAN:  I'm on with the cab driver thing.  I

4    thought that was excellent, too.

5              THE COURT:  There's one rule about artful drafting.

6    If they could have said it stronger, they would have, okay?

7    That's the definition of artful drafting.

8              MR. CURRAN:  But I think they could have said it

9    stronger, and I think that they're playing hide the ball.  And

10   I think it's unnecessary.

11             Thank you, Judge.

12             THE COURT:  Yes, sir.

13             MR. FELDMAN:  Your Honor, I want to just 30 seconds to

14   respond to one point proposed by the commission, by the staff

15   here, your Honor.  They cited the case *SEC v. Badian* on this

16   group pleading concept, the idea that they're saying it's

17   proper to name the defendants together, John Kirk, Ben Kirk,

18   Boyle, all together because they operated as a unit.  And they

19   cited, Judge Swain's opinion in *SEC v. Badian*.  What Judge

20   Swain said in *Badian* was that they had -- it was sufficiently

21   particularized, even though they named them in a group, because

22   the complaint specifically alleged that, quote, they operated

23   as a unit, unquote, and that, quote, each, unquote, of the

24   individuals took the particular offending acts.

25             We don't have that allegation here.  They didn't

E3jesecc

1    allege that they operated as a unit, as *Badian* said, or that

2    each of the people named in these group pleadings took the

3    offending acts.  So, yes, you can do group pleading if you say

4    each of these people did each of the things we list here.  But

5    they didn't do that.  And so *Badian* actually, your Honor, goes

6    against the SEC's position here.  And it points out why this is

7    not sufficiently particularized and how they could fix it, if

8    they want to.

9         MR. FLEMING:  Your Honor, I'll be quick, perhaps a

10   sonic attempt to try to persuade you.  But hear me out for just

11   a minute.

12        Mr. Newville talked about, as Mr. Curran said, not

13   being at liberty to divulge SEC information, which I think gets

14   to the heart of what our –– and I'm Mr. Huettel –– our main

15   complaint is.  They reference e-mails and communications as

16   supporting the knowledge of the lawyers that there's a fraud

17   here, but they don't cite any of the e-mails.  They don't cite

18   any of the communications.

19        And they then cite the *Shields* case, the Second

20   Circuit case discussing this very issue.  But what *Shields* says

21   is conclusory allegations that defendants knew but concealed

22   some things or knew or were reckless in knowing other things do

23   not satisfy the requirements of Rule 9(b).  Such allegations

24   are so broad and conclusory as to be meaningless.  That's the

25   Second Circuit.

E3jesecc

1           And I think that in a case like this, where the SEC is

2      alleging fraud against a lawyer, and that Mr. Huettel's case,

3      the worker bee partner of this firm who does stuff in the

4      background, it's ruinous for him to stand there and have a

5      fraud claim against him unless they're going to go out and

6      spell it out.  They're going to say, he's on this e-mail.

7      There's this communication.  Mr. Huettel said this.  Someone

8      said this to him.  And that is a bare minimum requirement of

9      theirs.

10          And I think that the notion that they're not at

11     liberty to divulge information really, really misses the point

12     in a fraud case.  That's exactly their obligation.  They're not

13     free to say, we can't divulge this.  That's really --

14          MR. CURRAN:  If they haven't request not just, quote,

15     one of them, Judge, but they keep citing to these e-mails, and

16     we don't have them.

17          THE COURT:  I assume that's the first thing you'll ask

18     for in discovery.

19          MR. CURRAN:  Maybe not the first thing.  Maybe not the

20     first thing.

21          MR. BRODY:  Your Honor --

22          MR. FLEMING:  But in the meantime, he's standing there

23     accused of fraud by the federal government.

24          THE COURT:  But my analysis is not whether or not you

25     think they're hiding the ball with regard to those allegations.

E3jesecc

1    My analysis of it has to be whether or not, even despite that,

2    there are sufficient factual allegations that would keep your

3    client in this case no matter what.

4              MR. FLEMING:  I understand.

5              THE COURT:  That's the --

6              MR. FLEMING:  I would argue that the allegations made

7    are not factual.  They're conclusory.

8         Last quick point on the venue point.  I realize your

9    Honor may have already decided that.  But Mr. Newville referred

10   to an opinion letter that Mr. Huettel did not sign being sent

11   to the DTC in New York.  In our brief we cited that it's not

12   the place where the opinion letters are received that

13   establishes venue, it's where they're transmitted.  That would

14   be California, of course.

15             MR. BRODY:  Your Honor --

16             THE COURT:  Let me just let defendants finish, then

17   I'll wind this up.

18             MR. SALLAH:  Your Honor, briefly, on behalf of

19   Mr. Hinton, I'm not really sure what -- other than clarifying

20   that Mr. Hinton out of the $11 million made 32,000 from the

21   sale of this stock as part of this alleged group, and I

22   appreciate that concession by the staff, I don't know what was

23   added; that there was a brief argument or mention that, your

24   Honor, one scalps, one scalps if one talks about a stock and is

25   selling the stock at the same time.  By doing that in and of

E3jesecc

1      itself one assumes the duty.

2               Your Honor, that statement comes from the *Zweig* case,

3      which predated *Chiarella*.  And while the staff wants to hang

4      its head on that case, which was cited in our papers, the Ninth

5      Circuit, who drafted *Zweig* said, post-*Chiarella Zweig* and the

6      Feldman case, *Zweig* may be distilled thusly where a financial

7      advisor gives advice with regard to a stock he or she intends

8      to purchase, he has a conflict of interest.  And if that

9      conflict is not apparent to investors, he is under a duty to

10     disclose the conflict.

11              Your Honor, I submit nothing in the SEC's complaint

12     brings Mr. Hinton into the role of a financial advisor who

13     would have duties.  *Chiarella* is the law of the land.  And the

14     staff cannot run from it no matter how much they'd like to.

15     And even if your Honor was going to listen to the staff about

16     this theory of assumption of the duty doctrine, one should go

17     back to the Ninth Circuit which came up with it and then later

18     corrected itself after *Chiarella*.

19              Thank you, your Honor.

20              MR. GOUREVITCH:  Your Honor, very briefly.  It is late

21     in the afternoon, and I would like to come very briefly back to

22     the timing for Mr. De Beer, because it is quite important for

23     him.

24              The staff talks about the transfer of the stock in the

25     oral argument as having occurred in 2009.  In fact, the

E3jesecc

1    complaint alleges that it occurs as early as 2008.  And its

2    scheme starts in 2009, and the pump and dump scheme starts in

3    2009.  They also allege in paragraph 35 that the press

4    releases -- that there are press releases issued, but unlike

5    the staff has said in the oral argument, there is no allegation

6    that press releases are issued throughout the course of the

7    scheme.  It simply said in the course of -- in the structure of

8    the complaint, it suggests that they are issued even prior to

9    the transfer of the stock.

10              Secondly, your Honor asked -- you talked about the

11   significance of the transfer of documents directly to the

12   Kirks.  And I would like to come back to what your Honor said.

13   I think your Honor said the most you can derive from that is

14   that they had some connection to the transaction.  And I think

15   that it actually puts it quite succinctly.  You cannot

16   address -- you cannot draw more from that.

17              The third point is that the SEC has talked about the

18   $330,000 payment which it has labeled as kickback.  That's a

19   legal conclusion, and that's all it is.  It's unsupported by

20   any factual basis.  The complaint alleges no connection, no

21   basis whatsoever as to what the reason for the payment was at

22   all, nor does it allege that Mr. De Beer had any knowledge that

23   it was from the sale of stock.

24              Thank you.

25              MR. POSSIDENTE:  If I may be heard briefly on behalf

E3jesecc

1   of the law firm.

2           SEC made the argument that the law firm's argument

3   where we're a defunct entity, we ought to be out of the case

4   because there's no purpose for us to be in the case, is

5   premature, that's really not true.  It's a procedural argument.

6   It's your Honor's inherent power to control the docket, and

7   under Rule 21, your Honor's ability to add or drop parties on

8   good cause, and we would submit that that cause exists.

9           THE COURT:  I'm not sure what record I have to make

10  that determination at this point.

11          MR. POSSIDENTE:  Well, I think, as our brief pointed

12  out, and as Mr. Devaney pointed out during the argument

13  previously, this is a defunct entity.

14          THE COURT:  How do I know that?  What does that mean?

15  Does it have assets?  Does it have employees still?

16          MR. POSSIDENTE:  No.

17          THE COURT:  Is it active?  Is it inactive?  Does it --

18          MR. CURRAN:  It shut down.

19          THE COURT:  Is it still an existing entity that could

20  sustain liability?  Is it still subject to lawsuits?  I don't

21  have any record to make that determination that somehow they

22  should be out of here because they don't exist.  I don't know

23  if that's a legal argument anyway but...

24          MR. CURRAN:  Judge, the reason the Venable law firm

25  exists is there came a time when, because of counsel's concern

E3jesecc

1    about potential conflicts between the individual partners and

2    the law firm, document retention and certain issues that we

3    perceived, we thought the law firm ought to have its own

4    counsel.

5            So there is no location.  There is no law firm locus

6    anymore.  I'm an officer of the court and I'm telling you this.

7    There's no law firm anymore.  There's no clients anymore.

8    There's no offices.  There are no employees.  There's no

9    telephone.  There's no website.

10           THE COURT:  The law firm is wasting its money paying

11   your bill.

12           MR. CURRAN:  Well, but, Judge, the reason -- I

13   represent the individual.

14           THE COURT:  Right.  But I'm saying, it's a little

15   awkward to come in and say, I'm the lawyer for the defunct

16   company that doesn't exist.  Okay?

17           MR. CURRAN:  Judge, you got to understand, the reason

18   why -- it relates to why.  And this was in actual caution in

19   respect to the commission's investigation.  We set up a law

20   firm to represent the law firm separately in order that they

21   could gather documents, that they could do certain things

22   without any inference from the commission that we as counsel

23   for individual partners were doing anything as regards to that.

24   And I think that that's going to be important here somewhere

25   down the road, Judge.

E3jesecc

1          THE COURT:  It may be.

2          MR. CURRAN:  That's why.

3          THE COURT:  But as I said, those issues are so

4   premature for me to try to analyze the consequences of letting

5   you in or out, simply because you say you shouldn't be here

6   because you don't exist.  I mean, I've heard those arguments

7   before, and usually it's to your advantage to come here and say

8   you don't exist.

9          MR. CURRAN:  The individuals aren't asking for out,

10  Judge.  I mean, under agency law and partnership law, anybody

11  who could be responsible for the law firm's obligations are

12  here before the Court.

13         THE COURT:  Well, I would continue to make that strong

14  argument to the SEC.  Maybe they'll realize they're wasting

15  their time.

16         MR. CURRAN:  They don't listen to me very well, Judge.

17         THE COURT:  I don't know why they're proceeding

18  against the law firm, or any of the other defunct companies,

19  but there are theoretical reasons why they do the things they

20  do.  And they usually ask me for injunctions for certain things

21  that I think are totally useless injunction, but I give it to

22  them because they're legally entitled to them.

23         So let's wind this up.

24         MR. PATTERSON:  Your Honor, could I just have 30

25  seconds for Gibraltar on the fraud claim.

E3jesecc

1          THE COURT:  Yes, sir.

2          MR. PATTERSON:  Philip Patterson, DeFeis O'Connell &

3    Rose for Gibraltar and Davis.

4          Earlier today your Honor asked the SEC where the

5    allegation is in the complaint that Gibraltar intended to

6    participate in the specific Trade Show and Pacific Blue alleged

7    pump and dump.  The answer from the SEC was, there were red

8    flags and so Gibraltar knew that it was participating in that

9    specific fraud.

10          I'd just like to ask your Honor to read paragraph 110

11    of the complaint, the second sentence.  I'll actually read it:

12    Gibraltar's business, according to the SEC, primarily consists

13    of liquidating low priced, thinly traded stocks on behalf of

14    its clients, often during periods of suspicious promotion.

15          Now, when your Honor asked the SEC where the red flags

16    were for which one could reasonably infer that Gibraltar

17    specifically intended to join this Pacific Blue and Trade Show

18    pump and dump, your Honor said, are you talking about paragraph

19    140 to 142?  And the SEC said yes.

20          So I'd like to read from paragraph 141.  This is the

21    purported red flags from which we can infer that Gibraltar

22    intended to participate in the Trade Show and Pacific Blue pump

23    and dump.  I quote, paragraph 141, here, numerous red flags

24    existed, including the sale of blocks of a low priced, thinly

25    traded issuer.  In short, as your Honor's questioning

E3jesecc

 1    indicated, the red flag, or at least one of the red flags,

 2    according to the SEC, from which we can tell that Gibraltar

 3    knew it was participating in a fraud, is what, according to the

 4    SEC's own complaint, in paragraph 110, says Gibraltar does on a

 5    daily basis.  It's not a red flag.  Whether the SEC wants to

 6    call it misrepresentation or a scheme liability, all they have

 7    is Ben Kirk opening three accounts in corporate names.  That is

 8    not enough of a red flag to demonstrate that Gibraltar intended

 9    to participate in the Trade Show and Pacific Blue pump and

10    dump.

11            Nothing further, your Honor.

12            THE COURT:  Yes, sir.

13            MR. BRODY:  Your Honor, I don't want to respond to

14    the, I guess, defendants' arguments.  What I wanted to raise,

15    your Honor, is that the parties wrote a prehearing checklist

16    which was submitted to the Court on January 17, 2014.  In the

17    checklist there is a dispute between the parties about whether

18    discovery should continue while the motion to dismiss is

19    pending.  Your Honor, it's the SEC's --

20            THE COURT:  I'm going to resolve that today because

21    I'm ruling.  So I'll rule orally, all right?  That was my

22    intention.

23            Obviously I've thoroughly reviewed all of the papers

24    and thoroughly heard the arguments with regard to both cases.

25    Let me first start with the first Gibraltar case, 13 CV 2575, I

E3jesecc

1   believe, Gibraltar and Davis.

2           They're accused of operating as an unregistered

3   broker.  I heard argument, the first argument on that, and

4   offering and selling unregistered securities under 15(a) and

5   5(a) and 5(c).  I find that that complaint is sufficient; that

6   if you read the facts in that complaint with the reasonable

7   inferences that should be drawn in the SEC's favor, they

8   sufficiently state a cause of action to support the claims in

9   that complaint.  I'll just highlight some things so the record

10  is not too long but the record is full.

11          There's a website.  They have a website.  They claim

12  primarily that they had a website that was soliciting

13  prospective US customers.  The facts as were alleged was that

14  the website advertised the formation of an offshore

15  international business corporation with nominee officers and

16  directors that enabled US customers to trade anonymously

17  without paying taxes on their profits.  That was the allegation

18  by the complaint.

19          Some of the underlying facts that were alleged in

20  support of that was that the company, Gibraltar, and Davis, its

21  principal, accepted deposits of Micro-cap stocks from US

22  promoters and brokers, arranged for the transfer agent to

23  retitle the stock certificate in Gibraltar's name, deposited

24  shares from Gibraltar's securities accounts at US broker

25  dealers, gave sell orders with US brokers, instructed US

E3jesecc

1   brokers to wire sales proceeds to accounts in the Bahamas, and

2   Gibraltar wired sales proceeds minus 2 to 3 percent commision

3   to US customers.  They sold $100 million in securities on

4   behalf of US customers.

5              The website, Gibraltar, was never registered with the

6   commission as a broker-dealer.  They also engaged in

7   transactions specifically with Magnum D'or, a Nevada

8   corporation headquartered in Fort Lauderdale, Florida, which

9   was the issue of one of the sets of allegations.  They, as I

10  say, primarily relied upon by the SEC that the website

11  solicited US customers.  Quite frankly, I don't find the facts

12  to be particularly strong in that direction, but I think the

13  facts are such that a reasonable finder of fact could review

14  those facts and could reasonably conclude that that is what, in

15  fact, was occurring.

16             For example, it described itself as a broker-dealer

17  registered in the Bahamas.  They offer, quote, offshore

18  brokerage services with commissions comparable to those on the

19  mainland, quote, mainland.

20             It indicated that using a Gibraltar offshore brokerage

21  account will enable you to trade on most stock exchanges in the

22  world at a cost equivalent to that incurred using mainland

23  brokers without paying taxes on the profits.

24             It promised prospective customers, quote, an extra

25  layer of confidentiality to protect assets from, quote, the

E3jesecc

1    government seizure or frivolous divorce settlement, closed

2    quote.

3              It showed price volume graphs solely for US market.

4              It was written only in English.

5              It charged fees in US dollars.  There's no provision

6    for currency exchange.

7              It referenced transfers of shares through US

8    depository institutions.

9              To sell in securities in the United States consistent

10   with that as alleged, Gibraltar created numerous accounts at US

11   brokers.

12             Davis is alleged to have submitted false IRS W8

13   benefactor beneficiary withholding forms to US brokers

14   certifying that it was the beneficial owner of the income

15   relating to the securities account.  And it's alleged Gibraltar

16   held shares, quote, for the benefit of, closed quote, US

17   Customs.  Gibraltar nor Davis, as I indicated, was registered

18   as a broker-dealer.  Gibraltar participated in unregistered

19   offers and sales of Magnum D'or stock -- in particular,

20   11 million shares, I believe, my recollection is used more than

21   600-plus transactions in those shares of US coverage.

22             With regard to any viable defense that's available,

23   including the lack of knowledge of the scheme or lack of

24   solicitation or any other foreign broker-dealer exemption, that

25   is not appropriate to serve at this stage to warrant dismissal

E3jesecc

1    of that complaint.  So I am going to deny the motion to dismiss

2    that complaint against Gibraltar on that basis.

3         There was also an application to consolidate this

4    other case, this case.  I'm going to deny that motion without

5    prejudice to renewal for trial to see whether or not at

6    that point consolidation is appropriate.  But I will order

7    coordinating discovery, and you should talk about a new

8    schedule for discovery for both of these cases.

9         With regard to this case, let me first say that I'm

10   going to grant at this stage only two motions.  I'm going to

11   first grant Dr. Carrillo's motion.

12        Obviously I have grave concern, and I've not been

13   convinced by looking at the case law or the complaint or

14   hearing the argument, that there's a sufficient basis to assert

15   jurisdiction over Dr. Carrillo.  The crux of asserting

16   jurisdiction, which the SEC has not sufficiently concentrated

17   on and given me a basis to conclude that Dr. Carrillo himself

18   was involved in any -- in every case describes him, his

19   conduct, activities, any actions on behalf of Dr. Carrillo,

20   that Dr. Carrillo should reasonably expect that those actions

21   would drag him in a court in the United States.  There's not

22   sufficient evidence that Dr. Carrillo took any active role at

23   all in the purchase or sale of the stock that was done in his

24   name.  As a matter of fact, nothing in the complaint will give

25   any impression that the SEC believes that Dr. Carrillo is an

E3jesecc

active participant in any of this activity, or that

Dr. Carrillo was taking any role, other than sending the

$20,000 for the initial investment, giving his son the

authority to trade on his behalf and, quite frankly, receiving

moneys that went through his accounts and went right back to

the defendants that the SEC says are participants in the

scheme.

I can't identify any activity or any conduct by

Dr. Carrillo that one can reasonably say that Dr. Carrillo

should have reasonably expected that that conduct, his action,

would possibly haul him into a US court, because some actions

of his would have some consequence on US investors,

particularly given -- I don't need to go through the back and

forth about being an underwriter.  I think still there's some

requirement to show that Dr. Carrillo had some purposeful

activity that he could reasonably expect that would have an

effect on US investors, or he should reasonably expect that

would drag him into a US court.

And additionally, with the sale of the stock, it's

only a significant inference that the SEC wants me to draw that

US investors were affected at all or had any relationship to

the sale of that stock, since the sale of that stock was in

Canada and not in the US.  I'm supposed to draw the inference

that because it's a US company, that Dr. Carrillo himself

should have expected it would have some US effect on US

E3jesecc

1      citizens when the stock was sold in Canada.  And, quite

2      frankly, there's not even an allegation that he even was aware

3      that the stock was sold in Canada or when the decision was made

4      to sell the stock, whether he had any participation whatsoever;

5      or even any knowledge whatsoever at the time the stock was sold

6      that the stock was being sold.

7              So as I say, by the nature of the artful drafting with

8      regard to Dr. Carrillo -- and, quite frankly, it's difficult

9      for me to find an active verb that corresponds with

10     Dr. Carrillo in this complaint.  I don't think there is an

11     active verb that corresponds to Dr. Carrillo.

12             And beyond that, I think that even if there was

13     jurisdiction in this case, I would probably still rule that

14     there was not a sufficient allegations in this complaint to

15     conclude that Dr. Carrillo is the purchaser, the individual

16     purchaser or seller of these shares, other than the inference

17     that they want to draw that it was in a Dr. Carrillo account.

18     There's no evidence whatsoever that Dr. Carrillo had -- there's

19     no allegation whatsoever that Dr. Carrillo had done any trading

20     himself in this account; that he specifically was aware that

21     any other activity was going on in Canada or in the United

22     States with regard to any of these other defendants.  There's

23     not even an allegation of contact between Dr. Carrillo and any

24     other defendant in this case with regard to being responsible

25     for the purchase or sale that existed here.  And I think it is

E3jesecc

1    not sufficient to simply allege that Dr. Carrillo, a non-US

2    resident, is the person whose name the stock is owned, so,

3    therefore, that he is subject to personal jurisdiction in the

4    United States in a civil lawsuit or enforcement action by the

5    SEC; and that it makes him liable for the sale of unregistered

6    securities, US securities, when those securities are sold by

7    someone else who has power of attorney over his account.

8           So I think the allegations against Dr. Carillo are

9    admittedly weak, and upon my review, insufficient to put

10   Dr. Carrillo -- the charge to moot against Dr. Carrillo with

11   regard to the claim alleged against him.  Quite frankly, I'm

12   not even sure even the allegation with regard to his being a

13   relief defendant, it's unclear to me -- there's no allegation

14   that would support that he's a relief defendant.  There's no

15   allegation he has any assets, any money that they say that is

16   somehow proceeds of some illegal transaction.  So I'm going to

17   grant the motion by Dr. Carrillo.

18          There's a closer question with regard to Gibraltar.

19   And I have been going back and forth, but I've decided that I

20   should dismiss the claims against Gibraltar on this complaint.

21   If the SEC wants to -- in light of our discussion wants to

22   attempt to refashion a set of allegations -- and they don't

23   have to refashion the whole complaint -- they want to propose

24   by letter application additional or changed paragraphs with

25   regard to the Gibraltar, and specify exactly what count and

E3jesecc

1   under what theory under what count they're being charged, you

2   know, they'll have leave to make that application.  And

3   Gibraltar can oppose that letter application so we don't have

4   to go through a new round of motions.

5        But there are two -- and I have to simply say, I --

6   well, I hesitate to say confusing theories, but I have the

7   first claim, the second claim and then I have the fifth claim,

8   which is an aiding and abetting claim.  Now, I really -- I

9   can't see any facts in this case that I can point to that I can

10  say that these are the facts that the SEC are relying upon to

11  allege that Gibraltar knowingly provided substantial assistance

12  to Ben Kirk's violations of Section 10(b).  I understand their

13  theory about red flags.  When I understood it, I thought it got

14  them closer than they were before, but, I mean, under that

15  theory, their whole business is a red flag.  So anybody who

16  they've traded with, you could charge them with aiding and

17  abetting.  Anybody who might end up being charged with a

18  securities violation or -- and I'm not quite sure why it's a

19  red flag with regard to one securities violation as opposed to

20  the other securities violation.

21        So I think that, as much as I'm trying to take the

22  facts that are alleged against Gibraltar and fit that into a

23  knowledgable participation in a violation of 10(b), those facts

24  don't fit into that.

25        Particularly, I'm going to start with Count Five,

E3jesecc

1    because Count Five is alone against Gibraltar and it's easier

2    to articulate.  But I don't see any facts in here that would

3    say -- and this seems to be the theory, as I hear it -- would

4    say that Gibraltar -- the way Gibraltar knowingly provided

5    substantial assistance to Ben Kirk is that when they decided to

6    do their business on behalf of Ben Kirk and basically trade the

7    shares in their name, they were attempting and had the intent

8    to help Ben Kirk violate Section 10(b).  If that's the theory,

9    then you have to tell me exactly why that's the theory and what

10   facts would lead one to believe that they were knowingly

11   providing substantial assistance to Ben Kirk's violation of

12   10(b).

13            Now, that seems to be a slightly different theory

14   that's alleged under Count One and Count Two.  And as we

15   discuss it, it seems to me that only under B, with regard to

16   the trades, the Scottsdale trades, that that's the only theory

17   that you are asserting liability, in scheme liability.  Again,

18   Gibraltar, you know, if you're not alleging scheme liability

19   and you're not alleging that they're liable for the scheme that

20   the other people you say are involved in, then you need to

21   articulate what scheme you say that he was involved in that's

22   different and how his participation is legally different than

23   his participation in knowingly or recklessly being involved in

24   the scheme to defraud investors.

25            And the argument seems to be that you need not for B

E3jesecc

1    allege that it was a scheme to defraud investors, as long as

2    there were untrue statements.  Well, then you have to tell me

3    separately that they intended to make untrue statements; that

4    they made it in connection with what transactions, and who else

5    do you say is involved in that particular set of untrue

6    statements that you say makes them codefendant on that count

7    with them?  It is not -- the second -- when I read the facts

8    with regard to most of the other defendants in Counts One and

9    Two, Carrillo, Carrillo Huettel, De Beer, Kirk, Hinton, the

10   allegations with regard to those seem to be an independent set

11   of allegations with an independent intent to defraud investors,

12   primarily with a pump and dump scheme.

13         Now, if that's what you're trying to charge Gibraltar

14   with, then make that clear that they're trying to allege the

15   same thing, and give me the fact that puts them in that greater

16   scheme.  If you're just saying no, and they're just a

17   separate -- they lied when they said who owns Scottsdale, if

18   you want to say that they're liable for that just because they

19   lied, then say that.  If you want to say they lied because the

20   evidence indicates they were attempting to facilitate the 10(b)

21   violation, then say that, and tell me how that's been

22   accomplished.  But I don't think that it's sufficiently alleged

23   the way it's alleged.  And I think that it doesn't give

24   Gibraltar sufficient notice as to what they're supposed to be

25   defending themselves against.  Either they're defending

E3jesecc

1   themselves against the greater conspiracy that you lumped

2   everybody else into or the greater activity or speed, or

3   they're defending themselves within something different.  And

4   on what facts do you say that you will present that would make

5   them independently liable on those claims?

6           I think that that -- I was struggling and thinking it

7   was close, and maybe I would just let it go, since Gibraltar is

8   here anyway, and it could flush itself out.  But I really do

9   think, given the discussion we had today, that it's unfair for

10  Gibraltar to have to go forward and try to guess whether or not

11  this is going to be a moving target and whether or not

12  ultimately you're going to be arguing that they are a greater,

13  more knowledgable participant in the scheme; or you're going to

14  end up saying, well, we're really not going to try to prove

15  that they were part of the greater scheme that they were

16  accusing the others of, but we're just going to go against them

17  on the single activity of just making misrepresentations about

18  the nominee companies or the ownership of the stock when they

19  made representations to Scottsdale on those trades.

20          If they have no greater participation, make that

21  clear.  If they do have greater participation and greater

22  responsibility, then make that clear.  But they're entitled to

23  know what you claim, what you independently would prove against

24  them about the extent of their activities and what those

25  activities involve and what those activities were intended to

E3jesecc

1   accomplish.

2           Now, with regard to the other defendants, I find that

3   the allegations with regard to the other defendants, although

4   in some respects with regard to each of the defendants, there

5   are some vague and unspecified allegations.  But I think the

6   allegations on the whole against the firm, Carrillo Huettel and

7   the lawyers, Ben Kirk, Hinton and De Beer, I think there are

8   enough factual allegations with regard to -- and I'll just

9   characterize it this way -- with regard to their relationships,

10  their personal, individual and company relationships, their

11  ownerships, their statements, their activities; I think the

12  nature of the allegations with regard to each one of those is

13  minimally sufficient, and some stronger than others.  If I were

14  to say, at this point I think the Hinton allegations are the

15  most minimal.  Some of the others have much more significant

16  allegations as to their participations, their motive and

17  opportunity, their statements, their participation in the

18  companies and their ownerships of stock that as a whole, that I

19  would say that if the SEC can prove that, in fact, they made

20  the type of representations that they attribute to each one of

21  them that they had the kind of ownership of the stock in

22  relationship to the companies and each other, and they

23  participated in the ways that they have alleged that they have

24  participated in terms of things that were drafted concerning

25  their companies, the activities or nonactivities of the

E3jesecc

1    companies, representations about independence and concealment

2    and/or -- and misrepresentation about their own personal

3    ownership in the stocks that were being sold to unwary

4    investors; if they can prove the specific allegations against

5    each one of those defendants, a reasonable jury will -- be

6    subject of dispute, and a reasonable jury could find, depending

7    on the nature or the strength of the testimony and the

8    evidence, they could find that they were liable for -- each one

9    of those defendants were liable, depending on ultimately the

10   strength of the evidence against them at trial.

11           Finally, I think, because I indicated with regard to

12   venue, I think venue is appropriate.  It takes minimal contact

13   with this district.  There is, I think, sufficient contact with

14   this district to make this an appropriate venue.  I think that

15   an argument could be made that there may be obviously more

16   contacts with two of the defendants in California rather than

17   here, but that's not a compelling reason to send this case for

18   the SEC or the other defendants, most of which it doesn't seem

19   to be particularly any more convenient for them to get to

20   San Diego than to come to New York, quite frankly; probably

21   less convenient to go to San Diego than to go to New York from

22   Canada and some other places.  But regardless of that, I don't

23   think that it's so compelling that it should overcome the

24   government's choice of forum at this point.  And it's chosen

25   New York as the forum to bring this action, and it is the venue

E3jesecc

1    that is available and appropriate for them to bring this

2    action.

3            With regard to I guess the other issues, with regard

4    to the service of process, I find that service of process was

5    reasonable and appropriate.  And the representations that were

6    made in order to get substituted process was appropriate and

7    reasonable.  I find that they made a reasonable attempt.  As I

8    said, the question is not whether or not they did everything

9    they could have done to find him.  The question is whether or

10   not, given his last known address and no one willing to provide

11   a current address or accept service on his behalf -- it hasn't

12   been explained to me exactly what would have possibly been a

13   more fruitful attempt to serve him that should have been

14   attempted prior to attempting to try to serve him several times

15   at his last known address, trying to find a new address for him

16   through his lawyers and/or trying to seek that his lawyers

17   accept service of process on his behalf.  I think those are

18   reasonable steps.  Those steps were communicated to the Court.

19           There are other reasonable steps.  In most cases

20   there's always something else you could have done.  But I don't

21   think the law requires that they come up with some other step,

22   which, quite frankly, has not been articulated to me today what

23   step would have been likely to be fruitful to have located the

24   defendant for service.

25           So even at this point in hindsight, it's not

E3jesecc

1   articulated to me that they had an opportunity to do something

2   that would have clearly revealed the whereabouts of the

3   defendant and given him an opportunity to serve them, and they

4   obviously should have done that and they did not do that.  It

5   hasn't been articulated in that way because I don't think

6   there's anything that could be argued that there's some

7   specific thing that if they had done it, that they would have

8   miraculously located the defendant, who was obviously not doing

9   anything to make himself available for service, even though it

10  would be obvious to his lawyers, and one would assume to him,

11  that service by the SEC was attempted and was desired.  So I

12  don't see that as a basis for filing the service of process is

13  inappropriate.

14          So I think it's time to move forward with this case.

15  As I say, if the SEC wants to try to see if you can

16  reformulate, you know, a count or two with regard to Gibraltar,

17  I'll consider that.  Look at the new set of allegations.  Let

18  them respond.  And if it's appropriate, I will let you move

19  forward with that.  I'm not going to preclude you from

20  attempting to do that further with Dr. Carrillo, if you think

21  that the attempt, given my issues and concerns, that an effort

22  can be made, successful effort, to sufficiently allege stronger

23  and sufficient facts against Dr. Carrillo.

24          But my assessment at this point is that I can't

25  imagine in what way you would be able to overcome both the

E3jesecc

1    jurisdictional issue and the pleading issue with regard to his

2    liability.  I think that it seems to me that that attempt would

3    be futile.  But if you would like to attempt to do that, then

4    I'll look at that very quickly and determine whether or not I

5    think that that would not be futile.  But I can't anticipate

6    what you could do to overcome the jurisdictional issue.

7    There's not a set of facts that you need to allege or a new

8    complaint that you need to allege.  I think we know what the

9    facts are with regard to that, and I don't think that those

10   issues could be overcome.

11        So if you intend to attempt to amend with regard to

12   any defendant, or particularly with regard to Gibraltar and/or

13   Dr. Carrillo, that should be done in the next 30 days.

14        Also, in that period of time I need the parties to get

15   together, sit down and hash out a schedule.  To the extent that

16   you agree, give me a joint letter.  To the extent that you

17   don't agree in that joint letter, give me the portions where

18   you don't agree and then I'll either resolve it, or if it takes

19   some more complicated discussion, I'll bring you in before me

20   or assign you to a magistrate judge.  And the magistrate judge

21   can monitor discovery so you can go forward.

22        So you should come up with a new schedule.  I don't

23   want this case to be any further delayed.  But in further

24   reviewing this case, I think I'm sufficiently comfortable with

25   my ruling today so that the parties can immediately,

E3jesecc

1   efficiently start to move forward with the case.

2          Yes.

3          MR. BRODY:  Yes, your Honor.  Just one brief

4   clarification question, which is I understand that you have

5   granted the motion of Gibraltar with respect to the first

6   claim, the second claim and the aiding and abetting claim,

7   which is the fifth claim.

8          With respect to the Section 5 claims, 11 and 12, have

9   you dismissed those?  We've alleged those as well, your Honor.

10          THE COURT:  As a matter of fact, I'm glad you reminded

11   me of that.

12          I am not dismissing the Section 5.  The Section 5

13   claim was sufficiently alleged with regard to Gibraltar.  So

14   Gibraltar is still in this case on that count.  If you want to

15   put them into a securities fraud scheme, then give me that.  If

16   you want to put them into a misrepresentation count with regard

17   to a specific limited set of misrepresentations that they alone

18   made or that they made in conjunction with others, then specify

19   that.  But I think you need to do that.

20          But with regard to the 5 claim, I think that, given

21   the nature of the purchase and sale of the securities, I think

22   you sufficiently alleged those.

23          MR. BRODY:  And that's with respect to Davis as well,

24   who's a defendant in both of those, in both of those, claim 11

25   and 12.

E3jesecc

1          THE COURT:  Yes.  Yes.  That's why I didn't address

2     Davis.

3          I'm not granting Davis' motion.  I think that he's not

4     charged with regard to the -- that's why we had that

5     discussion.  I was asking you, he was not charged in Counts One

6     and Two through Five, and I think he has a sole count against

7     him of liability.

8          So I'm going to deny the motion to dismiss him out of

9     the case.  I think clearly the allegations in the complaint are

10    sufficient to make allegations about his participation with

11    Gibraltar and the actions with regard to the sale of the

12    shares.

13         MR. O'ROURKE:  Your Honor, Kevin O'Rourke.  Just

14    briefly, Mr. Davis was also moved in the other case, the

15    smaller case.  I take it you're not granting his motion?

16         THE COURT:  Yes.  I apologize.  Yes.  My ruling with

17    regard to Gibraltar in the other case was with regard to both

18    Gibraltar and Davis and the other counts.  So that's the

19    ruling.

20         So what I'm going to do is at this point I'm just

21    going to schedule -- I'll schedule a conference.  We'll see if

22    we need it or need one earlier or later.  I'm going to schedule

23    a conference for like late June, maybe like June 25th.

24    Wednesday, June 25th at 10:00.  Get a schedule together.  Start

25    answering.  If you're going to attempt to amend, do that.  Get

E3jesecc

1   that out of the way.  And then if you don't need that

2   conference, if you just move forward with discovery, send me a

3   letter and we'll put it off until later in the summer or the

4   fall.

5           But otherwise, if we have issues to resolve, let me

6   know what they are by letter so I can be prepared for them and

7   we can resolve them at that conference.

8           Yes.

9           MR. GOUREVITCH:  Your Honor, I would ask if we could

10  schedule a conference for anytime in early July, if it would be

11  convenient.  I may have a scheduling conflict for June 25th.

12          THE COURT:  I don't have a problem with that.  Is

13  July 8th --

14          MR. GOUREVITCH:  Yes, your Honor.  Thank you very

15  much.

16          THE COURT:  Tuesday, July 8th, 10:00?  I'll schedule

17  it for that time.  We'll see if we really need it at all.

18          So let me know to the extent that you can agree on how

19  to proceed.  If you can't, let me know right away so I can

20  resolve those issues.  And I'd like to discuss that within the

21  next 30 days, too, about exactly how you're going to proceed.

22  Okay?

23          Thank you all very much.

24          (Adjourned)

25