UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiff,

        v.                                  :         1:13-cv-01735 (GBD)

CARRILLO HUETTEL LLP, *ET AL*,    :         ECF CASE

                          Defendants,

----------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPORT OF THE SEC'S APPLICATION FOR THE ISSUANCE OF A LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF MARCH 18, 1970 ON THE TAKING OF EVIDENCE IN CIVIL OR COMMERCIAL MATTERS**

      Plaintiff Securities and Exchange Commission ("SEC" or "Commission") submits this Memorandum of Law in Support of its Application ("Application") for the Issuance of a Letter of Request for International Judicial Assistance pursuant to the Hague Convention of March 18, 1970 on the Taking Evidence in Civil or Commercial Matters. The purpose of the Letter of Request is to obtain documents from DGM Bank and Trust in Barbados, because the SEC has seen evidence showing that certain bank accounts at DGM Bank and Trust in Barbados received funds that were proceeds of the alleged fraud in this action.

## BACKGROUND

In this matter, the Commission has alleged that from 2010 to 2012 the defendants were participants in a fraudulent international "pump-and-dump" scheme involving two publicly-traded U.S.-based companies: Tradeshow Marketing Company Ltd. ("Tradeshow") and Pacific Blue Energy Corporation ("Pacific Blue"). The primary goal of the scheme was to enrich the participants by "pumping" up trading in the stock of Tradeshow and Pacific Blue with false and misleading promotions, purportedly based on "independent" research from two stock-touting websites they controlled – Skymark Research ("Skymark") and Emerging Stock Report ("ESR"), and then secretly "dumping," *i.e.*, liquidating the promoters' shares into the artificially inflated demand they created. (Amended Complaint ("AC") ¶ 1.) However, the principals and employees of Skymark were not "independent." Tradeshow and Pacific Blue were controlled by a group of Canadian stock promoters: John Kirk, Ben Kirk, Dylan Boyle and James Hinton (the "Kirk/Boyle group"). This group secretly took control of the companies and then "pumped" the companies' stock price by sending investors false and misleading email blasts from both Skymark and ESR. They also hired a "boiler room" of individuals who called U.S. investors to tout the stocks, falsely claiming they were providing independent research. (AC ¶ 2.) The scheme realized at least $11 million in Tradeshow and Pacific Blue stock sale proceeds for the Defendants. (AC ¶ 5.)

The Kirks, Boyle and Hinton made at least $11 million by "scalping," i.e., by secretly selling Pacific Blue and Tradeshow shares while simultaneously promoting the stocks and encouraging others to buy using Skymark. By doing so, contrary to their recommendations to other investors, their recommendations were misleading and fraudulent. (AC ¶ 5.)

Ben Kirk (along with J. Kirk and Boyle) drafted and/or approved multiple false and misleading statements in Skymark's stock-touting emails. These emails, among other misrepresentations, falsely maintained that Skymark employees and associates were independent of the promoted companies. (AC ¶ 50.)

During late 2009 through the first few months of 2010, Skymark engaged in an aggressive promotion of the shares of TSHO, a company the Kirks and Boyle controlled. (AC ¶ 56.) Yet while Skymark and related entities were promoting TSHO, Skymark's principals and employees were selling large blocks of stock. From October 2009 through February 2010, various offshore entities controlled by the Kirk brothers or their associates sold over 5 million shares of TSHO for gross proceeds of at least $4.4 million. (AC ¶ 164).

Between April and August 2010, Skymark aggressively promoted the shares of PBEC, another entity controlled by the Kirks and Boyle. (AC ¶¶ 89 -96.) The Kirks purchased all outstanding shares of PBEC in late 2009 with the assistance of U.S.-based attorney Luis Carrillo, who was a central participant in the scheme. (AC ¶ 77). Under the guise of providing legal services, Carrillo helped the promoters acquire the PBEC shell, drafted Pacific Blue's misleading public filings, and provided misleading legal opinions. (AC ¶¶ 89 -101, 133-138.) During Skymark's promotion of PBEC, the Kirks and Boyle were liquidating shares of PBEC stock. (AC ¶ 152). From March through August 2010, various offshore entities controlled by the Kirk brothers or their associates sold over 6.5 million shares of PBEC for gross proceeds of at least $5 million. (AC ¶ 167). Carrillo and his law firm also received proceeds from sales of Pacific Blue stock that he arranged to be transferred in the name of his father, Dr. Luis Carrillo, who held the shares in part as a nominee for Carrillo. (AC ¶¶ 171-176.)

The Kirks and Boyle sold TSHO and PBEC stock through accounts they controlled at Scottsdale Capital Advisors ("Scottsdale") a broker-dealer in the United States, Gibraltar Global Securities ("GGSI"), a broker-dealer located in the Bahamas, and Grand Palm Ltd., a broker-dealer located in Turks and Caicos.  (AC ¶¶ 109, 140-141, 117-118.)

In order to sell their shares, Ben Kirk (along with John Kirk and Boyle) opened accounts at Scottsdale in the names of fake nominee entities.  (AC ¶ 109.)  Ben Kirk also concealed his beneficial ownership of Tradeshow shares by transferring and selling shares through at least three nominee accounts at GGSI in the names of Medford, Baltic and Mazi.  (AC ¶¶ 140-141, 117-118.)  Ben Kirk owned and controlled these accounts.  (AC ¶ 115-116.)  In total, Ben Kirk controlled at least 7,320,000 Pacific Blue shares through nominee entities which had purported to purchase the shares under a sham "Non-Affiliate Stock Purchase Agreement".  (AC ¶ 85.)  Ben Kirk ultimately sold 3.6 million Baltic and Mazi shares through GGSI (AC ¶¶ 117-118) and sold other shares through Scottsdale.  (AC ¶¶ 163-164)  In sum, GGSI sold both Tradeshow and Pacific Blue shares on Ben Kirk's behalf for total proceeds of at least $3.8 million during the scheme.  (AC ¶ 121.)

Along with John Kirk, Boyle and Hinton, Ben Kirk profited handsomely by selling millions of shares of Tradeshow and Pacific Blue into the increased demand created by their promotions, mostly through the offshore accounts that Ben Kirk and Boyle controlled.  (AC ¶ 157.)  Taking into account both Ben Kirk and Boyle's nominee entities, from August 2009 through February 2010 they realized over $4.4 million in proceeds from Tradeshow sales through accounts at Scottsdale and GGSI.  (AC ¶ 160.)  From March through August 2010, they realized over $5.6 million from Pacific Blue sales through their nominee accounts.  (AC ¶ 163.)  After these sales, Ben Kirk (and Boyle) also wired millions in sale proceeds from nominee

accounts at GGSI and Scottsdale to offshore accounts in Barbados. (AC ¶¶ 162, 164-166.)

In February 2010, Ben Kirk and Boyle wired over $3.4 million in Tradeshow proceeds from nominee accounts they held at Scottsdale to an account at a bank in Barbados (AC ¶ 166.) In April 2010, Ben Kirk and Boyle wired over $1.7 million in Pacific Blue proceeds from nominee accounts they held at Scottsdale to an account at a bank in Barbados. (AC ¶ 168.) In June 2010, Ben Kirk and Boyle wired over $450,000 in Pacific Blue proceeds from nominee accounts they held in Turks and Caicos to an account in Barbados. (AC ¶ 169.) In June 2010, Ben Kirk wired over $1.5 million in Pacific Blue proceeds from nominee accounts he held at GGSI to an account in Barbados. (AC ¶ 170.) Moreover, over $472,000 of the proceeds from the sale of Dr. Carrillo's shares was ultimately wired to the same offshore account in Barbados where the Kirks and Boyle sent their proceeds. (AC ¶ 172.)

Bank and wire records indicate that these proceeds referred to in paragraphs 166-172 of the Amended Complaint were wired to two primary accounts at DGM:  account #33596; and account #33573.  Evidence indicates that the Kirks, Boyle, and Carrillo transferred proceeds of the scheme.

## ARGUMENT

Since 1972, the United States has been a party to the Hague Convention on the Taking Evidence Abroad in Civil or Commercial Matters, T.I.A.S. 7444, 23 U.S.T. 2555, *reprinted in* 28 U.S.C. § 1781 ("Convention"), which is in force between the United States and Barbados. The Convention sets out procedures for judicial authorities of one signatory country to use in requesting evidence located in another signatory country and is intended to facilitate the taking of evidence abroad. *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 538 (1987).  The Convention's procedures are

Case 1:13-cv-01735-GBD-JCF   Document 200   Filed 03/19/15   Page 6 of 7

available to a court without regard to whether the evidence is sought from litigants or third

parties, or whether the evidence is located in a foreign state or within control of a party subject to

the jurisdiction of the court. *Id.* at 541. A court should make use of the Convention procedures

whenever it is determined on a case-by-case basis that their use will facilitate discovery. *Id.*

     In the present case, the SEC is seeking to obtain bank records from DGM Bank and

Trust, Inc. ("DGM") located at 2nd Floor, Hastings Financial Centre, Hastings, Christ Church,

B15154, Barbados, West Indies reflecting where some of the Defendants' proceeds from their

illicit fraud went.

     This Court has jurisdiction under the Federal Rules of Civil Procedure to order discovery,

including the production of documents from any person regarding any matter which is relevant to

the subject matter of the pending action. *See* Fed. R. Civ. Pro. 26. The evidence sought from

DGM is not otherwise obtainable by this Court through this Court's compulsory process.

     Accordingly, because the SEC has demonstrated that the Convention's procedures are

likely to provide access to evidence that will be admissible and relevant at the trial of this civil

action, and because these documents are necessary in order for the Court to do justice in this

case, the SEC respectfully requests that the Court issue the proposed Order granting its

Application.

Dated: March 19, 2015
       New York, New York

SECURITIES AND EXCHANGE COMMISSION

Todd D. Brody
Katherine S. Bromberg
Joshua M. Newville
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street
Suite 400
New York, NY 10281