**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION**,

                    **Plaintiff**,

          **v.**

**CARRILLO HUETTEL LLP, ET AL.,**

                    **Defendants,**

**1:13-cv-01735 (GBD)**
**ECF CASE**

### DECLARATION OF TODD BRODY IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND FINAL JUDGMENT

I, Todd D. Brody, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.      I am a member of the bar of this Court and an attorney for Plaintiff Securities and Exchange Commission (the "Commission").  I make this Declaration in support of the Commission's application for a default judgment pursuant to Rule 55.1 of the Civil Rules for the Southern District of New York and Fed. R. C. P. 55(a) against defendants Luis J. Carrillo ("Carrillo") Wade Huettel ("Huettel"), Carrillo Huettel LLP ("Carrillo Huettel"), Luniel De Beer ("De Beer"), Warren Davis ("Davis"), and Gibraltar Global Securities, Inc. ("Gibraltar") and for Final Judgment against defendant John Kirk pursuant to the terms of his partial consent judgment entered by the Court on October 1, 2013.

2.      I make this Declaration based on first-hand knowledge, information and belief. The sources of my information and the basis of my belief are documents and records obtained and reviewed by me.

1

## PROCEDURAL HISTORY OF THE CASE

3.      The Commission commenced this action on March 15, 2013, by filing the complaint and a summons for each defendant.  (Docket #1).

4.      Each defendant in this case with the exception of Joel Franklin, Pacific Blue Energy Corp. ("Pacific Blue") and Tradeshow Marketing Co., Ltd. ("Tradeshow") moved to dismiss.  The motions were largely denied.  (Docket # 146).

5.      On April 11, 2014, the Commission requested leave to file an amended complaint and submitted a proposed amended complaint for the Court's review.  (Docket # 153).  On June 4, 2014, the Court granted the Commission's request to amend the complaint to add a claim against Gibraltar under Section 17(a)(2) of the Securities Act of 1933.  (Docket # 165).  On June 26, 2014 the Commission filed its amended complaint ("Amended Complaint").  (Docket # 166). The defendants were all served with the Amended Complaint by ECF and by email to counsel (which also included a marked version showing the changes from the original complaint).

## CARRILLO

6.      On July 10, 2014, Carrillo answered the Amended Complaint.  (Docket # 172).

7.      On or about February 3, 2015, the Commission noticed Carrillo's deposition to take place in San Diego, California.  (A true and correct cope of the notice is attached hereto as Exhibit 1).  On February 4, 2015, the Commission received a letter from counsel to Carrillo objecting to the deposition, stating that the examination of Carrillo would implicate the attorney client privilege.  In response, the Commission adjourned the deposition until the privilege issue could be resolved.  On February 24, 2015, the Commission filed a motion to compel the production of documents withheld on privilege grounds and to compel the testimony of Carrillo on issues for which the privilege was asserted.  (Docket # 192).

8.      In addition, the Commission and counsel for Carrillo were unable to reach an agreement as to where Mr. Carrillo's deposition would take place.  The Commission offered to take the deposition either in San Diego, which was where Mr. Carrillo lived during the relevant period of time, or in New York where his counsel and the Commission's counsel reside.  In response, Carrillo offered to take the deposition by video or through some other non-in-person means, although counsel would not inform the Commission where Carrillo was even located.  (A true and correct cope of a letter to Court referencing these discussions is attached hereto as Exhibit 2).

9.      On April 8, 2015, the Court ordered Carrillo to produce certain documents previously withheld on the grounds of privilege and to testify with respect to communications with certain entities.  (Docket # 221).  On that same date, the Court also ordered Carrillo to appear for deposition in New York with the Commission paying the reasonable costs of his travel and accommodation.  (Docket # 222).

10.      On or about August 19, 2015, after the Commission had been unable to schedule Carrillo's deposition and Carrillo's counsel had advised the Commission that it was likely going to withdraw from the case, the Commission served a second notice of deposition to take Carrillo's deposition on September 25, 2015 at the Commission's office in New York.  (A true and correct copy of the notice is attached hereto as Exhibit 3).

11.      On September 2, 2015, Carrillo's counsel informed the Court that he "consents to the entry of an order granting [the Commission] the injunctive relief it has asserted in the Amended Complaint …."  (Docket # 244).  In the letter, Carrillo consented to injunctions against violating and aiding and abetting violations of the Securities laws, permanent penny stock bars, and permanent officer and director bars.

12.     The letter further stated that "Carrillo has determined no longer to defend against the Amended Complaint filed by the Commission in this action." *Id*.  The letter also stated that "Carrillo is fully aware and understands all of the potential consequences of his decision, including that the Commission may request that the Court default judgment against him in this matter pursuant to Federal Rule of Civil Procedure 55(b)(2)." *Id*.

13.     Following receipt of this letter, the Commission sought confirmation from Carrillo that he would not be attending the deposition properly noticed for September 25.  On September 8, 2015 counsel for Carrillo emailed the Commission that "Carrillo has informed that he will not be attending."  (A true and correct cope of the email is attached hereto as Exhibit 4).

## HUETTEL

14.     On July 10, 2014, Huettel answered the Amended Complaint.  (Docket # 169).

15.     On or about February 3, 2015, the Commission noticed Huettel's deposition to take place in San Diego, California.  (A true and correct cope of the notice is attached hereto as Exhibit 5).  In conversations with Huettel's counsel that followed, Huettel objected to the deposition, stating that the examination of Huettel would implicate the attorney client privilege. In response to these concerns, the Commission adjourned the deposition until the privilege issue could be resolved.  On February 24, 2015, the Commission filed a motion to compel the production of documents withheld on privilege grounds and to compel the testimony of Huettel on issues for which the privilege was asserted.  (Docket # 192).

16.     On April 8, 2015, the Court ordered Huettel to produce certain documents previously withheld on the grounds of privilege and to testify with respect to communications with certain entities.  (Docket # 221).

17.     Following the order, the Commission attempted to schedule Huettel's deposition. In connection with settlement discussions, the Commission also discussed the possibility of not taking Huettel's deposition but, instead, interviewing Huettel.  On November 19, 2015, counsel for Huettel informed the Commission that Huettel was going to decline to be interviewed and that it was Huettel's intent to inform the Court that he was not going to defend himself further and would consent to the injunctive relief sought in the Amended Complaint.    (Exhibit 6 attached hereto).  The Commission requested that Huettel formalize his intent with a letter to the Court as soon as possible and that if he changed his mind about defending himself but would not agree to be deposed, then the Commission would want a letter stating that Huettel would not agree to be deposed.  (*Id.*).

18.     On November 24, 2015, Huettel's counsel informed the Court that he "consents to the entry of an order granting [the Commission] the injunctive relief it has asserted in the Amended Complaint …."  (Docket # 254).  The letter further stated that "Mr. Huettel has determined no longer to defend against the Amended Complaint filed by the Commission in this action."  *Id*.  The letter also stated that "Mr. Huettel is fully aware and understands all of the potential consequences of his decision, including that the Commission may request that the Court default judgment against him in this matter pursuant to Federal Rule of Civil Procedure 55(b)(2)."  *Id*.

19.     In the letter, Huettel consented to injunctions against violating and aiding and abetting violations of the Securities laws, permanent penny stock bars, and permanent officer and director bars.

## CARRILLO HUETTEL

20.     Carrillo Huettel, a limited liability partnership, was initially represented by counsel in this case.  (Docket #36-37).

21.     On July 10, 2014, Carrillo Huettel answered the Commission's Amended Complaint.  (Docket #171).

22.     On October 20, 2014, counsel for Carrillo Huettel moved to withdraw.  (Docket # 178-180).  That motion was granted by the Court on October 23, 2014.  (Docket # 182).

23.     No other attorney has filed an appearance on behalf of Carrillo Huettel.

## DE BEER

24.     On July 10, 2014, De Beer answered the Amended Complaint.  (Docket # 174).

25.     On September 22, 2015, the Commission moved to compel De Beer's deposition after it had noticed his deposition and De Beer did not show up.  (Docket # 246).

26.     On September 23, the Court ordered De Beer to respond to the Commission's motion by no later than October 9, 2015.  (Docket # 247).

27.     Instead of responding to the Commission's motion, on October 9, 2015, De Beer wrote a letter to the Court stating that "I hereby consent to the entry of an order granting [the Commission] the injunctive relief it has asserted in the Amended Complaint .…"  (Docket # 248).  The letter further stated that "I have determined no longer to defend against the Amended Complaint filed by the Commission in this action."  *Id*.  The letter also stated that "I am fully aware and understand all of the potential consequences of my decision, including that the Commission may request that the Court default judgment against him in this matter pursuant to Federal Rule of Civil Procedure 55(b)(2)."  *Id*.

28.     In the letter, De Beer consented to injunctions against violating and aiding and abetting violations of the Securities laws, permanent penny stock bars, and permanent officer and director bars.

## DAVIS

29.     On July 10, 2014, Davis answered the Commission's Amended Complaint. The instant case as well as *SEC v. Gibraltar Global Securities, Inc. et al.*, 13-cv-02575 (S.D.N.Y.) ("SEC v. Gibraltar") were consolidated for purposes of discovery.  (*See* Docket # 151 at page 186, true and correct copies of excerpts from the transcript are attached hereto as Exhibit 7).

30.     On April 1, 2015, Magistrate Judge Francis ordered that the deposition of Davis be conducted in New York with the Commission bearing the reasonable costs of the witness' travel and accommodation.  (*See* 1:13-cv-02575, Docket # 53).  On April 14, 2015 counsel for Davis moved to withdraw.  (Docket # 224).

31.     In response to the Commission's opposition to the withdrawal motion, Davis filed an affidavit stating "I do not plan to defend these actions or participate in discovery."  (Docket # 228-1).

32.     The motion to withdraw was denied by Magistrate Judge Francis without prejudice to any future application made upon a showing that Davis had produced the requested discovery and appeared for its deposition.  (Docket # 229).

33.     On June 12, 2015, counsel for Davis sent a letter to the Court informing the Court that "Davis has indicated emphatically that he does not wish to defend these cases . . . ."  (Docket # 232).

34.     On June 12, 2015, the Court granted the motion to withdraw by counsel for Gibraltar and Davis.  (Docket # 233).  On July 2, 2015, the Court in SEC v. Gibraltar held that Davis defaulted by virtue of his statements to the Court that he would not defend the case any longer, ordered the injunctive relief, and referred the matter to the Magistrate Judge for an inquest on disgorgement, prejudgment interest, and penalties.  (1:13-cv-02575, Docket # 73).

## GIBRALTAR

35.     On June 7, 2013, the Commission and Gibraltar entered into a stipulation whereby Gibraltar agreed to waive any challenges to service of process in this action.  That stipulation was entered into the record by order dated June 10, 2013.  (Docket # 33).

36.     On July 10, 2014, Gibraltar answered the Commission's Amended Complaint.

37.     On April 1, 2015, Magistrate Judge Francis ordered that the deposition of Gibraltar be conducted in New York with the Commission bearing the reasonable costs of the witness' travel and accommodation.

38.     Gibraltar refused to appear for deposition in New York.

39.     On April 14, 2015 counsel for Gibraltar moved to withdraw.  (Docket # 223).  In an affidavit, Mr. Davis stated that Gibraltar "has no assets, is no longer in business and no party is willing to fund its defense of the SEC actions."

40.     This motion to withdraw was denied by Magistrate Judge Francis without prejudice to any future application made upon a showing that Gibraltar had produced the requested discovery and appeared for its deposition.  (Docket # 229).

41.     On June 12, 2015, counsel for Gibraltar informed the Court that Gibraltar would no longer be defending itself in this action.  (A true and correct cope of the letter to the Court is attached hereto as Exhibit 8).

42.      On June 12, 2015, the Court granted the motion to withdraw by counsel for

Gibraltar and Davis.  (Docket # 233).  On July 2, 2015, the Court in SEC v. Gibraltar held that

Gibraltar defaulted by virtue of its statements that it would not defend the case any longer,

ordered the injunctive relief, and referred the matter to the Magistrate Judge for an inquest on

disgorgement, prejudgment interest, and penalties.  (1:13-cv-02575, Docket # 73).

43.      No other attorney has filed an appearance on behalf of Gibraltar.

### THE FACTS ALLEGED IN THE AMENDED COMPLAINT

44.      Carrillo Huettel was a San Diego law firm purporting to specialize in securities

and reverse mergers.  (Amended Complaint ¶ 15).  At various times, Carrillo Huettel represented

Pacific Blue, Tradeshow, Gibraltar, Skymark Research, John Kirk and James Hinton ("Hinton").

(*Id.*).  At all relevant times, Carrillo Huettel was controlled by its two partners Carrillo and

Huettel.  (*Id.*).  Carrillo is an attorney admitted to practice in New York, New Jersey and

California.  (*Id.* at ¶ 16).  Huettel is an attorney admitted to practice in California.  (*Id.* at ¶ 17).

45.      De Beer was the President and CEO of Tradeshow and a director of Pacific Blue.

(*Id.* at ¶ 24).  He is a resident of Sammamish, Washington.  (*Id.*).

46.      Gibraltar was a broker-dealer incorporated and headquartered in the Bahamas.

(*Id.* at ¶ 18).  It is not registered with the Commission in any capacity.  (*Id.*).  Defendants

Benjamin Kirk. Dylan Boyle ("Boyle"), Hinton, and Carrillo all maintained accounts at

Gibraltar. (*Id.*).  Davis, a resident of the Bahamas, was the President of Gibraltar.  (*Id.* at ¶ 19).

As President, he controlled all of Gibraltar's activities during 2009 and 2010.  (*Id.*).

I.      **THE FRAUDULENT CONDUCT AND MISREPRESENTATIONS**

     A.      **Luis Carrillo's and Wade Huettel's Role in the Fraudulent Scheme**

          1.      **Pacific Blue**

47.     Pacific Blue began its corporate existence in April 2007 as Descanso Agency, Inc., which purported to be a specialized travel service company. (*Id.* at ¶ 76). In actuality, Descanso Agency was a shell with no substantive operations or revenue. (*Id.*). In September 2009, the Kirks and Carrillo arranged to purchase all outstanding shares of Descanso Agency, Inc., renamed the company Pacific Blue, and decided its purported business would be an alternative energy company. (*Id.* at ¶ 77). Defendant John Kirk contributed $200,000 of the purchase price for the Pacific Blue shell, and Dr. Luis Carrillo contributed $20,000. (*Id.* at ¶ 79). Carrillo and Huettel facilitated these payments through Carrillo Huettel LLP's attorney IOLTA trust account (the "Carrillo Huettel Trust Account"). (*Id.*).

48.     Carrillo and Huettel arranged for Pacific Blue's outstanding shares to be distributed in blocks of 4.9% to John Kirk, to Dr. Luis Carrillo, and to various foreign nominee entities controlled by the Kirks and Boyle. (*Id.* at ¶ 80). The acquisition was structured in this manner to keep the holdings of each secret nominee entity just under 5% of the outstanding shares. (*Id.*). The 4.9% structure designed by Carrillo and Huettel was meant to conceal and facilitate the manipulation by giving the misleading impression that shares were held by various independent entities, not by the Kirk/Boyle group. (Id at ¶ 81). To further conceal the true ownership of Pacific Blue's shares, Carrillo and Huettel drafted a sham "Non-Affiliate Stock Purchase Agreement" under which the 4.9% purchasers purportedly acquired their shares. (*Id.* at ¶2). Carrillo and Huettel knew that the 4.9% nominee owners were acting as a group, because

they knew that 90% of the purchase price came from their client John Kirk and almost all of the shares were being provided to entities connected to the Kirks. (*Id.*).

49.     Carrillo and Huettel also arranged for a large restricted block of Pacific Blue shares to be distributed to De Beer under an "Affiliate Stock Purchase Agreement" that they drafted. (*Id.* at ¶ 83). The De Beer "Affiliate Stock Purchase Agreement" was also a sham because it falsely stated that De Beer had purchased 40% of the company's shares for $80,000. (*Id.* at ¶ 84). As Carrillo and Huettel knew, De Beer did not pay any consideration for the shares: John Kirk paid for the shares and the block of restricted shares was simply assigned to De Beer. (Id).

50.     After the Kirks took control of Pacific Blue in September 2009, they asserted control over all of Pacific Blue's major decisions, including pushing the company to draft and release positive press releases. (*Id.* at ¶ 89). Carrillo and Huettel were heavily involved in the communications between Pacific Blue and the Kirks. (*Id.* at ¶ 90). They participated in emails and discussions with the Kirks regarding Pacific Blue that demonstrated their knowledge that the Kirks were exercising control over Pacific Blue. (*Id.*). In addition, Huettel specifically provided Ben Kirk comments on Pacific Blue promotional documents. (*Id.*)

51.     Pacific Blue's SEC filings from December 2009 through August 2010 contained multiple statements and omissions that were misleading, including statements that concealed the Kirks' affiliation with and control over Pacific Blue. (*Id.* at ¶91). These false statements appeared in Pacific Blue's Form 8K filed on December 9, 2009, Pacific Blue's Form 10-K filed on April 8, 2010, and Pacific Blue's Form 10-Qs filed on November 16, 2009, May 13, 2010, and August 17, 2010. (*Id.* at ¶¶ 92-95). Carrillo and Huettel drafted and actively facilitated the false statements in Pacific Blue's publicly filed documents. Despite knowing that the Kirk/Boyle

group owned and controlled Pacific Blue, they instructed Joel Franklin, Pacific Blue's President

and CEO, to make false statements on behalf of Pacific Blue.  (*Id.* at ¶ 97).  Franklin, who had no

experience managing public companies, signed whatever Carrillo Huettel LLP sent to him.  (*Id.*

at ¶ 98).  For example, Carrillo prepared and Huettel commented on the December 9, 2009 Form

8-K that falsely listed Franklin and De Beer as the only officers, directors, or "beneficial

owner[s] of more than five percent (5%) of our outstanding common stock."  (*Id.* at ¶ 99).

Huettel specifically reviewed and commented on this section.  (*Id.*).

52.     On November 6, 2009, Carrillo, copying Huettel, instructed Franklin to sign a

misleading "Related Party" worksheet to be relied upon by Pacific Blue's auditors.  (*Id.* at. ¶

100).  The worksheet stated that Franklin was the only company "affiliate" and failed to mention

the Kirks' secret control over Pacific Blue, disclose any of the Kirk-related entities, or mention

De Beer.  (*Id.*).  After Franklin signed the document, Carrillo sent it to Pacific Blue's auditors.

(*Id.*).  On May 10, 2010, Carrillo instructed Franklin to sign an updated "Related Party"

worksheet to be relied upon by Pacific Blue's auditors.  (*Id.* at ¶ 101).  The worksheet stated that

Franklin and De Beer were the only company "affiliates" and failed to mention the Kirks' secret

control over Pacific Blue or disclose the share ownership of the Kirk-related entities.  (*Id.*).

After Franklin signed the document, Carrillo sent it to Pacific Blue's auditors.  (*Id.*).

53.     Pacific Blue never generated any revenues, but was funded almost entirely

through the transfer of $2 million in mysterious overseas private placement funds, facilitated by

Carrillo, Huettel and the Kirks.  (*Id.* at ¶ 87).  On information and belief, these supposed private

placement funds were simply proceeds of the Kirks' and Boyle's fraudulent sales of Pacific Blue

shares, which they funneled back to Pacific Blue through the Carrillo Huettel Trust Account.

(*Id.*).

54.     During late 2009 and early 2010, John Kirk sold over 1 million shares of Pacific Blue in privately negotiated transactions for proceeds of over $210,000, which he received through the Carrillo Huettel Trust Account.  (*Id.* at ¶ 86).  Carrillo drafted additional misleading "non-affiliate" stock purchase agreements for these private sales of shares by John Kirk, falsely stating that John Kirk was not an officer, director or affiliate of Pacific Blue.  (*Id.*).

> **2.     Tradeshow**

55.     Tradeshow was founded in 2003 by Bruce Kirk, the father of John and Ben Kirk. (*Id.* at ¶ 31).  Tradeshow was purportedly established for the purpose of selling consumer merchandise at trade shows and shopping malls.  (*Id.*).  Since at least 2006, John Kirk exercised control over Tradeshow, even though he was never disclosed as an officer or director in Tradeshow's public filings.  (*Id.* at ¶ 33).  John Kirk oversaw Tradeshow's employees, made major company decisions, and had control over its bank account.  (*Id.*).

56.     In June 2008, John Kirk arranged for Bruce Kirk to gift 10 million Tradeshow shares (43% of the outstanding shares) at John Kirk's direction.  (*Id.* at ¶ 37).  John Kirk then instructed Tradeshow's stock transfer agent to reissue these shares in the name of various nominee entities controlled by John Kirk, Ben Kirk and Boyle.  (*Id.*).

57.     In 2009, the Kirks, Boyle and Hinton set up two "boiler-room" operations for the purpose of promoting Tradeshow stock.  (*Id.* at ¶ 47).  These two boiler rooms operated under the names Skymark and ESR.  (*Id.*).  Carrillo and Huettel knew that Skymark was under the control of the Kirks, because, among other things, they trademarked Skymark for Ben Kirk.  (*Id.* at ¶ 64).  Carrillo also provided advice to the Kirks and Boyle regarding the Skymark script and other written materials distributed by Skymark.  (*Id.* at ¶ 65).

58.     Tradeshow never generated any significant revenues.  (*Id.* ¶ 66).  For its fiscal year ended May 31, 2010, Tradeshow reported revenue of only $32,085 and a net loss of ($614,012).  (*Id.*).  Instead, Tradeshow's operations were funded almost entirely through $1.2 million in mysterious overseas private placement funds facilitated by Carrillo, Huettel and the Kirks.  (*Id.*).  On information and belief, these supposed private placement investments were simply proceeds of the Kirks' and Boyle's fraudulent sales of Tradeshow shares, which they funneled back to Tradeshow through the Carrillo Huettel Trust Account.  (*Id.*).

59.     On February 24, 2010, an article titled: "Tradeshow Marketing Knows How To Sell Its Stock" appeared on TheStreetSweeper.org.  (*Id.* at ¶ 68).  It highlighted the Kirks' connections to both Skymark and Tradeshow using information found in older SEC filings and other internet sources, and noted that Carrillo Huettel LLP represented both Skymark and Tradeshow.  (*Id.*).  After the article was publicized, Tradeshow's stock began a precipitous fall, dropping 40% over the next two weeks.  (*Id.*).  Instead of coming clean, the Kirks, Carrillo, Huettel, Boyle and De Beer conspired to deny the facts in the Street Sweeper article and to conceal the Kirks' shared control.  (*Id.* at 71).  In furtherance of this cover-up, Skymark and Tradeshow made public statements blaming the article on a mysterious stock shorting conspiracy.  Drafts of these statements were circulated between Ben Kirk, Carrillo, Huettel and De Beer.  (Id).  The public statements by Skymark and Tradeshow responding to the Street Sweeper article, which were drafted by or approved by the Kirks, Carrillo, Huettel and De Beer, were false and misleading because they failed to disclose the truth:  as the article implied, the Kirks and Boyle controlled Skymark, whose purpose was simply to promote the common stock of Tradeshow, a company also controlled by the Kirks and Boyle.  (*Id.* at ¶ 75).

**B.      De Beer's Role in the Tradeshow Fraudulent Scheme**

60.      On October 30, 2007, Luniel De Beer was promoted to CEO and President of
Tradeshow. (*Id.* at ¶ 34).  Notwithstanding this promotion, dozens of emails demonstrate that De
Beer was reporting to and taking instruction from the Kirks and that the Kirks retained their
control over Tradeshow through De Beer.  (*Id.*)  (*Id.* at ¶¶ 34-35).  De Beer and the Kirks
engaged in an almost daily stream of communications regarding Tradeshow press releases,
potential business announcements and contacts with investors.  (Id at ¶ 35.).  For example, John
Kirk drafted press releases for De Beer to release on behalf of Tradeshow and sent emails to De
Beer to release news and updated financials.  (*Id.*).  De Beer also received substantial
undisclosed compensation from the Kirks and Boyle for his role as CEO of Tradeshow.  (*Id.* at ¶
36).  In September and October 2009 the Kirks and Boyle wired De Beer over $330,000 of their
proceeds from their sale of Tradeshow stock.  (*Id.*).

61.      In June 2008, John Kirk arranged for Bruce Kirk to gift 10 million Tradeshow
shares (43% of the outstanding shares) at John Kirk's direction.  (*Id.* at ¶ 37).  John Kirk then
instructed Tradeshow's stock transfer agent to reissue these shares in the name of various
nominee entities controlled by John Kirk, Ben Kirk and Boyle.  (*Id.*).  De Beer, who had control
of Tradeshow's shareholder records, knew that the Kirks and Boyle owned a control block of
Tradeshow shares.  (*Id.* at ¶ 38).

62.      Tradeshow's annual reports signed by De Beer and filed with OTCMarkets.com
in November 2009 and October 2010 falsely claimed that De Beer was the only officer, director
or control person of Tradeshow.  (*Id.* at ¶ 42).  The annual reports failed to mention the Kirks'
and Boyle's share ownership, the fact that the Kirks were control persons of Tradeshow, or that
they were serving as de facto investment bankers, promoters and investor relations consultants.

(*Id.*).  Instead, they misleadingly claimed that:  (a) "There are no known individuals or corporations owning more than 5% of the Company's common stock"; and (b) "The Company does not utilize the services of an investment banker, promoter, relations consultant or an investor relations consultant.  The Company does not utilize the services of the promoter."  (*Id.*).

63.     Tradeshow's public filings also misrepresented De Beer's compensation by failing to disclose kickbacks of stock sale proceeds he received from the Kirks and Boyle.  (*Id.* at ¶ 44).  Specifically, none of these filings disclosed over $330,000 in wire transfers that he received from the Kirk/Boyle group.  (*Id.*).  Each of Tradeshow's annual and quarterly reports from November 2009 through October 2010 purported to disclose all related party transactions.  (*Id.* at ¶ 45).  This section was misleading because it failed to disclose: (1) the over $330,000 in kickbacks from the Kirks and Boyle to De Beer paid out of Tradeshow stock sales, and (2) the stock ownership, paid promotion and scalping orchestrated by the Kirks.  (*Id.*).

64.     De Beer signed and approved Tradeshow's annual reports filed with OTC Link during November 2009 and October 2010 and signed and approved Tradeshow's quarterly reports filed in November 2009, March 2010, April 2010 and October 2010.  (*Id.* at ¶ 43).  Furthermore, from July 2009 through October 2010, De Beer approved and publicly released dozens of Tradeshow press releases that provided updates on various supposed company developments.  (*Id.* at ¶ 46).  These press releases were misleading because they failed to disclose that the primary purpose of Tradeshow's existence as a publicly traded company, and the underlying purpose of the press releases, was simply to inflate demand for the shares so that the Kirks and Boyle could sell their Tradeshow shares.  (*Id.*).

### C.    Davis's and Gibraltar's Role in the Fraudulent Scheme

65.    Gibraltar's business primarily consists of liquidating low-priced, thinly-traded stocks on behalf of its clients, often during periods of suspicious promotion.  (*Id.* at ¶ 110). Gibraltar's website touts its goals of client secrecy ("confidentiality is paramount to Gibraltar") and asset protection ("transferring your assets into a legal entity which will protect them from litigation [or] government seizure").  (*Id.* at ¶ 111).  Gibraltar also offers to incorporate "International Business Corporations" (IBCs) for its clients, and suggests using nominee officers and directors ("giving you an extra level of confidentiality as your name will not show up as an officer or director on your IBC.").  (*Id.* at ¶ 112).

66.    Ben Kirk, Boyle and Hinton had accounts at Gibraltar in their own names or in the names of offshore corporations they controlled.  (*Id.* at ¶ 113).  Carrillo also had an account at Gibraltar and represented Gibraltar as its U.S. counsel.  (*Id.*).

67.    Gibraltar maintained omnibus accounts at Scottsdale through which it liquidated stocks held by its clients.  (*Id.* at ¶ 110).  Gibraltar knowingly, recklessly or negligently provided misleading representations in September 2009 and April 2010 to conceal the beneficial ownership of millions of Tradeshow and Pacific Blue shares controlled by Ben Kirk.  (*Id.* at ¶ 114).  Gibraltar knowingly, recklessly or negligently provided these false affidavits and misleading representations to Scottsdale in order for its client Ben Kirk to sell his restricted shares without disclosing that he was a control person and affiliate of the companies.  (*Id.*).

68.    Specifically, Ben Kirk controlled at least three separate nominee accounts at Gibraltar in the names of Strotas, Mazi, and Baltic, each a Panamanian corporation, for no apparent purpose other than to conceal his ownership identity.  (*Id.* at ¶ 115).  Gibraltar knew that it was maintaining these nominee accounts beneficially owned by Ben Kirk in addition to his

personal account and that there was no readily apparent legitimate purpose for these accounts. (*Id.*). Gibraltar maintained account opening documents for each of these accounts, which stated that Ben Kirk, not the Panamanian corporation, was the beneficial owner of each of the Strotas, Mazi, and Baltic accounts. (*Id.* at ¶ 116).

69.     Scottsdale required representations from Gibraltar regarding the beneficial ownership of shares it deposited through Scottsdale as part of its due diligence. (*Id.* at ¶ 118). Beneficial ownership of the shares mattered to Scottsdale because shares sold by or on behalf of an "affiliate" or control person of the company are considered "underwriter" sales and are thus ineligible for the Section 4(1) exemption from registration. (*Id.*).

70.     Had Scottsdale known, as Gibraltar knew, that Ben Kirk, a control person and affiliate of the companies, beneficially owned the Medford, Mazi, and Baltic shares, Scottsdale would have considered these shares restricted and ineligible for deposit and sale without registration. (*Id.* at ¶ 119). Thus, to effectuate share deposits and sales at Scottsdale on behalf of its client Ben Kirk, Gibraltar misrepresented the shares' beneficial ownership. (*Id.* at ¶ 120).

71.     For example, in April 2010, Gibraltar provided affidavits to Scottsdale for two separate deposits of 1.8 million Pacific Blue shares, misleadingly stating that it held securities for the "sole benefit" of its clients Mazi and Baltic, when Gibraltar knew that Ben Kirk was the beneficial owner and that Mazi and Baltic were nominee entities. (*Id.* at ¶ 121).

72.     In April 2010, Gibraltar also signed share deposit forms (called "DSR forms") relied upon by Scottsdale's clearing broker for the deposit and sale of 3.6 million Pacific Blue shares on behalf of Ben Kirk. (*Id.* at ¶ 122). These forms misleadingly represented that the shares were "acquired" from nominee entities Mazi and Baltic, when Gibraltar knew that its client Ben Kirk was the beneficial owner of the shares. (*Id.*).

73.     These representations, all of which were signed by Davis on behalf of Gibraltar, were false because they contradicted the information contained in the account opening documents Ben Kirk provided to Gibraltar for his nominee accounts.  (*Id.* at ¶ 123).  At all relevant times, Gibraltar knew that Ben Kirk was the beneficial owner of the Tradeshow and Pacific Blue shares, not the nominee entities, because Ben Kirk provided all instructions on the accounts, not the officers or directors of the Panamanian Corporations.   (*Id.*).

## II.     THE SALE OF UNREGISTERED SHARES

74.     As part of the scheme, the defendants in this case sold a significant amount of Tradeshow stock.  From August 2009 through February 2010, nominee entities controlled by Ben Kirk and Boyle realized more than $4.4 million in proceeds from stock sales of over 5 million shares through accounts at Scottsdale and Gibraltar.  Boyle received more than $300,000 in proceeds from stock sales that he conducted through a personal offshore account in Turks and Caicos.  John Kirk realized proceeds of $306,000 from stock sales conducted through accounts in his own name.  And Hinton realized proceeds of more than $21,000 in proceeds from sales of Tradeshow shares. (*Id.* at ¶ 167).

75.     Similarly, with respect to Pacific Blue, from March through August 2010, Nominee entities controlled by the Kirks and Boyle realized more than $5.6 million from stock sales.  John Kirk realized proceeds of more than $210,000 from his sale of over 1 million shares of Pacific Blue.  John Kirk realized proceeds of more than $100,000 from shares held in his mother's name but that he controlled.  And Hinton also realized proceeds of over $12,000 from shares sold and received an additional $150,000 in proceeds of Pacific Blue stock sales.  (*Id.* at ¶ 167).

76.     Dr. Carrillo contributed $20,000 towards the initial purchase of the Descanso shares and received 4.9% of the shares of Pacific Blue.  Dr. Carrillo held his shares, at least in part, as a nominee for Carrillo and Huettel.  (*Id.* at ¶ 154).  Carrillo had trading authority and power of attorney over the brokerage account where the sales were made, Carrillo provided some instructions to the broker concerning that account, and over one-third of the $1.1 million in sale proceeds was redirected to Carrillo Huettel LLP.  (*Id.*).

77.     There was no registration statement in effect for Tradeshow.  (*Id.* at ¶ 139).  John Kirk, who controlled Tradeshow, arranged for the Kirks, Boyle and Hinton to acquire Tradeshow securities (originally held by Bruce Kirk, who was also an affiliate of the issuer), in a transaction or chain of transactions not involving any public offering.  (*Id.* at ¶ 14).  Therefore, the Tradeshow securities were restricted securities as defined in Rule 144(a)(3)(i).  (*Id.*).  These securities were also control securities, because the beneficial ownership of over 40% of the outstanding stock of Tradeshow by the Kirks, Boyle and Hinton gave them control over the issuer, as demonstrated by their active involvement in the operations and promotion of the company.  (*Id.*).  The Kirks, Boyle and Hinton are statutory underwriters under Securities Act Section 2(a)(11) because they acquired the securities from an affiliate of the issuer with a view to public distribution.  (*Id.* at ¶ 141).  As statutory underwriters, in order to resell the securities to the public in reliance on Section 4(a)(1), they were required to comply with the applicable conditions of Rule 144 in order to not be deemed "underwriters" engaged in an illegal public distribution.  (*Id.*).

78.     There was likewise no registration statement in effect for Pacific Blue.  When John Kirk, with the assistance of Carrillo and Huettel, purchased all outstanding shares of Descanso in late 2009, took control of the company, replaced management, renamed the

company Pacific Blue and arranged for the redistribution of all outstanding shares, he set into motion a new distribution and offering of shares. (*Id.* at ¶ 148). The Kirks, Boyle, Hinton and Dr. Carrillo acquired Pacific Blue securities as part of this transaction from the issuer or an affiliate of the issuer with a view to public distribution. (*Id.* at ¶ 149). All shares were acquired as part of the consolidation and redistribution of 100% of the outstanding shares by John Kirk, who was an affiliate of the issuer. (*Id.*). Therefore, the Pacific Blue securities were restricted securities as defined in Rule 144(a)(3)(i). (*Id.*). These securities were also control securities, because the Kirks, Boyle and Hinton acted in concert and had "control" by virtue of their ownership of well over 50% of Pacific Blue stock. (*Id.*). The Kirks, Boyle, Hinton and Dr. Carrillo are underwriters under Section 2(a)(11) because they acquired shares from an affiliate of the issuer with a view to public distribution and did not comply with the applicable conditions of Rule 144. (*Id.* at ¶ 150). Pacific Blue was a shell company when its shares were purchased and redistributed by John Kirk in September 2009. (*Id.* at ¶¶ 76, 151). The Kirks, Boyle, Hinton and Dr. Carrillo sold millions of Pacific Blue shares within one year of Pacific Blue's December 9, 2009 Form 8-K that purported to contain the required Form 10 information and certification that the company had ceased being a shell. (*Id.* at ¶ 152). The Kirks, Boyle, Hinton and Dr. Carrillo also did not comply with the Rule 144 conditions relating to current public information, holding period, manner of sale, and volume limitations. (*Id.* at ¶ 153).

### A.   Carrillo's and Huettel's Involvement in the Sale of Pacific Blue Shares

79.   In order to deposit and sell thinly-traded, low-priced securities such as Pacific Blue, clearing and introducing brokers required legal opinions vouching for the unrestricted status of Pacific Blue shares. (*Id.* at ¶ 133).

80.     Carrillo and Huettel provided multiple misleading opinion letters to facilitate the deposit and sale of the Kirks' and Boyle's Pacific Blue shares.  (*Id.*).  For example, on or about November 23, 2009, Carrillo and Huettel provided opinion letters (signed by Carrillo) to Scottsdale for blocks of shares owned by Ben Kirk and Boyle's nominee entities, falsely confirming that the "shares are fully registered, unrestricted, . . . free trading" shares.  (*Id.* at ¶ 134).

81.     On or about March 2, 2010, Carrillo and Huettel provided an opinion letter (drafted by Huettel and signed by Carrillo) to the Depository Trust Company (DTC) for shares owned by Boyle's nominee entity falsely stating "the Subject Shares are freely transferrable without registration under the Securities Act by a holder which is not an 'affiliate' of the Company as defined in Rule 144(a)(3) under the Securities Act."  (*Id.* at ¶ 135).

82.     On or about April 21, 2010, Carrillo and Huettel provided an opinion letter (signed by Carrillo) to Scottsdale for blocks of shares in Gibraltar's name but owned by Ben Kirk's nominee entities falsely stating that "the shares have been registered under the Securities Act of 1933" and "we are not aware of any other agreement or understanding that would preclude [Gibraltar] from selling …."  (*Id.* at ¶ 136).

83.     Carrillo and Huettel knew that the Kirk/Boyle group beneficially owned well over 5% of Pacific Blue's common shares, that they controlled Pacific Blue, that they were "affiliates" under Rule 144 of the Securities Act, and that shares they held were not "free trading" shares.  (*Id.* at ¶ 137).

84.     Carrillo and Huettel knew that the shares were not "registered" under the Securities Act.  Carrillo and Huettel knew that the shares issued in the 2010 securities offering

were not "registered" under the Form SB-2 filed by the predecessor entity (Descanso) in 2007, because registration statements are transaction specific.  (*Id.* at ¶ 138).

85.     The 2007 Form SB-2 was filed well before the Kirks, Boyle and Carrillo purchased all outstanding shares, took control of the company, replaced management, renamed the company Pacific Blue and arranged for the redistribution of all outstanding shares.  (*Id.*).  The distribution in 2010 was a new offering, and each new offering must have a valid registration statement or a valid exemption.  (*Id.*).

**B.     De Beer's Involvement in the Sale of Pacific Blue and Tradeshow Shares**

86.     De Beer received over $330,000 in secret sales proceeds from the sale of unregistered Tradeshow and Pacific Blue stock by the Kirks.

87.     In addition to his directly receiving the proceeds from such sales, De Beer was a necessary participant and/or a substantial factor in the sale of unregistered stock by the Kirks and Boyle.  Specifically, in order to deposit the Kirks' and Boyle's Tradeshow and Pacific Blue share deposits for sale, Scottsdale and its clearing brokers required corporate resolutions from Tradeshow and Pacific Blue as part of their due diligence process.  (*Id.* ¶ 126).

88.     De Beer provided the Kirks and Boyle with misleading corporate resolutions and certifications on behalf of Tradeshow that allowed them to deposit shares for sale.  (*Id.* at ¶ 127).

89.     For example, on or about July 14, 2009, and again in September 2009, De Beer provided certifications for share certificates John Kirk held in the name of a nominee entity.  (*Id.* at ¶ 128).  De Beer's certifications falsely represented to Scottsdale, with no reasonable basis, that the "Holder is not a director, officer or an "Affiliate" of the Company as that term is used in paragraph (a) of Rule 144 of the Securities Act of 1933 . . ." and that "the Holder is not a beneficial owner of 5% or more of any class of equity securities of the Company." (*Id.*).

90.     On or about July 14, 2009, De Beer provided a certification with the same misleading representations as to a share certificate held by Boyle.  (*Id.*).

91.     On or about August 28, 2009, De Beer provided a corporate resolution to Ben Kirk for shares Ben Kirk held at Gibraltar in the name of a nominee entity.  (*Id.* at ¶ 129).  De Beer's resolution falsely claimed that the shares were "validly issued" and "free trading" shares. (*Id.*).

92.     These Tradeshow certifications and resolutions were false and misleading because De Beer knew that the Kirks and Boyle beneficially owned well over 5% of Tradeshow common shares, that they controlled Tradeshow, that they were "affiliates" under Rule 144 of the Securities Act, and that shares they held were not "free trading" shares.  (*Id.* at ¶ 130).

93.     De Beer also provided Ben Kirk with misleading corporate resolutions and certifications on behalf of Pacific Blue that allowed him to deposit shares for sale.  (*Id.* at ¶ 131). For example, on or about April 6, 2010, Franklin and De Beer provided a corporate resolution to Ben Kirk for shares Ben Kirk held at Gibraltar in the name of a nominee entity.  (*Id.*).  This resolution, signed by De Beer on behalf of Pacific Blue, falsely certified that the shares were "validly issued" and "free trading".  (*Id.*).  Ben Kirk and Gibraltar used this resolution to deposit and sell multiple shares.  (*Id.*). This resolution was false and misleading because De Beer knew that the Kirks and Boyle beneficially owned well over 5% of Pacific Blue's common shares, that they controlled Pacific Blue, that they were "affiliates" under Rule 144 of the Securities Act, and that shares were not "free trading."  (*Id.* at ¶ 132).

**C.    Gibraltar's/Davis's Involvement in the Sale of Pacific Blue and Tradeshow Shares**

94.     Gibraltar and Davis made false representations to Scottsdale misrepresenting the beneficial ownership of the shares held at Gibraltar in the Strotas, Mazi, and Baltic accounts.

These misrepresentations were made in affidavits provided as part of Scottsdale's due diligence process and also in share deposit forms relied upon by Scottsdale's clearing broker.

95.     Had Scottsdale known, as Gibraltar knew, that Ben Kirk, a control person and affiliate of the companies, beneficially owned the Medford, Mazi, and Baltic shares, Scottsdale would have considered these shares restricted and ineligible for deposit and sale without registration.

96.     After making these false representations, Gibraltar arranged to sell Pacific Blue and Tradeshow shares on behalf of Ben Kirk's nominee accounts for proceeds of over $3.5 million through omnibus accounts in Gibraltar's name at Scottsdale.

97.     Specifically, In October 2009, Gibraltar sold 965,000 Tradeshow shares for proceeds of over $600,000 for the benefit of its client Ben Kirk.  And from May through August 2010, Gibraltar sold over 2.7 million Pacific Blue shares for proceeds of approximately $2.9 million for the benefit of its client Ben Kirk.

### EVIDENCE CONCERNING THE SALE OF TRADESHOW AND PACIFIC BLUE STOCK BY THE PARTCIPANTS IN THE FRAUDULENT SCHEME

**I.     Ben Kirk's Accounts**

**A.     The Ben Kirk Account at Gibraltar**

98.     On or about August 16, 2007, Ben Kirk opened an individual brokerage account at Gibraltar.  Attached hereto as Exhibit 9 is a true and correct copy of the account opening documents for the Ben Kirk Account.

**B.     The Baltic Investments Ltd. Corp. at Gibraltar**

99.     Attached hereto as Exhibit 10 is a true and correct copy of the account application at Gibraltar naming Ben Kirk as the account holder for Baltic Investments Ltd. Corp. ("Baltic").

**C.      The Mazi International Corp. Account at Gibraltar**

100.    Attached hereto as Exhibit 11 is a true and correct copy of the account application at Gibraltar naming Ben Kirk as the account holder for Mazi International Corp. ("Mazi").

**D.      The Strotas Group Inc. Account at Gibraltar**

101.    Attached hereto as Exhibit 12 is a true and correct copy of the account application at Gibraltar naming Ben Kirk as the account holder for Strotas Group Inc. ("Strotas").

102.    Attached hereto as Exhibit 13 is a true and correct copy of a statement from Gibraltar reflecting all Tradeshow and Pacific Blue trades made by the defendants, their nominee entities, and some of the defendants' associates that had Gibraltar accounts.  This document was used by Jacqueline Fine, a staff accountant at the Commission, to calculate the disgorgement in this case from all of the relevant Gibraltar accounts beneficially owned by Ben Kirk and Dylan Boyle.  Exhibit 13 was provided to the Commission by the Securities Commission of the Bahamas. A true and correct copy of the Securities Commission of the Bahama's cover letter to the Commission enclosing Exhibit 13 is attached hereto as Exhibit 14.

**E.      The Strotas Account at Scottsdale Capital Advisors**

103.    In addition to the Strotas account at Gibraltar, Strotas had an account at Scottsdale Capital Advisors ("Scottsdale").

104.    Ben Kirk controlled the Strotas account at Scottsdale.  Attached hereto as Exhibit 15 is a true and correct copy of an email from Ben Kirk to Scottsdale directing Scottsdale to communicate with him at his email address.

105.    Attached hereto as Exhibit 16 is a true and correct copy of an email exchange between Ben Kirk and a broker at Scottsdale regarding stock powers.

106.     Attached as Exhibit 17 is a true and correct copy of an email from Scottsdale to Ben Kirk requesting Kirk to provide signed copies.

107.     Attached as Exhibit 18 is a true and correct copy of an email from Scottsdale requesting that Ben Kirk obtain signatures for the Strotas Group account.

108.     Attached as Exhibit 19 is a true and correct copy of an email from Scottsdale requesting that Ben Kirk provide signatures.

109.     Attached as Exhibit 20 is a true and correct copy of a February 16, 2010 email from Scottsdale to Ben Kirk concerning a wire for the Strotas account.

110.     Attached as Exhibit 21 is a true and correct copy of an email from Scottsdale to Ben Kirk sending a Strotas application for Scottsdale's clearing firm.

111.     Attached as Exhibit 22 is a true and correct copy of a note Ben Kirk signed stating that "we" sent a wire from the Strotas Scottsdale account to the Strotas Gibraltar account.

112.     Attached as Exhibit 23 are true and correct copies of wire records from the Strotas Scottsdale account, including notes signed by Ben Kirk directing certain of the wire transfers.

**F.     The Irish Delta Account at Scottsdale**

113.     The nominee entity, Irish Delta, Inc. ("Irish Delta") also maintained an account at Scottsdale that was controlled by Ben Kirk.

114.     Ben Kirk provided Scottsdale with his email address to communicate with him for the Irish Delta account.  *See supra* Ex. 15.

115.     Scottsdale requested Ben Kirk to obtain signatures for the Irish Delta account. *See supra* Ex. 18.

116.     Scottsdale requested that Ben Kirk provide letters of authorization for Irish Delta to send wires on that account.  *See supra* Ex. 19.

27

117.    Scottsdale sent an application to Ben Kirk for Irish Delta to open an account with Scottsdale's clearing firm, Penson.  *See supra* Ex. 21.

118.    Attached as Exhibit 24 is a true and correct copy of a trade blotter of the activity in the relevant Scottsdale accounts produced by Scottsdale to the Commission.  This trade blotter was used by Jacqueline Fine to calculate the disgorgement in this case.

**G.    The Veritas Account at Grand Palm Ltd.**

119.    Another of Ben Kirk's nominees was Veritas Holdings, Ltd. ("Veritas"), which maintained its account at Grand Palm Ltd. ("Grand Palm"), a Turks & Caicos brokerage.

120.    Attached as Exhibit 25 are true and correct copies of account documents for the Veritas account at Grand Palm, including a cash sheet listing Ben Kirk and Veritas Holding as one and the same.

121.    Attached hereto as Exhibits 26-27 are true and correct copies of account statements showing that Grand Palm facilitated four sales of Pacific Blue stock on behalf of Veritas and Ben Kirk that took place on May 10, May 17, May 28, and June 1, 2010 for 50,000 shares, 2,500 shares, 100,000 shares, and 287,025 shares respectively.  These exhibits were used by Jacqueline Fine to calculate the disgorgement in this case.

**H.    The Nelevi Account at Verdmont**

122.    Another of Ben Kirk's nominees was Nelevi S.A. ("Nelevi"), which maintained its account at Verdmont Capital ("Verdmont").

123.    On or around February 2, 2007, Ben Kirk created the account for Nelevi at Verdmont.  Attached as Exhibit 28 is a true and correct copy of the application for the Nelevi account, including Ben Kirk signing as a signatory to the account and a Certificate of Incumbency, which was filed on or around December 18, 2009.  Roberto Guardia Rabell, the

same subscriber for Baltic, Mazi, Strotas, and Irish Delta, was one of subscribers.  The second

was Javier Orillac Icaza: the other named partner for the law firm that wrote the Baltic, Mazi,

Strotas, and Irish Delta reference letters and prepared the information for all of their account

applications.  The address for Nelevi was also the same as the one used for Irish Delta: Orillac &

Guardia's office.

124.    Attached as Exhibit 29 is a true and correct copy of Nelevi account statements,

which show sales of shares of Pacific Blue stock during the period March 31, 2010 through July

1, 2010.  This exhibit was used by Jacqueline Fine to calculate the disgorgement in this case.

**II.     James Hinton's Account at Global**

125.    James Hinton had an account at Global Securities Corporation ("Global").

Attached hereto as Exhibit 30 is a true and correct copy of Hinton's Global account application.

Attached hereto as Exhibit 31 is a true and correct copy of Hinton's Global account records

reflecting trades in Hinton's account.  Jacqueline Fine used this exhibit to calculate the

disgorgement in this case.

**III.    The Carrillo Accounts at Global Securities**

126.    Dr. Luis Carrillo, the father of Carrillo, had accounts at Global.  Attached hereto

as Exhibit 32 is a true and correct copy of Carrillo's application to Global for these accounts over

which Carrillo had trading authority.  Attached hereto as Exhibit 33 are true and correct copies of

excerpts from the May 28, 2015 deposition of Nicholas Gregory where Mr. Gregory testified that

Carrillo had trading authority over the Dr. Carrillo accounts and also provided instructions on

those accounts.

127.    Attached hereto as Exhibit 34 is a true and correct copy of Carrillo's Global

account records reflecting sales of Pacific Blue shares between March 16, 2010 and August 2,

2010 in Dr. Carrillo's account. Jacqueline Fine used this exhibit to calculate the disgorgement in this case.

128.   Attached hereto as true and correct copies of Exhibit 35 are account records from Carrillo's Global account reflecting the following wires out of Dr. Carrillo's account:

a. Dr. Carrillo instructed GSC to wire a total of $100,000 in Pacific Blue proceeds to an account he controlled in California at Pacific Western Bank, via three separate wire transfers on April 12, 2010 ($50,000), June 28, 2010 ($35,000) and on July 8, 2010 ($15,000).

b. Dr. Carrillo instructed GSC to wire a total of $901,000 in Pacific Blue proceeds to an account he controlled in Mexico at Bancomer, via four separate wire transfers from May 6 through June 3, 2010.

c. The remainder (approximately $144,000) was commingled with other funds in Dr. Carrillo's GSC account.

Jacqueline Fine used this exhibit to calculate disgorgement.

129.   Attached hereto as Exhibit 36 are true and correct copies of Dr. Carrillo's Bancomer bank statements reflecting $420,000 in wires of Pacific Blue proceeds from Bancomer to three separate accounts he controlled at three banks in California via four separate wire transfers from May 11, 2010 through June 23, 2010: (1) $300,000 on May 11, 2010 to an account ending in 4511 at Pacific Western Bank (reflected in a true and correct copy of an excerpt of a Pacific Western Bank record of account ending in 4511 attached hereto as Exhibit 37); (2) $50,000 to an account ending in 1011 at First National Bank (reflected in a true and correct copy of an excerpt of a First National Bank record of account ending in 1011 Exhibit 38 attached hereto) and (3) $70,000 in two separate wires sent on June 8 and June 23, 2010 to an account ending in 6406 at Bank of America (reflected in a true and correct copy of an excerpt of a Bank of America record of account ending in 6406 attached hereto as Exhibit 39).

130.   On April 14, 2010 Dr. Carrillo transferred two checks in the amount of $32,500 from the Pacific Western Bank account ending in 4511 to two Bank of America accounts ending

in 6388 and 6389.  Attached hereto as Exhibit 40 are true and correct copies of excerpts from account statements for the Pacific Western Bank account ending in 4511 and the Bank of America accounts ending in 6388 and 6389 reflecting these transactions.

131.    Some of the proceeds from these sales were transferred from the Dr. Carrillo accounts to Carrillo Huettel and Huettel personally.  Attached hereto as Exhibit 41 are true and correct copies of checks reflecting $343,750 received by Carrillo Huettel from checks written from Dr. Luis Carrillo's accounts ending in 1011, 6406 and 4511.

132.    Attached hereto as Exhibit 42 are true and correct copies of relevant portions of bank statements reflecting transactions from Dr. Carrillo's accounts ending in 4511 and 6406 in which Dr. Carrillo transferred money from the proceeds of his sales of Pacific Blue shares to Luis J. Carrillo, totaling $126,360.  Attached hereto as Exhibit 43 is a true and correct copy of a check for $32,500 written from Dr. Luis Carrillo's account to Wade Huettel.

133.    Pacific Blue had an attorney trust account with Carrillo Huettel.  Attached as Exhibit 44 is a true and correct copy of a transaction detail spreadsheet produced by Carrillo Huettel reflecting transfers made to Carrillo Huettel for legal fees in the amount of $61,500.

IV.    **John Kirk's Accounts**

A.    **Ruth Kirk's Account at Canaccord**

134.    Ruth Kirk, the mother of John Kirk, had an account at Canaccord Genuity Corp. ("Canaccord") over which John Kirk had trading authority.  Attached hereto as Exhibit 45 are true and correct copies of the Canaccord account opening documents.

135.    Attached hereto as Exhibit 46 are true and correct copies of the Canaccord account statements.  Jacqueline Fine used this exhibit to calculate the disgorgement in this case.

### B.      John Kirk's Account at Montecito

136.     John Kirk had an account at Montecito Advisors, Inc. ("Montecito").  Attached hereto as Exhibit 47 are true and correct copies of the Montecito account statements.  Jacqueline Fine used this exhibit to calculate the disgorgement in this case.

### C.      John Kirk's Kita-Kaine Account

137.     Kita-Kaine Investment Holding Co. ("Kita-Kaine") was an entity beneficially held by John Kirk.  Attached hereto as Exhibit 48 are true and correct copies of the account opening documents for Kita-Kaine's account at Scottsdale.

138.     Attached hereto as Exhibit 49 are true and correct copies of the account statements for Kita-Kaine.  Jacqueline Fine used this exhibit to calculate the disgorgement in this case.

## V.      Dylan Boyle's Accounts

### A.      Gibraltar

139.     Dylan Boyle maintained an individual brokerage account at Gibraltar.  Attached hereto as Exhibit 50 is a true and correct copy of the account opening documents for the Dylan Boyle Account.

### B.      Scottsdale

140.     On or about June 11, 2009, Dylan Boyle opened an individual brokerage account at Scottsdale. Attached hereto as Exhibit 51 is a true and correct copy of the account opening documents for the Dylan Boyle Account.  Attached as Exhibit 52 are true and correct copies of the account statements for the account Boyle maintained at Scottsdale.  Jacqueline Fine used this exhibit to calculate the disgorgement in this case.

C. **Grand Palm**

141.    Attached hereto as Exhibit 53 are true and correct copies of the account opening documents for the Dylan Boyle Account.  Attached hereto as Exhibit 54 is a true and correct copy of a cash sheet reflecting trades and wires for Boyle's account at Grand Palm.  Jacqueline Fine used this exhibit to calculate the disgorgement in this case.

D. **Dylan Boyle's True North Consulting Account**

142.    True North Consulting ("True North") was an entity beneficially held by Dylan Boyle.  Attached hereto as Exhibit 55 is a true and correct copy of the account opening documents for True North's account at Grand Palm.  Attached as Exhibit 56 is a true and correct copy of a cash sheet reflecting trades and wires conducted in Boyle's True North account.  Jacqueline Fine used this exhibit to calculate the disgorgement in this case.

VI. **De Beer Receives Payments from Tradeshow and Pacific Blue**

143.    Between April 2009 and 2011 Tradeshow maintained an account at JPMorgan Chase Bank, N.A. ("Chase") (formerly Washington Mutual) over which De Beer had signatory power.  Attached hereto as Exhibit 57 is a true and correct copy of Tradeshow's account applications at Chase.

144.    De Beer owned a bank account in the name of De Beer Consulting LLC at Chase from 2010 to 2011.   Between March 26, 2010 and March 9, 2011, De Beer received $333,442.66 in payments from Tradeshow's Chase bank accounts via checks, and online payments in the amount of $333,442.66.  Attached hereto as Exhibit 58 are true and correct copies of excerpts from Tradeshow's Chase bank statements which show the payments to De Beer.

145.     From October 30, 2009 to June 2011, Pacific Blue maintained an account at

Chase.   Between June 24, 2010 and June 29, 2011, de Beer received $208,471.21 in payments

from Pacific Blue's Chase account via electronic payments.  Attached as Exhibit 59 are true and

correct copies of excerpts from Pacific Blue's Chase bank statements which show the payments

to De Beer.

## VII.    Gibraltar's Commissions on the Pacific Blue and Tradeshow Transactions

146.     Attached hereto as Exhibit 60 are true and correct copies of excerpts from the

Wells Submission of Gibraltar and Davis that was provided to the Commission on October 19,

2012.  The Wells Submission provides that Gibraltar's commissions on Tradeshow transactions

was $30,787.09 in 2009 and $759.32 in 2010.  The Wells Submission provides that Gibraltar's

commissions on Pacific Blue transactions were $105,082,29.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 11, 2016
        New York, New York

                              /s/ Todd D. Brody
                              Todd D. Brody
                              Senior Trial Counsel
                              Securities and Exchange Commission
                              Brookfield Place, 200 Vesey Street
                              New York, NY 10281
                              (212) 336-0080
                              brodyt@sec.gov