UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>   v.<br><br>CARRILLO HUETTEL LLP, ET AL.,<br><br>        Defendants, | 1:13-cv-01735 (GBD)<br>ECF CASE |

## DECLARATION OF JAQUELINE FINE IN SUPPORT OF THE COMMISSION'S MOTION FOR DEFAULT JUDGMENT AND FINAL JUDGMENT

I, JAQUELINE FINE, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years of age and am employed as a staff accountant in the New York Regional Office of the applicant Securities and Exchange Commission ("Commission"). I have been employed by the SEC for over 16 years. My duties include, but are not limited to, assisting in the investigation of possible violations of the federal securities laws and in litigation concerning alleged violations of those laws. In 2012, I was assigned to assist in an investigation of Skymark Research Inc., Benjamin T. Kirk ("Ben Kirk"), John Kirk, Dylan Boyle ("Boyle"), Luis J. Carrillo ("Carrillo"), Wade Huettel ("Huettel"), Carrillo Huettel LLP ("Carrillo Huettel"), James Hinton ("Hinton"), Luniel de Beer ("De Beer"), Warren Davis ("Davis"), Gibraltar Global Securities Inc. ("Gibraltar") and other related entities and persons.

2. I make this Declaration in support of the Commission's Motion for Default Judgment against Ben Kirk, Carrillo, Huettel, Carrillo Huettel, De Beer, Davis, and Gibraltar and for Final Judgment against John Kirk (the "Motion").

3. I make this declaration based upon personal knowledge, information, and belief.

The sources of my information and the bases of my belief are voluminous documents and financial records obtained by the Commission staff that I have reviewed extensively as well as information provided to me and summarized by other members of the Commission staff. In particular, during the Commission staff's investigation and litigation, Commission staff have: (i) reviewed documents the Commission staff obtained from Gibraltar Global Securities Inc. ("Gibraltar"), Global Securities Corporation ("Global"), JPMorgan Chase Bank, N.A., Penson Financial Services, Inc., Scottsdale Capital Advisors (SCA), Verdmont Capital, Montecito Advisors, Inc., Canaccord Genuity Corp. ("Canaccord"), Grand Palm collectively (the "Brokerage records"); (ii) prepared detailed summaries of the information in those documents that reflected activity in the accounts of Defendants; and (iii) reviewed trading and wire transfer confirmations relating to the accounts of Defendants. Because the Commission submits this Declaration for the limited purpose of supporting this Motion, I have not set forth each and every fact that I know about the investigation or litigation.

## I.  Summary of Profits from the Scheme

4. As set forth in greater detail below, documents reviewed by the staff reflect that Ben Kirk, John Kirk, Boyle, Hinton, and Carrillo sold millions of shares of Tradeshow Marketing Company, Ltd. ("Tradeshow") and Pacific Blue Energy Corporation ("Pacific Blue") stock under their control through accounts they held at a few broker-dealers opened both in their names and in the names of family members and nominee entities over which they had control. The total number of profits and proceeds from stock sold is $13,376,519.99 from 2009 through 2010.

5. My review of the evidence indicates that:

a. As discussed in Section II below, the sum total of all of the profits and proceeds made by the Defendants from sales of Tradeshow stock is $5,354,120.15.

b. As discussed in Section II below, the sum total of all of the profits made by the Defendants from sales of Pacific Blue stock is $8,022,399.84.

c. As discussed in Section II below, the sum total of all of the profits and proceeds made by the Defendants from sales of accounts of the Defendants at Gibraltar and Scottsdale totals $9,538,406.82.

d. As discussed in Section II below, the Dr. Luis Carrillo account for which defendant Carrillo had power of attorney and provided instructions, realized proceeds of $1,145,103.70 from sales of Pacific Blue stock.

e. As discussed in Section II below, the Kita-Kaine Investment Holding Co. ("Kita-Kaine") account at Scottsdale, beneficially owned and controlled by John Kirk, realized proceeds of $296,922.68 from sales of Tradeshow stock.

f. As discussed in Section II below, John Kirk's personal account at Montecito Advisors, realized proceeds of $88,626.41 from sales of Tradeshow stock.

g. As discussed in Section II below, Ruth Kirk's account at Cannacord, controlled by John Kirk, realized proceeds of $107,575.75 from sales of Pacific Blue stock.

h. As discussed in Section II below, the Strotas Group Corp. ("Strotas") account at Scottsdale, beneficially owned and controlled by Ben Kirk made profits of $1,353,266.38 from sales of Tradeshow stock and proceeds of $823,757.65 from sales of Pacific Blue stock.

i. As discussed in Section II below, the Irish Delta account at Scottsdale, beneficially owned and controlled by Ben Kirk, realized proceeds of

$2,418,061.43 from sales of Tradeshow stock and proceeds of $962,231.02 from sales of Pacific Blue stock.

j.  As discussed in Section II below, the Ben Kirk account at Gibraltar, realized proceeds of $83,067.09 from sales of Tradeshow stock.

k.  As discussed in Section II below, the Mazi International Corp. account at Gibraltar, beneficially owned and controlled by Ben Kirk, realized proceeds of $1,690,967.75 from sales of Pacific Blue stock.

l.  As discussed in Section II below, the Baltic Investments Ltd. account at Gibraltar, beneficially owned and controlled by Ben Kirk, realized proceeds of $615,386.64 from sales of Tradeshow stock and proceeds of $1,094,962.41 from sales of Pacific Blue stock.

m.  As discussed in Section II below, the Strotas account at Gibraltar, beneficially owned and controlled by Ben Kirk, realized proceeds of $27,155.44 from sales of Pacific Blue stock.

n.  As discussed in Section II, the Veritas Holdings account at Grand Palm, beneficially owned and controlled by Ben Kirk, realized proceeds of $520,386.03 from sales of Pacific Blue stock.

o.  As discussed in Section II below, the Nelevi, S.A. account at Verdmont, beneficially owned and controlled by Ben Kirk, made profits of $1,805,393.76 from sales of Pacific Blue stock.

p.  As discussed in Section II below, the Dylan Boyle account at Scottsdale made profits of $67,113.69 from sales of Tradeshow stock.

q. As discussed in Section II below, the Dylan Boyle account at Grand Palm realized proceeds of $305,021.21 from sales of Tradeshow stock.

r. As discussed in Section II below, the True North Consulting account at Grand Palm, controlled by Dylan Boyle realized proceeds of $52,840 from sales of Pacific Blue stock.

s. As discussed in Section II below, the Dylan Boyle account at Gibraltar realized proceeds of $105,514.64 from sales of Tradeshow stock.

t. As discussed in Section II below, James Hinton's account at Global made profits of $12,026.33 from sales of Pacific Blue stock and realized proceeds of $21,139.98 from sales of Tradeshow stock.

## II. Calculation of Profits: The Defendants, their Nominee Entities and Their Brokerage Accounts

6. During the Commission staff's investigation, I, along with other Commission staff reviewed the Brokerage Records provided by numerous institutions. These documents showed multiple accounts conducting trades of Pacific Blue and/or Tradeshow shares by (i) Ben Kirk (in accounts in his own name or in the name of nominee entities over which he had control); (ii) John Kirk (in accounts in his own name, in his mother's name, and in an entity over which he had control); (iii) Dylan Boyle (in accounts in his own name or in the name of nominee entities over which he had control), (iv) James Hinton, and (v) Dr. Luis Carrillo (in an account where defendant Carrillo had power of attorney and exercised control).

7. I determined that the total profits and proceeds for Pacific Blue and Tradeshow stock that was sold amounted to $13,376,519.99. I calculated this number as follows: (a) For the Pacific Blue total number of profits, after adding the profits and proceeds from sales of

Pacific Blue shares, I subtracted the $220,000 cash payment for the Pacific Blue shell (*See* Brody Decl., ¶ 47); (b) for each transaction where a "net amount" was listed on the brokerage records, I used that amount to calculate "profits" or "proceeds"; (c) where no "net amount" was listed, I determined the "profits" or "proceeds" by multiplying the stock price with the quantity of shares to determine the total amount per transaction; (d) where buys were listed within the brokerage records, I subtracted that amount to arrive at a "profits" number; (e) where no buys were listed within the brokerage records, I calculated a "proceeds" number; (f) I then added all the amounts to reach the total in each account; and (g) I added all of the profits and proceeds from each of the accounts together to reach a total number.

8. To calculate the prejudgment interest on the ill-gotten gains, I used the floating interest rate used by the Internal Revenue Service to determine interest due on underpaid taxes (the "IRS rate"), see 17 C.F.R. § 201.600(b).

### De Beer

9. I did not see any accounts where Luniel de Beer traded either Tradeshow or Pacific Blue shares. De Beer, however, received certain amounts from Tradeshow and Pacific Blue and the following paragraphs describe the money received.

10. From 2009 to 2011, Luniel de Beer had a bank account number in the name of De Beer Consulting LLC at JPMorgan Chase Bank, N.A. ("Chase").

11. Between April 2009 and 2011, Tradeshow maintained two accounts at Chase over which de Beer had signatory power.

12. Between March 26, 2010 and March 9, 2011, de Beer through his bank account for de Beer Consulting and his personal bank account received $333,442.66 in payments from Tradeshow's Chase bank accounts via checks, and online payments. Brody Decl. Ex. 58.

13. Using the method described above, I calculated prejudgment interest on ill-gotten gains received by de Beer from March 26, 2010 to March 9, 2011 to be $60,900.32, based on interest accrued between April 1, 2011 through July 31, 2016, as reflected in Exhibit 1 attached hereto.

14. From October 30, 2009 to June, 2011, Pacific Blue maintained an account at Chase.

15. Between June 24, 2010 and June 29, 2011, de Beer through his bank account for de Beer Consulting and his personal bank account received $208,471.21 in payments from Pacific Blue's Chase account via electronic payments. *See* Brody Decl. Ex. 59.

16. Using the method described above, I calculated prejudgment interest on ill-gotten gains received by de Beer from June 24, 2010 to June 29, 2011 to be $35,640.98, based on interest accrued between July 1, 2011 through July 31, 2016, as reflected in Exhibit 2 attached hereto.

17. The sum of the money De Beer received from Tradeshow and Pacific Blue plus interest is $638,455.17.

### Carrillo

18. Dr. Luis Carrillo, whom I understand to be the father of Luis J. Carrillo, had accounts at Global. Carrillo had trading authority over these accounts. *See* Brody Decl. Exs. 32,33. Between March 25, 2010 and August 2, 2010, the Dr. Carrillo accounts sold Pacific Blue shares for proceeds of $1,145,103.70. *See* Brody Decl. Ex. 39.

19. Using the method described above, I calculated prejudgment interest in ill-gotten gains received by Carrillo from sales of Pacific Blue shares in Dr. Carrillo's Global account between March 25, 2010 to August 2, 2010 to be $237,445.90, as reflected in Exhibit 3 hereto

based on interest accrued between September 1, 2010 through July 31, 2016.

20. Dr. Carrillo wired money out of his Global account as follows:

   a. Dr. Carrillo instructed GSC to wire a total of $100,000 in Pacific Blue proceeds to an account he controlled in California at Pacific Western Bank, via three separate wire transfers on April 12, 2010 ($50,000), June 28, 2010 ($35,000) and on July 8, 2010 ($15,000).

   b. Dr. Carrillo instructed GSC to wire a total of $901,000 in Pacific Blue proceeds to an account he controlled in Mexico at Bancomer, via four separate wire transfers from May 6 through June 3, 2010.

   c. The remainder (approximately $144,000) was commingled with other funds in Dr. Carrillo's GSC account.

*See* Brody Decl. Ex. 35.

21. Dr. Carrillo sent $420,000 in wires of Pacific Blue proceeds from his Bancomer account to three separate accounts he controlled at three banks in California via four separate wire transfers from May 11, 2010 through June 23, 2010: (1) $300,000 on May 11, 2010 to an account ending in 4511 at Pacific Western Bank; (2) $50,000 to an account ending in 1011 at First National Bank and (3) $70,000 in two separate wires sent on June 8 and June 23, 2010 to an account ending in 6406 at Bank of America. *See* Brody Decl. Exs. 36, 37, 38 and 39.

22. On April 14, 2010 Dr. Carrillo transferred two checks in the amount of $32,500 from the Pacific Western Bank account ending in 4511 to two Bank of America accounts ending in 6388 and 6389. *See* Brody Decl. Ex. 40.

23. Some of the proceeds from these sales were transferred from the Dr. Carrillo accounts to Carrillo Huettel, Carrillo, and Huettel personally.

24. Carrillo Huettel, the law firm where Carrillo was a partner, received $343,750 from Dr. Luis Carrillo's account. *See id.* Ex. 41.

25. Dr. Carrillo also transferred money from the proceeds of his sales of Pacific Blue shares to Luis J. Carrillo, totaling $126,360. *See* Brody Decl. Ex. 42.

26. Pacific Blue had an attorney trust account with Carrillo Huettel. This account reflects transfers from Pacific Blue made to Carrillo Huettel out of proceeds of Pacific Blue shares for legal fees in the amount of $61,500. *See* Brody Decl. Ex. 44.

27. The sum of the money Carrillo received, directly or through his law firm was $531,610. Using the method described above, I calculated prejudgment interest on the ill-gotten gains received by Carrillo to be $103,896.20 as reflected in Exhibit 4 hereto, based on interest accrued between December 1, 2010 and July 31, 2016. The total amount of proceeds and prejudgment interest is $635,506.20.

### Huettel

28. Wade Huettel received a check of $32,500 from Dr. Carrillo's Global account. *See* Brody Decl. Ex. 43. Carrillo Huettel, the law firm where Carrillo was a partner, also received $343,750 from Dr. Luis Carrillo's account. *See id.* Ex. 41. Carrillo Huettel also received payments for legal frees in the amount of $61,500 from Pacific Blue's attorney trust account with Carrillo Huettel. *See id.* Ex. 44. In total, Huettel received $437,750 from the Pacific Blue scheme. Using the method described above, I calculated prejudgment interest in ill-gotten gains received by Huettel to be $85,552.47, as reflected in Exhibit 5 attached hereto, based on interest accrued from December 1, 2010 to July 31, 2016. The total amount of proceeds and prejudgment interest is $523,302.47.

### Carrillo Huettel

29. I calculated the amounts that Carrillo Huettel obtained from the proceeds of sales of Tradeshow and Pacific Blue stock. Carrillo Huettel received $343,750 from Dr. Luis Carrillo's account. *See* Brody Decl. Ex. 41. Carrillo Huettel also received payments for legal frees in the amount of $61,500 from Pacific Blue's attorney trust account with Carrillo Huettel.

9

*See id.* Ex. 44. In total, Carrillo and Huettel received $405,250 from the Pacific Blue scheme. Using the method described above, I calculated prejudgment interest in ill-gotten gains received by Huettel to be $79,200.77, as reflected in Exhibit 6 attached hereto, based on interest accrued from December 1, 2010 to July 31, 2016. The total amount of proceeds and prejudgment interest is $484,450.77.

## John Kirk

30. Ruth Kirk, the mother of John Kirk, had an account at Canaccord over which John Kirk had trading authority. *See* Brody Decl. Ex. 45. Between June 1, 2010 and July 9, 2010, John Kirk sold Pacific Blue shares from this account realizing proceeds of $107,575.75. *See id.* Ex. 46.

31. John Kirk had an account in his own name at Montecito. Between September 28, 2009 and October 9, 2009, John Kirk sold Tradeshow shares realizing proceeds of $88,626.41. *See* Brody Decl. Ex. 47.

32. John Kirk beneficially owned an account at Scottsdale in the name of Kita-Kaine. *See id.* Ex. 48. This account sold Tradeshow stock between August 5, 2009 and February 23, 2010, resulting in proceeds of $296,922.68 from the sales of Tradeshow stock. *See* Brody Decl. Ex. 49.

33. John Kirk's total proceeds from the sale of Tradeshow and Pacific Blue shares in these three accounts were $493,124.84. Using the method described above, as reflected in Exhibit 7 attached hereto, I calculated prejudgment interest on the proceeds from these three accounts to be $104,269.21, based on interest accrued from August 1, 2010 to July 31, 2016. The total amount of proceeds and prejudgment interest is $597,394.05.

## Ben Kirk

34.     Between May 16, 2009 and July 21, 2009, Ben Kirk, using an account in his name at Gibraltar, sold 898,439 Tradeshow shares. *See* Brody Decl. Exs. 9, 13. I analyzed statements from the Gibraltar account, which showed sale prices ranging from $0.001 to $0.17. *See id.* Ex. 13. By multiplying the price and quantity and then adding up the amounts from each date listed, I determined Ben Kirk realized proceeds of $83,067.09 for this account.

35.     Between May 10, 2010 and July 2, 2010, an account at Gibraltar in the name of Baltic Investments Ltd. Corp. ("Baltic"), controlled by Ben Kirk, sold 1,023,324 shares of Pacific Blue. *See* Brody Decl. Exs. 10, 13. The sales prices ranged from $1.01 per share to $1.16. I multiplied the price and quantity for each day to get the individual transaction amounts. After adding up the transaction amounts, I determined that Ben Kirk realized proceeds of $1,094,962.41 from the sales of Pacific Blue shares in this account.

36.     Between October 7, 2009 and October 28, 2009, Baltic sold 965,000 shares of Tradeshow shares from this account. *See id.* Ex. 13. The sales prices ranged from $.47 per share to $.72. I multiplied the price and quantity for each day to get the individual transaction amounts. After adding up the transaction amounts, I determined that Ben Kirk realized proceeds of $615,386.63 from the sales of Tradeshow shares in this account.

37.     Between May 10, 2010 and June 25, 2010, an account at Gibraltar in the name of Mazi International Corp. ("Mazi"), controlled by Ben Kirk, sold a total of 1,619,222 shares of Pacific Blue. *See* Brody Decl. Exs. 11, 13. The sales prices ranged from $0.97 to $1.22. I multiplied the price and quantity for each day to get the individual transaction amounts. After adding up the transaction amounts, I determined that Ben Kirk realized proceeds of $1,690,967.75.

38. Between June 21 and June 29, 2010, an account at Gibraltar in the name of Strotas Group Inc. ("Strotas"), controlled by Ben Kirk, sold 25,000 Pacific Blue shares in quantities of 6,000, 10,000, and 9,000 for sales prices of $1.01, 1.06, and $1.17 respectively. *See* Brody Decl. Exs. 12, 13. By multiplying each dates share price by its corresponding quantity and adding together those transaction amounts, I determined that Ben Kirk realized proceeds of $27,155.44.

39. Between October 6, 2009 and February 2, 2010, an account at Scottsdale in the name of Strotas, controlled by Ben Kirk, sold a total of 2,065,000 shares of Tradeshow at sales prices ranging from $.51 to $.85 with net amounts listed for each transaction. *See* Brody Decl. Exs. 15-23, 24. By adding up the net amounts listed on the brokerage statements, I determined that Ben Kirk realized a total profit of $1,353,266.38.

40. Between March 15, 2010 and March 24, 2010, the Strotas account at Scottsdale also sold 1,830,000 Pacific Blue shares with sales prices ranging from $.46 to $.53, with net amounts listed for each transaction. *See* Brody Decl. Ex. 24. By adding up the net amount listed on the brokerage statements, I determined that Ben Kirk realized proceeds of $823,757.65.

41. Between February 2, 2010 and February 10, 2010, an account at Scottsdale in the name of Irish Delta, controlled by Ben Kirk, sold a total of 1,998,785 Tradeshow at sales prices ranging from $.902 to $1.52 with net amounts listed for each transaction. *See* Brody Decl. Ex. 24. By adding up the net amounts listed on the brokerage statements I determined that Ben Kirk realized proceeds of $2,418,061.43.

42. Between March 12, 2010 and March 25, 2010, the Irish Delta account at Scottsdale also sold a total of 1,830,000 Pacific Blue shares at sales prices ranging from $.30 to $.591, with net amounts listed for each transaction. *See* Brody Decl. Ex. 24. By adding up the

net amounts listed on the brokerage statements, I determined that Ben Kirk realized proceeds of $962,231.02.

43. Between May 10, 2010 and June 1, 2010 Ben Kirk used the Veritas account at Grand Palm to sell 50,000 shares, 2,500 shares, 100,000 shares, and 287,025 shares respectively, totaling 439,525 Pacific Blue shares for prices of $1.09, $1.16, $1.12, and $1.2795 respectively. *See* Brody Decl. Exs. 25-27. The brokerage statements listed a net amount for each transaction. By adding up the net amounts listed on the brokerage statements, I determined that Ben Kirk realized proceeds of $520,386.03.

44. Between March 31, 2010 and July 1, 2010 Ben Kirk used the Nelevi account at Verdmont Capital to sell a total of 2,018,086 Pacific Blue shares. *See* Brody Decl. Ex.28, 29. The prices ranged from $.90 to $1.252, and the brokerage statements listed a net amount for each transaction. By adding up the net amounts listed on the brokerage statements, I determined that Ben Kirk realized a total profit of $1,805,393.76.

### Dylan Boyle

45. Between May 26, 2009 and August 31, 2009, Dylan Boyle sold a total of 1,000,000 shares of Tradeshow in an account in his name at Gibraltar. *See* Brody Decl. Exs. 50, 13. The sales prices ranged from $.04 to $.26. By multiplying each dates share price by its corresponding quantity and adding together those transaction amounts, I determined that Dylan Boyle realized proceeds of $105,514.64.

46. Between July 27, 2009 and August 24, 2009, Dylan Boyle sold a total of 507,000 Tradeshow shares in an account in his name at Scottsdale. *See* Brody Decl. Exs. 51, 52. The sales prices ranged from $.12 to $.18, and the brokerage statements listed a net amount for each transaction. By adding up the net amounts listed on the brokerage statements I determined that

Dylan Boyle realized a profit of $67,113.69.

47.     Between August 24, 2009 and September 8, 2009, Dylan Boyle sold a total of 1,101,650 shares of Tradeshow in an account in his name at Grand Palm. The sales prices ranged from $.17 to $.35 and the brokerage statements listed a net amount for each transaction. By adding up the net amounts listed on the brokerage statements I determined that Dylan Boyle realized proceeds of $305,021.21.

48.     On May 10, 2010, Dylan Boyle sold 50,000 shares of Pacific Blue in an account in the name of True North Consulting (which he controlled), for proceeds of $52,840.

### Hinton

49.     Between April 12, 2010 and July 30, 2010, Hinton sold a total of 37,500 Pacific Blue shares for a profit of $12,026.33. *See* Brody Decl. Exs. 30, 31. Hinton also sold a total of 31,200 Tradeshow shares for proceeds of $21,139.98.

**III.     Proceeds for which Gibraltar is Jointly and Severally Responsible**

50.     The total profits and proceeds from the sales of Tradeshow and Pacific Blue in the accounts held at Gibraltar (Ben Kirk, Mazi International, Baltic Investments, Strotas Group, and Dylan Boyle) and the accounts held at Scottsdale (Strotas Group, Irish Delta, Dylan Boyle and Kita-Kaine) was $9,538,406.82.

51.     Gibraltar stated in its Wells Submission to the Commission that its commissions on transactions of Tradeshow shares totaled $30,787.09 and its commissions on transactions of Pacific Blue shares totaled $105,082.29. *See* Brody Decl. ¶ 60.

52.     The total combined number of profits and proceeds from sales of Tradeshow and Pacific Blue shares in the accounts held at Gibraltar and the accounts held at Scottsdale and plus the addition of the amount of commissions that Gibraltar earned on sales of Tradeshow shares

and Pacific Blue shares is $9,674,276.20.

53. Using the method described above, as reflected in Exhibit 8 attached hereto, I calculated prejudgment interest on ill-gotten gains received by Gibraltar to be $2,085,136.47, based on interest accrued from July 1, 2010 to July 31, 2016. The total amount of profits and proceeds in Gibraltar and Scottsdale accounts plus commissions and prejudgment interest is $11,759,412.67.

### Total Proceeds: Requested Disgorgement and Prejudgment Interest

54. I was asked to prepare a summary of the profits and proceeds from sales of Tradeshow and Pacific Blue stock in all reviewed accounts. The total profits and proceeds amount from sales of Tradeshow stock was $5,354,120.15. The total profits amount from sales of Pacific Blue stock was $8,022,399.84. As such, the total profits and proceeds amount was $13,376,519.99.

55. I was also asked to calculate the prejudgment interest accrued for the disgorgement amount sought by the Commission from calculation of the total profits and proceeds obtained by all of the Defendants. For the purposes of this calculation, I used the total profits amount from sales of Tradeshow stock, $5,354,120.15, and calculated interest accrued from April 1, 2010 to July 31, 2016, as reflected in Exhibit 9 attached hereto. For the purposes of this calculation, I used the total profits amount from sales of Pacific Blue stock, $8,022,399.84, and calculated interest accrued from September 1, 2010 to July 31, 2016. Based on these inputs, I used a calculator created by Commission staff, which uses the IRS underpayment rate as the interest rate, to generate a prejudgment interest report, which is attached hereto as Exhibit 10.

56. The calculated prejudgment interest for the Tradeshow sales is $1,218,898.35.

The calculated prejudgment interest for the Pacific Blue sales is $1,663,505.32. The total of these two amounts is $2,882,403.67. The total disgorgement amount (the profits and proceeds with interest) for all of the sales of Tradeshow and Pacific Blue shares by the defendants in this case is $16,258,923.66.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 11, 2016
      New York, New York

*Jacqueline Fine*
Jacqueline Fine