UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
SECURITIES AND EXCHANGE          :   13 Civ. 1735 (GBD) (JCF)
COMMISSION,                      :
                                 :        REPORT AND
                Plaintiff,       :   RECOMMENDATION
                                 :
     - against -                 :
                                 :
CARRILLO HUETTEL LLP, LUIS J.    :
CARRILLO, WADE D. HUETTEL,       :
GIBRALTAR GLOBAL SECURITIES,     :
WARREN DAVIS, JOHN B. KIRK,      :
BENJAMIN T. KIRK, DYLAN L. BOYLE,:
JAMES K. HINTON JR., LUNIEL DE   :
BEER, JOEL P. FRANKLIN, PACIFIC  :
BLUE ENERGY CORPORATION, and     :
TRADESHOW MARKETING COMPANY LTD.,:
                                 :
                Defendants.      :
- - - - - - - - - - - - - - - - - - -:

```
┌──────────────────────────────┐
│ USDS SDNY                     │
│ DOCUMENT                      │
│ ELECTRONICALLY FILED          │
│ DOC #: _____        │
│ DATE FILED: _1_|_17_|_17_     │
└──────────────────────────────┘
```

TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:

In this enforcement action alleging violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a) & (c), 77q(a), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, the Securities and Exchange Commission (the "SEC") seeks a default judgment pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure against six defendants: Carrillo Huettel LLP ("Carrillo Huettel"), Luis J. Carillo, Wade D. Huettel, Gibraltar Global Securities ("Gibraltar"), Warren Davis, and Luniel de Beer (collectively, the "Defaulting Defendants").[1] Only Mr. Carrillo

---

[1] The SEC settled its claims against John B. Kirk as to liability on October 1, 2013 (Judgment as to Defendant John B, Kirk dated Oct. 1 2013) and in this motion also sought entry of final judgment and an order of disgorgement against John B. Kirk. The plaintiff later informed the Court that it has agreed to a

and Mr. Huettel oppose the motion.  I recommend granting the motion in part.

Background

The Amended Complaint alleges that various defendants made false or misleading representations and illegally distributed shares in connection with two scams of the type popularly known by the phrase "pump and dump."[2]  (Amended Complaint, ¶ 1).  According to the SEC, the fraudulent schemes centered on the publicly-traded stock of two companies: Tradeshow, an entity established to sell merchandise at trade shows and shopping malls (Amended Complaint, ¶ 31), and Pacific Blue, an enterprise re-purposed as a purported alternative energy company (Amended Complaint, ¶ 77).

Tradeshow was largely controlled by John B. Kirk through the complicity of the nominal CEO and President, Mr. de Beer.  (Amended

_____

settlement in principle with Mr. Kirk and requested a stay of that portion of its motion.  (Letter of Todd D. Brody dated Nov. 8, 2016).  I therefore do not address that issue.

The residual defendants -- Benjamin T. Kirk, Dylan L. Boyle, James K. Hinton, Jr., Joel P. Franklin, Pacific Blue Energy Corporation ("Pacific Blue"), and Tradeshow Marketing Company Ltd. ("Tradeshow") -- have either settled with the SEC or had default judgments entered against them. (Final Judgment as to Defendant Benjamin T. Kirk dated July 20, 2016; Final Judgment as to Defendant Dylan L. Boyle dated July 20, 2016; Final Judgment as to Defendant James K. Hinton dated July 20, 2016; Final Judgment as to Defendant Joel P. Franklin dated March 25, 2013; Default Judgment and Order as to Defendant Tradeshow Marketing Company dated March 6, 2015; Default Judgment and Order as to Defendant Pacific Blue Energy Corporation dated March 6, 2015).

[2] "[In] the classic 'pump and dump' scheme[,] [] persons holding certain securities fraudulently inflate their price (the 'pump') in order to sell at an artificial profit (the 'dump') . . . ." United States v. Salmonese, 352 F.3d 608, 612 (2d Cir. 2003).

Complaint, ¶¶ 32-34; Declaration of Todd Brody dated Aug. 11, 2016 ("Brody Decl."), ¶¶ 55, 60).  By mid-2009 -- through gifts of shares from John Kirk's father, Bruce Kirk, a non-party who had founded the company -- John Kirk, his brother Benjamin T. Kirk, and Dylan L. Boyle beneficially owned over 40% of the outstanding stock of Tradeshow through various nominee entities. (Amended Complaint, ¶¶ 37-38; Brody Decl., ¶¶ 56, 61).  The Kirks, Mr. Boyle, and James K. Hinton, Jr., a stock promoter, initiated and controlled two "boiler room" operations,[3] known as Skymark Media Group ("Skymark") and Emerging Stock Report ("ESR"), to "tout[] their purported 'independent' research coverage" misleadingly "predicting dramatic increases in [Tradeshow's] stock price." (Amended Complaint, ¶¶ 47-50, 55-57; Brody Decl., ¶¶ 49, 56-57).  The communications Skymark and ESR had with potential buyers did not disclose that the Kirks and Mr. Boyle held millions of shares in Tradeshow and were selling those shares as their price (incrementally) rose. (Amended Complaint, ¶¶ 58-62).  When an article appeared in an on-line trade publication highlighting connections among the Kirks, Tradeshow, Skymark, and Carrillo Huettel (a law firm controlled by Mr. Carillo and Mr. Huettel that represented Tradeshow and Skymark (Amended Complaint, ¶¶ 15-17)), various defendants, including Skymark, Tradeshow, and Mr. de Beer, made misleading statements intending to cover up those connections. (Amended Complaint, ¶¶ 69-75; Brody

---

[3] A "boiler room" is a telemarketing or email marketing operation that uses high-pressure selling techniques to sell stocks of questionable value to the buyer without disclosing material facts about the issuer. See, e.g., United States v. Burke, 718 F. Supp. 1130, 1132 n.2 (S.D.N.Y. 1989).

Decl., ¶ 59).   In addition, Tradeshow and Mr. de Beer made false
and misleading statements in Tradeshow's annual reports, quarterly
reports, and press releases in order to conceal Tradeshow's
ownership, control, use of stock promoters, and payment of
kickbacks.   (Amended Complaint, ¶¶ 42-46; Brody Decl., ¶¶ 62-64,
88-92).   Mr. de Beer also made false statements in Tradeshow's
corporate resolutions regarding the trading status of the shares,
which should have been restricted.   (Amended Complaint, ¶¶ 127-130,
140; Brody Decl., ¶¶ 91-92).   Gibraltar, a Bahamian broker-dealer
at which Benjamin Kirk, Mr. Boyle, Mr. Hinton, and Mr. Carrillo
maintained accounts, and which was represented by Mr. Carrillo
(Amended Complaint, ¶¶ 18, 113), similarly provided misleading
representations -- signed by its president, Mr. Davis -- regarding
the ownership and trading status of Tradeshow shares in order to
facilitate (illegal) distribution of the securities (Amended
Complaint, ¶¶ 114-124, 144-146; Brody Decl., ¶¶ 65-70).

Pacific Blue was born, under a different name, as a travel
service company.   (Amended Complaint, ¶ 76; Brody Decl., ¶ 47).   In
September 2009, the Kirks and Mr. Carillo purchased all outstanding
shares of that company, renamed it, re-purposed it as an
alternative energy company, and then installed Mr. de Beer as
Chairman and Mr. Franklin as President, CEO, and Director.
(Amended Complaint, ¶¶ 77-79; Brody Decl., ¶ 47).   Although over
90% of the purchase price came from John Kirk, Mr. Carrillo and Mr.
Huettel "arranged for Pacific Blue's outstanding shares to be
distributed in blocks of 4.9% to John Kirk, [Mr. Carrillo's father]

4

Dr. Luis Carillo,[4] and to various foreign nominee entities controlled by the Kirks and [Mr.] Boyle."[5] (Amended Complaint, ¶¶ 79-82; Brody Decl., ¶¶ 47-48). Mr. Carrillo and Mr. Huettel drafted sham stock purchase agreements in order to conceal the fact that the Kirks, Mr. Boyle, Dr. Carrillo, and Mr. de Beer controlled "at least 85% of the company's outstanding shares" through offshore nominee entities controlled by the Kirks, as well as to conceal the existence of privately negotiated transactions in which John Kirk sold over 1 million shares of Pacific Blue, netting proceeds of over $210,000. (Amended Complaint, ¶¶ 82-86; Brody Decl., ¶¶ 48-49). The Kirks, through the cooperation of Mr. Franklin and Mr. de Beer, also directed the release of misleading statements in Pacific Blue's annual reports, quarterly reports, and press releases as to the company's ownership, internal controls, stock promotion, and payment of kickbacks. (Amended Complaint, ¶¶ 91-96; Brody Decl., ¶¶ 50-52, 93). Mr. Carrillo and Mr. Huettel "drafted and actively facilitated" these false statements by, for example, commenting on false representations in quarterly reports and directing Mr. Franklin to sign misleading documents on which Pacific Blue's auditors would rely. (Amended Complaint, ¶¶ 97-101). Mr. Carrillo and Mr. Huettel also provided false and misleading opinion letters

---

[4] The original complaint named Dr. Carrillo as a defendant, but the claims against him were dismissed for lack of personal jurisdiction. (Order dated March 20, 2014 ("3/20/14 Order") at 1).

[5] Under Section 13(d) of the Exchange Act and Rule 13d, beneficial ownership of more than 5% of a company's outstanding shares imposes certain reporting requirements on the beneficial owner. 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d-1.

to brokers "to facilitate the deposit and sale of the Kirks' and [Mr.] Boyle's Pacific Blue shares." (Amended Complaint, ¶¶ 133-138; Brody Decl., ¶¶ 79-84). ESR and Skymark misleadingly promoted the company in a manner similar to that used to promote Tradeshow, and Gibraltar similarly participated in illegal distribution of Pacific Blue shares (Amended Complaint, ¶¶ 102-107, 121-125; Brody Decl., ¶¶ 94-96). Indeed, the Amended Complaint alleges that all of the defendants participated in the illegal distribution of Pacific Blue shares. (Amended Complaint, ¶¶ 147-160).

Each of the individual Defaulting Defendants (that is, each defaulting defendant other than Carrillo Huettel and Gibraltar) has asserted that he will no longer defend against the Amended Complaint in this action. (Letter of William B. Fleming dated Nov. 24, 2015 (Mr. Huettel); Letter of Luniel de Beer dated Oct. 9, 2015 (Luniel de Beer); Letter of Thomas J. Curran dated Sept. 2, 2015 (Mr. Carrillo); Letter of Nicholas M. de Feis dated May 13, 2015 (Mr. Davis); Affidavit of Warren A. Davis dated April 23, 2015, attached as Exh. to Letter of Philip C. Patterson dated April 24, 2015, ¶ 5). Mr. Davis has also violated a court order to produce discovery, and Mr. Davis, Mr. Carrillo, and Mr. Huettel have each violated one or more court orders to testify through deposition. SEC v. Carrillo Huettel LLP, No. 13 Civ. 1735, 2015 WL 1610282, at *6 (S.D.N.Y. April 8, 2015) (requiring Mr. Carrillo and Mr. Huettel to testify regarding certain communications, but not setting date or location for testimony); SEC v. Gibraltar Global Securities, Inc., No. 13 Civ. 2575, 2015 WL 1514746, at *6 (S.D.N.Y. April 1,

2015) (requiring Mr. Davis to produce documents); (Memorandum Endorsement dated April 8, 2015 (requiring Mr. Carrillo to appear for deposition in New York); Memorandum Endorsement dated April 1, 2015 ("April 1 Order") (requiring Mr. Davis to appear for deposition in New York); Brody Decl., ¶¶ 9-13, 16-18, 30-33).[6] Gibraltar and Carrillo Huettel are no longer represented by counsel (Order dated July 2, 2015 (Gibraltar); Order dated Oct. 23, 2014 (Carrillo Huettel); Brody Decl., ¶¶ 22-23, 42-43) and, as each is a business entity rather than a natural person, neither may appear in this action pro se. See, e.g., Eagle Associates v. Bank of Montreal, 926 F.2d 1305, 1309-10 (2d Cir. 1991); RGI Brands LLC v. Cognac Brisset-Aurige, S.A.R.L., No. 12 Civ. 1369, 2013 WL 1668206, at *4-5 (S.D.N.Y. April 18, 2013), report and recommendation adopted, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013).

Discussion

    A.   Legal Standards

The decision whether to grant a motion for a default judgment "is within the sound discretion of the district court." SEC v. Coronati, No. 16 Civ. 2022, 2016 WL 6462240, at *2 (E.D.N.Y. Oct. 14, 2016) (quoting United States Fidelity and Guaranty Co. v.

---

[6] To be sure, the order requiring Mr. Davis to produce documents was entered in a different case; however, as Mr. Davis noted, the two cases were consolidated for the purpose of discovery and the issues regarding the production of documents were intertwined with the issue of Mr. Davis' deposition. (Letter of Philip C. Patterson dated Feb. 13, 2015, at 1-2). The order requiring Mr. Davis to appear for his deposition was entered in both cases. (April 1 Order, Docket no. 217 in SEC v. Carrillo Huettel, No. 13 Civ. 1735; April 1 Order, Docket no. 53 in SEC v. Gibraltar Global Securities, No. 13 Civ. 2575).

<u>Petroleo Brasiliero S.A.</u>, 220 F.R.D. 404, 406 (S.D.N.Y. 2004)). In making that determination, the court treats all factual allegations of the complaint (other than those pertaining to damages) as true and "then [] analyze[s] those facts for their sufficiency to state a claim." <u>Id.</u> (quoting <u>Brown v. Gabbidon</u>, No. 06 Civ. 8148, 2007 WL 1423788, at *2 (S.D.N.Y. May 14, 2007)); <u>see also</u> <u>Heneghan v. Thibeault</u>, No 15 Civ. 9651, 2016 WL 4411424, at *2 (S.D.N.Y. Aug. 19, 2016). Therefore, although only Mr. Carrillo and Mr. Huettel have opposed the SEC's motion, I must still evaluate whether the plaintiff has stated a claim against each of the Defaulting Defendants. In addition, a court must "independently establish the damages and other relief to be awarded on the basis of sufficient evidence." <u>SEC v. Tavella</u>, 77 F. Supp. 3d 353, 358 (S.D.N.Y. 2015). Where, as here, the plaintiff submits detailed affidavits and other evidence, it is unnecessary to hold an inquest or other proceeding. <u>Id.</u>

To establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5, the plaintiff must establish that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999). "Essentially the same elements are required under Section 17(a)(1)-(3) [of the Securities Act] in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections

8

(a)(2) or (a)(3)." Id. "Information is material when there is a substantial likelihood that a reasonable investor would find it important in making an investment decision." United States v. Contorinis, 692 F.3d 136, 143 (2d Cir. 2012).  In Section 10(b) fraud cases, scienter requires an "intent to deceive, manipulate, or defraud," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976)), which can be proved by "strong circumstantial evidence of conscious misbehavior or recklessness," ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  Because scienter is not required in fraud cases under Section 17(a)(2) or (a)(3) of the Securities Act, "[a] showing of negligence is sufficient."  SEC v. Ginder, 752 F.3d 569, 574 (2d Cir. 2014).

To establish a prima facie case for violation of Section 5 of the Securities Act, the SEC must prove that (1) "no registration statement was in effect as to the securities," (2) "the defendant[s] sold or offered to sell these securities," and (3) "there was a use of interstate transportation, or communication, or of the mails in connection with the sale or offer of sale." SEC v. Cavanaugh, 1 F. Supp. 2d 337, 361 (S.D.N.Y.), aff'd, 155 F. 3d 129 (2d Cir. 1998).  "Liability for violations of Section 5 extends to those who have 'engaged in steps necessary to the distribution of [unregistered] security issues,'" SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (alteration in original) (quoting SEC v. Chinese Consolidated Benevolent Association, Inc.,

120 F.2d 738, 741 (2d Cir. 1941)), aff'd sub nom. SEC v. Altomare, 300 F. App'x 70 (2d Cir. 2008), as long as those steps were not merely de minimis, see SEC v. North American Research and Develpoment Corp., 424 F.2d 63, 81 (2d Cir. 1970).   Thus, a defendant who neither offered nor sold an unregistered security himself is still liable if his acts "were a 'substantial factor in the sales transaction,'" that is, if, "but for the defendant's participation, the sale transaction would not have taken place."[7] Universal Express, 475 F. Supp. 2d at 422 (quoting SEC v. Murphy, 626 F.2d 633, 650-51 (9th Cir. 1980)).

B.   Liability under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act

1.   Mr. de Beer

Mr. de Beer signed Tradeshow's annual and quarterly reports, which falsely claimed that he was the only officer, director, or control person of the company, omitting the facts that the Kirks and Mr. Boyle owned shares in the company, that the Kirks controlled the company, and that the Kirks served as "de facto investment bankers, promoters[,] and investor relations consultants." (Amended Complaint, ¶ 42; Brody Decl., ¶ 62).   These public filings also misrepresented Mr. de Beer's compensation "by failing to disclose kickbacks of stock sale proceeds he received from the Kirks and [Mr.] Boyle." (Amended Complaint, ¶ 44; Brody

---

[7] There is an exemption from liability under Section 5 for "transactions by any person other than an issuer, underwriter, or dealer."   15 U.S.C. § 77d(a)(1).   However, the burden of establishing that the exemption is applicable is on the party seeking the exemption.   See, e.g., SEC v. Guild Films Co., 279 F.2d 485, 489 (2d Cir. 1960).

Decl., ¶ 63).   Mr. de Beer also released "dozens" of misleading press releases that failed to disclose that the primary purpose of Tradeshow and of the press releases was to inflate the value of the shares so that the Kirks and Mr. Boyle could sell them.  (Amended Complaint, ¶ 46; Brody Decl., ¶ 64).  Lastly, Mr. de Beer provided the Kirks and Mr. Boyle with misleading corporate resolutions and certifications that falsely represented that they were not officers or affiliates of Tradeshow, that they did not beneficially own 5% or more of the company's shares, and that the shares were not restricted.   (Amended Complaint, ¶¶ 128-130; Brody Decl., ¶¶ 89, 92).  Similar false representations were made as to Pacific Blue shares.  (Amended Complaint, ¶¶ 131-132; Brody Decl., ¶ 93).

These misrepresentations were material.   Concealing the ownership of the shares of both companies was integral to the fraud.    Indeed, when an article appeared highlighting the connections among the Kirks, Tradeshow, and Skymark, the share price tumbled 40%.  (Amended Complaint, ¶ 69; Brody Decl., ¶ 59). Moreover, falsely reporting the ownership of the shares and their trading status allowed them to be deposited and sold without registration.  (Amended Complaint, ¶¶ 126-132; Brody Decl., ¶¶ 91-93).  The undisclosed kickbacks were also material because such arrangements undermined the independence of Mr. de Beer, Tradeshow's CEO and President.  See, e.g., SEC v. Savino, No. 01 Civ. 2438, 2006 WL 375074, at *14 (S.D.N.Y. Feb. 16, 2006); SEC v. Scott, 565 F. Supp. 1513, 1527 (S.D.N.Y. 1983), aff'd sub nom. SEC v. Cayman Islands Reinsurance Corp., 734 F.2d 118 (2d Cir. 1984).

11

Finally, Mr. de Beer had the requisite scienter.  He knew that the Kirks controlled Tradeshow because he took direction from them regularly.  (Amended Complaint, ¶¶ 34-35; Brody Decl., ¶ 60).  He also knew about the ownership of Tradeshow and of Pacific Blue (Amended Complaint, ¶¶ 39, 84; Brody Decl., ¶ 61), and he was obviously aware of the kickbacks he received.

    2.  <u>Mr. Davis and Gibraltar</u>

Mr. Davis signed various false statements on behalf of Gibraltar, including an affidavit stating that Gibraltar held Pacific Blue securities for the sole benefit of two fake nominee companies, and share deposit forms falsely representing that the shares were acquired from the nominee entities, notwithstanding the fact that Benjamin T. Kirk was the beneficial owner of those shares.  (Amended Complaint, ¶¶ 109, 114-116, 120-123; Brody Decl., ¶¶ 70-73).  These representations were material because, had the broker-dealer with whom the shares were deposited known of the ownership of the securities, it would have considered the shares restricted and unable to be sold without registration.  (Amended Complaint, ¶ 119; Brody Decl., ¶ 95).  Furthermore, Mr. Davis and Gibraltar knew the representations were false, because they contradicted information on the documents opening Benjamin T. Kirk's Gibraltar accounts.  (Amended Complaint, ¶¶ 119, 123; Brody Decl., ¶ 68).

3.   <u>Mr. Carrillo, Mr. Huettel, and Carrillo Huettel</u>[8]

Mr. Carrillo and Mr. Huettel provided multiple opinion letters to brokers falsely asserting that Pacific Blue shares beneficially owned by the Kirks and Mr. Boyle were unrestricted and free trading or that they were registered and free trading. (Amended Complaint, ¶¶ 134-136; Brody Decl., ¶¶ 80-82). Mr. Carrillo and Mr. Huettel drafted SEC filings for Pacific Blue that contained statements concealing the Kirk's control over the company, as well as documents including similar misrepresentations intended for Pacific Blue's auditors. (Amended Complaint, ¶¶ 98-101; Brody Decl., ¶¶ 51-52). The opinion letters were material because, in reliance on them, brokers allowed the Pacific Blue shares to be deposited for sale. (Amended Complaint, ¶ 133; Brody Decl., ¶ 79). The statements concealing ownership were, as noted above, integral to the scheme to falsely inflate the price of the shares to enrich their owners. Moreover, Mr. Carrillo and Mr. Huettel knew the statements were false. They knew Jon Kirk owned the controlling block of shares because they were aware that John Kirk paid the bulk of the purchase price (which was funneled through their firm's IOLTA trust account) and they arranged for the distribution of the

---

[8] According to the SEC, "Carrillo Huettel's liability in this matter is derivative of its two partners." (Memorandum of Law in Support of the Securities and Exchange Commission's Motion for Default Judgment Against Luis Carrillo, Wade Huettel, Carrillo Huettel LLP, Luniel de Beer, Warran A. Davis and Gibraltar Global Securities, Inc. and its Motion for Final Judgment and Disgorgement Against John Kirk ("Pl. Memo.") at 9 n.5). Counsel for Carrillo Huettel similarly acknowledged this fact at oral argument on the firm's motion to dismiss. (Transcript of Argument dated Feb. 26, 2014 ("2/26/14 Tr."), at 98).

shares in blocks of 4.9%. (Amended Complaint, 79-81; Brody Decl., ¶¶ 47-49). They knew the Kirks exercised control over the company because they were intimately involved in communications with the Kirks about Pacific Blue. (Brody Decl., ¶ 50). From this knowledge, they were aware that the shares were not free trading. (Amended Complaint, ¶ 137; Body Decl., ¶ 83). They were further aware that the Pacific Blue shares were not registered. (Amended Complaint, ¶ 138; Brody Decl., ¶ 84).

Mr. Carrillo and Mr. Huettel oppose the SEC's motion. They argue that (1) "[n]one of the alleged 'statements' are 'actionable' to impose liability" because neither Mr. Carrillo nor Mr. Huettel "made" the statements, but rather merely published them on behalf of the controlling shareholders (Memorandum of Law in Support of Defendants Carrillo and Huettel's Opposition to Plaintiff's Motion for Default Judgment ("Carrillo/Huettel Memo.") at 10); (2) the opinion letters are not actionable because they were made based on client representations alone, and were therefore not "made" by the attorneys with the requisite scienter (Carrillo/Huettel Memo. at 11); the opinion letters were not made in connection with the purchase or sale of a security because they did not cause purchases or losses by the investing public (Carrillo/Huettel Memo. at 11-12); (4) there is no basis for "scheme" liability against Mr. Carrillo or Mr. Huettel (Carrillo/Huettel Memo. at 12-14); and (5) there is no basis for aiding and abetting liability against Mr. Carrillo or Mr. Huettel (Carillo/Huettel Memo. at 14-15).

Mr. Carrillo and Mr. Huettel raised these precise arguments in

14

their motions to dismiss.   (Memorandum of Law in Support of Defendant Luis J. Carrillo's Motion to Dismiss ("Carrillo MTD Memo.") at 6-8 (statements not attributable to Mr. Carrillo), 12 (statements not made in connection with purchase or sale of security), 14 (no basis for "scheme" liability), 14-19 (requisite scienter absent), 19-22 (no basis for aiding and abetting liability); Memorandum of Law in Support of Defendant Wade D. Huettel's Motion to Dismiss ("Huettel MTD Memo.") at 12-15 (statements not attributable to Mr. Huettel), 15-18 (requisite scienter absent and statements not made in connection with purchase or sale of security), 20-22 (no basis for aiding and abetting liability)).   The Honorable George B. Daniels, U.S.D.J., necessarily rejected them when he denied both motions.   (3/20/14 Order; Transcript of Argument dated March 19, 2014 ("3/19/14 Tr.") at 194-95).   I decline to revisit Judge Daniels' determination here.  See, e.g., Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817 (1988) ("[A]s a rule courts should be loathe to [revisit their prior legal decisions] in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" (quoting Arizona v. California, 460 U.S. 605, 618 n.8 (1983)); see also Chen-Oster v. Goldman, Sachs & Co., No. 10 Civ. 6950, 2015 WL 1566722, at *15-16 (S.D.N.Y. March 10, 2015) (declining to revisit prior decision by district judge in absence of extraordinary circumstances).

C.   <u>Liability under Section 5 of the Securities Act</u>

The SEC has established, for the purposes of this motion, that the Tradeshow and Pacific Blue shares at issue were not registered. (Amended Complaint, ¶¶ 138-139, 147; Brody Decl., ¶¶ 77-78).  The use of interstate transportation or communication or the mails is similarly established.  (Amended Complaint, ¶¶ 221, 226).  The remaining question is whether each of the Defaulting Defendants engaged in conduct that was a substantial factor in the offer or sale of these securities.

As noted above, Mr. de Beer provided misleading corporate resolutions that allowed Tradeshow and Pacific Blue shares to be deposited for sale.  Mr. Davis and Gibraltar provided documentation concealing the fact that Tradeshow and Pacific Blue shares offered for sale were beneficially owned by Benjamin T. Kirk, which similarly facilitated the deposit of those shares.

As to Mr. Carrillo and Mr. Huettel, their false opinion letters allowed the Pacific Blue shares to be deposited for sale. <u>See</u> <u>SEC v. Greenstone Holdings, Inc.</u>, 954 F. Supp. 2d 211, 214 (S.D.N.Y. 2013) (attorney who drafted broker-required opinion letter providing authority to issue unregistered shares as unrestricted liable under Section 5).  Moreover, the attorneys concealed the true ownership of the shares, in part by structuring ownership in 4.9% blocks, and facilitated the purchase of the securities.  On this record, their "role in facilitating the transactions clearly was a substantial factor in the sales of unregistered securities." <u>Murphy</u>, 626 F.2d at 652.

16

Again, Mr. Carrillo and Mr. Huettel raise arguments that Judge Daniels rejected on their motions to dismiss.  (Carrillo/Huettel Memo. at 15 (allegations insufficient to show substantial factor in offer or sale); Carrillo MTD Memo. at 23-24 (same); Huettel MTD Memo. at 23-24 (same); 3/20/14 Order (denying motions to dismiss); 3/19/16 Tr. at 194-95 (same)).  Again, I decline to revisit these issues.[9]

D.   Remedy

    1.   Injunctive Relief

Mr. de Beer, Mr. Carrillo, and Mr. Huettel have consented to the entry of an order permanently enjoining each of them from violating the federal securities laws, participating in any offering of a penny stock, and serving as an officer or director of any public company.[10]  (Letter of William B. Fleming dated Nov. 24, 2015 (Mr. Huettel); Letter of Luniel de Beer dated Oct. 9, 2015

---

[9] As noted above, in April 2015, the Court ordered Mr. Huettel to testify as to certain matters and ordered Mr. Carrillo and Mr. Davis to appear at depositions in New York.  These depositions did not, apparently, take place.  (Brody Decl., ¶¶ 9-13; 16-18; 30-33).  In addition, Mr. Davis has "concededly . . . failed to produce court-ordered discovery."  (Letter of Nicholas M. de Feis dated June 12, 2015, at 1).  Given these violations, which occurred almost two years ago and which will not be remedied, severe sanctions such as entry of a default judgment would be appropriate. See, e.g., Granados v. Traffic Bar and Restaurant, Inc., No. 13 Civ. 500, 2015 WL 9582430, at *3 (S.D.N.Y. Dec. 30, 2015) (noting that failure to obey discovery order may merit sanctions including entering judgment against disobedient party).

[10] Carrillo Huettel is a defunct entity.  (2/26/14 Tr. at 98).  As such, it is not necessary to enter an injunction against it. See, e.g., SEC v. John Adams Trust Corp., 697 F. Supp. 573, 574 (D. Mass. 1988) (declining to enter injunction requiring compliance with federal securities laws against defunct entity because "[e]quity [] does not sit to strangle a corpse.").

(Luniel de Beer); Letter of Thomas J. Curran dated Sept. 2, 2015 (Mr. Carrillo).  Mr. Davis and Gibraltar have not, however, consented to injunctive relief.

Permanent injunctive relief is appropriate where a defendant has violated securities laws and there is a reasonable likelihood that he will do so again.  SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99-100 (2d Cir. 1978).  In determining the likelihood of future violations, courts generally consider

> the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

Id. at 100.  Here, many of those factors favor entry of a permanent injunction barring Mr. Davis and Gibraltar from violating federal securities laws -- the only injunction sought against those defendants (Pl. Memo. at 25): they knowingly violated federal securities laws in connection with the securities at issue here, as well as in connection with the securities at issue in SEC v. Gibraltar Global Securities Inc., No. 13 Civ. 2575, 2015 WL 10910362, at *2-5 (S.D.N.Y. Oct. 16, 2015), report and recommnedation adopted in relevant part, 2016 WL 153090 (S.D.N.Y. Jan. 12, 2016).  However, both Mr. Davis and Gibraltar are already subject to such an injunction.  (Order at 1-2, Gibraltar Global Securities, No. 13 Civ. 2575 (July 2, 2015)).  In light of this, I fail to see why a further injunction should be entered in this case.  See, e.g., SEC v. Mattera, No. 11 Civ. 8323, 2013 WL

18

6485949, at *18 (S.D.N.Y. Dec. 9, 2013) ("Because [the defendant] has already been enjoined from future securities violations by one federal court during the pendency of this action, an additional injunction against [him] would be unnecessarily duplicative. Therefore, the SEC's request for a permanent injunction is denied as moot.").

   2. <u>Disgorgement and Pre-Judgment Interest</u>

  "Disgorgement of ill-gotten gains is a congressionally and judicially recognized remedy for a violation of the securities law." <u>SEC v. Shehyn</u>, No. 04 Civ. 2003, 2010 WL 3290977, at *7 (S.D.N.Y. Aug. 9, 2010) (footnote omitted) (awarding disgorgement for, <u>inter alia</u>, violation of Section 15); <u>see also</u> <u>SEC v. Tavella</u>, 77 F. Supp. 3d 353, 359-60 (S.D.N.Y. 2015) (awarding disgorgement for violation of Section 5). Disgorgement aims to deprive lawbreakers of all unjust enrichment and thereby deter others from committing similar violations. <u>SEC v. Universal Express, Inc.</u>, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009); <u>see also</u> <u>SEC v. StratoComm Corp.</u>, 89 F. Supp. 3d 357, 367 (N.D.N.Y. 2015). While courts have broad discretion in determining both whether to order disgorgement and the amount to be disgorged, <u>SEC v. First Jersey Securities, Inc.</u>, 101 F.3d 1450, 1474 (2d Cir. 1996), in setting the disgorgement amount, "a court must focus on the extent to which a defendant has profited from his [illegal conduct]," <u>Universal Express</u>, 646 F. Supp. 2d at 563. "[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation." <u>SEC v. Patel</u>, 61 F.3d 137, 139 (2d Cir. 1995)

(alteration in original) (quoting <u>SEC v. First City Financial Corp.</u>, 890 F.2d 1215, 1231 (D.C. Cir. 1989)).   Once the SEC demonstrates such an approximation, the defendant has the burden to show that the full amount was not realized and therefore should not be disgorged.   <u>See</u> <u>Universal Express</u>, 646 F. Supp. 2d at 563.   Any uncertainty in calculating the defendants' illicit gains should be resolved in favor of the plaintiff.   <u>Patel</u>, 61 F.3d at 140.

A court's discretion to award disgorgement is not limited to a defendant's personal pecuniary gain.   <u>See</u> <u>SEC v. Cole</u>, __ F. App'x __, __, 2016 WL 4703901, at *1 (2d Cir. 2016) ("To the extent defendants' challenge focuses [] on the purported absence of personal financial benefit, the argument is defeated by precedent."); <u>SEC v. Contorinis</u>, 743 F.3d 296, 306 (2d Cir. 2014) ("The amount a court may order a wrongdoer to disgorge may not exceed the total amount of gain from the illegal action, but that does not entail that the gain must personally accrue to the wrongdoer."), <u>petition for cert. dismissed</u>, 136 S. Ct. 531 (2015). Indeed, courts have discretion to impose joint and several liability for "combined profits" where there are "collaborating or closely related parties." <u>See</u> <u>SEC v. AbsoluteFuture.com</u>, 393 F.3d 94, 97 (2d Cir. 2004); <u>see also</u> <u>SEC v. Pentagon Capital Management PLC</u>, 725 F.3d 279, 288 (2d Cir. 2013) ("[T]here is no statutory requirement that a disgorgement award be measured as to each individual defendant."); <u>SEC v. Verdiramo</u>, 907 F. Supp. 2d 367, 373 & n.12 (S.D.N.Y. 2012) (stating that courts have discretion to impose joint and several liability for combined profits and

collecting cases).

An award of prejudgment interest "ensure[s] that the defendant does not profit [by] obtaining the time-value of any unlawful profits." Gibraltar Global Securities, 2015 WL 10910362, at *7 (alterations in original) (quoting SEC v. World Information Technology, Inc., 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008)). Courts generally use the IRS underpayment rate to calculate such interest. See id.

From Mr. Carrillo, Mr. Huettel, Carrillo Huettel, and Mr. de Beer, the SEC seeks joint and several disgorgement of "all participants' Tradeshow and Pacific Blue proceeds," that is, $13,376,519.99 plus prejudgment interest.[11] (Pl. Memo. at 19-20, 22). From Mr. Davis and Gibraltar, the SEC seeks joint and several disgorgement of proceeds from "Tradeshow and Pacific Blue shares sold through accounts at Gibraltar and at [non-party broker-dealer] Scottsdale [Capital Advisors] and in the fraudulent schemes" plus commissions received in furtherance of the schemes, that is, $9,674,276.20 plus prejudgment interest.[12] (Pl. Memo. at 21-22). The SEC has provided a declaration from a staff accountant at the SEC sufficiently establishing these amounts through review of financial records and other information obtained by the SEC, and no

_____

[11] Using the IRS underpayment rate, SEC staff has calculated the interest on this amount from April 1, 2010, through July 31, 2016, to total $2,882,403.67. (Declaration of Jaqueline Fine dated Aug. 11, 2016 ("Fine Decl."), ¶¶ 7-8, 54-56, & Exhs. 9-10).

[12] Using the IRS underpayment rate, SEC staff has calculated the interest on this amount from April 1, 2010, through July 31, 2016, to total $2,085,136.47. (Fine Decl., ¶¶ 50-53 & Exh. 8).

defendant has argued that they are inaccurate.  (Fine Decl., ¶¶ 1, 3, 5-8, 54-56; Carrillo/Huettel Memo. at 22-23).

Joint and several liability is appropriate in this case.  The operative complaint establishes that the Defaulting Defendants collaborated closely in these fraudulent schemes: as the SEC points out, Mr. Carrillo, Mr. Huettel, and Carrillo Huettel

> provided legal counsel to Tradeshow, to the Kirks regarding Skymark, facilitated funds for Tradeshow's operations, helped the promoters acquire the Pacific Blue shell, drafted Pacific Blue's misleading public filings, provided misleading legal opinions, and allowed the promoters to funnel sales proceeds through their firm's attorney-client trust account.

(Pl. Memo. at 19-20).  Mr. de Beer was similarly instrumental in the fraud in his position as CEO and President of Tradeshow and Chairman of Pacific Blue.  The Pacific Blue scam could not have succeeded without the misrepresentations as to ownership of Pacific Blue propounded by Mr. Davis and Gibraltar.  Moreover, "'[the] defendants [] engaged in complex and heavily disguised transactions' in an effort to conceal their fraud," SEC v. Boock, No. 09 Civ. 8261, 2012 WL 3133638, at *3 (S.D.N.Y. Aug. 2, 2012) (alteration in original) (quoting SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir. 1997)), as evidenced in part by the transactions connected with Dr. Carrrillo's sales of relevant securities outlined by Mr. Carrillo and Mr. Huettel (Carrillo/Huettel Memo. at 17-20; Reply Memorandum of Law in Further Support of the Plaintiff's Motion for Default Judgment ("Reply"), at 6-9).

Mr. Carrillo and Mr. Huettel argue that they cannot be jointly

22

and severally liable for total proceeds of the Tradeshow and Pacific Blue stock because they neither "'controlled' the primary malfeasors [n]or were 'indispensible' to the overall scheme." (Carrillo/Huettel Memo. at 23). This assertion apparently derives from the language of Section 20(a) of the Exchange Act, which states that a person who "controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be jointly and severally liable with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). However, that section is irrelevant here. Section 20(a) provides for so-called "'Controlling-person liability[,]' [which] . . . is a separate inquiry from that of primary liability and provides an alternative basis of culpability." In re Adelphia Communications Corp. Securities & Derivative Litigation, 398 F. Supp. 2d 244, 261 (S.D.N.Y. 2005) (quoting Suez Equity Investments v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001)). Nothing in that section prohibits joint and several liability for primary violators who collaborate. See, e.g., Pentagon Capital Management, 725 F.3d at 288 (affirming joint and several liability for disgorgement award against primary violators who collaborated); Gibraltar Global Securities, 2015 WL 10910362, at *7 (recommending joint and several liability for disgorgement award against primary violators who collaborated).

Mr. Carrillo and Mr. Huettel also complain that Benjamin Kirk, Dylan Boyle, and James Hinton were not held jointly and severally liable. However, those individuals entered into voluntary

settlements with the SEC, and these defendants have provided no authority indicating that a court should take into account awards imposed against settling defendants when determining whether non-settling defendants should be jointly and severally liable. Indeed, as the SEC points out, consent decrees like those entered on behalf of other defendants are compromises in which parties give up something they might have won or avoid something that they might have lost in litigation. (Reply at 5-6). Finally, to the extent that Mr. Carrillo and Mr. Huettel argue that they were merely small players in or received no benefit from these schemes (Carrillo/Huettel Memo. at 16-21, 24), they have not established that here. Indeed, by failing to participate fully in discovery and defaulting, they surrendered their opportunity to minimize their exposure. See, e.g., Gibraltar Global Securities, 2015 WL 10910362, at *7 (defaulting defendants' "refusal to participate in discovery []and thereby shed light on their relationship" with other entities connected with the violation "makes it appropriate to hold them jointly and severally liable for the total proceeds generated by their illegal conduct"). I do not credit the affidavit of Dr. Carrillo describing a minimal role for Mr. Carrillo and Mr. Huettel in the transactions. (Affidavit of Dr. Luis J. Carrillo dated Sept. 29, 2016). Dr. Carrillo resisted the SEC's efforts to depose him in this case (Reply at 7; Declaration of Todd Brody dated Nov. 10, 2016, ¶¶ 3-4 & Exhs. A-B), but now seeks to absolve his son of significant responsibility through written testimony not subject to cross-examination. Moreover, the

declaration is undermined by other evidence in the record.[13] (Reply at 7-8; Brody Decl., ¶¶ 126-29 & Exhs. 32-36; Fine Decl., ¶¶ 21, 24).

### 3. Civil Penalties

The federal securities laws empower courts to impose civil penalties for violations based on a three-tiered system. See 15 U.S.C. §§ 77t(d)(2) & 78u(d)(3)(B). A second-tier penalty is appropriate for a violation that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and a third-tier penalty may be imposed if, in addition to the requirements for a second-tier penalty, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2) & 78u(d)(3)(B). Under any tier, a court has the authority to impose a penalty equal to the amount of "pecuniary gain" the defendant received as a result of the violation, if that amount is greater than the listed statutory maximum. 15 U.S.C. §§ 77t(d)(2)(A) & 78u(d)(3)(B)(i). Otherwise, the maximum penalty

---

[13] The SEC asserts that Dr. Carrillo's declaration that he controlled all trades involving his trading account "directly conflicts with his attorney's repeated arguments during the motion to dismiss that the [SEC's] complaint . . . had not sufficiently alleged that Dr. Carrillo controlled the Pacific Blue account." (Reply at 7). However, Dr. Carrillo's counsel merely contended that the SEC had not sufficiently pled control in the complaint; he did not state that Dr. Carrillo did not have control over the account. (2/26/14 Tr. at 159-60). Judge Daniels agreed that those allegations were insufficient to provide personal jurisdiction over Dr. Carrillo, stating, "[N]othing in the complaint will give any impression that the SEC believes that Dr. Carrillo is an active participant in any of this activity . . . ." (3/19/14 Tr. at 186-87).

amounts available for second-tier violations during the relevant period are $75,000 for natural persons and $375,000 for entities, and for third-tier violations are $150,000 for natural persons and $725,000 for entities.  Adjustments to Civil Monetary Penalty Amounts, 74 Fed. Reg. 9159, 9161 (March 3, 2009) (to be codified at 17 C.F.R. Pt. 201, Subpt. E, tbl. IV).  The factors a court may consider in setting the size of the penalty include:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

SEC v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003).  In contrast to disgorgement, a court may not impose a civil penalty on a joint and several basis.  Pentagon Capital Management, 725 F.3d at 288.  Furthermore, the amount of "pecuniary gain" is limited to gains received within a five-year statute of limitations.  SEC v. Cole, No. 12 Civ. 8167, 2014 WL 4723306, at *5 (S.D.N.Y. Sept. 22, 2014).

Regarding the relevant considerations listed above, each of the Defaulting Defendants engaged in repeated violations of the federal securities laws with an intent to deceive, manipulate, or defraud; none has admitted wrongdoing; and all announced their refusal to cooperate in this litigation in 2015.  These factors indicate that a penalty of at least the second tier would be

justified.[14]

The SEC seeks a substantial third-tier penalty.  Its argument is rather lackadaisical, however.  It merely asserts at the outset that "[t]here is no question here that third-tier penalties are appropriate given the nature of the fraudulent conduct as well as the risk of substantial loss to investors who purchased unregistered Tradeshow and Pacific Blue stock sold by the boiler rooms." (Pl. Memo. at 23-24).  In Gibraltar Global Securities, I noted that "emphasiz[ing] the sheer volume of illegal transactions" does not "demonstrate that the defendants' conduct created a substantial risk of loss."  2015 WL 10910362, at *8.  The plaintiff then concludes that "the conduct warrants the imposition of maximum third-tier penalties.  Their egregious and recurrent actions involved fraud, deceit, and manipulation and caused substantial losses to the investors."  (Pl. Memo. at 25).  I will not infer, from this paltry argument, a substantial risk of loss.[15]  "Such cursory presentation is scarcely adequate for a law enforcement agency seeking to invoke the Court's discretion to impose [significant] fines."  Tavella, 77 F. Supp. 3d at 363.

I therefore recommend imposing tier-two fines in the amount of

---

[14] Mr. Carrillo and Mr. Huettel argue against a significant penalty based on arguments I have already rejected. (Carrillo/Huettel Memo. at 21-22).

[15] In its Reply, the SEC asserts that the sale of unregistered securities creates a substantial risk of loss "as a matter of law." (Reply at 10 & n.12).  I decline to read the cases it cites as establishing that legal rule.  Indeed, if the SEC's position were correct, nearly every violation of Section 5(a) of the Securities Act would merit tier-three penalties, whether or not the SEC presented argument or evidence of risk of loss.

$75,000 for each securities law or rule violated.[16]   See Shehyn, 2010 WL 3290977.  This amounts to $375,000 each for Mr. Carrillo, Mr. Huettel, Carrillo Huettel, and Mr. de Beer; $225,000 for Gibraltar; and $150,000 for Mr. Davis.  (Pl. Memo. at 24 n.10). Although these fines are substantially less than the maximum third-tier penalties requested by the SEC, "[i]n light of the substantial disgorgement and prejudgment interest award I have recommended, the 'punitive and deterrent purposes of the civil penalty statutes' can be achieved by [these] penalties."  Gibraltar Global Securities, 2015 WL 10910362, at *9 (quoting SEC v. Razmilovic, 822 F. Supp. 2d 234, 282 (E.D.N.Y. 2011), vacated in part on other grounds, 738 F.3d 14 (2d Cir. 2013).

Conclusion

     For the foregoing reasons, I recommend that the plaintiff's motion for default judgment (Docket no. 279) be granted in part. Specifically, I recommend that

1.   Default judgments be entered against Carrillo Huettel LLP, Luis J. Carrillo, Wade D. Huettel, Gibraltar Global Securities, Warren Davis, and Luniel de Beer;

2.   Permanent injunctions be entered barring Luis J. Carrillo, Wade D. Huettel, and Luniel de Beer from

     a.   Committing or aiding and abetting future violations of the securities laws and rules alleged against them;

     b.   Participating in any offering of a penny stock; and

     c.   Serving as an officer or director of any public company;

---

[16] The SEC does not present an argument that Carillo Huettel and Gibraltar should be subject to higher fines than the individual defendants.

3.  Carrillo Huettel LLP, Luis J. Carrillo, Wade D. Huettel, and Luniel de Beer be held jointly and severally liable for the disgorgement of $13,376,519.99 plus prejudgment interest as calculated by the plaintiff using the IRS underpayment rate;

4.  Gibraltar Global Securities and Warren Davis be held jointly and severally liable for the disgorgement of $9,674,276.20 plus prejudgment interest as calculated by the plaintiff using the IRS underpayment rate;

5.  The defendants be held liable for the following civil monetary penalties:

    a.  Carrillo Huettel -- $375,000

    b.  Luis J. Carrillo -- $375,000

    c.  Wade D. Huettel -- $375,000

    d.  Luniel de Beer -- $375,000

    e.  Gibraltar Global Securities -- $225,000

    f.  Warren Davis -- $150,000

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, Room 1310, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.


Respectfully submitted,


JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

29

Dated:    New York, New York
          January 17, 2017

Copies transmitted this date:

Todd D. Brody, Esq.
Katherine S. Bromberg, Esq.
Christopher J. Dunnigan, Esq.
Securities & Exchange Commission
200 Vesey Street
New York, NY 10281
(via ECF)

Thomas J. Curran, Esq.
Doris D. Short, Esq.
Peckar & Abramson, P.C.
41 Madison Ave.
20th Floor
New York, NY 10010
(via ECF)

Juan M. Marcelino, Sr., Esq.
David E. Fialkow, Esq.
Nelson Mullins Riley & Scarborough LLP
One Post Office Sq., 30th Floor
Boston, MA 02109
(via ECF)

William B. Fleming, Esq.
Gage, Spencer & Fleming, LLP
410 Park Ave.
New York, NY 10022
(via ECF)

Nicholas M. DeFeis, Esq.
Philip C. Patterson, Esq.
Allison S. Menkes, Esq.
De Feis O'Connell & Rose, P.C.
500 Fifth Ave., 26th Floor
New York, NY 10110
(via ECF)

Luniel de Beer
648 237th Pl. SE
Sammamish, WA 98074-3632
(via U.S. Mail)

Gibraltar Global Securities
c/o GTC Corporate Services Ltd.
Sassoon Shirley & Victoria Ave.
P.O. Box SS-5383
Nassau, Bahamas
(via U.S. Mail)

Warren Davis
warrenanthonydavis@gmail.com
(via email)